# IN THE UNITED STATES DISTRICT COURT

# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

CHERYL B. CANFIELD, on Behalf of Herself
and All Others Similarly Situated,

                        Plaintiffs,

       v.

STATOIL USA ONSHORE PROPERTIES
INC., STATOIL NATURAL GAS LLC,
STATOIL ASA,

                         Defendants.

Case No. 3:16-cv-85

Hon. Malachy E. Mannion

---

## MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

---

# TABLE OF CONTENTS

PRELIMINARY STATEMENT.......................................................................1

STATEMENT OF FACTS………….………......…..........................................2

    A.    FACTS GIVING RISE TO PLAINTIFF'S CLAIMS.............................2

    B.    THE CLAIMS ASSERTED IN THE COMPLAINT..............................5

ARGUMENT………….………..................................…………………6

    I.   THE CLAIMS ASSERTED IN THE COMPLAINT MEET THE
       EXCEPTIONS SET FORTH IN SECTION 1605(A)(2) OF THE
       ACT………….………........................………...........6

            A.    PLAINTIFFS' CLAIMS ARE BASED UPON ASA'S
                 COMMERCIAL ACTIVITY IN THE UNITED STATES AND
                 INJURIES CAUSED THEREFROM.........................................6

            B.    STATOIL IS SUBJECT TO THE
                 PERSONAL JURISDICTION OF THIS COURT.......................11

               1.   PLAINTIFF HAS COMPLIED WITH
                    RULE 4(M) OF F.R.C.P..........................................11

               2.   PLAINTIFF SUFFICIENTLY PLEAD FACTS
                    SUPPORTING PERSONAL JURISDICTION.................14

    II.   PLAINTIFFS STATE A CLAIM FOR RELIEF FOR
       BREACH OF CONTRACT……………………................................17

            A.    DEFENDANTS MOTION PROVIDES NO BASIS TO
                 DISMISS PLAINTIFF'S CONTRACT CLAIMS......................19

            B.    PLAINTIFF STATES A CLAIM FOR RELIEF
                 FOR BREACH OF CONTRACT ............................................23

               1.   THE INDEX CLAIM STATES
                    A CLAIM FOR RELIEF...........................................24

               2.   THE AFFILIATE CLAIM STATES
                    A CLAIM FOR RELIEF...........................................25

            C.    PLAINTIFF'S CONTRACT CLAIM IS TIMELY......................31

    III.  PLAINTIFF STATES A CLAIM FOR RELIEF FOR TORTIOUS
       INTERFERENCE WITH CONTRACT AND CIVIL
       CONSPIRACY…....………………………………......…….......34

IV.  PLAINTIFF'S CAUSE OF ACTION FOR UNJUST ENRICHMENT SHOULD NOT BE DISMISSED……………………………...……......38

V.  PLAINTIFF STATES A CLAIM FOR AN ACCOUNTING……………………………….……...…...……….....39

CONCLUSION……………………………...……………………………………41

CERTIFICATE OF SERVICE

# Table of Authorities

## *Cases*

*18 KT.TV, LLC v. Entest Biomedical, Inc.*, No. 3:11-244,
2011 U.S. Dist. LEXIS 128435 (M.D. Pa. Nov. 7, 2011)..................38

*2401 Pa. Ave. Corp. v. Fed'n of Jewish Agencies of Greater Phila.*,
507 Pa. 166, 489 A.2d 733 (1985).........................................32

*Abraham v. BP Production Co.*, 685 F.3d 1196 (10th Cir. 2012).........22, n.11

*Adams v. Copper Beach Townhome Cmtys., L.P.*,
816 A.2d 301 (Pa. Super. Ct. 2003)......................................36

*Aikens v. Baltimore & Ohio R. Co.*,
348 Pa. Super. 17, 501 A.2d 277 (1985)..............................37

*Allstate Ins. Co. v. Hewlett-Packard Co.*, No. 113-cv-02559,
2015 WL 179041 (M.D. Pa. Jan.14, 2015)..........................13

*Amoco Prod. Co. v. First Baptist Church*,
579 S.W.2d 280 (Tex. Civ. App. 1979)..............................29

*Anadarko Petro. Corp. v. Panhandle Eastern Corp.*,
545 A.2d 1171 (Del.1988)...................................................25

*Anderson Living Trust v. ConocoPhillips Co., LLC*,
952 F. Supp. 2d 979 (D.N.M. 2013)..............................23, 26

*Anderson Living Trust v. WPX Energy Production, LLC*,
306 F.R.D. 312 (D.N.M. 2014)...........................................21

*Anheuser-Busch, Inc. v. Paques*,
277 B.R. 615 (Bankr. E.D. Pa. 2000)..................................15

*Armstrong Petroleum Corp. v. Tri-Valley Oil & Gas Co.*,
116 Cal.App.4th 1375, 11 Cal.Rptr.3d 412 (Cal. Ct. App. 2004).......31

*Atlantica Holdings v. Sovereign Wealth Fund Samruk-Kazyna JSC*,
813 F.3d 98 (2d Cir. 2016)....................................................................11

*Banco Metropolitano, S.A. v. Desarollo de Autopistas y Carreteras de Guatemala*,
616 F.Supp. 301 (S.D.N.Y. 1985)........................................................12

*Barby v. Cabot Corp.*,
550 F.Supp. 188 (W.D.Okla. 1981).......................................................28

*Beer v. XTO Energy, Inc.*, No. 07-798-L,
2010 WL 476715 (W.D. Okla. Feb. 5, 2010)......................................26

*Bickell v. Stein*, 291 Pa. Super. 145, 435 A.2d 610 (1981)..........................38

*Bill Goodwin Const., LLC v. Wondra Const., Inc.,* No. 3:13cv157
2014 WL 1415078 (M.D.Pa. Apr. 10, 2014).......................................39

*Bilt-Rite Contractors, Inc. v. The Architectural Studio*,
581 Pa. 454, 866 A.2d 270 (Pa. Sup. Ct. 2005)............................35, 37

*Bohler-Uddeholm Am., Inc. v. Ellwood Grp., Inc.*,
247 F.3d 79 (3d Cir. 2001)..................................................................36

*Cabot Corp. v. Brown*, 754 S.W.2d 104 (Tex. 1987)..................................29

*Cf.*, *Frank C. Pollara Group, LLC v. Ocean View Inv. Holding, LLC*,
784 F.3d 177 (3d Cir. 2015)................................................................35

*CGB Occupational Therapy, Inc. v. RHA/Pennsylvania Nursing Homes*,
No. 00-4918, 2001 WL 1549824 (E.D.Pa. Dec. 5, 2001)...................37

*Clayton v. Atlantic Refining Co.*, 150 F.Supp. 9 (D.N.M.1957)...................29

*Concepcion v. VEB Backereimaschenbau Halle*,
120 F.R.D. 482 (D.N.J. 1988)..............................................................12

*Coosewoon v. Meridian Oil Co.*,
25 F.3d 920, 931 (10th Cir. 1994)........................................................28

*Cornell Cos. v. Borough of New Morgan*,
    512 F. Supp. 2d 238 (E.D. Pa. 2007)..................................................38

*Dayhoff, Inc. v. H.J. Heinz Co.*, 86 F.3d 1287 (3d Cir. 1996).....................15

*Doty v. Magnum Research*, 994 F. Supp. 894 (N.D. Ohio 1997)................12

*Esis, Inc. v. Coventry Health Care Workers Compensation, Inc.*,
    No. 13-2957, 2016 WL 928667 (E.D. Pa. Mar. 9, 2016)...................36

*eToll, Inc., v. Elias/Savion Adv., Inc.*,
    811 A.2d 10 (Pa. Super. Ct. 2002)......................................................34

*Fankhouser v. XTO Energy, Inc.*, No. Civ 07–798–L,
    2012 WL 831092 (W.D.Okla., Mar. 8, 2012)....................................26

*Fetter v. North American Alchohols, Inc.*, No. 06-4088,
    2007 WL 551512 (E.D. Pa. Feb. 15, 2007)........................................15

*First Senior Financial Group v. Suib*, No. 2604,
    2013 WL 10230565 (Ct. Com. Pleas, Aug. 26, 2013)......................35

*Gulf Petro Trading Co. v. Nigerian Nat'l Petroleum Corp.*,
    288 F. Supp. 2d 783 (N.D. Tex. 2003)...............................................12

*Harding v. Cameron*, 220 F.Supp. 466 (W.D.Okla. 1963)..........................29

*Harrison v. Bass Enters. Prod. Co.*,
    888 S.W.2d 532 (Tex. Ct. App.1994).................................................31

*Harrison v. Cabot Oil & Gas Corp.*, 110 A.3d 178 (Pa. 2015)...................33

*Heritage Resources, Inc. v. NationsBank*,
    939 S.W.2d 118 (Tex. 1996).........................................................19, 30

*Hondo Oil & Gas Co. v. Texas Crude Operator*,
    970 F.2d 1433 (5th Cir.1992).............................................................31

*Howell v. Texaco, Inc.*, 112 P.3d 1154 (Okla. 2004).............................26, 31

*Iams v.Carnegie Natural Gas Co.*,
    194 Pa. 72, 45 A. 54 (1899)................................................................28

*Integrated Waste Solutions, Inc. v. Goverdhanam,* No. 10-2155
    2010 WL 4910176 (E.D.Pa. Nov. 30, 2010)......................................35


*In re Chocolate Confectionary Antitrust Litig.*,
    602 F.Supp. 2d 538 (M.D.Pa. 2009)..................................................16

*In re Latex Gloves Prods. Liab. Litig.*, No. MD L 1148,
    2001 WL 964105 (E.D.Pa. Aug. 22, 2001)........................................16

*Johnson v. Jernigan*, 475 P.2d 396 (Okla.1970).........................................29

*Kilmer v. Elexco Land Services*,
    605 Pa. 403, 990 A.2d 1147 (2010)..............................................19, 20

*La Barte v. Seneca Res. Corp.*,
    285 A.D.2d 974, 728 N.Y.S. 2d 618 (N.Y. App. Div. 2001)..............28

*Lewis v. Asbestos Corp.*,No. MDL 875,
    2011 WL 5881180 (E.D.Pa. Aug. 2, 2011)........................................12

*Lewis v. Vollmer of America*, No. 05-1632,
    2006 WL 3308568 (W.D. Pa. Oct. 25, 2006)....................................13

*Lucas v. Natoli*, 936 F.2d 432 (9th Cir.1991)..............................................12

*Lutz v. Chesapeake Appalachia, LLC*,
    717 F.3d 459 (6th Cir. 2013)..................................................................31

*McClelland v. New Amsterdam Cas*. Co.,
    322 Pa. 429, 185 A. 198 (1936)........................................................33

*MDC Corp. v. John Harland Co*,
    228 F. Supp. 387 (S.D.N.Y. 2002)....................................................29

*Moore v. Millers Cove Energy Co.*,
    215 F.3d 1327 (6th Cir. 2000)...........................................................31

*Muschlitz Excavating, Inc. v. Gary J. Strasser Homebuilders, Inc.*,
    36 Pa. D. & C. 5th 116 (C.P. 2014).....................................38

*Nat'l Util. Serv., Inc. v. Cambridge-Lee Industs. Inc.*,
    199 Fed. Appx. 139 (3d Cir. 2006)....................................33

*OBB Personenverkehr AG v. Sachs*, 136 S. Ct. 390 (2015).....................8-11

*Obenchain Corp. v Corporation Nacionale de Inversiones*,
    656 F. Supp. 435 (W.D. Pa. 1987).....................................12

*Pennsylvania Orthopedic Ass'n v. Mercedes–Benz A.G.*,
    160 F.R.D. 58 (E.D.Pa.1995).............................................12

*Pollock v. Energy Corp. of Am.*, Civil Action No. 10-1553,
    2011 U.S. Dist. LEXIS 93616 (W.D. Pa. June 27, 2011)..................39

*Potts v. Chesapeake Exploration, LLC*,
    760 F.3d 470 (5th Cir. 2014)...............................................30

*QVC Inc. v. Starad, Inc.*, No. 03-5298,
    2005 WL 742500 (E.D.Pa. Mar. 31, 2005).........................29

*Ramming v. Natural Gas Pipeline Co. of America*,
    390 F.3d 470 (5th Cir. 2014)....................................27, 28, 30

*Raucci v. Candy & Toy Factory*,
    145 F. Supp. 3d 440 (E.D. Pa. 2015).................................32

*R.C. Beeson, Inc. v. Coca-Cola*,
    337 F.App'x. 241 (3d Cir. 2009)..................................32-34

*Remick v. Manfredy*, 238 F.3d 248 (3d Cir. 2001) ...............................n.5, 15

*Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607 (1992)................n.4, 6

*Ridolfi v. State Farm Mutual Automobile Ins. Co.*,
    146 F.Supp. 3d. 619 (M.D.Pa. 2015) .............................n.16

*Roberts Ranch Co. v. Exxon Corp.*,
    43 F. Supp. 2d 1252 (W.D. Okla. 1997)..............................................27

*Rupe v. Triton Oil & Gas Corp.*, 806 F.Supp. 1495 (D.Kan.1992).............32

*Saudi Arabia v. Nelson*, 507 U.S. 349 (1993).....................................8, 9, 11

*Shell Oil Co. v. Ross*, 357 S.W.3d 8 (Tex. App. Houston 2010).................22

*Simeone v. Bombardier-Rotax GmbH*,
    360 F.Supp.2d 665 (E.D.Pa. 2005).......................................................16

*Sovereign Bank v. BJ's Wholesale Club, Inc.*,
    533 F.3d 162 (3d Cir. 2008)...................................................................36

*Stirman v. Exxon Corp.*, 280 F.3d 554 (5th Cir.2002)...............................28

*Strayer v. Bare*, No. 1:06-2068,
    2008 WL 1924092 (M.D.Pa. April 28, 2008)......................................38

*Sussenbach Family Ltd. P'ship v. Access Midstream Partners, L.P.*,
    No. 3:14–1197, 2015 WL 1470863 (M.D.Pa. Mar. 31, 2015)...........38

*Texas Oil & Gas Corp. v. Hagen*,
    683 S.W.2d 24 (Tex.App.—Texarkana 1984).....................................20

*Texas Oil & Gas Corp. v. Hagen*, No. C-3768,
    1987 WL 47847 (TX Sup. Ct. Dec. 16, 1987).....................................28

*The Knit With v. Knitting Fever, Inc.*, No. 08-4221,
    2009 WL 342054 (E.D. Pa. April 8, 2009).........................................34

*Tifa, Ltd. v. Republic of Ghana*, 692 F.Supp. 393 (D.N.J. 1988).................15

*Total Control, Inc. v. Danaher Corp.*,
    359 F.Supp.2d 387 (E.D.Pa.2005)........................................................32

*Trenwick Amer. Litig. Trust v. Ernst & Young, LLP*,
    906 A.2d 168 (Del. Ch. 2006)...............................................................26

*United States Fid. & Guar. Co. v. Braspetro Oil Servs. Co.*,
    No. 97 Civ. 6124 (JGK), 1999 U.S. Dist. LEXIS 7236
    (S.D.N.Y. May 13, 1999)....................................................................15

*U.S. Fid. & Guar. Co. v. Petroleo Brasileiro S.A.-Petrobras*,
    No. 98 Civ. 3099 (JGK), 1999 WL 307642
    (S.D.N.Y. May 17, 1999)....................................................................11

*Vetrotex Certainteed Corp. v. Consol. Fiber Glass Prod. Co.*,
    75 F.3d 147 (3d Cir.1996)..................................................................14

*Vizant Technologies, LLC v. Whitchurch*,
    97 F.Supp.3d 618 (E.D. Pa. 2015)...........................................n.5, 15

*Warren v. Chesapeake Exploration, LLC*,
    759 F.3d 413 (5th Cir. 2014)............................................................23

*Watts v. Atl. Richfield Co.*, 115 F.3d 785 (10th Cir.1997)...........................28

*Williams v. Hilton Group PLC*, 93 Fed Appx. 384 (3d Cir. 2004)..............35

*Werwinski v. Ford Motor Company*, 286 F.3d 661 (3d Cir. 2002)...........n.16

*Wood v. Lucy, Lady Duff-Gordon*,
    222 N.Y. 88, 118 N.E. 214 (N.Y. App. Ct. Dec. 4, 1917).................29

*W.W. McDonald Land Co. v. EQT Production Co.*,
    983 F.Supp.2d 790 (S.D. W.Va. 2014)......................................26, 38

*Yzaguirre v. KCS Resources*, 53 S.W.3d 368 (Tex.2001)............................29

## ***Statutes***

28 U.S.C. §§1601, *et seq*...........................................................................6, 11

28 U.S.C. §1603 (d)........................................................................................7

28 U.S.C. §1603 (e) .....................................................................................n.4

28 U.S.C. §1605(a)(2).............................................................................6, 7, 9

28 U.S.C. §1608 (b)......................................................................................13

Uniform Commercial Code, §2-306(2)........................................................29

### ***Rules***

Fed. R. Civ. P. 4(m).................................................................11, 13

<u>**PRELIMINARY STATEMENT**</u>

Plaintiff submits this Memorandum of Law in opposition to the Motions to Dismiss of Defendants Statoil ASA ("ASA"), Statoil USA Onshore Properties Inc. ("Properties") (collectively, the "ASA Defendants"), and (separately) Statoil Natural Gas LLC ("NG") (collectively, "Defendants" or "Statoil"), and in response to the Memoranda of Law submitted therewith. The ASA Defendants move principally upon two grounds, that the Complaint fails to state a claim for breach of contract, and that any claim against ASA is barred by the doctrine of sovereign immunity.  Joined by NG, they make other arguments, invoking legal doctrines, including gist-of-the-action and economic loss doctrines, that have little or no application to this suit.

With respect to Plaintiff's factual allegations, it is indisputable that, as the ASA Defendants concede, any motion to dismiss is circumscribed in scope; such motion is restricted to the "four corners" of the complaint.  However, it is apparent from their Memorandum that the ASA Defendants find even these limited parameters too broad in scope.  Rather than addressing their motion to the Complaint at issue in its entirety, they confine their motion to a truncated and abridged, if not remastered version thereof.  Shrugging off certain allegations, distorting others, omitting even others entirely, and ultimately just making things up, the ASA Defendants fabricate and thereafter address a threadbare and shrunken Complaint that bears little, if any, resemblance to that actually filed by Plaintiff.

If cavalier as to the facts, the ASA Defendants are even more cavalier as to the law.  With respect to the contract claim, certain of their arguments, consisting of little more than generic bromides from assorted cases, achieve, at best, only a surface plausibility; however, closer examinations reveal them to be utterly hollow.  In that regard, the ASA Defendants fail to cite a

**single** case that even suggests the conduct in which they have engaged is lawful, instead inundating Plaintiff and this Court with cases to establish arguments whose relevance ranges from tenuous to illusory.  With respect to sovereign immunity, their Memorandum does not even satisfy this minimal threshold.  Instead, any plausibility is buried so deeply below the surface that Plaintiff is simply unable to discern it.

Indeed, the ASA Defendants' motion is, at times, so make-weight that it fails of its own accord.  The legal standards that the ASA Defendants' ask this Court to apply, and the cases they cite which actually bear on the issue presented, themselves refute the very arguments for which they are cited, and demonstrate beyond doubt that Plaintiff's Complaint states a claim for relief.

Finally, all Defendants perfunctorily assert further defenses, presenting arguments that are equally unpersuasive.  Once again, Defendants fail to cite a single case dismissing claims even remotely comparable to those asserted herein, instead contorting general legal principles beyond recognition in an attempt to shoehorn them into this case.  In short, Defendants' motion is without any merit, and should be denied.

## STATEMENT OF FACTS

### A.  Facts Giving Rise to Plaintiff's Claims

Plaintiff and other members of the Class are landowners ("Landowners") who own property in the Pennsylvania Marcellus and Utica shale regions.  Plaintiff, together with other Landowners, leased natural gas rights pursuant to gas leases (the "Gas Leases") to Chesapeake Energy Corporation, through its wholly-owned subsidiary, Chesapeake Appalachia, L.L.C. (collectively, "Chesapeake"), and its assignee, Statoil. (¶¶15-17) [1]  While these Gas

---

[1] All paragraph references are to paragraphs of the Complaint.

Leases may differ in certain respects, irrelevant hereto, they all provide a uniform royalty calculation:

> Lessee . . . shall pay the Lessor on gas, including casinghead gas and other gaseous substances, produced and sold from the premises [15%] of the amount realized from the sale of gas at the well. (¶ 18)

Pursuant to its participation agreement with Chesapeake, Statoil receives the exact same gas, subject to the exact same Gas Leases, as Chesapeake.

Chesapeake and Statoil market their respective gases separately. Chesapeake purchases its gas from the Landowners through a subsidiary which then sells it to another Chesapeake subsidiary formed to market the gas. The marketing subsidiary then sells the gas downstream from the wellhead to bona fide third parties at receipt/delivery points on the interstate system, or Citygates. (¶ 30). After Chesapeake's marketing affiliate aggregates the Landowners' gas and sells it downstream, it calculates a weighted average sales price from those sales and pays that price to Landowners, after deducting those expenses permitted by the Gas Lease incurred between the point of sale at the well and the downstream point of sale. The practice of Chesapeake is the standard industry practice and is consistent with that of other gas companies. *(Id.)*.

For the most part, Statoil operates in a manner similar to that of Chesapeake, but with one significant exception. Like Chesapeake, Properties takes its portion of gas produced from the Plaintiff's and other Landowners' gas wells "in-kind" at or near the wellhead where the gas is extracted. (¶25). Like Chesapeake, it immediately sells the gas to an affiliate, NG, purportedly at an index price. (¶¶25-26). Like Chesapeake, NG contracts with third party pipeline companies to transport the gas from the wellhead to the interstate pipeline transportation system, the interconnect. (¶ 25). Like Chesapeake, NG then contracts with third parties to

transport the gas through the interstate pipeline system and resells it at a profit to unaffiliated third-party buyers at the Citygate Price. (*Id.*).

Unlike Chesapeake, however, Statoil does not pay Landowners their share of what it *actually* receives from the ultimate sale of gas to bona fide third parties. Instead, Statoil accounts for the intra-corporate transfer from Properties to NG as an arm's-length, fair market transaction, and arbitrarily cuts off the sales chain immediately at that wellhead "transaction." Properties' sales to NG are not bona fide, arm's-length sales of the Landowners' gas that reflect a genuine arm's-length price. (¶¶ 27, 33). Landowners are deprived of their share of the revenue that NG generates when it sells Landowners' gas to third parties. Thus, Landowners do not receive the price Statoil "*actually receives*," the Citygate price, but a price based purportedly on an index that represents an estimate of the price at which different gas, subject to different leases, is sold to different third parties.[2] (¶ 27).

The price that Landowners receive from Statoil is well below the fair market price. The price Statoil pays Landowners is significantly below, at times less than half, the price paid by Chesapeake, for the **same** gas pursuant to the **same** Gas Leases, and it is consistently below the price paid by every other purchaser of the Landowners' gas. (¶ 32).

The revenue received from these sales to third parties by NG is revenue of which Landowners were entitled to their proportionate share under the Gas Leases. NG, and ultimately, ASA, have accepted and retained the benefits obtained by this wrongful conduct. (¶28).

Due to the uniform course of wrongful conduct in which each of the Defendants has engaged, resulting in the non-payment or underpayment of royalties, Plaintiff and the other Landowners have been injured. (¶ 34).

---

[2] As the Complaint alleges, certain Landowners are paid an index price for a hub point different from that where their gas is transported. (¶26 n.2)

## A. **The Claims Asserted In the Complaint**

Based upon the facts set forth above, Plaintiff, on behalf of all Landowners, has asserted seven claims for relief against Defendants:

1. Against Properties for Breach of Contract, based upon that party's failure to pay royalties "based upon an actual market price" rather than royalties based upon a published index price (the "Index Claim") (¶¶ 36-37);

2. Against Properties for Breach of Contract, based upon that party's sale to NG at artificially low prices that did not reflect the subsequent resale of such gas in actual arm's-length transactions (¶¶ 38-43);

3. Against Properties for Breach of Implied Covenant of Good Faith, based upon that party's breach of the Gas Lease by its failure to sell at an arm's-length price and for its failure to use reasonable efforts to obtain the best price obtainable for Plaintiff's gas and for that of other Landowners (together with Claim 2, the "Affiliate Claim") (¶¶ 48-52);

4. Against ASA and NG for tortious interference with contract, based upon those parties unjustifiably causing Properties to breach the Gas Lease (¶¶ 58-61);

5. Against all Defendants for Civil Conspiracy, based upon their agreement to act together with a common purpose to cheat Landowners unlawfully and deprive them of the royalty payments to which they were due (¶¶ 44-47);

6. Against all Defendants for Unjust Enrichment for accepting and receiving the benefits of royalty monies properly due Plaintiff and the other Landowners; and (¶¶ 53-57),

7.   Against all Defendants for an accounting of all relevant gas and royalty

calculations (¶¶ 62-63).

Plaintiff seeks compensatory damages for all damages sustained as a result of

Defendants' wrongdoing, or restitution and/or disgorgement of Defendants' unlawful and

inequitable profits.

## ARGUMENT

### I.   THE CLAIMS ASSERTED IN THE COMPLAINT MEET THE EXCEPTIONS SET FORTH IN THE ACT, SECTION 1605(A)(2)

Before addressing the substance of the Complaint, ASA argues that it is immune from

suit in the United States under the doctrine of sovereign immunity as codified by the Foreign

Sovereign Immunities Act (the "Act"), 28 U.S.C. §§1602, *et seq*., and that it is not subject to

personal jurisdiction.  As demonstrated below, these assertions are ill-considered.

#### A.   Plaintiff's Claims Are Based Upon ASA's Commercial Activity In the United States That Caused Injuries In the United States.

ASA argues that, because it is 75% owned by the State of Norway, it is an instrumentality

of a foreign state as defined by the Act, an assertion Plaintiff does not dispute.  ASA

acknowledges, however, that the immunity provided by the Act is not absolute; certain claims

are excepted, including those based upon commercial activity.

From this starting point, ASA's analysis goes quickly astray.  Recognizing that Plaintiff

relies upon the "commercial activity" exception to the Act, ASA first abstains from any analysis

as to the threshold issues presented by its motion: (1) what is commercial activity, and (2) what

are the exceptions?

With respect to the first question, commercial activity was defined by the Supreme Court in

the seminal case, *Republic of Argentina v. Weltover, Inc*., 504 U.S. 607, 614 (1992).  In

*Weltover*, the Court applied the following test:

6

"[W]hen a foreign government acts, not as regulator of a market, but in the manner of a private player within it, the foreign sovereign's actions are "commercial" within the meaning of the FSIA.  .   .   [T]he issue is whether the particular actions that the foreign state performs (whatever the motive behind them) are the type of actions by which a private party engages in "trade and traffic or commerce."

Commercial activity can be either "a regular course of commercial conduct or a particular commercial transaction or act."  28 U.S.C. §1603 (d).[3] Thus, under the Act, a single act or transaction may be deemed to be commercial activity.

There are three commercial activity exceptions to the general immunity granted by the statute.  Specifically, §1605(a)(2) provides that a state will not be immune from suit in the United States where the action is based:

(1) upon a commercial activity carried on in the United States by the foreign state;

(2) upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or,

(3) upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States.

Clearly, the purchase and sale of natural gas is the type of action in which a private party engages and does not implicate sovereign objectives.

Conceding that ASA and its subsidiaries engage in commercial activity, ASA nevertheless argues that the claims against it should be dismissed because they are not "based upon" the commercial activity alleged in the Complaint.

At first view, Plaintiff finds Defendants' position mystifying.  The commercial activity that the Complaint alleges as to ASA is that it exercised its control over Properties and NG to

---

[3] Commercial activity carried on in the United States by a foreign state is defined as "commercial activity carried on by such state and having substantial contact with the United States."  28 U.S.C. §1603(e).

structure their purchases and resales of the Landowners' natural gas in a manner that breached

the Gas Leases. The claim asserted against ASA is that such conduct constituted tortious

interference with contract, *i.e.*, the Gas Leases. Viewed more holistically, the Complaint alleges

that ASA, operating through its two U.S. subsidiaries, engages in the purchase and resale of

natural gas, and that it breached its contracts by its failure to pay the required percentage of the

amounts it actually receives. The commercial activity alleged in the Complaint and the claims

asserted against ASA could not be aligned with greater precision.

Viewed in greater depth, ASA's position is even more mystifying. Relying principally

upon two cases, *OBB Personenverkehr AG v. Sachs*, 136 S. Ct. 390 (2015), and *Saudi Arabia v.*

*Nelson*, 507 U.S. 349 (1993), ASA argues that the claims asserted in the Complaint are,

according to its motion, not "based upon" that corporation's commercial activity because the

"gravamen" of this lawsuit is the calculation of the royalty paid to the Landowners, which,

according to ASA, Plaintiff "admits" is "determined" by Properties and "is solely [Properties']

responsibility." ASA argues that its conduct is "peripheral," and only "led to" the conduct of

Properties.[4]

As to the facts, any suggestion that Plaintiff "admits" that Properties made any

determination of its own volition reflects not just a selective disregard for the citation that

purports to support this assertion (ASA omits the qualifying clause "at the direction of ASA" (¶

26)), but almost a complete disregard for the Complaint in its entirety, which alleges on

numerous occasions, too many to list here, that far from being a "peripheral" actor, ASA was at

the core of the alleged misconduct, controlling or "directing" the conduct of both Properties and

NG. (*E.g.*, ¶¶ 26, 27, 29, 33). This control is evidenced not just by the corporate structure, in

---

[4] As evidence of this admission, ASA notes that Plaintiff only named Properties in its breach of contract claim. Plaintiff did so only because Properties was the only signatory to the Gas Leases.

which ASA owns 100% of Properties, but by the fact that Properties, in order to shortchange Landowners, was required to shortchange itself. No rational management would deliberately injure itself, for the benefit of its parent, if pursuing its own interests rather than those of its parent.

More significantly, however, ASA's argument is premised upon a reading of the law that, to put it charitably, ASA might wish to rethink. *Personenverkher* and *Nelson* both involved claims based upon conduct immune under the Act and not excepted by the Act's § 1605 (a)(2) -- commercial activity outside the United States (a train accident) causing injury outside the United States (*Personenverkehr*), or conduct (arrest and torture), outside the United States causing injury outside the United States, that was not commercial at all (*Nelson*). Recognizing that the Act barred claims based upon such conduct, the plaintiff in each case tried to fashion an excepted claim, based upon ancillary activity in the United States. Both cases stand for the unremarkable proposition that a plaintiff cannot bootstrap a non-excepted claim onto an ancillary excepted claim in order to bring himself within the parameters of § 1605 (a)(2). In each case, the ancillary claim was dismissed not because it was ancillary, but because it was ancillary to a claim that was barred under the Act.

The instant Complaint, by contrast, poses no such problem. Plaintiff is not trying to bootstrap an excepted claim onto a non-excepted one; the Complaint does not allege a single act of non-commercial conduct or activity not included in § 1605(a)(2)'s exceptions, and ASA does not identify any. All of the claims asserted by Plaintiff are necessarily based upon commercial

activity in the United States, because the **only** conduct alleged in the Complaint involves commercial activity in the United States.[5]

The purchase of natural gas by Properties is commercial activity that occurs in the United States. The resale of gas to NG is commercial activity that occurs in the United States. The further resale of gas by NG is commercial activity that occurs almost entirely in the United States. The payment for Plaintiff's gas, pursuant to the express language of the Gas Lease, is commercial activity in the United States; such payment is made at the Plaintiff's address. Statoil's interference with contract, which is entirely performed in the United States, is commercial activity that occurred in the United States or, at a minimum, directly caused injury here. In short, no matter how one reads the Complaint, how one dissects it, or how one disassembles and reassembles it, all of the activity alleged therein is commercial, occurred in the United States, and/or caused injury in the United States, and any claim inescapably is based thereon.

In light of the above, ASA, not surprisingly, does not, and cannot, dispute that neither the claim against Properties for breach of contract, based as it is entirely upon commercial activity in the United States, nor the claim against ASA for tortious interference with contract, based as it is entirely on commercial activity in the United States (or, at a minimum, activity in Norway that caused a direct injury in the United States), would be exempt if pleaded in isolation. Nonetheless, because the claims are pled simultaneously and together, it suggests that, under *Personenverkher*, a court is required to fashion a hierarchical framework to determine which of

---

[5] As discussed more fully below, focal point of tortious interference with contract is deemed to behave where the contract was to be performed (Pennsylvania), and/or where the injury occurred (again, Pennsylvania). *Remick v. Manfredy*, 238 F.3d 248, 260 (3d Cir. 2001); *Vizant Technologies, LLC v. Whitchurch*, 97 F.Supp.3d 618, 634 (E.D. Pa. 2015). Even if the interference with contract is deemed to have occurred in Norway, the focal point of Plaintiff's injury was here, putting the claim within the third exemption, "commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States."

the claims is "central" and which is "peripheral," and dismiss the latter, notwithstanding the fact that both claims independently satisfy all of the elements of the Act. Defendants' argument simply makes no sense. While it may make sense to dismiss a permitted ancillary claim where the primary claim is not permitted, it makes no sense to dismiss a permitted claim, even if ancillary, if the main claim is also permitted. Statoil's position is necessarily premised on the senseless proposition that either *Personenverkher* and *Nelson*, without discussion, established a limit of one on the number of exempt claims that may be asserted in a single complaint, or that, through some unexplained law of metaphysics, the assertion of two exempt claims together reverses the legal polarity of one of them, rendering it non-exempt, and leaving only the other to proceed to trial. To put it politely, ASA's argument is decidedly unserious and should be treated as such.

Taking ASA's argument to its logical (or illogical) conclusion, a foreign sovereign could never be secondarily liable since its liability would be unavoidably "peripheral" and ancillary to that of the primary wrongdoer. That clearly is not, and never has been, the law. See, *Atlantica Holdings, Inc., v. Sovereign Wealth Fund Samruk-Kazyna JSC*, 813 F.3d 98, 106 (2d Cir. 2016); *U.S. Fid. & Guar. Co. v. Petroleo Brasileiro S.A.-Petrobras*, No. 98 Civ. 3099 (JGK), 1999 WL 307642, at *8 (S.D.N.Y. May 17, 1999) *aff'd sub nom. U.S. Fid. & Guar. Co. v. Braspetro Oil Servs., Co.*, 199 F.3d 94 (2d Cir. 1999). Accordingly, ASA's assertion of sovereign immunity should be rejected out of hand.

## B. Statoil Is Subject To The Personal Jurisdiction of this Court

### 1. Plaintiff Has Complied With Rule 4(m) F.R.C.P.

Defendant ASA next argues that the Complaint should be dismissed because service was not completed or attempted within the period set forth in Rule 4(m) of the Federal Rules of Civil

Procedure. ASA acknowledges that service upon a foreign state is expressly exempted from the time limit set forth by that Rule, but argues that Plaintiff has made no attempt to serve it and that, under those circumstances, the Complaint must be dismissed. Plaintiff is wrong both as to the law and as to the facts.

First, ASA's suggestion that the deadline to attempt service on a foreign government is a hard and fast one overstates the law; there is no universal rule. See, *e.g.*, *Lucas v. Natoli*, 936 F.2d 432 (9th Cir.1991) (granting unlimited time); *Lewis v. Asbestos Corp.*, No. 2:10–646252011 WL 5881180 (E.D.Pa. August 2, 2011); *Pennsylvania Orthopedic Ass'n v. Mercedes–Benz A.G.*, 160 F.R.D. 58, 60-61 (E.D.Pa.1995) ("[W]e cannot dismiss the Complaint under Rule 4(m) because that deadline does not apply to foreign service.").

But even assuming there is a hard and fast rule, ASA's assertion that Plaintiff has not attempted service is simply false. In this instance, within the period, Plaintiff indisputably served, by delivery to counsel, both subsidiaries, who, as discussed more fully below, may be agents or alter egos of ASA for jurisdictional purposes. See *Doty v. Magnum Research*, 994 F. Supp. 894 (N.D. Ohio 1997) (confirming service where plaintiff served subsidiary closely related to parent because subsidiary was involuntary agent for service of process in this country). *Doty* is consistent with decisions of courts in the Third Circuit and beyond holding that strict compliance with service under the FSIA is not necessary to the vitality of a claim. The rules of service should be "liberally construed where, as seems to be the case here, defendant has sufficient notice of the complaint." *Concepcion v. VEB Backereimaschenbau Halle*, 120 F.R.D. 482, 485 (D.N.J. 1988); *Obenchain Corp. v Corporation Nacionale de Inversiones*, 656 F. Supp. 435 (W.D. Pa. 1987*); Banco Metropolitano, S.A. v. Desarollo de Autopistas y Carreteras de Guatemala*, 616 F.Supp. 301, 304 (S.D.N.Y.1985); *Gulf Petro Trading Co. v. Nigerian Nat'l*

*Petroleum Corp.*, 288 F. Supp. 2d 783, 791 (N.D. Tex. 2003) (holding that where defendant filed a timely motion to dismiss, there was actual notice despite improper service under the FSIA).  In this instance, ASA at all times was on notice of this suit as Plaintiff delivered a copy of the Complaint to its counsel.

Even conceding, *arguendo*, that this service is deemed inadequate, it does not represent Plaintiff's only "attempt" to effect service.  Plaintiff's counsel initially conferred with ASA's counsel, who informed Plaintiff not just that ASA would contest service, but that it would invoke sovereign immunity, notwithstanding the completely commercial nature of its activities.  Once alerted, Plaintiff's counsel undertook to perfect service under the Act.  As set forth in the Affirmation of John F. Harnes, dated August 22, 2016 ("HA"), and submitted herewith, counsel obtained a translation of the Complaint into Norwegian (HA¶¶8-9), and thereafter contacted the Operations Manager of Clerk of the Middle District of Pennsylvania to effect service under § 1608(b) of the Act. (HA¶ 9).

Thereafter, Plaintiff's counsel attempted to contact the International Desk of Process Service at the U.S. State Department for information concerning how to forward the Complaint.  After repeated phone calls were neither answered nor returned, Plaintiff retained a process server versed in foreign service (HA¶11).  Similar conduct has been held to more than satisfy any due diligence requirement injected by the courts into Rule 4(m).  *Allstate Ins. Co. v. Hewlett-Packard Co.*, No. 113-cv-02559, 2015 WL 179041 (M.D. Pa. Jan. 14, 2015) (Plaintiff attempted to effect service, service was rejected, plaintiff translated complaint, and stated intention to attempt reserve); *Lewis v. Vollmer of America*, No. 05-1632, 2006 WL 3308568 (W.D. Pa. 2006) (After plaintiff's service upon subsidiary was deemed ineffective, he retained process server to effect international service).

Finally, pursuant to the Rule's express terms, dismissal for failure to comply with the time limitation set forth therein, even if applicable to service on a foreign sovereign, is without prejudice. This Court has the power to extend deadlines when appropriate. Here, assuming Plaintiff has failed to comply, it would be far more efficient to allow him to complete service than to require Plaintiff to commence the process all over again, and placing ASA on a different timetable than the other defendants.

### 2. Plaintiff Sufficiently Plead Facts Supporting Personal Jurisdiction.

In addition to its objections concerning service, ASA argues that it is not subject to the personal jurisdiction of this Court. Conceding that Pennsylvania's long-arm statute allows courts to exercise jurisdiction "to the fullest extent allowed under the Constitution," ASA argues that the Complaint alleges "no facts" to demonstrate that it has met that Constitutional threshold.

Personal jurisdiction may be exercised under two distinct theories, general jurisdiction, based upon continuous and systemic contacts with the forum, and claim-specific jurisdiction, where the cause of action arises from the defendant's forum related activities. *Vetrotex Certainteed Corp. v. Consol. Fiber Glass Prod. Co.*, 75 F.3d 147, 151 (3d Cir.1996)

ASA addresses the former, but not the latter. With respect thereto, the Complaint alleges that ASA interfered with a contract to which Plaintiff and the other Landowners, all Pennsylvania residents, were parties. The Complaint alleges that the contract at issue involving the purchase and resale of gas located in Pennsylvania, was performed in Pennsylvania, and breached in Pennsylvania. Payment to Plaintiff and the Class was made in Pennsylvania; as a consequence, Plaintiff and each member of the Class were necessarily injured in Pennsylvania. In light of these allegations, ASA's suggestion that Pennsylvania was not a foreseeable forum to

hear any dispute is head-scratching. Indeed, it is hard to perceive any forum with greater contacts to the dispute or one better suited the hear it.

It is well-settled in Pennsylvania that where a party tortuously interferes with a contract to be performed in Pennsylvania, knowing that the injury will be suffered in Pennsylvania, personal jurisdiction will lie. *Remick v. Manfredy*, 238 F.3d at 260; *Dayhoff, Inc. v. H.J. Heinz Co.*, 86 F.3d 1287, 1302 (3d Cir. 1996); *Vizant Technologies, LLC*, 97 F.Supp.3d at 634; *Fetter v. North American Alchohols, Inc.*, C.A. No. 06-4088, 2007 WL 551512 at *9 (E.D. Pa. February 15, 2007). In this instance, there can be little dispute, given the facts of this case, that ASA's interference was aimed at injuring Plaintiff in Pennsylvania.

Plaintiff also sufficiently alleges general jurisdiction. With respect thereto, the Court "must examine the extent to which defendants availed themselves of the privileges of American law, the extent to which litigation in the United States would be foreseeable to them, the inconvenience to defendants of litigating in the United States, and the countervailing interest of the United States in hearing the suit." *United States Fid. & Guar. Co. v. Braspetro Oil Servs. Co.*, 97 Civ. 6124 (JGK), 1999 WL 307666 at *48 (S.D.N.Y. May 17, 1999), *aff'd*, 199 F.3d 94 (2d Cir. 1999) ; *Tifa, Ltd. v. Republic of Ghana*, 692 F.Supp. 393, 404 (D.N.J. 1988). The "relevant area in delineating contacts is the entire United States," not merely Pennsylvania. *Braspetro Oil Servs. Co.*, at *48.

The court may exercise general jurisdiction over a foreign parent company when it acts as the alter ego of its American subsidiary, or where the levels of control and interaction are such that the exercise of jurisdiction does not violate principles of due process. *See Anheuser-Busch, Inc. v. Paques (In re Paques)*, 277 B.R. 615, 634 (Bankr. E.D. Pa. 2000). The courts in the Third Circuit have held that the applicability of *alter ego* jurisdiction depends on the analysis of ten

factors. *Simeone v. Bombardier-Rotax GmbH*, 360 F.Supp.2d 665, 675 (E.D.Pa.2005); *In re Latex Gloves Prods. Liab. Litig.*, No. MD L 1148, 2001 WL 964105, at *3 (E.D.Pa. Aug. 22, 2001); *In re Chocolate Confectionary Antitrust Litig.*, 602 F.Supp. 2d 538, 569-570 (M.D.P.A. 2009). The factors include: (1) ownership of all or most of the stock of the subsidiary; (2) common officers and directors; (3) a common marketing image; (4) common use of a trademark or logo; (5) common use of employees; (6) an integrated sales system; (7) interchange of managerial and supervisory personnel; (8) performance of business functions by the subsidiary which the principal corporation would normally conduct through its own agents or departments; (9) marketing by the subsidiary on behalf of the principal corporation, or as the principal's exclusive distributor; and (10) receipt by the officers of the subsidiary corporation of instruction from the principal corporation.  In this instance, just from publicly available information, Plaintiff can establish several of these factors, including, *inter alia*, the following:  (1)  It is undisputed that ASA owns of all of the stock of both Properties and NG;  ASA share common officers with its U.S. subsidiaries (See, *e.g.*, HA Ex.3, pp. A12-13);  (2)  NG and ASA share a common marketing image (HA Ex.4), (3), ASA and Properties use a common trademark and logo, (4) Properties sells its gas exclusively to ASA and its subsidiaries, (5) NG markets on behalf of ASA (HA Ex. 4), and, most importantly, (6) ASA exerts control over Properties.  *See In re Latex* Gloves, at *5-6. As noted, no company operating independently, rather than as a mere extension of its parent, would deliberately market its gas at a discounted price and reduce its own profitability.

Should the Court find that Plaintiff has failed to aver minimum contacts sufficient to maintain personal jurisdiction over ASA, Plaintiffs requests that jurisdictional discovery be permitted to determine whether *alter ego* jurisdiction is appropriate.  Courts should assist the

plaintiff by allowing jurisdictional discovery "unless the plaintiff's claim is clearly frivolous." *In re Chocolate Confectionary Antitrust Litig.*, 602 F.Supp.2d at 569-570. The plaintiff must identify "particular facts that demonstrate the likelihood of contacts sufficient to corral defendants within the courts' jurisdiction." *Id.* The Court should "generally permit jurisdictional discovery prior to dismissing a defendant for lack of personal jurisdiction." *Id.*

Jurisdictional discovery is appropriate here because Statoil's website suggests that it has complete control over its subsidiaries.[6] This information suggests that jurisdictional discovery would establish personal jurisdiction over ASA.

## II. PLAINTIFF STATES A CLAIM FOR RELIEF FOR BREACH OF CONTRACT

Turning to the substantive issues raised by Plaintiff's Complaint, Properties asserts that Plaintiff's claim for breach of contract should be dismissed because it fails to state a claim for relief. Properties argues that Plaintiff, although entitled only to the wellhead price (a fact expressly recognized in the Complaint), is seeking to rewrite her Gas Lease in order to seek something different. Thereafter, Properties suggests that Plaintiff is receiving a market price notwithstanding that such price is much lower – roughly half -- than that paid by Chesapeake, and consistently lower than that paid by every other major gas Company with an interest in the Gas Leases, because it is premised upon an index that purports to measure sales, comparable or otherwise.

---

[6] ASA's website lists a single Board of Directors. The website also has a tab prominently displayed on its homepage for "Owner Relations- USA." http://www.statoil.com/en/about/corporategovernance/governingbodies/board/Pages/default.aspx?redirectShortUrl= http%3a%2f%2fwww.statoil.com%2fboard (last visited July 29, 2016) No other country has its own 'relations' page on the website. http://www.statoil.com/en/about/worldwide/northamerica/usa/pages/ownerrelationsold.aspx (last visited July 29, 2016). Plaintiffs' royalty payment checks employ the same logo mark as Statoil's logo at the upper left hand corner of its webpage, available at http://www.statoil.com/en/Pages/default.aspx (last visited July 29, 2016).

Properties' factual arguments are fabricated by means of a selective reading of the Complaint that produces a narrative that has little to do with what is actually alleged, if it is not directly at odds therewith. For example, Properties asserts that Plaintiff is seeking the "downstream price" received by Statoil "free of cost" to the Leaseholder," a misstatement one might attribute to carelessness, albeit carelessness breathtaking in scope, were it not necessary for Properties, in making such an assertion, to ignore willfully Plaintiff's extended and detailed discussion of the manner in which costs are to be deducted from the downstream price according to the language of the Lease to arrive at the wellhead price (¶¶ 23, 30), including its comparison of Ready for Use or Sale provisions and Market Enhancement Clauses (¶ 30 n.2).

Properties' approach to the law dovetails with its approach to the facts. Deluging this Court with citations to numerous cases, a significant number of which have no discernible relevance hereto, Properties eschews any analysis thereof, instead weaving together isolated, cherry-picked phrases to support arguments that are not only unsupported by the cases in question, but fly directly in their face.[7] An analysis of these cases, standing alone, demonstrates forcefully that Defendants' conduct is improper and their motion should be denied. When coupled with the numerous cases which have directly held conduct similar to that alleged herein to be unlawful, Defendants' motion against the contract claim is revealed to be entirely without basis.

---

[7] While Plaintiff's Memorandum addresses primarily the substantive law articulated in these decisions, she notes that a significant majority of cases cited by Defendants do not involve a decision on a motion to dismiss, but rather involve the denial of motions for summary judgment. Such motions are decided under an entirely different standard, and the denial of a plaintiff's motion for summary judgment does not result in dismissal of the case. The standard applied to a motion to dismiss is familiar to this Court. *Suessenbach Family Ltd. P'ship v. Access Midstream Partners, L.P.*, Case No. 3:14–1197, 2015 WL 1470863, at * 1-2 (M.D.Pa. Mar. 31, 2015)

### A. Defendants' Motion Provides No Basis To Dismiss Plaintiff's Contract Claims

The cornerstone of Properties' motion with respect to Plaintiff's contract claim is its reliance on *Kilmer v. Elexco Land Services*, 605 Pa. 413, 990 A.2d 1147 (2010). Properties vigorously emphasizes that case's uncontroversial holding that, absent lease language to the contrary, the royalty paid for natural gas is to be calculated at the wellhead, a holding recognized in the Complaint. Having waded into *Kilmer's* shallows, however, Properties flinches from diving any deeper. More specifically, Statoil, as when addressing sovereign immunity, shrinks from the two-part threshold question demanding an answer: what does the term wellhead price mean, and how is it calculated? Properties' circumspection is understandable, for *Kilmer's* answer to that question makes clear that it is Properties, and not Plaintiff and the Class, who is seeking to re-write the Gas Leases in this case.

In *Kilmer*, the Pennsylvania Supreme Court adopted the defendants' method of calculating the wellhead price in the following terms, 605 Pa. at 424:

> Therefore, to calculate the price of the natural gas at the wellhead (and thus the royalties), they argue that we must work backward from the value-added price received at the point of sale by deducting the companies' costs of turning the gas into a marketable commodity. As mentioned, this calculation is often referred to in the industry as the "net-back" method of calculating royalties.

> The Gas Companies observe that the gas producers sell their product at various points downstream from the wellhead in various states of production and that the further downstream the sale, the higher the price. Similarly, expenditures for transportation of the gas to the high-demand markets of the east coast cities can earn much higher sales prices than in the fields of Western Pennsylvania. Therefore, by deducting the expenses of production and transportation from the final sales price, one can fairly calculate the price for the unprocessed gas at the moment of removal.

As Properties notes, the *Kilmer* decision was consistent with and based upon Texas law, e.g., *Heritage Resources, Inc. v. NationsBank*, 939 S.W.2d 118, 122 (Tex. 1996), citing, *Texas*

*Oil & Gas Corp. v. Hagen*, 683 S.W.2d 24, 28 (Tex.App. Texarkana 1984), *dism'd as moot*, 760 S.W.2d 960 (Tex.1988), as well as the norms of the industry. The royalty adopted by the Pennsylvania Supreme Court ensures that the landowner is paid what the gas company actually receives.

*Kilmer's* calculation of "wellhead price" mirrors precisely the calculation implemented by Chesapeake and other gas companies when determining the royalty to be paid for the same natural gas as that purchased by Properties, and, more importantly, the calculation sought by Plaintiff. (¶ 30). In seeking the net-back price, Plaintiff is not, as Statoil mendaciously argues, seeking a price from a "different delivery point," but is seeking the wellhead price as determined by *Kilmer*.[8] It is simple arithmetic that, if NG is making a profit when it resells Plaintiff's gas that it "purchased" from Properties, a profit to which Plaintiff is entitled, then Statoil is not paying the net-back price that all other gas companies are paying.

From that starting point, the obvious and paramount issue is whether, under the Gas Leases, Statoil is permitted to treat the intra-corporate transfer between Properties and NG as a bona fide sale that permits it to deprive Plaintiff of her share of the amount realized by Statoil upon the ultimate sale of Plaintiff's gas to a third party. Remarkably, and perhaps tellingly, Properties demurs from answering this question. Instead, embracing misdirection over analysis, it merely weaves together anodyne truisms and non sequiturs, such as: (1) parties are free to negotiate whatever terms they want in a gas lease, (2) Properties and NG are separate corporate entities, (3) indices can serve as a measure of market value, and (4) amounts received means the amount the lessee actually received, without ever addressing the propriety of its conduct head-

---

[8] Statoil also states, without any basis, that the price paid by Chesapeake alleged in the Complaint, is the gross price, rather than the price net of expenses. (ASA Mem., p. 25 n.15). This statement is also false. The prices alleged with particularity in the Complaint come directly from the check stubs Plaintiff and other Landowners received for their gas and reflect the per mcf sales price of the gas sold without any adjustment for any post-production deductions charges that may be subsequently deducted from the sales price identified in the check stubs.

on. The closest Properties comes to addressing the issue is its assertion: (1) that Plaintiff is seeking a different point of sale price from the wellhead price, an entirely unsupported assertion that, as shown above, is flatly wrong, and (2) that, in order to challenge the "sale" by Properties to NG of Plaintiff's gas, plaintiff must demonstrate that it is a "sham," an argument that, as shown below, is without basis.

Nevertheless, while Statoil may be silent on the fundamental issue in this action, the cases which it cites are not. Remarkably, not only does not a single one stand for the proposition that the conduct at issue in this litigation is permitted under the Gas Lease, but also many of the cases **upon which Statoil relies** have determined that such conduct is not permitted.

First among those is *Anderson Living Trust v. WPX Energy Production, LLC*, 306 F.R.D. 312 (D.N.M. 2014), a case involving claims strikingly similar to those herein. In *Anderson*, one WPX subsidiary, after recovering the natural gas from the plaintiffs, sold it to another WPX subsidiary, paying, for royalty calculation purposes, an index price published for the general area. The plaintiffs in *Anderson* challenged the use of an index price to calculate the royalty for the same reason Plaintiff does in this case: because that index purported to represent not only an average of sales prices from their wells, but also from wells belonging to other unrelated third parties.

Like Plaintiff in this case, the plaintiffs in *Anderson* asserted both an Index Claim and an Affiliate Claim. The *Anderson* court treated the latter, however, merely as a rephrasing of the former, intended to address the same argument forwarded by Statoil in this case:

> The [sale to an affiliate] claim could be considered a preemptive response to a very weak argument that the Defendants could potentially raise -- but have not raised – in defense of their royalty practices: that they are obligated to pay the royalty owners a fraction of the sale price, but that the affiliate transactions, themselves, count as a "sale" upon which the royalty can be paid. This argument would be doomed to fail – after all, if an affiliate sale counted as a sale for royalty

purposes, every producer could ensure that its first sale was to an affiliate for either no money or for a token amount of money -- and the Defendants have not raised it.

306 F.R.D. at 350 n.26.

That Statoil cites *Anderson* in support of its motion illustrates the complete absence of any analysis in its Memorandum, as that decision unequivocally rejects the central argument upon which its motion is based, an argument so "weak" and "doomed" that WPX, in contrast to Statoil, did not have the temerity even to raise it.

In another case cited by Statoil, *Shell Oil Co. v. Ross*, 357 S.W.3d 8 (Tex. App. Houston 2010), *rev'd on other grounds*, 356 S.W.3d 924 (Tex. 2011), Shell, the owner of 62% of a pooled interest with two other oil companies, when calculating the plaintiff's royalty, paid such royalty based on the average price, not of its sales, but on those of all three oil companies for the entire field, a practice suffering from the same flaw as the use of an index price, in that it was based upon unrelated sales as well as those of Shell. The appellate court affirmed the jury's verdict that this constituted a breach of the clear language of the lease, 357 S.W.3d at 17:

"By calculating the Reusses' royalties based on a weighted average price, Shell breached its contract by paying royalties on a price less than the amount that Shell realized from the sale of the gas."

Plaintiff cannot discern how this decision supports Statoil's payment of a royalty based upon an index; if use of an average price of all sales from the same properties violates the Lease, it follows, *a fortiori*, that use of an average price of unrelated all over the state is, at a minimum, equally violative.

Similarly, Statoil relies on *Abraham v. BP Production Co.*, 685 F.3d 1196 (10th Cir. 2012), a case in which the plaintiff challenged the calculation of a royalty based upon the sale of the plaintiffs' gas by one BP affiliate to another at a discount to the non-affiliate price. Although

the Tenth Circuit reversed the judgment for plaintiffs, it let stand the trial court's determination

that the plaintiff stated a claim for relief, only reversing the verdict on the ground that the trial

court had allowed the introduction of evidence the appellate court deemed inadmissible.[9]  At

least one court has deemed *Abraham* to reflect a recognition that the claims asserted by the

plaintiff in that case, and asserted herein, state a claim for relief.  *Anderson Living Trust v.

ConocoPhillips Co., LLC*, 952 F.Supp.2d 979, 1039 (D.N.M. 2013).

Again, in *Warren v. Chesapeake Exploration, LLC*, 759 F.3d 413 (5th Cir. 2014), another

case mystifyingly cited by Statoil, one Chesapeake affiliate sold natural gas to another, which

then resold it to third parties.  Rather than treating the intra-affiliate transfer as a "sale," as Statoil

does, Chesapeake calculated the royalty in the manner urged by Plaintiff here, netting back from

the ultimate sale to unrelated third parties.  Statoil's suggestion that the court in any way

approved an intra-corporate transfer as an actual sale is particularly unfathomable, as the court

expressly stated, 759 F.3d at 419:

> We note that the parties have not argued or briefed, and this opinion does not
> consider, the relationship among affiliated Chesapeake entities or the impact, if
> any, that relationship might have on issues regarding the payment or calculation
> of royalties.

Taken together, the cases which ASA relies argue forcefully that Plaintiff's contract

claims should not be dismissed; its motion fails of its own accord.

### B.     Plaintiff States A Claim For Relief For Breach of Contract

As noted above, Plaintiff challenges the conduct of Properties' on essentially two bases:

---

[9] Statoil cites *Abraham* for the incongruous proposition that comparable prices paid by a competitor "do not inform" a court as to market value.  Statoil once again grossly distorts the court's ruling.  The competitor had entered into two types of leases, one an amount-realized lease, like those in this case, the other based upon Federal regulations promulgated resulting in a higher royalty.  The competitor, for efficiency purposes, elected to pay all leases at the higher rate, overpaying the purely market-lease royalties.  The court unsurprisingly deemed it error to admit evidence of these higher prices, as they were determined in a different manner.

1. That Properties fails to pay Plaintiff a royalty based upon what it *actually receives*, but instead bases its royalty on index prices which do not reflect actual market transactions, the Index Claim;

2. That, even if Properties complies with the literal terms of the Gas Lease, its calculation of royalties based upon affiliate sales is a breach of its Implied Covenant of Good Faith and its duty to market Plaintiff's natural gas, the Affiliate Claim.

### 1. The Index Claim States a Claim for Relief

Plaintiff's Gas Lease provides, in pertinent part that she is to receive, as a royalty, "15% of the amount realized from the sale of gas at the well." (¶18). The other leases set forth in the Complaint contain similar language.[10] All of the Leases share one core principle: that the royalty is to be calculated on the basis of an *actual sale* of the Landowner's natural gas.

Statoil does not comply with this term of the Lease; it does not pay to Plaintiff or the other landowners a royalty based upon what it receives upon resale of their gas. Instead, it pays a royalty on the average price received by unidentified and unrelated oil companies for the resale of gas produced pursuant to unidentified and unrelated gas leases. Statoil devotes pages upon pages feverishly defending its use of index prices – that such prices reflect market transactions, that they represent the "going rate," that they are used in gas leases, and that they are recognized as a measure of value. At no point, however, does Statoil explain how the use of index prices complied with the language of each and every Gas Lease.

---

[10] The Royalty is calculated as: (1) "an amount equal to [a fixed percentage] of the revenue realized by Lessee for all gas and the constituents thereof produced and marketed from the Leasehold less the cost to transport, treat and process," (¶ 19), (2) "one eighth (1/8[th]) of the sales proceeds actually received by Lessee [Statoil] from the sale of such production," (¶ 20), (3) "an amount equal to [fixed percentage] of the revenue realized by the Lessee for all gas and constituents thereof produced and marketed from the Leased Premised during the preceding month." (¶ 21)

### 2. The Affiliate Claim States A Claim For Relief

With respect to the affiliate claim, as noted, even if this Court's purview were limited to the cases cited by ASA, it would be clear that Statoil's motion to dismiss Plaintiff's contract claim should be denied. However, this Court's purview is not so limited. In addition to the cases cited by Statoil, numerous cases have addressed the conduct alleged in the Complaint and have determined that such conduct constitutes both a breach of the Lease, and a breach of the covenant of good faith.

The basis for this self-evident proposition is found in the nature of the parent-subsidiary relationship. Directors of any corporation are obligated to operate it in the best interests of its shareholders. Where there is only one shareholder, *i.e.*, a corporate parent, directors have an obligation to operate the corporation in the best interest of that parent. This fundamental principle was articulated in express terms by the Delaware Supreme Court,[11] *Anadarko Petro. Corp. v. Panhandle Eastern Corp.*, 545 A.2d 1171, 1174 (Del.1988):

> In a parent and wholly-owned subsidiary context, the directors of the subsidiary are obligated only to manage the affairs of the subsidiary in the best interests of the parent and its shareholders. (Citations omitted)

As a consequence, it is a fundamental and obvious rule of corporate law that any transaction involving the interests of both the subsidiary and the parent is not an arm's-length transaction, but one that, for the subsidiary, involves a material conflict of interest. In such an instance, the interests of the parent, here ASA, prevail. This rule does not require the piercing of corporate veils, as Statoil stridently argues, but merely a recognition of basic corporate law. As the Chief Justice of the Delaware Supreme Court remarked while still Vice-Chancellor: "Wholly-owned subsidiary corporations are expected to operate for the benefit of their parent

---

[11] Properties is a Delaware corporation.

corporations; that is why they are created." *Trenwick Amer. Litig. Trust v. Ernst & Young, LLP*, 906 A.2d 168, 173 (Del.Ch.2006).

Courts applying this principle in oil and gas cases have uniformly reached the same logical conclusion. Thus, in *Howell v. Texaco, Inc.*, 112 P.3d 1154, 1162 (OK 2004), a case in which a defendant sought to calculate a royalty upon a sale to an affiliate, followed by a resale at a profit, the Oklahoma Supreme Court put it plainly:

> Whenever a producer is paying royalty based on one price but it is selling the gas for a higher price, the royalty owners are entitled to have their payments calculated based on the higher price. The plaintiffs here are entitled to have their royalty payments based on the prevailing market price or the work-back method, whichever one results in the higher market value. **We hold that an intra-company gas sale cannot be the basis for calculating royalty payments**. (Citation omitted; emphasis added)

See also, *W.W. McDonald Land Co. v. EQT Production Co.*, 983 F.Supp.2d 790, 804 (S.D.W.Va. 2014) ("The defendants cannot calculate royalties based on a sale between subsidiaries at the wellhead when the defendants later sell the gas in an open market at a higher price."); *Fankhouser v. XTO Energy, Inc.*, No. CIV 07–798–L, 2012 WL 831092 at *5 (W.D.Okla., Mar. 8, 2012); *Beer v. XTO Energy, Inc.*, No. 07-798-L, 2010 WL 476715 at *2-3 (W.D.Okla. February 5, 2010).

In *Anderson Living Trust v. ConocoPhillips Co., LLC*, 952 F.Supp.2d at 1041, the plaintiff challenged a course of conduct virtually identical to that alleged herein:

> If the Defendants are, indeed, undervaluing the proceeds upon which the Plaintiffs' royalty payments are calculated, by basing those payments upon sales of a mixture of hydrocarbons to affiliated intermediaries, the Plaintiffs' benefits from their royalty payments are diminished.

The court found that the complaint stated a cause of action for breach of contract, and a separate claim for fraud based upon the breach of the duty of good faith and fair dealing.

Similarly, in *Roberts Ranch Co. v. Exxon Corp.*, 43 F. Supp. 2d 1252, 1267-1268 (W.D. Okla. 1997), the court condemned the same conduct, citing:

> Courts should take care not to allow lessors to be deprived or defrauded of their royalties by their lessees entering into illusory or collusive assignments or gas purchase contracts. *Whenever a lessee or assignee is paying royalty on one price, but on resale a related entity is obtaining a higher price, the lessors are entitled to their royalty share of the higher price.* The key is common control of the two entities.

Here the Complaint alleges facts that establish that Properties is controlled by ASA (Properties is acting adversely to its own interests, for the benefit of ASA) and that the affiliated companies operate in a way that is designed to deprive Plaintiff and the Class of their rightful royalty.

The only case even remotely relevant to this issue cited by Statoil is *Ramming v. Natural Gas Pipeline Co. of America,* 390 F.3d 366 (5th Cir. 2014). Statoil suggests that this case requires Plaintiff to pierce the corporate veil. Statoil's reading of *Ramming* is more wishful than reasoned. The issue in *Ramming* was whether post-production expenses could be deducted pursuant to an agreement originally executed between two affiliated companies, one a production company, and one a marketing company.

The dispute with the plaintiffs only arose after Chesapeake acquired the production company. Thereafter, the marketing company began to deduct post-production expenses from the price it paid Chesapeake (perhaps mindful of its conflict of interest, the marketing company had not deducted them when the companies were affiliated), which not surprisingly passed those deductions onto the plaintiffs. There was no suggestion of collusion between Chesapeake and the marketing company; indeed, Chesapeake twice sought to challenge the fees it was being charged. 390 F.3d at 372-73. As the marketing company had not charged the production company when affiliated, and its subsequent relationship with Chesapeake was entirely arm's-

length, plaintiff had to show that the contract was void *ab initio*.  Not surprisingly, the Fifth

Circuit rejected the argument.  As a consequence, *Ramming*  has, at best, a tenuous relevance to

this case.

However, even ignoring the parent-subsidiary relationship among the Statoil entities, the

Complaint states a breach of contract claim for relief on a separate and independent basis.  The

law in virtually every oil and gas producing state, including Pennsylvania, imposes upon a lessee

of oil and gas rights a duty to market the oil and gas that it recovers from the lessor's well.  See,

*Stirman v. Exxon Corp.*, 280 F.3d 554, 564–66 (5th Cir.2002); *Iams v.Carnegie Natural Gas Co.*,

194 Pa. 72, 45 A. 54 (1899).  Although the scope of this duty differs from state to state generally,

it is applied uniformly to self-dealing transactions among affiliates.

In certain states, the duty to market requires a lessee to obtain the highest and best price

obtainable under the circumstances.  "Under Oklahoma law, an operator of an oil or gas lease

owes a fiduciary duty to royalty owners to market oil or gas at the highest market price available

at the time of any production under the lease." *Coosewoon v. Meridian Oil Co.*, 25 F.3d 920,

931 (10th Cir. Okla. 1994) (dismissed for failure to exhaust administrative remedies).

See also, *Watts v. Atl. Richfield Co.*, 115 F.3d 785, 794 (10th Cir.1997) *La Barte v. Seneca Res.*

*Corp.*, 285 A.D.2d 974, 975, 728 N.Y.S.2d 618 (4th Dep't 2001); *Barby v. Cabot Corp.,* 550

F.Supp. 188, 190 (W.D.Okla.1981).

Other states, such as Texas, generally impose the reasonable operator standard. *Texas Oil*

*& Gas Corp. v. Hagen*, 1987 WL 47847 at *2-3 (Dec. 16, 1987), *opinion withdrawn, case*

*settled*, 760 S.W.2d 960 (Tex.1988).  The reasonably prudent operator standard requires the

lessee to act "as an operator of ordinary prudence having regard to the interests of both the

plaintiffs, as lessors, and the defendant, as lessee." *Clayton v. Atlantic Refining Co.*, 150 F.Supp. 9, 13–16 (D.N.M.1957).

Whatever the standard, where the transactions at issue are between affiliated companies or otherwise not at arm's length, and the "interests of the lessee and lessor do not coincide," the courts give such transaction closer scrutiny, "because the implied covenant to market "serves to protect a lessor from the lessee's self-dealing or negligence." *Amoco Prod. Co. v. First Baptist Church*, 579 S.W.2d 280, 286 ("The implied covenant to reasonably market oil and gas serves to protect a lessor from the lessee's self-dealing or negligence."); *Yzaguirre v. KCS Resources*, 53 S.W.3d 368, 374 (Tex.2001) (Distinguishing between self-dealing and contracts negotiated at arm's-length.) *Harding v. Cameron*, 220 F.Supp. 466 (W.D.Okla.1963). In those situations, courts have typically determined that the lessee did not behave as a reasonably prudent operator unless it sold the hydrocarbons for the highest obtainable price. See, *Cabot Corp. v. Brown*, 754 S.W.2d 104, 106 (Tex.1987); *Amoco Prod. Co. v. First Baptist Church*, 579 S.W.2d at 286; See also, *Johnson v. Jernigan*, 475 P.2d 396, 399 (Okla.1970) (stating that, under Oklahoma law, the lessee must "develop the commodity he has found so that it will bring the highest possible market value").

This duty to seek the highest price possible is not unique to the oil and gas industry, but is rooted deeply in both the common law and statute. See, *e.g.*, *Wood v. Lucy, Lady Duff-Gordon*, 222 N.Y. 88, 118 N.E. 214 (1917) (Cardozo, J.), *MDC Corp. v. John Harland Co*, 228 F.Supp.2d 387, 393-94 (S.D.N.Y. 2002); *QVC Inc. v. Starad, Inc.*, C.A. No. 03-5298, 2005 WL 742500 (E.D.Pa. March 31, 2005).; Uniform Commercial Code, §2-306(2).

Although the Complaint alleges the breach of the duty to market in express terms, Statoil, as with numerous other issues, appears too timorous to address it head on. Instead, it obliquely

attempts to address it by suggesting an index price satisfies this duty, offering, as noted above, a number of justifications: (1) an index reflects actual purchases and sales and thus represents market value (ASA Mem., p.23-24), (2) it has been used as a measurement in leases (*Id.*, p.24), and (3) it has been used as a measurement in settlements *(id.)*.

This argument fails for two reasons, factual and legal. Factually, whatever the index price, it is, as noted above, arithmetically certain to be lower than any price that Statoil receives upon any sale to third parties that includes a profit; if Statoil's intra-corporate transfer price is lower than its resale price, then the intra-corporate price cannot be the highest price.

Legally, as Statoil concedes, an index price is merely one "tool" to determine market value "when there is no better evidence of market value available." (Statoil Mem., p. 21). Here, the Complaint articulates far better tools: (1) the comparable prices paid by Chesapeake and other companies for the exact same gas, pursuant to the exact same Leases, who all pay prices higher than Statoil, and (2) the net-back price based upon Statoil's actual resale of gas.

Not surprisingly, Texas law, upon which Statoil relies, has adopted this self-evident proposition. As the Texas Supreme Court has recognized, "the most desirable method [to determine the value of gas at the wellhead] is to use comparable sales. *Heritage Resources, Inc. v. Nationsbank*, 939 S.W.2d 118, 122 (Tex. 1996). See also, *Potts v. Chesapeake Exploration, LLC*, 760 F.3d 470, 474 (5th Cir. 2014). *Ramming*, 390 F.3d at 372, both cited by Statoil. "A comparable sale is one that is comparable in time, quantity, and availability of marketing outlets." *(Id.)*. One cannot find gas more comparable to that at issue than the gas pumped at the

same time, from the same well, pursuant to the same Leases.[12] *Howell*, 112 P.3d at 1159. As alleged in the Complaint, the prices paid by Chesapeake for the same gas is far higher.

"[W]hen information about comparable sales is not readily available," the courts use a second method, namely the calculation of the net-back price. (*Id.*). In this instance, the comparable price and the net-back price are essentially the same and all higher than that paid by Statoil.

Moreover, even if one were to accept index prices as indicia of value, their use would present, at best, an issue of fact to be determined after discovery and trial, not on a motion to dismiss where all inferences must be drawn in Plaintiff's favor. Accordingly, Properties' Motion should be denied.

## C. Plaintiff's Contract Claim Is Timely

As its next argument, Statoil argues that Plaintiff's contract claims are barred by the statute of limitations, and should be dismissed on this ground. Statoil recognizes that courts of oil producing states, including Texas, upon whose law Statoil purports to rely throughout its Memorandum, have held that where, as here, a royalty contract calls for the periodic payment of royalties, a new breach occurs with each wrongful payment and, as to that payment, starts the running of a new limitations period.[13] *Lutz v. Chesapeake Appalachia, LLC*, 717 F.3d 459, 466 (6th Cir. 2013), citing *Moore v. Millers Cove Energy Co.*, No. 98–6279, 215 F.3d 1327, 2000 WL 658052 (6th Cir.2000); *Armstrong Petroleum Corp. v. Tri-Valley Oil & Gas Co.*, 116 Cal.App.4th 1375, 1390–91, 11 Cal.Rptr.3d 412 , 424-25 (Cal.Ct.App. 2004); *Harrison v. Bass Enters. Prod. Co.*, 888 S.W.2d 532, 537 (Tex.Ct.App.1994); *Hondo Oil & Gas Co. v. Texas*

---

[12] Statoil makes no attempt to reconcile the fundamental paradox presented by its motion: why the comparable sales particularized in the Complaint are not pertinent to fairness, but index prices, which themselves purport to measure nothing but sale prices, comparable or otherwise, are.

[13] Contrary to Statoil's hyperbole, this does not extend the statute of limitations indefinitely. The statute expires as to prior claims.

*Crude Operator*, 970 F.2d 1433, 1440 (5th Cir.1992); *Rupe v. Triton Oil & Gas Corp.*, 806 F.Supp. 1495, 1498 (D.Kan.1992). Statoil argues that no Pennsylvania court has addressed this issue with respect to oil and gas royalties. Assuming this to be true, Pennsylvania courts have adopted this rule with respect to royalties and installment contracts in general. *Raucci v. Candy & Toy Factory*, 145 F. Supp. 3d 440, 449 (E.D. Pa. 2015); *Total Control, Inc. v. Danaher Corp.*, 359 F.Supp.2d 387, 391 (E.D.Pa.2005) (collecting cases). Thus, while Plaintiff's Gas Lease may have been executed in 2010, Plaintiff may, at a minimum, recover for all payments within the four-year period prior to the filing of this lawsuit, and the Complaint is timely.[14]

Undeterred by this clear expression of law, relying on *R.C. Beeson, Inc. v. Coca-Cola*, 337 Fed. Appx. 241, 244-45 (3d Cir 2009), Statoil argues that its initial sale to an affiliate at an index price constituted a repudiation of the entire Gas Lease, terminating the effectiveness of that contract in its entirety. This argument plumbs new depths and does not warrant serious consideration. Predictably, Statoil once again abjures even a minimal analysis as to the threshold question presented by its argument: what is repudiation and how does one establish it? Such an analysis reveals the chasm between what constitutes repudiation under Pennsylvania law and the basis upon which Statoil purports to invoke the concept.

Repudiation is a principle granting a party a right to bring an action for anticipatory breach of the contract. The Pennsylvania Supreme Court has placed strict limits upon what constitutes repudiation. "[U]nder Pennsylvania law there must be 'an absolute and unequivocal refusal to perform or a distinct and positive statement of an inability to do so.'" *2401 Pa. Ave. Corp. v. Fed'n of Jewish Agencies of Greater Phila.*, 507 Pa. 166, 174, 489 A.2d 733, 737

_____

[14] Because Properties' argument would result in, at most, a dismissal of just part of the case, this Court should wait to resolve issues of when Plaintiff and the Landowners discovered or should have discovered the breach until a full evidentiary record is established.

(1985), quoting *McClelland v. New Amsterdam Cas*. Co., 322 Pa. 429, 433, 185 A. 198, 200

(1936). *Harrison v. Cabot Oil & Gas Corp*., 110 A.3d 178, 184 (Pa.2015) (even filing of a

lawsuit to determine lease terminated is not deemed a repudiation.) Most significantly, this

refusal must be conveyed to the other party. *Nat'l Util. Serv., Inc. v. Cambridge-Lee Industs.*

*Inc.*, 199 Fed. Appx. 139, 142 (3d Cir.2006):

> "In a continuous or installment contract, the first instance of a continuing breach
> alone is not a "total breach" unless accompanied by an anticipatory repudiation of
> performance due in the future. Corbin, *supra,* § 954. Accordingly, while
> Cambridge–Lee's continuing breach as to its obligation to submit information to
> National Utility might have begun in May 1995, there was no repudiation or total
> breach at that point, because there was no indication then that Cambridge–Lee
> would not fulfill its future obligations under the contract."

Statoil makes no effort to explain how the garden-variety breach of contract that is the

subject of this Complaint satisfies the extreme prerequisites of repudiation. Instead, the ASA

Defendants merely argue that the first sale based upon an index price was a breach, because the

Lease "obligated" Statoil to base the royalty on actual sales. They then baldly state that if they

breached this obligation, they repudiated the Lease, silent as to how this prosaic breach differs

from any other, or how it indicated, unequivocally or otherwise, to anyone, let alone Plaintiff, an

inability or refusal to perform in the future. Having failed to articulate the legal standard for

repudiation, or how it has met such standard, the ASA Defendants' argument is not merely

underbuilt, but entirely non-existent.

Obviously, a simple breach of contract does not constitute repudiation. If it did, the body

of law regarding installment payments, cited above, and recognized by the ASA Defendants in

their Memorandum, simply would not exist. Nothing in *Beeson* stands to the contrary. In

*Beeson*, the contract at issue allowed the defendant to alter the royalty payment, but required it to

negotiate that change in good faith with the plaintiff if he objected to such alteration. In *Beeson,*

the claim was not simply that the royalties were too low. The defendant changed the royalty, informed plaintiff how it would calculate royalties in the future, the plaintiff objected, and the defendant refused to negotiate. Defendant's failure to negotiate, not the change in terms or payments, put plaintiff on notice of the defendant's refusal to honor the contract in the future. Here, there is no comparable conduct or "act indicating to [Plaintiff] that any future performance either will not occur or will not be in compliance with the contract terms," necessary, under *Beeson*, to "commence the running of the statute of limitations."

Finally, as a factual matter, Statoil acknowledges changing the methodology by which it calculated the royalty in September 2013, and that it is this calculation that caused Plaintiff's principal injury. If this Court is inclined to accept all of Statoil's arguments, as weak as they are, it should, resolving all inferences in plaintiff's favor, treat 2013 as the date when a new cause of action commenced and when Plaintiff was materially injured.

### III.    PLAINTIFF STATES A CLAIM FOR RELIEF FOR TORTIOUS INTERFERENCE WITH CONTRACT AND CIVIL CONSPIRACY

The ASA Defendants next challenge the Complaint's claims for relief alleging tortious interference and civil conspiracy, a challenge in which NG joins.[15] Defendants argue those claims are barred by the gist-of-the action doctrine, the economic loss doctrine and the statute of limitations. Further, they argue that the Complaint fails to allege the necessary elements of tortious interference with contract.

The gist-of-the-action doctrine "precludes plaintiffs from re-casting ordinary breach of contract claims into tort claims." *eToll, Inc., v. Elias/Savion Adv., Inc.*, 811 A.2d 10, 14 (Pa.Super.Ct.2002). Because Plaintiff has no contract with ASA or NG, she is not re-casting a contract claim. *The Knit With v. Knitting Fever, Inc.*, C.A. No. 08-4221, 2009 WL 3427054 at *

---

[15] No claim of tortious interference is asserted against Properties as it is the signatory to the contract.

17 (E.D. Pa. October 20, 2009) ("As a logical inference then, a party who was not in contractual privity with the plaintiff cannot invoke the gist of the action doctrine to foreclose tort claims against him or her."); *First Senior Financial Group v. Suib*, No. 2604, 2013 WL 10230565 (Ct. Com. Pleas, August 26, 2013). The doctrine has no application unless Properties is deemed to be an agent for the other entities. *Cf.*, *Frank C. Pollara Group, LLC v. Ocean View Inv. Holding, LLC,* 784 F.3d 177 (3d Cir. 2015).

Neither ASA nor NG address the conundrum of how Plaintiff can be limited to claim for breach of contract against those two defendants, or how any duties they breached are founded in contract rather than tort, when she has no contract with them and they have no contract duties. NG is correct that, without the breach of the Lease, Plaintiff's tortious interference claim would not exist; but the same may be said about virtually every claim for tortious interference with contract. Under Defendants' reasoning, in establishing her tortious interference claim for relief, *i.e.*, showing that the defendant caused a breach of an existing contract, Plaintiff at the same time necessarily defeats that claim, because the damages flow from the contract that was breached. As the Pennsylvania Supreme Court stated in *Bilt-Rite Contractors, Inc. v. The Architectural Studio,* 581 Pa. 454, 483-84, 866 A.2d 270, 288 (2005): "It would be nonsensical [to] allow a party to pursue an action only to hold that, once the elements of the cause of action are shown, the party is unable to recover for its losses."

ASA unsurprisingly makes no attempt even to address this issue; NG, to its credit, at least acknowledges it, arguing that privity is not a necessary component of the doctrine. The cases it cites, however, fall woefully short of establishing that proposition. Both *Williams v. Hilton Group PLC*, 93 Fed Appx. 384 (3d Cir. 2004) and *Integrated Waste Solutions, Inc. v. Goverdhanam,* C.A. No. 10–2155, 2010 WL 4910176 (E.D.Pa. November 30, 2010) involved

claims of fraud against an officer of the party in privity. They stand for the mundane proposition that a disclosed agent is bound by same the contractual duties as his principal. In *Esis, Inc. v. Coventry Health Care Workers Compensation, Inc.*, No. 13-2957, 2016 WL 928667 (E.D.Pa. March 9, 2016), one Aetna subsidiary executed an agreement binding other, non-signatory subsidiaries to perform certain obligations under the agreement. The court treated the non-signatory subsidiaries as parties to the contract, determining that "there [was] a valid contract between Concentra's former subsidiary and the Aetna defendants." Thus, directly at odds with NG's blunt-edged analysis of the case, the Court's finding that the parties were in privity was the very basis for its application of the gist-of-the-action doctrine. If this Court were to apply *Esis* in the manner urged by NG, it would treat all of the Statoil entities as parties to the Gas Leases and bound by their provisions (with all the resulting consequences), a result Plaintiff would, in the alternative, readily endorse.

The economic loss doctrine, one developed in the context of product liability claims, *Bohler-Uddeholm Am., Inc. v. Ellwood Grp., Inc.*, 247 F.3d 79, 104 n.11 (3d Cir. 2001), is similarly inapplicable. "The Economic Loss Doctrine provides that no cause of action exists for negligence that results solely in economic damages unaccompanied by physical or property damage." *Sovereign Bank v. BJ's Wholesale Club, Inc.*, 533 F.3d 162, 175 (3d Cir. 2008), citing *Adams v. Copper Beach Townhome Cmtys., L.P.*, 816 A.2d 301, 304 (Pa.Super.Ct.2003). As the court stated in *Adams*, 816 A.2d at 305:

> The Economic Loss Doctrine is concerned with two main factors: foreseeability and limitation of liability. As previously discussed, the Economic Loss Doctrine is enforced to bar purely economic claims because the tortfeasor has no knowledge of the contract or prospective relation and, therefore, no reason to foresee any harm to the plaintiff's interest. With regard to limitation of liability, this court stated in *Aikens* that "to allow a cause of action for negligent cause of purely economic loss would be to open the door to every person in the economic chain of the negligent person or business to bring a cause of action."

Where, as here, neither factor is implicated, an unthinkingly reflexive application of the economic loss doctrine makes little sense.[16] For this very reason, the Pennsylvania Supreme Court has recognized that the doctrine is not to be applied in all situations, but only where appropriate. *Bilt-Rite Contractors, Inc.*, 581 Pa. at 477-81. Defendants' rote incantation of the term "economic loss doctrine" is no substitute for a reasoned analysis as to why it should be applied here.

For that reason, with respect to claims for tortious interference with contract, the Pennsylvania Superior Court has expressly distinguished between negligent interference and intentional interference, holding that the doctrine bars the former, but not the latter. *Aikens v. Baltimore & Ohio R. Co.*, 348 Pa. Super. 17, 20, 501 A.2d 277, 278 (1985) ("[R]ecovery for purely economic loss occasioned by tortious interference with contract or economic advantage is not available under a negligence theory. A cause of action exists in this situation only if the tortious interference was intentional or involved parties in a special relationship to one another.") (Citation omitted). Here, Plaintiff asserts no claim of negligence, and Statoil nowhere suggests that she does.

Finally, Plaintiff's claims are not barred by the statute of limitations. "As with breach of contract, the statute of limitations for tortious interference with contract begins to run when the cause of action accrues." *CGB Occupational Therapy, Inc. v. RHA/Pennsylvania Nursing Homes*, C.A. No. 00-4918, 2001 WL 1549824, at *3 (E.D.Pa. Dec. 5, 2001). The limitations period runs when there is an actual breach of the contract (*id.*), or "upon discovery of the

---

[16] For this reason, *Werwinski v. Ford Motor Company*, 286 F.3d 661 (3d Cir. 2002), a case involving fraud in the inducement, is similarly not implicated, assuming that *Werwinski* is still controlling. *See*, *Ridolfi v. State Farm Mutual Automobile Ins. Co.*, 146 F.Supp.3d 619, 626-27 (M.D.Pa. 2015), comparing cases.

allegedly interfering acts or when the allegedly interfering acts should have been discovered with reasonable diligence." *Bickell v. Stein*, 291 Pa.Super. 145, 435 A.2d 610, 612 (1981).

As noted above, a new breach occurs whenever an improper payment is made. Accordingly, at a minimum, claims within the two-year period prior to this suit are clearly timely. *W.W. McDonald Land Co. v. EQT Production Co.*, 983 F.Supp.2d at 811. As with the contract claim, if this Court is inclined to entertain Statoil's motion on statute of limitations grounds, it should do so only after a full evidentiary record is established.

Finally, NG argues that Plaintiff has failed to plead the elements of tortious interference. It argues that Plaintiff fails to allege that NG acted with an "intent to harm" her and that its conduct is privileged.[17] This Court rejected similar claims in *Suessenbach Family Ltd. P'ship*, No. 3:14-1197, 2015 WL 1470863 at * 20 (M.D.Pa. Mar. 31, 2015) ("[K]nowingly misusing another's property for one's own ends qualifies as malice. See *e.g.*, *Strayer v. Bare*, No. 1:06-2068, 2008 WL 1924092 (M.D.Pa. April 28, 2008).").

## IV.    PLAINTIFF'S CAUSE OF ACTION FOR UNJUST ENRICHMENT SHOULD NOT BE DISMISSED

Unjust enrichment and breach of contract may be plead simultaneously under both federal and Pennsylvania law. See, *Cornell Cos. v. Borough of New Morgan*, 512 F. Supp. 2d 238, 265 (E.D. Pa. 2007);*18 KT.TV, LLC v. Entest Biomedical, Inc.*, No. 3:11cv244, 2011 U.S. Dist. LEXIS 128435, at *16 (M.D. Pa. Nov. 7, 2011); *Muschlitz Excavating, Inc. v. Gary J. Strausser Homebuilders, Inc.*, 36 Pa. D. & C.5th 116, 127-28 (C.P. 2014) ("[a] plaintiff may plead unjust enrichment in the alternative along with a claim for breach of contract. . . . [Pennsylvania Rule] of Civil Procedure 1020(c) specifically provide[s] for the alternative

---

[17] It also argues that Plaintiff was not damaged, because the breach of contract damaged her, a reframing of her gist-of-the-action argument, and one that could be made by every defendant who tortuously interfered with a contract.

pleading of causes of action.") (internal citations and quotations omitted). At the motion to dismiss stage, a claim for unjust enrichment is clearly an appropriate alternate avenue of relief for Plaintiffs to seek.

A benefit was conferred on the Defendants, *i.e.*, excess royalty payments, which the Defendants inequitably accepted, appreciated, and retained. *Bill Goodwin Const., LLC v. Wondra Const., Inc.*, No. 3:13cv157, 2014 WL 1415078 at *7 (M.D.Pa. Apr. 10, 2014). When the Defendants manipulated gas sales in order to decrease royalty owners' payments, they, but particularly ASA and NG, were unjustly enriched. Thus, the claim for unjust enrichment should stand.

## V.   PLAINTIFF STATES A CLAIM FOR ACCOUNTING

In order to establish the right to an accounting in a breach of contract case, a Plaintiff must demonstrate that:

"(1) there was a valid contract, express or implied, between the parties whereby the defendant:

(a) received monies [in any capacity] whereby the relationship created by the contract imposed a legal obligation upon the defendant to account to the plaintiff for monies received by the defendant, or

(b) if the relationship created by the contract between the plaintiff and defendant created a legal duty upon the defendant to account and the defendant failed to account and the plaintiff is unable, by reason of the defendant's failure to account, to state the exact amount due to him, and

(2) that the defendant breached or was in dereliction of his duty under the contract."

*Pollock v. Energy Corp. of Am.*, No. 10-1553, 2011 U.S. Dist. LEXIS 93616, at *22-23 (W.D. Pa. June 27, 2011).

The Gas Lease creates a lessor-lessee relationship between the parties. The Gas Lease provides a detailed description of how landowners' royalty payments should be calculated. See Complaint at ¶¶ 1, 8, 18-22. Defendants were obligated to account to Plaintiff for the revenue realized, and calculate their royalty payments therefrom, thus satisfying the first element of a proper claim for an accounting. The Complaint specifically alleges that Defendants have failed to calculate royalty payments based on accurate revenue realized figures, thus satisfying the second element of a proper claim for an accounting. See Complaint at ¶ 27.

Pennsylvania district courts have previously upheld claims for accounting at the motion to dismiss stage. In a case regarding the underpayment of royalties under gas leases, the court recognized that a demand for an accounting "presupposes that the party seeking the information does not know certain essential facts." *(Id.)*. Thus, the court applied a "more lenient standard." *(Id.)*. The same leniency should be applied here, and Plaintiffs' claim for an accounting should not be dismissed.

## <u>CONCLUSION</u>

For all of the reasons set forth above, Defendants' motions should be denied in all

respects.

Dated:  August 22, 2016
        Peckville, Pennsylvania


Respectfully submitted,


MAZZONI, KARAM, PETORAK & VALVANO
By:


*Gerard M. Karam*
Gerard M. Karam, Esq. #49625
Mazzoni, Karam, Petorak & Valvano
Suite 201, Bank Towers
321 Spruce Street
Scranton, PA 18503
(570) 348-0776
gmk@mkpvlaw.com
*Attorneys for Plaintiff*


THE CLARK LAW FIRM, P.C.

By:


*Douglas A. Clark*
Douglas A. Clark, Esq.
THE CLARK LAW FIRM
P.A. Supreme Court I.D. #76041
1563 Main Street
Peckville, PA 18452
(570) 307-0702
clarkesquire@comcast.net
*Attorneys for Plaintiff*

OF COUNSEL:

FRANCIS P. KARAM, ESQ. PC
Francis P. Karam
175 Varick Street
New York, NY 10014
(212) 489-3900
frank@karamlaw.com

CHITWOOD HARLEY HARNES LLP
John F. Harnes, Esq.
Gregory E. Keller, Esq.
79 Madison Avenue
New York, NY 10016
(917)595-4600
jfharnes@chitwoodlaw.com
gkeller@chitwoodlaw.com

## CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.8(b)

Pursuant to Local Rule 7.8(b), and Court Order (ECF Doc. No. 39), I

hereby certify that the within brief contains 12,865 words.

Respectfully submitted,

*Gerard M. Karam*

Gerard M. Karam, Esq. #49625
Mazzoni, Karam, Petorak & Valvano
Suite 201, Bank Towers
321 Spruce Street
Scranton, PA 18503
(570) 348-0776
gmk@mkpvlaw.com
*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on August 22, 2016, I electronically filed this Opposition to Defendants' Motions to Dismiss with the Clerk of the Court of the United Stated District Court for the Middle District of Pennsylvania using the CM/ECF system, which will alert all counsel of record of such filing.

Respectfully submitted,

*Gerard M. Karam*

Gerard M. Karam, Esq. #49625
Mazzoni, Karam, Petorak & Valvano
Suite 201, Bank Towers
321 Spruce Street
Scranton, PA 18503
(570) 348-0776
gmk@mkpvlaw.com
*Attorneys for Plaintiff*