**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **CHERYL B. CANFIELD,** | : | |
| **Plaintiff** | : | **CIVIL ACTION NO. 3:16-0085** |
| **v.** | : | **(JUDGE MANNION)** |
| **STATOIL USA ONSHORE PROPERTIES INC., STATOIL NATURAL GAS LLC, and STATOIL ASA,** | : : | |
| **Defendants.** | : | |

## MEMORANDUM

Currently before the court are a motion to dismiss filed by defendant Statoil Natural Gas LLC ("SNG"), (Doc. 25), and a motion to dismiss filed by defendants Statoil USA Onshore Properties, Inc. ("SOP") and Statoil ASA ("Statoil ASA"), (Doc. 31). The defendants' motions seek dismissal of all of the putative class actions claims brought by plaintiff Cheryl B. Canfield ("Canfield"), as detailed in her complaint, (Doc. 1). SOP and SNG are both wholly owned, indirect subsidiaries of Statoil ASA.[1] Canfield is the lessor of a lease currently held, in part, by lessee SOP. Having reviewed the parties submissions regarding Canfield's putative class action claims, and based on

---

[1] According to the disclosure statement filed with the court pursuant to Federal Rule of Civil Procedure 7.1, SOP's direct parent is Statoil USA Properties Inc. and Statoil ASA indirectly owns stock in SOP, presumably through ownership of Statoil USA Properties Inc. (*See* Doc. 13). The court will presume that Statoil ASA wholly owns SOP's parent corporation, Statoil USA Properties Inc., in accordance with the facts stated in Canfield's complaint. SNG's Rule 7.1 disclosure statement indicates that SNG is jointly owned by two entities, Statoil US Holdings Inc. and Statoil Norsk LNG AS. (*See* Doc. 12). Both of these entities are wholly owned by Statoil ASA. (*Id.*).

the foregoing, SNG's motion, (Doc. 25), is **GRANTED** in its entirety and Statoil ASA's and SOP's motion, (Doc. 31), is **GRANTED IN PART** and **DENIED IN PART**.

## I.     FACTUAL BACKGROUND[2]

Canfield is the owner of property located at 3835 State Route 3004, Meshoppen, Pennsylvania in the Marcellus Shale region. The Marcellus and Utica shale regions in and around Pennsylvania contain one of the largest natural gas formations in the world. On May 6, 2008, Canfield entered into an oil and gas lease with Cabot Oil & Gas Corporation ("Cabot Oil") for the exploration of oil and natural gas on her land. Her lease was subsequently acquired in part by defendant SOP, in part by Chesapeake Appalachia, L.L.C. ("Chesapeake"), and in part by Epsilon Energy Ltd. Although Canfield's complaint, (Doc. 1), asserts various claims against the defendants, her dispute primarily revolves around the royalty clause in her lease agreement as it has been interpreted by lessee SOP.

---

[2] All facts are taken from the plaintiff's complaint, (Doc. 1), unless otherwise noted. The facts alleged in the complaint must be accepted as true in considering the defendants' motions to dismiss. *See Dieffenbach v. Dept. of Revenue, 490 F. App'x 433, 435 (3d Cir. 2012); Evancho v. Evans, 423 F.3d 347, 350 (3d Cir. 2005).* The court will, however, look outside the pleadings and look to other evidence submitted by the parties to establish any facts needed to rule on Statoil ASA's jurisdictional arguments.

## A.    Canfield's Oil & Gas Lease

The royalty clause in Canfield's lease provides for both an in-kind percentage of oil or natural gas products to be delivered to Canfield's tank and for a percentage of the "amount realized" from the sale of any oil or natural gas products extracted from her land.[3] Specifically, clause three of the lease provides as follows:

> Lessee . . . **shall pay the Lessor** on gas, including casinghead gas and other gaseous substances, produced and sold from the premises **fifteen percent (15%) of the amount realized from the sale of gas at the well. "The amount realized from the sale of the well" shall mean the amount realized from the sale of the gas after deducting gathering, transportation, compression, fuel, line loss, and any other post-production costs and/or expenses incurred for the gas whether provided by a third party, Lessee or by a wholly owned subsidiary of Lessee.** Lessee is authorized by Lessor to provide gathering, transportation, compression, fuel, and other services for Lessor's gas either on its own or through one or more wholly owned subsidiaries of Lessee and to deduct from the royalty to be paid to the Lessor the costs and/or expenses of providing such services including, without limitation, line-loss.

(Doc. 1-2, at 1, ¶3) (emphases added).

The above language in Canfield's royalty clause allowed for the deduction of post-production fees. Post-production fees are normally incurred in order to transform the raw natural gas product into a finished, marketable product to be sold downstream in the commercial chain. (*See* Doc. 1, at ¶30). A superceding addendum to the primary lease document that was attached

---

[3] It is unlikely that Canfield receives her in-kind percentage of natural gas. (*See* Doc. 1-2, at 3 ¶10 (providing for payment "in lieu of supplying 'free gas'")). Generally, it is impractical for a landowner to take an in-kind portion of natural gas as it is a raw, unfinished product that is not suitable for usage. *See, e.g., Akin v. Marshall Oil Co., 41 A. 748 (Pa. 1989).*

to the lease and signed and dated the same day as the initial lease document modified the original lease terms. (Doc. 1-2, at 3–4). The addendum states that if there are any inconsistences between the added terms in the addendum and the printed lease terms, the added terms will control and supercede the printed terms of the lease. (*Id*. at 3). Within this addendum is a "ready for sale or use clause" directing the lessee to exclude any production or post-production costs in its calculation of royalties, stating as follows:

> Royalties shall be paid without deductions for the cost of producing, gathering, storing, separating, treating, dehydrating, compressing, transporting, or otherwise making the oil and/or gas produced from the lease premises ready for sale or use.

(*Id*. at 4, ¶13).[4] This language modified the royalty provision of the lease, and expressly provides that the lessee shall not deduct certain post-production fees.

---

[4] Canfield describes this clause as a "Market Enhancement Clause" and suggests that this clause allows lessee Chesapeake to deduct costs incurred between the well and the downstream sale.  (Doc. 1, at 12 n. 3). However, the express language of the clause provides that "[r]oyalties shall be paid *without deductions* for the cost . . . [to make] the oil and/or gas produced from the lease premises *ready for sale or use*." (*Id*. at 4 ¶13) (emphases added). While the lessee may be entitled to deduct any costs after the product is "ready for sale or use" or marketable, this clause expressly disallows any deductions before that point. Thus, what Chesapeake is allowed to deduct requires a more thorough inquiry and precise knowledge of the point at which the product is ready for sale or use. More importantly, this clause does not verify Chesapeake's alleged method of computing royalties.

## B.    The Relationship Between Canfield and the Statoil Entities

Though Canfield originally entered into the lease agreement with Cabot Oil, at some time in or around 2006, Chesapeake engaged in an aggressive lease acquisition program to exploit natural gas from properties in the Marcellus shale region, which included Canfield's property. At some point after she had entered into the agreement with Cabot Oil in 2008, Canfield's lease was transferred to Chesapeake, presumably as part of Chesapeake's overall plan to acquire leasehold interests in the area. In or around November 2008, Chesapeake also entered into industry participation agreements or joint venture agreements with SOP.[5] Under this agreement, SOP was to receive a minority interest in Chesapeake's holdings, including its lease interests. In return, SOP was to provide Chesapeake with an up front cash payment and would finance 75% of Chesapeake's drilling and completion costs until $2.125 billion had been paid. Canfield is unsure whether her specific lease was assigned to SOP from Chesapeake pursuant to this joint venture agreement or if an assignment to SOP occurred simultaneously with the assignment to Chesapeake from Cabot Oil. In any event, both companies now own a partial interest in her lease originally entered into with Cabot Oil.

---

[5] Canfield frequently refers to the defendants collectively as Statoil, with no distinction between the entities. However, based on the extensive arguments by the parties it is clear that neither Cabot Oil or Chesapeake assigned any part of Canfield's lease interest to SNG or Statoil ASA. The only party to the assignment was SOP and the remaining defendants are implicated by virtue of their corporate relationship to SOP. (*See also* Doc. 1, ¶1).

SOP's natural gas operations are distinct, however, from Chesapeake's operations, which ultimately results in noticeably different royalty payments to Canfield. Upon extraction at the wellhead, SOP takes title to its in-kind percentage of the natural gas extracted from Canfield's land and immediately sells the natural gas to its own affiliate, defendant SNG, pursuant to an agreement between the two entities.[6] Under this agreement, SNG takes title to the raw product at the wellhead and then contracts with third parties for post-production services, transforming the raw product into a finished product. SNG also contracts with pipeline companies to transport the natural gas through the interstate pipeline system. SNG, ultimately, resells the final product to third-party buyers at receipt/delivery gates along the interstate system, at Citygates. Thus, SOP holds the lease interests for immediate sale and SNG serves as a marketing company, taking title at the well, transforming the product into a finished one, and then selling the post-production product to distribution companies, industrial customers, and power generators downstream.

Partly at issue in this action is the agreement between SOP and SNG for the price of the raw natural gas at the wellhead where title is transferred

---

[6] Canfield's complaint is unclear with respect to SOP's role. Canfield is unsure if her own lease was acquired by virtue of the industry participation agreement with Chesapeake or through an assignment from Cabot Oil. (Doc. 1, at ¶15). Thus, with respect to her lease, it is unclear if SOP actually produces the gas or simply holds title to the product and allows Chesapeake to serve as producer or "operator" and bear all production costs—costs incurred to extract the product from the land. This should, ultimately, be clarified through discovery.

from SOP to SNG. Their agreement fixes the price of the raw natural gas to a uniform hub price or index price for natural gas, regardless of whether the natural gas is ever delivered to that particular hub on the interstate pipeline system. SOP does not dispute that it fixes the price at the wellhead to an index price. The Fifth Circuit Court of Appeals has explained the use of index prices as follows:

> Natural gas is transported throughout North America via a network of pipelines. The gas transportation network is centered around 'hubs,' which are geographical locations where major pipeline systems interlink. These hubs act as separate markets, at which supply and demand dictate prices that may differ between the hubs.
>
> * * *
>
> The market index prices for physical gas are most prominently published in two privately owned newsletters: [Platts'] *Inside FERC Gas Market Report* ("*Inside FERC*") and *Natural Gas Intelligence* ("*NGI*"). Both of these publications publish the natural gas price marketing indicators at the major pipeline hubs and market centers in the United States, and it is undisputed that both publications are highly influential to market prices for physical gas. The indexes are also used to determine royalties and public gas contracts, among other things. The publications gather pricing information about the various markets and pipeline hubs by requesting data about physical gas transactions from natural gas traders. After receiving data from the gas traders, and taking a variety of other factors into account, the publications release indexes that purport to represent the price of natural gas at different delivery points.

*United States v. Brooks*, 681 F.3d 678, 685 (5th Cir. 2012).

In or around April 2010, SOP and SNG began using this index price as opposed to what Canfield describes as an "actual negotiated price" at the direction of Statoil ASA. (Doc. 1, at 26). Canfield alleges that the original hub price was set at the Dominion South Point Hub ("DSPH"), with this hub

changing to the Tennessee Zone 4 "300 Leg" index price or hub in or around September 2013. Canfield's royalties are calculated using this fixed, index price.

In contrast to SOP, Chesapeake pays a royalty to leaseholders based on a price paid by third-parties downstream of the wellhead. Chesapeake's royalty price is, thus, based on the final natural gas product after the deduction of post-production costs and is calculated using the sale price of the finished product. Like SOP, Chesapeake also deals with an affiliate marketing entity. This marketing entity aggregates all the natural gas held under various leases and sells it downstream from the well. To calculate royalties to landowners, Chesapeake uses a weighted average sales price ("WASP") that uses prices paid by downstream buyers. According to Canfield, Chesapeake also deducts any costs incurred for post-production services before calculating royalties—*i.e.*, usage of the net-back method to arrive at a wellhead price.

The differences in Chesapeake's royalty calculation compared to SOP's calculation results in a different price paid to leaseholders, including Canfield, dependant on whether or not the lessee is Chesapeake or SOP. This is true even though the underlying lease is the same. As an illustration of this point, Canfield provided tables of her royalty unit payments for the months of September 2013 through September 2015. These payments were calculated using a per metric cubic foot (mcf) measurement of natural gas extracted from Canfield's land. The tables indicate that during nearly all of the months from

September 2013 to September 2015, with the exception of December 2014, Canfield received a higher royalty per mcf of natural gas extracted from her land from Chesapeake as compared to SOP. Thus, Chesapeake's different interpretation of the same lease agreement has led to a divergence in royalties payments to Canfield for the same quantities of natural gas even though both entities' lease document is held by the same lessor and contains the same royalty provision.

## II.    PROCEDURAL BACKGROUND

On January 15, 2016, Canfield filed a putative class action complaint against Statoil ASA, SOP, and SNG alleging seven separate causes of action. Three of these claims were solely against SOP. In her first claim, Canfield alleged that SOP breached the express terms of the royalty clause in her lease agreement by using an index price that did not reflect an actual market price for natural gas. In her second claim, Canfield alleged that SOP breached the lease by engaging in an affiliate sale with SNG which did not constitute an "arms'-length transaction." (Doc. 1, ¶40). In her fourth claim, Canfield alleged that SOP breached the implied covenant of good faith and fair dealing in the lease by engaging in an affiliate sale. She also alleged that SOP "had an obligation to use reasonable best efforts to market the gas to achieve the best price available." (*Id*. ¶50). Thus, the fourth claim is a duty of good faith claim and/or a duty to market claim.

Several claims were brought against all the defendants collectively. In her third claim, Canfield brought a civil conspiracy claim, alleging that the defendants "acted together with a common purpose to unlawfully cheat Landowners and their contractual rights" by orchestrating "sham sale transactions among themselves." (*Id.* ¶¶45–50). In her fifth claim, Canfield brought a quasi-contract claim against all the defendants alleging they were unjustly enriched. In her seventh claim, Canfield sought an accounting against all of the defendants for gas and royalty calculations.

Canfield brought one claim against Statoil ASA and SNG alone. In this sixth claim, Canfield alleged that Statoil ASA and SNG tortiously interfered with her contract/lease with SOP by "deliberately and without justification" causing SOP to breach the gas lease. (*Id*. ¶59).

In response to Canfield's complaint, on July 9, 2016, SNG filed one of the current motions to dismiss and a supporting brief. (Doc. 25, Doc. 26). Also on July 9, 2016, SOP and Statoil ASA, collectively, filed a motion to dismiss with a supporting brief. (Doc. 31, Doc. 32). The defendants' motions seek dismissal of all the claims in Canfield's complaint. Unique among the defendants, Statoil ASA primarily seeks dismissal pursuant to Federal Rules of Civil Procedure 12(b)(1), 12(b)(2), and 12(b)(5), arguing that this court lacks subject-matter over claims against the entity and lacks personal jurisdiction over the entity. Statoil ASA's subject-matter jurisdiction argument is premised on its alleged immunity from suit under the Foreign Sovereign Immunities Act of 1976 ("FSIA"), Pub. L. No. 94-583, 90 Stat. 2891 (codified

at and amending scattered sections of 28 U.S.C.). In addition, and in the alternative for Statoil ASA, the defendants seek dismissal pursuant to Federal Rule of Civil Procedure 12(b)(6), arguing that Canfield has failed to state any plausible claim.

On August 22, 2016, after requesting and receiving an extension of time, Canfield filed a brief in opposition to the defendants motions. (Doc. 40). On September 30, 2016, after requesting and receiving an extension of time, SNG filed a reply brief in support of its motion, (Doc. 45), and SOP and Statoil ASA filed their own, separate reply brief in support of their motion, (Doc. 46). On November 23, 2016, over six weeks after the defendants had filed their reply briefs, Canfield filed a motion for leave to file a sur-reply to the defendants' reply briefs. (*See* Doc. 56). SOP and Statoil ASA opposed this request. (*See* Doc. 57, Doc. 60). The court denied Canfield's request to file a sur-reply because it was untimely, not in compliance with local rules, and not warranted. (*See* Doc. 66, Doc. 67). The defendants' motions are, thus, ripe for review.

## III.   STATOIL ASA'S JURISDICTIONAL CHALLENGE

Statoil ASA challenges the subject-matter and personal jurisdiction of this court. Canfield alleges in her complaint that subject-matter jurisdiction is premised on 28 U.S.C. §1332 and that all of the defendants' business activities are "within the flow of, and have affected substantially, interstate trade and commerce." (Doc. 1, ¶7). However, Statoil ASA is a Norwegian

corporation with its principle office located in Stavanger, Norway and, based on a 2014 Form 20-F SEC filing attached to Statoil ASA's motion to dismiss, the Kingdom of Norway owns a two-thirds direct ownership interest in the company. (Doc. 32-2, at 10). Based on this information, both parties agree that Statoil ASA is an instrumentality of the Kingdom of Norway as defined by the FSIA[7] and that jurisdiction over such an entity is only proper under 28 U.S.C. §1330. Thus, Canfield's jurisdictional statement is clearly deficient.

Assuming this court would allow the plaintiff to cure the technical deficiency in her jurisdictional statement, the only remaining issue is whether Canfield's claims against Statoil ASA fit within an exception to FSIA immunity, vesting this court with subject-matter jurisdiction. Also at issue is whether Statoil ASA was properly served and whether Statoil ASA maintained sufficient minimum contacts with the forum to satisfy the constitutional requirements of personal jurisdiction. Based on the foregoing, the court finds that it lacks subject-matter over Canfield's claims against Statoil ASA and lacks personal jurisdiction over Statoil ASA.

---

[7] *See* 28 U.S.C. 1603(a),(b)(2) (including an instrumentality of a foreign state within the definition of a "foreign state" and defining an instrumentality of a foreign state as any entity with a majority share owned by a foreign state or political subdivision of a foreign state).

## A.    Standards of Review

### i.    Rule 12(b)(1)

Rule 12(b)(1) provides for the dismissal of a complaint based on a "lack of subject-matter jurisdiction." FED. R. CIV. P. 12(b)(1). "A motion to dismiss under Rule 12(b)(1) challenges the jurisdiction of the court to address the merits of the plaintiff's complaint." *Vieth v. Pennsylvania*, 188 F. Supp. 2d 532, 537 (M.D. Pa. 2002). Because the district court is a court of limited jurisdiction, the burden of establishing subject-matter jurisdiction always rests upon the party asserting it. *See Kokkonen v. Guardian Life. Ins. Co. of America*, 511 U.S. 375, 377 (1994). Generally, however, district courts "enjoy substantial flexibility in handling Rule 12(b)(1) motions." McCann v. Newmann *Irrevocable Trust*, 458 F.3d 281, 290 (3d Cir. 2006).

An attack on the court's jurisdiction may be either "facial" or "factual" and the "distinction determines how the pleading must be reviewed." *Constitution Party of Pennsylvania v. Aichele*, 757 F.3d 347, 357 (3d Cir. 2014). A facial attack tests the sufficiency of the pleadings, while a factual attack challenges whether a plaintiff's claims fail to comport factually with jurisdictional prerequisites. *Id.* at 358; *see also S.D. v. Haddon Heights Bd. of Educ.*, 833 F.3d 389, 394 n. 5 (3d Cir. 2016). If the defendant brings a factual attack, the district court may look outside the pleadings to ascertain facts needed to determine whether jurisdiction exists, which is distinct from a facial attack. *Id.* If there are factual deficiencies, the court's jurisdictional

determination may require a hearing, particularly where the disputed facts are material to finding jurisdiction. *McCann*, 458 F.3d at 290.

With regard to facial deficiencies, "[d]efective allegations of jurisdiction may be amended, upon terms, in the trial or appellate courts" to fix jurisdictional defects in a pleading. 28 U.S.C. §1653. "Section 1653 gives both district and appellate courts the power to remedy inadequate jurisdictional allegations, but not defective jurisdictional facts." *USX Corp. v. Adriatic Ins. Co.*, 345 F.3d 190, 204 (3d Cir. 2003). Further, a district court may be abusing its discretion by not allowing a plaintiff the opportunity to cure technical deficiencies in the jurisdictional statements found in the plaintiff's complaint. *See Scattergood v. Perelman*, 945 F.2d 618, 627 (3d Cir. 1991)."The court should freely give leave [to amend] when justice so requires." FED. R. CIV. P. 15(a)(2).

### ii.    Rule 12(b)(2) and Rule 12(b)(5)

Rule 12(b)(2) provides for the dismissal of a complaint due to a "lack of personal jurisdiction." FED. R. CIV. P. 12(b)(2).

> To survive a motion to dismiss for lack of personal jurisdiction, a plaintiff bears the burden of establishing the court's jurisdiction over the moving defendants. However, when the court does not hold an evidentiary hearing on the motion to dismiss, the plaintiff need only establish a prima facie case of personal jurisdiction and the plaintiff is entitled to have its allegations taken as true and all factual disputes drawn in its favor.

*Miller Yacht Sales, Inc. v. Smith*, 384 F.3d 93, 97 (3d Cir. 2004) (internal citation omitted). "Once these allegations are contradicted by an opposing

affidavit, however, plaintiff must present similar evidence in support of personal jurisdiction." *In re Chocolate Confectionary Antitrust Litig.*, 674 F. Supp. 2d 580, 595 (M.D. Pa. 2009). The plaintiff will not be able to rely on the bare pleadings alone. *Id.* "Once the motion is made, plaintiff must respond with actual proofs, not mere allegations." *Patterson ex rel. Patterson v. F.B.I.*, 893 F.2d 595, 604 (3d Cir. 1990) (quoting *Time Share Vacation Club v. Atlantic Resorts, Ltd.*, 735 F.2d 61, 67 n. 9 (3d Cir. 1984)). Courts may look beyond the pleadings when ruling on a motion brought under Rule 12(b)(2). *In re Chocolate Confectionary Antitrust Litig.*, 674 F. Supp. 2d at 595. "A Rule 12(b)(2) motion . . . is inherently a matter which requires resolution of factual issues outside the pleadings." *Patterson*, 893 F.2d at 603 (quoting *Time Share Vacation Club*, 735 F.2d at 67 n. 9). Thus, "[c]onsideration of affidavits submitted by the parties is appropriate and, typically, necessary." *In re Chocolate Confectionary Antitrust Litig.*, 674 F. Supp. 2d at 595.

Rule 12(b)(5) provides for the dismissal of a complaint based on "insufficient service of process." FED. R. CIV. P. 12(b)(5). "The party asserting the validity of service bears the burden of proof on that issue." *Kohar v. Wells Fargo Bank, N.A.*, No. 15-1469, 2016 WL 1449580, at *2 (W.D. Pa. April 13, 2016) (quoting *Grand Entm't Grp., Ltd. v. Star Media Sales, Inc.*, 988 F.2d 476, 488 (3d Cir. 1993)). "That party must do so by a preponderance of the evidence using affidavits, depositions, and oral testimony." *Id.*

However, where an objection has been raised under Rule 12(b)(2) based on a lack of personal jurisdiction, a defendant need not raise a

separate personal jurisdiction objection based on insufficient service; a defendant is not required to raise an identical objection twice. *McCurdy v. Am. Bd. of Plastic Surgery*, 157 F.3d 191, 196 (3d Cir. 1998). "Where personal jurisdiction is lacking, '[c]learly, a Rule 12(b)(2) motion . . . [is] more appropriate' than one under Rule 12(b)(5)." *Id.* (quoting 5A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure: Civil* §1353 at 278–79 (2d ed. 1990)) (alterations in original). Under the FSIA, proper service is a prerequisite to personal jurisdiction. *See* 28 U.S.C. §1330(b). Thus, Statoil ASA's service argument is simply an alternative basis for finding a lack of personal jurisdiction and will be treated as such.

### B.    Subject-Matter Jurisdiction

Statoil ASA's attack on subject-matter jurisdiction is both facial and factual. Statoil ASA argues that Canfield's complaint is deficient with respect to asserting jurisdiction over a foreign instrumentality. Statoil ASA also argues that it is presumptively entitled to immunity under the FSIA. Canfield has argued that an exception to immunity applies based on the relationship between Statoil ASA and its indirect subsidiaries. The court, however, finds that it lacks subject-matter jurisdiction over the claims against Statoil ASA.

The FSIA "provides the sole basis for obtaining jurisdiction over a foreign state[, including an instrumentality of a foreign state,] in the courts of this country." *OBB Personenverkehr AG v. Sachs*, 136 S. Ct. 390, 393 (2015) (quoting *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428,

443 (1989)). Once an entity is determined to be a foreign state for purposes of the FSIA, the entity is "presumptively immune from the jurisdiction of United States courts" unless an exception to the FSIA applies. *Id.* (quoting *Saudi Arabia v. Nelson,* 507 U.S. 349, 355 (1993)); *see also Fed. Ins. Co. v. Richard I. Rubin & Co.*, 12 F.3d 1270, 1285 (3d Cir. 1993). After presumptive immunity is found, the burden of production then shifts to the plaintiff to show an exception applies. *Fed. Ins. Co.*, 12 F.3d at 1285; *see also Richardson v. Donovan*, No. 14-3753,__F. App'x__, 2016 WL 7240172, at *2 (3d Cir. Dec. 15, 2016) (non-precedential). However, the ultimate burden of proving immunity, that of persuasion, always remains with the party seeking immunity. *Id.* The parties agree that Statoil ASA is an instrumentality of a foreign state and is, therefore, presumptively immune from suit.

Based on the above alone, the court agrees with Statoil ASA that Canfield's complaint is facially deficient. It does not reference the FSIA or the specific exception that applies. *See* FED. R. CIV. P. 8(a)(1) (providing that a pleading must contain "a short and plain statement of the grounds for the court's jurisdiction"). However, as further discussed below, an exception may or may not apply based on the allegation in Canfield's complaint that Statoil ASA "exercised complete control" over SNG and SOP and "directed the activities" of these indirect subsidiaries to "maximize its own corporate profits." (Doc. 1, ¶3). Canfield has argued extensively in her opposition brief that an exception does apply, in part, based on this language. If the facial deficiency were the end of the matter the court would grant Canfield leave to amend her

complaint to include an FSIA exception in the spirit of Rule 15(a)(2). However, based on the arguments presented by both parties, the court finds that Canfield's argument for subject-matter jurisdiction is also factually deficient and that no FSIA exception applies.

Canfield argues that the commercial activity exception, 28 U.S.C. §1605(a)(2), applies to save her claims against Statoil ASA. Despite the varying degrees of ownership and their separate corporate status, Canfield asserts in her complaint that Statoil ASA "exercised complete control" over SNG and SOP and "directed the activities" of these indirect subsidiaries. (Doc. 1, ¶3). Canfield argues that this conduct is sufficient to satisfy the commercial activity exception. Statoil ASA argues that this conduct is not sufficient and that in the event Canfield seeks to use an alter ego theory to impute the actions of SOP and SNG to Statoil ASA this attempt should fail.

The FSIA provision granting courts with subject-matter jurisdiction provides as follows:

> The district courts shall have original jurisdiction without regard to amount in controversy of any nonjury civil action against a foreign state as defined in section 1603(a) of this title as to any claim for relief in personam with respect to which the foreign state is not entitled to immunity either under sections 1605–1607 of this title or under any applicable international agreement.

28 U.S.C. §1330(a). Thus, subject-matter jurisdiction is defined in the negative to capture all foreign states who are not immune based on an enumerated exception. Canfield relies on the commercial activity exception to save her claims. *See* 28 U.S.C. §1605(a)(2). This exception provides three

distinct circumstances where a foreign state will not be immune. It provides that a foreign state will not be immune when the action is:

(1)   based upon a commercial activity carried on in the United States by the foreign state; or

(2)   based upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or

(3)   based upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States.

*Id*.

The phrase "commercial activity" arises in each of the three types of conduct described in the commercial activity exception and is a crucial element to obtaining subject-matter jurisdiction. *Velidor v. L/P/G Benghazi, 653 F.2d 812, 817 (3d Cir. 1981)*. The FSIA defines commercial activity as "either a regular course of commercial conduct or a particular transaction or act." 28 U.S.C. §1603(d). The definition goes on to state that "[t]he commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose." *Id.* The Supreme Court of the United States has defined this phrase further, particularly the term commercial, to comply with the restrictive theory of foreign sovereign immunity that was prevalent during the time of the statute's enactment. *Republic of Argentina v. Weltover, 504 U.S. 607, 612–13 (1992)*. Under the Supreme Court's definition of the term, "when a foreign government acts, not as regulator of market, but in the manner of a private player within it, the foreign sovereign's actions are

'commercial' within the meaning if the FSIA." *Id*. at 614. The important inquiry is not the profit motive or lack thereof of the foreign state, but whether the particular action is the type of action a private party would engage in. *Id*.; *Nelson*, 507 U.S. at 358–362.

Each of the three clauses also requires that the action be "based upon" the activity or act conferring jurisdiction. 28 U.S.C. §1605(a)(2). In *Saudi Arabia v. Nelson*, the Court compared the phrase "based upon a commercial activity" in the first clause to the "based upon" language as applied to the second and third clause. 507 U.S. at 358. Unlike the first clause, the second and third clauses simply require an action "based upon" acts performed "in connection with" some commercial activity. 28 U.S.C. §1605(a)(2). Analyzing these distinctions, the Court found that the "based upon" language as applied to the first clause required that there be "more than a mere connection with, or relation to commercial activity." *Id.* In *OBB Personenverkehr AG v. Sachs*, the Court further defined the "based upon" language as applied to the first clause to mean that, in order to fall within the first clause, the commercial activity must form the "gravamen" or "core" of the claim when looking at the particular activity or conduct underlying the plaintiff's claim. 136 S. Ct. at 395–97.

Canfield relies on the first clause of the commercial activity exception.[8] Canfield's brief in opposition provides various types of activities engaged in by the defendants to try and qualify Statoil ASA's conduct under this particular exception. Some of these activities include:

(1)    Statoil ASA's "directing" or "controlling" the conduct of SOP and SNG, (Doc. 40, at 8);

(2)    SOP's purchase of natural gas from landowners, (*Id*. at 9);

(3)    SOP's resale of natural gas to SNG, (*Id*.);

(4)    SOP's royalty payment to Canfield, (*Id*.); and

(5)    Statoil ASA's alleged tortious interference with Canfield's gas lease, (*Id*.).

Statoil ASA's alleged tortious interference itself is not commercial activity and, thus, can never qualify under the commercial activity exception. *See Nelson*, 507 U.S. at 358 (finding that the defendant's "tortious conduct itself fail[ed] to qualify as 'commercial activity' within the meaning of the [FSIA]"). Statoil's "directing" or "controlling" of Statoil ASA are, allegedly, the

---

[8] As Statoil ASA notes in its reply brief, in a single instance Canfield suggests that "at a minimum" Statoil ASA "caused a direct injury in the United States." (Doc. 40, at 10). Even if the court were to construe this single allegation as an argument under the third clause of the commercial activity exception it would fail. The third clause requires activity outside of the United States. 28 U.S.C. §1605(a)(2). Canfield has not explained what outside commercial activity she might be referring to. Instead, the majority of Canfield's argument and the subheading in her brief suggest that all of the alleged activity occurred within the United States, bringing it under the first clause alone.

tortious actions. Again, this tortious conduct itself cannot qualify under the commercial activity exception.[9]

The remaining activities that Canfield cites to—*i.e.*, those not relating to alleged tortious activity—are plausibly within the commercial activity exception, but only when using an alter ego or veil piercing theory to impute the activities of SOP to Statoil ASA. The purchase of natural gas, resale of the natural gas, and the payment of royalties are all part of the actions that form the basis of Canfield's claims. *See Sachs*, 136 S. Ct. at 395. However, these actions were all performed by SOP, not Statoil ASA, a separate entity. Thus, the only way to fit Statoil ASA's conduct within the commercial activity exception in accord with *Sachs* is to impute the commercial conduct of SOP to Statoil ASA.

Imposing an alter ego theory on Statoil ASA would make more sense if Canfield had sued both SOP and Statoil ASA for breach of contract and unjust enrichment in the alternative. Looking to the alleged facts that might establish Canfield's entitlement to relief, the "gravamen" or "core" of Canfield's claims are based on SOP's usage of an index price to calculate royalties and

_____

[9] Although not argued by Canfield, this activity also does not fall within the non-commercial tort exception. 28 U.S.C. §1605(a)(5). This exception denies immunity if the foreign state has engaged in a tort causing personal injury or property loss *unless* that claim is based on (1) the performance or failure to exercise or perform a discretionary function or (2) malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or *interference with contract rights*. 28 U.S.C. §1605(a)(5). Thus, to assert subject-matter jurisdiction over Canfield's tortious interference claim against Statoil ASA would be contrary to the clear guidance of the non-commercial tort exception.

SOP's engagement in affiliate sales with SNG. Thus, the gravamen of the complaint against SOP is the breach of her gas lease. It follows that imputing the actions of SOP to Statoil ASA would mean that the gravamen of that claim is also breach of contract. However, Canfield did not bring a claim of breach of contract claim against Statoil ASA. Her claim against Statoil is solely premised on unjust enrichment. Canfield cannot have it both ways. Canfield cannot impute the actions of SOP to Statoil ASA for jurisdictional purposes, but then sue Statoil ASA on a different theory than that asserted against the subsidiary.

Under different circumstances the court might allow Canfield to amend her complaint to include a breach of contract action against Statoil ASA for logical clarity. However, the court would have to allow Canfield to assert this claim using the alter ego theory announced by the Supreme Court in *First National City Bank v. Banco Para El Comercio Exterior de Cuba* ("*Bancec*"), 462 U.S. 611 (1983). This would effectively breach Statoil ASA's corporate veil as an indirect parent. The court finds that such an extreme measure is not warranted in this case.

The *Bancec* case is the Supreme Court's seminal case on using alter ego theories under the FSIA. The *Bancec* decision set out, as a basic principle, that "duly created instrumentalities of a foreign state are to be accorded a presumption of independent status." 462 U.S. at 627. Breaking from this proposition, the Court used equitable principles to hold that the separate status of a foreign state and its instrumentality would be disregarded

where doing so would be an injustice, particularly where the foreign state would reap the benefits of filing suit in a United States court while avoiding its obligations under international law. 462 U.S. at 632–33. The Supreme Court was guided by private law principles between corporations and their subsidiaries in reaching this conclusion. *Id*. at 623.

Again turning to private law principles, the Court found an exception to separate corporate identity would be made where the "corporate entity is so extensively controlled by its owner that a relationship of principle and agent is created" or where adhering to the entities separate state would "work fraud or injustice." *Id*. at 628–29. The Supreme Court noted that these exceptions were especially applicable in cases where the corporate form was used to evade legislative policies. *Id*. at 630. Ultimately, the exception was equitable in nature and was used to avoid an injustice. *Id*. at 630–31. Though *Bancec* did not specifically involve the commercial activity exception under the FSIA, appellate courts, including the Third Circuit Court of Appeals, have applied the principles in *Bancec* when making jurisdictional determinations under the FSIA commercial activity exception. *Fed. Ins. Co.*, 12 F.3d at 1287 (collecting cases). In addition, although *Bancec* did not deal directly with an instrumentality and its subsidiary, and instead with a foreign state and its instrumentality, the Third Circuit has applied the *Bancec* principles to such a case. *See id*. at 1286–1287.

The only way for this court to have subject-matter jurisdiction over contract claims against Statoil ASA based on the commercial conduct of SOP

24

is if one of the two exceptions in *Bancec* applies. The only relevant exception, based on Canfield's own arguments, would be that of control, that is, that SOP "is so extensively controlled by [Statoil ASA] that a relationship of principle and agent is created." *Bancec*, 462 U.S. at 629. This might be true if Statoil ASA "exercised complete control" over SNG and SOP and "directed the activities" of SOP, as Canfield asserts. (Doc. 1, ¶3). Canfield has not, however, presented any evidence to suggest this allegation might plausibly be true.

There are several alter ego tests within this circuit,[10] with varying names, but all seek the same purpose of holding a parent liable for the actions of a subsidiary or a corporation responsible for the actions of its shareholders. *See Vacaflor v. Pennsylvania State Univ.*, No. 4:13-CV-00601, 2014 WL 3573593, at *3 n. 2 (M.D. Pa. July 21, 2014)*. The traditional alter ego test in this circuit assesses the following factors: "gross undercapitalization, failure to observe corporate formalities, nonpayment of dividends, insolvency of debtor

---

[10] The Supreme Court did not provide factors to be used do determine control and explicitly refused to provide a mechanical formula. *Bancec*, 462 U.S. at 633–34. Courts applying *Bancec* have looked to private corporate law for guidance. *See, e.g., Bridas S.A.P.I.C. v. Government of Turkmenistan*, 447 F.3d 411, 481 (5th Cir. 2006). In *Bancec*, the court looked specifically to federal common law as the Court found this body of law to comport with international law. 462 U.S. at 623; *see also Kirschenbaum v. 650 Fifth Avenue & Related Props.*, 830 F.3d 107, 130 (2d Cir. 2016) (citing its own circuit case law to establish factors relevant to the alter ego analysis under *Bancec*). As such, although the inquiry is governed by "internationally recognized equitable principles," the court looks to federal common law and alter ego or veil piercing case law in the private context within this circuit for guidance. *Bancec*, 462 U.S. at 633.

corporation, siphoning of funds from the debtor corporation by the dominant stockholder, nonfunctioning of officers and directors, absence of corporate records, and whether the corporation is merely a facade for the operations of the dominant stockholder." *Pearson v. Component Tech. Corp.*, 247 F.3d 471, 484–85 (3d Cir. 2001). Where the relationship is one between two corporations and the "shareholder" is actually another corporate entity, the plaintiff "must essentially demonstrate that in all aspects of the business, the two corporations actually functioned as a single entity." *Id.* at 485. In addition, there must be "some overall element of injustice or unfairness" present. *Trevino v. Merscopr, Inc.*, 583 F. Supp. 2d 521, 529 (D. Del. 2008) (quoting *United States v. Golden Acres, Inc.*, 702 F. Supp. 1097, 1104 (D. Del. 1988)); *see also Vacaflor*, 2014 WL 3573593, at *3 (concluding that all applicable alter ego tests in the circuit require "some impropriety or injustice").

No one factor in the traditional test is dispositive. *Trevino*, 583 F. Supp. 2d at 529. Holding complete ownership over the entity is also not dispositive. "A corporate parent which owns the shares of a subsidiary does not, for that reason alone, own or have legal title to the assets of the subsidiary." *See Dole Food Co. v. Patrickson*, 538 U.S. 468, 475 (2003). While the court should look at the circumstances as a whole, generally, veil piecing or alter ego theory should only be used as a "rare exception, applied in the case of fraud or certain other exceptional circumstances." *Id.*

Here, Canfield has not presented a single allegation that would link the conduct of Statoil ASA to SOP under the traditional test, nor has she asserted

any exceptional circumstance that would warrant holding Statoil ASA responsible for SOP's actions. Canfield did attach Statoil ASA's 2011 Schedule 13D filed with the Securities Exchange Commission to try to establish an alter ego theory for purposes of personal jurisdiction. (Doc. 40-1, Ex. 3). The court carefully reviewed this document for any indication of control. However, not a single board member (ten total) or executive officer (ten total) listed for Statoil ASA were shown to have any connection to SOP, either as a board member or executive officer of SOP. (*Id.*, Ex. 3 ). Only three out of the twenty Statoil ASA board members and executive officers had any connection with the United States at all, one through citizenship alone and the other two based on business addresses listed on the schedule. One executive officer was shown to have a connection with Statoil USA Properties Inc. as an executive officer, but not SOP. Statoil USA Properties Inc. is SOP's direct parent.[11] As indicated by Canfield's own documentation, none of the board members and executives listed for Statoil ASA were shown to have a connection to SOP. Thus, at this stage, the allegation that Statoil ASA "controlled" and "directed" SOP, a separate entity, is pure speculation.

The court is also not convinced that equity would be best served by imposing an alter ego theory on Statoil ASA. The court can see no "element of injustice or unfairness" present to warrant imposing such an extreme measure over the foreign instrumentality. *Trevino*, 583 F. Supp. 2d at 529 (quoting *Golden Acres*, 702 F. Supp. at 1104). There is no injustice in forcing

---

[11] *See supra*, n. 1.

Canfield to proceed with her claims without Statoil ASA present. She has not alleged a claim of fraud against Statoil ASA or SOP, a typical circumstance justifying piercing the corporate veil. Nor has she indicated that she would be deprived of a remedy if forced to assert her contract claims without Statoil ASA.

Canfield requested jurisdictional discovery in her brief in opposition. (Doc. 40, at 16). Currently, the parties are engaged in fact discovery. (*See* Doc. 64). If Canfield had alleged some plausible basis for veil piercing, the court would be more willing to allow additional time for jurisdictional discovery. Generally, "the parties should be granted a fair opportunity to engage in jurisdictional discovery so as to adequately define and submit to the court facts necessary for a thorough consideration of the [immunity] issue." *Fed. Ins. Co.*, 12 F.3d at 1284 n. 11. However, as other courts have noted, there is tension between permitting discovery and protecting a foreign state's or its instrumentality's claim to immunity, including immunity from discovery. *Arriba Ltd. v. Petroleos Mexicanos*, 962 F.2d 528, 534 (5th Cir. 1992). The court must attempt to balance the need for discovery to substantiate the plaintiff's claim that an exception to sovereign immunity exists and the sovereign's claim to immunity altogether. *Butler v. Sukhoi Co.*, 579 F.3d 1307, 1314 (11th Cir. 2009); *In re Papandreou*, 139 F.3d 247, 253 (D.C. Cir. 1998) ("[A] district court authorizing discovery . . . must proceed with circumspection, lest the evaluation of the immunity itself encroach unduly on the benefits the immunity was to ensure."). Moreover, it is also not an abuse of discretion to deny

jurisdictional discovery where the complaint utterly fails to provide a prima facie case that the district court has jurisdiction. *Id.*

Here, the complaint fails to show any facts that would lead this court to conclude that SOP is or was the alter ego of Statoil ASA in the underlying natural gas transactions. The briefing also fails to allege any specific facts that might be used to show that SOP was the alter ego of Statoil ASA. Canfield also has not come forward with any supplemental facts to indicate jurisdiction is proper. Thus, at this stage, Canfield's ability to ever meet the requirements of *Bancec's* control test is pure speculation. Meanwhile, discovery into Statoil ASA's business operations will be highly intrusive. Further, the court can see no equitable basis for imposing such a burden. Accordingly, the court will deny Canfield's request for any additional jurisdictional discovery.

### C.    Personal Jurisdiction

In addition to lacking subject-matter jurisdiction, the court finds it also lacks personal jurisdiction over Statoil ASA. The FSIA provides that "[p]ersonal jurisdiction over a foreign state shall exist as to every claim for relief over which the district courts have jurisdiction under subsection (a) where service has been made under section 1608 of this title." 28 U.S.C. §1330(b). Thus, under the FSIA, a finding of personal jurisdiction requires a finding of subject-matter jurisdiction and proper service. Though not in the language of the FSIA, the Due Process Clause of the United States Constitution also limits the exercise of personal jurisdiction over foreign

defendants. The court may only exercise personal jurisdiction where the defendant has "certain minimum contacts with [the forum] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice."[12] *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945). The court has already found that subject-matter jurisdiction is lacking. In addition, Statoil ASA has not been properly served.

Normally, service must occur within 90 days after the filing of a complaint, but this rule does not apply where the defendant is a foreign instrumentality. FED. R. CIV. P. 4(m). Courts are also more flexible in allowing extra time for service where the plaintiff has made a good faith effort to attempt service. *See, e.g., Allstate Ins. Co. v. Hewlett-Packerd Co.*, No. 113-cv-02559, 2015 WL 179041, at *3 (M.D. Pa. Jan. 14, 2015); *Lewis v. Vollmer of Am.*, No. 15-1632, 2006 WL 3308568, at *3 (W.D. Pa. Oct. 25, 2006). This flexibility will not be applied where the plaintiff has made no attempt at service. *See Allstate Ins. Co. v. Funai Corp.*, 249 F.R.D. 157, 161 (M.D. Pa. 2008).

---

[12] The court will not address Statoil ASA's minimum contacts argument and, instead, rules on other grounds. However, the same reasons that lead the court to conclude it lacks subject-matter jurisdiction—the absence of a plausible alter ego theory—would likely lead the court to conclude that Statoil ASA did not have sufficient contact with the United States to warrant asserting personal jurisdiction, under either a specific or general subject matter jurisdiction analysis. *See In re Chocolate Confectionary Antitrust Litig.*, 674 F. Supp. 2d 580, 595 (M.D. Pa. 2009). Canfield has not shown that Statoil ASA had any actual contact with the United States. Simply creating a United States entity, Statoil USA Properties Inc., that later created another entity, SOP, is not enough. Thus, Canfield would need to impute the activities of those United States entities to Statoil ASA, which, thus far, she cannot do.

Canfield has made no actual attempt at service and flexibility under the rules would not be justified. Canfield admits that she has not properly served Statoil ASA. Canfield requests that the court excuse this failure and allow more time because she believes she has made a good faith attempt to serve Statoil ASA. In support of this, Canfield submitted an affirmation from her attorney, John F. Harnes, explaining his attempts at service. (Doc. 40-1). However, this document does not show that any actual attempt at service was made.

In his affirmation, Attorney Harnes first explains that he believed Statoil ASA would waive service based on a review of other dockets where Statoil ASA was listed as a defendant. (*Id*. ¶4). He did initially provide Statoil ASA's counsel with a copy of the complaint. (*Id*. ¶5). Realizing that Statoil ASA would contest service, he attempted to locate agents within the United States to serve Statoil ASA because service under the Hague Convention[13] would be time-consuming and expensive. (*Id*. ¶7). After determining that this could not be accomplished, he spoke to the Clerk of Court in this district to find out more information about serving Statoil ASA by mail. (*Id*. ¶9). Concluding this would not be enough, Attorney Harnes hired a process server and retained a company well versed in international service of process. (*Id*. ¶12). His efforts to locate a company were delayed by the defendants' motions to

---

[13] The Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil and Commercial Matters, Nov. 15, 1969, 20 U.S.T. 361, T.I.A.S. No. 6338.

dismiss. (*Id*.). Attorney Harnes did not state that the third-party service company he hired has actually attempted or completed service.

Nothing in the affirmation suggests that there was an actual attempt to serve Statoil ASA. It shows that Attorney Harnes engaged in research to determine how service should be made and that he ultimately hired a process server, but it does not show that there was any actual attempt to serve the company. Attorney Harnes' research regarding service is not enough. Canfield's complaint was filed on January 13, 2016 and, to date, there is no indication in the docket or other indication from Canfield that service has been completed. The court sees no justification for such a delay, even under the most liberal reading of Rule 4(m). Without proper service, and without subject-matter jurisdiction, the court lacks personal jurisdiction over Statoil ASA.[14] Accordingly, Canfield's tortious interference, civil conspiracy, unjust enrichment, and accounting claims against Statoil ASA are dismissed with prejudice.

---

[14] Had Canfield asserted some plausible basis for the court to find that Statoil ASA was the alter ego of SOP, the court would be more inclined to allow Canfield's claim to proceed at this stage. Service on a subsidiary is effective to complete service on a parent corporation where the subsidiary is the alter ego of the parent. *United States ex rel. Thomas v. Siemens AG*, 708 F. Supp. 2d 505, 519 (E.D. Pa. 2010); *Akzona Inc. v. E.I. Du Pont De Nemours & Co.*, 607 F. Supp. 227, 237 (D. Del. 1984). SOP waived service. (*See* Doc. 14). However, as discussed in part III.B, *supra*, Canfield has not asserted any facts, either in her complaint or her brief, to plausibly suggest that SOP was the alter ego of Statoil ASA. Thus, SOP's waiver is not sufficient to find that Statoil ASA also waived service.

## IV.     FAILURE TO STATE A CLAIM

### A.     Standard of Review - Rule 12(b)(6)

Rule 12(b)(6) provides for the dismissal of a complaint, in whole or in part, if the plaintiff fails to state a claim upon which relief can be granted. FED. R. CIV. P. 12(b)(6). In reviewing such a motion, the court must "accept all factual allegations as true, construe the [c]omplaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the [c]omplaint, the plaintiff may be entitled to relief." *Fleisher v. Standard Ins. Co.*, 679 F.3d 116, 120 (3d Cir. 2012) (internal quotation marks and citation omitted). It is the moving party that bears the burden of showing that no claim has been stated. *Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005).

Dismissal is appropriate only if, accepting all of the facts alleged in the complaint as true, the plaintiff has failed to plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 547 (2007). This "plausibility" determination is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). Ultimately, the plaintiff must be able to "provide the grounds of his entitlement to relief," requiring more than bold-faced labels and conclusions. *Phillips v. County of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008) (brackets and internal quotation marks omitted) (quoting *Twombly*, 550 U.S. at 555). "[A] formulaic recitation of the elements of a cause of action will not do." *Id.*

The Third Circuit has announced a three-part inquiry to apply the pleading principles announced in *Iqbal* and *Twombly*.

> First, the court must take note of the elements a plaintiff must plead to state a claim. Second, the court should identify allegations that, because they are no more than conclusions, are not entitled to the assumption of truth. Finally, where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief.

*Connelly v. Steel Valley Sch. Dist.*, 706 F.3d 209, 212 (3d Cir. 2013). Also, the court should grant leave to amend a complaint before dismissing it as merely deficient. *See, e.g.*, *Fletcher-Harlee Corp. v. Pote Concrete Contractors, Inc.*, 482 F.3d 247, 252 (3d Cir. 2007); *Grayson v. Mayview State Hosp.*, 293 F.3d 103, 108 (3d Cir. 2002); *Shane v. Fauver*, 213 F.3d 113, 116-17 (3d Cir. 2000). "Dismissal without leave to amend is justified only on the grounds of bad faith, undue delay, prejudice, or futility." *Alston v. Parker*, 363 F.3d 229, 236 (3d Cir. 2004).

In considering a motion to dismiss, the court generally relies on the complaint, attached exhibits, and matters of public record. *See Sands v. McCormick*, 502 F.3d 263, 268 (3d Cir. 2007). The court may, however, consider "undisputedly authentic document[s] that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the [attached] documents." *Pension Benefit Guar. Corp. v. White Consol. Indus.*, 998 F.2d 1192, 1196 (3d Cir. 1993). Moreover, "documents whose contents are alleged in the complaint and whose authenticity no party questions, but which are not physically attached to the pleading, may be considered." *Pryor*

*v. Nat'l Collegiate Athletic Ass'n*, 288 F.3d 548, 560 (3d Cir. 2002) (quoting 62 Fed. Proc., L. Ed., §62:508).

### B.     Breach of Contract and Accounting Claims Against SOP

Canfield's complaint contains three separate breach of contract claims against SOP, along with an accounting claim premised on the contract claims. Canfield's first claim against SOP alleges that SOP's sale at the well using an index price was a breach of the express terms of the royalty provision. Canfield's second claim also alleges a breach of the lease's royalty provision based on SOP's sale to an affiliate entity, though Canfield does not clarify if this allegation is based on express or implied terms in the lease. Canfield's fourth claim against SOP is based on an alleged breach of implied terms in the lease.

SOP argues that all of Canfield's contract claims are barred by Pennsylvania's statute of limitations and that SOP has fully complied with the terms of the lease, express and implied. SOP's statute of limitations argument fails at this time. Canfield's fourth claim based on a breach of the implied duty to market survives, along with her accounting claim, her seventh claim. Her first and second claim against SOP will be dismissed with prejudice.

i.    Statute of Limitations

Canfield's breach of contract claims plausibly fall within Pennsylvania's statute of limitations. Under Pennsylvania law,[15] "a lease is in the nature of a contract and is controlled by principles of contract law." *T.W. Phillips Gas & Oil Co. v. Jedlicka*, 42 A.3d 261, 267 (Pa. 2012). A *prima facie* case for breach of contract in Pennsylvania requires three elements: (1) the existence of a contract, (2) breach of the duties imposed by the contract, and (3) damages. *Joyce v. Erie Ins. Exchange*, 74 A.3d 157, 168 (Pa. Super. Ct. 2013). The limitations period for a breach of contract action in Pennsylvania is four years. 42 PA. CONS. STAT. ANN. §5525(a). "[This] statute of limitations begins to run as soon as a right to institute and maintain suit arises." *Crouse v. Cyclops Indus.*, 745 A.2d 606, 611 (Pa. 2000). When the right to institute a suit arises is a legal question for the court. *Id.* at 611. In general, for a breach of contract action, this date is based on the date that the breach

---

[15] A district court sitting in diversity must apply the choice of law principles of the forum state to determining the controlling law to be applied. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496–97 (1941); *Maniscalco v. Brother Int'l (USA) Corp.*, 709 F.3d 202, 206 (3d Cir. 2013). "[U]nder Pennsylvania choice-of-law principles, the place having the most interest in the problem and which is the most intimately concerned with the outcome is the forum whose law should be applied." *In re Complaint of Bankers Trust Co.*, 752 F.2d 874, 882 (3d Cir. 1984). Pennsylvania has the greatest interest here as the place of the contracting of the lease, the place of performance, and the place of the real property interest. Canfield's lease provides no alternative choice of law provision. Accordingly, the court applies Pennsylvania law, including its statute of limitations. *See Ross v. Johns-Manville Corp.*, 766 F.2d 823, 826 (3d Cir. 1985).

occurs. *S.T. Hudson Engineers, Inc. v. Camden Hotel Devel. Assoc.*, 747 A.2d 931, 934 (Pa. Super. Ct. 2000).

Pennsylvania also applies the discovery rule to breach of contract actions, except those relating to the sale of goods. *See, e.g., Morgan v. Petroleum Prods. Equip. Co.*, 92 A.3d 823, 828 (Pa. Super. Ct. 2014); *see also* 13 PA. CONS. STAT. ANN. §2725(b). "The discovery rule is a judicially created device which tolls the running of the applicable statute of limitations until the point where the complaining party knows or reasonably should know that he has been injured and that his injury has been caused by another party's conduct." *Crouse*, 745 A.2d at 611. This inquiry is typically a question of fact for a jury. *Id.* The court may determine this date as a matter of law only where reasonable minds would not differ in finding that a plaintiff knew or should have known of his or her injury and its cause on that particular date. *Fine v. Checcio*, 870 A.2d 850, 858–59 (Pa. 2005).

The court cannot state at this time when the cause of action accrued for purposes of the statute of limitations. Canfield's complaint was filed on January 15, 2016. SOP alleges that the statute of limitations had passed based on the allegation in Canfield's complaint that "beginning in or about April 2010 . . . [SOP] began selling all of its production to [SNG]" at a unit index price. (Doc. 1, ¶26). This date is the date of the alleged breach and the date on which Canfield was entitled to sue. However, the court also finds it plausible that the discovery rule should be applied to toll this initial date.

The April 2010 date in the complaint appears to have been provided by the defendants and is likely not based on Canfield's own knowledge. (*Id*. ¶26 n. 2). It is unlikely that Canfield knew of SOP's private agreement with SNG to use an index price. Instead, it is plausible that she would have been put on notice of the breach at the time she noticed a reduced royalty payment as compared to Chesapeake's royalties. Canfield noticed a difference in the royalties being paid to her in or around September 2013. (*Id*. ¶31). Thus, it is plausible that the limitations period should be tolled to September 2013 or shortly after, which would make Canfield's January 2016 complaint timely. This may be, ultimately, a fact question. After discovery, reasonable minds may or may not differ as to whether or not Canfield should have noticed other signs of the alleged breach earlier. At this stage, however, Canfield is entitled to proceed with her claim as the face of the complaint suggests that the discovery rule should be applied to toll the statute of limitations period.

It is also plausible that Canfield's lease is divisible such that each obligation to pay her royalties triggered a new statute of limitations period. Where a contract is divisible, such as an installment contract, the limitations period begins to run at each new breach. *See Bush v. Stowell*, 71 Pa. 208, 212 (1872); 14 Samuel Williston, *A Treatise on the Law of Contracts* §45:20 (Richard A. Lord ed., 4th ed. 1990) (hereinafter *Williston on Contracts*). "A contract is divisible if one portion or segment of the contract is enforceable independent from the other portions or segments.*" Stone v. City of Phila.*, No. 86-1877, 1987 WL 8538, at *1 (E.D. Pa. Mar. 27, 1987). "[T]he parties'

performances must be apportionable into corresponding parts of part performances and the corresponding pairs must be properly regarded as agreed upon equivalents." *Id*.  (citing *Producers' Coke Co. v. Hillman*, 90 A. 144, 145 (Pa. 1914)); *see also* RESTATEMENT (SECOND) OF CONTRACTS §240 (1981). Divisibility is also related to the doctrine of partial performance as it is "a mitigating doctrine which reduces the risk of forfeiture" where a party has partially performed an obligation under a contract. 15 *Williston on Contracts* §45:1.

In *Jacobs v. CNG Transmission Corp.*, 772 A.2d 445, 450 (Pa. 2001), the Pennsylvania Supreme Court explained that it is the intention of the parties that governs whether a contract is entire or severable. The severability concept announced in *Jacobs* is a distinct, but interrelated concept to that of divisibility. *See* 15 *Williston on Contracts* §45:1. In line with *Jacobs*, the divisibility determination is also guided by the intention of the contracting parties. *Hillman*, 90 A. at 145; *see also* *Lutz v. Chesapeake Appalachia, L.L.C.*, 717 F.3d 459, 466 (6th Cir. 2013); 15 *Williston on Contracts* §45:1.

Reviewing the SOP-Canfield lease, it is plausible that the royalty provision is divisible. Other courts have found royalties to be owed under an oil and gas lease to be divisible obligations subject to a new limitations period with each payment. *See, e.g.*, *Lutz*, 717 F.3d at 466–470 (6th Cir. 2013) (collecting cases). No Pennsylvania court has addressed this specific issue. However, in the event the discovery rule is not applicable or able to save Canfield's contract claims, Canfield may still be entitled to argue that the

parties intended the royalty obligation to be divisible such that each new breach restarted the statute of limitations. If the obligations were divisible, those breaches falling within the limitations period could then proceed. While the court declines to rule on this novel issue now, Canfield may reassert this argument at a later time if necessary.

ii.   <u>Breach of Express Terms in the Lease</u>

Canfield has not alleged a plausible claim for breach of the express royalty provision in her lease. In her first claim for relief, Canfield alleges that SOP breached the express terms of her royalty clause because SOP did not base their royalty calculation on a "an actual market price" and, instead, based their royalty calculation on a "published index price, whether or not such index price [had] any relation to the actual market price conditions pertinent to the gas in question and whether the Landowners' gas was ever transported to the Hub point where the index price was published." (Doc. 1, at ¶36). This argument assumes that either: (1) the lease required royalties be based on a market price from a downstream sale (an "express market price/downstream sale claim") and/or (2) that SOP could not use an index price unrelated to the location where the natural gas was eventually sold to end-users (an "express index-price claim"). Having read the lease, the court finds that SOP's method of calculating royalties complied with the lease's express and unambiguous terms. Thus, Canfield's first claim based on either

40

a market price/downstream sale theory or index-price theory must be dismissed.

In Pennsylvania, a lease "must be construed in accordance with the terms of the agreement as manifestly expressed, and '[t]he accepted and plain meaning of the language used, rather than the silent intentions of the contracting parties, determines the construction to be given the agreement.'" *Jedlicka*, 42 A.3d at 267 (quoting *J.K. Willison v. Consol. Coal Co.*, 637 A.2d 979, 982 (Pa. 1994)). Generally, a contract should be construed as a whole and all of its parts and provisions should be given effect if possible. 16 SUMM. PA. JUR. 2D *Commercial Law* §1:124 (2d ed.).

In addition, "[d]etermining the intention of the parties is a paramount consideration in the interpretation of any contract." *Hutchinson v. Sunbeam Coal Corp.*, 519 A.2d 385, 389 (Pa. 1986). In accordance with the first principle, the intention of the parties should be determined based on the language of the contract itself if that language is clear and unambiguous. *Id.* at 390. If the language is ambiguous, "parol evidence is admissible to explain or clarify or resolve that ambiguity, irrespective of whether the ambiguity is created by the language of the instrument or by extrinsic or collateral circumstance[—*i.e.*, a latent or patent ambiguity]." *Id.* (quoting *In re Herr Estate*, 191 A.2d 32, 34 (Pa. 1960)).

"A contract is ambiguous if it is reasonably susceptible of different constructions and capable of being understood in more than one sense." *Id*. "[A]mbiguity in a written oil and gas lease is construed in favor of the lessor

and against the lessee." *Mason v. Range Resources-Appalachia LLC*, 120 F. Supp. 3d 425, 440 (W.D. Pa. 2015 ) (citing *Jacobs v. CNG Transmission Corp.*, 332 F. Supp. 2d 759, 773–74, n. 6 (W.D. Pa. 2004)). This rule only applies where parol evidence fails to clarify the ambiguity. *Id.* Whether an ambiguity exists is a question left for the court. *Hutchinson*, 519 A.2d at 390. But, generally, the determination of the intent of the contracting parties based on conflicting parol evidence is left to a jury. *Id.*

Canfield's royalty provision unambiguously provides that her royalties shall be calculated based on "the amount realized from the sale of gas at the well." (Doc. 1-2, at 1 ¶3). SOP argues that this expressly means that they must calculate royalties based on the actual sale price at the well, irrespective of whether or not this sale price is based on an index price. The court agrees that SOP's inter-affiliate sale to SNG at the physical location of the well complied with the express lease terms.

The phrase "amount realized" in an oil and gas royalty clause has acquired a technical meaning. "Technical terms and words of art are [to be] given their technical meaning unless the context or a usage which is applicable indicates a different meaning." *Fischer & Porter Co. v. Porter*, 72 A.2d 98, 101 (Pa. 1950) (quoting RESTATEMENT (FIRST) OF CONTRACTS §235 (1932)) (alteration in original). In the oil and gas industry, the phrase amount realized "is commonly viewed as synonymous with proceeds." 8 Patrick H. Martin & Bruce M. Kramer, *Williams & Meyers, Oil and Gas Law, Manual of Oil & Gas Terms A* (LexisNexus Matthew Bender 2016) (hereinafter *Williams*

& *Meyers*)[16] (citing *Sondrol v. Placid Oil Co.*, 23 F.3d 1341, 1343 (8th Cir. 1994)*; see also Tana Oil & Gas Corp. v. Cernosek*, 188 S.W.3d 354, 360 (Tex. App. 2006) ("The term 'amount realized' or 'net proceeds' has been construed by Texas courts to mean the proceeds received from the sale of the gas or oil."). Proceeds is defined as "the money obtained by an actual sale." *Williams & Meyers, Manual of Oil & Gas Terms P*.

In comparison, "market value" refers to the value of the product in the relevant market. *Williams & Meyers, Manual of Oil & Gas Terms M*. A proceeds or amount realized royalty clause must be distinguished from a market value royalty clause. *See Sondrol*, 23 F.3d at 1343; *Exxon Corp. v. Middleton*, 613 S.W.2d 240, 245 (Tex. 1981). "Market value is the price a willing seller obtains from a willing buyer." *Heritage Res., Inc. v. NationsBank*, 939 S.W.2d 118, 122 (Tex. 1996). Market value is more difficult to determine than a simple account of proceeds. There are two primary methods used to determine market value, one uses the net-back method, but the best method is based on comparable sales. *NationsBank*, 939 S.W.2d at 122*; see also Tex. Oil & Gas Corp. v. Vela*, 429 S.W.2d 866, 872 (Tex. 1968).

The phrase "at the well" is "commonly understood to mean that the oil and gas is to be *valued* in its unprocessed state as it comes to the surface at

---

[16] As explained by the Third Circuit and the Western District of Pennsylvania, *Williams and Meyers, Oil and Gas Law* and its *Manual of Oil and Gas Terms* is "the foremost authoritative treatise on the law relating to oil and gas." *Smith v. Steckman Ridge, LP*, 590 F. App'x 189, 194 n. 5 (3d Cir. 2014) (quoting the district court). Pennsylvania courts frequently cite to and rely on this treatise for guidance. *Id.*

the mouth of the well." *Williams & Meyers, Manual of Oil & Gas Terms A* (emphasis added). Thus, the phrase "at the well" relates to the proper valuation of the natural gas product, but does not necessarily dictate where the sale is to be made, the point of sale.

Canfield, in several instances, alleges that her lease required royalties based on a "market price." The court construes this to mean a sale within the market—*i.e.*, the downstream market—not market value. Canfield's royalty provision was clearly not a market value lease; it unambiguously provides that royalties will be based on the amount realized from the sale of gas at the well, or proceeds. If Canfield intended to convert her proceeds lease into a market value lease, this would fail. The price paid by SNG to SOP at the well are the proceeds SOP received for the sale of Canfield's natural gas. There is no allegation that SOP misrepresented the price paid by SNG. Thus, SOP's usage of the sale price to calculate royalties was clearly proper under the lease.

Next, the court addresses whether the physical location of the sale was proper. As explained above, "at the well" refers to value, not the point of sale. Canfield's lease does not indicate where the sale was to be made. The parties could have made clear where the sale was to be made or clarified in the royalty provision the method of calculation when the sale occurred at the well versus downstream of the well. *Cf. Hall v. CNX Gas Co.*, 137 A.3d 597, 599 (2016) (construing lease language that explained differing royalty calculations when the gas was "sold or used beyond the well" and when gas was sold "at

the well"). The parties did not do this and, perhaps confusingly, Canfield is now left with two lessees, SOP and Chesapeake, who have determined the point of sale should be in different locations—one at the well and one downstream. The court is not convinced that Chesapeake's interpretation of Canfield's lease is proper and, instead, finds that SOP's sale at the actual location of the well complied with the lease's royalty provision.

The court carefully reviewed the lease and could not find any language indicating SOP's sale to third-parties was required to be downstream. The only indication in the lease that the parties might have intended a downstream sale was found in language that was modified and superceded by the parties' addendum to the lease. In addition to the "amount realized at the well" language, Canfield's royalty provision states that "'[t]he amount realized from the sale of gas at the well' shall mean the amount realized from the sale of the gas after deducting . . . post-production costs" and the clause authorizes the lessee and/or its affiliates to provide post-production services. (Doc. 1-2, at 1 ¶3). Thus, the initial lease language utilized the net-back method of calculating royalties based on a downstream sale to determine a wellhead price. This suggested that the actual sale was to be made at some point downstream and would verify Chesapeake's usage of the net-back method.

In the superceding addendum attached and made part of the lease, however, the lessee agreed that royalties would be paid without deductions for either production or post-production costs incurred to make the natural gas ready for sale or use. This provision states as follows:

45

Case 3:16-cv-00085-MEM Document 72 Filed 03/22/17 Page 46 of 73

> Royalties shall be paid without deductions for the cost of producing, gathering, storing, separating, treating, dehydrating, compressing, transporting, or otherwise making the oil and/or gas produced from the lease premises ready for sale or use.

(*Id*. at 4 ¶13). This ready for sale or use clause completely abrogated the initial lease language discussing post-production costs. Thus, the final lease provides for royalties to be calculated based on the amount realized at the well and also provides that the lessee cannot deduct post-production costs.

The only way to construe the "at the well" language and ready for sale or use clause together is to require a sale at the physical location of the well. If the sale was to made downstream, as Canfield suggests, without deductions for post-production costs, as the explicit lease language suggests, then the resulting royalty could not be a wellhead price. This interpretation would render the phrase "at the well" meaningless as this phrase indicates royalties should be based on the wellhead value, not the value of the product downstream.

Instead, the court interprets Canfield's royalty provision to unambiguously require royalties calculated using the wellhead value, which is determined based on an actual sale at the well. Where the lessee is selling at the well, the lessee need not incur post-production costs and, therefore, would not be forced to deduct these costs in defiance of the ready for sale or use clause. The addendum language is redundant when the lessee is selling at the well. This added language can be viewed, however, as mere surplusage, without violating any of the lease terms. *Cf. NationsBank*, 939 S.W.2d 118, 122–23 (construing a market value, at the well clause and no

deductions clause as consistent with each other). This interpretation takes into account all of the lease terms, complies with the express lease language, and does not render any phrase meaningless. SOP's interpretation was, thus, proper. SOP, quite literally, complied with the lease terms when selling to SNG at the well to arrive at a wellhead price. Accordingly, Canfield's claim based on an breach of the express terms of her lease based on a market price/downstream sale theory must fail.

With respect to Canfield's express index-price claim, there is no express language in the contract to suggest that SOP was prohibited from using an index price or that SOP's usage of an index price was required to be tied to the location where the natural gas was sold. The contract simply requires that royalties be based on "the amount realized"—*i.e.*, proceeds— and is entirely silent with respect to how SOP must negotiate a price when selling to third-parties. If such an obligation exists, it must be implied. Thus, SOP's usage of an index price is not an express breach of the contract and any express index-price claim must fail as a distinct claim. SOP's transaction, while distinct from Chesapeake, complied with the literal terms of the lease. Accordingly, Canfield's first claim premised on a breach of the express terms of the royalty provision must be dismissed with prejudice.

In her second claim for relief, Canfield alleges a breach of the lease occurred based on SOP's sale of natural gas to an affiliate because it was not an arms'-length transaction (the "affiliate claim"). It is unclear if this claim was intended to be a separate breach of contract claim based on an express term

47

or an implied term. Her claim does not state what term or phrase in the lease SOP allegedly breached by engaging in an affiliate sale. If Canfield intended to bring an express breach of contract claim based on the sale of gas to an affiliate, this would fail.

The court has carefully reviewed the lease and can find no express provision requiring SOP to make royalties based on an arms'-length sale or a sale to a non-affiliate. Thus, SOP's actions do not amount to breach of an express obligation. If the parties intended to require sales to a non-affiliate then they certainly could have agreed to do so expressly. *See Trinity Valley Sch. v. Chesapeake Operating, Inc.*, No. 3:13-cv-01082-k, 2015 WL 4945911, at *4 (N.D. Tex. Aug. 19, 2015), *vacated due to settlement*, 2015 WL 9269774. Accordingly, Canfield has failed to assert a plausible express affiliate claim and any such claim must be dismissed with prejudice.

With respect to an implied claim, Canfield's fourth claim includes similar allegations regarding affiliate sales, alleging that SOP's sale to an affiliate breached implied terms. Thus, if Canfield's second claim was intended to be interpreted as an implied breach claim, in addition to an express breach claim, this allegation would be redundant. Accordingly, the court will dismiss Canfield's second claim with prejudice and will deal, separately, with the alleged breach of implied obligations as stated in the fourth claim.

### iii.   Breach of Implied Terms in the Lease

Canfield has asserted a plausible breach of contract claims based on implied obligations. In her fourth claim for relief, Canfield asserts that SOP had "an obligation to use reasonable best efforts to market the gas and achieve the best price available" as well as an "implied duty of good faith and fair dealing." (Doc. 1, at ¶¶50–51). Canfield argues that these obligations/duties were breached, again, because SOP sold the natural gas extracted from her land to an affiliate (an "implied affiliate claim") and at an index price that was unconnected to comparable sales at the location of the well (an "implied index-price claim").

The Pennsylvania Supreme Court is cited as the first court to recognize implied covenants in oil and gas leases. *See* James W. Adams et al., *Pa. Oil & Gas Law & Practice* §18.1, at 18-1 ( 2d ed. 2015). In *Stoddard v. Emery*, 18 A. 339 (Pa. 1889), the court found that an implied covenant to bore wells on property existed in a lease, but that this implication would not dictate the amount of wells required where that number was expressly fixed in the contract. The court explained that "[h]ad there been nothing said in the contract on the subject, there would of course have arisen an implication that the property should be developed reasonably." *Id*. at 442. This general principle of implied covenants was recently restated, again in dicta, in a more recent Pennsylvania Superior Court case as follows:

> In the absence of an express provision, the law will imply an agreement by the parties to a contract to do and perform those things that according to reason and justice they should do in order to carry out the purpose for which the contract was made and to

refrain from doing anything that would destroy or injure the other party's right to receive the fruits of the contract. Accordingly, a promise to do an act necessary to carry our the contract must be implied.

*Katzin v. Central Appalachia Petroleum*, 39 A.3d 307, 309 (Pa. Super. Ct. 2012) (quoting *Daniel B. Van Campen Corp. v. Bldg. & Constr. Trades Council of Phila. & Vicinity*, 195 A.2d 134, 136–137 (Pa. Super. Ct. 1963)). However, importantly, "[t]he law will not imply a different contract than that which the parties have expressly adopted." *Hutchinson*, 519 A.2d at 388.

Pennsylvania currently recognizes three implied covenants in oil and gas leases: (1) an implied duty to reasonably develop the land; (2) an implied duty to protect the land from drainage due to adjoining operations; and (3) an implied duty to bring extracted gas to market. *See Jacobs v. CNG Transmission Corp.*, 772 A.2d 445, 244–45 (Pa. 2001); *Kleppner v. Lemon*, 35 A. 109 (Pa. 1896); *Iams v. Carnegie Natural Gas Co.*, 45 A. 54, 55 (Pa. 1899); *Pa. Oil & Gas Law & Practice* §18.1, at 18-1. It is said that these implied obligations rest on the general principle of cooperation between contracting parties, which is similar to the implied duty of good faith in contracts. *Williams & Meyers*, §802.1 at 6.1–10; *see also Iams*, 45 A. at 55 (describing the implied covenant to market as an "obligation to operate for the common good of both parties") (quoting *Glasgow v. Chartiers Oil Co.*, 25 A. 232 (Pa. 1892)). The Pennsylvania Supreme Court has not addressed whether an implied duty of good faith is imposed on all contracts or whether it should be applied to oil and gas leases, specifically. *See Ash v. Continental Ins. Co.*, 932 A.2d 877, 883 n. 2 (Pa. 2007). Because Pennsylvania has not

50

expressly adopted the implied duty of good faith in an oil and gas lease as a distinct claim, but has adopted other specific covenants, the court will analyze Canfield's claim under the implied duties recognized by the Pennsylvania Supreme Court.

Moreover, the duty of good faith is premised on the same principle of cooperation forming the foundation of the current, implied duties in oil and gas leases. *Williams & Meyers*, §802.1, at 6.1–8. Some scholars have noted that the standard of good faith implied in relational contracts and the standard implied in oil and gas leases are the same. *Id*. at p. 12 (citing C. Meyers & S. Crafton, *The Covenant of Further Exploration—Thirty Years Later*, 32 Rocky Mt. Min. L. Inst. 1-1-, 1-22 (1986)). Some Pennsylvania case law suggests this is true. *See T.W. Phillips Gas & Oil Co. v. Jedlicka*, 42 A.3d 261, 275–77 (Pa. 2012) (where a contract calls for production from a well only producing "in paying quantities" the court must consider the good faith judgment of the operator); *Colgan v. Forest Oil Co.*, 45 A. 119, 121 (Pa. 1899) (applying a subjective, good faith standard to the implied duty to develop land in stating that the court's "right to interference [with the operator's decision to develop or not develop wells on land] does not arise until it has been shown clearly that he is not acting in good faith on business judgment, but fraudulently, with intent to obtain a dishonest advantage over the other party to the contract.").

While the two concepts may intertwine, it is likely that the Pennsylvania Supreme Court would view them as distinct. This is so because, although using "good faith" language in its earliest case law on the topic of implied

duties, the Pennsylvania Supreme Court also made clear that a lessor and lessee in an oil and gas lease do not share a special or fiduciary relationship. Colgan, 45 A. at 120.

> There is no relation of special trust or confidence between the lessor and lessee in oil or gas leases, any more than in any other. Like all other contracting parties, they deal at arm's length, each with his own interest. So long as the question is one of business judgment and management, the lessee is not bound to work unprofitably to himself for the profit of the lessor; and the parties must be left, as in other cases, to their own ways. It is only when a manifestly fraudulent use of opportunities and control is shown that courts are authorized to interfere.

*Id*. Thus, while there may be some instances where Pennsylvania court's impose a subjective standard that aligns more closely with the standard of good faith and fair dealing, it is unlikely that this sets forth a separate, cognizable claim under Pennsylvania law. Accordingly, Canfield's implied affiliate claim and implied index-price claim premised on a breach of a generalized duty of good faith and fair dealing fails as a matter of law.

Next, Canfield asserts that her implied breach claim is based on the implied duty to market, which is a cognizable claim under Pennsylvania law. *See Iams*, 45 A. at 54–55. In *Iams v. Carnegie Natural Gas Co.*, the Pennsylvania Supreme Court held that where gas was obtained from the lessor's property in sufficient quantities, a landlord/tenant relationship was established and the defendant lessee would be required to market the gas found "but only at a reasonable profit[,]" taking into consideration "the distance to market, the expense of marketing, and everything of that kind." 45 A. at 54. At that point, the lessee is "under an 'obligation to operate for the good of both

parties, and to pay the rent or royalty reserved.'" *Id.* at 55 (quoting *Glasgow*, 25 A. at 232).

The Pennsylvania Supreme Court's explanation of the lessee's marketing obligation in *Iams*, decided in 1899, could not have taken into consideration the restructuring of the oil and gas industry in the 1980s and 1990s. *See* John S. Lowe, *Defining the Royalty Obligation*, 49 SMU L. REV. 223 (1996). Prior to this restructuring, producers extracted gas from the land and sold it to pipelines at the well or in the field under long-term contracts; the pipelines then sold to regulated, local distribution companies who served as retailers under a price-regulated scheme. *Id.* at 224. Under this framework, the lessee's obligation was to find a buyer, a pipeline, if one could be found. Today, pipelines are open-access transporters, not merchants; natural gas is no longer price fixed; and markets are not fixed, they can be created by those operating within the industry. *See id.*

Without recent Pennsylvania Supreme Court guidance, this court must consider what Pennsylvania's duty to market means in the current natural gas context, if Canfield's implied index-price claim or implied affiliate claim is recognized under Pennsylvania law, and if the facts alleged state a plausible claim. Where the Pennsylvania Supreme Court has not addressed an issue, this court is guided by state intermediate appellate courts, other federal courts applying Pennsylvania law, state supreme courts addressing the issue, analogous decisions, dicta, scholarly work, and "any other reliable data tending convincingly to show how the highest court of the state would decide

the issue at hand." *Mason*, 120 F. Supp. 3d at 439 (quoting *Spence v. ESAB Grp., Inc.*, 623 F.3d 212, 216–217 (3d Cir. 2010) (quoting *Norfolk S. Ry. Co. v. Basell USA Inc.*, 512 F.3d 86, 92 (3d Cir. 2008)).

First, the court must address the scope of *Iams* after the Pennsylvania Supreme Court's decision in *Kilmer v. Elexco Land Srvs., Inc.*, 990 A.2d 1147 (2010). In *Kilmer*, the court was tasked with interpreting Pennsylvania's Guaranteed Minimum Royalty Act ("GMRA"), 58 PA. STAT. §33, *repealed and replaced by* Oil and Gas Lease Act, 58 PA. STAT. §33.1 *et seq.* (2013). The GMRA imposed a statutory requirement that a lessee pay at least a one-eight royalty to the landowner. The court specifically held that lease terms requiring royalties to be paid after the deduction of post-production costs—usage of the net-back method to calculate a wellhead price—did not violate the GRMA. *Kilmer*, 990 A.2d at 1158. The court interpreted the term "royalty" in the GMRA to be consistent with the industry standard that royalties bear post-production costs. *Id*. at 1157.

Notably, one of the landowner/lessor arguments in *Kilmer* opposing this interpretation was that the duty to market referenced in *Iams* imposed an obligation on the lessee to bear all the costs to get the natural gas to the point of sale. *Id*. at 1152–53. This is commonly referred to as the First Marketable Product Doctrine and this doctrine has been adopted in a minority of states. The court rejected this argument. Post-*Kilmer,* it is clear that Pennsylvania does not follow the First Marketable Product Doctrine and that Pennsylvania

allows lessors and lessees to contract royalties based on a wellhead price. *See id.* at 1158.

While the Pennsylvania Supreme Court refused to apply the interpretation urged by the landowners in *Kilmer* based on *Iams*, the court did not expressly overturn the *Iams* decision. As such, *Iams* remains good law, but it may not be interpreted to impose a duty on the lessee to bring the natural gas to its final point of sale. The court notes, however, that *Kilmer* will not be extended beyond its reach. *Kilmer* was a statutory construction case; it did not dictate how a lease would be construed or overturn the validity of all implied duties. But, in line with *Kilmer's* holding, this court will refrain from looking to the laws of states that impose the First Marketable Product Doctrine, such as Colorado, Oklahoma, and Kansas. *See Kilmer*, 990 A.2d at 1152. These states impose a higher duty on the lessee and likely do not accurately reflect how the Pennsylvania Supreme Court would apply the current, implied duty to market.

The court must also address what standard of conduct should be applied to the implied duty to market. The Pennsylvania Supreme Court has not clarified what standard should be applied to the lessee's conduct in the performance of his or her implied duty to market, and case suggests a mixture of both the subjective standard—that of good faith—and an objective standard or the reasonably prudent operator standard. James W. Adams et al., *Pa. Oil & Gas Law & Practice* §18.1, at 18-1, 18-2; *see also* George A. Bibikos and Jeffrey C. King, *A Primer on Oil and Gas Law in the Marcellus Shale States*,

4 Tex. J. of Oil, Gas, & Energy L. 155, 173–76 (2008–2009). In *Colgan v. Forest Oil Co.,* the court imposed a subjective good faith standard on the lessee when discussing what today is referred to as the implied duty to reasonably develop the land for production. 45 A. at 119. In *Kleppner v. Lemon,* addressing the same duty to develop the land by drilling wells, the Pennsylvania Supreme Court applied a more objective standard to the lessee's conduct stating that "[w]hatever ordinary knowledge and care would dictate as the proper thing to be done for the interest of both lessor and lessee, under any given circumstances, is that which the law requires to be done as an implied stipulation of the contract." 35 A. at 109. This enunciation is similar to that stated in *Iams* which directs courts, when assessing the lessee's duty to market, to take into consideration "the distance to market, the expense of marketing, and everything of that kind." 45 A. at 54.

More recently, however, in *T.W. Phillips Gas & Oil Co. v. Jedlicka*, 42 A.3d 261, 263 (Pa. 2012), the Pennsylvania Supreme Court held that a lease habendum clause that stated the term of the lease would be held so long as the oil or gas produced "in paying quantities" would be construed in light of the operator's good faith judgment. The court's analysis was neither purely subjective or purely objective, but a mixture. Under *Jedlicka*, if a well consistently pays a profit, an objective inquiry, it will be deemed to be producing in paying quantities. *Jedlicka*, 42 A.3d at 276. Only where this objective test is not met must the court resort to the operator's good faith judgment. *Id.* Although the issues surrounding habendum clauses and when

the lease terminates are distinct from the duty to market, there does appear to be some theoretical overlap between in the two. *Williams & Meyers*, §854 at 396.3–396.6. In light of this, the mixed standard in *Jedlicka* would likely apply to the implied duty to market. *See also id*. §856.3 at 415. Thus, the court must assess objective factors, but may also consider whether the lessee's business judgment was exercised in good faith.

The Pennsylvania Supreme Court also has not addressed the scope of the implied duty to market in any recent decisions, but the court finds adequate explanation of the duty in Texas Supreme Court decisions. Texas is a majority state that does not impose the First Marketable Product Doctrine and allows parties to calculate royalties based on a wellhead price. In *Yzaguirre v. KCS Resources, Inc.*, the Texas Supreme Court explained that "[t]he implied covenant to reasonably market oil and gas serves to protect a lessor from the lessee's self-dealing or negligence." *Yzaguirre v. KCS Res., Inc.*, 53 S.W.3d 368, 374 (Tex. 2001). Accordingly, where the lease is silent, the lessee has a duty to market the oil and gas reasonably. 53 S.W.3d at 373. Where the lease is a proceeds lease, this obligation includes an "obligation to obtain the best current price reasonably available." *Union Pacific Res. Grp., Inc. v. Hankins*, 111 S.W.3d 69, 72 (Tex. 2003) (quoting *Yzaguirre*, 53 S.W.3d at 374). This same protection is not needed in a lease requiring royalties based on a market value. *Id*.

A central inquiry in determining whether the duty has been breached is whether the transaction was a fraud or a sham, particularly where the

allegation is based on an inter-affiliate sale. *Id*. at 74. This list is not exhaustive and the implied duty may extend beyond allegations of fraud or a sham, however. *See Occidental Permian Ltd. v. Helen Jones Found.*, 333 S.W.3d 392, 401 (Tex. App. 2011). The ultimate purpose of the duty is "to protect a lessor from the lessee's self-dealing or negligence." *Yzaguirre*, 53 S.W.3d at 374. However, at no point does the implied duty convert the proceeds clause into a market value clause as "[u]nder some circumstances, a reasonable marketer may sell gas for more or less than market value." *Hankins*, 111 S.W.3d at 74.

Canfield's implied breach claims are based on SOP's usage of an index-price and based on the inter-affiliate sale between SOP and SNG. Simple allegations of one affiliate selling to another do not state a plausible claim for breach of the implied duty to market. *See Flanagan v. Chesapeake Exploration, LLC*, No. 3:15-CV-0222-B, 2015 WL 6736648, at \*2–3 (N.D. Tex. Nov. 4, 2015); *see also Gottselig v. Energy Corp. of Am.*, No. 15-971, 2015 WL 5820771, at \*6 (W.D. Pa. Oct. 5, 2015) (holding there is no obligation on the part of the lessee to inform the lessee of the relationship between the lessee and its marketing affiliate). Here, however, Canfield not only alleges that SOP and SNG were affiliates, but that SOP used an index price to calculate royalties. The court construes Canfield's implied index-price claim and affiliate claim as one claim implicating the implied duty to market. Her claim is virtually identical to the claim made by Texas landowners in *Union Pacific Resources Group, Inc. v. Hankins*. The *Hankins* action was also a

putative class action. 111 S.W.3d at 70. Though, ultimately, the Texas Supreme Court found that the proposed class could not be certified, 111 S.W.3d at 75, notably, the action made it to the class certification stage.

In addition to alleging that SOP used an index price and sold to an affiliate, Canfield alleges that SOP changed the hub for this index price around September of 2013 from the Dominion South Point Hub near Pittsburgh, Pennsylvania to the Tennessee Zone 4 "300 Leg" Hub. SOP does not dispute this fact. At this stage, the court cannot conclude that the original hub price or the changed hub price reflected "the best current price reasonably available." *Hankins*, 111 S.W.3d at 72. Under the standard of care enunciated in *Jedlicka*, the court must assess objective factors, but also consider the lessee's good faith business judgment. The court has no information to attempt to make that assessment at this stage.

Moreover, in several instances, Canfield suggests that SNG was a "sham intermediary" and that the sale between SOP and SNG was a "sham sale." (Doc. 1, at ¶¶29, 46). A sham sale would suggest SOP and SNG were one and the same. A sham sale would most certainly violate the implied duty to market under either a reasonably prudent operator or a good faith standard. *See Hankins*, 111 S.W.3d at 72; *see also Texas Oil & Gas Corp. v. Hagen*, 683 S.W.2d 24 (Tex. App. 1984), *dismissed as moot*, 760 S.W.2d 960 (Tex. 1988). Canfield's complaint contains no facts to indicate that there was a sham sale between SOP and SNG by using similar allegations as those in the veil piercing and alter ego context. SOP suggests that this is fatal. The

court disagrees. The court will assume the veracity of this allegation and allow discovery to proceed. The "sham sale" allegation, when coupled with the inter-affiliate nature of the sale and the fluctuating index price used by SOP, states a plausible claim for breach of the implied duty to market. Thus, Canfield may proceed with her fourth claim.

### iv.    Accounting

Because Canfield's breach of contract claim as stated in her fourth claim for relief survives, her accounting claim also survives at this stage. Pennsylvania recognizes the right to a legal or equitable accounting in certain circumstances. *See Precision Indus. Equip. v. IPC Eagle*, No. 14-3222, 2016 WL 192601, at *8–9 (E.D. Pa. Jan. 14, 2016). A legal accounting is not a claim, but a demand for relief. *See* PA. R. CIV. P. 1021(a). It is incident to a proper contract claim. *Buczek v. First Nat'l Bank of Mifflintown*, 531 A.2d 1122, 1123 (Pa. Super. Ct. 1987). Thus, a legal accounting requires a valid contract, either express or implied, and a breach of that contract. *Precision Indus. Equip.*, 2016 WL 192601, at *8–9. It also requires that either:

(1)    the defendant received monies as agent, trustee or in any other capacity whereby the relationship created by the contract imposed a legal obligation upon the defendant to account to the plaintiff for the monies received by the defendant, or

(2)    . . . the relationship created by the contract between the plaintiff and defendant created a legal duty upon the defendant to account and the defendant failed to account and the plaintiff is unable, by reason of the defendant's failure to account, to state the exact amount due him.

*Id*. at *8 (quoting *Haft v. U.S. Steel Corp.*, 499 A.2d 676, 677–78 (Pa. Super. Ct. 1985))).

Here, Canfield has alleged a plausible breach of contract claim based on the implied duty to market and may be entitled to a legal accounting as an equitable remedy.[17] SOP had a contractual duty to obtain the best price reasonably available in accordance with the implied duty to market. Having found a plausible breach of contract claim, the court will allow Canfield's demand for an accounting to stand.

## C.    Canfield's Remaining Claims Against SOP

Canfield's remaining claims against SOP must be dismissed. In her fifth claim for relief, Canfield alleges SOP was unjustly enriched. In her third claim for relief, Canfield alleges that SOP, SNG, and Statoil ASA engaged in a civil conspiracy. With respect to her unjust enrichment claim, the court agrees that this claim, pleaded on an alternative theory of liability, is improper where no party disputes the existence or applicability of the underlying contract, the lease. Canfield's civil conspiracy claim is barred by the gist of the action doctrine. Thus, SOP's motion to dismiss is granted with respect to these claims and they are dismissed with prejudice.

---

[17] Canfield's complaint does not specify whether she seeks a legal or equitable accounting. However, her brief in opposition suggests that she seeks a legal accounting, specifically, not an equitable accounting. (*See* Doc. 40, at 50–51).

i.   Unjust Enrichment

Under Pennsylvania law, the doctrine of unjust enrichment applies only in the absence of a contract. *Wilson Area Sch. Dist. v. Skepton*, 895 A.2d 1250, 1254 (Pa. 2006). "[P]arties in contractual privity . . . are not entitled to the remedies available under a judicially-imposed quasi-contract . . . because the terms of their agreement (express or implied) define their respective rights, duties, and expectations." *Id.* (quoting *Curley v. Allstate Ins. Co.*, 289 F. Supp. 2d 614, 620–21 (E.D. Pa. 2003)). While plaintiffs may plead unjust enrichment as an alternative theory to breach of contract, they may do so only where there is doubt as to the contract's validity. *Gottselig*, 2015 WL 5820771, at *7; *Montanez v. HSBC Mortg. Corp. (USA)*, 876 F. Supp. 2d 504, 516 (E.D. Pa. 2012); *AmerisourceBergen Drug Corp. v. Allstate Healthcare, LLC*, No. 10-6087, 2011 WL 3241356, at *3 (E.D. Pa. July 29, 2011).

Here, there is no doubt regarding the validity of the lease between Canfield and SOP. SOP does not dispute that it is obligated to perform under the lease. Thus, the relationship between the parties is wholly defined by the lease terms and the obligations imposed by those terms. Accordingly, the unjust enrichment claim will be dismissed with prejudice.

ii.   Civil Conspiracy

Canfield's civil conspiracy claim must also be dismissed. In Pennsylvania, a civil conspiracy requires "two or more persons [who] combined or agreed with intent to do an unlawful act by unlawful means."

*Thompson Coal Co. v. Pike Coal Co.*, 412 A.2d 466, 472 (Pa. 1979). It is a claim premised on the existence of some underlying tort. *Boyanowski v. Capital Area Intermediate Unit*, 215 F.3d 396, 405 (3d Cir. 2000). The only tort action in Canfield's complaint is tortious interference with a contract. This claim was not asserted against SOP. If asserted against SOP, this claim would, ultimately, be barred by Pennsylvania's "gist of the action" doctrine. The related civil conspiracy claim must also be barred by this doctrine.

The gist of the action doctrine "precludes plaintiffs from casting ordinary breach of contract claims as tort claims." *McShea v. City of Phila.*, 995 A.2d 334, 339 (Pa. 2010). Thus, a court must determine whether a plaintiff's actions lie in tort or contract where an underlying contract exists. *See Bruno v. Erie Ins. Co.*, 106 A.3d 48, 68 (Pa. 2014). Only where the contract claim is collateral to the tort claim will the tort claim be allowed to proceed. *Egan v. USI Mid-Atlantic, Inc.*, 92 A.3d 1, 18 (Pa. Super. Ct. 2014).

> In this regard, the substance of the allegations comprising a claim in a plaintiff's complaint are of paramount importance, and, thus, the mere labeling by the plaintiff of a claim as being in tort, e.g., for negligence, is not controlling. If the facts of a particular claim establish that the duty breached is one created by the parties by the terms of their contract—i.e., a specific promise to do something that a party would not ordinarily have been obligated to do but for the existence of the contract—then the claim is to be viewed as one for breach of contract. If, however, the facts establish that the claim involves the defendant's violation of a broader social duty owed to all individuals, which is imposed by the law of torts and, hence, exists regardless of the contract, then it must be regarded as a tort.

*Bruno*, 106 A.3d at 68 (internal citations omitted). The claim of tortious interference against the contracting party is barred by this doctrine if it is not

independent of the contract claim. *Alpart v. General Land Partners, Inc.*, 574 F. Supp. 2d 491, 505 (E.D. Pa. 2008).

The court has already determined that a valid breach of contract claim exists against SOP. Canfield's allegations against SOP all relate to the alleged breach of the royalty provision in her oil and gas lease, including the implied duties within that provision. Because Canfield's claims all relate to duties imposed by the lease, she cannot bring a tortious interference claim based on these same allegations. Canfield appears to admit as much in her brief in opposition. (*See* Doc. 40, at 45 n.15). It follows that she cannot bring a civil conspiracy claim where that claim is entirely premised on the tortious interference claim. If Canfield is precluded from bringing the tortious interference claim, it logically follows that she is precluded from bringing the related, tort-based civil conspiracy claim. This logic has even more force where no actual tort claim has been asserted against the defendant. *Cf. Alpart*, 574 F. Supp. 2d at 506 (allowing civil conspiracy claim to proceed only against those defendants with corresponding tort claims).

If Canfield had alleged a fraud then the court would be more reluctant to dismiss the civil conspiracy claim at this early stage. *Cf. Telwell Inc. v. Grandbridge Real Estate Capital, LLC*, 143 A.3d 421, 429–430 (Pa. Super. Ct. 2016) (finding it "far from clear" that the plaintiff's fraudulently misrepresentation claim was barred by the gist of the action doctrine based on the complaint alone). The existence of a fraud claim would make the court's determination of whether the claim is truly in tort or contract more

difficult. *See also* [Mendelsohn, Drucker & Assocs. v. Titan Atlas Mfg., Inc., 885 F. Supp. 2d 767, 790 (E.D. Pa. 2012)](collecting cases and concluding that plaintiff's fraud claim was not barred by the gist of the action doctrine). However, Canfield has not asserted a fraud claim. Thus, the court has no trouble concluding that the action against SOP is truly based on a contract theory, not a tort theory. Accordingly, Canfield's civil conspiracy claim against SOP will be dismissed with prejudice.

### D.   Canfield's Claims Against SNG

SNG seeks dismissal of all of the claims against it in Canfield's complaint, which includes claims for tortious interference (the sixth claim), civil conspiracy (the third claim), unjust enrichment (the fifth claim), and a claim for an accounting (the seventh claim). In addition to other arguments, SNG argues that all of Canfield's allegations fail to state legally cognizable claims against the entity. The court agrees that the claims against SNG are legally deficient and should be dismissed.

### i.   Tortious Interference

Canfield has not alleged a plausible tortious interference claim against SNG. A claim for tortious interference with an existing contractual relationship requires the following four elements:

> (1)   the existence of a contractual relationship between the complainant and a third party;

(2)     an intent on the part of the defendant to harm the plaintiff by interfering with that contractual relationship;

(3)     the absence of privilege or justification on the part of the defendant; and

(4)     the occasioning of actual damages as a result of defendant's conduct.

*Phillips v. Selig*, 959 A.2d 420, 429 (Pa. Super. Ct. 2008) (citing RESTATEMENT (SECOND) OF TORTS §766 (1979)); *see also Adler, Barish, Daniels, Levin & Creskoff v. Epstein*, 393 A.2d 1175, 1183 (Pa. 1978). The second element is sometimes stated as "purposeful action on the part of the defendant, specifically intended to harm the existing relation." *Remick v. Manfredy*, 238 F.3d 248, 263 (3d Cir. 2001) (citing *Pelagatti v. Cohen*, 536 A.2d 1337, 1343 (Pa. Super. Ct. 1987). The second and third element of tortious interference are interwined with the primary inquiry being whether or not the conduct was proper. *Corrections U.S.A. v. McNany*, 892 F. Supp. 2d 626 (M.D. Pa. 2012).

Here, Canfield pleads that SNG "deliberately and without justification" caused SOP to breach the oil and gas lease at issue. (Doc. 1, at ¶59). This is a mere legal conclusion without any well-pleaded, factual allegations. Canfield has not alleged what wrongful conduct or "interference" or "purposeful action" SNG allegedly engaged in to "cause" the breach. The comments to Section 766 of the Restatement (Second) of Torts, which the Pennsylvania Supreme Court has adopted, provide a non-exclusive list of possible means of interference as follows:

> There is no technical requirement as to the kind of conduct that may result in interference with the third party's performance of the contract. The interference is often by inducement. The

66

> inducement may be any conduct conveying to the third person the actor's desire to influence him not to deal with the other. Thus it may be a simple request or persuasion exerting only moral pressure. Or it may be a statement unaccompanied by any specific request but having the same effect as if the request were specifically made. Or it may be a threat by the actor of physical or economic harm to the third person or to persons in whose welfare he is interested. Or it may be the promise of a benefit to the third person if he will refrain from dealing with the other.
>
> [I]t is not necessary to show that the third party was induced to break the contract. Interference with the third party's performance may be by prevention of the performance, as by physical force, by depriving him of the means of performance or by misdirecting the performance, as by giving him the wrong orders or information.

RESTATEMENT (SECOND) OF TORTS §766 cmt. k. (1979). At a minimum, the conduct must be improper. *Epstein*, 393 A.2d at 431.

Here, Canfield has not made any allegations that plausibly lead this court to find inducement, prevention of performance, or fraud or misrepresentations made by SNG. While Canfield describes SNG's conduct as "wrongful," (Doc. 1, at ¶59), she does not explain what constituted the wrongful conduct. *Cf. ClinMicro Immunology Center, LLC v. PrimeMed, P.C., No. , 2012 WL 3011698, at *7 (M.D. Pa. July 23, 2012)* (dismissing tortious interference claim where the plaintiff failed to allege any conduct on the part of the defendant). The only conduct alleged is SNG's purchase of natural gas at an index price. Assuming that Canfield intends for this conduct to serve as the interference, it is not plausible that this conduct, alone, was improper or wrongful, therein satisfying the second and third element.

Conduct is proper where it has been "sanctioned by the rules of the game which society has adopted." *Epstein*, 393 A.2d at 1184 (internal

quotation marks omitted). Generally the court gives consideration to the following factors to determine if conduct is improper: (1) the nature of the actor's conduct; (2) the actor's motive; (3) the interests of the other with which the actor's conduct interferes; (4) the interests sought to be advanced by the actor; (5) the proximity or remoteness of the actor's conduct to the interference; and (6) the relations between the parties. *Id*.

Here, it is not plausible that simply buying natural gas at a favorable price and reselling that product for a profit is wrongful or improper. The buying and selling of natural gas are normal business activities for those entities marketing natural gas. The only motive alleged by Canfield is that of a profit motive for the benefit of the SNG; a simple profit motive would be proper for all corporate entities. There was no relationship between SNG and the leaseholders that would impose a higher negotiating standard on SNG. There is nothing in the complaint to suggest that SNG's conduct in obtaining the index-price deal with SOP was somehow improper, either through misrepresentation or some other conduct. Thus, without more, Canfield's claim fails under the second and third element for tortious interference.

The court also finds that amendment to Canfield's complaint would be futile. *See Alston*, 363 F.3d at 236. Despite having been granted leave to file a brief in opposition in excess of page limitations, Canfield did not directly address SNG's argument that her tort claim was deficient because it did not allege improper conduct. (*See* Doc. 40, at 38). Instead, she cited to and relies on a decision involving a fraud claim and related civil conspiracy claim, not a

tortious interference claim. *See Strayer v. Bare*, No. 3:06cv2068, 2008 WL 1924092 (M.D. Pa. April 28, 2008). This case does not save her tortious interference claim. More importantly, in all of her briefing, Canfield did not allege any conduct by SNG that this court might plausible construe as wrongful. Like her complaint, the only conduct alleged was SNG's purchase and resale of natural gas. Thus, Canfield's claim appears to be premised entirely on this conduct and nothing else. This is not sufficient under Pennsylvania law. Accordingly, her claim against SNG for tortious interference with a contract will be dismissed with prejudice.

ii.   <u>Civil Conspiracy</u>

SNG also seeks dismissal of Canfield's related, civil conspiracy claim because she failed to plead an actionable underlying tort, among other arguments. The court agrees. Having dismissed Canfield's tortious interference claim, the court must also dismiss her civil conspiracy claim.

Civil conspiracy is a claim premised on the existence of some underlying tort. *Boyanowski*, 215 F.3d at 405. The only tort claim in Canfield's complaint is intentional interference with a contract. The court has dismissed this claim with respect to Statoil ASA based on a lack of subject-matter and personal jurisdiction. As discussed above, the court has found that Canfield failed to allege an actionable tort against SNG. Canfield did not bring an intentional interference claim against SOP, and rightly so. Accordingly, there is no remaining tort claim and the civil conspiracy claim must be dismissed.

### iii.   Unjust Enrichment

Canfield also has not alleged a plausible unjust enrichment claim against SNG. "An action based on unjust enrichment is an action which sounds in quasi-contract or contract implied in law." *Roethlein v. Portnoff Law Assocs., Ltd.*, 81 A.3d 816, 825 n. 8 (Pa. 2013) (citing *Schott v. Westinghouse Elec. Corp.*, 259 A.2d 443, 448 (Pa. 1969)). It is an obligation "created by law for reasons of justice." *Schott*, 259 A.2d at 449. It is defined as "the retention of a benefit conferred on another, without offering compensation, in circumstances where compensation is reasonably expected, and for which the beneficiary must make restitution." *Id.* (quoting *Am. & Foreign Ins. Co. v. Jerry's Sport Ctr., Inc.*, 2 A.3d 526, 593 n. 7 (Pa. 2010)). The proper remedy for this claim is restitution. *See id.* (citing to RESTATEMENT (FIRST) OF RESTITUTION §1 (1937)).

In accordance with its definition, a claim for unjust enrichment is sometimes stated as requiring three elements: (1) a benefit conferred on the defendant by the plaintiff; (2) an appreciation of such benefit by the defendant; and (3) acceptance and retention of such benefit by the defendant under such circumstances that it would be inequitable for the defendant to retain the benefit without some payment of value. *Stoeckinger v. Presidential Fin. Corp. of Del. Valley*, 948 A.2d 828, 833 (Pa. Super. Ct. 2008); *AmeriPro Search, Inc. v. Fleming Steel Co.*, 787 A.2d 988, 991 (Pa. Super. Ct. 2001); *see also* RESTATEMENT (THIRD) OF RESTITUTION AND UNJUST ENRICHMENT §1

cmt. d (2011) (describing this formulation as "not helpful"). The most important inquiry in this analysis is whether the enrichment was unjust. *Id.*; *id.*

SNG argues that there has been no benefit conferred on SNG by Canfield. SNG also argues that there is no misleading behavior that would justify shifting Canfield's royalty losses due to SOP's alleged conduct onto SNG. This would mean that her claim fails under the traditional definition of unjust enrichment and the first element of the restated three-part formulation for unjust enrichment—the benefit conferred prong. The court agrees.

The First Restatement of Restitution provides as follows:

A person confers a benefit upon another if he gives to the other possession of or some other interest in money, land, chattels, or choses in action, performs services beneficial to or at the request of the other, satisfies a debt or a duty of the other, or in any way adds to the other's security or advantage. He confers a benefit not only where he adds to the property of another, but also where he saves the other from expense or loss. The word benefit, therefore, denotes any form of advantage.

RESTATEMENT (FIRST) OF RESTITUTION §1 cmt. b. "A person who has conferred a benefit upon another as the performance of a contract with a third person is not entitled to restitution from the other merely because of the failure of performance by the third person." *Id*. §110 (cited with approval in *Meehan v. Cheltenham Twp.*, 189 A.2d 593, 596 (Pa. 1963)). An exception from this principle will be made where there is some misleading behavior. *D.A. Hill Co. v. Cleveland Realty Investors*, 573 A.2d 1005, 1009 (Pa. 1990); *Meehan*, 189 A.2d at 596; *see also* RESTATEMENT (FIRST) OF RESTITUTION §110 cmt. a. Thus, without misleading behavior, a plaintiff cannot shift his or her loss from the breaching party to the party who indirectly benefitted from the breach.

Canfield did not confer a benefit on SNG. If SOP breached the lease as Canfield alleges, then SOP retained a benefit from the breach in the form of lower royalty payments to Canfield. SOP then transferred this benefit to SNG, a transferee of the benefit. Canfield cannot shift the loss she suffered due to SOP's breach onto SNG in the absence of any misleading behavior from SNG. Canfield has not alleged any misleading behavior from SNG in her complaint. In her brief in opposition, Canfield did not directly address SNG's argument and simply concludes that SNG was unjustly enriched because the "[d]efendants manipulated gas sales." (Doc. 40, at 50). However, there is nothing in the complaint or briefing to verify this characterization of SNG's conduct. There is no allegation that SNG induced or made misrepresentations to SOP to use an index price. Again, Canfield attempts to impute the conduct of SOP to SNG without justification. Without any misleading behavior, her claim fails. Accordingly, the unjust enrichment claim against SNG will be dismissed with prejudice.

### iv.   Accounting

Lastly, Canfield is not entitled to a legal accounting from SNG. There is no contractual relationship between the two parties. *See Precision Indus. Equip.*, 2016 WL 192601, at *8–9. There is nothing in the complaint or brief in opposition to suggest that Canfield requests an equitable accounting. Canfield suggests the opposite.[18] Thus, the court will not address this

---

[18] *See, supra* n. 17.

argument and Canfield's claim for a legal accounting against SNG will be dismissed with prejudice.

## V.    CONCLUSION

In light of the above, SOP's and Statoil ASA's collective motion to dismiss, (Doc. 31), is **GRANTED IN PART** and **DENIED IN PART**. The court lacks subject-matter jurisdiction over the claims against Statoil ASA and lacks personal jurisdiction over Statoil ASA. Accordingly, the claims against Statoil ASA are **DISMISSED WITH PREJUDICE** and Statoil ASA will be dismissed as a party. Canfield's first, second, third, fifth, and sixth claim for relief against SOP are also **DISMISSED WITH PREJUDICE**. Her fourth claim for relief premised on an alleged breach of the implied duty to market survives. Canfield may proceed with this claim.

Further, SNG's motion to dismiss, (Doc. 25), is **GRANTED** in its entirety. The claims against SNG are **DISMISSED WITH PREJUDICE** and SNG will be dismissed as a party. An appropriate order shall follow.

s/ *Malachy E. Mannion*
**MALACHY E. MANNION**
**United States District Judge**

**Dated: March 22, 2017**

O:\Mannion\shared\MEMORANDA - DJ\CIVIL MEMORANDA\2016 MEMORANDA\16-0085-02v.2.wpd