**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **CHERYL B. CANFIELD,** | : | |
| **Plaintiff,** | : | **CIVIL ACTION NO. 3:16-0085** |
| **v.** | : | **(JUDGE MANNION)** |
| **STATOIL USA ONSHORE** **PROPERTIES INC.,** | : | |
| | : | |
| **Defendant.** | : | |
| | : | |

**MEMORANDUM**

Currently before the court is a motion for reconsideration filed by plaintiff Cheryl B. Canfield ("Canfield"). (Doc. 75). Canfield requests that this court reconsider its March 22, 2017 order and memorandum. (Docs. 72–73). Specifically, Canfield requests that this court reconsider dismissing the first and second claim for relief in Canfield's complaint, (Doc. 1), against remaining defendant Statoil USA Onshore Properties, Inc. ("SOP").[1] Based on the foregoing, Canfield's motion is **DENIED**.

I.    **BACKGROUND**

Canfield owns property in the Marcellus Shale region within Pennsylvania. On May 6, 2008, Canfield entered into an oil and gas lease

---

[1] The court also dismissed all claims against former defendants Statoil Natural Gas LLC and Statoil ASA. Canfield does not seek reconsideration of the court's dismissal of the claims against these entities.

with Cabot Oil & Gas Corporation ("Cabot Oil") for the exploration of oil and natural gas on her land. Her lease was subsequently acquired, in part, by defendant SOP. Her dispute with SOP primarily revolves around the royalty clause in her lease agreement.

In her complaint, Canfield challenged SOP's calculation of royalties. SOP's calculation is based on the sale of Canfield's natural gas at the well, with that sale price calculated using an index price. SOP takes title to its in-kind percentage of the natural gas extracted at the well and immediately sells the natural gas to an affiliate, Statoil Natural Gas LLC ("SNG"), pursuant to an agreement between the two entities. Under this agreement, SNG takes title to the raw product at the wellhead and then contracts with third parties for post-production services. SNG also contracts with pipeline companies to transport the natural gas through the interstate pipeline system and, ultimately, resells the final product to third-party buyers at receipt/delivery gates along the interstate system. Thus, SOP holds the lease interests for immediate sale and SNG serves as a marketing company, taking title at the well, transforming the product into a finished one, and then selling the post-production product to distribution companies, industrial customers, and power generators downstream.

At issue in this action is the agreement between SOP and SNG for the price of the raw natural gas at the wellhead where title is transferred from SOP to SNG. Their agreement fixes the price of the natural gas to a uniform

2

hub price or index price for natural gas, regardless of whether the natural gas is ever delivered to that particular hub on the interstate pipeline system. These index prices are influential in natural gas markets and purport to represent the price of natural gas at different delivery points in the country. In or around April 2010, SOP and SNG began using a chosen index price as opposed to what Canfield described as an "actual negotiated price." (Doc. 1 ¶26). SOP does not dispute that it fixes the price at the wellhead to an index price.

On January 15, 2016, Canfield filed a putative class action complaint against SOP, SNG, and the indirect parent of these entities, Statoil ASA. Canfield brought six separate claims against SOP specifically. In her first claim, Canfield alleged that SOP breached the express terms of the royalty clause in her lease agreement by using an index price. In her second claim, Canfield alleged that SOP breached the lease by engaging in an affiliate sale with SNG. In her fourth claim, Canfield alleged that SOP breached the implied covenant of good faith and fair dealing in the lease by engaging in an affiliate sale. In this claim, she also alleged that SOP "had an obligation to use reasonable best efforts to market the gas to achieve the best price available." (*Id*. ¶50). The court construed this fourth claim as a duty of good faith claim and/or a duty to market claim. Canfield also alleged civil conspiracy (third claim) and unjust enrichment (fifth claim). She also requested an accounting as a specific form of relief (seventh claim).

On July 9, 2016, SNG filed a motion to dismiss Canfield's complaint. (Doc. 25). Also on July 9, 2016, SOP and Statoil ASA, collectively, filed a motion to dismiss. (Doc. 31). On March 22, 2017, the court granted SNG's motion and dismissed all claims against SNG with prejudice. The court granted in part and denied in part SOP's and Statoil ASA's joint motion. The court dismissed all claims against Statoil ASA with prejudice, finding that the entity was a Norwegian entity immune from suit under the Foreign Sovereign Immunities Act of 1976 ("FSIA"), PUB. L. NO. 94-583, 90 STAT. 2891 (codified at and amending scattered sections of 28 U.S.C.). The court dismissed some, but not all of the claims against SOP.

As against SOP, the court dismissed with prejudice the first, second, third, fifth, and sixth claims for relief. (*See* Doc. 73). The court allowed the implied breach claim, the fourth claim, to proceed. The court determined that Canfield had pled a plausible breach of the implied duty to market, though not a plausible good faith claim under Pennsylvania law. In addition, because Canfield has asserted a plausible contract claim the court allowed her request for an accounting, her seventh claim, to proceed.

On April 5, 2017, Canfield filed the current motion for reconsideration and brief in support. (Docs. 75–76). On April 26, 2017, after requesting and receiving an extension of time, SOP filed a brief in opposition. (Doc. 81). Canfield filed a reply on May 10, 2017, (Doc. 82), rendering her motion ripe for review. Canfield specifically seeks reconsideration of the court's March 22,

2017 decision with respect to her express breach of contract claims—her first and second claims for relief. In the alternative, she seeks reconsideration of the court's decision to dismiss those claims with prejudice and requests leave to amend her complaint. SOP argues that reconsideration is not warranted.

## II.    LEGAL STANDARDS

### A.    Motions for Reconsideration

A motion for reconsideration may be used to seek remediation for manifest errors of law or fact or to present newly discovered evidence which, if previously discovered, might have affected the court's decision. *United States el rel. Schumann v. Astrazeneca Pharmaceuticals, L.P.*, 769 F.3d 837, 848 (3d Cir. 2014) (citing *Max's Seafood Café v. Quineros*, 176 F.3d 669, 677 (3d Cir. 1999)); *Harsco Corp. v. Zlotnicki*, 779 F.2d 906, 909 (3d Cir. 1985). A party seeking reconsideration must demonstrate at least one of the following grounds: (1) an intervening change in the controlling law; (2) the availability of new evidence that was not available when the court granted the motion; or (3) the need to correct a clear error of law or fact or to prevent manifest injustice. *Lazaridis v. Wehmer*, 591 F.3d 666, 669 (3d Cir. 2010); *Max's Seafood Café*, 176 F.3d at 677 (citing *North River Ins. Co. v. CIGNA Reinsurance Co.*, 52 F.3d 1194, 1218 (3d Cir. 1995)). However, "[b]ecause federal courts have a strong interest in the finality of judgments, motions for

reconsideration should be granted sparingly." *Continental Casualty Co. v. Diversified Indus. Inc.*, 884 F. Supp. 937, 943 (E.D. Pa. 1995).

Reconsideration is generally appropriate in instances where the court has "misunderstood a party, or has made a decision outside the adversarial issues presented to the [c]ourt by the parties, or has made an error not of reasoning, but of apprehension." *York Int'l Corp. v. Liberty Mut. Ins. Co.*, 140 F. Supp. 3d 357, 360–61 (3d Cir. 2015) *(*quoting *Rohrbach v. AT & T Nassau Metals Corp.*, 902 F. Supp. 523, 527 (M.D. Pa. 1995)). It may not be used as a means to reargue unsuccessful theories that were presented to the court in the context of the matter previously decided "or as an attempt to relitigate a point of disagreement between the [c]ourt and the litigant." *Id.* at 361 (quoting *Ogden v. Keystone Residence*, 226 F. Supp. 2d 588, 606 (M.D. Pa. 2002)). The "motion will not be granted merely because a party is dissatisfied with the court's ruling, nor will a court consider repetitive arguments that were previously asserted and considered." *Frazier v. SCI Med. Dispensary Doctor + 2 Staff Members*, No. 1:07-194, 2009 WL 136724, at *2 (M.D. Pa. Jan. 16, 2009) (collecting cases).

### B. Leave to Amend

The filing of an amended complaint is governed by Federal Rule of Civil Procedure 15. Where the time to amend as a matter of right has

expired,[2] "a party may amend its pleading only with the opposing party's written consent or the court's leave." FED. R. CIV. P. 15(a)(2). "The court should freely give leave when justice so requires." FED. R. CIV. P. 15(a). In the spirit of Rule 15, the United States Court of Appeals for the Third Circuit has adopted a liberal approach to the amendment of pleadings in order to ensure that "a particular claim will be decided on the merits rather than on technicalities." *Dole v. Arco Chem. Co.*, 921 F.2d 484, 486–87 (3d Cir. 1990). Amendment, however, is not automatic. *See Dover Steel Co., Inc. v. Hartford Accident and Indent.*, 151 F.R.D. 570, 574 (E.D. Pa.1993). Leave to amend will not be granted if there is "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of the allowance of the amendment, futility of amendment, etc." *Foman v. Davis*, 371 U.S. 178, 182 (1962); *see also Oran v. Stafford*, 226 F.3d 275, 291 (3d Cir. 2000).

The court's dismissal of Canfield's first and second claim for relief with prejudice was premised on futility.

> Futility means that the complaint, as amended, would fail to state a claim upon which relief could be granted. The standard for assessing futility is the same standard of legal sufficiency as applied under Federal Rule of Civil Procedure 12(b)(6). In other words, the District Court determines futility by taking

---

[2] *See* FED. R. CIV. P. 15(a)(1).

all pleaded allegations as true and viewing them in
the light most favorable to the plaintiff.

*Great W. Mining & Mineral Co. v. Fox Rothschild LLP*, 615 F.3d 159, 175 (3d
Cir. 2010) (internal quotation marks, citations, and original alterations
omitted). If the proposed amendment "is frivolous or advances a claim or
defense that is legally insufficient on its face, the court may deny leave to
amend." *Harrison Beverage Co. v. Dribeck Imp., Inc.*, 133 F.R.D. 463, 468
(D.N.J.1990).

## III.    DISCUSSION

Canfield challenges the dismissal of her express breach of contract
claims on two primary grounds. First, she alleges that the court's construction
of her lease agreement was incorrect, an error of law. Canfield proposes a
new interpretation of her lease that was not previously proposed to the court.
Second, she alleges that the court misconstrued her second claim for relief,
a factual error that warrants a different result on the motion to dismiss or
leave to amend the complaint. The court disagrees and will address each
argument in turn.

### A.    Canfield's Lease and the Court's Construction

Canfield's breach of contract claims revolve entirely around the
interpretation of the royalty clause in her lease agreement. This provision
provides, in part, as follows:

> Lessee . . . shall pay the Lessor on gas, including casinghead gas and other gaseous substances, produced and sold from the premises *fifteen percent (15%) of the amount realized from the sale of gas at the well*.

(Doc. 1-2 at 1 ¶3) (emphasis added). The clause goes on to define "the amount realized from the sale of the gas at the well" as follows:

> "The amount realized from the sale of the well" shall mean the amount realized from the sale of the gas after deducting gathering, transportation, compression, fuel, line loss, and any other post-production costs and/or expenses incurred for the gas whether provided by a third party, Lessee or by a wholly owned subsidiary of Lessee.

(*Id*.). In addition, in a superceding addendum to the primary lease document that was attached to the lease and signed and dated the same day as the initial lease document there is a "ready for sale or use" clause. (*Id*. at 3–4). This clause directs the lessee to exclude any production or post-production costs in its calculation of royalties, stating as follows:

> Royalties shall be paid without deductions for the cost of producing, gathering, storing, separating, treating, dehydrating, compressing, transporting, or otherwise making the oil and/or gas produced from the lease premises ready for sale or use.

(Doc. 1-2 at 4 ¶13). The addendum states that if there are any inconsistences between the added terms in the addendum and the printed lease terms, the added terms will control and supercede the printed terms of the lease. (*Id*. at 3).

As explained in the court's March 22, 2017 memorandum, certain terms in the lease are well-defined. The phrase "amount realized" in an oil and gas royalty clause has acquired a technical meaning. It "is commonly viewed as synonymous with proceeds." 8 Patrick H. Martin & Bruce M. Kramer, *Williams & Meyers, Oil and Gas Law, Manual of Oil & Gas Terms A* (LexisNexus Matthew Bender 2016) (hereinafter *Williams & Meyers*). Thus, Canfield's lease is a proceeds lease.

The phrase "at the well" is "commonly understood to mean that the oil and gas is to be *valued* in its unprocessed state as it comes to the surface at the mouth of the well." *Williams & Meyers, Manual of Oil & Gas Terms A* (emphasis added). Thus, the phrase "at the well" relates to the proper valuation of the natural gas product, but does not necessarily dictate where the sale is to be made, the point of sale.

The point of sale is left undefined in the lease. Canfield, in her complaint and briefing, argued that the royalty clause required using the net-back method. This method is used when the sale of the natural gas occurs, not at the wellhead, but at some point downstream. To arrive at a wellhead price or the value "at the well," the lessee must deduct post-production costs. This would be a plausible construction of the lease if not for the "ready for sale or use" clause. This provision explicitly prohibits the deduction of post-production fees.

In arriving at its conclusion, the court first noted that the original royalty provision allowed for the deduction of post-production costs to arrive at a

wellhead price by explicitly defining "[t]he amount realized from the sale of gas at the well" as allowing these deductions. As the court noted, however, the "ready for sale or use clause" explicitly disallowed the deduction of post-production costs and was incorporated in an addendum that purported to control and supercede the printed terms of the lease. As the court explained:

> The only way to construe the "at the well" language and ready for sale or use clause together is to require a sale at the physical location of the well. If the sale was to be made downstream, as Canfield suggests, without deductions for post-production costs, as the explicit lease language suggests, then the resulting royalty could not be a wellhead price. This interpretation would render the phrase "at the well" meaningless as this phrase indicates royalties should be based on the wellhead value, not the value of the product downstream.

(Doc. 72 at 46). Construing all of the lease language together, the court determined that SOP's royalty calculation based on a sale at the physical location of the well, without the need to deduct post-production costs incurred to get the product downstream, was proper. Canfield's first claim for relief was then dismissed based on the court's interpretation of the contract.

Next, the court discussed Canfield's second claim for relief which, as stated in the complaint, did not explain if Canfield was alleging a breach based on the express terms of the lease or implied terms. This claim was entirely premised on SOP's sale to an affiliate, SNG, which Canfield alleged was at "artificially low prices." (Doc. 1 ¶39). Canfield alleged that these sales did not constitute "arms'-length transactions." (*Id.* ¶40). These same allegations regarding the necessity of "arms-length transactions" were also

included in Canfield's fourth claim for relief based on the implied covenant of good faith and fair dealing and the implied duty to market. (*See id*. ¶¶49–52). Unsure if Canfield's second claim was based on an express or implied term, the court addressed both possible interpretations of Canfield's "affiliate claim." The court could find no express term requiring SOP to engage in an arms'-length sale and dismissed any express breach claim with prejudice. (*See* Doc. 72 at 48).

The court allowed Canfield's fourth claim to proceed based on the implied duty to market. (*See id*. at 58–60). The court found that SOP's usage of an index price, SOP's sale to an affiliated entity, and the change in the index price around September of 2013 implicated a plausible breach of the implied duty to market. This implied duty required SOP to obtain the best current price reasonably available because the lease was a proceeds lease and not a market value lease.[3] The court concluded that it did not have enough information to determine if this implied obligation had been satisfied.

In addition, in several instances Canfield had suggested that the sale to SNG was a "sham." (Doc. 1 at ¶¶29, 46). SOP, in its briefing, argued that this allegation needed to be dismissed because Canfield had not pled and could not show the elements needed to disregard SOP and SNG's separate, corporate forms. The court disagreed and allowed the "sham sale" allegation to proceed when coupled with the other allegations regarding the index price

---

[3] *See Union Pacific Res. Grp., Inc. v. Hankins*, 111 S.W.3d 69, 72 (Tex. 2003).

and the change of that index price in 2013. (Doc. 72 at 60). Though not explicitly stated in the court's opinion, the court likened the sham sale allegation to misbehavior on SOP's part, not an attempt to disregard SNG's separate corporate form.

## B.    Canfield's Newly Proposed Interpretation of the Lease

Canfield now proposes that the "ready for sale or use" clause in the addendum supercedes the "at the well" language in the original royalty provision. Canfield argues that both the original lease terms and the "ready for sale of use" clause contemplated a downstream sale. The court does not agree with Canfield's interpretation of the lease.

In Pennsylvania, a lease "must be construed in accordance with the terms of the agreement as manifestly expressed, and '[t]he accepted and plain meaning of the language used, rather than the silent intentions of the contracting parties, determines the construction to be given the agreement.'" *Jedlicka*, 42 A.3d at 267 (quoting *Willison v. Consol. Coal Co.*, 637 A.2d 979, 982 (Pa. 1994)). "Determining the intention of the parties is a paramount consideration in the interpretation of any contract." *Hutchinson v. Sunbeam Coal Corp.*, 519 A.2d 385, 389 (Pa. 1986). Generally, a contract should be construed as a whole and all of its parts and provisions should be given effect if possible. 16 SUMM. PA. JUR. 2D *Commercial Law* §1:124 (2d ed.). "A contract should not be interpreted in a way that leads to an absurdity or

13

renders the contract ineffective to accomplish its purpose." *Clairton Slag, Inc. v. Dep't of Gen. Servs.*, 2 A.3d 765, 773 (Pa. Commw. Ct. 2010).

The intention of the parties should be determined based on the language of the contract itself if that language is clear and unambiguous. *Hutchinson,* 519 A.2d at 390. If the language is ambiguous, "parol evidence is admissible to explain or clarify or resolve that ambiguity, irrespective of whether the ambiguity is created by the language of the instrument or by extrinsic or collateral circumstance[—*i.e.*, a latent or patent ambiguity]." *Id.* (quoting *In re Herr Estate*, 191 A.2d 32, 34 (Pa. 1960)). Whether an ambiguity exists is a matter of law. *Id.*

Canfield proposes that the addendum language "assumes a sale downstream." (Doc. 76 at 5). The provision states, in part:

> Royalties shall be paid without deductions for the cost of producing, gathering, storing, separating, treating, dehydrating, compressing, transporting, or otherwise making the oil and/or gas produced from the lease premises ready for sale or use.

(Doc. 1-2 at 4 ¶13). The court fails to see how this provision presumes anything other than the fact that the lessee cannot deduct certain post-production costs. This interpretation is, of course, completely proper and in accord with the "at the well" language when the lessee is selling the natural gas at the physical location of the well. If the provision requires something more, this requirement must be implied and is not based on the addendum's express language.

In support of her interpretation of the lease language contemplating a downstream sale, Canfield submitted an affidavit from her attorney, Douglas A. Clark, along with attached exhibits. (Doc. 77). The affidavit and exhibits detail conversations between Attorney Clark and SOP's in-house counsel, Mary Lou Fry. The attached correspondences between Attorney Clark and Attorney Fry did not discuss Canfield's specific lease, but a lease with another landowner in the putative class. (*Id*. at 2 ¶2). This class member's lease does not calculate royalties based on "the amount realized from the sale at the well," as Canfield's lease does, but on "revenue realized by Lessee for all gas . . . produced and marketed from the Leasehold, less the cost to transport, treat, and process the gas." (*See id*. at 3). This lease has no "at the well" language. The lease does have an addendum provision that disallows the deduction of certain post-production costs from proceeds, but allows

deductions if the lessor enhances the market value to receive a better price.[4] This provision is also not identical to Canfield's "ready for sale or use" clause.

First, Attorney Clark's discussion with Attorney Fry about a different lease and their interpretations of that lease do not shed light on the proper interpretation of Canfield's lease. The leases do not have identical royalty provisions or identical addendum provisions. While it is true that there appears to be a conflict between the allowance of certain deductions in the original lease language and the addendum language discussed by Attorney Clark and Attorney Fry, that conflict does not present an identical issue when compared to Canfield's lease. Unlike Canfield's lease, the addendum language in the lease discussed by Attorney Clark and Attorney Fry does

---

[4] The addendum provision at issue in the correspondences states, in part:

> It is agreed between the Lessor and Lessee that, notwithstanding any language herein to the contrary, all oil, gas or other proceeds accruing to the Lessor under this lease or by state law shall be without deductions, directly or indirectly, for the cost of producing, gathering, storing, separating, treating, dehydrating, compressing, processing, transporting, and marketing the oil, *in enhancing the value of the marketable oil, gas or other products to receive a better price may be deducted* from the Lessor's share of production so long as they are based on Lessee's actual costs of such enhancements.

(Doc. 77-1 at 3) (emphasis added). This provision was incorporated into a correspondence sent to SOP and the court presumes that it accurately quotes the relevant lease addendum provision despite being grammatically unsound.

allow some deductions. How the original royalty provision and the addendum interact to form the parties' agreement in that lease and whether an ambiguity exists in that lease is not a matter before this court. That lease is not before the court. It is the language of Canfield's particular lease that informs the court's interpretation of Canfield's agreement.

Second, it is only when the language of the lease is ambiguous that the court can turn to parole or outside evidence "to explain or clarify or resolve that ambiguity." *Hutchinson,* 519 A.2d at 390. Thus, even if Canfield's lease and the lease discussed in correspondences with SOP's counsel were identical, the court could only turn to these letters for guidance if the written lease language was ambiguous. The court sees no ambiguity in Canfield's lease.

There is nothing ambiguous about the phrase "at the well." There is also nothing ambiguous about the "ready for sale or use" clause. The court can see no ambiguity when these provisions are read together. The court reads these two provisions together to avoid an absurd result, particularly avoiding turning a proceeds, wellhead value royalty clause into a downstream, market value royalty clause. SOP has managed to comply with both provisions. In doing so, SOP and SNG created a market at the well. This was likely unforeseen by Canfield at the time of the signing of the lease as the industry was rapidly expanding in the Marcellus Shale region during this time. There is no express language prohibiting this conduct and SOP's conduct violates

neither the initial lease language or the addendum. If SOP's conduct is a violation of the lease, it is based on implied, but not express, terms.

Canfield also asserts that the "ready for sale or use" clause completely modified the "at the well" language and that the addendum language and "at the well" language cannot be read together. (Doc. 76 at 5 n. 2). Canfield does not explain exactly how the addendum modifies the "at the well" language. As explained above both can in fact be read together. If Canfield's interpretation of the addendum suggests that the initial "at the well" language means something other than "at the well"—*i.e.*, wellhead value—this interpretation must fail based on the plain language of the lease. Accordingly, any claim against SOP based on its sale of gas at the well, as opposed to downstream of the well, fails.

### C.    Canfield's "Sham Transaction Theory"

Next, Canfield argues that the court misinterpreted the "affiliate claim" stated in her second claim for relief. Canfield argues that this affiliate claim was intended to be an express breach of contract claim based on the sham transaction theory stated in *Flanagan v. Chesapeake Exploration LLC*, No. 3:15-CV-0222-B (N.D. Tex. August 10, 2015), an unpublished decision. The court agrees that it misinterpreted Canfield's second claim for relief.

As explained in her brief, Canfield's second claim for relief was premised on the idea that the sale between SOP and SNG was a sham warranting disregard of the corporate form of these two entities. The court

18

interpreted Canfield's sham allegations as allegations of SOP's misbehavior and/or attempts to reduce royalties, not as an allegation of alter ego or veil piercing. Canfield did not allege any of the factors warranting disregarding SNG's separate, corporate form as SOP correctly noted in its briefing to the original motions to dismiss. Nor did Canfield include any specific "sham" allegations in her second claim for relief. Nonetheless, the court finds that this sham transaction claim fails.

In *Flanagan*, the Northern District of Texas found that a lessor stated a plausible claim for express breach of contract where the lessee sold gas at the wellhead to its wholly-owned subsidiary. *Flanagan*, slip op. at 2, 9. The court found that the lessor's claim was plausible under a "sham transaction theory," as termed by the court. *Id*. at 8–9. This theory utilized the alter-ego theory under Texas law. *Id*. The court's sham transaction theory had, at its foundation, a decision by the Texas Court of Appeals in *Texas Oil & Gas Corp. v. Hagen*, 683 S.W.2d 24 (Tex. App. 1984). Like *Flanagan*, the facts in *Hagen* involved a sale between a parent and a wholly-owned subsidiary and the *Hagen* court's reasoning was premised on disregarding the corporate form. *Hagen*, 683 S.W.2d at 28. The *Hagen* opinion was withdrawn and set aside by the Texas Supreme Court due to settlement. *See Texas Oil & Gas Corp. v. Hagen*, 760 S.W.2d 950 (Tex. 1988). The *Flanagan* court concluded that the theory stated in the *Hagen* opinion remained valid even though it was not affirmed by the Texas Supreme Court. *Flanagan*, slip op. at 8.

19

The sham transaction theory in *Flanagan* and *Hagen* is simply this: if the two entities in the sale are treated as one and the same and their corporate form is disregarded then technically no sale has occurred and the true sale is at some other point. Any royalties that were paid based on that false sale would be improper, not based on actual proceeds, and an express breach of contract. While this might be a theoretical basis for liability under Texas law, the court cannot fit this theory into the facts of this particular case in light of Pennsylvania law.

Application of the sham transaction theory used in *Flanagan* would require this court to find that SOP and SNG are one and the same. Analytically, this would make the transaction between them a nullity or as Canfield explains a "sham." To make this claim plausible Canfield must have alleged the five elements of the single entity theory, not the alter ego theory, and then shown that Pennsylvania law would allow the sham transaction theory on that basis. This court would then be faced with deciding whether the Pennsylvania Supreme Court would adopt such a novel theory. The court need not dive into those complexities, however, as two of the elements of the single entity theory are fatal to Canfield's novel claim.

In Pennsylvania, there is a strong presumption against disregarding the corporate form absent unusual circumstances. *Lumax Indus., Inc. v. Aultman,* 669 A.2d 893, 895 (Pa. 1995). There are different names used by courts to disregard the corporate form including the alter ego theory and/or piercing the corporate veil, reverse piercing, and the single entity theory. "The *alter ego*

20

theory is applicable where the individual or corporate owner controls the corporation to be pierced *and the controlling owner is to be held liable*." *Miners, Inc. v. Alpine Equip. Corp.*, 722 A.2d 691, 695 (Pa. Super. Ct. 1998) (emphasis in original). The enterprise entity theory or single entity theory is to be used "where two or more corporations share common ownership and are, in reality, operating as a corporate combine." *Id.*

In order to use *Flanagan's* sham transaction theory, the court would need to apply the single entity theory to disregard the separate corporate forms of SOP and SNG. Unlike the entities in *Flanagan* and *Hagen*, SOP and SNG are not in a parent-subsidiary relationship. Instead, they are affiliated due to their indirect ownership by Statoil ASA, a Norwegian entity that is no longer a party to this case. The alter ego theory is not applicable in this context, but the single entity theory might be applicable if the court presumes that Statoil ASA's indirect ownership is common ownership of both entities.[5]

The Pennsylvania Supreme Court has not yet officially adopted the single entity theory, just as it has not adopted *Flanagan's* sham transaction theory. *See J.B. Hunt Transport, Inc. v. Liverpool Trucking Co., Inc.*, No. 1:11-CV-1751, 2013 WL 3208586, at *4 (M.D. Pa. June 24, 2013); *id.*; *In re Atomica Design Grp., Inc.*, 556 B.R. 125, 173 (Bankr. E.D. Pa. 2016). There

---

[5] The court makes this presumption for analytical purposes, but it is not clear that indirect ownership can be a basis for applying the single entity theory or that SOP and SNG are fully owned by entities that are wholly owned by Statoil ASA. The disclosure statements filed by SOP and SNG do make this point clear, but the statements do clearly indicate that Statoil ASA does not directly own both entities. (*See* Docs. 12–13).

is no consensus regarding whether or not the Pennsylvania Supreme Court would adopt the single entity theory. *See J.B. Hunt Transport*, 2013 WL 3208586, at *4. Most courts confronted with the issue have avoided making this determination where the plaintiff inadequately pleaded its elements. *In re Atomica Design*, 556 B.R. at 174, n. 33 (collecting cases). The court agrees that this is wise and will not address whether Pennsylvania would adopt the single entity theory because Canfield has not pled the required elements to state this novel type of claim when used in conjunction with *Flanagan's* sham transaction theory. Similarly, whether the Pennsylvania Supreme Court would adopt the sham transaction theory where the lessee is a parent entity selling to a wholly-owned subsidiary, or vice-versa, is an issue the court need not address.

The elements of the single entity theory include (1) identity of ownership, (2) unified administrative control, (3) similar or supplementary business functions, (4) involuntary creditors, and (5) insolvency of the corporation against which the claim lies. *Miners*, 722 A.2d at 695. Canfield's novel sham transaction/single entity claim fails based on the fourth and fifth elements of the single entity theory. Addressing the fourth element, there is no indication that SOP is an involuntary creditor. "An involuntary creditor is someone who did not have the opportunity to rely on any information when becoming a creditor, such as a tort victim." *J.B. Hunt Transport*, 2013 WL 3208586, at *4. Assuming SOP owes royalties to Canfield, SOP is a voluntary creditor due to the contractual nature of the relationship. *See id.* With respect

to the fifth element, there is no allegation or any indication that SOP is insolvent.

*Flanagan's* sham transaction theory as a basis for express breach of contract is not plausible when coupled with the single-entity theory, assuming the Pennsylvania Supreme Court would adopt either theory. The single entity theory, if it were to be valid in Pennsylvania, is applicable only where the primary debt holder cannot pay and is a theory used in the interest of equity. It is not a primary basis for contractual liability when viewing its elements. To apply the single entity theory, in advance and without insolvency, as a basis for holding an entity liable for express breach of contract is not plausible. Accordingly, Canfield second claim for relief premised on the sham transaction theory is not plausible.


**D.     Denial of Leave to Amend**

Canfield requests that if the court cannot reconsider its ultimate decision to grant SOP's motion to dismiss that, in the alternative, the court grant her leave to amend the complaint. The court sees no basis for granting her leave. The court's interpretation of the lease is a matter of law and Canfield has offered no basis for changing that interpretation. There is no express language in the lease that SOP breached. With respect to the second claim for relief premised on the sham transaction theory, this claims fails as explained above. Any amendment to the complaint to replead this claim would be futile. Accordingly, Canfield's request for leave to amend will be denied.

## IV. CONCLUSION

For reasons stated above, Canfield's motion for reconsideration, (Doc. 75), will be **DENIED**. SOP's conduct complied with the express terms of the lease. Canfield's claim for breach of implied obligation may, of course, proceed. In addition, Canfield has not asserted a plausible express breach of contract claim based on a sham transaction theory. Based on the facts alleged, such a claim is not plausible and any amendment to restate this claim, if the court were to permit it, would be futile. Accordingly, the court finds no basis for reconsidering its previous dismissal of Canfield's first and second claim for relief with prejudice. An appropriate order shall follow.

s/ *Malachy E. Mannion*
**MALACHY E. MANNION**
**United States District Judge**

**Dated: June 12, 2017**

O:\Mannion\shared\MEMORANDA - DJ\CIVIL MEMORANDA\2016 MEMORANDA\16-0085-03.wpd