UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

ANGELO R. RESCIGNO, SR.,
Executor of the Estate of CHERYL B.
CANFIELD,

             Plaintiff,

    vs.

STATOIL USA ONSHORE
PROPERTIES INC., STATOIL
NATURAL GAS LLC and STATOIL
ASA,

            Defendants.

) Case No. 3:16-cv-00085-MEM
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

**COMPENDIUM OF UNREPORTED DECISIONS CITED
IN LEAD PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF
LEAD PLAINTIFF'S MOTION FOR FINAL APPROVAL OF CLASS
ACTION SETTLEMENT AND PLAN OF ALLOCATION**

ROBBINS GELLER RUDMAN
  & DOWD LLP
SAMUEL H. RUDMAN
FRANCIS P. KARAM
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100

THE CLARK LAW FIRM
DOUGLAS A. CLARK, Attorney I.D. #76041
1563 Main Street
Peckville, PA  18452
Telephone:  570/307-0702

LAW OFFICES OF JOHN F. HARNES PLLC
JOHN F. HARNES (admitted *pro hac vice*)
750 Lexington Avenue, 9th Floor
New York, NY  10022
Telephone:  917/810-8460

*Attorneys for Plaintiff*

2012 WL 6043272

2012 WL 6043272
Only the Westlaw citation is currently available.
NOT FOR PUBLICATION
United States District Court, D. New Jersey.

Raymond ALVES, et al., Plaintiffs,

v.

Merrill MAIN, Ph.D., et al., Defendants.

Civil Action No. 01–789 (DMC).
|
Dec. 4, 2012.

OPINION

CAVANAUGH, District Judge.

**\*1** This action began with the filing of a *pro se* complaint
by Plaintiff Raymond Alves more than a decade ago. Since
then, the case has transformed into a large-scale consolidated
class action on behalf of all involuntarily civilly committed
residents of New Jersey's Special Treatment Unit ("STU")
in Avenel, New Jersey, confined pursuant to the New Jersey
Sexually Violent Predator Act, N .J.S.A. 30:4–27.24, *et seq.*
("NJSVPA" or "the Act").

Represented *pro bono* by the Seton Hall Law School Center
for Social Justice and Gibbons P.C., the plaintiff class
challenges the mental health treatment provided at the STU,
alleging that the New Jersey Department of Human Services
does not provide minimally adequate treatment required by
federal and state law. After years of litigation followed by
years of complex and intense settlement negotiations, a class
wide settlement has been reached that the settling parties
contend substantially improves the treatment available at the
STU and provides the residents with a better opportunity to
regain their liberty.

Presently before the Court is the joint motion for final
approval of the parties' settlement. [CM/ECF No. 193.] The
parties, through their counsel, seek: (1) approval of the
proposed Settlement Agreement; (2) a nominal award of
attorney's fees to Class Counsel; and (3) the appointment of
a monitor in furtherance of the Settlement Agreement. The
papers submitted have been carefully considered, as have
objections to the settlement. A Fairness Hearing was held on
November 13, 2012. For the reasons that follow, the Court

approves the final settlement and **grants** attorney's fees to the
Seton Hall Law School Center for Social Justice in the amount
of $78,000. The Court will appoint a monitor by separate
order.

**I. *BACKGROUND*** [1]

[1]     Aspects of this Opinion are drawn from the parties' joint
        submission.

**A. *The Parties***
Plaintiffs are Raymond Alves, Derrick Sessoms and Michael
Culbreath on behalf of themselves and a class consisting
of all persons involuntarily confined to the STU under the
New Jersey Sexually Violent Predator Act.[2] Defendants are
Merrill Main, Ph.D., in his official capacity of Clinical
Director of the STU; Jennifer Velez, in her official capacity
as Commissioner of the New Jersey Department of Human
Services ("DHS"); Lynn A. Kovich, in her official capacity
as Assistant Commissioner of the New Jersey Division of
Mental Health and Addiction Services ("DMHAS"); and
Jeffrey Chiesa, in his capacity as the Attorney General of New
Jersey.

[2]     At times in this Opinion, Plaintiffs and the Class are
        referred to as "residents." This is the term the parties use
        to refer to individuals confined to the STU.

**B. *Overview***
Plaintiffs are convicted sex offenders who have completed
prison sentences but remain involuntarily confined pursuant
to the NJSVPA, which authorizes the indefinite civil
commitment of any individual determined to be a "sexually
violent predator." N. J.S.A. 30:4–27 .26. A sexually violent
predator is defined as a person who has been convicted of
at least one sexually violent offense and who suffers from
"a mental abnormality or personality disorder that makes
the person likely to engage in acts of sexual violence if not
confined to a secure facility for control, care and treatment."
*Id.* The "secure facility" that houses the Plaintiffs in this
case is the STU in Avenel, New Jersey, which is operated by
the New Jersey Department of Corrections. N.J.S.A. 30:4–
27.34(a).

**\*2** Once committed to the STU, a sexually violent predator
remains there until such time as a state court finds that he
"will not be likely to engage in acts of sexual violence," in
which case he may be "conditionally discharged." N.J.S.A.
30:4–27.32(c)(1). In order to be "conditionally discharged,"

the individual must establish that he has been successfully treated for the mental abnormality or personality disorder that was the basis for his confinement to the STU. In order for residents to have a meaningful opportunity to work toward a potential release, the Act provides that class members receive mental health treatment, which is provided by the New Jersey Department of Human Services. N.J.S.A. 30:4–27.34(b).

Plaintiffs claim, *inter alia,* that the various Defendants have failed to provide the class with adequate mental health treatment required by federal and state law. Mental health treatment is key for STU residents. As discussed below, without adequate mental health treatment, Plaintiffs and the class members will likely never be released from the STU. However, with adequate treatment, the residents have an opportunity to show that they have been cured of their mental abnormality and deserve a conditional discharge.

### C. *The STU—Present Day*
Dr. Main, the clinical director at the STU, has submitted a declaration that details the treatment programs presently in place at the facility. According to Dr. Main, the primary therapy provided to Class Members is a form of group therapy administered in "process groups." The process groups are supplemented, for some residents, by individual resident specific, psycho-educational "modules" devoted to topics such as victim empathy, relapse prevention, and arousal reconditioning. (Declaration of Merril Main, Ph.D. ("Main Decl.") ¶ 3.) At present, two process groups are offered to the residents per week.

The treatment program at the STU is divided into phases, from phase 1 (Orientation) to phase five (Transition). (Main Decl. ¶ 5 .) When the STU staff believes that a resident has sufficiently progressed through the stages and further involuntarily commitment is unnecessary, a conditional discharge is recommended pursuant to the Act. (*Id.*) Dr. Main states that in nearly every case where a conditional discharge has been recommended, the resident had reached stage 5 of the program. (*Id.*) Discharge of STU residents is rare; since the Act was implemented in 1999, 525 individuals have been committed under the NJSVPA. (Declaration of Barbara Moses, Esq. ("Moses Decl.") ¶ 22(a).)[3] Of the 525 individuals committed, 47 residents have been released from the STU into the community at large. (*Id.*) Of the 47 residents released from the STU, 28 were discharged, in accordance with the recommendation of their treatment team, after reaching stage 5 of the treatment program. (*Id.*) The

remaining 19 were released by state courts at phases 1–4 of the treatment program, nearly always over the objection of the STU treatment team. (*Id.*)

[3]     Ms. Moses is a Visiting Clinical Professor at Seton Hall University School of Law and serves as the Director of the Civil Rights and Constitutional Litigation Clinic at Seton Hall's Center for Social Justice, co-class counsel in this case. (Moses Decl. ¶ 1.)

**\*3** As of June 26, 2012, the total population of the STU stood at 469. (Moses Decl. ¶ 22(d).) 165 of these residents have been continuously confined for 10 years or more. (*Id.*) As of May 4, 2012, there were 5 men confined to the STU who had reached stage 5 of the treatment program and 20 men in phase 4. (*Id.*)

### D. *The Operative Complaint*
Plaintiffs in this case challenge the quantum and quality of therapy offered, contending it is inadequate. Plaintiffs' Second Amended Complaint ("SAC") alleges inadequacy with respect to current treatment at the STU based on, among other things, the following:

• That Defendants offer Class Members a maximum of two 90–minute process groups per week, and that the groups are often overcrowded, start late, or end early, further reducing therapy time (SAC ¶¶ 32–33);

• That Defendants prevent many Class Members from enrolling in the modules they need in order to progress in treatment by failing to offer those modules at all or offering them too infrequently (SAC ¶¶ 34–35);

• That Defendants arbitrarily restrict certain Class Members (particularly those housed in the South Unit) from enrolling in therapy sessions that meet elsewhere in the STU, thus preventing them from completing modules prescribed for them and necessary for advancement (SAC ¶¶ 36–37);

• That Defendants improperly withhold therapy as punishment for infraction of STU rules (SAC ¶ 38);

• That Defendants fail to give Class Members timely and concrete information concerning the criteria used to evaluate their treatment progress and readiness for release, the goals they must accomplish in order to progress towards discharge, and the time it will take to do so, leading to confusion, frustration, and a counter therapeutic sense of hopelessness throughout the STU (SAC ¶ 42);

• That Defendants fail to assist Class Members with the discharge planning that is crucial to convince a court that they can in fact be safely released (SAC ¶ 43);

• That treatment is not adequately tailored to the specific needs of each Class Member, as required by the NJSVPA (SAC ¶ 31);

• That these deficiencies are caused in part by Defendants' failure to hire and retain sufficient qualified mental health professionals with training in sex offender specific treatment (SAC ¶ 33);

• That as a result of these deficiencies, few Class Members have been able to regain their liberty, even conditionally, and few are now sufficiently advanced in the treatment program to have a reasonable hope of discharge in the foreseeable future (SAC ¶¶ 39–41); and

• That although the DOC has appointed an ombudsman to address complaints about the STU facilities or security issues, there is no comparable mechanism for addressing complaints regarding the treatment program, leading to frustration-and a large number of *pro se* complaints by STU residents (SAC ¶ 44).

### E. *Relevant Procedural History*

#### i. *Commencement of the Action*

**\*4** On February 15, 2001, the original Complaint in the *Alves* case was submitted *pro se* by Plaintiff Raymond Alves. On March 9, 2001, this Court granted Alves *in forma pauperis* status, directed that his Complaint be filed, and appointed *pro bono* counsel. On July 30, 2002, the Seton Hall University School of Law Center for Social Justice, through its then director, Baher Azmy, Esq., entered an appearance as *pro bono counsel* for Mr. Alves. (Declaration of Baher Azmy, Esq. ("Azmy Decl.") ¶¶ 1–3, 6.)[4] Gibbons P.C., through Lawrence S. Lustberg, Esq., has joined the Center for Social Justice as *pro bono* co-counsel for Plaintiffs.

[4]     Mr. Azmy is the Legal Director of the Center for Constitutional Rights in New York, and is on leave from Seton Hall University School of Law, where he was a Professor of Constitutional Law and Director of the Center for Social Justice. (Azmy Decl. ¶ 1.)

On October 25, 2002, Alves filed an amended complaint asserting claims against both the DHS officials responsible for the mental health program at the STU and New Jersey

Department of Corrections officials responsible for the STU facility where Alves was confined at the time, then located in Kearney, New Jersey. (Azmy Decl. ¶¶ 7–11.) On November 17, 2003, this Court granted in part a pre-answer motion to dismiss the Amended Complaint, finding that the NJSVPA was non-punitive on its face, and that, after *Seling v. Young,* 531 U.S. 250, 121 S.Ct. 727, 148 L.Ed.2d 734 (2001), a plaintiff could not state a viable claim under the Double Jeopardy Clause on the theory that the Act was punitive "as applied." (Opinion dated November 17, 2003, at 9–11.) This Court also dismissed Plaintiff's claim under the Equal Protection Clause. (*Id.*)

#### ii. *Discovery & Consolidation*

From 2003 through 2005, the parties engaged in extensive discovery, including written discovery and depositions. (Azmy Decl. ¶¶ 14–26.) During this general time frame, approximately 30 additional cases filed by *pro se* residents of the STU were consolidated into the *Alves* case. (Declaration of David L. DaCosta, Esq. ("DaCosta Decl.") ¶ 3.) These consolidations included the case captioned *Bagarozy v. Harris,* 04–3066, which was filed by a group of STU residents led by Richard Bagarozy (the "Bagarozy Plaintiffs"). Prior to consolidation of the *Bagarozy* case into *Alves,* the Honorable Faith Hochberg, U.S.D.J., entered an Order granting the Bagarozy Plaintiffs' request for *pro bono* counsel, and eventually the law firm of Greenberg Traurig, LLP entered an appearance on behalf of the Bagarozy Plaintiffs. (DaCosta Decl. ¶ 4.)

#### iii. *Settlement Negotiations*

Starting in late 2004 and gaining steam in early 2005, the parties decided to concentrate on settlement negotiations with the goal of resolving all cases on behalf of all STU residents on a class wide basis. (Azmy Decl. ¶¶ 20–21.) Although no formal motion to amend the complaint or certify a class was brought at that time, it was understood by all that, given the nature of the relief sought and the alterations to the treatment structure at the STU that were being discussed, negotiations on a class-wide basis were the only feasible way for the case to resolve. This began a period of intensive settlement negotiations, which were hard-fought and often highly contentious. (Azmy Decl. ¶¶ 27–38; DaCosta Decl., ¶¶ 3–4; Moses Decl. ¶¶ 6–9.)

**\*5** In 2008, after the parties had reached an impasse over what would constitute adequate mental health treatment at the STU, the parties agreed upon the utilization of a joint

neutral expert, Judith Becker, Ph.D., who was selected by Plaintiffs' *pro bono* counsel and Defendants. (Azmy Decl. ¶¶ 36–38; DaCosta Decl. ¶ 7.) The concept was that Dr. Becker would review the existing STU treatment program, offer her opinion on the program, and produce a report, which would be considered solely for purposes of breaking the stalemate in settlement discussions. On December 29, 2008, Dr. Becker issued her report. (*See* Report of Judith V. Becker, Ph.D ., attached to the Certification of Ian Marx, Esq., as Exhibit C (the "Becker Report").)

Negotiations were continuing into 2010 when Alves and others were moved from Kearney, New Jersey facility to the current STU located in Avenel. As a result of this move, the Department of Corrections and DOC-affiliated defendants took the position that the claims against them were moot. (Azmy Decl. ¶¶ 50–51.) In response, the parties agreed to work primarily toward a settlement of Plaintiff's treatment related claims, which were pending only against the Department of Health and Human Services and DHS-related defendants. (Azmy Decl. ¶¶ 51–52.) Although the DOC defendants were not formally dismissed at this time, the case turned away from DOC issues and toward resolving the treatment claims against the DHS defendants.

## II. *OVERVIEW OF THE SETTLEMENT AGREEMENT*
In September 2011, the parties agreed to a tentative settlement, which required final approval from various levels of the state government. (Azmy Decl. ¶ 52; Moses Decl. ¶ 15.)

On January 20, 2012, the Court conducted an in-person conference with counsel at which it was represented that counsel had authority to finalize the settlement agreement. (Moses Decl. ¶ 16.) In attendance, by video conference, were the three lead plaintiffs in the case, Raymond Alves, Michael Culbreath, and Derrick Sessoms. (*Id.*)

On February 3, 2012, the Settlement Agreement was executed. (Moses Decl. ¶¶ 16–17 & Settlement Agreement (attached as Exhibit A).)[5] The settlement requires Defendants to improve both the quantity and quality of the mental health treatment offered in the STU, thereby affording Class Members a better chance to be released from the facility. The Settlement Agreement itself is a lengthy document, running 35 single-spaced pages with an additional 35 pages of exhibits. The crux of the settlement is to respond to the issues in the Complaint and increase the volume and

availability of treatment. Some of the more pertinent terms are the following.[6]

5    An addendum to the Settlement Agreement was executed in July 2012. (Moses Decl., Ex. B.)

6    The pertinent settlement terms are merely summarized herein. In the event the description of settlement terms in this Opinion conflicts with the actual language of the Settlement Agreement, the Settlement Agreement, of course, controls.

• *Guarantee of Comprehensive, Individualized Treatment Plan.* The Settlement Agreement requires that Defendants provide every member of the STU with a comprehensive treatment plan within 45 days of the individual's commitment to the facility. (Moses Decl ., ¶ 19(a).) The treatment plan must be narrowly tailored to the individual resident's needs. (*Id.*) Moreover, the plan will be reviewed every six months by the resident's treatment team and once a year by the STU's Treatment Progress Review Committee ("TPRC"). (*Id.*)

> **\*6** • *Guarantee of Therapy Hours.* The Settlement Agreement increases and guarantees a specific number of hours of treatment. Upon approval, Defendants are required to offer "every class member (including detainees not yet committed who nonetheless wish to commence treatment, but excluding residents who refuse treatment and those on MAP)[7] a minimum of 20 hours per week of professionally-led or professionally monitored therapeutic programming, regardless of the resident's living quarters." In addition, the "therapy offered must include, at a minimum, three 90–minute process group sessions per week, one to two psycho-educational modules, if recommended for that resident, and a 90–minute self help group.... If a module recommended to a resident in phase 3 or higher is unavailable, Defendants must provide that resident with the equivalent self-study materials." (Moses Decl. ¶ 19(b).) Although residents on program MAP "may not be entitled to the full 20 hours of therapy, they will continue to attend their core therapy, consisting of regularly scheduled process groups and modules, unless therapeutically contraindicated. Residents on tier or wing MAP will be offered twice-weekly MAP process group." (*Id.*)

7     MAP is a program generally reserved for residents displaying more volatile or problematic behavior. A more fulsome discussion of the MAP program can be found in prior opinions. *See Fournier v. Corzine,* No. 07–1212, 2007 WL 2159584, at \*8 n. 11 (D.N.J. July 26, 2007).

- *No Changes in Program Phases Without Notice.* The Settlement Agreement provides that Defendants may not increase the number of treatment phases (as discussed previously, presently at 5) without notice to Class Counsel. And the treatment phases cannot be altered so as to intentionally prolong a resident's confinement to the STU. (Moses Decl. ¶ 19(c).)

   - *Communication and Feeedback for Residents.* The Settlement Agreement provides that "[t]he treatment plans, six-month reviews and TPRC reviews must include specific and individualized recommendations for each resident's treatment goals. Residents must be informed of the objective criteria needed to meet those goals (for example, completion of certain modules and successful post-module testing) and must be given anticipated time frames for completion of the objective criteria and for attainment of their ultimate treatment goals. Similarly, the TPRC reports must include an anticipated time frame for promotion for the next phase of the program. In addition, Defendants must adopt objectively measurable pre-and post module testing and provide residents with their results within 15 days of the test. Defendants must also inform the residents of any significant decision regarding their treatment ... both orally and in writing within 15 days." (Moses Decl. ¶ 19(d).)

   - *Post–Discharge Preparation.* The Settlement Agreement requires that social work staff at the STU develop a discharge plan for residents in phase 4 or higher, which includes requiring the staff to assist with housing and obtaining the support necessary for discharge. (Moses Decl. ¶ 19(e).)

   - *Vocational, Educational, and Recreational Opportunities.* "Defendants must conduct an individualized vocational assessment of each resident within 45 days of final commitment, develop a plan for building on his skills and strengths, and offer each resident not on MAP or treatment refusal status an average of 10 weekly hours of institutional (paid) work or other vocational activities. Residents will also be entitled to ten hours of educational activities per week, including GED coursework.... Recreational activities must also be available six days per week." (Moses Decl. ¶ 19(f).)

 \*7   • *Hire Additional Treatment Staff.* The STU must hire additional licensed and qualified therapists so that the therapist to resident ratio is 8 therapists for every 50 residents. Therapists must spend 16 hours a week in direct contact with the residents. (Moses Decl. ¶ 19(g).)

- *Staff Training & Evaluation.* The Settlement requires the DHS to retain independent experts in the field of sex offender treatment and have at least one expert visit the facility per quarter. The expert will evaluate the STU program, report his or her findings to the STU administration and provide continuing education to the STU's therapists and staff. (Moses Decl. ¶ 19(h) .)

- *The Appointment of a Treatment Ombudsperson.* The Settlement Agreement requires Defendants to retain a treatment ombudsperson who will establish a resident complaint system for treatment issues. The ombudsperson will be required to investigate all treatment related complaints and report back to residents. The ombudsperson will also meet with the residents in town hall meetings. (Moses Decl. ¶ 19(i).)

- *The Appointment of an Independent Monitor.* The Settlement Agreement will also result in the appointment of a neutral monitor by the Court. The monitor will be responsible for conducting annual inspections of the facility, during which he or she will be given full access to the facilities, residents and staff. The agreement also provides that the monitor will prepare a written report regarding defendant's compliance for the period being evaluated, which will be provided to counsel for Plaintiffs and Defendants. Defendants will then have a period to respond to the monitor's report. If Defendants lodge objections and they are overruled, Defendants will have a 75 day period to cure any deficiency identified. If they fail to do so, Plaintiffs can seek enforcement from the Court or declare the provisions null and void and

resume litigation. The monitoring period is for a presumptive five years. There are certain triggers that can shorten the monitoring period for specific provisions to no less than 3 years. (Moses Decl. ¶ 19(j).)

• ***Preservation of Individual Claims.*** The settlement agreement also preserves for class members the right to pursue damages with respect to any claims not alleged in the Second Amended Complaint, including tort claims. (Moses Decl. ¶ 31(a) citing Settlement Agreement § Section IX.)

### III. *CERTIFICATION OF THE CLASS & PRELIMINARY APPROVAL*

On March 24, 2012, Plaintiffs filed an amended consolidated class action complaint, which remains the operative pleading.[8] Shortly thereafter, the parties filed a joint motion for class certification and preliminary approval of the settlement. By Order dated March 29, 2012, modified on April 4, 2012, this Court certified a class pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(2) that is defined as:

[8]     Of note, the Department of Corrections and the DOC-related defendants are not named in the SAC and the parties, and any related claims, are not part of this settlement. (Moses Decl. ¶ 31(e); Azmy Decl. ¶ 51.)

all persons who are committed or confined pending commitment to the New Jersey Special Treatment Unit pursuant to the New Jersey Sexually Violent Predator Act, N.J.S.A. 30:4–27.24, *et seq.*

**\*8** (Order dated April 4, 2012; CM/ECF No. 158.) This Court also: (1) found that the settlement is "preliminarily approved as fair, reasonable and adequate subject to further consideration by this Court"; (2) designated Plaintiffs as class representatives; (3) appointed Gibbons P.C. and Seton Hall's Center for Social Justice as Class Counsel; (4) approved the form and manner of notice to be given to the class, including a deadline for class members to submit objections; and (5) scheduled a Fairness Hearing. *Id.*

The Class includes approximately 471 residents of the STU. (Declaration of Barbara Moses, Esq., Regarding Notice and Objections, dated June 12, 2012 ("June 12 Decl.") ¶ 8; CM/ECF No. 177.) Notice of the settlement was provided to all class members who were given a chance to submit objections. (June 12 Decl. ¶¶ 4–7.)[9] Approximately 156 objections to the settlement have been received. (June 12 Decl. ¶ 9.)

[9]     Rule 23(e) requires that notice of a proposed class settlement be provided "in a reasonable manner to all class members who would be bound." *Id.* Here, no legitimate challenge to the adequacy of class notice has been made. And the fact that a number of objections have been received confirms that notice of the proposed settlement was adequate.

Thereafter, Class Counsel and Defendants submitted a joint motion for final approval of the settlement. *Pro bono* counsel for the Bagarozy Plaintiffs submitted a brief in opposition to the settlement. Generally speaking, as is discussed more below, the Bagarozy Plaintiffs are dissatisfied with the settlement because it does not incorporate all of the recommendations of Dr. Becker, the expert who evaluated the STU during settlement negotiations. This group of Plaintiffs also objects to the settlement's lack of guaranteed funding. In addition to the brief from the Bagarozy group, 156 objections were received by individuals confined to STU. These objections are, at times, difficult to understand and run the gamut from objecting to issues or parties that are not involved in the case, to seeking millions of dollars in damages, even though this is an injunctive class action.

On November 13, 2012, a Fairness Hearing was held pursuant to Federal Rule of Civil Procedure 23(e)(2). Appearing for Plaintiffs was Class Counsel, Seton Hall's Center for Social Justice and Gibbons, as well as three Seton Hall Law School students working under the supervision of Professor Moses.[10] *Pro bono* counsel Greenberg Traurig appeared for the Bagrozy Plaintiff/Objectors. Also appearing was Jack Furlong, Esq., representing two Plaintiffs, William Moore and Maryann Hysler.[11]

[10]     The students are Lisa Savadjian, Rose Harper, and Kyle Bruno. (Transcript of Fairness Hearing, dated November 13, 2012 ("Tr.") at 3:21–25.)

[11]     Lamont Brooks and Douglas Minatee, two former residents of the STU, also appeared at the Fairness Hearing and placed comments on the record. (Tr. at 49:4–56:4.) However, the Court notes that neither Mr. Brooks nor Mr. Minatee are class members since neither is confined to the STU.

### IV. *APPROVAL OF CLASS ACTION SETTLEMENTS*

Under Rule 23, a court may only approve a class settlement after it has held a hearing and determined that the settlement is "fair, reasonable, and adequate." Fed.R.Civ.P. 23(e)(2).

2012 WL 6043272

The fairness of a class action settlement is most commonly evaluated by consideration of the factors found in *Girsch v. Jepson,* 521 F.2d 153 (3d Cir.1975):

> 1) the complexity, expense and likely duration of the litigation ...; (2) the reaction of the class to the settlement ...; (3) the stage of the proceedings and the amount of discovery completed ...; (4) the risks of establishing liability ...; (5) the risks of establishing damages ...; (6) the risks of maintaining the class action through the trial ...; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery ...; (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

**\*9** The *Girsch* factors are a guide and the absence of one or more does not automatically render the settlement unfair. *See In re Am. Family Enter.,* 256 B.R. 377, 418 (D.N.J.2000). Rather, the Court must look at all the circumstances of the case and determine whether the settlement is within the range of reasonableness. *See In re AT & T Corp. Secs. Litig.,* 455 F.3d 160 (3d Cir.2006). In addition, a district court should consider whether the settlement is proposed by experienced counsel who reached the agreed-upon terms through arms-length bargaining. *See In re Warfain Sodium Antitrust Litig.,* 391 F.3d 516, 535 (3d Cir.2004). Settlement of litigation is generally favored by courts, especially in the class action setting. "The law favors settlement, particularly in class actions and other complex cases where substantial judicial resources can be conserved by avoiding formal litigation." *In re Gen. Motors Corp. Pick–Up Truck Fuel Tank Prod. Liab. Litig.,* 55 F.3d 768, 784 (3d Cir.1995); *see also In re Warfain,* 391 F.3d at 535 (noting the "overriding public interest in settling class action litigation"). At the same time, the district court functions as "a fiduciary who must serve as a guardian of the rights of absent class members" by ensuring that the proposed settlement is fair, reasonable, and adequate." *In re General Motors,* 55 F.3d at 785. In sum, the Court's evaluation of the settlement is guided by the *Girsch* factors, but the Court is "free to consider other relevant considerations and tacts involved in the settlement." *Colon v. Passaic County,* No. 08–4439, 2012 WL 1457764, at *2 (D.N.J. Apr.24, 2012).

## V. APPLICATION OF THE GIRSCH FACTORS

### 1. Complexity, Expense and Likely Duration of the Litigation

This factor is intended to "capture 'the probable cost, in both time and money, of continued litigation.' " *In re General Motors,* 55 F.3d at 812 (quoting *Bryan v. PPG Indus.,* 494 F.2d 799, 801 (3d Cir.1974)). Where the complexity, expense, and duration of litigation are significant, the Court will view this factor as favoring settlement. *In re Prudential Ins. Co. of Am. Sales Practices Litig.,* 962 F.Supp. 450, 536 (D.N.J.1997) ("*Prudential I* ").

If this action were to continue, the parties would expend considerable time and money pursuing their claims. Absent settlement, additional discovery would be required, including depositions, additional expert discovery and dispositive motion practice. If the action survived dispositive motion practice (in whole or in part), a trial would also be required, which could take weeks. Appeals that would likely follow could take additional years. Added to all of this would be the further complication that the consolidated cases contain a mix of individual *pro se* litigants who would likely seek to pursue individual claims. By reaching a settlement now, the parties "avoid[ ] the costs and risks of a lengthy and complex trial." *Ehrheart v. Verizon Wireless,* 609 F.3d 590, 595 (3d Cir.2010). Since continued litigation would be time-consuming and expensive, settlement makes eminent sense. This factor weighs in favor of approving the settlement.

### 2. Reaction of Class

**\*10** The second *Girsch* factor evaluates whether members of the class generally support or object to the settlement. *See In re General Motors,* 55 F.3d at 812. In order to properly evaluate the settlement, "the number and vociferousness of the objectors" must be examined. *Id.* Generally, "silence constitutes tacit consent to the settlement." *Id.*

Here, there are approximately 471 members in the Class. (*See* June 12 Decl. ¶ 8.) Two-thirds of the class did not submit timely objections to the settlement. (*Id.*) Thus, the Court presumes that two-thirds, or approximately 312 class members, *support* the settlement. *See In re General Motors,* 55 F.3d at 812. This is strong support in the STU community for approval of the Settlement Agreement. *See, e.g., Pack v. Beyer,* No. 91–3709, 1995 WL 775360, at *6 (D.N.J. Dec.22, 1995) (approving prison conditions settlement with more than 40% of class objecting because, in part, "a clear majority of the class favors settlement"). The two-third support is even more impressive because Class Counsel states that she observed a flyer posted in the STU, which was apparently created by an objecting member of the class, attempting to gather support for opposition to the settlement, stating:

"Counsel has told us that the more residents that make valid challenges, the better chance we have of getting a better deal." (June 12 Decl. ¶ 7.) The Court does not comment on the flyer to suggest that the effort was in any way improper, but rather to illustrate that, despite this effort, more than two-thirds of the class (i.e., over 300 STU residents) agreed with the settlement reached. (Moses Decl. ¶ 29.) Thus, overall, the Court considers the reaction of the class to be very positive.

Objections to the settlement were also received. The Bagarozy Plaintiffs, through *pro bono* counsel, the Greenberg Trauig law firm, submitted a brief, which primarily objects to the settlement based on their concern that the settlement does not incorporate all or mostly all of the report of Dr. Becker. In addition, the Court received 156 timely *pro se* objections to the settlement, which amounts to about one-third of the class. (June 12 Decl. ¶ 9.) These objections were submitted by un-counseled class member residents of the STU and touch on a wide range of issues. Some of the objections are difficult to understand, and many are repetitive.[12] Moreover, a number of the objections lack legal merit on their face[13] and/ or are "the result of a fundamental misunderstanding of the underlying purpose of the class action, a lack of knowledge of the ramifications to class members of a court-approved settlement, and unrealistic or overly optimistic expectations." *Hawker v. Consovoy,* 198 F.R.D. 618, 628 (D.N.J.2001).[14] Class Counsel has submitted a declaration that attempts to summarize these *pro se* objections. (*See generally* June 12 Decl.)

[12]  For example, a number of objections are presented in the context of form letters, which means that the letter was prepared by a resident (or residents) and then circulated to others who changed the name on the letter and submitted it. Form letters like those described are submitted multiple times and are signed by various class members, sometimes with alterations and comments. (June 12 Decl. ¶ 12.)

[13]  By way of example only, one objection complains about life in the STU but also states that the objector generally "does not wish to escape and that if the doors were opened he would get some burgers but return to the STU to eat them." (Moses Decl. ¶ 25(d) .)

[14]  In cases of this type, it is not unusual to have a large number of objections, nor is it unusual for a court to approve a settlement over such objections. *See, e.g., Reed v. General Motors Corp.,* 703 F.2d 170 (5th Cir.1983) (approving settlement over objections of

more than 40% of class members and 23 out of 27 named plaintiffs); *Austin v. Pa. Dep't of Corr.,* 876 F.Supp. 1437, 1472 (E.D.Pa.1995) (approving settlement related to prison conditions over objections of 457 class members); *Hawker,* 198 F.R.D. at 628 (approving prison conditions settlement over objections from 250 class members); *Pack,* 1995 WL 775360, at *5 (approving prison conditions settlement over objection from 41% the class)

Turning to the objections, the Court begins with Dr. Becker's report.

### (i) *Objections Based on the Becker Report*

**\*11**  Judith Becker, Ph.D., evaluated the STU facility in 2008, pursuant to a Court-approved regimen for the sole purpose of aiding settlement negotiations. Following the evaluation, a report was issued in which Dr. Becker opined on whether aspects of the facility were "minimally adequate/satisfactory" or "not minimally adequate/unsatisfactory." (*See* Procedures of Joint Expert Review and Evaluation; CM/ECF No. 214 at 41.) The primary objection to the settlement, from counseled objectors like the Bagarozy Plaintiffs and from *pro se* objector/class members alike, is that the settlement agreement does not adopt *all* or nearly all of the Report's recommendations.

This objection confuses the appropriate inquiry for evaluating the fairness of the settlement, essentially contending that the settlement must be measured by Dr. Becker's report. In short, these objectors ostensibly state that any settlement that does not fully incorporate Dr. Becker's report is inadequate or unfair. This is unrealistic and incorrect. The applicable legal standard is much different than the one relied upon by Dr. Becker in preparing her report. Under an appropriate legal analysis guided by controlling principles, there is no question that the settlement is fair, reasonable and adequate and would provide Plaintiffs with more than the minimally adequate mental health treatment to which they are entitled.

#### a. *The Becker Report Does Not Apply the Applicable Law*
"Minimally adequate" treatment is determined by the standard set forth by the Supreme Court in *Youngberg v. Romeo,* 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982). In *Youngberg,* which arose under facts different from those here, the Supreme Court held that an individual involuntarily confined to an institution for the mentally retarded had a fundamental liberty interest in "minimally adequate" treatment, defined as "such training as an appropriate

Alves v. Main, Not Reported in F.Supp.2d (2012)

2012 WL 6043272

professional would consider reasonable" to facilitate his freedom from restraint. *Id.* at 318.

The Third Circuit has applied the *Youngberg* standard to involuntarily committed sex offenders confined to the STU. *See Deavers v. Santiago,* 243 Fed. Appx. 719, 722 (3d Cir.2007) (applying *Youngberg* to STU resident committed under the NJSVPA); *cf. Learner v. Fauver,* 288 F.3d 532 (3d Cir.2002) (applying *Youngberg* to individual confined under New Jersey's former sex offender statute). Thus, in cases where, like here, state officials have imposed substantial deprivations of liberty associated with civil commitment, they must also provide access to mental health treatment that gives those committed a chance to be cured or to improve the medical condition for which they were confined. *See Greenfield v. Corzine,* No. 09–4983, 2012 WL 1134917, at *22 (D.N.J. Apr.4, 2012); *see also Badu–Shabazz v. Sharp,* No. 10–5637, 2011 WL 1080521, at *14 (D.N.J. Mar.21, 2011).

However, *Youngberg* only requires "*minimally adequate* " treatment, which is not the same as optimal treatment, perfect treatment, desired treatment, or state-of-the-art treatment. Id at 202; *see also Haggert v. Adams,* No. 02–1456, 2005 WL 399300, at *18 (N.D.Ill. Jan.14, 2005) (noting, in action by Illinois sexually violent predators, that *Youngberg* "does not provide for optimal treatment"); *Canupp v. Sheldon,* No. 04–260, 2009 WL 4042928, at *11 (M.D.Fla. Nov.23, 2009) (noting that *Youngberg* requires only "minimal" treatment). Indeed, under *Youngberg* there is a presumption that a treatment professional's decisions are correct, and a constitutional violation only occurs when there is "such a substantial departure from accepted professional judgment, practice or standards as to demonstrate that the person responsible did not base the decision on such a judgment." *Id.* at 202; *see also Deavers,* 243 Fed. Appx. at 722; *Badu–Shabazz,* 2011 WL 1080521, at *14 (finding no *Youngberg* allegation could be sustained because there is "no factual allegation of an absolute denial of treatment ... and [plaintiff] does not allege that he has been denied treatment altogether"); *Canupp,* 2009 WL 4042928, at *11 (noting in, SVP case, that "[u]nder the professional judgment standard decisions made by trained professionals are entitled to a presumption of correctness").[15]

[15]  While obviously bound by the law of this Circuit, it is worth noting that that the Eighth Circuit has not read *Youngberg* the same as the Third Circuit and has held that *sex offenders are not constitutionally entitled to any*

mental health treatment. *See Strutton v. Meade,* 668 F.3d 549, 557 (8th Cir.2012) ("the district court was correct that Strutton does not have a fundamental right to sex offender treatment). Of course, the NJSVPA requires that the New Jersey DHS "provide or arrange for treatment for a person committed pursuant to [the Act]." N.J.S.A. 30:4–27.34(b).

**\*12** Dr. Becker's report does not mention or apply the *Youngberg* standard. This alone invalidates using her report as the measure of fairness of the settlement. No one disputes Dr. Becker's expertise or that her report was comprehensive, learned, and scholarly and that it furthered the settlement process in this case. However, in performing her review, Dr. Becker was to rely on the "professional standards [she] believed relevant and applicable." (*See* Joint Settlement Procedures at 40.) That is, Dr. Becker gave her opinion as any expert would based on her expertise and her personal view of the circumstances she was evaluating. However, Dr. Becker's report does not substitute for the judgment of the court and does not replace the *Youngberg* standard for determining minimally adequate care.

b. *The Becker Report Conflicts With Other Relevant Authority*

There are other problems with using the Becker Report to judge the settlement's fairness. For example, the objectors fail to acknowledge that Dr. Becker is not the only expert in the field of sex offender treatment, and other experts have substantially differing opinions about what constitutes adequate treatment. For example, Dr. Main, a defendant in this case, is also an expert on the subject of treatment for civilly committed sex offenders. And while his view with respect to this case is weighted, he has also served as an expert in other cases. In one such case, *Strutton v. Meade,* Dr. Main testified as an expert witness that a program offering substantially less than what is *already* offered to STU residents would satisfy *Youngberg. See* 2010 WL 1253715, at *4, 17–18 (E.D.Mo. Mar.31, 2010). There, the treatment offered consisted of only one weekly process group (one third of what the settlement here requires) and no modules at all (less than what is already offered at the STU and certainly less than what the settlement provides). *See id.* at *17–18. After a jury trial, the district court found such treatment more than sufficient, concluding that sex offenders did not have a right to *any* treatment. Id The Eighth Circuit affirmed on direct appeal. *See Strutton v. Meade.* 668 F.3d 549, 557 (8th Cir.2012) ("the district court was correct that Strutton does not have a fundamental right to sex offender treatment").

Likewise, the objectors' reliance on the Becker Report fails to account for the fact that many of the Report's recommendations are not required for the provision of minimally adequate care based on existing case law. The Bagarozy Plaintiffs (and other *pro se* objectors) claim that Dr. Becker's recommendations were not followed with respect to, primarily, the following subjects: the gradual de-escalation of restraints;[16] increased therapeutic community time; increased visitation; recreational activities; and psychiatric consultation. (Bagarozy Br. 22.) However, in light of preexisting case law in this district, the inclusion of these recommendations are not required under the *Youngberg* standard, and it is hard to see how Class Counsel could have forced Defendants to relent on any of these subjects during settlement negotiations.

16    This refers to STU residents' desire for to have more freedom of movement, including greater opportunities for furloughs and/or supervised forays into the community and the use of a halfway house or group home community. (*See* Bagarozy Br. at 22.)

 **\*13**  For example, in *Greenfield v. Corzine,* this Court already dismissed a class member's claim alleging, among other things, that the vocational, recreational, and educational offerings at the STU were inadequate. *See* 2012 WL 1134917 (D.N.J. Apr.4, 2012) (Cavanaugh, J.). In *Mina tee v. Special Treatment Unit,* another court in this district dismissed claims of one of the Bagarozy Plaintiffs alleging that Defendants should have placed him in a community based setting, and rejected the plaintiff's request for an injunction directing the creation of a halfway house or community-based treatment facility. *See* 2011 WL 5873055, at \*4 n. 6 (D.N.J. Nov.16, 2011); *see also Former v. Corzine,* 2007 WL 2159584 (D.N.J. July 26, 2007) (Cavanaugh, J.) (rejecting challenge that NJSVPA was punitive because residents are not permitted to transfer to halfway houses). Finally, in *Badu–Shabazz,* another court dismissed allegations that treatment program at the STU was inadequate because there is "no factual allegation of an absolute denial of treatment ... and [plaintiff] does not allege that he has been denied treatment altogether." 2011 WL 1080521, at \*14.

In sum, the Becker Report contains recommendations that could be described as "pie-in the-sky" in terms of the quality and quantity of sex offender treatment. However, the report is not based on the *Youngberg* standard and does not control whether the settlement is fair and reasonable.[17] Despite the objectors' protestations to the contrary, the Court does not find that the Becker Report weighs against approval of the settlement.

17    The objectors frequently invoke a statement in Dr. Becker's report that the living conditions in the STU were "the worst she has ever seen." (Becker Report at 9.) However, this was not a reference to the STU's treatment programs, which is what this case is about, but rather a reference to the physical facilities, which have since changed and are nevertheless within the control of the New Jersey Department of Corrections, a non-party.

### c. *The Settlement Incorporates Many of Dr. Becker's Recommendations*

Although full implementation of the Becker Report is not necessary for a fair and reasonable settlement, the Bagarozy Plaintiffs and the unrepresented class member objectors fail to account for the fact that the Settlement Agreement does, in fact, implement many of Dr. Becker's recommendations.

For example, Dr. Becker recommended that the STU conduct a comprehensive psychological evaluation of each resident upon admission, that pre- and post-module testing be performed, and that certain instruments, including the "Psychopathy Checklist Revised," be utilized to assess treatment progress. (*See* Becker Report at 12–13, 27.) The Settlement Agreement responds to these recommendations. *See* Settlement Agreement §§ VI.A.3.a, VI.A.3.C, and VI.A.3.e.[18]

18    Coincidentally, Dr. Becker recommended that *every* resident be assessed using the Hare Psychopathy Checklist (which is psycho-diagnostic tool commonly used to asses psychopathy) and urged the parties to utilize penile plethysmography "with every resident who is willing to undergo such assessment." (Becker Report at 12.) The settlement does *not* implement these recommendations; indeed, the settlement agreement prohibits the use of both techniques unless they are administered by properly trained staff. This is noteworthy because a number of objectors oppose the use of these assessment tools for any reason, while at the same time championing the Becker Report as the barometer of the settlement's fairness. This inconsistency underscores that Dr. Becker's opinion is subject, like any other assessment, to negotiation and compromise, especially in the course of settlement discussions.

Dr. Becker also suggested that the STU provide more "clear criteria" for the advancement through the STU treatment phases and ensure that therapists were available to further

Alves v. Main, Not Reported in F.Supp.2d (2012)

2012 WL 6043272

that advancement. The settlement addresses these issues. It increases the number of process groups, mandates a greater number of available modules, requires the staff to provide a minimum number of resident to therapist hours, and results in the hiring of additional therapists. *See generally* Settlement Agreement at §§ VI.A.3.a.3, VI.B.2.

 **\*14** Dr. Becker also recommended that "more process groups and more modules be offered," so that each resident is provided "a minimum of 15 to 20 hours in direct clinical service." The Settlement Agreement incorporates this recommendation. *See* Settlement Agreement §§ VI.B.3 and VI.B.10.

Likewise, Dr. Becker criticized the STU's procedures for "release preparation and programming" based on her primary concern that a majority of men on conditional release "felt that had to find housing and jobs on their own." The Settlement Agreement again addresses this issue by requiring the STU's social work staff to develop a discharge plan for every resident in stage 4 or higher and assist the resident in finding housing and obtaining support. *See generally* Settlement Agreement at § VI.G.

The Settlement Agreement also adopts additional recommendations in the Becker Report regarding staffing levels, vocational and recreational offerings, and the hiring of an Ombudsman. (Moses Decl. ¶ 33.) Thus, even though much of the treatment recommended does not appear to be constitutionally required, the Settlement Agreement does not ignore or minimize the Becker Report, as the objectors contend. In fact, the Settlement Agreement adopts much of it.

In sum, the objections that have been filed based on the Becker Report do not demonstrate to the Court that the settlement is unfair or unreasonable.

### (ii) *Objections Based on the Possibility of Inadequate Funding*

The Bagarozy Plaintiffs and other class members also object to the settlement because it requires funding by the State of New Jersey, which is not guaranteed. The Court does not view this objection as a serious impediment to approving the settlement. Defendants cannot guarantee the funding needed to fully implement the settlement because it is subject to the budget process. However, that does not make the settlement illusory, as the objectors suggest. Indeed, the Settlement Agreement clearly provides that the Defendants will seek

"as one of DHS's top priorities" sufficient funding for the settlement. *See* Settlement Agreement § VIII. A.

The settlement also goes a step further. In the event funding is not secured, the Plaintiffs are *not,* as they suggest, without recourse. The Settlement Agreement specifically provides that, if funding is not secured, the Plaintiffs have the opportunity to declare any affected provisions "void" and resume litigation with respect to that provision. *See* Settlement Agreement §§ VIII.B, X .A. Plaintiffs are not required to give up any additional rights or forfeit any other terms of the settlement and can simply resume litigation with respect to any affected portion. This is a palpable benefit to Plaintiffs; if a portion of the settlement is not funded, Plaintiffs will continue to reap the benefits of whatever portions of the agreement are not affected, and still have the right to pursue litigation to address any shortfalls.

 **\*15** Defendants cite *Levell v. Monsanto,* 191 F.R.D. 543 (S.D.Ohio 2000), to suggest a lack of guaranteed funding undercuts the fairness of the settlement. This case is easily distinguishable. In *Monsanto,* the settlement, which was contingent on funding from the federal government, did not have a provision that allowed the Plaintiffs to reinstitute suit such as the one present here, leaving the Plaintiffs with *absolutely no recourse* if the necessary funding was not secured. *Id.* at 551–53. Rather than suggesting that guaranteed funding was required for a fair settlement, the *Monsanto* court went out of its way to say that, had the parties provided a contingency for the funding issue, such as one that would allow the plaintiffs to resume litigation if funding was not secured, the settlement could have been approved. *See id.* at 553 n. 16.[19] That is precisely what has happened here.

19      Objectors also cite *Wyatt v. Anderholt,* 503 F.2d 1305 (5th Cir.1974) and *Harris v. Vector Marketing Corp.,* 2011 WL 4831157 (N.D.Cal. Oct.12, 2011) to support their argument. The precise reason is unclear, however, because neither case has anything to do with settlement or fairness of class action settlements.

This case is very much like *Austin v. Pa. Dep't of Corr.,* 876 F.Supp. 1437 (E.D.Pa.1995), where the court specifically rejected the argument that the settlement was illusory and unenforceable because it required statutory funding, noting that the ability to reinstiute suit gave Defendants a "clear incentive to achieve full compliance." Id at 1448. So too here.

Finally, it should be noted that Defendants have *already* begun to implement the settlement, even though it has not yet

Alves v. Main, Not Reported in F.Supp.2d (2012)

2012 WL 6043272

been approved. Dr. Main represents that, using funds already received from prior appropriations acts, "even in advance of the approval of the settlement," the STU has begun to develop pre-and post-module testing; revised the Resident Guide; implemented a newly devised and developed treatment plan, and conducted individualized vocational assessments for residents. (Main Decl. ¶ 8; Supplemental Declaration of Merrill Main, Ph.D. ("Supp. Main Decl.") ¶¶ 2–4 .) Moreover, the state has entered into two previous settlement agreements with similar funding contingencies and neither of those agreements has been voided due to insufficient funding. (*See* Supplemental Declaration of David L. DaCosta ("Supp. DaCosta Decl.") ¶ 4.)

### (iii) *Additional Objections*

The Court has received additional *pro se* objections from class member residents of the STU. These objections have been summarized by Class Counsel. (*See* June 12 Decl. & Ex. D (Table Summary of Objections).) Some of the objections are difficult to understand. Some are also repetitive in the sense that there are a number of objections stating, in verbatim fashion, the same grievances but signed by different residents. And, as mentioned before, a number of additional objections appear to be "the result of a fundamental misunderstanding of the underlying purpose of the class action, a lack of knowledge of the ramifications to class members of a court-approved settlement, and unrealistic or overly optimistic expectations." *Hawker,* 198 F.R.D. at 628. To the extent possible, the objections are grouped by category and addressed below. The Court has also tried to identify representative objections for each category; however, many of the objections raise a number of issues, and thus, do not fit neatly within any single category.

### a. *Objections Based on Claims for Monetary Damages*

**\*16** There are a number of objections that seek monetary damages, often tens of millions of dollars.[20] These objections are meritless because this is a class action certified pursuant to Rule 23(b)(2) that seeks only injunctive relief. *See Hawker,* 198 F.R.D. at 630 (when complaint did not seek money damages "the absence of an award of money damages is neither unfair nor unreasonable).

20   For example, class member Joseph Aruanno seeks "significant monetary and punitive damages." *See* Objection of Joseph Aruanno [CM/ECF No. 177–5 at 17]. Likewise, class member John Banda asks for "$25 million dollars from each listed defendant in their

personal and individual capacities." *See* Objection of John Banda [CM/ECF No. 177–5 at 91].

### b. *Objections Based on Commitment to the STU*

There are a large number of objections that claim that the writer was improperly committed to the STU; that civil commitment to the STU is unconstitutional; that the living conditions at the STU are substandard; and that actuarial instruments used in pre-commitment hearings are improper.[21] Any objections challenging the constitutionality of civil commitment fail as a matter of law. *See Kansas v. Hendricks,* 521 U.S. 346, 117 S.Ct. 2072, 138 L.Ed.2d 501 (1997) (upholding constitutionality of indefinite civil commitment). The remaining objections simply misapprehend the scope of this case. This case is limited to the quantum and quality of mental health treatment at the STU. It does not involve commitment to the STU or what happened to individual class members prior to commitment. Thus, these objections do not weigh against approval of the settlement. *See, e.g., P.M. v. Terhune,* 67 F.Supp.2d 401, 406 (D.N.J.1999) (objections based on issues not involved in the case are futile).

21   *See, e.g.,* Objection of Walter Harrell [CM/ECF No. 177–4]; Objection of Daniel Goodman [CM/ECF No. 177–5]; Objection of Santos Rivera [CM/ECF No. 177–7 at 112]; Objection of Bharat Malde [CM/ECF No. 176–6 at 141]; Objection of David Carson [CM/ECF No. 177–5 at 145–46].

### c. *Objections Seeking Halfway House Community*

A number of objections seek the use of a halfway house system, or the implementation of outpatient sex offender treatment, as opposed to the in-patient STU facility. *See, e.g.,* Objection of Michael Hasher [CM/ECF No. 177–6 at 66–85.] However, the creation of a halfway house system is not required under Youngberg. *See, e.g., Fournier,* 2007 WL 2159584, at *8. And the Supreme Court has already approved the use of inpatient facilities like the STU. *See Kansas,* 521 U.S. at 370. Thus, these objections do not weigh against approval of the settlement.

### d. *Objections Seeking Release*

A number of objectors seek immediate release or release from the STU at a certain age or after a certain period of confinement.[22] However, the Supreme Court has already approved indefinite civil confinement of sexually violent predators. *See Kansas,* 521 U.S. at 346. Thus, these objections are futile.

2012 WL 6043272

22      *See, e.g.,* Objection of Tyrone Hill [CM/ECF No. 177–6 at 88]; Objection of Stephen Jaffe [CM/ECF No. 177–6 at 103]; Objection of David Haggerty [CM/ECF No. 177–6 at 58]; Objection of Victor Moody [CM/ECF No. 177–7 at 47].

### e. Objections Based on Department of Corrections Issues

A large number of objections are focused on the physical facilities at the STU and on the presence and activities of DOC personnel.[23] These objections do not bear on the fairness of the settlement because the DOC and its personnel are not parties to this case. *See, e.g., D.M,* 67 F.Supp.2d at 406. To the extent appropriate, these claims may be pursued as individual actions.

23      *See, e.g.,* Objection of Mark King [CM/ECF No. 177–6 at 113]; Objection of Benjamin Hudson [CM/ECF No. 177–6 at 95]; Objection of Paul Winthrop [CM/ECF No. 177–8 at 82].

### f. Objections Based on Individual Claims

A number of objections have been filed that are based on individual issues or the perception that the settlement will eliminate a resident's individual claims, including objections focused on the "prison like" conditions at the facility; the food served; the housing conditions;[24] and other similar, individual issues. These objections also do not bear on the fairness of the settlement because the Settlement Agreement does not address or extinguish these claims. Stated differently, any complaints based on issues that are beyond the scope of the Second Amended Complaint are not part of this settlement. The objections received show tremendous confusion on this subject so it bears repeating: To the extent claims are not part of the Second Amended Complaint and are otherwise cognizable, residents can attempt to pursue these claims independently. *See* Settlement Agreement § Section IX.[25]

24      *See, e.g.,* Objection of Richard Bagarozy [CM/ECF No. 177–5 at 22–31].

25      A letter from Jack Furlong, Esq., dated May 14, 2012, suggests that his clients, William Moore and Maryann Hysler, object to the settlement to the extent it impacts their claims regarding religious liberty and the right to marry. As discussed at the Fairness Hearing, the settlement does not impact these claims. (*See* Tr. 38:8–40–23.)

### g. Objections to the Class Representatives

**\*17** A number of objectors, including one of the more prominent form objection letters, object to Plaintiffs' class representatives. Although the reasons are not entirely clear, some objectors suggest the class representatives are subject to different treatment regimes and that this creates a conflict.[26] Others suggest that the representatives were either misled or engaged in collusion.

26      *See, e.g.,* Objection of Benjamin Hudson [CM/ECF No. 177–6 at 95]; Objection of Gilden Rivera [CM/ECF No. 177–7 at 106]; Objection of Edward Salerno [CM/ECF No. 177–7 at 123–24]; Objection of Rodney Roberts [CM/ECF No. 177–7 at 115].

For Rule 23 purposes, lead plaintiffs are typical of the class they represent if there is a strong similarly in legal theories alleged and the claims arise from the same course of conduct. *See In re Prudential Ins. Co. Sales Practices Litig.,* 148 F.3d 283, 311–12 (3d Cir.1998) ("*Prudential II* "); *Grasty v. Amalgamated Clothing & Textile Workers Union,* 828 F.2d 123 (3d Cir.1987).* Lead plaintiffs are considered adequate representatives if they do not have interests antagonistic to those of the class. *See Prudential II,* 148 F.3d at 312; *Georgine v. Amchem Prods., Inc.,* 83 F.3d 610, 630 (3d Cir.1996). *aff'd sub nom. Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997).

Here, there is no conflict between the class representatives and class members because, regardless of why each class member is confined in the STU, they are all subject to the same general mental health program and, therefore, its alleged inadequacies impacts all of them. The lead plaintiffs seek a mental health program that offers them a reasonable prospect of being successfully treated for the mental abnormality that led to their confinement. This goal does not and could not conflict with any other class member because no class member has an interest in an inadequate treatment program. Thus, regardless of any slight variance in treatment for individual class members, the Court is satisfied that the lead plaintiffs are adequate and typical class representatives.

### h. Objections to Class Counsel

A number of objectors contend that Class Counsel suffers from a conflict of interest. In determining the adequacy of class counsel, the Court determines whether counsel is "qualified, experienced, and generally able to conduct the proposed litigation." *New Directions Treatment Servs. v. City*

2012 WL 6043272

*of Reading,* 490 F.3d 293, 303 (3d Cir.2007). These objectors contend that the Seton Hall Law School Center for Social Justice has a conflict and cannot represent the Plaintiffs in this case because, in 1999, certain professors at the law school supported passage of the NJSVPA.[27] This objection is frivolous.

27      *See, e,g.,* Objection of Eric Cruz [CM/ECF No. 177–5 at 168]; Objection of Benjamin Hudson [CM/ECF No. 177–6 at 95]; Objection of Daniel Richards [CM/ECF No. 177–7 at 97]; Objection of Mark Pepe [CM/ECF No. 177–7 at 73].

First, none of the professors that supposedly create this conflict have ever represented Defendants. Second, none have ever been part of the Center for Social Justice, let alone worked on this case. (Azmy Decl. ¶ 3.) Third, this Court has already twice before rejected requests to remove Class Counsel; the first in an Order dated September 6, 2012, and the second at the Fairness Hearing. (*See* Order dated September 6, 2012, at 6 ¶ 10; Tr. 12:8–21.) Class Counsel has done an exemplary job representing the Plaintiffs in this case, and any objections to the fairness of the settlement on this ground are rejected.

### 3. *The Stage of the Proceedings and the Amount of Discovery Completed*

**\*18**  The third *Girsh* factor requires that the Court consider the "degree of case development that Class Counsel have accomplished prior to Settlement," including the type and amount of discovery already undertaken. *In re General Motors,* 55 F.3d at 813. Under this factor, the Court considers whether the amount of discovery completed in the case has permitted "counsel [to have] an adequate appreciation of the merits of the case before negotiating." *In re Schering–Plough/Merck Merger Litig.,* No. 09–1099, 2010 U.S. Dist. LEXIS 29121 at \*30, 2010 WL 1257722 (Mar. 26, 2010). The discovery analyzed encompasses both formal and "informal" discovery, including discovery from parallel proceedings, companion cases and even third parties, such as experts or witnesses. *Id.*

This factor weighs heavily in favor of settlement. The lead case in this consolidated action is a decade old. The parties engaged in years of formal discovery. They also engaged in a continual informal exchange of information during the settlement process. The Becker Report provided a form of searching discovery that likely exceeds any discovery permitted by the rules.

Indeed, the existence of the Becker Report and the discovery prior to and after it makes clear that counsel was intimately familiar with the facts of this litigation. And if that wasn't enough, following consummation of the settlement, the parties engaged in "confirmatory discovery" on the merits of the settlement. Prior opinions have addressed how comprehensive the discovery process was in this case:

> The facts and merits of this case have been investigated, pored over, and discussed in depth for more than 10 years, including through STU facility changes and changes in administrations. There were at least three full years of formal fact discovery. In addition, in a searching and lengthy process supervised by the Court, a neutral expert approved by both sides did an unprecedented, and for the most part unlimited, investigation of the conditions and treatment programs at the STU. This involved numerous on-site visits, interviews with staff and residents, and the review of countless documents. During this process, the Court resolved any disputes on a real time basis, so that the investigation could proceed. This investigation resulted in a highly detailed, 27 page, single spaced report on the STU. The Court cannot imagine any "discovery" that would even approach this delving investigation and report, which certainly aided the contentious settlement process. Morever, during the arduous settlement negotiations, exhaustive information was exchanged and it was patently obvious to the Court that all counsel were apprised of the relevant facts. Indeed, adversary counsel argued strenuously over many specific and discrete issues that revealed a deep understanding of the issues in this case.

> In sum, this is not a case resolved on a scant record without discovery. Nor does class counsel lack an understanding of the facts and issues. Quite the opposite.

**\*19**  *Alves v. Ferguson,* No. 01–789, 2012 WL 2339809, at \*3–4 (D.N.J. June 19, 2012). This factor weighs in favor of settlement.

### 4 & 5. *The Risk of Establishing Liability and Damages*

The fourth and fifth *Girsch* factors are commonly analyzed together. *See, e.g., McCoy v. Healthnet, Inc.,* 569 F.Supp.2d 448, 461 (D.N.J.2008). These factors survey the "possible risks of litigation by balancing the likelihood of success ... against the immediate benefits offered by settlement." *Prudential II,* 148 F.3d at 319. Where the risks of litigation are high, these factors weigh in favor of the settlement. *See id.* To

properly weigh these considerations, the Court should rely to a certain extent on the estimation provided by class counsel, who is experienced with the intricacies of the underlying case. *See Weber v. Gov't Empls. Ins. Co.,* 262 F.R.D. 431, 445 (D.N.J.2009) (quoting *Perry v. FleetBoston Fin. Corp.,* 229 F.R.D. 105, 115 (E.D.Pa.2005)).

When the risk of establishing liability in this case is balanced against the benefit resulting from the Settlement Agreement, it is clear these factors weigh heavily in favor of settlement. Certain Objectors to the settlement contend that, in light of the Becker Report, the risk of not establishing liability is very slight. Their view is that liability is a *fait accompli* and the only discussion should be about the scope of damages. This position is not realistic. Liability would be a strongly contested issue in this case.

As mentioned previously, the *Youngberg* standard controls the adequacy of treatment, not the Becker Report. And under *Youngberg,* Plaintiffs would have to establish that the present state of the STU is legally deficient. This would not necessarily be simple. This is demonstrated by the fact that class members, often proceeding *pro* se, have had tremendous difficulty successfully litigating the issue of their treatment. *See, e.g, Deavers,* 243 Fed. Appx. at 722 (no violation of rights when placed in restricted activities program without opportunity to contest allegations against him); *Belton v. Singer,* No. 10–6462, 2011 WL 2690595 (D.N.J. July 8, 2011) (dismissing case brought by class member and finding that rights were not violated when placed in prison facility with poor conditions and subjected to prison policies); *Bondutrant v. Christie,* No. 10–3005, 2010 WL 4869094, at *6 (D.N.J. Nov.22, 2010) (dismissing claim of class member that his rights were violated when placed in South Unit and limited to "segregated activities").[28]

28    *See also Greenfield,* 2012 WL 1134917; *Minatee,* 2011 WL 5873055; *Former,* 2007 WL 2159584; and *Badu–Shabazz,* 2011 WL 1080521, all discussed *supra.*

Yet, the class members' lack of success is not for a lack of trying. A brief sampling of Third Circuit case law shows that, certain objectors, such as Joseph Aruanno, are prolific *pro se* litigators on the subjects of their confinement, treatment, and civil rights, having more than 20 cases reach the Third Circuit-all without success.[29] Likewise, at the Fairness Hearing, Class Counsel persuasively described the repeated inability of class members to establish liability and prevail on the merits in

cases that were somewhat similar to this case. (Tr. 17:9–18:21.)

29    *See Aruanno v. Velez,* No. 12–152, 2012 WL 1232415 (D.N.J. Apr.12, 2012) (noting, "[s]ince 2005, Mr. Aruanno has filed over 28 civil cases in this Court and 27 appeals in the United States Court of Appeals for the Third Circuit"), *aff'd* 2012 WL 4748193 (3d Cir. Oct.5, 2012).

**\*20** Class Counsel's oral presentation on prior cases underscores the considerable risk Plaintiffs would face if the settlement was rejected and Plaintiffs attempted to litigate the case to conclusion. In the face of all of this, some objectors still seem to think that liability can be easily established in light of the Becker Report, which they contend is the report of the State's "own expert ."[30] This oversimplifies the liability issue in the case and ignores that the Becker Report does not utilize the *Youngberg* standard, wholly apart from the fact that there are serious issues regarding whether the Becker Report would even be admissible at a trial.[31] In reality, as Class Counsel notes, this settlement would be the first time that a federal court has mandated change to the STU and would achieve more for the residents in one action then has been accomplished in more than a decade of *pro se* litigation. (*See* Moses Decl. ¶¶ 40–42.) With no track record of prior success, Plaintiffs' ability to establish liability in this case is questionable.

30    This is a highly misleading description. It is true that Dr. Becker was one of several experts suggested by Defendants when the parties were considering various individuals to evaluate the STU for settlement purposes. But, this does not make Dr. Becker "Defendants' expert," and Defendants never adopted Dr. Becker's opinions. And, were the case to proceed, it would seem certain that Defendants would, in fact, retain a different expert.

31    There is some disagreement among the parties as to whether Dr. Becker's report was to be considered for settlement purposes only pursuant to Federal Rule of Evidence 408. The relevant procedural history suggests that the Becker Report was for settlement purposes only and would *not* be properly admissible at trial.

Moreover, even if Plaintiffs were successful *and prevailed on* the merits of the case (which, again, has apparently never happened in this district), there is the further risk that the relief they would obtain following a trial would be *less* or the same as what has already been negotiated in the parties' Settlement Agreement. In other words, contrary to what many

2012 WL 6043272

objectors seem to think, prevailing on the merits of the case does not mean that the entire Becker Report would be automatically implemented. Thus, the Court believes the risk that Plaintiff would not establish liability at trial weighs in favor of settlement.

In stark contrast to the serious risk associated with liability, the benefits of settlement are obvious. As the papers and objections received make clear, one of the primary complaints of the residents at the STU is how long they have been confined to the facility. Professor Moses has expressed the opinion that the Settlement Agreement provides real change in the near future and that she believes the best and most effective way for class members to regain their liberty is to pursue increased treatment and eschew further litigation. (Moses Decl. ¶ 47.) Thus, this factor weighs in favor of approving the settlement.

### 6. *The Risk of Maintaining the Class Through Trial*

The sixth *Girsch* factor "measures the likelihood of obtaining and keeping class certification if the action were to proceed to trial." *In re Warfain,* 391 F.3d at 538. This case was certified as a class action regardless of whether the settlement was approved. This was not a settlement class. *Cf. In re Cmty Bank of N. Va.,* 418 F.3d 277, 299 (3d Cir.2005) (discussing concept of "settlement only" classes). Thus, there is no real risk that this action would not proceed to trial as a class action. Nevertheless, it should be noted that this consolidated class action is comprised of many individual *pro se* complaints from confined residents, which presents practical problems. In addition, class certification can always be modified at any time before final judgment. Fed.R. Civ. P. 23(c)(1)(C). All in all, the risk of decertification is small. Yet, should this case proceed to trial, there remains the possibility that the class could be decertified or procedural problems managing the class could arise. This factor is neutral.

### 7. *The Ability of Defendants to Withstand a Greater Judgment*

**\*21** The seventh *Girsch* factor is "concerned with whether the defendants could withstand a judgment for an amount significantly greater than the settlement." *In re Cendant,* 264 F.3d 201, 244 (3d Cir.2001). Since the individual defendants are state employees, it would be the State of New Jersey that bears ultimate responsibility for satisfying any judgment, as well as funding any additional litigation, trials, and appeals. Presumably the State can fund any judgment that could be received, thus this factor is neutral. However, it should

be noted that these are difficult economic times. And the negotiations in this case were not isolated from the economic reality affecting the State of New Jersey. (Azmy Decl. ¶ 55.) While New Jersey would be able to fund a judgment in this case following a trial, it is more preferable to have a settlement that Defendants consider a funding priority, as opposed to the potential for an unfunded judicial mandate following a trial and appeals years from now.

### 8 & 9. *The Range of Reasonableness of the Settlement in Light of the Best Possible Recovery and the Risks of Litigation*

The final two *Girsh* factors collectively "evaluate whether the settlement represents a good value for a weak case or a poor value for a strong case." *In re Warfarin,* 391 F.3d at 538. To make this determination, the Court analyzes the reasonableness of the settlement against the best possible recovery and the risks the parties would face if the case went to trial. *Prudential II,* 148 F.3d at 322.

Here, continued litigation involves considerable risk that the Plaintiffs would lose the merits of the case. Moreover, even if Plaintiffs prevailed, the relief obtained could be less than is provided for in the Settlement Agreement. The best possible recovery is hard to quantify in a case like this. *See Canupp,* 2009 WL 4042928, at \*11 (noting in, SVP case, that [i]t is difficult to gauge the range of possible recovery in an injunctive case for an area of the law that is not well litigated"). It appears that few comparable cases have actually been tried, and when they have, the results have not been good for plaintiffs. *See generally Strutton,* 668 F.3d at 557 (affirming complete denial of relief and finding no treatment is required). The only case that has been identified where civilly committed sexually violent predators prevailed following a trial is *Turay v. Richards,* No. 07–35309, 2009 WL 229838 (9th Cir. Jan.29, 2009). And *Turay* is not necessarily encouraging for Plaintiffs. In *Turay,* while the plaintiffs were successful at trial in showing that the State of Washington's SVP treatment program was constitutionally deficient, after appeals, the involvement of a special master and many court proceedings, it took seven years for plaintiffs to secure any relief .[32]

32    While the *Turay* plaintiffs did secure the right to be discharged to halfway house4ike communities as sought by some objectors in this case, there is a crucial distinction between the Washington program and the NJSVPA. In particular, the Washington SVP program

2012 WL 6043272

expressly contemplates the use of less restrictive facilities; the NJSVPA does not. (Moses Decl. ¶ 44.)

In contrast, the Settlement Agreement here mandates material improvements to the treatment program at the STU within 6 months. (Moses Decl. ¶ 43.) The reforms address most of the issues in the second amended complaint and do so quickly and with some degree of certainty. The settlement yields substantial and immediate benefits, and it is reasonable in light of the best possible recovery and the attendant risks of litigation-little or no recovery at all. Thus, the Court finds these factors weigh in favor of settlement.

### 10. *Additional Considerations*

#### (i) *Class Counsel*

**\*22** In addition to the *Girsh* factors, courts in this Circuit traditionally "attribute significant weight to the belief of experienced counsel that settlement is in the best interest of the class." *Austin,* 876 F.Supp. at 1472. As the Third Circuit has noted, "[c]lass counsel's duty to the class as a whole frequently diverges from the opinion of either the named plaintiff or other objectors." *Walsh v. Great Atl. & Pac. Tea Co.,* 726 F.2d 956, 964 (3d Cir.1983) (affirming district court decision denying named plaintiff's motion to dismiss class counsel, denying motion to appoint additional counsel for objectors, and approving settlement over objections from named plaintiff).

Here, Class Counsel are highly skilled attorneys, especially in this area of the law. Their opinions carry persuasive weight. *See Prudential I,* 962 F.Supp. at 543 ("the Court credits the judgment of Plaintiff's counsel, all of whom are active, respected, and accomplished in this type of litigation"). Professor Moses represents that class counsel has "reviewed all of the objections and have spoken to a large number of Class Members about the Settlement, both in person and via telephone," and that "[counsel] continue to sincerely believe ... that the Settlement is in the best interest of the Class as a whole." (Joint Br. 29.) Moreover, Professor Moses states that "while the settlement does not guarantee release for any class member, class counsel believes that the bargained for improvements to the quantity and quality of the mental health treatment offered at the STU-overseen by an independent monitor-will enable the Class Members to progress more rapidly and regain their freedom more quickly." (Moses Decl. ¶ 47.) Class Counsel's recommendation provides further support for approving the settlement.

#### (ii) *The Settlement Negotiations Were Overseen by a Magistrate Judge*

In this case, the parties also benefitted from the involvement of a magistrate judge in mediating the Settlement.[33]. The participation of an independent mediator in settlement negotiations "virtually insures that the negotiations were conducted at arm's length and without collusion between the parties." *Bredbenner v. Liberty Travel, Inc.,* 09–905, 2011 WL 1344745, at \*10 (D.N.J. Apr.8, 2011); *Kolar v. Rite Aid Corp.,* No. 01–cv–1229, 2003 WL 1257272, at \*3 (E.D.Pa. Mar.11, 2003) (noting that involvement of magistrate judge in settlement process "provides a great deal of comfort at the threshold of our fairness consideration").

[33]  The Court would be remiss if it did not recognize Magistrate Judge Falk for his outstanding effort in bringing this matter to a joint conclusion. During the course of this litigation, he shepherded this matter through numerous pretrial obstacles and played a major role in bringing both sides together in final settlement. Quite simply, but not for his significant involvement over a period of ten years, no resolution would be in sight.

#### (iii) *The Settlement Agreement Requires a Court Appointed Monitor*

The Settlement Agreement also calls for the Court to appoint a monitor to ensure compliance with the agreement's terms. While the appointment of a monitor may not fit neatly within any of the traditional *Girsch* factors, the presence of an observer specifically delegated the task of ensuring compliance with the agreement is an additional safeguard that the settlement reforms are real, will be implemented, and will provide the class with the increased treatment that they have bargained for.

### VI. *SUMMARY*

**\*23** To the extent the future of the STU residents depends largely on mental health treatment, this Court finds that the Settlement Agreement does an excellent job of increasing the quantum and quality of available care. This should provide each resident with an increased opportunity to show that he has successfully treated his mental abnormality and should be considered for a conditional discharge. The Agreement may not provide every class member with every aspect of treatment that they desire. But, the settlement does more for the treatment of sexually violent predators than any case has been able to accomplish in more than a decade of *pro se* litigation since the NJSVPA was passed into law.

2012 WL 6043272

The Settlement Agreement easily satisfies the *Girsch* factors. The settlement is eminently fair and the negotiation process was unassailable. The Court has no hesitation in concluding that the majority (if not all) of the *Girsh* factors, and several additional considerations, strongly favor approval. The settlement provides a significant benefit to all class members, which is substantiated by the generally positive response from the class. The settlement was also recommended by two groups of experienced class counsel, who truly advocated for the best interests of their clients. For all of the reasons stated above, the settlement is fair, reasonable and adequate. The Settlement Agreement is **approved.**

## VII. *ATTORNEY'S FEES*

The Settlement Agreement also provides that Defendants agree to pay Plaintiffs' class counsel, the Seton Hall Center for Social Justice, $78,000 in attorney's fees as part of the settlement. *See* Settlement Agreement XII.A. In any Section 1983 action, like this one, the Court may determine that a prevailing party is entitled to attorney's fees. *See* 42 U.S.C. § 1988. A reasonable fee is generally calculated by application of the lodestar method, which requires multiplying the hours reasonably expended by a reasonable hourly rate. *See City of Riverside v. Rivera,* 477 U.S. 561, 568, 106 S.Ct. 2686, 91 L.Ed.2d 466 (1986) (citing *Hensley v. Eckerhart,* 461 U.S. 424, 433, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983)).

There is no need for a full lodestar analysis in this case. The Court finds that the comparatively *de minimus* attorney's fee award agreed to by the parties in this case is *per se* reasonable in this decade old case. Professor Moses represents that she personally spent more than 400 hours on this litigation, and that her usual billing rate is $375.00 per hour. (Moses Decl.

¶¶ 48–49.) Professor Azmy represents that he spent nearly 1,500 hours working on the case at $375.00 per hour for a total of more than $560,000 in attorney's fees. (Moses Decl. ¶ 50; Azmy Decl. ¶ 59 .) Seton Hall Law School students also spent more than a 1,000 hours working on this litigation. (Moses Decl. ¶ 48.) Co-class counsel at Gibbons, Lawrence Lustberg, Esq. and other attorneys, spent nearly 700 hours working on the case-in addition to incurring nearly $40,000 in expenses. (Moses Decl. ¶ 51.) In total, the attorney's fees expended in this case appear to be close to $2 million. In light of this, the minimal fee award of $78,000 is clearly "reasonable" under the circumstances. *Hensley,* 462 U.S. at 433.

## VIII. *MONITOR*

**\*24** The Settlement Agreement also calls for the Court to appoint a monitor to facilitate the implementation of the Settlement Agreement and render determinations as to whether DMHAS is in compliance. *See generally* Settlement Agreement § VII. The monitor will be appointed by separate order following further conference with counsel.

## IX. *CONCLUSION*

Based on all of the reasons set forth above, the party's motion for joint approval of settlement [CM/ECF No. 193] is **GRANTED.** The Court hereby **approves** the parties Settlement Agreement and **grants** Class Counsel's request for $78,000 in attorney's fees.

An appropriate Order will be entered.

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 6043272

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

2011 WL 5869773, 18 Wage & Hour Cas.2d (BNA) 740

2011 WL 5869773
Only the Westlaw citation is currently available.
United States District Court,
M.D. Pennsylvania.

Stephen BROWN, Jr. and Matthew Jury, Individually and on behalf of all others similarly situated, Plaintiffs

v.

TRUEBLUE, INC., f/k/a Labor Ready, Inc., and Labor Ready Northeast, Inc., Defendants.

Civil Action No. 1:10–CV–0514.
|
Nov. 22, 2011.

**Attorneys and Law Firms**

Craig P. Kalinoski, Law Office of Craig P. Kalinoski, Scranton, PA, Jason T. Brown, Shelly Leonard, Steven Blau, Blau, Brown & Leonard LLC, New York, NY, for Plaintiffs.

Amelia D. Winchester, David R. Ongaro, Kyann C. Kalin, Ongaro Burtt LLP, San Francisco, CA, Justin G. Weber, Pepper Hamilton LLP, Harrisburg, PA, for Defendants.

*MEMORANDUM*

YVETTE KANE, Chief Judge.

**\*1** Plaintiffs Stephen Brown and Matthew Jury filed suit against Defendants TrueBlue and Labor Ready Northeast alleging violations of the Pennsylvania Minimum Wage Act, 43 Pa. Stat. § 333.101 *et seq.,* Pennsylvania's Wage Payment and Collection Law, 43 Pa. Stat. § 260.1 *et seq.,* Pennsylvania's Check Casher Licensing Act, 63 Pa. Stat. § 2301 *et seq.,* and the Fair Labor Standards Act, 29 U .S.C. § 201 *et seq.* (Doc. No. 1.) Plaintiffs moved for class certification of two classes pursuant to Rule 23 of the Federal Rules of Civil Procedure and moved for certification of one collective action brought pursuant to the FLSA. (Doc. Nos.27, 42.) Just prior to the hearing on class certification, Defendants filed a motion to compel arbitration. (Doc. No. 63.) The Court continued the hearing on class certification pending the resolution of the motion to compel arbitration. (Doc. No.

66.) The motion to compel arbitration has been fully briefed, and the Court held argument on the motion on September 8, 2011. For the reasons stated more fully herein, the Court will grant Defendants' motion to compel arbitration and stay these proceedings pending the completion of arbitration.

**I. BACKGROUND**

**A. Factual Background**

Defendants provide temporary staffing services, whereby Defendants send their employees to do work for a local business seeking short-term labor. (Doc. No. 1 ¶¶ 16, 23.) Defendants' employees report to a branch office by 7:00 a.m., where Defendants provide their employees with a work assignment. (*Id.* ¶ 24.) The employees are paid each day they work upon completion of the work day. (*Id.* ¶ 23.) When the employees have completed their work for the day, they return to Defendants' branch office where they are given the option of being paid by check or by cash voucher. (*Id.* ¶ 28.) If an employee elects to use a cash voucher, the employee is given a voucher and a pin number, which the employee may redeem for cash at one of the cash dispensing machines located in the branch offices. (*Id.* ¶ 28.) Employees are charged a fee for using the cash dispensing machines totaling one dollar plus any change in the employee's net pay.[1] (*Id.* ¶¶ 28–29.) Plaintiffs, Defendants' employees, allege that the fees applied when using the cash dispensing machines often result in Defendants' employees being paid less than the prevailing minimum wage. (*Id.* ¶ 32.)

[1]  For example, in the cash voucher submitted by Plaintiffs in support of their motion for class certification, the voucher lists Plaintiff Brown's daily gross pay at $58.00, representing eight hours of work at $7.25 per hour. (Doc. No. 27–8.) It lists deductions totaling $6.25, including $0.03 for Pennsylvania unemployment taxes, $0.84 for Medicare, $1.78 for Pennsylvania state withholding, and $3.60 for social security. (*Id.*) Plaintiff Brown's net pay is listed as $51.75. (*Id.*) The cash dispensing machine fee is listed as $1.75, representing one dollar plus the seventy-five cents in change in Plaintiff Brown's net pay. (*Id.*) Also included on the voucher is a statement that the cash dispensing machine charges a fee and if the employees do not wish to accept this fee, they may request a check. (*Id.*) The voucher further directs them to "[a]sk the branch employees where you may be able to cash Labor Ready payroll checks for no fee." (*Id.*)

Both Plaintiffs Brown and Jury signed employment agreements. (Doc. Nos.67–1, 67–2.) Those employment

Brown v. TrueBlue, Inc., Not Reported in F.Supp.2d (2011)

2011 WL 5869773, 18 Wage & Hour Cas.2d (BNA) 740

agreements included an "Employment and Dispute Resolution" section. That section included, as a condition of Plaintiffs' employment, an arbitration provision providing:

> *1. Arbitration, Waiver of Jury Trial.* Labor Ready and I agree that any claim arising out of or relating to this Agreement, or the breach of this Agreement, or my application, employment, or termination of employment, shall be submitted to and resolved by binding arbitration under the Federal Arbitration Act. Labor Ready and I agree that all claims shall be submitted to arbitration including, but not limited to, claims based on any alleged violation of a constitution, or any federal, state, or local laws; Title VII, claims of discrimination, harassment, retaliation, wrongful termination, compensation due or violation of civil rights; or any claim based in tort, contract, or equity. Any arbitration between Labor Ready and I will be administered by the American Arbitration Association under its Employment Arbitration Rules then in effect. Labor Ready agrees to pay for the arbiter's fees where required by law. The award entered by the arbitrator will be based solely upon the law governing the claims and defenses pleaded, and will be final and binding in all respects. In any claim or jurisdiction where this agreement to resolve claims by arbitration is not enforceable, Labor Ready and I agree to submit our claims for resolution by a bench trial (trial by judge) specifically waiving a jury as the ultimate fact finder.

**\*2** (*Id.*) Plaintiffs Brown and Jury signed and dated their employment agreements on September 23, 2008, and July 16, 2009, respectively. (*Id.*)

The "Employment and Dispute Resolution" sections further included agreements to pursue relief via arbitration individually, rather than on a class basis. Specifically, Plaintiff Brown's agreement provides:

> *2. Class Actions.* In any such arbitration, or in a court of competent jurisdiction if arbitration is prohibited by law, neither Labor Ready nor I shall be entitled to join or consolidate claims as a representative or member of a class, representative, or collective action.

(Doc. No. 67–1.) Plaintiff Jury's agreement, under the heading *"2. Representative Actions"* provides that: "In any arbitration, or in a court of competent jurisdiction if arbitration is prohibited by law .... **I must give my *written consent* to be represented in a lawsuit against Labor Ready and I will not represent anyone else without their written permission."** (Doc. No. 67–2 (emphasis in original).)

**B. Procedural History**

Plaintiffs initiated this action by filing a complaint with this Court on March 7, 2010. (Doc. No. 1.) Defendants filed an answer with affirmative defenses on May 17, 2010. (Doc. No. 16.) Notably, Defendants did not note the existence of an agreement to arbitrate in their answer. (*Id.*) Plaintiffs filed their first motion for class certification on December 23, 2010. (Doc. No. 27.) Plaintiffs filed a second motion for class certification on March 8, 2011. (Doc. No. 42.) On March 18, 2011, the Court scheduled a hearing on Plaintiffs' two motions for class certification to take place on June 10, 2011. (Doc. No. 52.) Briefing continued on the motions for class certification through May 10, 2011, when Defendants filed a motion for leave to file a sur reply brief in opposition to the second motion for class certification. (Doc. No. 61.) The Court granted Defendants' motion on May 26, 2011. (Doc. No. 62.)

On June 7, 2011, fifteen months after Plaintiffs filed their complaint and three days before the hearing on class certification was scheduled to be held, Defendants filed a motion to compel arbitration. (Doc. No. 63.) The Court issued an order continuing the hearing on the motions for class certification on June 7, 2011. (Doc. No. 66.) The Court heard argument on the motion to compel arbitration on September 8, 2011. (Doc. No. 78.) Following the hearing, the Court ordered supplemental briefing on September 13, 2011. (Doc. No. 79.) The parties submitted their supplemental briefs on September 27, 2011. (Doc. Nos.83, 84.) The motion to compel arbitration is now ripe for disposition.

**II. STANDARD OF REVIEW**

The Federal Arbitration Act establishes a strong federal policy in favor of the arbitration of disputes such that any doubt regarding the scope of an arbitration agreement must be resolved in favor of arbitration. *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.,* 460 U.S. 1, 24–25, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983); *Alexander v. Anthony Int'l, L.P.,* 341 F.3d 256, 263 (3d Cir.2003). In spite of this presumption of arbitrability, prior to depriving a party of his day in court, there must be a finding that: (1) a valid agreement to arbitrate was entered; and (2) the claims at issue fall within the scope of the agreement. *Kaneff v. Del. Title Loans,* 587 F.3d 616, 620 (3d Cir.2009). In making these determinations, the Court applies the same standard as it would when reviewing a motion for summary judgment, granting a motion to compel only if there is "no genuine issue of fact concerning the formation

2011 WL 5869773, 18 Wage & Hour Cas.2d (BNA) 740

of the agreement to arbitrate." *Kirleis v. Dickie, McCamey & Chilcote, P.C.,* 560 F.3d 156, 159 (3d Cir.2009) (internal citations and quotations omitted). Accordingly, the Court must view the evidence and reasonable inferences drawn therefrom in a light most favorable to the non-moving party. *Id.* However, even if these requirements are satisfied, Section 2 of the Federal Arbitration Act provides that an agreement to arbitrate may be invalidated "upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. "This saving clause permits agreements to arbitrate to be invalidated by generally applicable contract defenses, such as fraud, duress, or unconscionability, but not by defenses that apply only to arbitration or that derive their meaning from the fact that an agreement to arbitrate is at issue." *AT & T Mobility, LLC v. Concepcion,* —— U.S. ——, ——, 131 S.Ct. 1740, 1746, 179 L.Ed.2d 742 (2011).

## III. DISCUSSION

**\*3** In the present matter, Plaintiffs do not dispute that an agreement to arbitrate exists or that the claims at issue here fall within the scope of that agreement. Rather, Plaintiffs argue that (1) pursuant to Section 2 of the Federal Arbitration Act, Pennsylvania's unconscionability doctrine serves to invalidate the arbitration agreement; and (2) Defendants have waived their right to arbitrate the agreement by failing to move for arbitration until fifteen months after this action was commenced. The Court will consider these arguments *seriatim.*

### A. Unconscionability

As previously noted, an arbitration agreement "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. "This saving clause permits agreements to arbitrate to be invalidated by generally applicable contract defenses, such as fraud, duress, or unconscionability, but not by defenses that apply only to arbitration or that derive their meaning from the fact that an agreement to arbitrate is at issue." *Concepcion,* 131 S.Ct. at 1746. Plaintiffs argue that under the Pennsylvania doctrine of unconscionability, as articulated in *Thibodeau v. Comcast Corp.,* 912 A.2d 874, 885–86 (Pa.Super.Ct.2006), the arbitration agreement at issue here is unenforceable. Defendants counter that pursuant the Supreme Court's decision in *Concepcion,* —— U.S. ——, 131 S.Ct. 1740, 179 L.Ed.2d 742, the Federal Arbitration Act preempts *Thibodeau* and Plaintiffs' argument must fail.

In *Thibodeau,* the Pennsylvania Superior Court declined to enforce an arbitration agreement contained in a Comcast Customer Agreement, where the agreement was included in a "take it or leave it" contract from a service provider with a government monopoly and where damages amounted to approximately $9.60 per month. *Id.* at 885–86. The Superior Court emphasized that the Federal Arbitration Act was not designed to "occupy the entire field of arbitration agreements." *Id.* at 879. Accordingly, applying 9 U.S.C. § 2, the Superior Court analyzed the arbitration agreement pursuant to Pennsylvania's unconscionability doctrine. *Id.* at 880. The court concluded that the arbitration agreement was unenforceable because under the laws of Pennsylvania, "where the arbitration clause is contained in an adhesion contract and unfairly favors the drafting party, such clauses are unconscionable and must be deemed unenforceable." *Id.* To that end, Plaintiffs argue that under *Thibodeau* the arbitration agreement at issue here is unenforceable.

Contrary to Plaintiffs' assertions, however, the *Thibodeau* rule is no longer good law following *Concepcion.* In *Concepcion,* the Supreme Court considered an appeal from the United States Court of Appeals for the Ninth Circuit in which that court refused to enforce an arbitration agreement on the grounds that it was procedurally and substantively unconscionable under the law of the state of California as set forth in *Discover Bank v. Superior Court,* 36 Cal.4th 148, 30 Cal.Rptr.3d 76, 113 P.3d 1100 (Cal.2005). The Supreme Court reversed the Ninth Circuit, holding that the Federal Arbitration Act preempted the *Discover Bank* rule, and held that under the Federal Arbitration Act the arbitration clause and its class action waiver were valid and enforceable. *Concepcion,* 131 S.Ct. at 1750. The Supreme Court reasoned that the Federal Arbitration Act must preempt the *Discover Bank* rule because the rule required the availability of classwide arbitration, which undermines the central purpose of the Federal Arbitration Act. *Id.* at 1753.

**\*4** The *Discover Bank* rule and the rule articulated in *Thibodeau* are strikingly similar. The *Discover Bank* rule provides that "class action waivers in consumer contracts of adhesion are unenforceable, whether the consumer is being asked to waive the right to class action litigation or the right to classwide arbitration." *Discover Bank,* 30 Cal.Rptr.3d 76, 113 P.3d at 1110; *see also Concepcion,* 131 S.Ct. at 1746 (defining the *Discover Bank* rule as a "rule classifying most collective-arbitration waivers in consumer contracts as unconscionable"). Similarly, *Thibodeau* held that "where the arbitration clause is contained in an

adhesion contract and unfairly favors the drafting party, such clauses are unconscionable and must be deemed unenforceable." *Thibodeau,* 912 A.2d at 880 (concluding that mandating individual arbitration rendered the arbitration clause unconscionable). Indeed, in *Thibodeau* the Superior Court expressly approved of the California law. Relying on *Szetela v. Discover Bank,* 97 Cal.App.4th 1094, 118 Cal.Rptr.2d 862 (Cal.Ct.App.2002), the Pennsylvania Superior Court in *Thibodeau* observed that "[t]he California Court of Appeals recently ruled on the identical issue presented in these cases, finding that forced individual arbitration by precluding class actions is so one-sided as to be 'blindingly obvious' and violated 'fundamental notions of fairness.' ... The court found that because the effect of the enforcement of the agreement was corporate immunity, preclusion of class action litigation was unconscionable." *Thibodeau,* 912 A.2d at 884.

In light of the Supreme Court's rejection of the *Discover Bank* rule, a fair reading of *Concepcion* must lead the Court to conclude that *Thibodeau* cannot serve to invalidate an arbitration agreement. Although the *Thibodeau* rule appears to address "the revocation of any contract," the rule in fact serves to invalidate agreements for the sole reason that they are agreements to arbitrate. The *Thibodeau* rule articulates a clear preference against arbitration and in favor of class actions, concluding "[i]t is only the class action vehicle which makes small consumer litigation possible.... Should the law require consumers to litigate or arbitrate individually, defendant corporations are effectively immunized from redress of grievances." *Thibodeau,* 912 A.2d at 885. *Thibodeau* is, therefore, in conflict with both *Concepcion* and *Perry v. Thomas,* which held that a court may not "rely on the uniqueness of an agreement to arbitrate as a basis for a state-law holding that enforcement would be unconscionable." *Perry v. Thomas,* 482 U.S. 483, 493, n. 9, 107 S.Ct. 2520, 96 L.Ed.2d 426 (1987).

The Court does pause briefly to note one possible distinction between *Concepcion* and the instant action, namely, that the present action concerns an employment contract rather than a consumer contract. However, upon a review of *Concepcion,* the Court is unable to discern any basis for limiting the effect of that case to consumer contracts, and Plaintiffs have provided none.[2] The Supreme Court in *Concepcion* spoke in broad language about arbitration agreements generally, without limiting its holding to the consumer contract context or carving out an exception for employment contracts. Further, the United States Court of Appeals for the Third

Circuit has instructed that the Supreme Court's holding in *Concepcion* is "both broad and clear: a state law that seeks to impose class arbitration despite a contractual agreement for individualized arbitration is inconsistent with, and therefore preempted by the [Federal Arbitration Act], irrespective of whether class arbitration 'is desirable for unrelated reasons.' " *Litman v. Cellco P'ship,* No. 08–4103, 2011 U.S.App. LEXIS 17649, at *17, 2011 WL 3689015 (3d Cir. Aug. 24, 2011) (quoting *Concepcion,* 131 S.Ct. at 1753)). Accordingly, the Court must agree with those courts that have applied *Concepcion* to uphold arbitration agreements in employment contracts. *See, e.g., Valle v. Lowe's HIW, Inc.,* No. 11–1489 SC, 2011 U.S. Dist. LEXIS 93639, at *16–17, 2011 WL 3667441 (N.D.Cal. Aug.22, 2011) (concluding a California case applying the *Discover Bank* rule to an employment contract was no longer good law following *Concepcion* ).

2    The Court questioned the parties at oral argument regarding whether *Concepcion* could be limited to consumer contracts. (Doc. No. 81 at 16:1–3.) In response Plaintiffs were only able to cite to a California Superior Court case in which a divided court held that an arbitration agreement could not preempt the state Private Attorney Generals Act. *Brown v. Ralphs Grocery Co.,* 197 Cal.App.4th 489, 128 Cal.Rptr.3d 854 (Cal.App.2d Dist.2011); *but see Quevedo v. Macy's, Inc.,* No. 09–cv–1522, —— F.Supp. ——, ——, 2011 WL 3135052, at *17 (C.D. Cal. June 16, 2011) (concluding plaintiff's PAGA claims must proceed to arbitration). However, an action under the Private Attorney Generals Act "is an enforcement action, with one aggrieved employee acting as a private attorney general.... Such an action is fundamentally a law enforcement action." *Brown,* 197 Cal.App.4th at 499, 128 Cal.Rptr.3d 854 (internal citations and quotations omitted). The Superior Court went on to explain that "a law established for a public reason cannot be contravened by a private agreement." *Id.* at 500, 128 Cal.Rptr.3d 854 (quoting Cal. Civ.Code § 3513). Because this matter concerns a private action, rather than a law enforcement action advanced by private individuals on behalf of the state, *Brown* cannot serve to invalidate the arbitration agreement at issue here.

**\*5** There can be little doubt that *Thibodeau* is no longer viable following the Supreme Court's decision in *Concepcion.* Each Court that has considered the issue has held that in light of *Concepcion* the Federal Arbitration Act preempts Pennsylvania's unconscionability doctrine. *See King v. Advance Am.,* No. 07–cv–237, 2011 U.S. Dist. LEXIS 98630, at *16, 2011 WL 3861898 (E.D.Pa. Aug. 31, 2011); *Black v. JP Morgan Chase & Co.,* 2011 U.S. Dist. LEXIS

Case 3:16-cv-00085-MEM    Document 176-1    Filed 09/25/20    Page 24 of 147
Brown v. TrueBlue, Inc., Not Reported in F.Supp.2d (2011)
2011 WL 5869773, 18 Wage & Hour Cas.2d (BNA) 740

99428, at *70 n. 25, 2011 WL 3940236 (W.D.Pa. Aug. 25, 2011); *Clerk v. Cash Cent. of Utah, LLC,* No. 09–cv–4964, 2011 U.S. Dist. LEXIS 95494 (E.D.Pa. Aug. 24, 2011); *Clerk v. Cash Am. Net of Nev., LLC,* No. 09–cv–2245, 2011 U.S. Dist. LEXIS 95489 (E.D.Pa. Aug. 22, 2011); *Alfeche v. Cash Am. Int'l, Inc.,* No. 09–cv–0953, 2011 U.S. Dist. LEXIS 90085, 2011 WL 3565078 (E.D.Pa. Aug. 12, 2011). In the absence of any other argument supporting the unconscionability of the instant arbitration agreement, the Court must conclude that the arbitration agreement at issue here is valid.

**B. Waiver**

Plaintiffs' second argument against enforcement of the agreement to arbitrate is that Defendants have waived their right to enforce the agreement by delaying the invocation of the arbitration agreement until well after this action was commenced. Defendants counter that their delay was excusable in light of *Concepcion* because that case "changed the whole landscape of arbitration agreement and class arbitration agreements." (Doc. No. 81 at 22:14–16.)

"[A]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or any allegation of waiver, delay, or a like defense to arbitrability." *Moses H. Cone Mem'l Hosp.,* 460 U.S. at 24–25. Accordingly, waiver is not to be lightly inferred. *See, e.g., PaineWebber Inc. v. Faragalli,* 61 F.3d 1063, 1068–69 (3d Cir.1995) (concluding that waiver should only be found "where the demand for arbitration came long after the suit commenced and when both parties had engaged in extensive discovery"). In determining whether the right to arbitrate has been waived, the central question is whether the party arguing in favor of waiver has been prejudiced by the moving party's conduct. *See Hoxworth v. Blinder, Robinson & Co.,* 980 F.2d 912, 925 (3d Cir.1992) (noting that "prejudice is the touchstone for determining whether the right to arbitrate has been waived" and concluding that defendant had waived their right to arbitrate by "actively litigating the case for almost a year prior to filing their motion to compel arbitration"). The Third Circuit has set forth a non-exhaustive list of six factors that should guide the waiver determination:

(1) the timeliness or lack thereof of a motion to arbitrate; (2) the degree to which the party seeking to compel arbitration or to stay court proceedings pending arbitration has contested the merits of its opponent's claims; (3) whether that party has informed its adversary of the intention to seek arbitration even if it has not yet filed a motion to stay the district court proceedings; (4) the extent of its non-merits motion practice; (5) its assent to the trial court's pretrial orders; and (6) the extent to which both parties have engaged in discovery.

**\*6** *Ehleiter v. Grapetree Shores, Inc.,* 482 F.3d 207, 223 (3d Cir.2007) (internal citations omitted); *see also Hoxworth,* 980 F.2d at 926–27. Notably, "not all the factors need be present to justify a finding of waiver, and the waiver determination must be based on the circumstances and context of the particular case." *Nino v. Jewelry Exchange, Inc.,* 609 F.3d 191, 209 (3d Cir.2010) (internal citations and quotations omitted).

At first glance Plaintiffs present a compelling case for waiver. Defendants failed to file their motion to compel arbitration until fifteen months after the complaint was filed. The Third Circuit has held that a fifteen month delay in filing a motion to compel arbitration "weighs firmly in favor of waiver." *Id.* at 210. Defendants failed to refer to the arbitration clause in the answer to their complaint. (Doc. No. 16.) Defendants have also engaged in some discovery and have fully briefed Plaintiffs' two motions for class certification.

Plaintiffs' argument in favor of waiver unravels, however, when one considers the impact of *Concepcion* on the waiver analysis. Plaintiffs do not dispute that the delay in Defendants' filing the motion to compel was caused by the perceived unfavorable state of the law prior to *Concepcion.* (Doc. No. 81 at 3:9–15.) Although Defendants waited fifteen months after Plaintiffs filed the complaint before filing the motion to compel arbitration, the motion to compel was filed just weeks after the Supreme Court issued its opinion in *Concepcion* on April 27, 2011. Other courts of appeals, as well as the United States District Court for the Western District of Pennsylvania, have held that an intervening change in the law may excuse an otherwise untimely motion to compel arbitration. *See, e.g., Nesslage v. York Sec., Inc.,* 823 F.2d 231, 234 (8th Cir.1987) (finding no waiver after two years of litigation where motion to compel was filed shortly after a Supreme Court opinion holding that the plaintiff's claims were subject to arbitration); *Benoay v. Prudential–Bache Secur., Inc.,* 805 F.2d 1437, 1440 (11th Cir.1986) (concluding that although the motion to compel was filed more than two years after the complaint was filed "the motion was timely in light of a change in law affecting the parties' rights"); *Fischer v. A.G. Becker Parabis, Inc.,* 791 F.2d 691 (9th Cir.1986) (finding no waiver after three years of litigation based on intervening Supreme Court precedent); *Kaliden v. Shearson Lehman Hutton, Inc.,* 789 F.Supp. 179, 183 (W.D.Pa.1991) (concluding that defendant

did not "act[ ] in a manner inconsistent with arbitration in light of the potential changes in the decisional law that occurred during the pendency of the case"). Likewise, district courts in other circuits have held that *Concepcion* represented an intervening change in the law justifying enforcement of an otherwise untimely motion to compel arbitration. *David v. Metron Servs.,* No. 4:10–cv–2052, 2011 U.S. Dist. LEXIS 101652, at *8, 2011 WL 4007982 (E.D.Mo. Sept. 8, 2011) (finding no waiver where motion to compel arbitration was filed on June 3, 2011, in a putative class action filed on October 28, 2010, because *Concepcion* represented an intervening change in law); *Estrella v. Freedom Fin.,* 2011 U.S. Dist. LEXIS 71606, at *14–*15, 2011 WL 2633643 (N.D.Cal. July 5, 2011) (finding no waiver where defendant first filed the motion to compel twenty-seven months after the complaint was filed but only nineteen days after *Concepcion*).

**\*7** In the present matter, there can be little doubt that *Concepcion* represents a change in the law of the Third Circuit.[3] *See, e.g., Litman v. Cellco P'ship,* No. 08–4103, 2011 U.S.App. LEXIS 17649, 2011 WL 3689015 (3d Cir. Aug. 24, 2011) (noting that the court of appeals is bound by its prior holdings regarding class action waivers in the absence of a contrary en banc opinion or Supreme Court decision and concluding that "[t]he Supreme Court's more recent opinion in *Concepcion* works just such a change in the law"). Had Defendants filed the motion to compel arbitration prior to *Concepcion,* Defendants risked this Court finding the arbitration agreement was unconscionable under *Thibodeau* and either refusing to enforce the agreement or requiring Defendants to pursue arbitration on a class basis. The former result would have been unsatisfactory to Defendants. The latter result, for the reasons expressed in *Concepcion,* would have been intolerable. *See Concepcion,* 131 S.Ct. at 1751–52 (explaining that "class arbitration greatly increases risks to defendants" by eliminating the procedural safeguards of appellate review and also greatly increases the cost of arbitration by making "the process slower, more costly, and more likely to generate procedural morass"). Accordingly, Defendants's delay is excused by an intervening change in law, and their having filed the motion to compel arbitration approximately six weeks after *Concepcion* weighs against a finding of prejudice. *See, e.g., Wood v. Prudential Ins. Co. of Am.,* 207 F.3d 674, 680 (3d Cir.2000) (concluding a one-andone-half month delay was not prejudicial); *Painewebber Inc. v. Faragalli,* 61 F.3d 1063, 1069 (3d Cir.1995) (concluding a two month delay was not prejudicial).

3    The Court invited the parties to provide supplemental briefing on the issue of whether the Third Circuit's decision in *Gay v. CreditInform,* 511 F.3d 369 (3d Cir.2007), undermines Defendants' argument regarding an intervening change in law. (Doc. No. 79.) In *Gay,* the Third Circuit noted that:

> To the extent, then, that *Lytle* and *Thibodeau* hold that the inclusion of a waiver of the right to bring judicial class actions in an arbitration agreement constitutes an unconscionable contract, they are not based "upon such grounds as exist at law or in equity for the revocation of any contract" pursuant to section 2 of the FAA, and therefore cannot prevent the enforcement of the arbitration provision in this case.

*Gay,* 511 F.3d at 394–95. The Third Circuit went on to note that "though the Pennsylvania cases are written ostensibly to apply general principles of contract law, they hold that an agreement to arbitrate may be unconscionable simply because it is an agreement to arbitrate." *Id.* at 395. However, because the court of appeals in *Gay* ultimately applied Virginia rather than Pennsylvania law, the Third Circuit subsequently characterized *Gay*'s findings regarding *Thibodeau* as dicta. *Puleo v. Chase Bank USA, N.A.,* 605 F.3d 172, 177 n. 2 (3d Cir.2010); *Homa v. Am. Express Co.,* 558 F.3d 225 (3d Cir.2009). Although these characterizations of *Gay,* themselves, appear to be dicta, neither party argued that *Gay* would have given Defendants a basis for seeking enforcement of the arbitration agreement.

The remaining factors paint a somewhat ambiguous picture. Weighing against a finding of prejudice is the fact that Defendants never contested the merits of Plaintiffs' claims via a motion to dismiss or a motion for summary judgment. Further, the only document filed by Defendants between the date of the *Concepcion* opinion was entered and the date on which Defendants moved to compel arbitration was a motion for leave to file a sur reply brief to Plaintiffs' motion for class certification on May 10, 2011. (Doc. No. 61.) In addition, discovery in this case was rather limited. Defendants have represented that they have conducted depositions of Plaintiff Brown and Plaintiff Jury and made one request for documents resulting in thirty pages of disclosures from Plaintiffs.[4] (Doc. No. 81 at 9:7–12.) Weighing in favor of a finding of prejudice is Defendants' failure to indicate to the Court or Plaintiffs that the disposition of *Concepcion* may influence their decision to pursue arbitration. The Supreme Court granted a writ of certiorari on May 24, 2010, two months after the complaint was filed and one week after Defendants filed their answer. Defendants, represented by sophisticated

counsel who indicated to the Court that he practices in California and is "very familiar" with the *Discover Bank* rule (*Id.* at 4:1–9, 30 Cal.Rptr.3d 76, 113 P.3d 1100), certainly would have been aware of the Supreme Court's decision to review that rule and could have informed Plaintiffs that if the Supreme Court reversed the Ninth Circuit that Defendants would revisit their decision to not seek arbitration.

4  Notably, the record suggests, and Plaintiffs do not dispute that they have received the benefit of discovery in that Defendants have disclosed "thousands and thousands of pages of documents." (Doc. No. 81 at 9:13–18.)

**\*8** Ultimately, the Court finds that the six *Hoxworth* factors weigh against a finding of prejudice. This is not a case in which the party moving for arbitration has tactically pursued a case in court only to reverse course after availing himself of the court system proved unfruitful. Rather, Defendants here appear to have acted in good faith, only seeking arbitration after it became clear that, in the wake of *Concepcion,* that option had become available. The Court further notes that when Plaintiffs were asked directly about the prejudice they suffered as a result of Defendants' delay in seeking arbitration, they failed to identify any harm. At oral argument the Court asked Plaintiffs's counsel, "In the time that this case has been pending in this Court, what efforts have you undertaken on behalf of Plaintiffs that would not have been necessary had this case gone to arbitration?" (*Id.* at 14:13–16.) Plaintiffs' counsel responded, "Honestly, I can't think of any at this point." (*Id.* at 14:17–18.) When pressed again by the Court whether he agreed with Defendants' regarding the lack of prejudice, Plaintiffs' counsel responded, "I admitted that I wouldn't have done anything different in arbitration." (*Id.* at 24:4–13.) The Third Circuit advises that "prejudice is the touchstone for determining whether the right to arbitrate has been waived." *Hoxworth,* 980 F.2d at 925. Because Plaintiffs have failed to demonstrate the existence of prejudice sufficient to justify a finding of waiver, the Court cannot refuse to enforce the arbitration agreement on this basis.

## IV. CONCLUSION

Upon a review of all the arguments, the Court must grant Defendants' motion to compel arbitration. There is no dispute that an arbitration agreement exists and that this dispute is governed by that agreement. Plaintiffs' arguments regarding unconscionability are squarely foreclosed by the United States Supreme Court's decision in *Concepcion.* Moreover, although the Court is troubled that Defendants' motion to compel arbitration was not filed until fifteen months after this action commenced, it is undisputed that the reason for this delay was that *Concepcion* represented a significant change in the state of the law. Because this intervening change in the law of this circuit excuses Defendants' delay, and because Plaintiffs have failed to demonstrate prejudice, the Court cannot find that Defendants waived their right to proceed to arbitration. Accordingly, pursuant to 9 U.S.C. § 3, the Court will grant Defendants' motion to compel arbitration and stay all further proceedings in this matter pending the outcome of the arbitration of Plaintiffs' claims.

## *ORDER*

**AND NOW,** on this 22nd day of November 2011, **IT IS HEREBY ORDERED THAT** Defendants' motion to compel arbitration (Doc. No. 63) is **GRANTED** and this action is **STAYED** pursuant to 9 U.S.C. § 3, pending arbitration. The parties are directed to file a joint status report no later than January 31, 2012, apprising the Court of the status of this case.

## All Citations

Not Reported in F.Supp.2d, 2011 WL 5869773, 18 Wage & Hour Cas.2d (BNA) 740

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

City of Sterling Heights General Employees' Retirement..., Not Reported in...

2015 WL 5097883, Fed. Sec. L. Rep. P 98,620

🟡  KeyCite Yellow Flag - Negative Treatment

Declined to Extend by In re AVEO Pharmaceuticals, Inc. Securities Litigation, D.Mass., November 14, 2017

2015 WL 5097883

NOT FOR PUBLICATION

United States District Court, D. New Jersey.

CITY OF STERLING HEIGHTS GENERAL EMPLOYEES' RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated, Plaintiffs,

v.

PRUDENTIAL FINANCIAL, INC., et al., Defendants.

Civil Action No. 12–5275.
|
Signed Aug. 31, 2015.

**Attorneys and Law Firms**

Peter S. Pearlman, Cohn, Lifland, Pearlman, Herrmann & Knopf, LLP, Saddle Brook, NJ, for Plaintiffs.

Daniel C. Fleming, Wong Fleming, Princeton, NJ, for Defendants.

**OPINION**

ARLEO, District Judge.

**\*1**  Before this Court are the following motions: (1) The motion of Lead Plaintiffs National Shopmen Pension Fund ("National Shopmen"), Heavy & General Laborers' Locals 472 & 172 Pension and Annuity Funds, and Roofers Local No. 149 Pension Fund (collectively, "Lead Plaintiffs") to certify a class, appoint National Shopmen as class representative, and appoint class counsel pursuant to Federal Rule of Civil Procedure 23 [Dkt. No. 133]; and (2) the motion of Defendants Prudential Financial, Inc. ("Prudential"), John R. Strangfeld, Richard J. Carbone, and Mark B. Grier (collectively, "Defendants") to exclude the expert testimony of Lead Plaintiffs' expert [Dkt. No. 185]. No oral argument was heard pursuant to Federal Rule of Civil Procedure 78 and Local Civil Rule 78.1. In consideration of the parties' submissions in connection with these motions, and

for the reasons set forth herein, Lead Plaintiffs' motion is **GRANTED** and Prudential's motion is **DENIED.**

**I. Background and Procedural History**

This case is a putative securities class action in which Lead Plaintiffs allege that Prudential violated Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") between May 5, 2010, and November 4, 2011 (the "Class Period"), by making false and misleading statements that overstated Prudential's income and understated its expenses. *See generally* Dkt. No. 22, Am. Compl. Prudential is a public corporation headquartered in New Jersey. *Id.* ¶ 2. Its common stock trades on the New York Stock Exchange ("NYSE"). *Id.* Defendants Strangfeld, Carbone, and Grier are current and former high-level executives of Prudential against whom Lead Plaintiffs allege direct liability under § 10(b) and control person liability under § 20(a).[1] *Id.* ¶¶ 34, 32–44. Lead Plaintiffs are purchasers of Prudential's common stock during the Class Period. *Id.* ¶ 29.

[1]  The Amended Complaint also originally asserted a cause of action under § 20(b), but that claim was dismissed in a February 6, 2014, order. Dkt. No. 34, Order on Mot. to Dismiss.

Prudential is principally engaged in the business of "life insurance, annuities and retirement-related services." *Id.* ¶ 5.[2] Lead Plaintiffs claim that Prudential knowingly or recklessly failed to account for life insurance policies that were eligible for payment to a beneficiary or escheatment to a state, which falsely inflated Prudential's reported financial results during the Class Period. *Id.* ¶¶ 11–12, 54, 57. At the heart of Lead Plaintiffs' allegations are Prudential's historical use of the Social Security Administration's Death Master File (the "DMF") and various states' investigations into Prudential's unclaimed property practices that began in 2009 and ended with a global settlement in January 2012. *See id.* ¶¶ 8, 57(e), 101–07. The DMF is a database maintained by the Social Security Administration that tracks deaths in the United States. *Id.* ¶ 8. Lead Plaintiffs claim that for many years, Prudential regularly used the DMF to identify deceased annuity policyholders in order to stop annuity payments, but only sometimes used the DMF to identify deceased life insurance policyholders and locate their beneficiaries or, if there were no beneficiaries under a given policy, inform the relevant state authorities that the policy was eligible for escheatment. *Id.* ¶¶ 9–10, 57(c). As a result, Lead Plaintiffs allege, Prudential knowingly retained monies that did not belong to it and understated its

liabilities to policyholders. *Id .* ¶¶ 1011. Lead Plaintiffs allege that Defendants therefore materially overstated Prudential's financial strength in financial reports and other disclosures made during the Class Period. *Id.* ¶¶ 12, 16, 45–56.

2   Prudential's operations are comprised of two separate lines of business: the Financial Services Businesses—the bulk of Prudential's operations—and the Closed Block Business. *See* Am. Compl. ¶ 5. The Financial Services Businesses are composed of four broad divisions: (1) U.S. Retirement Solutions and Investment Management; (2) U.S. Individual Life and Group Insurance; (3) International Insurance and International Investments; and (4) Corporate and Other. *Id.* The Closed Block Business is essentially a legacy business composed of life insurance products that Prudential ceased to offer following Prudential's demutualization; accordingly, its assets and liabilities have been segregated from the Financial Services Businesses. *Id.* Prudential consistently represented during the Class Period that only the performance of the Financial Services Businesses impacted the value of Prudential's common stock. *Id.* ¶ 6.

**\*2** The Class Period begins on May 5, 2010, when Prudential issued a press release announcing its financial results for the first quarter of 2010. *Id.* ¶ 45. Prudential reiterated its first quarter results on May 7, 2010, when it filed its Form 10–Q for the first quarter of 2010. *Id.* ¶ 46. Lead Plaintiffs allege that essentially all announcements of Prudential's financial results during the Class Period were materially false and misleading such that Prudential's common stock traded at inflated prices throughout the Class Period. *Id.* ¶¶ 47–56, 61–63, 66–68, 71–75, 80–85.

Prudential allegedly began to disclose the truth about its unclaimed property practices and the ongoing state investigations on August 5, 2011, when it acknowledged the breadth of those investigations and confirmed that they would "result in additional payments and impact claims revenues." *Id.* ¶ 86. S & P downgraded the United States' credit rating on the same day. *Id.* ¶ 87. At the close of trading on August 8, 2011—the next trading day—Prudential's per-share stock price stood at $48.14, down from a close of $53.99 on August 5. *Id.* ¶ 89. On November 2, 2011, Prudential issued a press release announcing the company's financial results for the third quarter of 2011. *Id.* ¶ 91. In the press release, Prudential revealed that it would take a pre-tax $99 million charge (the "DMF Charge") to its reserves to account for additional payments expected to result from the use of new DMF matching criteria. *Id.* Prudential also announced several other unrelated charges in the press release, including

a $435 million charge "to strengthen reserves for guaranteed death and income benefits." *Id.* Mr. Carbone reiterated the DMF Charge on a conference call the next day. *Id.* ¶ 94. Prudential again acknowledged the DMF Charge when it filed its third quarter 2011 Form 10–Q ("3Q11 Form 10–Q") on November 4, 2011.[3] *Id.* ¶ 97. Specifically, Mr. Carbone noted on the conference call that the DMF Charge resulted in a $0.15 per share impact on Prudential's stock. *Id.* ¶ 94. The 3Q11 Form 10–Q provided additional detail regarding the state investigations and the new DMF matching criteria that resulted therefrom. *Id.* ¶ 98. After closing at $53.67 per share on November 2, 2011, Prudential's stock price closed at $53.05 and $52. 19 on November 3 and November 4, respectively. *Id.* ¶ 99.

3   Lead Plaintiffs allege that the charge was actually increased to $139 million due to a $40 million charge against the Closed Block Business. Am. Compl. ¶ 97. Lead Plaintiffs acknowledge, however, that Prudential consistently represented that the Closed Block Business had no impact on the value of Prudential's common stock. *Id.* ¶ 6. Given that fact, the $40 million charge to the Closed Block Business is not at issue here.

Plaintiff City of Sterling Heights General Employees' Retirement Systems instituted this action on August 22, 2012. Dkt. No. 1, Compl. Lead Plaintiffs and Lead Plaintiffs' counsel were appointed as lead plaintiffs and lead counsel on March 21, 2013. Dkt. No. 21. Lead Plaintiffs filed the Amended Complaint on May 6, 2013. Dkt. No. 22, Am. Compl. Defendants thereafter moved to dismiss the Amended Complaint, and the Honorable Susan D. Wigenton, U.S.D.J., issued an order on February 6, 2014, granting in part and denying in part Defendants' motion. Dkt. No. 34, Order on Mot. to Dismiss. Lead Plaintiffs now move for certification of a class consisting of all purchasers of Prudential's common stock during the Class Period, with the exception of Defendants and various entities and persons connected to Defendants. Dkt. No. 133, Mot. for Class Cert. Defendants oppose class certification and move to exclude the report and opinions of Lead Plaintiffs' expert, Professor Steven P. Feinstein (the "Feinstein Report"). Dkt. No. 185, Mot. to Exclude Expert Report.

## II. Legal Standard

### A. Class Certification Requirements
**\*3** Federal Rule of Civil Procedure 23 sets forth the requirements that must be fulfilled before a case may proceed

Case 3:16-cv-00085-MEM   Document 176-1   Filed 09/25/20   Page 29 of 147
City of Sterling Heights General Employees' Retirement..., Not Reported in...
2015 WL 5097883, Fed. Sec. L. Rep. P 98,620

as a class action. There are four basic prerequisites for class action treatment:

> (1) the class is so numerous that joinder of all members is impracticable;

> (2) there are questions of law or fact common to the class;

> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and the representative parties will fairly and adequately protect the interests of the class.

Fed.R.Civ.P. 23(a). These are known as the numerosity, commonality, typicality, and adequacy requirements. *See In re Constar Int'l Inc. Sec. Litig.,* 585 F.3d 774, 780 (3d Cir.2009). Second, plaintiffs must also meet the requirements of one of Rule 23(b)'s provisions. *Id.* Here, Lead Plaintiffs seek certification under Rule 23(b)(3), which permits certification only if "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed.R.Civ.P. 23(b)(3). "The twin requirements of Rule 23(b)(3) are known as predominance and superiority." *In re Hydrogen Peroxide Antitrust Litig.,* 552 F.3d 305, 310 (3d Cir.2008). In general, Rule 23(b)(3)'s predominance requirement is the most crucial requirement in securities class actions. *Halliburton Co. v. Erica P. John Fund, Inc. (Halliburton II),* —— U.S. ——, ——, 134 S.Ct. 2398, 2412, 189 L.Ed.2d 339 (2014). This case is no different.

A plaintiff "must affirmatively demonstrate" that Rule 23's requirements are satisfied, *Wal–Mart Stores, Inc. v. Dukes,* —— U.S. ——, ——, 131 S.Ct. 2541, 2551, 180 L.Ed.2d 374 (2011), by providing actual evidentiary proof that the requirements are met. *Comcast Corp. v. Behrend,* ——U.S. ——, ——, 133 S.Ct. 1426, 1432, 185 L.Ed.2d 515 (2013). Therefore, a reviewing court must conduct a "rigorous analysis" of each of Rule 23's requirements, *Dukes,* 131 S.Ct. at 2551, and must be satisfied that each requirement is established by a preponderance of the evidence. *In re Blood Reagents Antitrust Litig.,* 783 F.3d 183, 187 (3d Cir.2015). This analysis frequently overlaps with "the merits of the plaintiff's underlying claim." *Dukes,* 131 S.Ct. at 2551. The merits may be considered, however, "only to the extent ... that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Amgen Inc. v. Conn. Ret. Plans & Trust Funds,* —— U.S. ——, —— – ——, 133 S.Ct. 1184, 1194–95, 185 L.Ed.2d 308 (2013).

**B. Admissibility of Expert Opinion**

Courts are also frequently called upon to consider expert opinion offered to support or oppose class certification. *Hydrogen Peroxide,* 552 F.3d at 323. Where an expert opinion is critical to class certification and a party challenges the reliability of that opinion, the reviewing court must engage in a two-step analysis before analyzing whether Rule 23's requirements have been met: (1) whether the party's challenges bear upon "those aspects of [the] expert testimony offered to satisfy Rule 23" and (2) if so, whether the opinion is admissible as to those aspects under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharms. Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). *Blood Reagents,* 783 F.3d at 188.

**\*4** Federal Rule of Evidence 702 provides the general parameters of admissible expert testimony:

> A witness who is qualified as an expert by knowledge, skill experience, training, or education may testify in the form of an opinion or otherwise if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

> (b) the testimony is based on sufficient facts or data;

> (c) the testimony is the product of reliable principles and methods; and

> (d) the expert has reliably applied the principles and methods to the facts of the case.

In deciding whether to admit expert testimony, the trial court serves as a "gatekeeper" tasked with "ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert,* 509 U.S. at 597; *see also Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 14748, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999) (applying *Daubert* standard to all expert testimony). The Court considers whether: (1) the expert is qualified; (2) the expert's testimony is reliable; and (3) the expert's testimony is helpful to the trier of fact, i.e., it must "fit" the facts of the case. *See United States v. Schiff,* 602 F.3d 152, 172 (3d Cir.2010). The proponent of the expert testimony must prove these three requirements by a preponderance of the evidence. *Mahmood v. Narciso,* 549 F. App'x 99, 102 (3d Cir.2013) (citing *In re TMI Litig.,* 193 F.3d 613, 663 (3d Cir.1999)).

Case 3:16-cv-00085-MEM   Document 176-1   Filed 09/25/20   Page 30 of 147
City of Sterling Heights General Employees' Retirement..., Not Reported in...
2015 WL 5097883, Fed. Sec. L. Rep. P 98,620

In determining whether proposed expert testimony is reliable, the trial court should examine:

> (1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put.

*In re Paoli R.R. Yard PCB Litig.,* 35 F.3d 717, 742 n. 8 (3d Cir.1994); *see also Schneider,* 320 F.3d at 405. Each step of the expert's analysis must be reliable, including "the methodology, the facts underlying the expert's opinion, and the link between the facts and the conclusion." *ZF Meritor, LLC v. Eaton Corp.,* 696 F.3d 254, 291 (3d Cir.2012). But proponents of expert testimony need not "prove their case twice-they do not have to demonstrate to the judge by a preponderance of the evidence that the assessments of their experts are correct, they only have to demonstrate by a preponderance of the evidence that their opinions are reliable." *Oddi v. Ford Motor Co.,* 234 F.3d 136, 145 (3d Cir.2000).

### C. Section 10b and Rule 10b–5

Section 10b and Rule 10b–5, *see* 15 U.S.C. § 78j and 17 C.F.R. 240.10b–5, prohibit deception in relation to the sale of securities. In order to recover, a plaintiff must prove the following elements: "(1) a material misrepresentation or omission, (2) scienter, (3) a connection between the misrepresentation or omission and the purchase or sale of a security, (4) reliance upon the misrepresentation or omission, (5) economic loss, and (6) loss causation." *City of Edinburgh Council v. Pfizer, Inc.,* 754 F.3d 159, 167 (3d Cir.2014).

**\*5** At the class certification stage, materiality and loss causation need not be considered. *See Amgen,* 133 S.Ct. at 1199 (materiality); *Erica P. John Fund, Inc. v. Halliburton Co. (Halliburton* I), 563 U.S. 804, 131 S.Ct. 2179, 2185–86, 180 L.Ed.2d 24 (2011) (loss causation). Conversely, the element of reliance must be considered at class certification. *Halliburton II,* 134 S.Ct. at 2407–08.

In order to establish reliance, the plaintiff may invoke the rebuttable presumption set forth in *Basic, Inc. v. Levinson,* 485 U.S. 224, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988), which

presumes that all investors rely on the integrity of the market price when deciding whether to buy or sell stock. *Id.* at 247. The presumption is based on the "fraud-on-the-market" theory, which provides that where a company's stock trades on an efficient market, its stock price incorporates all material public information, including misrepresentations. *See id.* at 246 (internal quotations and citation omitted). In order to invoke the *Basic* presumption of reliance, the plaintiff must show: "(1) that the alleged misrepresentations were publicly known, (2) that they were material, (3) that the stock traded in an efficient market, and (4) that the plaintiff traded the stock between the time the misrepresentations were made and when the truth was revealed." *Halliburton II,* 134 S.Ct. at 2408.[4]

[4]   As mentioned above, the Supreme Court has ruled that materiality is not an inquiry for the class certification stage. *See Amgen,* 133 S.Ct. at 1199.

Because market efficiency is so crucial to the invocation of the *Basic* presumption, "which in turn is necessary to meet the Rule 23(b)(3) predominance requirement, a district court should conduct a rigorous market efficiency analysis." *In re DVI, Inc. Sec. Litig.,* 639 F.3d 623, 638 (3d Cir.2011), *abrogated on other grounds by Amgen v. Conn. Ret. Plans & Trust Funds,* —— U.S. ——, 133 S.Ct. 1184, 185 L.Ed.2d 308 (2013). The defendant may rebut the presumption by proving that the alleged misrepresentation(s) had no impact on the stock price, thereby precluding class certification under Rule 23(b)(3). *Halliburton II,* 134 S.Ct. at 2414.

### III. Analysis

#### A. Defendants' Motion to Exclude Lead Plaintiffs' Expert Report

Here, Lead Plaintiffs use the Feinstein Report to establish market efficiency and invoke the *Basic* presumption. Because the Feinstein Report bears directly on issues relevant to class certification, the Court first analyzes the report's admissibility to the extent it concerns matters relevant to class certification.

#### 1. Expert Qualifications

Defendants do not challenge Professor Feinstein's qualifications. His credentials and experience qualify him to offer an expert opinion in this case. *See* Dkt. No. 133–7, Decl. & Report of Steven P. Feinstein ¶¶ 6–16, Exhibit 2. Professor Feinstein holds a Ph.D. in Economics, a Master of Philosophy in Economics, a Master of Arts in Economics, all from Yale University, and a Bachelor of Arts in Economics

Case 3:16-cv-00085-MEM    Document 176-1    Filed 09/25/20    Page 31 of 147

City of Sterling Heights General Employees' Retirement..., Not Reported in...

2015 WL 5097883, Fed. Sec. L. Rep. P 98,620

from Pomona College. He is a chartered financial analyst and has taught undergraduate and masters-level courses at Babson College in Valuation, Capital Markets, Quantitative Methods, and Security Valuation, among others. Before his time at Babson College, he taught finance at Boston University and worked as an Economist for the Federal Reserve Bank of Atlanta. He has also been published extensively in the field of finance. The qualification requirement is construed liberally; "a broad range of knowledge, skills, and training qualify an expert." *Schneider ex rel. Estate of Schneider v. Fried,* 320 F.3d 396, 404 (3d Cir.2003). Professor Feinstein is qualified.

### 2. Reliability

**\*6** Defendants dispute the reliability of Professor Feinstein's testimony on two bases. First, they argue that Professor Feinstein's testimony fails to prove that the DMF Charge on November 2, 2011, affected the price of Prudential stock because, *inter alia,* there were other disclosures on the same day for which Professor Feinstein does not account. Second, Defendants argue that Lead Plaintiffs' damages model is barebones and unimplemented, and so does not satisfy Daubert.

### a. Market Efficiency Analysis

As an initial matter, Defendants do not challenge the reliability of the Feinstein Report's market efficiency analysis. The Court is satisfied that Professor Feinstein's analysis on that point is reliable.

Professor Feinstein's market analysis is based on the factors set forth in *Cammer v. Bloom,* 711 F.Supp. 1264 (D.N.J.1989); *Krogman v. Sterritt,* 202 F.R.D. 467 (N.D.Tex.2001); and *Unger v. Amedisys,* 401 F.3d 316 (5th Cir.2005). *Cammer* identifies five relevant factors to determine whether a company's stock trades in an efficient market: (1) the company's average weekly trading volume; (2) the number of securities analysts following and reporting on the company; (3) the number of market makers in the company's stock; (4) whether the company is eligible to file the Form S–3 Registration Statement with the SEC; and (5) whether there is a demonstrable cause and effect relationship between the release of information about the company and movements in the stock price. *Cammer,* 711 F.Supp. at 1286–87. *Krogman* and *Unger* identify three additional factors that should be considered: (1) the magnitude of the company's market capitalization; (2) the size of the bid-ask spread for the company's stock, i.e., the difference between the price that potential buyers are willing to pay and the price at which

potential sellers are willing to sell; and (3) the company's float, i.e., the percentage of shares that are publicly held. *Krogman,* 202 F.R.D. at 478; *Unger,* 401 F.3d at 323. The use of these factors has been cited with approval in a majority of circuits. *See In re DVI, Inc. Sec. Litig.,* 639 F.3d 623, 634 n. 16 (3d Cir.2011) (collecting cases).

In his report, Professor Feinstein explores these factors and concludes that Prudential's stock trades in an efficient market. *See* Feinstein Report ¶¶ 29–153. He also conducts an event study to analyze the fifth *Cammer* factor-i.e., whether there exists an empirically demonstrable causal relationship between the release of Prudential-specific information and movement in Prudential's stock price. An event study includes "regression analyses that seek to show that the market price of the defendant's stock tends to respond to pertinent publicly reported events." *Halliburton II,* 134 S.Ct. at 2415. Defendants do not challenge the reliability of the event study method, and there is no dispute that the method is widely accepted in the academic community and in the courts. *See* Feinstein Report ¶¶ 91–92; *see, e.g. In re DVI, Inc. Sec. Litig.,* No. 03–5336, 2010 WL 3522090, at \*12 n. 24 (E.D.Pa. Sept.3, 2010).

**\*7** The event study examines the movement of Prudential's stock price on seven dates during the Class Period immediately following earnings announcements or changes in earnings guidance. *See* Feinstein Report ¶¶ 99–100. The first six dates concern earnings announcements during the Class Period that Lead Plaintiffs allege were false and misleading, while the seventh date concerns the disclosure of, *inter alia,* the DMF Charge. The dates examined contained earnings announcements and changes in earnings guidance-information virtually all economists agree is important to investors. *Id.* ¶¶ 96–98. The event study then contains a detailed regression analysis that sought to isolate the impact of Prudential's earnings announcements from other potentially confounding factors. *Id.* ¶¶ 102–14. Professor Feinstein's analysis ultimately found statistically significant changes in Prudential's stock price attributable to the earnings announcements on six of the seven days examined. *Id.* ¶¶ 115–22, Ex. 7. Based on this result, Professor Feinstein concluded that Prudential's stock traded in an efficient market during the Class Period. *Id.* ¶ 120. Defendants do not dispute that Prudential's stock trades on an efficient market. The Court is therefore satisfied that Professor Feinstein's opinion concerning market efficiency is reliable.

### b. The DMF Charge

City of Sterling Heights General Employees' Retirement..., Not Reported in...

Case 3:16-cv-00085-MEM    Document 176-1    Filed 09/25/20    Page 32 of 147

2015 WL 5097883, Fed. Sec. L. Rep. P 98,620

Defendants argue that Professor Feinstein does not provide a reliable basis from which to conclude that the DMF Charge announced on November 2, 2011, caused the downward price movement the following day. Lead Plaintiffs agree that Professor Feinstein does not offer such a conclusion at this stage because such an opinion is not required for plaintiffs to invoke the presumption of reliance at class certification. Dkt. No. 216, Pls.' Opp. at 13. The parties, in effect, agree on the scope of Professor Feinstein's opinion. This dispute is therefore not a challenge to admissibility, but a question of whether the Feinstein Report provides sufficient proof to certify the class.

Professor Feinstein did not compartmentalize each disclosure made concurrently with the DMF Charge, but he did not need to do so. Such an analysis would require the expert to wade into questions of loss causation and materiality, issues that are not properly before the Court at the class certification stage. See *Amgen,* 133 S.Ct. at 1199 (materiality not relevant at class certification); *Halliburton I,* 131 S.Ct. 2184–87 (loss causation not relevant at class certification); *see also Blood Reagents,* 783 F.3d at 188. Professor Feinstein's event study does not seek to prove that the DMF Charge caused Prudential's stock price to drop, but that is not cause for exclusion under Rule 702.

### c. Plaintiffs' Damages Model
Defendants also attack the reliability of Professor Feinstein's damages model, arguing that Professor Feinstein merely describes a framework for calculating damages without actually applying it in this case. But as will be discussed in the context of Lead Plaintiffs' motion for class certification, class treatment would still be appropriate here even if damages were required to be calculated on an individual basis. *See Neale v. Volvo Cars of N. Am., LLC,* ——F.3d ——, 2015 WL 4466919, at *17 (3d Cir. July 22, 2015) (denial of class certification solely because damages require individual calculation would be abuse of discretion). The Court therefore need not consider the reliability of Professor Feinstein's damages model at this stage. *Blood Reagents,* 783 F.3d at 188.

### 3. Fit
 **\*8**  Defendants also do not challenge the helpfulness of Professor Feinstein's report, so long as it is reliable. To satisfy the third requirement, expert testimony must be "relevant for the purposes of the case" and helpful to the factfinder. *Schneider,* 320 F.3d at 404. Professor Feinstein's opinion helps establish that Prudential's stock traded in an efficient

market. *See* Feinstein Decl. & Report ¶ 2. It therefore bears directly upon reliance through a detailed empirical analysis of market efficiency. *See id.* ¶¶ 29–157. Lead Plaintiffs have also satisfied the third requirement of fit.

In light of the foregoing, Defendants' motion to exclude Professor Feinstein's expert report is denied. The Court now turns to Lead Plaintiffs' motion for class certification.

### B. Lead Plaintiffs' Motion for Class Certification
Defendants challenge adequacy and predominance. Under adequacy, they argue that National Shopmen is insufficiently educated about the case to serve as class representative under Rule 23(a)(4). Under predominance, Defendants advance three arguments. Specifically, Defendants argue that (1) Plaintiffs cannot invoke the *Basic* presumption of fraud-on-the-market because they have not shown that the DMF Charge was responsible for the subsequent drop in stock price because of contemporaneous disclosures; (2) those same contemporaneous disclosures rebut the *Basic* presumption, even if it is invoked, because they raise a triable issue as to price impact; and (3) Lead Plaintiffs have failed to provide an adequate model for the calculation of damages on a class-wide basis.[5] The Court first addresses the Rule 23(a) prerequisites before reaching the Rule 23(b)(3) predominance inquiry.

[5]     Defendants also claim that Lead Plaintiffs are not entitled to the presumption in the first instance because they have failed to identify a corrective disclosure. Their arguments under this point rely on disputable interpretations of various facts and are inappropriate to reach at this stage.

### 1. Rule 23(a) Prerequisites

### a. Numerosity, Commonality, and Typicality
Defendants do not challenge class certification on numerosity, commonality, or typicality grounds. The Court is satisfied that those requirements are met here.

"Numerosity requires a finding that the putative class is 'so numerous that joinder of all members is impracticable.' " *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 259 F.3d 154, 182 (3d Cir.2001) (quoting Fed.R.Civ.P. 23(a)(1)). This requirement is readily met in securities cases involving an issuer whose stock trades publicly on the NYSE. *See, e.g., In re Honeywell Int'l Inc. Sec. Litig.,* 211 F.R.D. 255, 260 (D.N.J.2002). As Prudential stock trades on the NYSE with significant daily volume, *see* Feinstein Report ¶ 47, it

Case 3:16-cv-00085-MEM Document 176-1 Filed 09/25/20 Page 33 of 147
City of Sterling Heights General Employees' Retirement..., Not Reported in...
2015 WL 5097883, Fed. Sec. L. Rep. P 98,620

is clear that joinder would be impracticable. The numerosity requirement is therefore easily met here.

"The commonality requirement will be satisfied if the named plaintiffs share at least one question of fact or law with the grievances of the prospective class." *Newton,* 259 F.3d at 183 (internal quotations and citations omitted). The standard for meeting this requirement is therefore not particularly demanding, *see id.,* and the Court finds that it is easily met here. For example, the issues of materiality and loss causation both present common questions of law and fact and can be proven with common evidence. *See Amgen* 133 S.Ct. at 1198; *Halliburton I,* 131 S.Ct. at 2185.

 **\*9** The standard for demonstrating typicality under Rule 23(a)(3) is similarly undemanding and requires that "the claims of the named plaintiffs and putative class members involve the same conduct by the defendant." *Newton,* 259 F.3d at 183–84. Additionally, "the class representative must not be subject to a defense that is both inapplicable to many members of the class and likely to become a major focus of the litigation." *In re Schering Plough Corp. ERISA Litig.,* 589 F.3d 585, 599 (3d Cir.2009). The factual and legal predicates of National Shopmen's (the proposed class representative) claims are the same as those for the class members. Defendants have not identified any unique defense to which National Shopmen is exposed. Rule 23(a)(3)'s typicality requirement is therefore met.

### b. Adequacy

Defendants challenge National Shopmen's adequacy as class representative, arguing that deposition testimony of its corporate representative shows that National Shopmen is inadequately informed about the details of this litigation and is therefore unfit to serve as class representative. The Court disagrees.

Rule 23(a)(4) requires a showing that "the representative parties will fairly and adequately protect the interests of the class." In assessing adequacy, the Court first examines the qualifications of proposed class counsel. *Schering Plough,* 589 F.3d at 602. Here, Defendants do not challenge proposed class counsel's qualifications. It is clear that proposed class counsel is highly qualified to represent the class. *See* Dkt. No. 133–6, Ex. D to Williams Decl. Next, the Court determines whether the proposed class representative has "interests antagonistic to those of the class." *New Directions Treatment Servs. v. City of Reading,* 490 F.3d 293, 313 (3d Cir.2007) (internal quotations and citations

omitted). This inquiry principally focuses on whether there are "conflicts of interest between named parties and the class they seek to represent." *Schering Plough,* 589 F.3d at 602 (internal quotations omitted). Where, as here, the proposed class representative has retained adequate counsel, the class representative is not inadequate simply because it lacks "particularized knowledge concerning the dispute at issue." *Szczubelek v. Cendant Mortg. Corp.,* 215 F.R.D. 107, 120 (D.N.J.2003). Instead, a class representative may be adequate even when it possesses only minimal knowledge regarding the litigation. *New Directions,* 409 F.3d at 313.

National Shopmen easily meets this standard. To be sure, National Shopmen's corporate representative inaccurately characterized certain facts regarding this litigation during his deposition. But Lead Plaintiffs also point to his many accurate statements regarding the litigation during the same deposition. The deposition testimony meets the threshold "minimal knowledge" standard set forth above. The Court therefore rejects Defendants' contention that National Shopmen cannot adequately serve as class representative. The adequacy requirement of Rule 23(a)(4) is satisfied.

 **\*10** Lead Plaintiffs have therefore satisfied the Rule 23(a) prerequisites to class certification. The Court now shifts its attention to Rule 23(b)(3)'s predominance requirement.

### 2. Predominance Under Rule 23(b)(3)

Class certification under Rule 23(b)(3) is appropriate only if "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members." Fed.R.Civ.P. 23(b)(3). The predominance inquiry "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 623, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997). This requirement is considerably more demanding than Rule 23(a)'s commonality prerequisite and "imposes a more rigorous obligation upon a reviewing court to ensure that issues common to the class predominate over those affecting only individual class members." *Sullivan v. DB Investments, Inc.,* 667 F.3d 273, 297 (3d Cir.2011).

The Court's predominance inquiry in this case focuses on the reliance element of Lead Plaintiffs' Rule 10b–5 claim. In particular, the Court must determine whether Lead Plaintiffs establish entitlement to the *Basic* presumption of reliance and, if so, whether Defendants successfully rebut that presumption by showing a lack of price impact.

2015 WL 5097883, Fed. Sec. L. Rep. P 98,620

#### a. Establishing the *Basic* Presumption: Market Efficiency

In order to establish entitlement to the *Basic* presumption, Lead Plaintiffs must prove that Prudential stock trades in an efficient market.[6] *Halliburton II,* 134 S.Ct. at 2416. Defendants then may rebut that presumption with evidence demonstrating a lack of price impact attributable to the alleged misrepresentations. *Id.* at 2415. If the Court finds the *Basic* presumption does not apply, either because market efficiency was not established or because Defendants proved there was no price impact, then individual issues of reliance would predominate over common issues in this case, "rendering class certification inappropriate." *Id.* at 2416.

[6]     The three other requirements to invoke the presumption are all easily met here. Materiality will always rise or fall by common evidence, and publicity and market timing are not in dispute. Thus, the *Basic* presumption will be invoked if market efficiency is shown.

Lead Plaintiffs have proven that Prudential's stock traded in an efficient market. For one, Prudential's stock trades on the NYSE. *See In re DVI, Inc. Sec. Litig.,* 639 F.3d 623, 634 (3d Cir.2011) (trading on the NYSE strongly supports a finding of market efficiency); *see also In re Merck & Co., Inc. Sec., Derivative & ERISA Litig.,* No. 05–1151, 2013 WL 396117, at *11 (D.N.J. Jan.30, 2013) (no further market efficiency analysis necessary where the defendant's stock traded on the NYSE and was a component of the Dow Jones Industrial Average). Professor Feinstein's expert report also establishes that each of the widely-cited *Cammer/Krogman* factors weighs in favor of a finding of market efficiency. *See* Feinstein Report ¶¶ 35–153. Defendants do not argue to the contrary. *See* Dkt. No. 184–1, Decl. & Report of Daniel R. Fischel ¶¶ 5–30. The Court is therefore convinced that Prudential's stock trades in an efficient market. Thus, the *Basic* presumption affirms that the investors relied on the alleged misrepresentations unless Defendant can prove an absence of price impact.

#### b. Loss Causation

 **\*11**  Defendants argue that Lead Plaintiffs are not entitled to the *Basic* presumption because Lead Plaintiffs have not proven that the DMF Charge affected the price of Prudential stock. Defendants do not dispute that Prudential's stock dropped following the DMF Charge. Instead, they argue that this drop was caused by contemporaneous disclosures and

Professor Feinstein failed to isolate the price impact of the DMF Charge from the impact of other contemporaneous disclosures.

This is loss causation, and loss causation need not be proven at this stage.

> "The fact that a subsequent loss may have been caused by factors other than the revelation of a misrepresentation has nothing to do with whether an investor relied on the misrepresentation in the first place, either directly or presumptively through the fraud-on-the-market theory. Loss causation has no logical connection to the facts necessary to establish the efficient market predicate to the fraud-on-the-market theory."

 *Halliburton I,* 131 S.Ct. at 2186.

Price impact and loss causation are distinct. Price impact asks "whether the alleged misrepresentations affected the market price" of the stock. *Halliburton I,* 131 S.Ct. at 2187. Loss causation, on the other hand, asks whether the subsequent decline in the price of the stock was caused by a correction of the prior misrepresentations or by other confounding factors. *Id.* at 2185 (citing *Dura Pharm., Inc. v. Broudo,* 544 U.S. 336, 342, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005)). The distinction is subtle: "whether the alleged misrepresentations affected the market price in the first place"—i.e., whether there was "price impact"—is a different inquiry than whether those same representations "also caused a subsequent economic loss." *Id.* at 2186. This is particularly important at class certification because evidence of loss causation is irrelevant at that stage, *See id.* at 2187, while evidence of price impact, or lack thereof, is highly relevant. *See Halliburton II,* 134 S.Ct. at 2415–16. Whether the initial misrepresentations affected the stock price is price impact. Whether the final disclosure later caused the stock price to drop is loss causation. Defendants' argument here relies solely on the latter, and is therefore inappropriate at this stage.

Defendants' citations to authority for the contrary proposition are inapposite. In *Sicav v. James Jun Wang,* the Southern District of New York rejected class certification which was premised not on a theory of corrective disclosures, as in this case, but on a theory based in "the mechanics by which shares of stock were priced during a protracted period of open-market trading." No. 12–6682, 2015 WL 268855, at *3 (S.D.N.Y. Jan.21, 2015). The Court noted that such claims "have almost always been held ill-suited to classwide resolution." *Id.* Specifically, "the need for a trade-

Case 3:16-cv-00085-MEM  Document 176-1  Filed 09/25/20  Page 35 of 147
City of Sterling Heights General Employees' Retirement..., Not Reported in...
2015 WL 5097883, Fed. Sec. L. Rep. P 98,620

by-trade inquiry into whether or not there was persistent price inflation" prevented common issues from predominating. *Id.* The case also did not deal with or cite to *Basic.* Defendants only other case decided at class certification, *In re Xcelera.com Securities Litigation,* No. 00–11649, 2008 U.S. Dist. LEXIS 77807, 2008 WL 7084626 (D.Mass. Apr. 25, 2008), was decided before *Amgen* and *Halliburton* established that loss causation and materiality need not be proven at class certification. Defendants' remaining authority concern the plaintiffs' proof requirements at summary judgment and trial, not at class certification. *See Schiff,* 602 F.3d at 171–72, 174–76 (materiality immediately before trial); *Bricklayers & Trowel Trades Int'l Pension Fund v. Credit Suisse Sec. (USA) LLC,* 752 F.3d 82, 96 (1st Cir.2014) (loss causation at summary judgment); *In re Exec. Telecard Sec. Litig.,* 979 F.Supp. 1021, 1023–25 (S.D.N.Y.1997) (damages at summary judgment); *In re Omnicom Grp., Inc. Sec. Litig.,* 541 F.Supp.2d 546, 550–51 (S.D.N.Y.2008) (loss causation at summary judgment), *aff'd,* 597 F.3d 501 (2d Cir.2010).

**\*12** Defendants do not contest that Prudential's stock price dropped significantly following the DMF Charge. The argument that the drop may have been caused by other contemporaneous disclosures, not the DMF Charge, goes to loss causation, an issue inappropriate for consideration at class certification.

#### c. Rebutting the *Basic* Presumption: Price Impact

Defendants argue that rebutting the *Basic* presumption merely requires Defendants to introduce evidence raising a triable issue of fact as to whether there was a price impact, citing Federal Rule of Evidence 301. The Court disagrees.

A plaintiff is not required to prove price impact in order to rely on the *Basic* presumption. *See Halliburton II,* 134 S.Ct. at 2414. Instead, the plaintiff can establish entitlement to the presumption through evidence of publicity and market efficiency—"an indirect way of showing price impact." *Id.* at 2415. Once those prerequisites are established, the defendant bears the burden to prove a lack of price impact through direct evidence. *Id.* at 2415–16; *see also id.* at 2417 (Ginsburg, J., concurring) (emphasizing that "it is incumbent upon the defendant to show the absence of price impact"); *Aranaz v. Catalyst Pharm. Partners, Inc.,* 302 F.R.D. 657, 673 (S.D.Fla.2014) (stating that the defendants' burden to prove absence of price impact is "daunting"). The Northern District of Texas considered and rejected the same argument Defendants advance here. *See Erica P. John Fund, Inc. v. Halliburton Co.,* No. 02–1152, —— F.R.D. ——, 2015 WL 4522863, at *4–7 (N.D.Tex. July 25, 2015) (finding that the defendant bore the burdens of both production and persuasion to prove lack of price impact). Merely pointing to other potential causes for a stock price change following a corrective disclosure is therefore not enough to rebut the *Basic* presumption.

Here, Professor Feinstein's event study analysis establishes positive, statistically significant price movements following five of six alleged misrepresentations. *See* Feinstein Report ¶¶ 96–122, Exhibit 7.[7] Professor Feinstein chose those alleged misrepresentations for his event study because they were initial announcements of financial results and earnings guidanceinformation that is widely accepted to be important to investors. *Id.* ¶ ¶ 96–98. Defendants do not challenge those findings or provide any evidence that those price movements were attributable to something other than the alleged misrepresentations. *See* Fischel Report ¶¶ 5–30; Dkt. No. 23412, Rebuttal Report of Steven P. Feinstein ¶¶ 30–40. Instead, Professor Fischel criticizes the fact that Professor Feinstein did not find statistically significant price impact following fourteen other alleged misrepresentations and did not relate the statistically significant price impacts to the alleged misrepresentations. Fischel Report ¶¶ 17–18, Ex. 1.

[7] The Report also finds a statistically significant movement following the disclosure of the DMF Charge, as discussed above. *Id.*

But virtually all of the fourteen other alleged misrepresentations were either: (1) repeat announcements of the financial results to which Prudential's stock price did react in a statistically significant manner or (2) statements having nothing to do with Prudential's financial results. *See* Fischel Report Ex. 1; Am. Compl. ¶¶ 46, 50, 59–60, 66, 69, 72–74, 78, 90. Defendants provide no rebuttal to Professor Feinstein's justifications for choosing the dates that he did for his event study. They also provide no reason why the absence of a statistically significant price impact following some alleged misrepresentations should be given more weight than the presence of statistically significant price impact following the five alleged misrepresentations of financial results.[8] Lead Plaintiffs have produced evidence showing statistically significant changes in Prudential's stock price following important financial disclosures. In the face of these, Defendants have not successfully proven lack of price impact. The *Basic* presumption therefore stands unrebutted. Reliance can be proven here through common evidence.

8    Also, it also does not necessarily follow from the mere absence of a statistically significant change in the stock price that there was no price impact. It is possible that those statements assisted in maintaining an inflated price for Prudential's stock-a possibility that Defendants do not rule out. *See, e.g., In re Bristol–Myers Squibb Sec. Litig.,* No. 00–1990, 2005 WL 2007004, at \*17–18 (D.N.J. Aug.17, 2005) (finding that "a misstatement could serve to maintain the stock price at an artificially inflated level without also causing the price to increase further").

### d. Damages

**\*13** Defendants also argue that class certification must be denied because Lead Plaintiffs have failed to demonstrate that damages are capable of measurement on a class-wide basis. Defendants cite *Comcast Corp. v. Behrend,* ––– U.S. ––––, 133 S.Ct. 1426, 185 L.Ed.2d 515 (2013), for the proposition that Lead Plaintiffs must affirmatively establish at class certification that damages can be calculated class-wide in order to satisfy the Rule 23(b)(3) predominance requirement.

But *Comcast* was an antitrust case in which there was only one viable theory of antitrust impact and the plaintiffs' damages model did not measure damages in accordance with that theory. *Id.* at 1433. Based on the particular facts of that case, issues common to the proposed class would have been overwhelmed by individual damage calculations. *See id.* The Court therefore required an inquiry into the merits of the plaintiffs' damages model at the class certification stage. *See id.* at 1432–35. The case did not stand for the general proposition that in all class actions, a plaintiff must prove that damages are calculable on a class-wide basis before class certification can be granted.

Class certification will not necessarily be defeated where there are individual issues with respect to the calculation of damages. *See Neale v. Volvo Cars of N. Am., LLC,* ––– F.3d ––––, 2015 WL 4466919, at \*16–17, \*17 n. 10 (3d Cir. July 22, 2015) (holding that the predominance analysis in *Comcast* "was specific to the antitrust claim at issue" and reiterating the well-established proposition that class certification is not necessarily defeated because of individual damages calculations). Indeed, in securities cases such as this one where all other issues are provable by common evidence, denial of class certification solely on the basis of individual damages calculations would be "an abuse of discretion." *See id.* at \*17. Because common issues predominate on all other issues of law and fact presented to the Court, the Court need

not assess the validity of Plaintiff's damages model at this stage.

In light of the foregoing, the Court finds that common issues of law and fact predominate over individual issues. Rule 23(b)(3)'s predominance requirement is satisfied.

### 3. Superiority Under Rule 23(b)(3)

Finally, the Court is satisfied that "a class action is superior to other available methods for fairly and efficiently adjudicating" this case. Fed.R.Civ.P. 23(b)(3). In determining superiority, the Court should weigh the following non-exhaustive list of factors:

(A) the class members' interests in individually controlling the prosecution or defense of separate actions;

(B) the extent and nature of any litigation concerning the controversy already begun by or against class members;

(C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

(D) the likely difficulties in managing a class action.

*Id.; Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 615–16, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997); *Garcia v. Freedom Mortg. Corp.,* 274 F.R.D. 513, 516 (D.N.J.2011). Consideration of those factors makes clear that the class action is superior to any other method of adjudicating this case. Perhaps most importantly, the class likely consists of a significant number of investors with relatively small losses who would have decreased motivation to pursue their cases individually. *See Krangel v. Golden Rule Res., Ltd.,* 194 F.R.D. 501, 506 (E.D.Pa.2000). The remaining three factors also weigh in favor of class treatment. The Court is not aware of any pending cases by or against class members, and concentration of the litigation here is desirable to ensure consistency in adjudication. There is also no indication that there will be any particular difficulties in managing this case as a class action. Indeed, it is well-settled that the class action is a particularly appropriate vehicle for adjudication of federal securities cases. *See In re NYSE Specialists Sec. Litig.,* 260 F.R.D. 55, 80 (S.D.N.Y.2009). The superiority requirement is met.

### IV. Conclusion

**\*14** In light of the foregoing, Defendants' motion to exclude Lead Plaintiffs' expert report is **DENIED** and Lead Plaintiffs'

Case 3:16-cv-00085-MEM   Document 176-1   Filed 09/25/20   Page 37 of 147

**City of Sterling Heights General Employees' Retirement..., Not Reported in...**
2015 WL 5097883, Fed. Sec. L. Rep. P 98,620

motion for class certification is **GRANTED.** An appropriate order follows.

**All Citations**

Not Reported in F.Supp.3d, 2015 WL 5097883, Fed. Sec. L. Rep. P 98,620

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

Desantis v. Snap-On Tools Co., LLC, Not Reported in F.Supp.2d (2006)

2006 WL 3068584

📁    KeyCite Yellow Flag - Negative Treatment

Distinguished by Louisiana Municipal Police Employees' Retirement System v. Black, Del.Ch., February 19, 2016

2006 WL 3068584
Only the Westlaw citation is currently available.
NOT FOR PUBLICATION
United States District Court, D. New Jersey.

Ronald DESANTIS, Matt Setser, Shawn Dickmyer, William Bradley Freeman, Scott Factor, Scott Ingento, Aaron Reeves, Anthony Hobby, Dwight Lankart, Richard Fortuna, and Paul Vladyka, on behalf of themselves and all others similarly situated, Plaintiffs,

v.

SNAP–ON TOOLS COMPANY, LLC, Snap–On Credit, LLC, and Snap–On Incorporated, Defendants.

Civil Action No. 06–cv–2231 (DMC).
|
Oct. 27, 2006.

**Attorneys and Law Firms**

Donna Dubeth Gardiner, Edward Bruce Deutsch, Ronald J. Riccio, McElroy, Deutsch, Mulvaney & Carpenter, LLP, Morristown, NJ, Gerald Allen Marks, Justin M. Klein, Marks & Klein, LLP, Red Bank, NJ, for Plaintiffs.

Gage Andretta, Daniel D. Barnes, Wolff & Samson, PC, West Orange, NJ, for Defendants.

**OPINION**

DENNIS M. CAVANAUGH, U.S.D.J.

**\*1** This matter comes before the Court upon the application of Class Plaintiffs Ronald Desantis, Matt Setser, Shawn Dickmyer, William Bradley Freeman, Scott Factor, Scott Ingento, Aaron Reeves, Anthony Hobby, Dwight Lankart, Richard Fortuna, and Paul Vladyka ("Class Plaintiffs"), pursuant to Fed. R. Civ P. 23(e), for Final Approval of the Settlement Agreement with Defendants Snap-on

Tools Company, LLC, Snap-on Credit, LLC, and Snap-on Incorporated ("Snap-on Inc."). A hearing on the application for Final Approval was held by this Court on August 28, 2006. Also before this Court is Class Counsel's application for approval of attorneys' fees and reimbursement of expenses. For the reasons set forth below, the Court approves the Settlement Agreement and Class Counsel's application for attorneys' fees and expenses.

**I.** *Background*

**A. Procedural History**

1. *The Hochberg Action*
On September 25, 2003, Class Counsel, on behalf of Plaintiffs Michael Marron, Jeffrey Goldwasser, Aaron Reeves, and Anthony Hobby, filed a Class Action Complaint against Defendants Snap-on Tools Company, LLC ("Tools") and Snap-on Credit, LLC ("Credit"). *Civil Case No.* 03–cv–04563 (FSH)(PS) ("Hochberg Action"). Judge Hochberg granted Tools' Motion to Compel Arbitration on or about July 1, 2004. Judge Hochberg determined that the arbitrators were to determine whether class actions in arbitration should be permitted. Tools filed a Notice of Appeal of Judge Hochberg's Order with the United States Circuit Court of Appeals for the Third Circuit. On or about August 23, 2005, this appeal was dismissed by the Third Circuit.

Due to an error of service, Credit was not properly served with a Complaint and a separate action had to be filed against Credit. Therefore, Judge Hochberg's July 1, 2004 Order did not apply to Credit. On July 7, 2004, Credit filed a Motion to Dismiss the Complaint against it. On September 29, 2004, Judge Hochberg granted Credit's Motion, without prejudice. Thereafter, on October 13, 2004, Class Counsel filed a new action with Credit being named as the sole defendant. Judge Hochberg granted Class Counsel's Motion to Compel Arbitration. This decision was also appealed to the Third Circuit by Credit and was also dismissed. The parties consented to consolidate the Credit Action and the Hochberg Action in the American Arbitration Association ("AAA").

2. *Proceedings Before the AAA*
The AAA refused Tools' request for a single arbitrator. Tools and Credit sought review of this decision from Judge Hochberg. On May 4, 2005, Credit agreed to the jurisdiction of the AAA and agreed to fully participate in the six pending arbitrations.

2006 WL 3068584

Each of the six arbitrations involved discovery, briefing and conferences between the parties and arbitrators. Both the Hobby and Fortuna arbitrations resulted in the arbitrators finding that the contested clause in the Franchise Agreement does not preclude class actions. Both of these decisions were contested by Defendants before Judge Hochberg. The Van Curen arbitration was resolved through a settlement. The Reeves, Lankart and Vladyka arbitrations were all stayed pending settlement discussions.

### 3. *Florida State Court Class Action*

**\*2** On or about December 6, 2004, Class Counsel, on behalf of Plaintiffs Ronald DeSantis, Shawn Dickmyer, Scott Factor, William Bradley Freeman, Scott Ingenito, and Matt Setser, filed a Class Action Complaint in Florida state court, Sixth Judicial Circuit, Pinellas County, *Case No.,* 04–008709CI against Defendants. On September 14, 2005, the Florida court granted Tools' Motion to Compel Arbitration. After unsuccessful motions for reconsideration and interlocutory appeal, Tools' request to stay the arbitrations was denied by the AAA on December 13, 2004. The AAA also denied Defendants' request for a single arbitrator. In or about early May 2006, the parties filed motions and cross-motions in all but two of the pending arbitrations seeking, *inter alia,* preliminary injunctive relief by Plaintiff and dismissing the class actions by Respondents. Detailed case management schedules have been implemented by the arbitrators with extensive briefs and hearings scheduled throughout the summer of 2006.

### 4. *The Instant Action*

Class Plaintiffs, on behalf of themselves and all others similarly situated, filed a Complaint against Defendants on May 17, 2006. Plaintiffs are eleven former franchisees of Defendant Snap-on Tools, some of whom were also borrowers from Snap-on Credit. Defendants allege that certain of the Class Plaintiffs owe monies to either Snap-on Tools or Snap-on Credit. (Comp.¶ 1–11.) In the Complaint, Class Plaintiffs allege that due to certain deceptive business practices, their franchises were caused to fail. More specifically, the Complaint alleges that Defendants targeted unsophisticated persons to become franchisees for Snap-on Inc. Additionally, the Complaint alleges that franchisees are contractually required to make minimum weekly purchases of product from Snap-on Tools. The Complaint further alleges that these products can only be re-sold by franchisees to a

limited number of end-users. The Complaint seeks, *inter alia,* injunctive relief and monetary damages.

This Court issued an Order on May 16, 2006, preliminarily approving the settlement and providing for class notice.[1] Pursuant to that Order, the class action administrator, LECG, LLC, distributed 2,938 Notices of Pendency and Class Action and Proposed Settlement ("the Notice") via first class mail to Former Franchisees and 3,180 Notices to Current Franchisees. A Fairness Hearing for final approval of the Settlement Agreement was held on August 28, 2006.[2]

[1]    That Order was amended several times during June and July, with a Fourth Amended Order signed by the Court on July 18, 2006.

[2]    An error in mailing occurred and this Court allowed an additional 60 days for objections to be filed. No such objections were filed.

### B. Settlement Agreement

The Settlement Agreement provides for both monetary and non-monetary benefits to the Class. Pursuant to the Settlement Agreement, the Class is defined as "all persons in the United States who were or are currently franchisees." (Settlement Agreement ("SA"), ¶ 2.4). "Franchisees" are defined as:

all individuals or entities in the United States who, from January 1, 1998 through April 18, 2006, operated one or more franchises, independent dealerships, and/ or conversion franchises, but does not include trial franchisees or employees of independent contractors of Franchisees. "Former Franchisee" is a Franchisee who has sent in notice to terminate or has been sent a letter of termination or has otherwise terminated by April 18, 2006 and has checked in prior to May 30, 2006.

**\*3** (SA ¶ 2.17). The monetary and non-monetary benefits vary depending on franchisee status.

### 1. *Benefits of Settlement to Former Franchisees*

Approximately $61.6 million[3] in Former Franchisee debt will be discharged and forgiven by Defendants as a result of the settlement agreement. Also, letters will be sent to all credit reporting agencies to correct any negative credit reports stemming from debt allegedly owed to Defendants by Former Franchisees. Finally, Former Franchisees who responded to the Notice were eligible for either one of two optional cash payments. Option A provided responding Former Franchisees

Desantis v. Snap-On Tools Co., LLC, Not Reported in F.Supp.2d (2006)

2006 WL 3068584

with a cash payment of $1,000 and a Release. Option B provides for a cash payment of up to $20,000 to each Former Franchisee per each franchise operated. The estimated total cash payments to the class is $25 million.

3    Originally, the estimated debt forgiveness was $75 million. However, this figure was the result of an accounting error and accurate amount of debt forgiveness pursuant to the Settlement Agreement will be $61.6 million. (Rabenhurst Declaration, ¶ 2, 3).

### 2. *Benefits of Settlement to Current and Prospective Franchisees*

Current and Prospective Franchisees will receive benefits from the settlement which include a possible qualification for an additional amount of money as a credit to their Snap-on Tools statement for each franchise based on the average weekly paid sales. Defendants have also agreed to make a number of modifications to the Snap-on Tools franchise distribution model and business practices, designed to benefit both Current and Prospective Franchisees. These include, *inter alia,* a reduction of the required investment for initial inventory, offers of financing to qualified franchisees who have been on credit hold for five of the last ten weeks prior to the date of the final approval of the Settlement Agreement, a technology credit, making reasonably available improved initial training for new franchisees, and improvement of recruitment training practices. The following valuations have been provided for these changes: $4,522,847 for the reduction cost on initial inventory, $3,816,000 for the technology credit, and $27,600,000 for the improved training. Additionally the estimated cost of design and implementation of changes is $4 million. These figures, combined with the estimated cash payments to class members equals benefits valued at over $64 million.

### 3. *Benefit to Representative Plaintiffs*

Representative Plaintiffs will be paid no more than $50,000 as compensation and consideration for the time they have spent working with Class Counsel on this matter and the sacrifices they have made as a result. Specifically, Representative Plaintiffs acted as private attorneys general, working with Class Counsel and helping to bring the Settlement to fruition. Defendants have also agreed to pay former franchisees who retained counsel on or before April 18, 2006 an Incentive Award of not more than $15,000. The final amount of the Incentive Award is to be determined by the Court, and

therefore does not diminish any of the other benefits provided to any Class Member.

### 4. *Retention of Jurisdiction*

The Settlement Agreement also provides that this Court will retain jurisdiction over implementation and enforcement of all terms of the Agreement. Furthermore, all parties have agreed to submit to the jurisdiction of the Court for purposes of implementing and enforcing the Settlement.

## II. *Approval of the Settlement Agreement*

### A. Satisfaction of Rule 23 Criteria for Class Certification

**\*4** The Court must certify the Class of Franchisees pursuant to the requirements of Federal Rule of Civil Procedure 23(a) and (b). *See Anchem Prod., Inc. v. Windsor,* 521 U.S. 621–22 (1997). In determining whether certification is appropriate, this Court may take the Settlement Agreement into consideration. *See In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions,* 148 F.3d 283, 308 (3d Cir.1998) *cert denied,* 525 U.S. 1114 (1999).

### 1. *Rule 23(a) Requirements*

To certify a class, Rule 23(a) requires that there be numerosity, commonality, typicality and adequacy of representation. Fed.R.Civ.P. 23(a). Here, the numerosity requirement is met because the Class has well over 5,000 members. Joinder of this many Plaintiffs is clearly not feasible. *See Stewart v. Abraham,* 275 F.3d 220, 226–27 (3d Cir.2001). Commonality exists because there are common questions of law and fact. *Baby Neal for and by Kanter v. Casey,* 43 F.3d 48, 56 (3d Cir.1994). Plaintiffs' claims arise from a common nucleus of operative facts, namely, Defendants' alleged deceptive business practices. Furthermore, there is commonality among the questions of law raised because the same legal and equitable claims are asserted by Plaintiffs and Class Members against Defendants. The typicality requirement is also met here because the interests of the Class and the Lead Plaintiffs are "aligned." *In re Warfarin Sodium Antitrust Litig.,* 391 F.3d 516, 531 (3d Cir.2004). Specifically, the claims of the Plaintiffs and of the Class arise from the same alleged deceptive business practices and therefore their interests are properly aligned. Finally, there is adequacy of representation because the Class Plaintiffs' and Class Members' interests are aligned, as stated immediately above; and also, because there has been a strong showing that Class Counsel are qualified

2006 WL 3068584

to handle this type of complex litigation. For these reasons, the requirements of 23(a) for class certification are satisfied in this case.

### 2. *Rule 23(b) Requirements*

In a case where money damages predominate, class certification is appropriate where common questions predominate and class resolution is the superior method for the fair and efficient adjudication of the controversy. As discussed above, common questions of fact and law predominate in this case. Furthermore, for purposes of Rule 23(b), these "questions of law or fact common to members of the Class predominate over any questions affecting only individual members." Fed.R.Civ.P. 23(b)(3). Specifically, each Class Member's claims depend upon resolution of the same factual and legal questions regarding the Defendants' alleged deceptive business practices. *See Warfarin,* 391 F.3d at 528; *In re Cmty. Bank of N. Virginia,* 418 F.3d 277, 309 (3d Cir.2005) (cases where Third Circuit found the predominance requirement satisfied because the claims arose from Defendants' same fraudulent scheme).

Even though the laws of various states differ as to the claims raised by this nationwide class of Franchisees, this Court still finds that there is Rule 23(b) predominance. The Third Circuit has noted that "the same concerns with regards to case manageability that arise with litigation Classes are not present with Settlement Classes, and thus these variations [in state laws] are irrelevant to certification of a settlement class." *Warfarin,* 391 F.3d at 529. Furthermore, the same common issues regarding Defendants' business practices still lie at the core of Class Members' claims.

 **\*5** Finally, it is clear that approving the settlement is a superior method of resolving these claims. Approving this Settlement Agreement is a more efficient and less risky means of addressing Class Members' grievances.

Based on the foregoing, the proposed Settlement Class is certified pursuant to Rule 23(b)(3).

### B. Satisfaction of Rule 23(e) Standard

Federal Rule of Civil Procedure 23(e), provides that "[a] class action shall not be dismissed or compromised without the approval of the court, and notice of the proposed dismissal or compromise shall be given to all members of the class in such a manner as the court directs." Fed.R.Civ.P. 23(e). In determining whether to approve a class action settlement

pursuant to Rule 23(e), " 'the district court acts as a fiduciary who must serve as a guardian of the rights of absent class members' " *In re Gen. Motors Corp. Pick–Up Truck Fuel Tank Prod. Liab. Litig.,* 55 F.3d 768, 785 (3d Cir.1995) *(quoting Grunin v. Int'l House of Pancakes,* 513 F.2d 114, 123 (8th Cir.)*, cert. denied, 423* U.S. 864 (1975) (citation omitted)).

Before giving final approval to a proposed class action settlement, the Court must determine that the settlement is "fair, adequate, and reasonable." *Lazy Oil Co. v. Witco Corp.,* 166 F.3d 581, 588 (3d Cir.1999); *Walsh v. Great Atl. & Pac. Tea Co.,* 726 F.2d 956, 965 (3d Cir.1983). In *Girsh v. Jepson,* the Third Circuit identified nine factors, so-called "Girsh factors," that a district court should consider when making this determination:

(1) the complexity, expense and likely duration of the litigation;

(2) the reaction of the class to the settlement;

(3) the stage of the proceedings and the amount of discovery completed;

(4) the risks of establishing liability;

(5) the risks of establishing damages;

(6) the risks of maintaining the class action through the trial;

(7) the ability of the defendants to withstand a greater judgment;

(8) the range of reasonableness of the settlement fund in light of the best possible recovery;

(9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

521 F.2d 153, 157 (3d Cir.1975). "These factors are a guide and the absence of one or more does not automatically render the settlement unfair." *In re American Family Enterprises,* 256 B.R. 377, 418 (D.N.J.2000). Rather, the court must look at all the circumstances of the case and determine whether the settlement is within the range of reasonableness under *Girsh. In re Orthopedic Bone Screw Prod. Liab. Litig.,* 176 F.R.D. 158, 184 (E.D.Pa.1997).

Since *Girsh* was decided there has been a "sea-change in the nature of class actions." *Prudential,* 148 F.2d at 323. Thus, district courts should also consider other relevant and

Desantis v. Snap-On Tools Co., LLC, Not Reported in F.Supp.2d (2006)

2006 WL 3068584

appropriate factors.[4] *See also In re AT & T Corp. Sec. Litig.,* 455 F.3d 160 (3d Cir.2006). In sum, the Court's assessment of whether the settlement is fair, adequate and reasonable is guided by the *Girsh* factors, but the Court is in no way limited to considering only those enumerated factors and is free to consider other relevant circumstances and facts involved in this settlement.

[4]      The *Prudential* court suggested that district courts may consider "the maturity of the underlying substantive issues, as measured by the experience in adjudicating individual actions, the development of scientific knowledge, the extent of discovery on the merits, and other factors that bear on the ability to assess the probable outcome of a trial on the merits of liability and individual damages; the existence and probable outcome of claims by other classes and subclasses; the comparison between the results achieved by the sentiment for individual class or subclass members and the results achieved— or likely to be achieved—for other claimants; whether class or subclass members are accorded the right to opt out of the settlement; whether any provisions for attorneys' fees are reasonable; and whether the procedure for processing individual claims under the settlement is fair and reasonable." 148 F.3d at 323.

### B. Application Of Girsh Factors To This Case

**\*6** The Court has considered the proposed settlement in keeping with the *Girsh* factors and finds that the balance of factors weigh in favor of approval. Particularly, this Court is very satisfied that this innovative hybrid settlement not only compensates Class Plaintiffs for past injuries but also provides non-monetary relief in the form of changes to Snap-on's internal business that will benefit Current and Prospective Franchisees in the future.

#### 1. *Complexity, Expense and Likely Duration of Litigation*

This factor is concerned with assessing the "probable costs, in both time and money, of continued litigation." *In re Cendant Corp. Litig.,* 264 F.3d 201, 234 (3d Cir.2001). While this case was only filed in early 2006, as recounted in the procedural history above, it is part of a complex series of cases and therefore has a long detailed history. This case is the culmination of eleven separate class action arbitrations. The various litigations required an analysis of a wide range of legal and factual issues, including franchise law, arbitration law, public injunction law, and corporate law.

If fully litigated, this case would likely be very expensive because Defendants have and would continue to vigorously contest the class action. Extended discovery, expert reports and motion practice would make this litigation costly for all parties. To the contrary, the settlement was only reached after extensive arms-length negotiations between the parties, and thereby avoids years of contentious litigation.

This Court is satisfied that the first Girsh factor weighs heavily in favor of approving the Settlement.

#### 2. *Reaction of Class to Settlement*

This factor requires the Court to evaluate whether the number of objectors, in proportion to the total class, indicates that the reaction of the class to the settlement is favorable. Here, as of August 21, 2006, there were only four objectors, equal to less than 0.07% of the total class. Notably, as of August 21, 2006, the percentage of opt-outs is only 3.9%. The Third Circuit has repeatedly recognized that low numbers of objectors and opt-outs is probative on the issue of whether a settlement is fair, adequate and reasonable. *Warfarin,* 391 F.3d at 536. This Court is persuaded that the few number of objectors and opt-outs weighs heavily in favor of approving the Settlement.

Additionally, the lack of merit of the objectors' arguments also weighs in favor of approving the Settlement. As is discussed in more detail below, the objectors' arguments are not persuasive and do not provide sufficient grounds for this Court to find that the Girsh factors do not weigh in favor of approving the settlement. In light of the very few objectors to the Settlement Agreement and the weak nature of the objectors' claims, this Court is satisfied that the second Girsh factor weighs heavily in favor of approving the Settlement.

#### 3. *Stage of Proceedings and Amount of Discovery Completed*

**\*7** Pursuant to the third Girsh factor, the Court must consider the "degree of case development that Class Counsel have accomplished prior to Settlement," including the type and amount of discovery already undertaken. *GMC Pick– Up Truck,* 55 F.3d at 813. *See also Prudential,* 148 F.3d at 319. In considering this factor, this Court may consider not only discovery in the instant action but also discovery taken in "related or companion proceedings." *GMC Pick–Up Trucks,* 55 F.3d at 813. Review of the amount of discovery completed in the case informs the Court of "whether counsel had an adequate appreciation of the merits of the case before

Desantis v. Snap-On Tools Co., LLC, Not Reported in F.Supp.2d (2006)

2006 WL 3068584

negotiating." *Id. See also* AT & T, 455 F.3d at 167 (noting extent of discovery).

In this case, the evidence shows that Class Counsel were well-apprised of the merits of the case before and during negotiation. Specifically, Class Counsel engaged in pre-filing investigative work starting in May 2003. Class Counsel performed extensive research to vigorously challenge an arbitration clause and a clause allegedly precluding class actions. Furthermore, Plaintiffs utilized the work of two experts on the channel stuffing and revenue recognition claims. Depositions were conducted on these issues by both sides.

Based on the foregoing, this Court is persuaded that the third Girsh factor weighs in favor of approving the Settlement Agreement.

### 4. *Risks of Establishing Liability and Damages*

The Court must consider the rewards that might have been gained if the case was litigated balanced against the benefits of immediate settlement. *See* GMC Pick–Up Truck, 55 F.3d at 814; *Prudential,* 148 F.3d at 319. Litigation poses many risks for Franchisees. To prevail at trial, Franchisees would have to attain Class certification as well prove liability and damages. Plaintiffs would have to expend time and money to make these showings, without any guarantee of success.

In this case, the risks of litigation are great because Plaintiffs' claims involve complex and contested questions of law. Furthermore, prevailing on these claims would require expert testimony from each side. Thus, at trial, this case could easily become a battle of the experts, lessening Plaintiffs' likelihood of success. Defendants' submissions have made it clear to this Court that they intend to contest the issue of liability as well as the legal basis of Plaintiffs' claims. For these reasons, Plaintiffs face many obstacles in attaining a successful result at trial and these Girsh factors weigh in favor of approving the Settlement Agreement.

### 5. *Risks of Maintaining the Class Action Through Trial*

While this Court approves certification of the settlement class, the Court must consider whether there is a risk that the class could not be maintained during trial. Pursuant to Federal Rule of Civil Procedure Rule 23, a court may decertify a class during litigation if it proves to be unmanageable. *See* *Prudential,* 148 F.3d at 321. Here, not only do Plaintiffs have to attain certification and avoid decertification during

litigation, they must also effectively rebut Defendants' argument that a clause in the franchise agreement prohibits class actions. While this issue has been decided in favor of some of the Class Plaintiffs through arbitration, there are still other arbitrations pending on this same issue. Therefore, great risks are posed in even getting this class certified for purposes of litigation.

**\*8** Additionally, the Third Circuit has recently reiterated that if Defendants have a unique defense against a Class that "will play a significant role at trial" then decertification may be necessary. *Beck v. Maximus, Inc.,* 457 F.3d 291, 300 (3d Cir.2006). In this case, Defendants are not only likely to continue to contest class certification but will also argue that the different choiceof-law issues involved in the state law claims render the class action unmanageable.

Bearing these risks and obstacles in mind, and having determined that certification of the settlement class is appropriate, this factor weighs in favor of approving the Settlement Agreement.

### 6. *Ability of Defendants to Withstand a Greater Judgment*

To evaluate whether the Settlement Agreement is fair to Plaintiffs, the Court must evaluate whether Defendants could withstand a judgment much greater than the amount of the settlement. *See* Cendant, 264 F.3d at 240; *Prudential,* 148 F.3d at 321–22; *GMC Pick–Up Truck,* 55 F.3d at 818. This factor does not weigh in favor of approving the Settlement Agreement because there have been no claims by either party that the solvency of Snap-on Inc. would be threatened by an award to Plaintiffs. However, as noted above, approval of a settlement may still be appropriate even if all the factors do not weigh in favor of approval.

### 7. *Range of Reasonableness of the Settlement Fund in Light of the Best Possible Recovery and in Light of all the Attendant Risks of Litigation*

To assess the reasonableness of the Settlement Agreement, this Court must compare the value of the proposed settlement against "the present value of the damages plaintiffs would likely recover if successful, appropriately discounted for the risk of not prevailing." GMC Pick–Up Truck, 55 F.3d at 806. Based on their discovery, investigation and evaluation of the facts and law relating to all matters alleged in the pleadings, Plaintiffs and Defendants have agreed to a settlement that will provide substantial monetary and non-monetary benefits to Class Plaintiffs. Plaintiffs and Defendants agree and

clearly document that the Settlement Agreement offers Class Members value in excess of $125 million. Furthermore, the hybrid nature of this settlement, providing both monetary and non-monetary benefits, effectively compensates Plaintiffs for their claimed injuries and makes changes to benefit Current and Prospective Franchisees. Due to the complex nature of this litigation, the parties would have faced great risk and uncertainty should the suit have proceeded to trial, with no guarantee of recovery. Even if it is possible that Plaintiffs could have won more substantial money damages at trial, it is unclear that they would have obtained the desired modifications to the Snap-on business model. Weighing the risks of recovery against the satisfactory results Class Members receive with settlement, it is clear that these factors weigh in favor of approving the Settlement Agreement.

**\*9** In sum, the Court finds that the Settlement is fair, adequate, reasonable and proper, and is in the best interests of the Class. Accordingly, the Court approves the Settlement.

### III. *Approval of Fee Award*

In approving attorneys fees in a class action settlement, this Court must evaluate "what class counsel actually did and how it benefitted the class." *Prudential,* 148 F.3d at 342. The Third Circuit recently repeated the standard for approving attorneys fees in a class action settlement: "afford a presumption of reasonableness to fee requests submitted pursuant to an agreement between a properly-selected lead plaintiff and properly-selected lead counsel," yet this presumption is rebuttable "when a district court finds the fee to be prima facie excessive." Cendant, 264 F.3d at 220. Still, this presumption does not alleviate this Court's burden of acting as the Class Members' fiduciary because the Third Circuit has "caution[ed] against affording the presumption too much weight at the expense of the court's duty to act as 'a fiduciary guarding the rights of absent class members.' " AT & T, 455 F.3d at 175 (citing Cendant 264 F.3d at 231).

Here, Class counsel's attorneys fees are calculated by using a percentage of recovery method, applying a certain percentage to the settlement fund. *See In re Cendant Corp. PRIDES Litig.,* 243 F.3d 722, 732 n. 10 (3d Cir.2001). Class Counsel seek approval of their requests for fees in the amount of $13 million, the equivalent of 10.4% of the settlement. Also, Class Counsel seeks reimbursement of expenses in the amount of $166,485.26 for McElroy, Deutsch, Mulvaney & Carpenter, LLP and $200,688.49 for Marks & Klein, LLP. Defendant does not oppose Class Counsels' motion.

Class Counsel submit that the settlement agreement will confer a benefit on the class in excess of $125 million. The Settlement Agreement also provides for debt forgiveness estimated to be the equivalent of $61.6 million. Finally, the Settlement Agreement requires the Defendants to make modifications and enhancements to its current business practices that will benefit the Class Members. Class Counsel estimate the value of these modifications to be approximately $60 million.

The Third Circuit's recent decision of *In re AT & T Corporation Securities Litigation* states that "[i]n reviewing an attorneys' fees award in a class action settlement, a district court should consider the *Gunter* factors, the *Prudential* factors, and any other factors that are useful and relevant with respect to the particular facts of the case." 455 F.3d at 166. The *Gunter* factors and *Prudential* factors are substantially similar to the factors provided by *Girsh*.[5] To avoid redundancy, this Court incorporates by reference its above discussion of the Girsh factors and the reasons given for approval of the settlement. Additionally, there are further reasons why the attorneys fees are reasonable in this matter and should be approved.

[5]    The factors listed in *Gunter* include: "(1) the size of the fund created and the number of persons benefitted; (2) the presence or absence of substantial objections by members of the class to the settlement terms and/or fees requested by counsel; (3) the skill and efficiency of the attorneys involved; (4) the complexity and duration of the litigation; (5) the risk of nonpayment; (6) the amount of time devoted to the case by plaintiffs' counsel; and (7) the awards in similar cases." *Gunter v. Ridgewood Energy Corp.,* 223 F.3d 190, 195, n. 1. Similarly, the factors listed in *Prudential* include: size of the fee award, fee percentages in other class actions, quality of class counsel, fee percentage that would have been negotiated between private parties, and size of the expected recovery under the proposed settlement. *Prudential,* 148 F.3d at 339.

**\*10** First, the 6,118 class members will share in a recovery of approximately $125 million. This is an impressive ratio for the size of the fund and the number of persons benefitted. Additionally, there is an absence of substantial objections to the requested attorneys' fees. The fact that there were so few objectors to the amount of attorneys fees indicates that there is a positive reaction amongst the class to the requested fees. Furthermore, these qualified and experienced attorneys spent a large amount of time preparing this case, arbitrating it and in negotiating a settlement, all with the risk of a very contentious

2006 WL 3068584

litigation looming without any guaranteed successful result. Importantly, Class Counsel in this case achieved a very favorable and creative settlement that properly benefits all members of the class.

This fee award is in no way greater than the fees awarded in similar cases. Specifically, the fee application seeks only 10.4% of the settlement amount, a figure well below the norm. *See Cendant PRIDES Litig.,* 243 F.3d at 736 (fee awards range from nineteen to forty-five percent); In *re AremisSoft Corp. Sec. Litig.,* 210 F.R.D. 109 (D.N.J.2002) (noting fee awards between one-third and one-half of the settlement); *In re Safety Components, Inc. Sec. Litig.,* 166 F.Supp.2d 72, 101 (D.N.J.2001) (noting recent fee awards ranging between 27.5% and 33.8%). In fact, "[m]any courts, including several in the Third Circuit, have considered 25% to be the 'benchmark' figure for attorney fee awards in class action lawsuits, with adjustments up or down for significant case-specific factors." *Varacallo v. Massachusetts Mut. Life Ins. Co.,* 226 F.R.D. 207, 249 (D.N.J.2005) (*quoting In re Warfarin Sodium Antitrust Litig.,* 212 F.R.D. 231, 262 (D.Del.2002).* Additionally, the attorneys' fees are to be paid separate from the payments to the class and in no way diminish the payments made to the class.

Finally, this Court is satisfied that awarding the requested attorneys fees is appropriate because this Court retains jurisdiction and is therefore available to Class members for final resolution of any dispute or objection that may arise.

Here, the percentage of recovery Class Counsel seeks falls well below the norm. This fact, when considered in combination with the other factors recounted above, satisfies the Court of the reasonableness of the fees. As such, the Court does not deem a lodestar cross-checking to be necessary.

At this time there is a dispute among Class Counsel as to the proper allocation of the attorneys fees to be paid by Defendants. This Court needs the benefit of an evidentiary hearing and oral argument on this issue to decide the proper delineation of fees between McElroy, Deutsch, Mulvaney & Carpenter, LLP and Marks & Klein, LLP. This Court approves the requested attorneys' fees, holding that they should be held in escrow until this Court conducts an evidentiary hearing to determine proper allocation of the fees.

## IV. *Objectors' Arguments*

**\*11** As stated above, the arguments set forth by the notably small number of objectors are not persuasive. Only one objector, Jeff Uhle ("Uhle"), appeared at the August 28, 2006 hearing for Class Action Settlement approval. The objectors generally attack the class certification as well as the adequacy, fairness and reasonableness of this settlement. As discussed fully above, this Court disagrees with these arguments because the Court finds that certification is appropriate pursuant to Federal Rule of Civil Procedure 23(a) and (b); and also that the Settlement Agreement is adequate, fair and reasonable. Listed below are the additional objections raised by Uhle and his fellow objectors as well as the reasons why these objections are without merit. Uhle also raised a host of other meritless objections that the Court does not find persuasive. The Court, acting in its fiduciary capacity to protect Class Members' interests, does not deem it necessary to summarize and dismiss each of these objections because they do not raise any questions as to whether the Settlement Agreement is fair, reasonable and adequate or whether the attorneys fees are unreasonable.

### A. Value of Settlement is Misrepresented
Objector Uhle argues that the value of the settlement is misrepresented because there is insufficient information on the payments to be made to Class Members and no evidence that the forgiveness-of-debt equals $61.6 million. First, amounts paid to Class Members pursuant to Option B will be determined under a disclosed formula, utilizing factors designed to ensure intra-class fairness. Second, the parties submitted a sworn verification as to the amount of the debt forgiveness. The value of the settlement to Franchisees has been carefully documented and explained and the Court is unpersuaded by the argument that the settlement's value has been misrepresented.

### B. Lack of Information on Internal Business Changes
There is also an objection to the lack of information concerning the internal business changes Defendant will undertake pursuant to the Settlement Agreement. The business changes agreed upon through settlement have been characterized as the most significant in Snap-on's history. They specifically address the alleged deceptive practices that Plaintiffs complained of. The declarations submitted by the parties evidence that Snap-on has seriously studied this matter and made a commitment to these changes. Additionally, this Court retains jurisdiction over this matter and can thereby resolve any disputes regarding the promised internal business modifications.

2006 WL 3068584

Objector Uhle complains that some of the deceptive business practices raised in the complaint are not addressed in the settlement agreement. This is a meritless objection, disregarding the fact that this settlement is the product of negotiation-an attempt by both parties to reach a fair agreement, thereby avoiding the risks of litigation.

This Court is satisfied that the parties have submitted clear and strong evidence of the internal business changes to be effected by Defendant and that Class Members also had sufficient information to decide whether the settlement was favorable to them.

### C. Release is Too Broad

**\*12**  The objectors argue that the release of Class Members' claims against Defendant is too broad. To the contrary, the release of claims in this case is consistent with Third Circuit precedent as to what claims may be released pursuant to a settlement agreement. *See In re Prudential Ins. Co. of Am. Sales Practice Litig.,* 261 F.3d 355, 366–67 (3d Cir.2001). Additionally, adequate notice was given to Class Members to object to the Settlement or opt out of the release of claims. Again, a notably small number of individuals chose to opt out. This Court is unpersuaded that the settlement is not reasonable, fair or adequate based on this objection.

### D. Conflict of Interest of Class Counsel

Uhle argues that Class Counsel have a conflict of interest because the Settlement Agreement improperly restricts Class Counsels' practice of law and the Marks firm has been limited from representing potential clients against Snap-on. Specifically, Uhle points to language in the Settlement

Agreement which states that Class Counsel had "no present intention of representing any persons who are not Class Members with respect to defendants." This is not an agreement but merely an attempt by one negotiating party to achieve finality through the settlement. The Settlement Agreement does not restrict Class Counsel's right to represent any future clients and therefore does not create any impermissible conflict of interest.

### E. Incentive Fees Paid to Lead Plaintiffs are Disproportionate

This Court finds that the incentive awards to representative Plaintiffs are not disproportionate but fairly, adequately and reasonably compensate them for their time and efforts. Such incentive awards are common and long-established. *See In re Remeron Direct Purchaser Antitrust Litig,* No. Civ. 03–0085(FSH), 2005 WL 3008808, at \*18 (D.N.J. Nov.9, 2005). Additionally, these incentive awards will not diminish any of the other benefits provided to any Class Member. The Court finds that they are not disproportionate and not grounds for finding that the settlement is not fair, adequate or reasonable.

### V. *Conclusion*

For the reasons expressed above, Plaintiff's Motion for Final Approval of the Settlement Agreement is **granted.** The Settlement Agreement is hereby **approved.** An appropriate Order accompanies this Opinion.

### All Citations

Not Reported in F.Supp.2d, 2006 WL 3068584

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

Distinguished by Rudel Corporation v. Heartland Payment Systems, Inc., D.N.J., January 22, 2018

2010 WL 547613
Only the Westlaw citation is currently available.
NOT FOR PUBLICATION
United States District Court, D. New Jersey.

In re MERCK & CO., INC.
VYTORIN ERISA LITIGATION.
This Document Relates to: All Cases.

Civil Action No. 08–CV–285 (DMC).
|
Feb. 9, 2010.

## OPINION

DENNIS M. CAVANAUGH, District Judge.

**\*1** This matter comes before the Court upon motion for final approval of class certification and final approval of the proposed Settlement and Release Agreement and by Co–Lead Class Counsel, seeking an award of attorneys' fees and reimbursement of expenses. After considering the submissions of the parties, and based upon the following, it is the decision of this Court for the reasons herein expressed, class certification is **granted** for settlement purposes, approval of the Settlement Agreement and Release is **granted** and the motion to award attorneys' fees and reimbursement of costs is **granted.**

## I. *Background*

### A. Factual

A joint venture arose between Merck & Co., Inc. ("Merck") and Schering–Plough Corporation ("Schering–Plough") (collectively, "Defendants") when Merck's patented drug Zocor was used in combination with another cholesterol lowering drug developed by Schering–Plough, Zetia, to create Vytorin. (Plaintiffs' Complaint ("Pl.Compl."), ¶¶ 4, 8). Vytorin and Zetia, patented by Schering–Plough, are marketed and sold by Merck/Schering–Plough Pharmaceuticals ("MSP"). The Food and Drug Administration ("FDA") approved each drug for the lowering of LDL (or "bad") cholesterol. (*See* Pl. Compl., ¶¶ 5, 7).

Vytorin, however, was not approved for the reduction of heart disease. (Pl.Compl., ¶ 10). Plaintiffs' Master Complaint asserts that Vytorin was marketed as the new and improved Zocor and as effective in reducing cholesterol along with arterial plaque, known to cause heart attacks and other adverse cardiac conditions. (Pl.Compl., ¶¶ 9, 11).

In 2002, a study was performed called "Effect of Combination Exetimibe [sic] and High–Dose *Simvastatin v. Simvastatin* Alone on the Atherosclerotic Process in Patients with Heterozygous Familial Hypercholestorolemia." ("ENHANCE"). (Pl.Compl., ¶ 12). Zetia contains ezetimibe alone while Vytorin consists of both ezetimibe and simvastatin. The Master Complaint asserts that the purpose of the study was to prove that "Vytorin's combination of Zetia and Zocor stops or reduces the growth of fatty arterial plaque better than Zocor alone." (Pl.Compl., ¶ 12). However, the study concluded not only that Vytorin was "less effective in reducing arterial plaque build-up than Zocor, but also that Vytorin posed serious safety concerns." (Pl.Compl., ¶ 13). Plaintiffs allege that Defendants had financial incentive to and actively sought to conceal the results of this study until January 14, 2008. (Pl. Compl ., ¶ 14–16).

Specifically, Merck's 2006 and 2007 10K Forms reveal global Vytorin sales for 2004, 2005, 2006 and 2007 at $132.4 million, $1.028 billion, $1.995 billion and $2.779 billion, respectively. (Pl.Compl., ¶ 15). With respect to Zetia, global sales in those same years were respectively, $1.053 billion, 1,379 [sic] billion, $1.929 billion and $2.407 billion. (Pl.Compl., ¶ 15). Further, Vytorin and Zetia are alleged to account for 60%–70% of Schering–Plough's earnings per share. (Pl.Compl., ¶ 15).

**\*2** Plaintiffs' core allegations concerning deceptive advertising and concealment are disputed by Defendants. Defendants contend that drug advertising and promotion was consistent with product labeling as approved by the FDA. Further, Defendants contend that the ENHANCE study involved a small group of patients afflicted with a preexisting condition only affecting 0.2 percent of the population and as a result, the findings cannot be extrapolated to the population of Vytorin and Zetia purchasers as a whole. Indeed, Defendants assert that the ENHANCE study demonstrates reductions in LDL. Finally, Defendants suggest that problems with the quality of digital images generated during the study delayed the release of the study results.

In re Merck & Co., Inc. Vytorin Erisa Litigation, Not Reported in F.Supp.2d (2010)

2010 WL 547613

### B. Procedural

Plaintiffs filed an initial complaint in this multi-district matter on January 15, 2008. On April 8, 2008, the Judicial Panel on Multi-district Litigation centralized all federal litigation involving Vytorin and Zetia before this Court. By way of case management order, entered by this Court on June 4, 2008, an organizational structure consisting of a Plaintiffs' Steering Committee, an Executive Committee of Plaintiffs' Steering Committee, Consumer Liaison to Executive Committee and appointment of Co–Liaison Counsel was instituted. The present litigation consists of more than 140 putative class actions seeking certification of nationwide and state-wide classes on behalf of consumers and third party payors ("TPPs").

An Amended and Proposed Class Action Master Complaint ("Master Complaint") was filed on September 25, 2008. The Master Complaint asserts legal and equitable claims pursuant to statutory and state law. By way of response, Defendants filed a motion to dismiss the Master Complaint on December 8, 2008. This motion was later stayed pending the outcome of settlement negotiations instituted in May 2009. A motion for preliminary approval of settlement was filed on September 8, 2009. On September 17, 2009, this Court entered an order granting preliminary approval of settlement, preliminary class certification and approving class notice. On February 3, 2010, a motion for final settlement approval was filed. On February 8, 2010, a fairness hearing concerning the settlement was held before this Court.

Pursuant to the arms length settlement negotiations beginning in 2009, the proposed settlement agreement identifies a Master Class and two Subclasses. The Master Class includes:

> [a]ll individuals and entities in the United States and its territories who, for purposes other than resale, purchased, reimbursed, used and/or paid for VYTORIN or ZETIA during the period from November 1, 2002 through [September 17, 2009]. For purposes of the Class definition, individuals and entities "purchased" VYTORIN or ZETIA if they paid or made a co-payment for some or all of the purchase amount.

The Consumer Subclass includes:

> [a]ll individual persons in the United States and its territories who, for purposes other than resale, purchased, reimbursed, used and/or paid for VYTORIN or ZETIA during the period from November 1, 2002 through [September 17, 2009]. For purposes of the Subclass definition, individuals "purchased" VYTORIN or ZETIA if they paid or made a co-payment pursuant to the terms of a health insurance plan, for some or all of the purchase amount.

**\*3** The Third Party–Payor Subclass includes:

> [a]ll entities in the United States and its territories that, for purposes other than resale, purchased, reimbursed and/or paid for VYTORIN or ZETIA during the period from November 1, 2002 through [September 17, 2009]. Such entities include, but are not limited to, all self-funded employer plans, private insurance providers, managed care organization, insurance companies, employee benefit plans, health and welfare funds, union plans, workers compensation entities, HMOs, PPOs, entities with self-funded plans, and any other entity who is a party to a contract, issuer of policy, or sponsor of a plan, and is at risk, under such policy, contract, or plan, to pay or reimburse all or part of the cost of prescription drugs dispensed to covered natural persons.[1]

---

1    A separate settlement agreement has been entered into with a group of independently represented health plans ("IRHPs"), conferring an award of $14.525 million on members of that subclass.

Thirty percent (30%) of the total settlement or $12.45 million dollars has been allocated to pay consumer subclass members. The remaining seventy percent (70%) has been allocated between TPPs and IRHPs, each initially receiving $14.525 million. The allocation plan does not permit "spillovers." That is, amounts paid to consumers will not be used to satisfy claims of TPPs or IRHPs.

## II. *Legal Standard*

### A. Settlement Plan and Allocation

**1. Satisfaction of Rule 23 Criteria for Class Certification**
The Court must certify the Master Class and Subclasses pursuant to the requirements of Federal Rule of Civil Procedure 23(a) and (b). *See Anchem Prod., Inc. v. Windsor,* 521 U.S. 621–22 (1997). In determining whether certification is appropriate, this Court may take the Settlement Agreement into consideration. *See In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions,* 148 F.3d 283, 308 (3d Cir.1998) *cert denied,* 525 U.S. 1114 (1999).

i. *Rule 23(a) Requirements*

2010 WL 547613

To certify a class, Rule 23(a) requires that there be numerosity, commonality, typicality and adequacy of representation. Fed.R.Civ.P. 23(a). Here, the numerosity requirement is met given that the multi-district action accounts for over 140 putative class actions and includes over 100 Plaintiffs in the constituent actions. Further, at the hearing before this Court, parties projected that the prospective class of Plaintiffs could range anywhere from 10,000 members to 100,000 members. Joinder of this many Plaintiffs is clearly not feasible. *See Stewart v. Abraham,* 275 F.3d 220, 226–27 (3d Cir.2001).

Commonality exists because there are common questions of law and fact. *Baby Neal for and by Kanter v. Casey,* 43 F.3d 48, 56 (3d Cir.1994). Plaintiffs' claims arise from a common nucleus of operative facts, namely, Defendants' alleged deceptive business practices in marketing the drugs while allegedly suppressing the results of the ENHANCE study. Furthermore, there is commonality among the questions of law raised because the same core legal and equitable claims apply to all Plaintiffs, including claims asserted pursuant to the Racketeer Influenced and Corrupt Organizations Act ("RICO") and the New Jersey Consumer Fraud Act.

**\*4** Typicality is satisfied so long as the interests of all plaintiffs are "aligned." *In re Warfarin Sodium Antitrust Litig. .,* 391 F.3d 516, 531 (3d Cir.2004). So long as "the claims of the named plaintiffs and putative class members involve the same conduct by the defendant, typicality is usually established regardless of factual differences." *Newton v. Merrill Lynch Pierce, Fenner & Smith, Inc.,* 259 F.3d 154, 183–84 (3d Cir.2001). Specifically, the claims of the Lead Plaintiffs and of the Class arise from the same alleged deceptive business practices by Defendants and therefore, their interests are properly aligned.

"The adequacy of representation inquiry has two components designed to ensure that absentees' interests are fully pursued. First, the interests of the named plaintiffs must be sufficiently aligned with those of the absentees." *Georgine v. Amchem Products,* 83 F.3d 610, 630 (3d Cir.1996) (internal citation omitted). "This component includes an inquiry into potential conflicts among various members of the class because the named plaintiffs' interests cannot align with those of absent class members if the interests of different class members are not themselves in alignment. Second, class counsel must be qualified and must serve the interests of the entire class." *Id.* While Plaintiffs acknowledge a potential disparity given that some Plaintiffs are consumers and some are TTPs, Plaintiffs assert any potential conflict that may

have arisen has been remedied with the implementation of separate subclasses, individually representing any unique interests of consumers and any unique interests of TTPs. Nonetheless, the overarching interests are aligned as outlined above. Further, any unnamed Plaintiffs are likely to fall under one of the subclasses and therefore, those potential Plaintiffs interests are adequately represented. The adequacy component also requires that Plaintiffs be represented by qualified counsel. The firms representing Plaintiffs are known nationally and well reputed with a focus in class action and multi-district litigation. Therefore, the requirement of adequate representation is satisfied.

For these reasons, the requirements of 23(a) for class certification are satisfied in this case.

### ii. *Rule 23(b) Requirements*

Next, the Court must find that the class fits within one of the three categories of class actions set forth in Fed.R.Civ.P. 23(b). In a case where money damages predominate, class certification is appropriate where common questions predominate and class resolution is the superior method for the fair and efficient adjudication of the controversy. As discussed above, common questions of fact and law predominate in this case. Furthermore, for purposes of Rule 23(b), these "questions of law or fact common to members of the Class predominate over any questions affecting only individual members." Fed.R.Civ.P. 23(b)(3). Specifically, each Class Member's claims depend upon resolution of the same factual and legal questions regarding the Defendants' alleged deceptive business practices with respect to the efficacy and safety of a drug. *See Warfarin,* 391 F.3d at 528; *In re Cmty. Bank of N. Virginia,* 418 F.3d 277, 309 (3d Cir.2005) (cases where Third Circuit found the predominance requirement satisfied because the claims arose from Defendants' same fraudulent scheme).

**\*5** Even though the laws of various states differ as to the claims raised by these multi-district Plaintiffs, this Court still finds that there is Rule 23(b) predominance. The Third Circuit has noted that "the same concerns with regards to case manageability that arise with litigation Classes are not present with Settlement Classes, and thus these variations [in state laws] are irrelevant to certification of a settlement class." *Warfarin,* 391 F.3d at 529. Furthermore, the same common issues regarding Defendants' business practices still lie at the core of Class Members' claims.

Finally, it is clear that approving the settlement is a superior method of resolving these claims. Approving this Settlement Agreement is a more efficient and less risky means of addressing Class Members' grievances.

Based on the foregoing, the proposed Settlement Class is certified pursuant to Rule 23(b)(3).

### 2. Satisfaction of Rule 23(e) Standard

Federal Rule of Civil Procedure 23(e), provides that "[a] class action shall not be dismissed or compromised without the approval of the court, and notice of the proposed dismissal or compromise shall be given to all members of the class in such a manner as the court directs." Fed.R.Civ.P. 23(e). In determining whether to approve a class action settlement pursuant to Rule 23(e), " 'the district court acts as a fiduciary who must serve as a guardian of the rights of absent class members' " *In re Gen. Motors Corp. Pick–Up Truck Fuel Tank Prod. Liab. Litig.,* 55 F.3d 768, 785 (3d Cir.1995) (quoting *Grunin v. Int'l House of Pancakes,* 513 F.2d 114, 123 (8th Cir.1975), *cert. denied,* 423 U.S. 864, 96 S.Ct. 124, 46 L.Ed.2d 93 (1975) (citation omitted)).

Before giving final approval to a proposed class action settlement, the Court must determine that the settlement is "fair, adequate, and reasonable." *Lazy Oil Co. v. Witco Corp.,* 166 F.3d 581, 588 (3d Cir.1999); *Walsh v. Great Atl. & Pac. Tea Co.,* 726 F.2d 956, 965 (3d Cir.1983). In *Girsh v. Jepson,* the Third Circuit identified nine factors, so-called "*Girsh* factors," that a district court should consider when making this determination:

(1) the complexity, expense and likely duration of the litigation;

(2) the reaction of the class to the settlement;

(3) the stage of the proceedings and the amount of discovery completed;

(4) the risks of establishing liability;

(5) the risks of establishing damages;

(6) the risks of maintaining the class action through the trial;

(7) the ability of the defendants to withstand a greater judgment;

(8) the range of reasonableness of the settlement fund in light of the best possible recovery;

(9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

521 F.2d 153, 157 (3d Cir.1975). "These factors are a guide and the absence of one or more does not automatically render the settlement unfair." *In re American Family Enterprises,* 256 B.R. 377, 418 (D.N.J.2000). Rather, the court must look at all the circumstances of the case and determine whether the settlement is within the range of reasonableness under *Girsh. See In re Orthopedic Bone Screw Prod. Liab. Litig.,* 176 F.R.D. 158, 184 (E.D.Pa.1997); *see also In re AT & T Corp. Sec. Litig.,* 455 F.3d 160 (3d Cir.2006).[2] In sum, the Court's assessment of whether the settlement is fair, adequate and reasonable is guided by the *Girsh* factors, but the Court is in no way limited to considering only those enumerated factors and is free to consider other relevant circumstances and facts involved in this settlement.

[2] District courts should also consider other relevant and appropriate factors. The court in *Krell v. Prudential Ins. Co. of Am. (In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions),* suggested that district courts may consider "the maturity of the underlying substantive issues ... the extent of discovery on the merits, and other factors that bear on the ability to assess the probable outcome of a trial on the merits of liability and individual damages ... whether class or subclass members are accorded the right to opt out of the settlement; whether any provisions for attorneys' fees are reasonable; and whether the procedure for processing individual claims under the settlement is fair and reasonable." 148 F.3d 283, 323 (3d Cir.1998).

**\*6** The "[a]pproval of a plan of allocation of a settlement fund in a class action is governed by the same standards of review applicable to approval of the settlement as a whole: the distribution plan must be fair, reasonable and adequate." *Karcich v. Stuart (In re Ikon Office Solutions, Inc., Sec. Litig.),* 194 F.R.D. 166, 184 (E.D.Pa.2000) (citations and internal quotations omitted); *see also Walsh v. Great Atlantic & Pacific Tea Co.,* 726 F.2d 956, 964 (3d Cir.1983) ("The Court's principal obligation is simply to ensure that the fund distribution is fair and reasonable as to all participants in the fund.").

### B. Judicial Approval of Attorneys' Fees

In re Merck & Co., Inc. Vytorin Erisa Litigation, Not Reported in F.Supp.2d (2010)

2010 WL 547613

The awarding of fees is within the discretion of the court, so long as the court employs the proper legal standards, follows the proper procedures, and makes findings of fact that are not clearly erroneous. *In re Cendant Corp. PRIDES Litig.,* 243 F.3d 722, 727 (3d Cir.2001). Notwithstanding this deferential standard, a district court is required to clearly articulate the reasons that support its conclusion. *In re Rite Aid Corp. Sec. Litig.,* 396 F.3d 294, 301 (3d Cir.2005). The Third Circuit Court of Appeals identified several factors—the *Gunter* factors—that a district court should consider. These factors include:

> (1) the size of the fund created and the number of persons benefitted; (2) the presence or absence of substantial objections by members of the class to the settlement terms and/or fees requested by counsel; (3) the skill and efficiency of the attorneys involved; (4) the complexity and duration of the litigation; (5) the risk of nonpayment; (6) the amount of time devoted to the case by plaintiff's counsel; and (7) the awards in similar cases.

*Rite Aid,* 396 F.3d at 301 (citing *Gunter v. Ridgewood Energy Corp.,* 223 F.3d 190, 195 n. 1 (3d Cir.2000)). The Third Circuit identified three additional factors that apply in percentage of fee awards, including:

> (8) the value of benefits attributable to the efforts of class counsel relative to the efforts of other groups, such as government agencies conducting investigations, (9) the percentage fee that would have been negotiated had the case been subject to a private contingent fee arrangement at the time counsel was retained, and (10) any innovative terms of settlement.

*In re Diet Drugs (Phentermine/Flenfuramine/ Dexflenfuramine) Products Liab. Litig.,* 582 F.3d 524, 541 (3d Cir.2009)

The Court need not apply these fee award factors in a formulaic way. Certain factors may be afforded more weight than others. *Rite Aid,* 396 F.3d at 301. The Third Circuit emphasized in *Rite Aid,* however, that the district court must engage in a robust assessment of these factors. 396 F.3d at 302; *see also Gunter,* 223 F.3d at 196 (vacating district court's ruling because the fee-award issue was resolved in a cursory and conclusory fashion). While the Third Circuit has not adopted a particular standard for fee awards in common fund cases, the Third Circuit acknowledges that fee awards generally range from 19% to 45%. *In re General Motors Corp. Pickup Fuel Tank Products Liability Litigation,* 55 F.3d 768, 822 (3d Cir.1995).

### III. *Discussion*

#### A. Settlement Plan and Allocation—Application of the *Girsh* Factors

**\*7** The Court will consider the proposed settlement in light of the Girsh factors. The balance of factors, here, weighs in favor of approval.

1. *Complexity, Expense and Likely Duration of Litigation*
This factor is concerned with assessing the "probable costs, in both time and money, of continued litigation." *In re Cendant Corp. Litig.,* 264 F.3d 201, 234 (3d Cir.2001). This litigation has been ongoing for more than two years. Undoubtedly, without settlement, the continued costs and time required to proceed through discovery, pre-trial matters, trial and post-trial matters would be great in this multi-district action.

Additionally, there will necessarily be significant delay in recovery if this case is tried. *See, e.g., In re Warfarin Sodium Antitrust Litig.,* 391 F.3d 516, 536 (3d Cir.2004); *Weiss v. Mercedes–Benz of N. Am., Inc.,* 899 F.Supp. 1297, 1301 (D.N.J.1995). In contrast, the settlement provides immediate recovery of more than $40 million dollars, less attorneys' fees and expenses. The first *Girsh* factor weighs in favor of approving the settlement.

2. *Reaction of Class to Settlement*
This factor requires the Court to evaluate whether the number of objectors, in proportion to the total class, indicates that the reaction of the class to the settlement is favorable. The Court also notes that the second *Girsh* factor is especially critical to its fairness analysis, as the reaction of the class "is perhaps the most significant factor to be weighed in considering its adequacy." *Sala v. National R.R. Passenger Corp.,* 721 F.Supp. 80, 83 (E.D.Pa.1989); *Fanning v. AcroMed Corp. (In re Orthopedic Bone Screw Prods. Liab. Litig.),* 176 F.R.D. 158, 185 (E.D.Pa.1997) (stating that a "relatively low objection rate militates strongly in favor of approval of the settlement" (internal citations omitted)).[3]

[3]    Originally, Blue Cross Blue Shield of Alabama and Michigan filed objections, including a typographical error objection, an inequitable distribution of the fund objection, and overly broad language objection to Article XXII, which subsequently were resolved and withdrawn. By way of Stipulation, dated February 3, 2010, these objections were resolved. Class Members Sam A.

In re Merck & Co., Inc. Vytorin Erisa Litigation, Not Reported in F.Supp.2d (2010)

2010 WL 547613

Cannata and Dennis P. Levin originally filed objections and subsequently, withdrew those objections raised with respect to attorneys' fees., contingent upon a reduction in reimbursement costs. In withdrawing the original objections, the counsel for Cannata and Levin represent to the Court that the Class Counsel has agreed to "reduce its request for reimbursement of expenses by the amount of Fifty–Five thousand dollars ($55,000) representing a portion of the amount claimed for Internet Research and Internal Copying Expenses." The reduction was applied to an original reimbursement request of $196,186.00 that is now a request for $141,186.00. Further, it is represented that a reasonable fee is to be paid from the Class Counsel fee award to the Objectors' Counsel, consisting of a group of four law firms. Assuming, without concluding, all parties agree, the motion to withdraw the former objections is granted. Lastly, it has been represented to this Court by Class Counsel that an objection by Consumer Class Member, Ellis Eisen, Esq. has been withdrawn.

Few objections have been raised. As stated on the record, before this Court, all objections have been resolved and withdrawn. Therefore, this factor weighs strongly in favor of settlement.

3. *Stage of Proceedings and Amount of Discovery Completed*

Pursuant to the third *Girsh* factor, the Court must consider the "degree of case development that Class Counsel have accomplished prior to Settlement," including the type and amount of discovery already undertaken. *GMC Pick–Up Truck,* 55 F.3d at 813; *see also Prudential,* 148 F.3d at 319. In short, under this factor the Court considers whether the of amount of discovery completed in the case has permitted "counsel [to have] an adequate appreciation of the merits of the case before negotiating." *Prudential,* 148 F.3d at 319; *See also AT & T,* 455 F.3d at 167 (noting extent of discovery).

Class counsel has reviewed in excess of 1.2 million documents pertaining to Defendants' marketing practices, Defendants' interaction with governmental agencies, circumstances surrounding the ENHANCE study as well as other clinical and regulatory documents. Additionally, Class Counsel has conducted informal discovery, obtained information from named Plaintiffs in this matter, consulted expert witnesses, retained private investigators and prepared relevant legal documents in response to a motion to dismiss filed before this Court. It is clear that Class Counsel had an adequate appreciation of the facts in this matter before

proceeding with settlement negotiations. This factor weighs in favor of settlement approval.

4. *Risks of Establishing Liability*

**\*8** A trial on the merits always entails considerable risk. *Weiss,* 899 F.Supp. at 1301. "By evaluating the risks of establishing liability, the district court can examine what the potential rewards (or downside) of litigation might have been had class counsel elected to litigate the claims rather than settle them ." *In re GMC Pick–Up Truck Fuel Tank Prods. Liab. Litig.,* 55 F.3d 768, 814 (3d Cir.1995).

Risk is inherent in litigation. In this case, the risks of litigation are great because Plaintiffs' claims involve complex and contested questions of law and fact. Previously, Defendants filed a motion to dismiss the Master Complaint demonstrating that, in the absence of settlement, Defendants will continue to zealously advocate in defense of their products. Further, at the fairness hearing conducted before this Court, Defendants reasserted their belief that this motion would be otherwise meritorious in the absence of settlement, citing a number of cases in support of that motion. Although Plaintiffs assert that their claims are legally sound, indeed, they acknowledge that FDA statements in support of the efficacy of Defendants' drugs pose a level of risk. Therefore, this factor weighs in favor of settlement approval.

5. *Risks of Establishing Damages*

The fifth *Girsh* factor "attempts to measure the expected value of litigating the action rather than settling it at the current time." *GMC,* 55 F.3d at 816. Ultimately, a battle of experts will ensue presenting differing damages calculations and "[a] jury would therefore be faced with competing expert opinions representing very different damage estimates ... adding further uncertainty." *In re Rent–Way Sec. Litig.,* 305 F.Supp.2d 491, 506 (W.D.Pa.2003). Even if Plaintiffs successfully established causation at trial, post-trial motions and appeals present added risk. *In re Apollo Group, Inc. Sec. Litig.,* 2008 U.S. Dist. LEXIS 61995, 2008 WL 3072731 at * 1–4 (D.Ariz. Aug. 4, 2008) (granting Rule 50(b) motion, following lengthy trial, notwithstanding the $280 million jury verdict). This uncertainty of the final damage award along with the attendant risk of successfully establishing damages weighs in favor of settlement approval.

6. *Ability of Defendants to Maintain Class Certification Through Trial*

2010 WL 547613

The standard for certification is the same for settlement classes as it is for conventional classes. *GMC,* 55 F.3d at 817. "Rule 23(b) does not require that class members share every factual and legal predicate to meet the commonality and typicality standards." *Id.* Further, certain issues such as damages can be tried on an individual basis. *Id.* If certification is precluded, alternatives, such as multi-district litigation, exist helping to retain some of the substantive advantages of class certification. *Id.*

Plaintiffs present a compelling argument that if the class is not certified here, then few if any members of the litigation will have financial incentive or actual means to proceed in individual suits. Further, Plaintiffs argue that settlement class certification eliminates some of the other hurdles present in class action litigation, including conflict or choice of law issues, manageability issues and concerns with respect to injury and causation elements of individual claimants. Given Plaintiffs' recognition of the particular issues that arise with respect to class certification for purposes of litigation, it seems that this factor weighs in favor settlement approval.

7. *Ability of Defendants to Withstand a Greater Judgment*
**\*9** To evaluate whether the Settlement Agreement is fair to Plaintiffs, the Court must evaluate whether Defendants could withstand a judgment much greater than the amount of the settlement. *See Cendant,* 264 F.3d at 240; *Prudential,* 148 F.3d at 321–22; *GMC,* 55 F.3d at 818. While Plaintiffs recognize that Defendants potentially have resources to withstand a greater judgment, this factor is not dispositive. *See GMC,* 55 F.3d at 818. Given that Defendants' global sales are reported in the billions of dollars, there is strong indication that Defendants can potentially withstand a greater judgment. This factor does not weigh in favor of settlement approval.

8/9. *Reasonableness of the Settlement Fund in Light of the Best Possible Recovery, and in Light of the Attendant Risks of Litigation*
"According to Girsh, courts approving settlements should determine a range of reasonable settlements in light of the best possible recovery (the eighth *Girsh* factor) and a range in light of all the attendant risks of litigation (the ninth factor)." *GMC,* 55 F.3d at 806. Neither party presents the Court with an estimate of prospective recovery. if the litigation concluded with a successful result for Plaintiffs. Assuming, without concluding, that Plaintiffs would prevail at trial, then it appears that recovery would prove substantial in light of the billions of dollars grossed from global sales. Although a

concrete estimate would enable the Court to conduct a more refined analysis, the potential costs of continued litigation along with potential recovery favors settlement, especially by way of comparison to settlement recovery in the amount of $41.5 million dollars.

### B. Attorney' Fees

1. *The Gunter/Prudential Factors*
Consideration of the Gunter factors weighs in favor of the reasonableness of the attorneys' fees in this common fund class action settlement. Co–Lead Class Counsel seeks 33 ⅓ % of the value of the Settlement as fees, totaling $13,819,500.00, plus $141,186.00 as reimbursement for the expenses and costs actually incurred.

First, courts consider the size of the fund created and the number of persons benefitted by the settlement. "As a general rule, as the size of the fund increases, the appropriate percentage to be awarded to counsel decreases." *Chemi v. Champion Mortgage,* 2009 U.S. Dist. LEXIS 44860, 2009 WL 1470429 \*31 (D.N.J. May 26, 2009) (citing *In re Cendant Corp.,* 232 F.Supp.2d 327, 337 (D.N.J.2002)). "This rule is based on the premise that, 'in many instances [,] the increase in recovery is merely a factor of the size of the class and has no direct relationship to the efforts of counsel.' " *Id.* The Third Circuit appears to recognize, or at least, implicitly endorse recognition of, $100,000,000.00 as a benchmark of a large settlement. *Id.* (citing Welch *& Forbes, Inc. v. Cendant Corp.,* 243 F.3d 722, 736–37 n. 19 (3d Cir.2001)).

In the instant case, the settlement value is by no means insubstantial, totaling $41,500,000.00. However, the benefit conferred is not so large that recovery dictates a reduction in the percentage of fee recovered in accordance with the purported Third Circuit benchmark. The number of class members is large, at least consisting of Plaintiffs IBEW Local 164 Welfare Fund, Fire & Police Retiree Health Care Fund of San Antonio, Government Employees Health Association, Inc., Pipefitters Local 537 Trust Fund, Teamsters Healthcare, Midwestern Teamsters Health & Welfare Fund, UFCW & Employers Arizona Health & Welfare Trust, County of Nassau, Louisiana Health Insurance Indemnity Company d/b/a BlueCross BlueShield of Louisiana, Helen Aronis, Kenneth Bever, Glenda Morgan, Roy Cosgrove, Charles Miller, Anna Iannuzzi, Robert Mastondrea, Robert Love, Donald Varino, Frances Weiland, and Daniel Tollefson, on behalf of themselves and all others similarly situated. Therefore, the

2010 WL 547613

size of the fund and number of persons benefitted by the fund weighs in favor of an award of attorneys' fees.

**\*10** Second, the Court evaluates the presence or absence of substantial objections by members of the class to the settlement terms and/or fees requested by counsel. Substantive objections raised by class members Blue Cross Blue Shield ("BCBS") of Alabama and BCBS of Michigan, in their individual capacities and as TTP class representatives, have been resolved by way of stipulation entered into the docket on February 3, 2010. Reimbursement cost objections raised by individual consumer class members Sam A. Cannata and Dennis P. Levin were also withdrawn pursuant a reduction in reimbursement expenses as reflected in the recent motion also before this Court seeking final seeking class certification and final settlement approval.[4]

[4]     Ellis Eisen, Esq., a Consumer Class Member and formerly an objector to the instant settlement agreement, through Class Counsel has represented to this Court that the previous objection filed has been resolved and withdrawn.

Mahzer Jaweed ("Dr.Jaweed"), absent from the Court hearing earlier this day, filed a request for clarification. Pursuant to that request, Dr. Jaweed documents an emergent admission to the hospital where he was informed that he was suffering from cancer and was told to stop taking Vytorin, "the offending agent" which had prompted the admission. Dr. Jaweed expresses concern that despite that grave personal injury incurred, he will not be able to demonstrate a causal connection between cancer and Vytorin in the absence of medical research supporting a linkage. Although the Settlement Agreement and Release does not release damage claims for personal injury, there is no indication that Defendants will not seek to assert a defense of statute of limitations, laches or estoppel even if a linkage is later discovered. Dr. Jaweed seeks clarification that nothing in the settlement will preclude a suit by Dr. Jaweed "should a causal connection between and Vytorin/Zetia be discovered, and that the statute of limitations clock did not begin to run at that time." Unfortunately, and with all due respect, the Court is not in a position to address or propose amendment to the settlement agreement based on the emergence of hypothetical research. Indeed, this concern appears to center around a personal injury claim otherwise excluded from the present settlement agreement. Therefore, settlement is not precluded on this ground. Therefore, an absence of objections favors settlement.

Third, the skill and efficiency of the attorneys involved is high. Class Counsel are highly skilled attorneys with substantial experience in class action litigation, particularly mass tort and multi-district litigation, as illustrated by firm biographies and the Declarations of Counsel accompanying their fee application. Therefore, this factor favors an award of attorneys' fees.

Fourth, multi-district class action litigation is inherently complex, involving classes of persons from multiple states and consolidation of cases from multiple districts. Beyond the obvious complexity and consequent demand of multi-district suits, this litigation has been ongoing for more than two years to date. The prospective duration of this matter if the does settle accompanied with the constant attention to detail required by an inherently complex suit favors the award of attorneys' fees.

**\*11** Fifth, "[c]lass Counsel accepted the responsibility of prosecuting this class action on a contingent fee basis and without any guarantee of success or award." *In re Ins. Brokerage Antitrust Litig.,* 579 F.3d 241, 281 (3d Cir.2009). The risk of non-payment appears substantial given expense of unreimbursable out-of-pocket costs and the 8,199.48 uncompensated hours dedicated to this matter. In the absence of a settlement, the fee awarded is contingent upon prevailing at trial. If a jury were to find in favor of Defendants that the FDA approval of these allegedly defective drugs negates the claims of alleged deceptive advertising, potentially, Co–Lead Counsel would recover nothing and lose more than $5 million dollars invested in this case. Further, although Plaintiffs may prevail at trial, "even a victory at trial is not a guarantee of ultimate success." *In re Warner Communications Sec. Litigation,* 618 F.Supp. 735, 748 (S.D.N.Y.1985). "If plaintiffs were successful at trial and obtained a judgment for substantially more than the amount of the proposed settlement, the defendants would appeal such judgment. An appeal could seriously and adversely affect the scope of an ultimate recovery, if not the recovery itself ." *Id.* at 748. "The attorneys' contingent fee risk is an important factor in determining the fee award." *Id.* at 747. The risk of little to no recovery weighs in favor of an award of attorneys' fees.

Sixth, the Executive Committee Members have expended 8,199.48 hours and incurred more than $141,186.00 in out-of-pocket expenses, including time and money expended pursuant to an initial investigation, legal research and preparation of relevant legal matters, including instituting a national class notice plan and the attendant procedures

2010 WL 547613

required to implement such a plan. Moreover, the time dedicated and expenditures incurred do not include costs that will arise immediately in the future, such as the settlement hearing conducted before this Court on February 8, 2010.

Seventh, awards in similar common fund cases appear analogous to the present request. *In re Remeron Direct Purchaser Antitrust Litig.,* No. 03–0085, 2005 U.S. Dist. LEXIS 27013, 2005 WL 3308808 at \*44 (D.N.J. Nov. 9, 2005) (not for publication) (review of 289 settlements demonstrates "average attorney's fees percentage [of] 31.71% with a median value that turns out to be one-third") (internal citations omitted); *General Motors,* 55 F.3d at 822 (in common fund cases "fee awards have ranged from nineteen percent to forty-five percent of the settlement fund"). Given that the award requested appears consistent with other similar cases, this factor weighs in favor of an award of attorneys' fees.

Eighth, the Court must assess "whether Class Counsel had benefitted from 'the efforts of other groups, such as government agencies conducting investigations [.]' " *In re Diet Drugs,* 582 F.3d at 544 (citing *In re AT & T Corp.,* 455 F.3d 160 (3d Cir.2006)). Indeed the former FDA approval of these drugs created a hurdle in the present litigation, rather than a benefit. However, there is a corresponding case presently pending before this Court, *In re Merck & Co., Inc. Vytorin ERISA Litigation* 08–CV–1974, which may have afforded some collateral, but indirect benefits to the present matter. Nonetheless, this factor favors an award despite the effect of any collateral benefits arising from the co-pending case because such effects appear insubstantial by way of comparison to the efforts contributed by Co–Lead Class Counsel in the face of the obstacles presented by this multi-district litigation.

**\*12** Ninth, the 33 ⅓ % fee award requested reflects commonly negotiated fees in the private marketplace. *Remeron,* 2005 U.S. Dist. LEXIS 27013, 2005 WL 3308808 at\*46 ("Attorneys regularly contract for contingent fees between 30% and 40% with their clients in non-class, commercial litigation."); *Karcich,* 194 F.R.D. at 194 ("[I]n private contingency fee cases ... plaintiffs' counsel routinely negotiate agreements providing for between thirty and forty percent of any recovery"). Accordingly, this commonality favors an award of attorneys' fees.

Tenth, although the settlement may contain innovative terms, none have been underscored with respect to the instant matter.

Therefore, this factor neither weighs in favor nor detracts from a decision to award attorneys' fees.

### 2. *Lodestar Cross-check*

In addition to assessing the *Gunter* factors, courts in this circuit confirm the reasonableness of a fee by using the lodestar calculation method when a fee award is based on percentage of recovery. *See Rite Aid,* 396 F.3d at 305–306. The lodestar analysis is performed by "multiplying the number of hours reasonably worked on a client's case by a reasonable hourly billing rate for such services based on the given geographical area, the nature of the services provided, and the experience of the attorneys ." *Id.* "The reasonableness of the requested fee can be assessed by calculating the lodestar multiplier, which is equal to the proposed fee award divided by the lodestar (i.e., the product of the total hours and the blended billing rate). But the lodestar 'multiplier need not fall within any predefined range, provided that the District Court's analysis justifies the award.' " *In re Ins. Brokerage Antitrust Litig.,* 579 F.3d at 280.

"After a court determines the lodestar amount, it may increase or decrease that amount by applying a lodestar multiplier. 'The multiplier is a device that attempts to account for the contingent nature or risk involved in a particular case and the quality of the attorneys' work.' " *In re Diet Drugs,* 582 F.3d at 540 n. 33. The common fund doctrine "provides that a private plaintiff, or plaintiff's attorney, whose efforts create, discover, increase, or preserve a fund to which others also have a claim, is entitled to recover from the fund the costs of his litigation, including attorneys' fees.' " *Id.* at 540 (citing *In re Cendant Corp. Sec. Litig.,* 404 F.3d 173, 187 (3d Cir.2005) (internal citation omitted)) "When calculating attorneys' fees in such cases, the percentage-of-recovery method is generally favored." *Id.* (citing *Prudential,* 148 F.3d at 333).

In support of the lodestar calculation, Co–Lead Class Counsel provided charts detailing the hours worked and billing rates for each attorney and paralegal or support staff who worked on this matter. Class Counsel have expended a total of 8,199.48 hours in this litigation with a total lodestar in the amount of $4,958,945.50 and unreimbursable expenses at a rate of $141,186.00.

**\*13** Carella, Byrne, Cecchi, Olstein, Brody & Agnello, P.C., formerly Carella, Byrne, Bain, Gilfillan, Cecchi, Stewart & Olstein, reports an expenditure of 2,567.10 hours with a total lodestar of $1,452,562 .50 and $35,587.99 in unreimbursable expenses. The hourly attorney billing rate presented ranges

from $500.00–$750.00 (non-weighted average = $625.00) at a total of 2,312.1 hours, representing 0.90066 or 90% of the hours expended. The hourly paralegal and/or professional support staff rate is documented as $105.00 at a total of 187.5 hours, representing 0.000327 or .0327% of the hours expended.

Wolf Haldenstein Adler Freeman & Herz LLC reported an expenditure of 1,583.8 hours with a total lodestar of $920,059.00 and $52,904.02 in unreimbursable expenses. The hourly attorney billing presented ranges from $320.00–$835.00 (non-weighted average = $577.50) at a total of 1,464.4 hours, representing 0.92461 or 92.46% of the hours expended. The hourly paralegal and/or professional support staff rate ranges from $85.00–$255.00 (non-weighted average = $170.00) at a total of 119.4 hours, representing 0.000631 or .0631 % of hours expended.

Seeger Weiss LLP reports an expenditure of 1,875.3 hours with a lodestar of $1,308,614.00 and $29,767.19 in unreimbursable expenses. The hourly attorney billing rate presented ranges from $345.00–$775 .00 (non-weighted average $560.00) with a total of 1,840 hours, representing 0.981176 or 98.11% of hours expended. The hourly paralegal and/or professional support staff rate ranges from $165.00–$225.00 (non-weighted average = $195.00) at a total of 35.3 hours.

Hagan Berman Sobol Shapiro LLP reports an expenditure of 1,026.98 hours with a total lodestar of $354,900.50 and unreimbursable expenses in the amount of $28,436.09. The hourly attorney billing rate presented ranges from $250.00–$650.00 (non-weighted average $450.00) with a total of 551.78 hours, representing 0.537284 or 53.72% of hours expended. The hourly paralegal and/or professional support staff is documented as $150.00 at a total of 475.2 hours, representing 0.462715 or 46.27%.

Lieff, Cabraser, Heimann & Bernstein, LLP reports an expenditure of 1,174.8 hours with a lodestar of $748,569.00 and $46,247.05 in unreimbursable expenses. The hourly attorney billing rate presented ranges from $250.00–$825.00 (non-weighted average $537.50) with a total of 1,077 hours, representing 0.916751 or 91.67% or of hours expended. The hourly paralegal and/or professional support staff ranges from $175.00–$250.00 (non-weighted average = $212.50) at a total of 97.8 hours, representing 0.083248 or 8.32%.

The fee requested requires a multiplier of approximately 2.786 based on the lodestar presented to the Court by the Co–Lead Class Counsel. Generally, "multiples ranging from one to four are frequently awarded in common fund cases when the lodestar method is applied." (internal quotation and citation omitted). *In re Diet Drugs,* 582 F.3d at 545 n. 41. Upon review of the hourly wage charts submitted and the lodestar presented by Co–Lead Counsel, for purposes of a cross-check, this Court concludes that the fees requested, with a multiplier of 2.786 is reasonable under the circumstances and awards the fees as requested. Additionally, the Court acknowledges that the fee secured is entirely attributable to the efforts of Counsel.

### 3. *Costs*

**\*14** The Court also finds that Class Counsel is entitled to receive costs, as they have been "adequately documented and reasonably and appropriately incurred in the prosecution of the case." *See In re Cendant Corp.,* 232 F.Supp.2d at 343 (quoting *In re Safety Components Int'l, Inc.,* 166 F.Supp.2d 72, 104 (D.N.J.2001)). Class Counsel has provided itemized expenditures, and has certified that full documentation of the costs have been maintained in the firms' records. Class counsel is awarded reimbursement costs in the requested amount of $141,186.00.

Class counsel also seeks permission to pay incentive fees to the representative Plaintiffs. It is not uncommon to award such fees. *See, e.g., Cullen v. Whitman Med. Corp.,* 197 F.R.D. 136, 145 (E.D.Pa.2000) (quoting *In re S. Ohio Corr. Facility,* 175 F.R.D. 270, 272 (S.D.Ohio 1997)) ("[C]ourts routinely approve incentive awards to compensate named plaintiffs for services they provided and the risks they incurred during the course of the class action litigation."). The Court grants permission to award incentive fees.

### IV. *Conclusion*

In accordance with the foregoing, the Court certifies the Master Class and Subclasses for settlement purposes, approves the proposed Settlement Agreement and Release and awards the fees requested by Co–Lead Class Counsel.

### All Citations

Not Reported in F.Supp.2d, 2010 WL 547613

In re Merck & Co., Inc. Vytorin Erisa Litigation, Not Reported in F.Supp.2d (2010)

2010 WL 547613

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

---

Case 3:16-cv-00085-MEM    Document 176-1    Filed 09/25/20    Page 58 of 147

In re New Jersey Tax Sales Certificates Antitrust Litig, Not Reported in Fed. Supp. (2016)
2016 WL 5844319

2016 WL 5844319
Only the Westlaw citation is currently available.
NOT FOR PUBLICATION
United States District Court, D. New Jersey.

IN RE NEW JERSEY TAX SALES
CERTIFICATES ANTITRUST LITIG.

Civil Action No. 12-1893 (MAS) (TJB)
|
Signed September 30, 2016
|
Filed 10/03/2016

## MEMORANDUM OPINION

SHIPP, District Judge

**\*1** This matter comes before the Court on Plaintiffs' motions for "Final Approval of All Class Settlements, Final Certification of Settlement Class, and Final Approval of Plan Allocation" and for "Attorneys' Fees and Reimbursement of Expenses to Plaintiffs' Counsel, and for Incentive Awards to Representative Plaintiffs." (ECF Nos. 437, 438.) Arlene M. Davies ("Ms. Davies") and Jerilean Roberts filed objections to the motion for final approval of the class settlements. (ECF Nos. 450, 453.) Plaintiffs filed a reply in support of their motions. (ECF No. 460.) As no objections were filed with respect to the Motion for Attorneys' fees, Reimbursement of Expenses, and Incentive Awards to Named Plaintiffs (ECF No. 438), this motion is deemed unopposed. The Court held a fairness hearing on April 25, 2016. (ECF No. 469.) Having considered the submissions on the record and the arguments presented at the fairness hearing, the Court grants Plaintiffs' motions.

## I. Background

Plaintiffs filed this putative class action against participants in an alleged bid-rigging conspiracy involving municipal auctions of real property liens in the state of New Jersey. Plaintiffs' First Amended Consolidated Master Class Action Complaint ("FACC") alleges that Defendants[1] engaged in an unlawful conspiracy to restrain trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, the New Jersey Antitrust Act, N.J.SA. § 56:9-3, the New Jersey Tax Lien Law, N.J.S.A. § 54:5-63.1, and New Jersey common

law. (FACC ¶ 1, ECF No. 320.) Specifically, Plaintiffs allege that Defendants engaged in a conspiracy to unlawfully manipulate the interest rates associated with Tax Sales Certificates ("TSCs") sold at public auctions in New Jersey. (*Id.*) Defendants were also subject to criminal charges for this conduct, and several defendants pled guilty to violating Section 1 of the Sherman Act by participating in a conspiracy to rig bids and allocate customers at certain public tax lien auctions in New Jersey. (Pls.' Opening Br. 3, ECF No. 437-1.) Likewise, some defendants in this civil action settled early and cooperated with Plaintiffs by participating in proffer sessions and providing documentary evidence. (Joint Declaration of Settlement Class and Liaison Counsel ("Pls.' Counsel's Deel.") ¶¶ 57-59, 67, 68, 89, 110, ECF No. 439.)

[1] 1) CCTS Capital, LLC n/k/a Crestar Capital, LLC and William S. Green (collectively the "Crestar Defendants"); 2) American Tax Funding, LLC; 3) BBX Capital Corporation f/k/a BankAtlantic Bancorp, Inc., Fidelity Tax, LLC, Heartwood 55, LLC, Michael Deluca, Gary I. Branse, and David Jelley; 4) Richard Simon Trustee, Betty Simon Trustee, and Joseph Wolfson; 5) Robert W. Stein; 6) Mooring Tax Asset Group, LLC ("MTAG") and Lambros Xethalis; 7) Norman T. Remick; 8) Michael Mastellone; 9) Pat Caraballese and PAM Investors; 10) Robert U. Del Vecchio Sr. and Robert U. Del Vecchio Trust; 11) CCTS, LLC, CCTS Tax Liens I, LLC, CCTS Tax Liens II, LLC, DSBD, LLC, Pro Capital LLC, David Butler, and David M. Farber; 12) Plymouth Park Tax Services, LLC; 13) M.D. Sass Investors Services, Inc., M.D. Sass Tax Lien Management, LLC, M.D. Sass Municipal Finance Partners – I, L.P., M.D. Sass Municipal Finance Partners – II, L.P., M.D. Sass Municipal Finance Partners – III, LLC, M.D. Sass Municipal Finance Partners – IV, LLC, M.D. Sass Municipal Finance Partners – V, LLC, M.D. Sass Municipal Finance Partners – VI, LLC, Vinaya J. Jessani, and Stephen E. Hruby; 14) Robert E. Rothman; 15) Royal Bancshares of Pennsylvania, Inc., Royal Bank America, Crusader Servicing Corporation, and Royal Tax Lien Services, LLC; 16) William A. Collins; 17) Isadore H. May; 18) Burlington Assembly of God/ Fountain of Life Center, Mercer S.M.E., Inc., Susan M. Esposito, and David B. Boudwin; 19) Richard J. Pisciotta, Jr.; and 20) Phoenix Funding, Inc. and Benedict Caiola (all defendants collectively are referred to as "Defendants"). (FACC 1-2.)

### A. Motions to Dismiss

**\*2** In March 2013, Defendants moved to dismiss Plaintiffs' complaint. (ECF Nos. 173, 174, 177, 178, 182, 185, 186,

Case 3:16-cv-00085-MEM    Document 176-1    Filed 09/25/20    Page 59 of 147

In re New Jersey Tax Sales Certificates Antitrust Litig, Not Reported in Fed. Supp. (2016)
2016 WL 5844319

187, 188, 193.) Plaintiffs filed an eighty-three page brief in opposition to all but one of the motions to dismiss. (ECF No. 242.) Plaintiffs filed a separate twenty-five page brief to oppose the remaining motion to dismiss. (ECF No. 241.) In September 2013, Plaintiffs amended their complaint to add additional defendants that they learned about through their ongoing investigation. (Pls.' Counsel's Decl. ¶ 75.) Thereafter, Crestar Defendants made a motion for judgment on the pleadings. (ECF No. 279.) On October 23,2013, the Court held oral argument on the motions to dismiss and also held a settlement conference. (ECF No. 300.) Following the settlement conference, the Court issued a decision on the record. (ECF No. 309.) The Court made the following rulings: 1) Plaintiffs adequately alleged antitrust standing; 2) the heightened pleading requirements of Fed. R. Civ. P. 9(b) did not apply to Plaintiffs' antitrust claims; 3) the conspiracy was adequately pled with respect to those defendants that had pled guilty; 4) the conspiracy was not adequately pled with respect to those defendants that did not plead guilty; 5) the Filed Rate Doctrine did not apply to Plaintiffs' claims; 6) Plaintiffs' declaratory judgment claim could not stand and was dismissed; 7) N.J.S.A. 54:5-52 did not provide for a stand-alone cause of action, so it was dismissed with prejudice; 8) Plaintiffs' other state law causes of action under the New Jersey Tax Sale Law failed and were dismissed without prejudice; 9) Plaintiffs' unjust enrichment claim failed and was dismissed; 10) Defendants' arguments on statutes of limitations and fraudulent concealment failed; and 11) MTAG was dismissed without prejudice. (*See* Oct. 23, 2013 Tr. 75:15-90:11, ECF No. 309.)

Thereafter, Plaintiffs filed the First Amended Consolidated Master Class Action Complaint, and some of the non-settling defendants filed motions to dismiss. (ECF Nos. 320, 340, 341.) On October 31, 2014, the Court issued a decision granting in part and denying in part the motions to dismiss. (ECF No. 375.) Importantly, the Court denied the motions to dismiss with respect to Plaintiffs' antitrust claim but dismissed with prejudice Plaintiffs' unjust enrichment and New Jersey Tax Sale law claims. (*Id.*)

### B. Settlements

From the Spring of 2012 through the Spring of 2013, "Lead Counsel intensively negotiated settlements with various counsel representing the Butler/Farber, Rothman, Mercer, Pisciotta, Collins, and May Defendants." (Pls.' Counsel's Decl. ¶ 105.) Before finalizing the settlement agreements, lead counsel obtained information from proffer sessions, telephone calls with counsel for defendants, and its own

investigations, which included Open Public Records Act ("OPRA") requests. (*Id.* ¶¶ 49, 50, 57, 58, 59, 60, 61, 62,67,68, 110.) From August 13, 2013 to October 30, 2015, the Court granted preliminary approval for numerous settlements with Defendants in this action, totaling $9,585,000 in cash, plus interest, and discounts for those class members who are still subject to a tax sales certificate. (ECF Nos. 276,277,376,394,426.) Throughout the course of the litigation, lead counsel and certain other Plaintiffs' counsel have kept the named plaintiffs informed of the settlement negotiations as they took place and prior to executing various settlement negotiations with defendants. (Pls.' Counsel's Decl. ¶ 295.) Notice of the settlements was disseminated in accordance with the Court's October 30, 2015 Order. (ECF No. 426.) (Decl, of Kenneth Jue ("Jue Decl.") ¶¶ 2-7, ECF No. 459; Supplemental Decl, of Kenneth Jue ("Jue Supp. Decl.") ¶¶ 3-4, ECF No. 467.)

### C. Attorneys' Fees

Fifteen law firms submitted lodestar information and expenses for the period of inception through January 31, 2016. (Pls.' Counsel's Decl. ¶ 302.) To date, none of Plaintiffs' attorneys have received any compensation for work they performed in this case, and have not been reimbursed for any expenses incurred. (*Id.* ¶ 303.) As compensation for work performed in this case, Plaintiffs' Counsel seeks up to 30% of the proposed settlement as fees and reimbursement of $83,047.92 in litigation expenses. (*Id.* ¶¶ 306, 307.) In support of the fee applications, Plaintiffs' Counsel submitted declarations attesting to the work performed during the time period, the hours of work performed, the value of the work performed, and the amount of unreimbursed expenses incurred by each law firm from the period of inception through January 31,2016. (Pls.' Counsel's Decl., Exs. 22-37, ECF No. 439-1.) Counsel also attested that applying historical rates to the 7,109.05 hours worked yields a total lodestar of $3,750,782 for the applicable work performed in prosecution of this litigation during the relevant time period, which equates to approximately 30% of the available settlement funds. (Pls.' Counsel's Decl. ¶ 306.)

### D. Named Plaintiffs' Awards

**\*3** Plaintiffs' Counsel declares that since the inception of this litigation in 2012, the four named plaintiffs have played an active role in this litigation and protected the interests of the Class by monitoring the litigation, reviewing pleadings, motion papers, and settlements, and in some instances, traveling to observe Court proceedings. (*Id.* ¶ 315.)

Case 3:16-cv-00085-MEM    Document 176-1    Filed 09/25/20    Page 60 of 147

In re New Jersey Tax Sales Certificates Antitrust Litig, Not Reported in Fed. Supp. (2016)

2016 WL 5844319

Plaintiffs' Counsel also declares that they did not promise any of the named plaintiffs that they would receive an incentive award for their participation in this litigation. (*Id.* ¶ 316.) To compensate the named plaintiffs for their time and expenses in litigating this action, Plaintiffs' Counsel requests that the Court approve an "incentive award of $3,500 for each of the four named plaintiffs, totaling $14,000." (Pls.' Fees Moving Br. 34, ECF No. 438-1.)

### E. Fairness Hearing

By Order dated October 30, 2015, the Court approved the class notice and notice plan. (ECF No. 426.) Thereafter, Plaintiffs moved for "Final Approval of All Class Settlements, Final Certification of Settlement Class, and Final Approval of Plan Allocation" and for "Attorneys' Fees and Reimbursement of Expenses to Plaintiffs' Counsel, and for Incentive Awards to Representative Plaintiffs." (ECF Nos. 437, 438.) The Court conducted a fairness hearing on April 15, 2016. (ECF No. 469.) At the hearing the Court heard arguments from Class Counsel; Mr. Robert Davies, Ms. Davies's son; and Counsel for Ms. Davies. (*Id.*) In addition, Ms. Christine Sweeney read a statement onto the record. (*Id.*) The Court reserved decision on Plaintiffs' motions.

## II. Class Certification

As an initial matter, no objections have been raised with respect to class certification for the purpose of settlement. Nonetheless, the Court shall engage in the two-step analysis prescribed by Federal Rule of Civil Procedure 23 to determine whether to certify the class for settlement purposes. *See Sheinberg v. Sorensen*, No. 00-6041, 2016 WL 3381242, at *3 (D.N.J. June 14, 2016).

To certify a settlement class, the plaintiffs must satisfy the four threshold requirements of Rule 23(a) – namely numerosity, commonality, typicality, and adequacy – and one of the subparts of Rule 23(b) – in this case, the requirements of Rule 23(b)(3) that the 'questions of law or fact common to the class members predominate over questions affecting only individual members [predominance], and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy [superiority].

*Yaeger v. Subaru of Am., Inc.*, No. 14-4490, 2016 WL 4541861, at *5 (D.N.J. Aug. 31, 2016).

The proposed Settlement Class in all agreements is defined as:

All persons who owned real property in the State of New Jersey who had a Tax Sale Certificate issued with respect to their property that was purchased by a Defendant during the Class Period at a public auction in the State of New Jersey at an interest rate above zero percent.

(Pls.' Settlement Moving Br. 6, ECF No. 399-1.) As discussed below, for settlement purposes only, the Court finds that the proposed Settlement Class meets the requirements of Rule 23 and conditionally certifies the Settlement Class.

### A. Numerosity

Rule 23(a)(1) requires a class to be "so numerous that joinder of all members is impracticable." *Yaeger*, 2016 WL 4541861, at *5. When examining the potential size of a class, "[p]recise enumeration of the members of a class is not necessary .... [and] [i]t is permissible to estimate class size." *Zinberg v. Wash. Bancorp, Inc.*, 138 F.R.D. 397, 405 (D.N.J. 1990). Moreover, "[j]oinder of all members of the class need not be impossible to satisfy Rule 23 ... [but rather] difficult[ ] or inconvenien[t]." *Id.* at 405-06. "There is no minimum number ..." but where a class is likely to exceed forty members, the Rule 23(a) numerosity requirement is generally met. *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 595 (3d Cir. 2012). Here, while the exact size of the settlement class is unknown, Plaintiffs assert that the information collected from LienSource and the data supplied by defendants confirms that there are thousands of Settlements Class Members. (Pls.' Opening Br. 26.) This estimate is sufficient to satisfy the numerosity requirement. In addition, the proposed Settlement Class is also readily ascertainable as "membership is based upon the objective criterion of ownership of real property in New Jersey for which a TSC was issued and was purchased by a defendant during the Class Period, and for which the purchase was made at an interest rate above zero percent." (*Id.*) *See Byrd v. Aaron's Inc.*, 784 F.3d 154, 163 (3d Cir. 2015).

### B. Commonality

**\*4** In Rule 23(b)(3) cases, such as this one, the Third Circuit has applied "the Rule 23(a)(2) commonality requirement and the 23(b)(3) predominance tests together." *In re Prudential Ins. Co. of Am. Sales Practice Litig.*, 962 F. Supp. 450, 510 (D.N.J. 1997), *aff'd sub, In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283 (3d Cir. 1998); *see, e.g., Georgine v. Amchem Prods. Inc.*, 83 F.3d 610, 626 (3d Cir. 1996) ("Because 23(b)(3)'s predominance requirement incorporates the commonality requirement, we

2016 WL 5844319

will treat them together."). Commonality requires that the "common contention ... must be of such a nature that it is capable of classwide resolution – which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011); *id.* at 353 ("[T]he existence of a class of persons who have suffered the same injury as that individual, such that the individual's claim and the class claim will share common questions of law or fact and that the individual's claim will be typical of the class claims.") (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 157-58 (1982)). Ultimately, "even a single question of law or fact common to the members of the class will satisfy the commonality requirement." *Wal-Mart Stores, Inc.*, 564 U.S. at 369. Rule 23(b)(3) then requires that "questions of law or fact common to class members [must] predominate over any questions affecting only individual members ...." *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 310 (3d Cir. 2008). Although the predominance requirement is "far more demanding" than Rule 23(a)(2), *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 624 (1997), Rule 23(b)(3) class actions need not be as cohesive as Rule 23(b)(2) class actions because Rule 23(b)(3) class members have an opportunity to opt out. *See Barnes v. Am, Tobacco Co.*, 161 F.3d 127, 142-43 (3d Cir. 1998).

Here, the common questions of law or fact include:

a. Whether defendants conspired with others to fix bids and allocate TSCs at auctions in New Jersey in violation of the Sherman Act;

b. Whether defendants' conduct had the anticompetitive effect of reducing and unreasonably restraining the market for the purchase of TSCs;

c. The names of the individuals and entities who participated in the anticompetitive scheme;

d. The duration of the anticompetitive scheme;

e. The effect of defendants' conduct and the extent of injuries sustained; and

f. The amount of damages the anticompetitive scheme caused members of the class.

(Pls.' Opening Br. 27.) In addition, the Court finds that these questions predominate over individual factual differences between class members as to the specific interest rate on their lien and whether the lien remains outstanding or was foreclosed upon or otherwise extinguished. In particular, to prove the alleged conspiracy, Plaintiffs would have to focus on Defendants' conduct rather than on any individual factual differences in the class members' conduct. Thus, the Court finds that the proposed class satisfies the commonality and predominance requirements in Rule 23(a)(2) and Rule 23(b)(3), respectively.

**C. Adequacy and Typicality**
The adequacy and typicality analyses under Rule 23(a)(3) and Rule 23(a)(4), respectively, often merge and can therefore be discussed together. *See Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 186 (3d Cir. 2001) (finding that typicality "criteria tend[s] to merge into [the] analysis of adequacy of representation under [Rule] 23(a)."). The adequacy prong of Rule 23(a)(4) requires two steps of inquiry. "First, the adequacy inquiry 'tests the qualifications of the counsel to represent the class.' " *In re Schering Plough Corp. ERISA Litig.*, 589 F.3d 585, 602 (3d Cir. 2009) (quoting *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 532 (3d Cir. 2004)). "The second component of the adequacy inquiry seeks 'to uncover conflicts of interest between named parties and the class they seek to represent.' " *Id.* (quoting *In re Warfarin*, 391 F.3d at 532). Additionally, "[t]he burden to prove that the representation is not adequate rests with the party challenging the class'[s] representation." *Bizzarro v. Ocean Cty.*, No. 07-5665, 2009 WL 1617887, at *14 (D.N.J. June 9, 2009). Furthermore, "[n]ot every distinction between a class member and a class representative renders the representative inadequate." *In re Nat'l Football League Players' Concussion Injury Litig.*, 307 F.R.D. 351, 376 (E.D. Pa 2015), *aff'd*, 821 F.3d 410 (3d Cir. 2016).

**\*5** The typicality analysis correspondingly "focuses on the similarity of the legal theory and legal claims; the similarity of the individual circumstances on which those theories and claims are based; and the extent to which the proposed representative may face significant unique or atypical defenses to her claims." *In re Schering Plough Corp.*, 589 F.3d at 597-98. "[F]actual differences among the claims of the putative class members do not defeat certification." *Baby Neal v. Casey*, 43 F.3d 48, 56 (3d Cir. 1994). In fact, " '[e]ven relatively pronounced factual differences will generally not preclude a finding of typicality where there is a strong similarity of legal theories' or where the claim arises from the same practice or course of conduct." *In re Prudential*, 148 F.3d at 311 (quoting *Baby Neal*, 43 F.3d at 58).

Here, "[i]t appears there is no conflict or antagonism between the named plaintiffs and the settlement [C]lass members, and there is no substantial prospect that time will be wasted to sort out atypical aspects of any named plaintiffs circumstances or claims." *Yaeger*, 2016 WL 4541861, at \*6. While the Court recognizes that there are factual differences between Class members, such as the particular interest rate on each Class member's tax Hen and whether the lien remains outstanding, these factual differences do not render the named plaintiffs inadequate or preclude a finding of typicality. In addition, the named class members include both plaintiffs who have redeemed their liens and plaintiffs who are still subject to the TSCs, so to the extent that their interests diverge, the named Plaintiffs adequately represent both of these interests. (Oct. 29, 2015 Tr. 18:11-15, ECF No. 436.) Moreover, all of the claims of the proposed Class arise from the same alleged bid-rigging conspiracy; thus, the Class members' interests are aligned and the named plaintiffs' claims are typical of the Class claims. Furthermore, as Plaintiffs' Counsel are experienced class action litigators that are familiar with the legal and factual issues involved in this litigation, the Court finds that they were well qualified and adequately represented the interests of the class throughout this litigation, which included substantial motion practice as well as extensive settlement negotiations. (Pls.' Counsel's Deel. ¶ 46.)

### D. Superiority

Finally, with respect to Rule 23(b)(3) requirements, as discussed above, the Court finds that common questions of fact and law predominate over questions affecting individual Class members. In addition, the Court also finds that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. "Fairness is an explicit criterion for a superiority determination, and ... must be balanced against any disincentive for class action litigation which might result from" denying class certification. *Katz v. Carte Blanche Corp.*, 496 F.2d 747, 761 (3d Cir. 1974). As noted above, it is estimated that the Class contains thousands of members, thus absent certification Plaintiffs would have to conduct individual trials, which would likely prove too costly for individuals and, given the estimated size of the class, too burdensome for the Court. Thus the class action is a superior method of adjudicating these claims. *See, e.g., Varacallo v. Mass. Mut. Life Ins. Co.*, 226 F.R.D. 207, 233 (D.N.J. 2005) (finding that class satisfied the superiority requirement where it was "unlikely that individual Class Members would have the resources to pursue successful litigation on their own.").

Having found that the proposed Settlement Class meets the requirements of Rule 23, the Court conditionally certifies the Settlement Class.

### III. Final Approval of the Settlement

**\*6** "The decision of whether to approve a proposed settlement of a class action is left to the sound discretion of the district court." *Girsh v. Jepson*, 521 F.2d 153, 156 (3d Cir. 1975). Under Federal Rule of Civil Procedure 23(e)(2), a Court may approve settlement of a class action "only after a hearing and on finding that it is fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2). The factors that are relevant to the determination of whether a settlement is "fair, reasonable, and adequate" include:

(1) the complexity, expense and likely duration of the litigation;

(2) the reaction of the class to the settlement;

(3) the stage of the proceedings and the amount of discovery completed;

(4) the risks of establishing liability;

(5) the risks of establishing damages;

(6) the risks of maintaining the class action through the trial;

(7) the ability of the defendants to withstand a greater judgment;

(8) the range of reasonableness of the settlement fund in light of the best possibly recovery; and

(9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

*Girsh*, 521 F.2d at 157 (quoting *City of Detroit v. Grinnell Corp.*, 495 F.2d 448 (2d Cir. 1974)). "The settling parties bear the burden of proving that the *Girsh* factors weigh in favor of approval of the settlement." *In re Pet Food Prods. Liab. Litig.*, 629 F.3d 333,350 (3d Cir. 2010). In general, "[c]ourts apply an 'initial presumption of fairness' to settlements that occurred ...[1] through arm's-length negotiations by [2] individuals 'experienced in similar litigation,' [3] following 'sufficient discovery,' and [4] that prompted objections from 'only a small fraction of the class.' " *Yaeger*, 2016 WL 4541861, at \*7. However, where as here, "the settlement class certification, the proposed settlement, the incentive

Case 3:16-cv-00085-MEM    Document 176-1    Filed 09/25/20    Page 63 of 147

In re New Jersey Tax Sales Certificates Antitrust Litig, Not Reported in Fed. Supp. (2016)
2016 WL 5844319

fees to class representative plaintiffs, and the uncontested cap on reimbursement of attorneys' fees and costs were simultaneously negotiated, there must be a heightened standard of review to determine the fairness of the proposed settlement." *Id.* at *8.

### A. Complexity, Expense, and Likely Duration of the Litigation

In discussing the complexity, expense and likely duration of this litigation, Plaintiffs' Counsel stated "the only wrongdoing here relates to the interest rate associated with [the property tax] lien[s]." (Apr. 25, 2016 Unofficial Tr. 6:15-16.) In addition, Plaintiffs' Counsel noted that over 5,600 property tax lien auctions took place during the class period, and that not all of these auctions were the subject of a conspiracy. (*Id.* at 6:22-7:6,16:23-17:4.) Plaintiffs' counsel argued that, absent settlement, class members would have to show: (1) that a particular property tax lien auction was the subject of a conspiracy; and (2) what the lien would have sold for in absence of the conspiracy. (*Id.* at 6:22-7:6.) In addition, Plaintiffs' Counsel asserts that Defendants would have surely opposed class certification and moved for summary judgment. (Pls.' Settlement Reply Br. 11, ECF No. 460.) Objector Ms. Davies, however, argues that "Class Counsel offers nothing to suggest that *this settlement* would be particularly complex or lengthy relative to other class actions." (Objector's Br. 14, ECF No. 450.)[2] The Court disagrees with Ms. Davies. As an initial matter, "[a]n antitrust action is a complex action to prosecute." *In re Ins. Brokerage Antitrust Litig.*, 282 F.R.D. 92, 102 (D.N.J. 2012). In addition, the size of the settlement class, which is estimated to include thousands of members, supports settlement. *See In re Nat 7 Football League Players' Concussion Injury Litig.*, 307 F.R.D. at 388 (stating that "sheer size of the Class supports settlement"). Thus, the Court finds that these facts weigh in favor of settlement.

2    While the Court consider Ms. Davies's objections in approving the proposed settlements, the Court does not reach the issue of whether Ms. Davies has standing to object. *See Larson v. AT&T Mobility LLC*, 687 F.3d 109,131 n.34 (3d Cir. 2012) ("Even assuming *arguendo* that they did not have constitutional standing to bring an objection based on adequacy of representation, the District Court still has an independent duty to ensure that all class members are adequately represented.").

### B. Reaction of the Class to Settlement

**\*7** In evaluating the reaction of the class, courts look primarily to the "objection rate," while considering the potential concern "that the passive victims ... lacked 'adequate interest and information to voice objections.' " *Yaeger*, 2016 WL 4541861, at *9 (citation omitted). Between January 8, 2016 and March 4, 2016, notice of the settlements was disseminated pursuant to the notice plan approved by the Court. (Jue Deel. ¶¶ 2-7; Jue Supp. Deel. ¶¶ 3-4.)

As evidenced by the number of impressions of the notice of the settlement on internet search advertising, internet banner advertising, and Facebook advertising, in addition to the publication of the notice in newspapers, on the settlement website, and mailing of approximately 100,000 postcard notices, notice of the settlements was widely disseminated. (*Id.*) Following the notice period, out of an estimated class of thousands of members, only three class members opted out of the class, and only two[3] individuals objected to the settlement – Ms. Jerilean Roberts and Ms. Davies. (Pls.' Settlement Reply Br. 15.) In addition, as the subject of this suit affected the interest rate on mortgages for Plaintiffs' homes, it seems more likely than not that most affected people who received notice of settlement would have voiced objections to the settlement to the extent that they had objections. Thus, the Court finds that the low objection rate in this litigation weighs in favor of approving settlement.

3    In Plaintiffs' Reply Brief, which was filed before the Fairness Hearing, Plaintiffs asserted that there were "at most, three objections," Plaintiffs appear to have included Ms. Christine Sweeney in this calculation. Thereafter Ms. Sweeney, however, advised the Court that she did not object to the proposed settlements, and she did not make any objections to the proposed settlements at the Fairness Hearing. (Apr. 25, 2016 Unofficial Tr. 34:23-40:1.) Thus, the Court is aware of only two objections to the proposed settlements.

### C. The Stage of the Proceedings and the Amount of Discovery Completed

"The third *Girsh* factor 'captures the degree of case development that class counsel [had] accomplished prior to settlement. Through this lens, courts can determine whether counsel had an adequate appreciation of the merits of the case before negotiating.' " *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 537 (3d Cir. 2004) (quoting *In re Cendant Corp, Litig.*, 264 F.3d 201, 235 (3d Cir. 2001)). Here, the parties entered into a settlement before formal discovery commenced. Other district courts in this Circuit

2016 WL 5844319

have approved class settlements in the absence of formal discovery. *See, e.g., McAlarnen v. Swift Transp. Co.*, No. 09-1737, 2010 WL 365823, at \*8 (E.D. Pa. Jan. 29, 2010); *In re Processed Egg Prods. Antitrust Litig.*, 284 F.R.D. 249,267 (E.D. Pa. 2012). In her opposition brief, Ms. Davies, however, argues that "[w]ithout discovery, Class Counsel had no basis to discount the substantial class-wide damages here." (Objector's Br. 12.) The Court disagrees with Ms. Davies.

Here, Plaintiffs' Counsel argues that Plaintiffs developed an adequate appreciation of the merits of this litigation through informal discovery, in addition to extensive motion practice. (Pls.' Settlement Reply Br. 9.) Specifically, Plaintiffs' Counsel asserts that based on the documentary evidence, which included bid books and responses to OPRA requests; proffer sessions with cooperating defendants; and information from criminal proceedings regarding the alleged conspiracy, they gained an appreciation of some of the strengths and weaknesses of this action. (Pls.' Counsel's Decl. ¶¶ 49-50, 57-62, 67-68, 110.) In particular, Plaintiffs' Counsel noted that not all of the auctions were rigged and that for the auctions that were "rigged," Plaintiffs would be required to demonstrate what the liens would have sold for in a market free from collusion in order to establish damages. (Apr. 25, 2016 Unofficial Tr. 6:22-7:24, 16:23-17:4.) Plaintiffs' Counsel also noted that certain defendants were found not guilty of conspiracy in the criminal case based on the same conduct that is the subject of this action, and that objector Ms. Davies was unable to prevail on her conspiracy claim in state court foreclosure proceedings. (*Id.* at 13:10-14:6.) Plaintiffs' Counsel argues that these cases demonstrate the difficulties that they identified in proving Plaintiffs' claims. Based on the substantial informal discovery that Plaintiffs' Counsel conducted, the Court finds that Plaintiffs' Counsel was sufficiently well prepared and informed to engage in robust settlement negotiations. Thus, notwithstanding the absence of formal discovery in this litigation, the Court finds that this factor weighs in favor of approving the proposed settlements.

### D. Risks of Establishing Liability and Damages, and Maintaining a Class Action Through Trial

 **\*8**  The risks of establishing liability and damages "balance the likelihood of success and the potential damage award if the case were taken to trial against the benefits of an immediate settlement." *Prudential*, 148 F.3d at 319. As discussed above, here Plaintiffs' Counsel argues that the risk of proving liability is evidenced by the successful motions

to dismiss of certain defendants, not guilty verdicts in the criminal case against the Wolfson Defendants, and Ms. Davies's inability to prevail on her counterclaim in the state foreclosure action. (Pls.' Opening Br. 19-21.) In addition, they cite the difficulties in certifying a class and note that absent settlement, Defendants would have opposed certification and moved for summary judgment. (Pls.' Settlement Reply Br. 11.) Ms. Davies, however, argues that "the fact that **fifteen** Defendants pleaded guilty, or were convicted, makes the risk of establishing liability far lower than in a typical class action." (Objector's Br. 15.) In addition, Ms. Davies argues that "Class Counsel have provided no reason why the calculation of the class's damages has suddenly become more complex" from the time that they calculated damages for the Amended Complaint. (*Id.* at 16.) The Court disagrees with Ms. Davies. As Class Counsel argues, to establish liability and damages Plaintiffs must prove not only that a particular auction was rigged but that absent the conspiracy, the interest rate for the lien would have been lower. Contrary to Ms. Davies's suggestion, Plaintiffs cannot prevail in this showing by relying merely on the allegations in the Amended Complaint. Moreover, given that Plaintiffs' Counsel has learned that not all of the auctions were rigged (and even in some of the auctions that were rigged the interest rates were not necessarily higher than they would have been absent the conspiracy), the Court agrees that there is a significant risk that Plaintiffs would not be able to prevail on their claims at trial, and that there is a significant risk that Plaintiffs would not be able to maintain a class action through trial. In addition, with respect to the guilty pleas Ms. Davies cites, the Court finds that these pleas are of limited utility given that they do not identify which auctions were rigged. (*See* Pls.' Counsel's Decl., Exs. 2-10, ECF No. 439-1.) Thus the Court finds that the risk of establishing liability and damages and of maintaining a class through trial weigh in favor of approving settlement.

### E. Ability of Defendants to Withstand a Greater Judgment

The Defendants' ability to withstand a greater judgment is relevant to approval of the settlement where, as here, "[D]efendant[s'] professed inability to pay is used to justify the amount of the settlement." *In re Nat'l Football League Players' Concussion Injury Litig.*, 821 F.3d at 440. Here, Plaintiffs cite the inability of certain individual defendants to withstand greater judgment and argue that this factor weighs in favor of approving settlement. (Pl.'s Opening Br. 22.) Ms. Davies, however, argues that because the Defendants are jointly liable, the inability of certain defendants to

Case 3:16-cv-00085-MEM   Document 176-1   Filed 09/25/20   Page 65 of 147

In re New Jersey Tax Sales Certificates Antitrust Litig, Not Reported in Fed. Supp. (2016)

2016 WL 5844319

withstand a greater judgment is not relevant. (Objectors' Br. 14.) Rather, Ms. Davies argues that "[t]he relevant inquiry is the financial condition of the Defendants as a whole, regardless of whether certain Defendants may be unable to pay a greater judgment." (*Id.*) Thus, Ms. Davies argues that because Plaintiffs have not shown that the larger corporate defendants would be unable to pay a larger judgment, this factor does not weigh in favor of approving the proposed settlements. The Court agrees with Ms. Davies. Accordingly, this factor does not weigh in favor of approving settlement.

### F. Range of Reasonableness of Settlement Fund
Finally, the Court must determine "whether the settlement represents a good value for a weak case or a poor value for a strong case." *In re Warfarin*, 391 F.3d at 538. In other words, the Court must determine whether the settlement amount is reasonable in light of both the best possible recovery and the risks of not prevailing at trial. In her opposition, Ms. Davies argues that the Court does not have the requisite information to determine the reasonableness of the settlement amount, and in addition, the information that is available suggests that the settlement award is inadequate. (Objector's Br. 8-12.) With respect to the range of reasonableness, Plaintiffs' Counsel asserts that from their review of the bid books and proffer sessions with certain defendants, they have since learned that not all of the auctions at issue were rigged, and even for those auctions in which Defendants conspired, some of the rates that resulted did not exceed the rate that would have been expected in the absence of a conspiracy. Ms. Davies's counsel, however, contends that without access to the bid books, Ms. Davies, as well as the Court, is unable to determine Plaintiffs' damages. (Objectors' Br. 8.) The Court agrees that it is not possible to predict the precise value of damages that Plaintiffs would recover if successful. The absence of this information does not, however, preclude the Court from evaluating the reasonableness of the proposed settlements. *See Yaeger*, 2016 WL 4541861, at *11 (finding that "[i]t is not possible to forecast the precise value of the damages plaintiffs would likely recover if successful" but concluding that settlement was reasonable.).

**\*9** Arguing that the information that is available suggests that the settlement is inadequate, Ms. Davies provides the following description of her calculation of the best possible recovery:

> One year's interest at 18% on $200 million of Tax Sales Certificates amounts to $36 million annually. That is almost $400 million over the Class Period. Trebling this number

yields damages over $1.2 billion. On top of that, the class would be entitled to prejudgment interest from 1998-2009 to present.

(Objectors' Br. 9-10 (emphasis omitted).) As an initial matter, the Court exercises its discretion to evaluate the comparison of potential single damages of the class rather than treble damages. *See Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 324 (3d Cir. 2011) (stating that a district court is not required to consider treble damages in assessing the fairness of a proposed settlement and finding no abuse of discretion where the district court used single damages to assess the fairness). Thus, accepting Ms. Davies's calculations the Court evaluates the reasonableness of the settlement fund in light of a best possible recovery of $400 million. Given the significant risks of establishing liability, damages, and maintaining a class action, as discussed above, the Court finds that the settlements, which include cash settlements that are approximately 2.5% of the best possible recovery in addition to a discounted rate on outstanding liens, fall within the range of reasonableness. *See also In re Ionosphere Clubs, Inc.*, 156 B.R. 414, 427 (S.D.N.Y. 1993), *aff'd*, 17 F.3d 600 (2d Cir. 1994) ("[T]here is no reason, at least in theory, why a satisfactory settlement could not amount to a hundredth or even a thousandth part of a single percent of the potential recovery."); *In re AT&T Corp. Sec. Litig.*, No. 00-5364, 2005 WL 6716404, at *6 (D.N.J. Apr. 25, 2005) ("In the present case, although the best possible recovery had yet to be determined, a recovery of $ 100,000,000 represents a material percentage considering the significant risks [p]laintiffs faced in establishing liability."). Thus, this factor weighs in favor of approving the proposed settlements.

Finally, the Court also finds that additional factors weigh in favor of approving the proposed settlements, such as the ability of Class members to opt out of the settlements. In addition, as the Court noted during the hearing on Plaintiffs' motion for preliminary approval of certain proposed settlements, the Court finds that experienced counsel engaged in arms length negotiations. (Oct. 29, 2015 Tr. 52:16-19; 54:4-9.)

Having found that the majority of the factors considered weigh in favor of approving the settlements, the Court approves the proposed settlements.

### IV. Attorneys' Fees, Reimbursement of Litigation Expenses, and Incentive Awards
Under Rule 23(h)(1) of the Federal Rules of Civil Procedure, Plaintiffs' Counsel must direct notice of the motion for

Case 3:16-cv-00085-MEM Document 176-1 Filed 09/25/20 Page 66 of 147
In re New Jersey Tax Sales Certificates Antitrust Litig, Not Reported in Fed. Supp. (2016)
2016 WL 5844319

attorneys' fees to Class members in a reasonable manner. Fed. R. Civ. P. 23(h)(1). Here, as discussed above, Plaintiffs' Counsel's notice was distributed pursuant to the approved notice plan. (Pls.' Fee Moving Br. 11-12.) The section of the on-line notice titled "How will the lawyers be paid?" provided:

**\*10** Any fees and expenses approved by the Court will be paid out of the Settlement Fund. To date, Settlement Class Counsel have not received any payment for any work done on this case since it began. You will not be personally responsible for payment of attorneys' fees or expenses for Settlement Class Counsel. Instead, Settlement Class Counsel will ask the Court to approve payment of attorneys' fees in an amount not to exceed one-third of the monetary total of all the Settlements. Settlement Class Counsel will also seek reimbursement of reasonably incurred expenses. As to the fees and expenses sought by Settlement Class Counsel and approved by the Court, Settlement Class Counsel intend to deduct the fees and expenses from each settlement on a proportional basis. The expenses will be deducted from the Proposed Settlements, following the deduction for attorneys' fees .... These fees would pay Settlement Class Counsel for investigating the facts, litigating the case, and negotiating the Proposed Settlements.

(Nov. 4, 2015 Order, Ex. 1 ("Long Form Notice") 15, ECF No. 428.) The notice also provided the procedure for opting out and making objections to the proposed Settlements. (*Id.* at 13-16.) No objections were made with respect to the Motion for Attorneys' Fees, Reimbursement of Litigation Expenses and Incentive Awards. After careful consideration, the Court makes the following findings of fact and conclusions of law pursuant to Rules 23(h)(3) and 52(a) of the Federal Rules of Civil Procedure:

1. Plaintiffs' Counsel submitted declarations of the time expended, the services rendered, and the current billing rates charged to clients, together with expenses incurred in pursuing this class action, all in compliance with Rule 54(d) of the Federal Rules of Civil Procedure. (Pls.' Counsel's Decl., Exs. 22-37, ECF No. 439-1.)

2. These submissions are summarized as follows:

   a. Class Counsel have expended 4,724.35 hours in this litigation, and all other plaintiffs' counsel have devoted another 2,384.7 hours.

   b. The lodestar from Plaintiffs' Counsel from March 2012 through January 2016 of $3,750,782.

   c. Counsel incurred costs and expenses of $83,047.92 on behalf of this class in this action.

3. The documentation submitted in support of the request for attorneys' fees adequately describes the services rendered, the hourly rate of each attorney and paralegal performing services, and the expenses incurred, all based upon contemporaneous billing records.

**A. Attorneys' Fees, Costs, and Expenses**

"Attorneys' fees are typically assessed through the percentage-of-recovery method or through the lodestar method." *In re AT& T Corp.*, 455 F.3d 160,164 (3d Cir. 2006). In antitrust cases like this one, the percentage-recovery method is generally favored and the lodestar method is used to crosscheck this calculation. *Id.* "The crosscheck is performed by dividing the proposed fee award by the lodestar calculation, resulting in the lodestar multiplier." *Id.* If the multiplier is too high, the court should reconsider its calculation. *Id.*

When analyzing whether a requested fee is appropriate under the percentage-of-recovery method, a district court generally considers the following factors:

(1) the size of the fund created and the number of persons benefitted;

(2) the presence or absence of substantial objections by members of the class to the settlement terms and/or fees requested by counsel;

(3) the skill and efficiency of the attorneys involved;

(4) the complexity and duration of the litigation;

(5) the risk of nonpayment;

(6) the amount of time devoted to the case by plaintiffs' counsel; and

(7) the awards in similar cases.

*Id.* at 165(quoting *Gunter v. Ridgewood Energy Corp.*, 223 F.3d 190, 195 n.1 (3d Cir. 2000)).

First, the Court finds that the award of nearly ten million dollars in addition to discounts on outstanding liens for the benefit of thousands of class members justifies an attorneys' fee award of approximately three million dollars. Second, the lack of objections to the requested fee in the present case

justifies the award. Third, the history of this litigation, which, as discussed above, has included extensive motion practice and informal discovery; Plaintiffs' Counsel's submissions, which detail the work performed in connection with this litigation; and Plaintiffs' Counsel's familiarity with antitrust and class action litigation, which the Court recognized in its decision appointing interim lead counsel (Mem. Op. 2, ECF No. 108), justify the award. Fourth, as discussed above, this litigation pertained to complex issues in terms of proving conspiracy claims and included extensive motion practice. Thus, the Court finds that this factor also justifies the award. Fifth, as detailed in Plaintiffs' Counsel's submissions, counsel has expended significant resources in terms of attorney time and costs to litigate this matter and to date have not received any compensation. Thus, the Court finds that both the risk of non-payment and the amount of time devoted to the litigation justify the award. Finally, the Court finds that the approximately thirty percent fee that is sought here falls within the range of awards approved in similar cases. *See In re Ins. Brokerage Antitrust Litig.*, 297 F.R.D. 136, 155 (D.N.J. 2013) (stating that a thirty-three percent fee award "has regularly been found acceptable in common fund settlements in this District") (collecting cases).

 **\*11**  Having found that the percentage-recovery-fee sought is appropriate, the Court cross checks the fee award by applying the lodestar analysis. "The lodestar analysis is performed by 'multiplying the number of hours reasonably worked on a client's case by a reasonable hourly billing rate for such services based on the given geographical area, the nature of the services provided, and the experience of the attorneys.' " *Id.* at 156. Here, Plaintiffs' Counsel's billing rates range from approximately $275 to $980. (Pls.' Counsel's Deel., Exs. 23-37.) Considering the blended billing rate, the Court finds that Plaintiffs' Counsel's hourly rates are reasonable based on the seniority of the attorneys and the given geographical area. Likewise, the Court finds that the hourly rates of the support staff are also reasonable. In addition, the Court notes that Plaintiffs' Counsel tried to avoid duplicating efforts and to ensure efficiency by requiring all counsel to submit monthly time and expense reports to the Interim Liaison Counsel throughout the duration of this case. Dividing the proposed fee award by the product of the total hours and the blended billing rate, the lodestar multiplier is 76.7%. This negative multiplier confirms the reasonableness of the requested fee award. *See In re Ins. Brokerage Antitrust Litig.*, 579 F.3d 241, 284-85 (3d Cir. 2009) (affirming fee award noting that lodestar multiplier was less than one). Likewise, having reviewed Plaintiffs' submissions detailing their expenses,

which include costs of tax preparation fees for tax returns of the settlement funds, a vendor that assisted in creating a database of Class Members, a mediator, and a process server, the Court finds that the expenses totaling $83,047.92 are reasonable.

#### B. Incentive Awards

Finally, the Court approves incentive award payments of $3,500 to each of the four Class Representatives. "Incentive awards are 'important to compensate plaintiffs for the time and effort expended in assisting the prosecution of the litigation, the risks incurred by becoming and continuing as a litigant, and any other burdens sustained by the plaintiff.' " *O'Brien v. Brain Research Labs, LLC*, 2012 WL 3242365, at \*31 (D.N.J. Aug. 9, 2012) (quoting *O'Connor v. A.R. Res., Inc.*, No. 08-1703,2012 WL 12743, at \*9 (D. Conn. Jan. 4, 2012)). Here, the Court accepts the representations of Plaintiffs' Counsel that the named plaintiffs played an active role in this litigation and protected the interests of the Class by monitoring the litigation, reviewing pleadings, motion papers, and settlements, and in some instances, traveling to observe Court proceedings. (Pls.' Counsel's Decl. ¶ 315.) The Court also accepts Plaintiffs' Counsel's representation that they did not promise the named plaintiffs an incentive award. (*Id.* ¶ 316.) The requested incentive award of $3,500 is within the range of reasonableness of comparable incentive awards in courts in this Circuit. *See, e.g.*, *In re Ins. Brokerage Antitrust Litig.*, 282 F.R.D. at 125 (approving an incentive award of $5,000 for each of the seventeen named plaintiffs); *Varacallo*, 226 F.R.D. at 259 (awarding $3,000 to named plaintiff minimally involved in case preparation). Moreover, the named plaintiffs' duties are not at an end, rather they must continue to monitor the administration of the settlement, and thus should be compensated for these tasks.

#### V. Conclusion

For the reasons discussed above, the Court grants Plaintiffs' motions for "Final Approval of All Class Settlements, Final Certification of Settlement Class, and Final Approval of Plan Allocation" and for "Attorneys' Fees and Reimbursement of Expenses to Plaintiffs' Counsel, and for Incentive Awards to Representative Plaintiffs."

**Dated:** September 30, 2016.

**All Citations**

Not Reported in Fed. Supp., 2016 WL 5844319

WESTLAW    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

**In re New Jersey Tax Sales Certificates Antitrust Litig, Not Reported in Fed. Supp. (2016)**

2016 WL 5844319

---

**End of Document**                                    © 2020 Thomson Reuters. No claim to original U.S.
Government Works.

Case 3:16-cv-00085-MEM    Document 176-1    Filed 09/25/20    Page 69 of 147

In re Par Pharmaceutical Securities Litigation, Not Reported in F.Supp.2d (2013)
2013 WL 3930091, Fed. Sec. L. Rep. P 97,579

2013 WL 3930091
NOT FOR PUBLICATION
United States District Court, D. New Jersey.

In re PAR PHARMACEUTICAL
SECURITIES LITIGATION.

Civil Action No. 06–3226 (ES).
|
July 29, 2013.

**OPINION**

[SALAS](), District Judge.

**\*1** This matter comes before the Court upon request by Lead Plaintiff Louisiana Municipal Employees Retirement System ("Lead Plaintiff" or "LAMPERS"), pursuant to [Fed.R.Civ.P. 23(e)](), for final approval of the Stipulation of Settlement (Stipulation of Settlement "Settlement," D.E. 306–2) with Defendants Par Pharmaceutical Companies, Inc. ("Par"), Dennis J. O'Connor, and Scott Tarriff (collectively, "Defendants") and approval of the proposed Plan of Allocation for the settlement proceeds. (Motion for Final Approval of Class Action Settlement and For Approval of Plan of Allocation, D .E. No. 316). Also pending before this Court is Lead Counsel's Motion for Award of Attorneys' Fees, Reimbursement of Litigation Expenses, and Compensatory Award to Lead Plaintiff.[1] (Motion for an Award of Attorneys' Fees, Reimbursement of Litigation Expenses, and Compensatory Award to Lead Plaintiff, D.E. No. 317). The Court held a fairness hearing on July 2, 2013 at 10:30 a.m.

[1]    Former Co–Lead Counsel Federman & Sherwood also submitted a Motion for Attorneys' Fees and Reimbursement of Expenses, (D.E. No. 318); however, Federman & Sherwood withdrew the motion during the July 2, 2013 fairness hearing and all counsel agreed to meet and confer regarding the allocation of the 30% attorneys' fee request, (July 2, 2013 Fairness Hearing Tr. 25:22–26:2, 29:23–30:18). Furthermore, Defendants do not oppose the Motion for Final Approval of Class Action Settlement and For Approval of Plan of Allocation, and take no position on the Motion for an Award of Attorneys' Fees, Reimbursement of Litigation

Expenses, and Compensatory Award to Lead Plaintiff. (*Id.* at 7:20–8:2).

For the reasons set forth below, the Court will approve the Settlement and the Plan of Allocation and grant Lead Counsel's Motion for Award of Attorneys' Fees, Reimbursement of Litigation Expenses, and Compensatory Award to Lead Plaintiff.

**I. Background**

This class action involves allegations of securities fraud brought on behalf of investors in Par, a Delaware corporation headquartered in New Jersey, which develops, manufactures, and distributes generic and branded drugs. (Lead Plaintiff's Second Consolidated Amended Complaint ("SAC") ¶ 2, D.E. No. 133). Lead Plaintiff, on behalf of itself and each of the class members, alleged that Defendants issued materially false and misleading statements concerning Par's financial performance and prospects. (*Id.*).

On July 5, 2006, Par announced plans to restate its financial statements for fiscal years 2004, 2005, and the first quarter of 2006 to correct "an understatement of accounts receivable reserves which resulted primarily from delays in recognizing customer credits and uncollectible customer deductions." (SAC ¶ 4). In response, Par common stock dropped from $18.25 per share to $13.47 per share. (SAC ¶ 5). On December 14, 2006, Par announced additional plans to restate its financial statements for the period prior to 2004 and previously reported revenues through the first quarter of 2006. (SAC ¶ 8). On March 13, 2007, Par filed its restatement for 2001 through 2005. (SAC ¶ 9). On July 10, 2007, Par filed its restatement for the first quarter of 2006. (*Id.*). In its restatements, Par admitted that it had understated its accounts receivable reserves by more than $83.5 million and overvalued its inventories by more than $9.9 million. (*Id.*).

As a result, Lead Plaintiff alleged that Defendants violated § 10(b) of the Securities Exchange Act of 1934 and Securities and Exchange Commission Rule 10b–5. (*Id.* ¶ 204). Lead Plaintiff further alleged that Defendants Dennis O'Connor and Scott Tarriff violated § 20(a) of the Securities Exchange Act of 1934. (*Id.* ¶ 208).

**\*2** On August 8, 2011, the Court appointed LAMPERS as sole Lead Plaintiff and Berman DeValerio as sole Lead Counsel.[2] (D.E. No. 258). On July 23, 2012, the Court granted Lead Plaintiff's Motion for Class Certification. (Opinion & Order, D.E. Nos. 286–87).

2013 WL 3930091, Fed. Sec. L. Rep. P 97,579

2    On August 8, 2011, the Court vacated the November 15, 2006 Order, thereby removing Snow Capital Investment Partners and WR Capital Management as Co–Lead Plaintiffs and Federman & Sherwood and Robbins Geller Rudman & Dowd LLP as Co–Lead Counsel. (D.E. No. 81).

Thereafter, on October 24, 2012, LAMPERS, on behalf of itself and the class, and Defendants engaged in mediation with Jed D. Melnick, Esq. of Judicial Arbitration and Mediation Services ("JAMS"). (Settlement 4). After extensive, arm's-length negotiations during the mediation, the parties reached an agreement in principle to settle the litigation. (*Id.*).

The terms of the Settlement provide for payments to members of the class, i.e., persons who purchased Par stock from July 23, 2001 through July 5, 2006. (*Id.* ¶ 1.4). Specifically, the Settlement comprises an aggregate total sum of $8.1 million. (*Id.* ¶ 2.1). The parties agree that this figure represents approximately 7% of total class-wide damages. (Memorandum of Law in Support of Lead Plaintiff's Motion for Final Approval of Class Action Settlement and for Approval of Plan of Allocation ("Pl. Br. for Settlement Approval") 1, D.E. No. 316–1).

The Court now turns to Lead Plaintiff's request for approval of the Settlement and Plan of Allocation and Lead Counsel's Motion for Award of Attorneys' Fees, Reimbursement of Litigation Expenses, and Compensatory Award to Lead Plaintiff.

## II. Standard of Review

### A. Settlement and Plan of Allocation Approval
Federal Rule of Civil Procedure 23(e) provides that "[t]he claims, issues, or defenses of a certified class may be settled, voluntarily dismissed, or compromised only with the court's approval ." Fed.R.Civ.P. 23(e). In determining whether to approve a class action settlement pursuant to Rule 23(e), "the district court acts as a fiduciary who must serve as a guardian of the rights of absent class members." *In re Gen. Motors Corp. Pick—Up Truck Fuel Tank Prod. Liab. Litig.,* 55 F.3d 768, 785 (3d Cir.1995) (quoting *Grunin v. Int'l House of Pancakes,* 513 F.2d 114, 123 (8th Cir.1975)).

Before giving final approval to a proposed class action settlement, the Court must determine that the settlement is "fair, adequate, and reasonable." *Girsh v. Jepson,* 521 F.2d 153, 157 (3d Cir.1975). In *Girsh,* the Third Circuit

identified nine factors that a district court should consider when determining whether a settlement is fair, adequate, and reasonable:

> (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

**\*3** *Id.*

"These factors are a guide and the absence of one or more does not automatically render the settlement unfair. Rather, the court must look at all the circumstances of the case and determine whether the settlement is within the range of reasonableness under *Girsh." In re Am. Family Enters.,* 256 B.R. 377, 418 (D.N.J.2000) (citing *In re Orthopedic Bone Screw Prods. Liab. Litig.,* 176 F.R.D. 158, 184 (E.D.Pa.1997)).

The "[a]pproval of a plan of allocation of a settlement fund in a class action is governed by the same standards of review applicable to approval of the settlement as a whole: the distribution plan must be fair, reasonable and adequate." *In re Computron Software, Inc.,* 6 F.Supp.2d 313, 321 (D.N.J.1998) (citation & internal quotation marks omitted); *see also Walsh v. Great Atl. & Pac. Tea Co.,* 726 F.2d 956, 964 (3d Cir.1983) ("The Court's principal obligation is simply to ensure that the fund distribution is fair and reasonable as to all participants in the fund.").

### B. Attorneys' Fees
Pursuant to 29 U.S.C. § 216, the Court is authorized to award reasonable attorneys' fees to be paid by the defendant and costs of the action. 29 U.S.C. § 216. As recognized by the Supreme Court, "the district court has discretion in determining the amount of a fee award. This is appropriate in view of the district court's superior understanding of the litigation and the desirability of avoiding frequent appellate review of what essentially are factual matters." *Hensley v. Eckerhart,* 461 U.S. 424, 437, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983). That said, "it is incumbent upon a district court to make its reasoning and application of the fee-awards

2013 WL 3930091, Fed. Sec. L. Rep. P 97,579

jurisprudence clear, so that [a reviewing court has] a sufficient basis to review for abuse of discretion." *Gunter v. Ridgewood Energy Corp.,* 223 F.3d 190, 196 (3d Cir.2000).

In *Gunter,* the Third Circuit identified several factors that a district court should consider when evaluating a motion for an award of attorneys' fees. *Id.* at 195 n. 1. These factors include:

> (1) the size of the fund created and the number of persons benefitted; (2) the presence or absence of substantial objections by members of the class to the settlement terms and/or fees requested by counsel; (3) the skill and efficiency of the attorneys involved; (4) the complexity and duration of the litigation; (5) the risk of nonpayment; (6) the amount of time devoted to the case by plaintiffs counsel; and (7) the awards in similar cases.

*Id.; see also In re Rite Aid Corp. Sec. Litig.,* 396 F.3d 294, 301 (3d Cir.2005). "These fee award factors need not be applied in a formulaic way ... and in certain cases, one factor may outweigh the rest." *Rite Aid,* 396 F.3d at 301 (citation & internal quotation marks omitted). Nevertheless, district courts must "engage in robust assessments of the fee award reasonableness factors when evaluating a fee request." *Id.* at 302.

## III. Discussion

### A. Settlement

**\*4** The Court first turns to whether the Settlement and Plan of Allocation are fair, adequate, and reasonable in light of the *Girsh* factors. As detailed below, this Court finds that the balance of factors weighs in favor of approval of both the Settlement and Plan of Allocation.

### 1. Complexity, Expense and Likely Duration of Litigation

The first factor set forth in *Girsh* addresses the "probable costs, in both time and money, of continued litigation." *In re Cendant Corp. Litig.,* 264 F.3d 201, 233 (3d Cir.2001) (citation & internal quotation marks omitted). This factor weighs in favor of approval where "continuing litigation through trial would have required additional discovery, extensive pretrial motions addressing complex factual and legal questions, and ultimately a complicated, lengthy trial." *In re Warfarin Sodium II Antitrust Litig.,* 391 F.3d 516, 536 (3d Cir.2004).

Securities fraud class actions are notably complex, lengthy, and expensive cases to litigate. *See, e.g., In re Rent–Way Sec. Litig. .,* 305 F.Supp.2d 491, 501 (W.D.Pa.2003) ("[T]his has been, and will continue to be, a very expensive case to prosecute and defend in light of the complexity of the issues and necessity for expert witnesses."). Here, "[s]ignificant, complex, expensive, and lengthy litigation remained ahead ... including summary judgment, pre-trial motions, and post-trial appeals, as well as additional discovery and depositions to prepare for summary judgment and trial." (Pl. Br. for Settlement Approval 8). This mater has been pending for seven years, and even if Lead Plaintiff were to succeed at trial, "necessary delay through a trial, post-trial motions, and the appellate process would likely deny the Class any recovery for years, an unfavorable result for all parties." *In re Lucent Techs., Inc. Sec. Litig.,* 307 F.Supp.2d 633, 642 (D.N.J.2004).

Given the procedural and substantive complexities inherent in securities fraud class actions, and the time and expense necessarily involved in fully adjudicating this matter, the Court finds that this factor weighs decidedly in favor of approving the Settlement.

### 2. The Reaction of the Class to the Settlement

The second factor set forth in *Girsh* "attempts to gauge whether members of the class support the settlement." *In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions,* 148 F.3d 283, 318 (3d Cir.1998). Where "no Class members have sought to exclude themselves from the class," this factor "weighs strongly in favor of approval." *In re Datatec Sys. Inc. Sec. Litig.,* No. 4–525, 2007 WL 4225828, at \*3 (D.N.J. Nov.28, 2007); *see also Bradburn Parent Teacher Store, Inc. v. 3M,* 513 F.Supp.2d 322, 331 (E.D.Pa.2007) ("[T]otal absence of objections argues in favor of the proposed settlement."). This factor is especially critical to the Court's fairness analysis, as the reaction of the class "is perhaps the most significant factor to be weighed in considering [the settlement's] adequacy." *Sala v. Nat'lR.R. Passenger Corp.,* 721 F.Supp. 80, 83 (E.D.Pa.1989).

**\*5** On February 15, 2013, Lead Counsel sent notice to 8,186 persons identified as potential class members and nominees for beneficial owners. (Pl. Br. for Settlement Approval 11). By May 29, 2013, Lead Counsel sent and/or delivered an additional 76,386 notice packets on behalf of banks, brokers, and other nominees through the fulfillment request process. (*Id.* at 11–12). On February 25, 2013, the Summary Notice was published in the national edition of *Investor's Business Daily* and issued over the *PR Newswire.* (*Id.* at 12). Objections

2013 WL 3930091, Fed. Sec. L. Rep. P 97,579

to the Settlement or requests for exclusions from the class were to be postmarked no later than April 1, 2013. (*Id.*).

Lead Counsel did not receive a single objection to the Settlement, nor did Lead Counsel receive any valid requests for exclusion. (*Id.*). Given the size of the class, the lack of any objections or exclusions strongly supports approval of the Settlement.

### 3. Stage of the Proceedings and the Amount of Discovery Completed

The third factor set forth in *Girsh* considers the "degree of case development that class counsel have accomplished prior to settlement," including the type and amount of discovery already undertaken. *In re General Motors Corp. Pick—Up Truck Fuel Tank Prod. Liab. Litig.,* 55 F.3d 768, 813 (3d Cir.1995); *see also Prudential,* 148 F.3d at 319 ("To ensure that a proposed settlement is the product of informed negotiations, there should be an inquiry into the type and amount of discovery the parties have undertaken."). In short, this factor considers whether the amount of discovery completed permits counsel to "have an adequate appreciation of the merits of the case before negotiating." *Id.*

On July 23, 2012, the Court granted Lead Plaintiff's Motion for Class Certification. (Order Granting Motion to Certify Class, D.E. No. 287). Immediately thereafter, Lead Counsel entered into negotiations with Defendants over document requests and served subpoenas on numerous non-parties, including Par's outside auditors, consultants, attorneys, and software vendors. (Pl. Br. for Settlement Approval 12). As a result, Lead Counsel "received, reviewed, and analyzed hundreds of thousands of pages of relevant documents." (*Id.*). Lead Counsel engaged in highly-involved factual and legal investigations, which included interviewing former Par employees and retaining an experienced economist to assess likely damages. (*Id.*).

Lead Plaintiff avers, and this Court agrees, that the Settlement was reached only after "extensive factual investigation and comprehensive legal briefing," thereby providing Lead Plaintiff with a thorough understanding of the strengths and weaknesses of the case. (*Id.; see also* July 2, 2013 Fairness Hearing Tr. 20:24–22:9). Therefore, this factor weighs in favor of approving the Settlement.

### 4. The Risks of Establishing Liability

The fourth factor set forth in *Girsh* considers "what the potential rewards (or downside) of litigation might have been had class counsel decided to litigate the claims rather than settle them ." *Cendant,* 264 F.3d at 237. (citation & internal quotation marks omitted). Courts must "attempt to balance the likelihood of success at trial against the benefits of immediate settlement." *Rent–Way,* 305 F.Supp.2d at 504; *see also Prudential,* 148 F.3d at 319 (finding this factor to weigh in favor of approval because of plaintiffs' foreseeable burden at trial).

**\*6** In order to prevail on its claims, Lead Plaintiff "would have to establish, among other elements, that Defendants' public statements contained misrepresentations or omissions, those misrepresentations or omissions were material, that Defendants acted with scienter, and that Defendants' statements caused losses." (Pl. Br. for Settlement Approval 14). Lead Plaintiff submits that its ability to prove Defendants' scienter is unclear. (*Id.*). Moreover, "Defendants vigorously contend that Lead Plaintiff would not be able to establish scienter," which requires Lead Plaintiff to prove "either knowing or reckless misconduct." (*Id.* at 14–15). The Third Circuit has adopted the following standard for recklessness under Rule 10b–5:

> [H]ighly unreasonable (conduct), involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, ... which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.

*U.S. S.E.C. v. Infinity Grp. Co.,* 212 F.3d 180, 192 (3d Cir.2000) (citation omitted); *see also Datatec,* 2007 WL 4225828, at \*4 ("Lead Plaintiff[ ] would face the formidable task of proving scienter and loss of causation.").

Given these significant risks to establishing liability at trial, the Court finds that the fifth factor weighs in favor of approving the Settlement.

### 5. The Risks of Establishing Damages

Like the fourth factor, the fifth factor set forth in *Girsh* "attempts to measure the expected value of litigating the action rather than settling it at the current time." *General Motors Corp.,* 55 F.3d at 816. The Court compares a potential damage award if the case were taken to trial against the benefits of immediate settlement. *Prudential,* 148 F.3d at 319. "Normally, proving damages involves many of the same risks as proving liability because the former is contingent upon the

In re Par Pharmaceutical Securities Litigation, Not Reported in F.Supp.2d (2013)
2013 WL 3930091, Fed. Sec. L. Rep. P 97,579

latter." *Rent–Way,* 305 F.Supp.2d at 505 (citation & internal quotation marks omitted).

It is axiomatic that both Lead Plaintiff and Defendants would rely on expert testimony to assist the jury in determining damages at trial. Courts in this district have recognized that competing expert testimony presents significant risks to Lead Plaintiff's success in establishing damages. *See Cendant,* 264 F.3d at 239 ("[E]stablishing damages at trial would lead to a 'battle of experts' with each side presenting its figures to the jury and with no guarantee whom the jury would believe."); *see also Rent–Way,* 305 F.Supp.2d at 506 ("A jury would therefore be faced with competing expert opinions representing very different damage estimates, thus adding further uncertainty as to how much money—if any—the Class might recover at trial.").

Moreover, Defendants "have made clear that they strongly disagree with Lead Plaintiff's estimate of likely recoverable damages." (Pl. Br. for Settlement Approval 16). Given the inherent unpredictability and risk associated with damage assessments in the securities fraud class-action context, the Court finds that this factor weighs in favor of approving the Settlement.

### 6. The Risks of Maintaining a Class Action through the Trial

 **\*7**  Pursuant to Fed.R.Civ.P. Rule 23, a court may decertify a class during litigation if it proves to be unmanageable. *Prudential,* 148 F.3d at 321 (citations omitted). To the extent such risk is low, courts tend to place less weight on this factor. *See Cendant,* 264 F.3d at 239 (finding that the risk of decertification was extremely slight, rendering this factor effectively neutral); *see also Rent–Way,* 305 F.Supp.2d at 506–07 ("Our Court of Appeals has recognized that this exercise is somewhat perfunctory, since the district court always retains the discretion to decertify or modify a class that becomes unmanageable.").

This Court granted class certification on July 23, 2012. (Order Granting Motion to Certify Class, D.E. No. 287). Although there may be inherent risks in maintaining a class throughout trial, there is nothing in the record to suggest decertification is likely here. The Court finds that this factor is effectively neutral.

### 7. The Ability of Defendants to Withstand a Greater Judgment

The seventh factor set forth in *Girsh* considers "whether the defendants could withstand a judgment for an amount significantly greater than the Settlement." *Cendant,* 264 F.3d at 240. Notably, even a finding that this factor cuts against Settlement approval may not materially alter the Court's fairness analysis. *See, e.g., Bradburn Parent Teacher Store,* 513 F.Supp.2d at 333 (finding that even when defendant "likely can withstand a judgment significantly greater than the Settlement ... this determination in itself does not carry much weight in evaluating the fairness of the Settlement."); *Warfarin,* 391 F.3d at 538 (concluding that Defendant's ability to pay a higher amount was irrelevant in determining the fairness of the settlement).

As of year-end 2011, Par had a market capitalization of approximately $1.2 billion, and it reported $162.52 million of cash equivalents. (Pl. Br. for Settlement Approval 18). Yet, Lead Plaintiff argues that Par's directors' and officers' insurance was rapidly depleting as a result of the present litigation, and "if the case proceeded to trial and the likely appeals, the policies almost certainly would have been severely depleted." (*Id.*). Moreover, Lead Plaintiff argues that Par's financial position months or years from now is very difficult to predict, given the highly competitive pharmaceutical market in which Par operates. (*Id.*).

Considering Par's financial position, the arguments advanced by Lead Plaintiff, and the uncertainty of trial outcomes, the Court finds that this factor slightly weighs in favor of approving the Settlement.

### 8. The Range of Reasonableness of the Settlement Fund in Light of the Best Possible Recovery and in Light of the Attendant Risks of Litigation

The final two factors set forth in *Girsh* are typically considered in tandem, and "ask whether the settlement is reasonable in light of the best possible recovery and the risks the parties would face if the case went to trial." *Prudential,* 148 F.3d at 322. In making this assessment, the Court compares the present value of the damages plaintiffs would likely recover if successful, appropriately discounted for the risk of not prevailing, with the amount of the proposed settlement. *General Motors,* 55 F.3d at 806 (citation & internal quotation marks omitted).

 **\*8**  Here, Lead Plaintiff maintains that the Settlement's 7% recovery of total class-wide damages "is consistent with or above the average level of recovery in similar securities fraud class actions." (Pl. Br. for Settlement Approval 20); *see*

Case 3:16-cv-00085-MEM    Document 176-1    Filed 09/25/20    Page 74 of 147

In re Par Pharmaceutical Securities Litigation, Not Reported in F.Supp.2d (2013)
2013 WL 3930091, Fed. Sec. L. Rep. P 97,579

*also In re Raviscent Techs., Inc. Sec. Litig.,* No. 00–1014, 2005 WL 906361, at *9 (E.D.Pa. Apr.18, 2005) ("As another court in this District has noted, a study by Professor John C. Coffee, Jr., Adolf A. Berle Professor of Law at Columbia University Law School, determined that since 1995, class action settlements have typically recovered between 5.5% and 6.2% of the class members' estimated losses.") (citations & internal quotation marks omitted).

As detailed in Sections III.A.4 and III.A.5, *supra,* the Court appreciates the significant risks associated with the full adjudication of this matter. In addition, Lead Plaintiff's 7% recovery figure suggests that the Settlement is within the proper range of reasonableness in light of the best possible recovery. Therefore, the Court finds that both of these factors weigh in favor of approving the Settlement.

In sum, the Court finds that the balance of the *Girsh* factors decidedly weighs in favor of approving the Settlement.

### B. Plan of Allocation

The Court next considers whether to approve Lead Plaintiff's Plan of Allocation.

The "[a]pproval of a plan of allocation of a settlement fund in a class action is governed by the same standards of review applicable to approval of the settlement as a whole: the distribution plan must be fair, reasonable and adequate." *Datatec,* 2007 WL 4225828, at *3 (citation omitted). "The court's principal obligation is simply to ensure that the fund distribution is fair and reasonable as to all participants in the fund." *Walsh v. Great Alt. & Pac. Tea Co.,* 726 F.2d 956, 964 (3d Cir.1983). Moreover, "[t]he proposed allocation need not meet the standards of scientific precision, and given that qualified counsel endorses the proposed allocation, the allocation need only have a reasonable and rational basis." *In re The Mills Corp. Sec. Litig.,* 265 F.R.D. 246, 268 (E.D.Va.2009).

Here, Lead Plaintiff developed the Plan of Allocation with the assistance of its damages expert. (Pl. Br. for Settlement Approval 21). The Plan of Allocation "provides for the distribution of the Net Settlement Funds on a *pro rata* basis based on a formula tied to liability and damages." (*Id.*). The calculation of each Authorized Claimant's Net Recognized Loss "will depend on several factors, including when the Authorized Claimant purchased his, her, or its Par stock during the Class Period, whether the stock was held over the

corrective disclosure, whether the stock was sold during the Class Period, and if so, when." (*Id.* at 22).

Lead Plaintiff's Plan of Allocation is fair, adequate, and reasonable. It is fully recommended by Lead Counsel, and, although notice was sent to over 84,572 potential class members, no member has objected to it. (*Id.* at 23). Therefore, the Court finds that the balance of factors weighs in favor of approving the Plan of Allocation.

### C. Award of Attorneys' Fees

 **\*9** Next, the Court considers Lead Counsel's request for an award of attorneys' fees.

Lead Counsel seeks $2,430,000, or 30% of the settlement fund, as attorneys' fees. (July 2, 2013 Fairness Hearing Tr. 29:23–30:18). Applying the factors set forth in *Gunter,* the Court finds that Lead Counsel's request for attorneys' fees is justified.

The Supreme Court has long recognized that "a litigant or a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole." *Boeing Co. v. Van Gemert,* 444 U.S. 472, 478, 100 S.Ct. 745, 62 L.Ed.2d 676 (1980); *see also In re Cendant,* 404 F.3d 173, 205 (3d Cir.2005) ("[W]e agree with the long line of common fund cases that hold that attorneys whose efforts create, discover, increase, or preserve a common fund are entitled to compensation.") (citation & internal quotation marks omitted).

First, courts consider "the size of the fund created and the number of persons benefitted." *Rite Aid,* 396 F.3d at 301 (citation omitted). Here, the $8.1 million settlement represents a sizeable recovery for the Par shareholders. As set forth in Section III.A.8, *supra,* this figure is "estimated to be approximately 7% of total class-wide damages, consistent with or above the average for securities fraud class actions." (Memorandum of Law in Support of Lead Counsel's Motion for Award of Attorneys' Fees, Reimbursement of Litigation Expenses & Compensatory Award to Lead Plaintiff ("Pl. Br. for Attorneys' Fees") 13, D.E. No. 317–1). Furthermore, the Settlement will benefit a significant number of individuals. The class consists of all persons who purchased Par stock from July 23, 2001 through July 5, 2006. (*Id.*). Lead Counsel mailed 84,572 notice packets to potential class members, and received 367 claims by the end of May, 2013. (*Id.* at 14). Thus, the size

2013 WL 3930091, Fed. Sec. L. Rep. P 97,579

of the fund and the number of persons benefitted support approving the requested fee.

Second, courts consider "the presence or absence of substantial objections by members of the class to the settlement and/or fees requested by counsel." *See Rite Aid, 396 F.3d at 305* ("[T]he absence of substantial objections by class members to the fee requests weigh[s] in favor of approving the fee request."). Here, as set forth in Section III.A.2, *supra,* Lead Counsel did not receive a single objection to the Settlement, nor did Lead Counsel receive any valid requests for exclusion. (Pl. Br. for Attorneys' Fees 14). The lack of any objections or exclusions strongly supports approval of the Settlement.

Third, courts consider "the skill and efficiency of the attorneys involved." *Rite Aid, 396 F.3d at 301* (citation omitted). Here, Lead Counsel and Liaison Counsel are highly skilled attorneys that specialize in complex federal civil litigation involving securities class actions. (Pl. Br. for Attorneys' Fees 15). Moreover, Defendants' counsel are highly-regarded attorneys who "zealously fought Lead Plaintiff's claims at every turn." (*Id.*). This factor strongly weighs in favor of approving the fee request.

 **\*10** Fourth, courts consider "the complexity, expense, and likely duration of the litigation." *Rite Aid, 396 F.3d at 301* (citation omitted). As set forth in Section III.A.1, *supra,* securities fraud class actions are notably complex, lengthy, and expensive cases to litigate. In addition, Lead Plaintiff faced further discovery and depositions in light of extensive preparation for summary judgment, pre-trial motions, and post-trial appeals. (Pl. Br. for Settlement Approval 8). As such, this factor weighs in favor of approving the fee request.

Fifth, courts consider the "risks of non-payment or non-recovery ." *Rite Aid, 396 F.3d at 301* (citation omitted). These risks include the "risks of establishing liability." *Id. at 304.* As set forth in Section III.A.4, *supra,* Lead Plaintiff faced substantial risks at trial, including the difficult tasks of proving scienter and establishing damages. Therefore, the Court finds that this factor weighs in favor of approving the fee request.

Sixth, courts consider the "amount of time devoted to the case." *Rite Aid, 396 F.3d at 301* (citation omitted); *see also In re AT & T Corp. Sec. Litig., 455 F.3d 160, 171 (3d Cir.2006)* (noting that this factor "overlaps with the third" factor). Through May 31, 2013, Lead Counsel and Liaison Counsel

"spent 7003 .4 hours of attorney and other professional support time prosecuting the action." (Pl. Br. for Attorneys' Fees 19). As noted in Section III.A.3, *supra,* Lead Counsel engaged in extensive factual and legal investigations, which included interviewing former Par employees and retaining an experienced economist to assess likely damages. The Court finds that this factor weighs in favor of approving the fee request.

Seventh, courts consider "the awards in similar cases." *Rite Aid, 396 F.3d at 301* (citation omitted). Lead Plaintiff submits, and this Court agrees, that "a fee of 30% or more of the settlement is common in cases settling for similar amounts." (Pl. Br. for Attorneys' Fees 20); *see also In re Remeron Direct Purchaser Antitrust Litig., No. 03–0085, 2005 WL 3008808 (D.N.J. Nov.9, 2005)* ("Courts within the Third Circuit often award fees of 25% to 33% of the recovery.") (citation omitted). The Court finds that Lead Counsel's fee request is comparable to fees typically awarded in analogous cases. As such, the final factor weighs in favor of approving the fee request.

In addition to assessing the *Gunter* factors, courts in the Third Circuit confirm the reasonableness of a fee by using the lodestar calculation method when a fee award is based on a percentage of recovery. *See Rite Aid, 396 F.3d at 305–06.* The lodestar analysis is performed by "multiplying the number of hours reasonably worked on a client's case by a reasonable hourly billing rate for such services based on the given geographical area, the nature of the services provided, and the experience of the attorneys ." *Id.*

 **\*11** Here, Lead Counsel's lodestar value is $3,037,533, a figure significantly higher than the requested fee. (Pl. Br. for Attorneys' Fees 10–11). Thus, the lodestar "cross-check" confirms the reasonableness of Lead Plaintiff's fee request.

### D. Reimbursement of Litigation Expenses

Next, the Court considers Lead Counsel's request for reimbursement of litigation expenses.

"Counsel in common fund cases is entitled to reimbursement of expenses that were adequately documented and reasonably and appropriately incurred in the prosecution of the case." *In re Cendant Corp. Deriv. Litig., 232 F.Supp.2d 327, 343 (D.N.J.2002); see also AT & T, 455 F.3d at 172 n. 8* ("Expenses are generally considered and reimbursed separately from attorneys' fees ....").

Case 3:16-cv-00085-MEM    Document 176-1    Filed 09/25/20    Page 76 of 147

In re Par Pharmaceutical Securities Litigation, Not Reported in F.Supp.2d (2013)
2013 WL 3930091, Fed. Sec. L. Rep. P 97,579

Lead Counsel "requests reimbursement of $587,928.43 in expenses advanced or incurred ... while prosecuting this Action." (Pl. Br. for Attorneys' Fees 21). The Court has carefully reviewed Lead Counsel's declarations summarizing and categorizing its expenses, and finds that Lead Counsel's request for reimbursement of litigation expenses is reasonable.

### E. Compensatory Award to LAMPERS

Finally, the Court considers whether to award LAM PERS a compensatory award for its role in the pending litigation.

The PSLRA states that "[n]othing in this paragraph shall be construed to limit the award of reasonable expenses (including lost wages) directly relating to the representation of the class to any representative party serving on behalf of a class." 15 U.S.C. § 78u–4(a)(4). Pursuant to this subsection, Lead Counsel requests an award of $18,000 "to compensate it for its reasonable costs and expenses incurred in managing this litigation and representing the Class." (Pl. Br. for Attorneys' Fees 22).

Here, LAMPERS "stepped into the role of Lead Plaintiff at a crucial point in this Action." (*Id.*). Specifically, LAMPERS (i) reviewed and approved pleadings filed in this Action; (ii) had extensive and regular telephonic and email communications with Lead Counsel regarding strategy and developments in the Action; (iii) reviewed and commented on submissions to the Court and the Mediator; (iv) reviewed and approved the retention of experts; and (v) fully participated in the mediation and settlement discussions on behalf of the Class. (*Id.* at 22–23). Moreover, Lead Counsel included in the notice packets to potential class members that Lead Plaintiff would seek a compensatory award no greater than $18,000, and Lead Counsel received no objections. (*Id.* at 23); *see also Lucent Techs.,* 307 F.Supp.2d at 450 (granting motion for compensatory award where notice was provided to all potential class members and no party objected).

The Court grants Lead Counsel's request for a compensatory award of $18,000 to LAM PERS.

### F. Conclusion

For the reasons set forth above, the Court approves the Settlement and Plan of Allocation, and grants Lead Counsel's motion for award of attorneys' fees, reimbursement of litigation expenses, and compensatory award to LAMPERS.

**All Citations**

Not Reported in F.Supp.2d, 2013 WL 3930091, Fed. Sec. L. Rep. P 97,579

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

🔖  KeyCite Yellow Flag - Negative Treatment

Distinguished by [Finkel v. American Oil & Gas, Inc.,](#) D.Colo., January 20, 2012

2010 WL 1257722

Only the Westlaw citation is currently available.

NOT FOR PUBLICATION

United States District Court, D. New Jersey.

In re SCHERING–PLOUGH/
MERCK MERGER LITIGATION.

Civil Action No. 09–CV–1099 (DMC).
|
March 26, 2010.

**Attorneys and Law Firms**

[Lisa J. Rodriguez](#), Trujillo, Rodriguez & Richards, LLP, Haddonfield, NJ, [Barry J. Gainey](#), Gainey & McKenna, Esqs., Paramus, NJ, [Melissa E. Flax](#), Carella Byrne Cecchi Olstein Brody & Agnello, PC, Roseland, NJ, [Christopher A. Seeger](#), Seeger Weiss LLP, New York, NY, [Peter S. Pearlman](#), Cohn, Lifland, Pearlman, Herrmann & Knopf, LLP, Saddle Brook, NJ, [Olimpio Lee Squitieri](#), Squitieri & Fearon, LLP, Jersey City, NJ, [Maria Delgaizo Noto](#), Noto & Washburne, PC, Matawan, NJ, [Jeffrey W. Herrmann](#), Cohn, Lifland, Pearlman, Herrmann & Knopf, LLC, Saddlebrook, NJ, for Plaintiffs.

[Douglas Scott Eakeley](#), [Natalie Janet Kraner](#), [Maureen A. Ruane](#), [Jason E. Halper](#), Lowenstein Sandler Pc, Roseland, NJ, for Defendants.

**OPINION**

[DENNIS M. CAVANAUGH](#), District Judge.

**\*1** This matter comes before the Court upon motion by Plaintiffs for final approval of class certification, final approval of the proposed Settlement and for an award of attorneys' fees consistent with the provision set forth in the Stipulation of Settlement. After considering the submissions of the parties, and based upon the fairness hearing conducted before this Court on March 24, 2010, it is the decision of this Court for the reasons herein expressed, Plaintiffs' motion for class certification is **granted,** for final approval of the Settlement is **granted** and for an award of attorneys' fees is **granted.**

**I. *Background*[1]**

[1]    These facts have been adopted from the parties' respective submissions.

On March 9, 2009, Schering–Plough Corporation ("Schering–Plough") and Merck & Co., Inc. ("Merck"), announced that their respective boards of directors had unanimously approved an agreement and plan of merger (the "Merger Agreement") under which the two companies would be combined (the "Merger"). Under the terms of the Merger, Schering–Plough, which would continue as the surviving public corporation, would be renamed Merck & Co., Inc. ("New Merck"); Merck would become a wholly-owned subsidiary of New Merck; Schering–Plough shareholders would receive $10.50 in cash and 0.5767 of a share of New Merck common stock for each share of Schering–Plough common stock they hold; and Merck shareholders would receive one share of common stock of New Merck for each share of Merck common stock they hold. The transaction was valued at approximately $41.1 billion.

A. Procedural History

Actions seeking to block the Merger were filed against Schering–Plough and its board of directors (the "Board") beginning on March 10, 2009, in both the Superior Court of New Jersey, Union County ("Superior Court"), and the United States District Court for the District of New Jersey ("District Court"). In total, 11 cases were filed in the Superior Court. Seven plaintiffs filed actions in the Law Division (*Plotkin, Zank, Rosenberg, Clark, Rubery, Murphy,* and *Gordone* ), while four complaints were filed in the Chancery Division (*Pirelli Armstrong Tire Pension Fund, Manson, Erste–Sparinvest,* and *City of Dearborne Heights Retirement System* ) (collectively, the "State Actions"). An additional four cases were filed in District Court: *Landesbank Berlin Investment, Husarsky, Louisiana Municipal Employees Retirement System* (*"LAMPERS"* ), and *City of Edinburgh/Lothian Pension Fund* (collectively, the "Federal Actions").

On April 30, 2009, the Court entered an Order appointing Carella Byrne and Grant & Eisenhofer as co-lead counsel, with Seeger Weiss as liaison counsel (collectively, "Class Counsel"), in the District Court action and, in a separate Order, consolidated all of the Federal Actions. On June 1, 2009, the Court denied the *Plotkin* plaintiffs' motion to abstain in favor of the Superior Court actions based upon *Colorado River* abstention, and held that it would retain jurisdiction

over the now-consolidated Federal Actions. In light of the Court's decision to continue with the Federal Actions, the Chancery Division dismissed the State Actions by way of Order, also dated June 1, 2009.

### B. Post Merger Claims and Facts

**\*2** The complaints in all of the actions generally alleged that the Schering board members had breached their fiduciary duties to shareholders by approving the Merger, because the terms of the Merger were insufficiently favorable to Schering's shareholders and/or the Board had failed to perform appropriate due diligence before approving the Merger. Throughout the litigation the board members denied any wrongdoing in connection with the Merger.

Three days after the announcement of the Merger, on March 12, 2009, an article appeared in *Lancet,* a prestigious medical journal, reporting on a favorable clinical trial for TRA, a drug which Schering had "in the pipeline" and expected to be a potential blockbuster drug. On the day after the announcement of the publication of the *Lancet* article, Merck's stock jumped 12.4%.

On May 20, 2009, Schering and Merck issued a joint preliminary proxy statement on SEC Form S–4 (the "May S–4") that purported to disclose to shareholders all material aspects of the Merger, including the process that lead up to the Board of Directors' approval.

On June 3, 2009, Class Counsel filed a consolidated complaint (the "Consolidated Complaint") which generally repeated the allegations contained in the initial complaints and added allegations concerning (a) the timing of the Merger announcement relative to the March 12, 2009 *Lancet* article about TRA;[2] 1(b) alleged incomplete and materially misleading disclosures in the May S–4; and © severance payments to Schering executives.

2    The Consolidated Complaint alleged that the timing of the announcement was material to the relative value of Merck's offer to Schering shareholders. The Consolidated Complaint alleged that, had the *Lancet* article appeared before the announcement of the Merger, Schering's shareholders, rather than Merck's, would have benefitted from the announcement. Class Counsel's economic experts estimated this would have resulted in a 2.7% discount to Schering shareholders rather than the announced 34% premium.

On June 16, 2009, Schering and Merck filed an amended S–4 (the "June S–4"), which contained additional disclosures from the May S–4. For instance, the June S–4 disclosed the fees to be received by Schering's and Merck's financial advisers, Goldman, Sachs & Co. ("Goldman") and Morgan Stanley & Co., Incorporated ("Morgan Stanley"), including the percentage of their respective fees that was contingent upon consummation of the Merger. Schering also disclosed the existence of the pending arbitration relating to Remicade andgolimumab, which was filed by a subsidiary of Johnson & Johnson ("J & J") with respect to a distribution agreement with a subsidiary of Schering–Plough, giving the Schering subsidiary the right to distribute these products.[3]

3    The disclosure of this arbitration was material because the Remicade distribution agreement, which was worth more than $2 billion per year to Schering–Plough, provided that it could be terminated by one party if the other party underwent a "change of control." J & J contended that the Merger constituted a "change of control," giving it the right to terminate the distribution agreement. In Merck's 2010 annual report, filed on March 1, 2010, Merck stated that an adverse decision in this arbitration would have a material adverse affect on Merck's business.

### C. Discovery

Immediately after the Consolidated Complaint was filed, Class Counsel and Defendants' counsel agreed upon an accelerated discovery and briefing schedule for a possible preliminary injunction motion to stop the vote on Merger, which was estimated to be held during the first week of August 2009. Defendants agreed to produce documents on a rolling basis, and depositions where scheduled so that an application for a preliminary injunction could be filed and ruled upon by the end of July 2009.

As part of the discovery process, Class Counsel and their experts reviewed more than 180,000 pages of documents, including Board meeting minutes, Goldman and Morgan Stanley presentations and deal evaluations, and internal communications from Schering. In addition, Class Counsel deposed Fred Hassan, Schering's CEO and Chairman, and Patricia Russo, ScheringPlough's lead Independent Director.

**\*3** The information provided in discovery tended to confirm Schering's representations in the May S–4 that its Board of Directors considered alternative merger partners other than Merck, and negotiated the merger agreement in good faith

2010 WL 1257722

and at an arm's-length basis. The documentary evidence and depositions also confirmed that Schering's board had not considered the timing of the release of the *Lancet* article relative to the timing of the announcement of the Merger.

### D. Settlement

Throughout the discovery process, Class Counsel and Defendants' counsel discussed potential resolutions of the claims asserted in the Consolidated Complaint. Based upon the information provided in discovery, Class Counsel believed that the best potential result would be a preliminary injunction preventing a vote on the Merger until additional disclosures were made to shareholders. In order to resolve the claims, Defendants agreed to make additional disclosures in advance of the shareholder vote on the Merger.

On July 24, 2009, Schering–Plough published an SEC Form 8–K (the "8–K") which addressed, among other things, Class Counsel's claims concerning the *Lancet* announcement. Specifically, the 8–K showed shareholders the movement of Merck's stock price subsequent to the *Lancet* announcement, and made the following disclosure:

> Schering–Plough confirms that it did not consider the Lancet article specifically, or the timing of its publication, in connection with the board of directors' decision to approve the transaction with Merck or the timing of such approval or the timing of the announcement of the proposed merger with Merck. Further, Schering–Plough did not request or instruct its financial advisors, Goldman, Sachs & Co. and Morgan Stanley & Co., Incorporated, to consider the fact or timing of the publication of the Lancet article in connection with completion of their work in the rendering of their respective fairness opinions.

Schering also included in the 8–K a table setting forth Schering and Merck's stock prices on the days immediately before and after the announcement of the Merger, a timeline of major disclosures of results in the TRA trials, and provided additional information relating to consideration of other potential suitors and the negotiation of "deal protection" provisions in the Merger agreement. In addition, Schering included a copy of the Consolidated Complaint as an exhibit, Exhibit 99. 1, to the 8–K. Defendants continued to deny any wrongdoing, and the 8–K specifically stated that the additional disclosures were not required by any law or regulation.

On August 7, 2009, Schering shareholders voted overwhelmingly to approve the ScheringPlough/Merck

Merger, with 99.1% of votes cast in favor of the transaction. The parties moved for preliminary approval of the Settlement on December 2, 2009. On December 4, 2009, this Court entered an order preliminarily approving the Settlement, preliminarily certifying a Settlement Class, and directing that notice of the Settlement be distributed to the Class. In accordance with the terms of the Preliminary Approval Order, Defendants provided direct mail notice to the Class, in excess of 450,000 Schering shareholders. As of the deadline for filing objections, March 3, 2010, only five Class members objected to the Settlement, representing a minuscule .00001% of the Class.

## II. *Legal Standard*

### A. Class Certification

**\*4** Class certification is subject to the requirements of [Federal Rule of Civil Procedure 23, subsections (a)](#) and [(b)](#). *See Amchem Prod., Inc. v. Windsor,* 521 U.S. 621–22 (1997). In determining whether certification is appropriate, this Court may take the Settlement Agreement into consideration. *See [In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions,](#) 148 F.3d 283, 308 (3d Cir.1998) cert denied, [525 U.S. 1114](#) [(1999).](#)*

#### 1. *[Fed.R.Civ.P. 23(a)](#)*

In accordance with [Fed.R.Civ.P. 23(a)](#), class certification is appropriate where a prospective class establishes: (1) numerosity (a "class [so large] that joinder of all members is impracticable"); (2) commonality ("questions of law or fact common to the class"); (3) typicality (named parties' claims or defenses "are typical ... of the class"); and (4) adequacy of representation (representatives "will fairly and adequately protect the interests of the class"). *[Amchem, 521 U.S. at](#) [613.](#)* "To obtain class certification, plaintiffs must establish all four elements of [Rule 23(a)](#) along with one provision of [Rule 23(b).](#)" *[Johnston v. HBO Film Mgmt.,](#) 265 F.3d 178, [183 (3d Cir.2001);](#) see [Georgine v. Amchem Prods., Inc.,](#) 83 [F.3d 610 (3d Cir.1996).](#)* "All four [Rule 23(a)](#) prerequisites for class certification serve as 'guideposts for determining whether maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence.' " *[In re Schering Plough Corp. ERISA Litig.,](#) 589 F.3d 585, 597 (3d [Cir.2009).](#)*

2. *Fed.R.Civ.P. 23(b)*

Pursuant to Fed.R.Civ.P. 23(b), a class action may be maintained if Rule 23(a) is satisfied and if:

(1) prosecuting separate actions by or against individual class members would create a risk of:

(A) inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class; or

(B) adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests;

(2) the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.

B. Settlement Approval

Federal Rule of Civil Procedure 23(e), provides that "[a] class action shall not be dismissed or compromised without the approval of the court, and notice of the proposed dismissal or compromise shall be given to all members of the class in such a manner as the court directs." Fed.R.Civ.P. 23(e). In determining whether to approve a class action settlement pursuant to Rule 23(e), "the district court acts as a fiduciary who must serve as a guardian of the rights of absent class members" *In re GM Corp. Pick–Up Truck Fuel Tank Prod. Liab. Litig.,* 55 F.3d 768, 785 (3d Cir.1995) (quoting *Grunin v. Int'l House of Pancakes,* 513 F.2d 114, 123 (8th Cir.1975), *cert. denied,* 423 U.S. 864, 96 S.Ct. 124, 46 L.Ed.2d 93 (1975) (citation omitted)).

**\*5** Before giving final approval to a proposed class action settlement, the Court must determine that the settlement is "fair, adequate, and reasonable." *Lazy Oil Co. v. Witco Corp.,* 166 F.3d 581, 588 (3d Cir.1999); *Walsh v. Great Atl. & Pac. Tea Co.,* 726 F.2d 956, 965 (3d Cir.1983). In *Girsh v. Jepson,* the Third Circuit identified nine factors, so-called *"Girsh* factors,"* that a district court should consider when making this determination:

(1) the complexity, expense and likely duration of the litigation;

(2) the reaction of the class to the settlement;

(3) the stage of the proceedings and the amount of discovery completed;

(4) the risks of establishing liability;

(5) the risks of establishing damages;

(6) the risks of maintaining the class action through the trial;

(7) the ability of the defendants to withstand a greater judgment;

(8) the range of reasonableness of the settlement fund in light of the best possible recovery;

(9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

521 F.2d 153, 157 (3d Cir.1975). "These factors are a guide and the absence of one or more does not automatically render the settlement unfair." *In re American Family Enterprises,* 256 B.R. 377, 418 (D.N.J.2000). Rather, the court must look at all the circumstances of the case and determine whether the settlement is within the range of reasonableness under *Girsh. See In re Orthopedic Bone Screw Prod. Liab. Litig.,* 176 F.R.D. 158, 184 (E.D.Pa.1997); *see also In re AT & T Corp. Sec. Litig.,* 455 F.3d 160 (3d Cir.2006).[4] In sum, the Court's assessment of whether the settlement is fair, adequate and reasonable is guided by the *Girsh* factors, but the Court is in no way limited to considering only those enumerated factors and is free to consider other relevant circumstances and facts involved in this settlement.

[4]   District courts should also consider other relevant and appropriate factors. The court in *Krell v. Prudential Ins. Co. of Am. (In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions),* suggested that district courts may consider "the maturity of the underlying substantive issues ... the extent of discovery on the merits, and other factors that bear on the ability to assess the probable outcome of a trial on the merits of liability and individual damages ... whether class or subclass members are accorded the right to opt out of the settlement; whether any provisions for attorneys' fees are reasonable; and whether the procedure for processing individual claims under the settlement is fair and reasonable." 148 F.3d 283, 323 (3d Cir.1998).

2010 WL 1257722

C. Attorneys' Fees

"While the common benefit doctrine is distinct from the common fund doctrine, the former derives from the latter." *In re Diet Drugs,* 582 F.3d 524, 546 n. 44 (3d Cir.2009); *see Polonski v. Trump Taj Mahal Assocs.,* 137 F.3d 139, 145 (3d Cir.1999)* ("The origins of [the common benefit] doctrine can be traced to the common fund rule whereby those who share in a fund must participate in paying attorney's fees when a prevailing plaintiff's litigation redounds to the benefit of the common fund."). With respect to the common benefit doctrine, "[t]he creation or preservation of a fund is not the justification for the fee award; rather, [ ] it is the vindication of the class' [ ]rights that is the common benefit conferred on the class that justifies an award of attorneys' fees." *Pawlak v. Greenawalt,* 713 F.3d 972, 983 (3d Cir.1983). "[A] common benefit action is distinguishable from a common fund action because any fees not awarded to counsel will not be paid to the plaintiffs to augment their settlement fund, as is the case in the normal common fund situation." *Id.*

**\*6** "Under the common benefit doctrine, an award of attorney's fees is appropriate where 'the plaintiff's successful litigation confers a substantial benefit on the members of an ascertainable class, and where the court's jurisdiction over the subject matter of the suit makes possible an award that will operate to spread the costs proportionately among them.' " *In re Diet Drugs,* 582 F.3d 524, 546 (3d Cir.2009) (quoting *Polonski v. Trump Taj Mahal Assocs.,* 137 F.3d 139, 145 (3d Cir.1999)). "This test entails satisfying three distinct elements: (1) the plaintiff must confer a substantial benefit; (2) to members of an ascertainable class; and (3) the court must ensure that the costs are proportionally spread among that class. Because this test may be read literally to include every lawsuit against any institutional defendant, we have refined this language further." *Id.* "In *Marshall v. United Steel Workers,* 666 F.2d 845, 848 (3d Cir.1981), the Third Circuit Court of Appeals inquired: (1) whether the benefits may be traced with some accuracy; (2) whether the class of beneficiaries are readily identifiable; and, (3) whether there is a reasonable basis for confidence that the costs may be shifted with some precision to those benefitting." *Id.*

### III. *DISCUSSION*

A. Class Certification

1. *Fed.R.Civ.P. 23(a)*

The prospective class proposes that the numerosity requirement is satisfied given that upon certification, the class will consist of thousands of Schering shareholders, collectively owning more than 1.6 billions shares of stock. To date, over 450,000 putative members have been identified and noticed. "No minimum number of plaintiffs is required to maintain a suit as a class action, but generally if the named plaintiff demonstrates that the potential number of plaintiffs exceeds 40, the first prong of Rule 23(a) has been met." *Stewart v. Abraham,* 275 F.3d 220, 226–27 (3d Cir.2001), *cert. denied,* 536 U.S. 958, 122 S.Ct. 2661, 153 L.Ed.2d 836 (2002). The size of the prospective class far exceeds the threshold number of constituents recognized by the Third Circuit Court of Appeals for the United States, therefore, the numerosity requirement is satisfied.

The prospective class contends that the commonality requirement is satisfied given that all Plaintiffs are united by a common question of fact and/or law. A common question of fact concerns whether disclosures, pertaining to the proposed transaction, provided to shareholders for the purpose of voting upon the Schering/Merck merger were adequate. Further, a common question of law concerns whether the members of the board breached fiduciary duties owed to shareholders in consummating the proposed transaction. "Rule 23(a)(2)'s commonality element requires that the proposed class members share at least one question of fact or law in common with each other." *In re Warfarin Sodium Antitrust Litig.,* 391 F.3d 516, 527–28 (3d Cir.2004). "Because the [commonality] requirement may be satisfied by a single common issue, it is easily met." *Baby Neal for and by Kanter v. Casey,* 43 F.3d 48, 56 (3d Cir.1994). Questions of fact and law common to all prospective class members satisfies the commonality requirement for purposes of Fed.R.Civ.P. 23(a).

**\*7** The prospective class asserts that the typicality requirement is satisfied because "Defendants acted or failed to act in the same manner identically with respect to all shareholders." "Typicality requires that 'the claims or defenses of the representative parties are typical of the claims or defenses of the class.' " *In re Schering Plough Corp.,* 589 at 597. "Typicality is satisfied so long as the interests of all plaintiffs are "aligned." *In re Warfarin Sodium Antitrust Litig.,* 391 F.3d 516, 531 (3d Cir.2004). So long as "the claims of the named plaintiffs and putative class members involve the same conduct by the defendant, typicality is usually established regardless of factual differences." *Newton v. Merrill Lynch Pierce, Fenner & Smith, Inc.,* 259 F.3d 154, 183–84 (3d Cir.2001). "[T]he named plaintiffs' claims must

In re Schering-Plough/Merck Merger Litigation, Not Reported in F.Supp.2d (2010)
2010 WL 1257722

merely be 'typical, in common-sense terms, of the class, thus suggesting that the incentives of the plaintiffs are aligned with those of the class .' " *In re Schering Plough Corp.,* 589 at 597 (citing *Beck v. Maximus, Inc.,* 457 F.3d 291, 295 (3d Cir.2006)). "The similarity between claims or defenses of the representative and those of the class does not have to be perfect." *Id.* (citing *Baby Neal,* 43 F.3d at 56). Typicality is present given that the misconduct at issue concerns whether Defendants fulfilled or disregarded obligations and duties to shareholders in consummating the underlying transaction.

Corresponding defenses raised with respect to these claims is also typical of each prospective class member and, there is no indication that a defense unique to the representative Plaintiffs exists. *See In re Schering Plough Corp.,* 589 at 599 ("A common thread running through the various components of typicality—the requirements of similarity of legal claims, factual similarity, and absence of defenses unique to the representative—is the interest in ensuring that the class representative's interests and incentives will be generally aligned with those of the class as a whole.").

First, the proposed class indicates that the adequacy requirement is satisfied because the putative class members have precisely the same interest and incentive to pursue claims with respect to the Merger, are subject to the same burden in establishing claims in the underlying action and rely upon the same factual support, namely the disclosure advanced and consideration afforded to individual shareholders in attempting to prevail. Second, in reference to the adequacy of counsel, the proposed class asserts that the firms involved are nationally reputed in the area of class action litigation and the adequacy of each has been acknowledged before this Court in previous class action matters. "The adequacy of representation inquiry has two components designed to ensure that absentees' interests are fully pursued. First, the interests of the named plaintiffs must be sufficiently aligned with those of the absentees." *Georgine v. Amchem Products,* 83 F.3d 610, 630 (3d Cir.1996) (internal citation omitted). "This component includes an inquiry into potential conflicts among various members of the class because the named plaintiffs' interests cannot align with those of absent class members if the interests of different class members are not themselves in alignment. Second, class counsel must be qualified and must serve the interests of the entire class." *Id.* There is an identity of interest with respect to prospective class members and any potential absentees, therefore, the first prong of the adequacy requirement is satisfied. The national reputation of the firms involved in

the present matter along with this Court's previous favorable recognition of these firms satisfies the second prong of the adequacy requirement.[5]

[5]    *See In re Merck & Co., Vytorin ERISA Litig.,* 2010 U.S. Dist. LEXIS 12344 (D.N.J. Feb. 9, 2010); *Pro v. Hertz Equip. Rental Corp.,* 2008 U.S. Dist. LEXIS 100181(D.N.J. Dec. 11, 2008).

**\*8** Therefore, certification of the class is appropriate with respect to subsection (a) of Fed.R.Civ.P. 23.

### 2. *Fed.R.Civ.P. 23(b)*

The prospective class asserts that certification is proper in accordance with Fed.R.Civ.P. 23(b)(1)(A) and Fed.R.Civ.P. 23(b)(2). "Subdivision (b)(1)(A) is used to 'obviate the actual or virtual dilemma which would ... confront the party opposing the class' if separate lawsuits resulted in 'incompatible standards' for that opposing party." *In re Comp. of Managerial Prof'l & Tech. Employees Antitrust Litig.,* 2006 U.S. Dist. LEXIS 249, \*14 (D.N.J. Jan. 5, 2006). "Basically the phrase 'incompatible standards of conduct' is deemed to refer to the situation in which different results in separate actions would impair the opposing party's ability to pursue a uniform continuing course of conduct." *Id.* (internal citation omitted). "That section requires that the varying adjudications 'would establish incompatible standards of conduct for the party opposing the class.' " *In re Merck & Co.,* 2009 U.S. Dist. LEXIS 10243, \*33 (D.N.J. Feb. 10, 2009). In that case, the Court determined that "[t]his language does not require that the varying adjudications would establish incompatible standards as the exclusive or even primary remedy. It only requires that varying adjudications would establish incompatible standards, and Plaintiffs have persuaded this Court that this requirement is met." *Id.* Notably, "[t]he Federal Rules of Civil Procedure do not give Defendants the option of waiving any requirements of Rule 23." *Id.*

More specifically, the prospective class alleges that this provision is satisfied because in the event of individual suits, there is significant risk that Schering will be exposed to differing standards of conduct with respect to a group that is owed a duty of uniform treatment pursuant to applicable securities laws and regulations as well as fiduciary obligations. The Court agrees that individual suits will likely result in disparate treatment where uniformity is otherwise required and practicable. Therefore, this Court concludes that the provision set forth in Fed.R.Civ.P. 23(b)(1)(A) is satisfied.

2010 WL 1257722

With respect to Fed.R.Civ.P. 23(b)(2), "[a] class action is maintainable [ ] when 'the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole ....' " *In re Comp. of Managerial,* 2006 U.S. Dist. LEXIS 249, at *18. "Subsection (b)(2) class actions are 'limited to those class actions seeking primarily injunctive or corresponding declaratory relief.' " *Id.* at 19 (citing *Barnes v. American Tobacco Co.,* 161 F.3d 127, 142 (3d Cir.1998)). Additionally, "class certification under (b)(2) requires that the proposed class be cohesive." *Id.* According to the Court of Appeals, "while 23(b)(2) class actions have no predominance or superiority requirements, it is well established that the class claims must be cohesive." *Id.* (citing *Barnes,* 161 F.3d at 143). Cohesion is required for two reasons: (1) "unnamed members with valid individual claims are bound by the action without the opportunity to withdraw and may be prejudiced by a negative judgment in the class action [;]" and (2) " 'the suit could become unmanageable and little value would be gained in proceeding as a class action ... if significant individual issues were to arise consistently." *Id.* (citing *Santiago v. City of Philadelphia,* 72 F.R.D. 619, 628 (E.D.Pa.1976)); *see Barnes,* 161 F.3d at 143.

**\*9** First, the relief sought pursuant to this Settlement is exclusively injunctive or declaratory. Second, the prospective class is cohesive given that the factual circumstances in the present action are the same with respect to members of the prospective class. *See Geraghty v. United States Parole Comm'n,* 719 F.2d 1199, 1205–06 (3d Cir.1983). Indeed, the underlying factual circumstances revolve around Defendants' conduct towards prospective class members, specifically with respect to disclosures advanced and the circumstances surrounding the consummation of the Merger.

### B. Settlement Approval

1. *Complexity, Expense and Likely Duration of Litigation*
This factor is concerned with assessing the "probable costs, in both time and money, of continued litigation." *In re Cendant Corp. Litig.,* 264 F.3d 201, 234 (3d Cir.2001). Significant delay in recovery if this case proceeds to trial favors settlement approval. *See, e.g., In re Warfarin Sodium Antitrust Litig.,* 391 F.3d 516, 536 (3d Cir.2004); *Weiss v. Mercedes–Benz of N. Am., Inc.,* 899 F.Supp. 1297, 1301 (D.N.J.1995). As asserted by Plaintiffs, this case is a complex, $41 billion dollar reverse merger resulting in the creation of the second largest pharmaceutical company in the world.

This suit commenced over a year ago. Although the need for the injunction sought has been extinguished given that the Transaction has been consummated and the Merger has concluded, the remaining call for declaratory relief is likely to result in a significant delay in time and cause each side to incur significant costs and expend extensive time engaging in continued discovery, expert retention, legal analysis and trial. Therefore, this factor favors settlement approval.

2. *Reaction of Class to Settlement*
This factor requires the Court to evaluate whether the number of objectors, in proportion to the total class, indicates that the reaction of the class to the settlement is favorable. The Court also notes that the second *Girsh* factor is especially critical to its fairness analysis, as the reaction of the class "is perhaps the most significant factor to be weighed in considering its adequacy." *Sala v. National R.R. Passenger Corp.,* 721 F.Supp. 80, 83 (E.D.Pa.1989); *Fanning v. AcroMed Corp. (In re Orthopedic Bone Screw Prods. Liab. Litig.),* 176 F.R.D. 158, 185 (E.D.Pa.1997) (stating that a "relatively low objection rate militates strongly in favor of approval of the settlement" (internal citations omitted)). Further, "silence constitutes tacit consent to the agreement." *GM Trucks,* 55 F.3d 768, 812 (3d Cir.1995). While the purported class numbers approximately 450,000 members, only 5 have raised objections to the proposed Settlement. These objections primarily concern the award of attorneys' fees requested, not the merits of the proposed Settlement, and are recited in detail below. In the absence of an identifiable or tangible economic benefit to shareholders, objectors dispute the $3.5 million dollar fee application of Class Counsel. The limited objections raised, by comparison to the number of prospective class members affected by the proposed Settlement, weighs in favor of Settlement Approval.

3. *Stage of Proceedings and Amount of Discovery Completed*
**\*10** Pursuant to the third *Girsh* factor, the Court must consider the "degree of case development that Class Counsel have accomplished prior to Settlement," including the type and amount of discovery already undertaken. *GM Trucks,* 55 F.3d at 813; *see also Prudential,* 148 F.3d at 319. In short, under this factor the Court considers whether the of amount of discovery completed in the case has permitted "counsel [to have] an adequate appreciation of the merits of the case before negotiating." *Prudential,* 148 F.3d at 319; *See also AT & T,* 455 F.3d at 167 (noting extent of discovery). The discovery analyzed encompasses both formal and "informal" discovery,

including discovery from parallel proceedings, companion cases and even third parties, such as experts or witnesses.

Although Settlement was achieved before Defendants filed an Answer to the Amended Consolidated Complaint, Plaintiffs argue that discovery took place on an accelerated and comprehensive basis. Plaintiffs contend that Class Counsel reviewed in excess of 180,000 pages of documents produced by Defendants', conducted depositions, retained experts and informally acquired other information from defense counsel. Further, Class Counsel reviewed this information with the economic experts retained for purposes of the litigation. Class Counsel asserts that "[b]ased upon this review, Class Counsel gained an adequate appreciation of the merits of the claims asserted and determined that the best result for the shareholder was for Schering to make additional disclosures so that the shareholders would be fully informed of all material information in order to make an intelligent decision as to whether the Merger should be approved." Therefore, this factor favors final Settlement approval.

### 4. *Risks of Establishing Liability*

A trial on the merits always entails considerable risk. *Weiss,* 899 F.Supp. at 1301. "By evaluating the risks of establishing liability, the district court can examine what the potential rewards (or downside) of litigation might have been had class counsel elected to litigate the claims rather than settle them ." *GM Trucks,* 55 F.3d at 814. "The inquiry requires a balancing of the likelihood of success if 'the case were taken to trial against the benefits of immediate settlement.' " *In re Safety Components Int'l,* 166 F.Supp.2d 72, 89 (D.N.J.2001).

"Corporate directors have a fiduciary relationship with the corporation, and its stockholders." *Casey v. Brennan,* 344 N.J.Super. 83, 108, 780 A.2d 553 (App.Div.2001) (citing *Francis v. United Jersey Bank,* 87 N.J. 15, 36, 432 A.2d 814 (1981)). "New Jersey law has characterized the directors of a corporation as fiduciaries and has demanded of them the utmost fidelity in their dealings with the corporation and its stockholders." *Id.* (citing *Daloisio v. Peninsula Land Co. .,* 43 N.J.Super. 79, 88, 127 A.2d 885 (App.Div.1956)). In analyzing corporate law, New Jersey courts look to Delaware for guidance. *Balsamides v. Protameen Chems.,* 160 N.J. 352, 372–73, 734 A.2d 721 (1999). Directors are required to "disclose fully and fairly all material information within the board's control when it seeks shareholder action." *Wayne Co. Employees Retirement Sys. v. Corti,* 954 A.2d 319, 330 (Del.Ch.2008). "The fiduciary duties of loyalty, good faith, and due care obligate directors to communicate all material

information fully, fairly, and candidly to stockholders." *Casey,* 344 N.J.Super. at 110, 780 A.2d 553 (citing *Malone v. Brincat,* 722 A.2d 5, 9 (Del.1998)). At the same time, "[a]bsent fraud, self-dealing or unconscionable conduct, the law will not impose liability on corporate fiduciaries, pursuant to the business judgment rule." *Fishbein Family Partnership v. PPG Indus.,* 871 F.Supp. 674, 771 (D.N.J.1994); *see also Maul v. Kirkman,* 270 N.J.Super. 596, 637 A.2d 928 (App.Div.1994). "The business judgment rule is an acknowledgment of the managerial prerogatives of the directors. It is a presumption that in making a business decision the directors of a corporation acted on an informed basis in good faith and in the honest belief that the action taken was in the best interests of the company. Absent an abuse of discretion, that judgment will be respected by the courts. The burden is on the party challenging the decision to establish facts rebutting the presumption." *Shields v. Murphy,* 1987 U.S. Dist. LEXIS 6992, *13 (D.N.J. Aug. 4, 1987) (citing *Aronson v. Lewis,* 473 A.2d 805, 812 (1984)). "The application of the business judgment rule requires a probing into the Defendants' minds to determine whether they acted honestly or in good faith." *Resolution Trust Corp. v. Moskowitz,* 1994 U.S. Dist. LEXIS 20554, *24 (D.N.J. Aug. 23, 1994) (citing *Papalexious v. Tower West Condominium,* 167 N.J.Super. 516, 527, 401 A.2d 280 (Ch.Div.1979)). "Such a determination, however, involves a complex question of fact [ ]." *Id.* (citing *Papalexious,* 167 N.J.Super. at 528, 401 A.2d 280).

**\*11** Plaintiffs contend that once "Defendants agreed to provide robust, supplemental disclosures in a final proxy statement, including an express acknowledgment to shareholders that ScheringPlough's Board never considered the *Lancet* article or the timing of its publication in connection with the Merger [,]" a substantial risk arose that Plaintiffs would not be able to establish a breach of fiduciary duty. The Court agrees that these supplemental disclosures created substantial risk that Plaintiffs would not prevail on a breach of fiduciary duty claim. Therefore, this element favors Settlement approval.

### 5. *Risks of Establishing Damages*

The fifth *Girsh* factor "attempts to measure the expected value of litigating the action rather than settling it at the current time." *GMC,* 55 F.3d at 816. Ultimately, a battle of experts will ensue presenting differing damages calculations and "[a] jury would therefore be faced with competing expert opinions representing very different damage estimates ... adding further uncertainty." *In re Rent–Way Sec. Litig.,*

305 F.Supp.2d 491, 506 (W.D.Pa.2003). Even if liability is successfully established at trial, post-trial motions and appeals present added risk. *In re Apollo Group, Inc. Sec. Litig.,* 2008 U.S. Dist. LEXIS 61995, at *1–4 (D.Ariz. Aug. 4, 2008) (granting Rule 50(b) motion, following lengthy trial, notwithstanding the $280 million jury verdict).

Given that the articles of incorporation relieve directors of liability of a breach of duty of care and that Plaintiffs did not uncover evidence in support of a claim for breach of duty of loyalty, the only viable claim remaining for purpose of establishing damages was breach of the duty of disclosure. However, traditionally the remedy for a breach of duty of disclosure is injunctive, rather than monetary; therefore, Plaintiffs acknowledge that recovery of damages was unlikely. If the recovery of damages is foreclosed given the nature of the underlying action, the risk of establishing damages is not necessarily present. Therefore, this factor is neutral and does not weigh in favor of or against final Settlement approval.

6. *Ability of Defendants to Maintain Class Certification Through Trial*

The standard for certification is the same for settlement classes as it is for conventional classes. *GMC,* 55 F.3d at 817. Fed.R.Civ.P. 23 also allows for decertification of a class, unmanageable or otherwise. As the Court of Appeals has explained, after *Amchem,* this factor is of negligible importance:

> Because the district court always possesses the authority to decertify or modify a class that proves unmanageable, examination of this factor in the standard class action would appear to be perfunctory. There will always be a 'risk' or possibility of decertification, and consequently the court can always claim this factor weighs in favor of settlement. The test becomes even more 'toothless' after *Amchem.* The Supreme Court in *Amchem* held a district court could take settlement into consideration when deciding whether to certify a class, and that, '[c]onfronted with a request for settlement-only class certification, a district court need not inquire whether the case, if tried, would present intractable management problems ... for the proposal is that there be no trial.' It would seem, therefore, that after *Amchem* the manageability inquiry in settlement-only class actions may not be significant.

**\*12** *Weber v. Gov. Emples. Ins. Co.,* 2009 U.S. Dist. LEXIS 91322, *35 (D.N.J. Sep. 30, 2009) (citing *In re Prudential,* 148 F.3d at 321. "To the extent that "[t]here will always be a 'risk' or possibility of decertification" in any class action, *id.,* this factor weighs marginally in favor of settlement approval." *Id.* Plaintiffs do not assert that the ability to maintain a class action poses a significant risk. Therefore, this factor neither weighs against nor in favor of Settlement approval.

7. *Ability of Defendants to Withstand a Greater Judgment*
To evaluate whether the Settlement Agreement is fair to Plaintiffs, the Court must evaluate whether Defendants could withstand a judgment much greater than the amount of the settlement. *See Cendant,* 264 F.3d at 240; *Prudential,* 148 F.3d at 321–22; *GMC,* 55 F.3d at 818. Plaintiffs assert that this factor should be considered neutral because once Defendants agreed to provide supplemental disclosures to shareholders, there was nothing left to demand from Defendants.

The Court agrees. The "capacity to withstand a greater judgment cannot be considered in a vacuum without reference to the value of the settlement and the claims themselves, and in light of the fact that under the settlement the Plaintiffs are eligible to receive the entirety of the benefits to which they believe they were entitled under [the law], this factor does not weigh against approval of the settlement.' *Weber,* 2009 U.S. Dist. LEXIS 91322, at *37. As discussed above, the remaining viable claim presented by Plaintiffs primarily allows for injunctive relief. Among other remedies listed, the Amended Consolidated Complaint requests injunctive relief "requiring Defendants to correct material deficiencies in the Joint Preliminary Proxy before proceeding with any vote of Schering stockholders with respect to the proposed transaction." Through the collaborative efforts of counsel, this result was achieved and shareholders were provided with more expansive disclosures prior to the consummation of the underlying transaction. Therefore, this factor will be treated as neutral.

8/9. *Reasonableness of the Settlement Fund in Light of the Best Possible Recovery, and in Light of the Attendant Risks of Litigation*
"According to Girsh, courts approving settlements should determine a range of reasonable settlements in light of the best possible recovery (the eighth *Girsh* factor) and a range in light of all the attendant risks of litigation (the ninth factor)." *GMC,* 55 F.3d at 806. "The last two Girsh factors evaluate whether the settlement represents a good value for a weak case or a poor value for a strong case." *In re Warafin,* 391 F.3d at 538. Plaintiffs argue that "Plaintiff[s] achieved the fullest extent of what could [have] been

achieved for Company shareholders, and provided a benefit that fully vindicated the rights of Company shareholders." The benefit conferred appears to be the fuller, more complete disclosure of material information surrounding the proposed Merger and memorialized in supplemental disclosures to an amended proxy statement. Beyond the material information newly disclosed, Plaintiffs assert that Plaintiffs' efforts to compel a more complete disclosure resulted in the extraordinary (and perhaps unprecedented) step of publishing the Amended Consolidated Complaint, and allowed shareholders to independently evaluate additional information concerning the Merger. The value of the benefit conferred is commensurate with the projected success of this case and potential relief available. Therefore, this factor favors Settlement approval.[6]

[6]    Plaintiffs also assert that the form of notice provided to prospective class members satisfies the requirements of Rule 23(e) (1). Rule 23(e)(1) instructs courts to "direct notice in a reasonable manner to all class members who would be bound by the proposal." Such notice to class members "need only be reasonably calculated, under all of the circumstances, to apprise interested parties of the pendency of the settlement proposed and to afford them an opportunity to present their objections." Prudential, 962 F.Supp. at 527–28 (citations omitted).

## C. Objections

**\*13**    After providing notice of the Settlement to approximately 450,000 putative class members, five class members filed a response in connection with that notice. The objections raised primarily concern the fees negotiated at arm's-length pursuant to mediation.[7]

[7]    Submission by George H. Koshefsy ("Mr.Koshefsky")- Mr. Koshefsky submits a request for clarification. Pursuant to a letter, dated January 14, 2010, Mr. Koshefsky requests clarification as to what this class action and notice of proposed Settlement means.

### 1. Curtis Karnow ("Mr.Karnow")

Mr. Karnow objects to an award of attorneys' fees on the ground that the alleged benefit received appears trivial, there is no monetary gain on behalf of the putative class and the time spent on the action is allegedly of little value. Mr. Karnow also seems to suggest that the proposed Settlement is in some way collusive given the arrangement between Plaintiffs and Defendants precludes future claims by prospective class members.

### 2. Jean F. Goodwyn ("Ms.Goodwyn")

Ms. Goodwyn appears to express her dissatisfaction with what she perceives as Class Counsel's obligation to transmit notice of the proposed Settlement to the proper financial institution, rather than her individually. Ms. Goodwyn also indicates that she has no time to search through old records and would "love to receive something from this claim, [is] sure it will never happen."

### 3. Craig W. Cole and Susan G. Cole and as Trustee for the Cole Children's Trust (the "Coles")

The Coles object to the proposed Settlement on the ground that the attorneys' fees requested are not justified by the work performed and that the lawsuit is a guise for generating legal fees. That letter requests the "court to carefully examine the validity of the fees being sought and to set aside a portion thereof for the benefit of the shareholders; or in the alternative, to simply reduce the fees (which seem excessive) to a more rational level."

### 4. Kenneth R. Wynne ("Mr.Wynne")

By way of objection, dated February 12, 2010,. Mr. Wynne contends that "the merger under challenge was consummated after the parties signed a 'Stipulation of Settlement[,]' suggest[ing] that the lawsuit, while pending, was an obstacle to closing the merger." The objection continues, there is "no indication that the terms of the merger changed in any way based upon the class litigation. In other words, this facially appears to be an instance in which the litigation was used more to leverage an award of attorneys' fees than it was to achieve any benefit, certainly not an economic benefit, for the stockholders." Mr. Wynne objects to both the reasonableness of the Settlement and the proposed award of attorneys' fees.

### 5. Allain Marain ("Mr.Marain")

Mr. Marain objects to the proposed Settlement insofar as the Settlemet: (a) awards attorneys' fees and costs to Class Counsel; (b) bars Defendants from opposing Class Counsel's application for fees and costs; (c) permits Class Counsel to apply for a $3.5 million dollar award of attorneys' fees without notice to the Class and an opportunity to be heard; and (d) places the cost of noticing Class Members of Class Counsel's application for $3.5 million on Defendants. In accordance with this objection, Mr. Marain asserts that the only purpose of certifying the class and approving the proposed Settlement

is to permit an award of attorneys' fees. Mr. Marain alleges that there is no identifiable or economic benefit to the proposed class. Further, Mr. Marain imputes Class Counsel with a conflict of interest because upon merger, Plaintiffs, the former stockholders of Schering, are now stockholders of Defendant, Merck. Citing *City of Burlington v. Dogue,* 505 U.S. 557, 112 S.Ct. 2638, 120 L.Ed.2d 449 (1992), Mr. Marain also contends that the lodestar method, with a multiplier, is inapplicable. Finally, Mr. Marain contends that if fees are awarded, such fees derive from the shareholders' equity in Merck.

**\*14** In accordance with that objection, Mr. Marain seeks an order to compel Defense Counsel to vigorously oppose Class Counsel's application and to order Class Counsel serve notice on all putative class members affording each a right to be heard. In lieu of the proposed Settlement, Mr. Marain requests the Court to approve that portion of the Settlement dismissing the lawsuit, to impose sanctions against Class Counsel pursuant to Fed.R.Civ.P. 11, to issue an order compelling defense counsel generally, and Mark R. Silber, Esq., counsel to Class Member Allan Marain ("Mr.Marain"), individually, to submit an affidavit of services and for an entry of joint and several judgment against Class Counsel, awarding reasonable attorneys fees and costs, for a finding of fact that Mr. Marain will save Class Members an amount equal to or in excess of $3 .5 million dollars and for such other relief as the Court may deem proper.

Pursuant to the motion for sanctions, Mr. Marain alleges that the initial complaint was unsubstantiated and lacks "evidentiary support." *See* Fed.R.Civ.P. 11(b)(3). In response, Class Counsel contends that pursuant to Fed.R.Civ.P. 11(c)(2), "a motion for sanctions must be made separately from any other motion." Further, Class Counsel asserts that the motion for sanctions is untimely. *See In re Schaefer Salt Recovery, Inc.,* 542 F.3d 90 (3d Cir.2008). The Court agrees that the motion is untimely. Nonetheless, even if timing were proper, the Court does not find sanctions proper in the instant matter.

Pursuant to the proceeding conducted on the record before this Court on March 24, 2010, Mr. Marain reasserted the objection to settlement. The substance of the argument presented seems to be that a common benefit was not conferred, therefore, the fee application attendant to the proposed Settlement is not warranted. Instead, Mr. Marain appears to suggest that Class Counsel did not prevail in obtaining the relief requested pursuant to the initial complaint, that the measure of success is dictated by the amount of discovery accomplished rather than achieving actual equitable relief and finally, that counsel's submissions concerning the lodestar projection do not comport the disclosure requirements of the lodestar method.

By way of response, Class Counsel suggests that every class action settlement reflects a measure or judgment as to the strengths and weaknesses of the parties' relative positions regardless of whether the claims are pursued to a final judgment on the merits. Moreover, Class Counsel indicates that Mr. Marain's argument, premised upon the initial complaint, is misguided given that the Amended Consolidated Complaint identifies a Third Count seeking injunctive relief to compel more adequate disclosures which, as evidenced by the supplemental disclosures to the proxy and the SEC 8–K form, was achieved. Lastly, Class Counsel asserts that the lodestar method in this jurisdiction is used as a cross-check in relation to the fee award negotiated between the parties at arm's-length and agreed upon before a disinterested mediator. Further, the multiplier suggested, 2.18, is analogous to the multipliers regularly used in common fund cases.

**\*15** Finally, Defense Counsel indicated that there was an attempt, and indeed a preference, to negotiate the fee issue in the same manner that negotiation of the underlying legal issue was executed. However, when initial fee negotiations proved futile, counsel agreed to submit the issue to mediation. The award requested is the product of successful mediation.

Although few objections were presented to this Court, the objections have been considered and scrutinized. Ultimately, with the exception of Mr. Marain who contends that a common benefit has not been conferred upon the prospective class, the objections primarily dispute the fee award requested. As discussed further below, the Court agrees that in the absence of Class Counsel's hard fought negotiation with Defense Counsel, extended disclosures, permitting the shareholders to exercise a fully informed decision pursuant to the Merger that was approved by 99.1%, would not have been rendered; therefore, contrary to Mr. Marain's assertion, a common benefit was rendered and a fee award is appropriate.

### D. Attorneys' Fees

#### 1. *Applicability*

"Despite the difficulties they pose to measurement, nonpecuniary benefits to the corporation may support a settlement." *Bell Atl. Corp. Bolger,* 2 F.3d 1304, 1311 (3d

Cir.1993) (citing *Maher v. Zapata Corp.,* 714 F.2d 436, 466 (5 Cir.1983) (nonmonetary relief is adequate settlement relief)). "Attorneys' fees are awardable even though the benefit conferred is purely nonpecuniary in nature." *Merola v. Atlantic Richfield Co.,* 515 F.2d 165, 169–70 (3d Cir.1975) (citing *Mills,* 396 U.S. at 375 (non-monetary recovery on the merits does not preclude an award of fees)).

i. Substantial Benefit; Ascertainable Class; and Proportional Spread

"The substantial benefit requirement has been interpreted quite broadly and has been held to include pecuniary as well as nonpecuniary gains." *Shields,* 1987 U.S. Dist. LEXIS 6992, at \*13 (citing *Mills,* 396 U.S. at 394–96). In *Amalgamated Clothing & Textile Workers' Union v. Wal–Mart Stores,* the Second Circuit Court of Appeals agreed with the district court's identification of "the facilitation of communication among shareholders and between shareholders and management as a substantial interest that was vindicated by plaintiffs' action." 54 F.3d 69, 72 (2d Cir.1995) ("In order to exercise the right of corporate suffrage, shareholders must be informed of important issues confronting the corporation."). "Accordingly, we hold that the promotion of corporate suffrage regarding a significant policy issue confers a substantial benefit regardless of the percentage of votes cast for or against the proposal at issue." *Id.* at 71–72. "The benefit is similar to the benefit resulting from a successful claim under Rule 14a–9, prohibiting omission of material facts from proxy statements, and fees are regularly allowed for successful 14a–9 lawsuits." *Id.; see Mills,* 396 U.S. at 396–97; *see Palwak,* 713 F.2d at 984 (Third Circuit determined that in a common benefit action where the vindication of rights conferred a benefit on the class, a court is permitted to use its equitable powers to award attorneys' fees, including for time spent in preparing a fee application).

**\*16** Similarly, in the instant matter the supplemental disclosures facilitated communication and informed shareholders of previously undisclosed material information permitting shareholders to exercise their voting rights accordingly. The supplemental disclosures provided to shareholders were material in disclosing the relevance of the *Lancet* article in connection with the Board's consideration of the merger and, the supplemental disclosures were material in apprising shareholders of: (a) fees paid to Schering's financial advisers, including the amount contingent upon consummation of the Merger; (b) the Board's reasons for approaching only one potential Merger partner besides Merck;© details concerning the Board's negotiation of certain

aspects of the merger, including "deal-protection" provisions in the Merger Agreement; and (d) information relating to Schering's arbitration efforts to retain marketing rights to its blockbuster drug, Remicade. Therefore, this Court concludes that a substantial benefit was conferred as a consequence of the efforts of Class Counsel to obtain for shareholders more complete, informative and material supplemental disclosures for the purpose of exercising their vote in accordance with the Merger, ultimately approved by 99.1% of voting shares.

In the instant matter, the ascertainable class consists of the corporation's shareholders. The fees sought amount to $3.5 million dollars. In fact, the Stipulation of Settlement identifies the non-opt out class as consisting of "all holders of Schering–Plough common stock at any time during the period from March 8, 2009 through and including November 3, 2009, the Closing Date of the Transaction, other than the Director Defendants and any person, firm, trust, corporation, or other entity affiliated with any of the Defendants (the "Class")." Fee division will be spread proportionally given that the cost is incurred by the corporation, an individual fictitious entity, in the first instance. The debt accrued may indirectly affect the profits ultimately dispensed to shareholders. To the extent that the debt in some way indirectly encroaches upon the profits payable to shareholders, the affect will be proportionate.

ii. Accurate trace; Readily Identifiable Beneficiaries; and Precise Cost Shifting

The benefit conferred may be accurately traced by comparing the original disclosures provided to shareholders with the subsequent proxy statement and attendant supplemental disclosures. The material information conferred pursuant to the supplemental disclosures is outlined above. The benefit conferred may also be traced to the ultimate approval of the Merger at a rate of 99.1%.

Pursuant to Fed.R.Civ.P. 23(b), this is a mandatory, non-opt out class. The readily identifiable beneficiaries consists of the class members as defined in the preceding subsection. Further, given that 99.1% of voting shares voted in favor of the underlying Transaction and that pursuant to the Stipulation of Settlement, Defendants stipulate that "the filing of and prosecution of the claims and discussions with Plaintiffs' counsel were contributing causal factors in Defendants' decision to make the additional disclosures discussed in paragraphs 1 and 2 of Exhibit A and the sole cause of Defendants' decision to disclose the information set forth in paragraphs 3 through 9 of Exhibit A, which constitutes information sought in Plaintiffs' Consolidated

In re Schering-Plough/Merck Merger Litigation, Not Reported in F.Supp.2d (2010)

2010 WL 1257722

Complaint," the benefitting class members are readily identifiable.[8]

[8]      Exhibit A—Form 8–K submitted to the SEC.

**\*17**  There is a reasonable basis for confidence that the costs may be shifted with some precision to those benefitting. The holders of common stock contracted with the corporation in purchasing the stock. In consenting to the Merger by majority vote, common stock shareholders are now subject to the articles of incorporation and by-laws of the new entity.

Therefore, the Court concludes that the common benefit doctrine has been satisfied permitting an appropriate award of attorneys' fees.

   2. *Lodestar Method*

Pursuant to the lodestar method, "a district court in calculating the attorney fee to be awarded first determines the hours reasonably expended by counsel in successfully achieving the result sought by litigation and then multiplies those hours by a reasonable hourly rate for the attorney's services." *Joy Mfg. Corp. v. Pullman–Peabody Co.,* 742 F.Supp. 911, 913 (W.D.Pa.1990) (citing *Lindy Bros. Builders Inc. of Philadelphia v. American Radiator & Standford Corp.,* 487 F.2d 161 (3d Cir.1973)). "The formula also has been applied in the so-called "common benefit" cases where a nonmonetary benefit has been conferred through litigation but no monetary fund exists from which the cost of obtaining the benefit can be spread among the beneficiaries." *Id.; See Tandycrafts, Inc. v. Initio Partners,* 562 A.2d 1162, 1167 (Del.1989). "The Third Circuit's reasoning in *General Motors* illustrates the principle that the method used to calculate an attorney-fee award in a particular case is not necessarily determined by which of the exceptions (i.e., statutory, contractual, or special equity) justified that award. Consequently, attorney fees awarded pursuant to the 'specialequity' common-benefit doctrine may, at times, be computed using the lodestar method where circumstances warrant." *City of Birmingham v. Horn,* 810 So.2d 667, 681 (Ala.2001) (citing *Charles v. Goodyear Tire & Rubber Co.,* 976 F.Supp. 321 325 (1997)) (applying the lodestar method after noting the difficulty in valuing a settlement that included equitable relief); and *Cooperstock v. Penwalt Corp.,* 820 F.Supp. 921, 926 (E.D.Pa.1993) (applying the lodestar method after finding that the benefit conferred upon the class plaintiffs was "unquantifiable")).

"The first step in applying the lodestar formula is to determine the appropriate hourly rate. In determining the appropriate hourly rate, the court should first consider the attorney's usual billing rate." *Cityside Archives Ltd. v. New York City Health & Hosps. Corp.,* 37 F.Supp.2d 652, 658 (D.N.J.1999) (citing *Public Interest Research Group of N.J., Inc. v. Windall,* 51 F.3d 1179, 1185 (3d Cir.1985)). "The Supreme Court has indicated that the district court can also consider the 'prevailing market rates' in the relevant community to assist in the determination of an appropriate hourly rate." *Id.; see Blum v. Stenson,* 465 U.S. 886, 895, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984). "In calculating the second part of the lodestar formula, the time reasonably expended, '[the district court should review the time charged, decide whether the hours set out were reasonably expended for each of the particular purposes described and then exclude those that are 'excessive, redundant, or otherwise unnecessary.' " *Id.; see Public Interest,* 51 F.3d at 1188. "Time expended is considered 'reasonable' if the work performed was 'useful and of a type ordinarily necessary to secure the final result obtained from the litigation.' " *Id.*

**\*18**  "After a court determines the lodestar amount, it may increase or decrease that amount by applying a lodestar multiplier. 'The multiplier is a device that attempts to account for the contingent nature or risk involved in a particular case and the quality of the attorneys' work.' " *In re Diet Drugs,* 582 F.3d at 540 n. 33. There is strong suggestion that " a multiplier of 3[is] the ceiling for an award in a simple case where 'no risks pertaining to liability or collection were pertinent.' " *Id.* at 545 n. 17 (citing *In re Cendant Corp. Prides Litig.,* 243 F.3d 722 (3d Cir.2001)).

Class Counsel indicates that the total amount of attorneys' fees accrued pursuant to the underlying litigation, before application of a lodestar multiplier, is approximately $1,606,466.25. Class Counsel reports that, "after deducting total expenses of $131,777.16, the fee requested is approximately 2.18 times Class Counsel's overall lodestar, representing an average hourly rate of approximately $1,294 per hour." Individually, Carella, Byrne, Cecchi, Olstein, Brody & Agenllo, P.C. reports an expenditure of $12,133.46 in litigation costs and a presently uncompensated expenditure of 874.80 hours, cumulatively, totaling $570,027.50. The resulting non-weighted average hourly rate is approximately $651.60. Individually, Grant & Eisenhofer, P.A. reports an expenditure of $93,493.28 in litigation costs and a presently uncompensated expenditure of 982.30 hours, cumulatively, totaling $457.438.00. The resulting non-weighted average

hourly rate is approximately $465.68. Individually, Seeger Weiss LLP reports an expenditure of $21,363.29 in litigation costs and a presently uncompensated expenditure of 583.70 hours, cumulatively, totaling $384,335.50. The resulting non-weighted average is approximately $658.44. Individually, Pomerantz, Haudek, Grossman & Gross LLP reports an expenditure of $4,159.98 in litigation costs and an uncompensated expenditure of 142 hours, cumulatively, totaling $88,166.50. The resulting non-weighted average is approximately $620.88. Individually, Brower Piven, P.C. reports an expenditure of $681.15 in litigation costs and an uncompensated expenditure of 189.45 hours, cumulatively, totaling $106,498.75. The resulting non-weighted average is approximately $562.14. Therefore, the Court concludes an overall hourly lodestar non-weighted average ranging from $465.68 to $681.15 is not unreasonable in light of similar rates charged in the market and in light of the usual billing rates documented in counsel's declarations to the Court. Further, in reviewing the submissions detailing the time expended, the Court concludes that efforts by counsel were reasonable and were executed with an eye towards the final result achieved.

The fee arrangement was concluded pursuant to mediation before the Honorable Nicholas H. Politan, former U.S.D.J. By way of declaration, Judge Politan asserts that the fee agreement "was the product of extensive arm's-length negotiations, hard fought litigation and excellent advocacy from all parties." "[W]ith regard to attorneys' fees[,] ... the presence of an arms' length negotiated agreement among the parties weighs strongly in favor of approval," even if it is "not binding on the court." *Weber v. Gov. Emples. Ins. Co.,* 2009 U.S. Dist. LEXIS 91322, *53 (D.N.J. Sep. 30, 2009). Judge Politan further states, "I believe it is in the interests of all the parties that they avoid the burdens and risks associated with further litigation." Additionally, each firm involved in the present matter has submitted declarations containing itemized expenditures and charts detailing hourly

rates of work performed by each partner, associate and support staff member. Moreover, this fee is the product of mediation conducted before a disinterested and revered member of the legal community, therefore, the Court is hard pressed to conclude that the fee is not warranted. Further, the application of a multiplier of 2.18 is not uncommon where the lodestar method is applied. *See also In re Diet Drugs, 582 F.3d at 545 n. 42.* Finally, in awarding these fees, the court is mindful of the fact that the fee award requested was a negotiated amount with the assistance of a neutral third party and further, that Defendants acknowledge and agree to this amount. Accordingly, this Court concludes that the requested $3.5 million dollar attorney fee application is appropriate.

### 3. *Costs*

**\*19** The Court also finds that Class Counsel is entitled to receive costs, as they have been "adequately documented and reasonably and appropriately incurred in the prosecution of the case." *See In re Cendant Corp., 232 F.Supp.2d at 343* (quoting *In re Safety Components Int'l, Inc., 166 F.Supp.2d 72, 104 (D.N.J.2001)*). Class Counsel has provided itemized expenditures, and has certified that full documentation of the costs have been maintained in the firms' records. Costs are to be awarded in the amount of $131,777.16.

### III. *Conclusion*

Upon review, this Court concludes that the Settlement is fair, adequate and reasonable. For the foregoing reasons, Plaintiffs' motion for class certification is **granted,** for final approval of the Settlement is **granted** and for the award of attorneys' fees requested is **granted.**

### All Citations

Not Reported in F.Supp.2d, 2010 WL 1257722

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

In re Viropharma Inc. Securities Litigation, Not Reported in Fed. Supp. (2016)
2016 WL 312108, Fed. Sec. L. Rep. P 99,007

2016 WL 312108
United States District Court, E.D. Pennsylvania.

IN RE VIROPHARMA INC.
SECURITIES LITIGATION.

CIVIL ACTION NO. 12-2714
|
Signed 01/25/2016

## MEMORANDUM

Jones, II, J.

 **\*1**  Presently before the Court is the unopposed Motion filed by Carpenters' Local 27 Benefit Trust Funds ("Lead Plaintiff") for Settlement, (Dkt No. 91), including a Memorandum of Law in Support thereof, (Dkt No. 91-1 [hereinafter Settlement Mot.]), and Lead Plaintiff's Motion for Attorneys' Fees and Expenses, (Dkt No. 92), and Memorandum of Law in Support thereof. (Dkt No. 92-1 [hereinafter Attorneys' Fees Mot.].) The Court heard oral argument on both Motions on December 17, 2015. For the following reasons, both Motions are GRANTED.

### I. Background

#### a. Underlying Claim

On May 17, 2012, Pete Castro filed the initial complaint in this Court. (Dkt No. 1.) On July 23, 2012, Mr. Castro moved for appointment as lead plaintiff and the appointment of Pomerantz Haudek Grossman & Gross LLP and Berger & Montague as co-lead counsel. (Dkt No. 17.) Also on July 23, 2012, Carpenters Local 27 Benefit Trust Funds moved to be appointed as Lead Plaintiff, with Labaton Sucharow LLP as Lead Counsel and Goldman Scarlato & Penny, P.C. as liaison counsel. (Dkt No. 20.) On August 8, 2012, Mr. Castro submitted his non-opposition to Carpenters' Local 27 Defined Benefit Trust Fund's Motion. (Dkt No. 22.) Carpenters' Local 27 Defined Benefit is a pension fund for active and retired members of Local 27, including more than 9,000 beneficiaries. (Carpenters' Local 27 Defined Benefit Trust Fund Declaration, Dkt No. 91, Ex. 1 [hereinafter Carpenters' Decl.] ¶ 1.) Pursuant to provisions of the Private Securities Litigation Reform Act of 1995 (the "PSLRA"), 15 U.S.C.

§ 78u-4, the Court appointed Carpenters' Local 27 Defined Benefit Fund as Lead Plaintiff in this action and approved its selection of Labaton Sucharow LLP as Lead Counsel. (Dkt No. 24.) Lead Counsel worked with liaison counsel Goldman Scarlato & Penny, P.C., and additional counsel Robbins Geller Rudman & Dowd LLP (collectively "Plaintiff's Counsel"). Defendants were represented by counsel from Morgan, Lewis & Bockius LLP (collectively "Defendants' Counsel").

On October 19, 2012, Lead Plaintiff filed its Amended Class Complaint against ViroPharma, Vincent J. Milano (Chief Executive Officer), Charles A. Rowland, Jr. (Chief Financial Officer), Thomas F. Doyle (Vice President Strategic Initiatives), and J. Peter Wolf (General Counsel) (collectively "Defendants") for violations of Section 10(b) and 20(a) of the Securities and Exchange Act of 1934, 15 U.S.C. § 78a *et seq.*, due to Defendants' alleged misrepresentations to the market regarding Vancocin, an antibiotic drug indicated to treat *Clostridium Difficile* Associated Diarrhea ("CDAD"). (Dkt No. 35 [hereinafter AC]; Johnathan Gardner Declaration,[1] Dkt No. 91-2 [hereinafter Gardner Decl.] ¶¶ 13-14.)[2] This action was brought on behalf of investors who between December 14, 2011 and April 9, 2012, inclusive (the "Class Period"), acquired ViroPharma Securities[3] (collectively the "Settlement Class"). (AC ¶ 1.) Lead Plaintiff had purchased ViroPharma Securities during the Class Period. (AC ¶ 30.)

---

[1]    Jonathan Gardner is a Member of Labaton Sucharow (Lead Counsel). His declaration was submitted pursuant to Fed. R. Civ. P. 23.

[2]    To prepare the Amended Class Complaint, Lead Counsel conducted a pre-filing investigation that included interviewing 35 former ViroPharma employees, and contacting 73 additional potential witnesses. (Gardner Decl. ¶¶ 3, 24.) In addition, in preparing the Amended Class Complaint, Lead Counsel reviewed and analyzed documents filed by ViroPharma with the SEC, press releases, news articles, research reports by financial analysts, and other publications concerning Vancocin. (Gardner Decl. ¶ 24.) Lead Counsel also consulted with an expert regarding federal regulation of drug development. (Gardner Decl. ¶ 25.)

[3]    "ViroPharma Securities" refers to ViroPharma's publicly traded common stock, its 2.0% Senior Convertible Notes due 2017, and its exchange-traded call and put options. (Gardner Decl. ¶ 13 n. 4; Notice at 11.)

 **\*2**  Lead Plaintiff's Amended Complaint contained three counts. Counts I and II alleged violations of Section 10(b) of

In re Viropharma Inc. Securities Litigation, Not Reported in Fed. Supp. (2016)

2016 WL 312108, Fed. Sec. L. Rep. P 99,007

the Exchange Act and Rule 10b-5 promulgated thereunder. (AC ¶¶ 196-218.) Count III alleged violations of Section 20(a) of the Exchange Act. (AC ¶¶ 219-25.)

The Amended Complaint contained the following allegations. During the Class Period, Vancocin was the only drug approved by the Food and Drug Administration (the "FDA") to treat CDAD. (AC ¶ 2.) The patent for Vancocin expired in 1996. (AC ¶ 4.) However, generics were generally barred from entering the market because the FDA had a bioequivalence requirement requiring human testing. (AC ¶¶ 4, 42, 44-49.) Thus, ViroPharma had a virtual monopoly on the market for treating CDAD. (AC ¶ 2.) Moreover, during the Class Period, ViroPharma made an incredible 97% profit margin on its sales of Vancocin. (AC ¶ 3.) Vancocin represented over half of ViroPharma's 2011 revenues. (AC ¶¶ 3, 39.)

However, in 2006, the FDA changed its position regarding the proof necessary to establish bioequivalence, allowing for laboratory testing instead of testing on human subjects, thereby substantially lowering the barriers to entry for generics. (AC ¶¶ 5, 50-51, 65-66.) At the time, ViroPharma estimated that it could lose as much as 60-90% of the Vancocin market within months if generics were approved by the FDA. (AC ¶¶ 5, 43.) On March 17, 2006, ViroPharma filed a Citizen's Petition with the FDA requesting a stay of the FDA's action. (AC ¶¶ 6, 52-53.) In 2007, three competitor pharmaceutical companies submitted applications to the FDA for approval of generic versions of Vancocin. (AC ¶¶ 8, 55.) The pending Citizen's Petition blocked approval of generic Vancocin applications by ViroPharma's competitors until the Citizen's Petition was resolved. (AC ¶ 7.)

In 2008, Congress passed the QI Program Supplemental Funding Act of 2008 (the "QI Act"), Pub. L. 110-379, 122 Stat. 4075 § 3560, which permitted the FDA to grant an additional three years of marketing exclusivity for "old antibiotics," such as Vancocin, under the Hatch-Waxman Act, Pub. L. 98-417, 98 Stat. 1585, if the drug company could demonstrate that the "old antibiotic" could be administered for a "new condition of use." (AC ¶¶ 9, 57-64.) ViroPharma, submitted a supplemental New Drug Application ("sNDA") for a label change to the FDA which attempted to show that Vaconcin had a new condition of use due to a study ViroPharma licensed from Genzyme (the "Genzyme Study"). (AC ¶¶ 10-11, 68-70; Gardner Decl. ¶ 16.) ViroPharma also amended its Citizen's Petition requesting three additional years of marketing exclusivity under the QI Act. (AC ¶ 12.)

In February 2011, the FDA rejected the sNDA. (AC ¶¶ 71, 75-77.) Along with the rejection, the FDA allegedly sent a letter to ViroPharma explaining that the Genzyme Study could not be used to compare Vancocin to what was studied in the Genzyme Study. (AC ¶ 76.) A new efficacy claim must be supported by an adequate and well-controlled trial, pursuant to 21 C.F.R. § 314.126. Thus, argues Lead Plaintiff, as early as February 2011, Defendants knew that their Citizen's Petition to have Vancocin affirmed for a new condition of use would fail, as the FDA had warned ViroPharma that the Genzyme Study did not constitute an adequate and well-controlled trial as to Vancocin's purported new condition of use. (AC ¶ 77.) Lead Plaintiff further alleges that the FDA told ViroPharma again on May 20, 2011, and May 24, 2011 that the Genzyme Study was not designed to show Vancocin's efficacy and that the Study could not be used to support a claim for efficacy of a new condition of use. (AC ¶ 157.)

**\*3** ViroPharma amended the sNDA and resubmitted it in June 2011. (AC ¶ 71.) On December 14, 2011, the FDA approved the sNDA and label change. (AC ¶¶ 72, 87.) Lead Plaintiff alleges that in the letter approving the label change, the FDA explained that Vancocin's new label did not support a finding of a new condition of use. (AC ¶¶ 88-90, 159.) Regardless, Lead Plaintiff alleges, Defendant released a press release announcing that "[a]s a result of today's sNDA approval, ViroPharma believes Vancocin meets the requirements for, and thus has, three years of [marketing] exclusivity, and that generic vancomycin capsules will not be approved during this period." (AC ¶¶ 17-18, 91, 95-99.) ViroPharma's stock increased roughly seventeen percent (17%) on the day of the announcement. (AC ¶¶ 19, 100.) This date marks the beginning of the Class Period.

On December 22, 2011, ViroPharma filed a supplement to its Citizen's Petition. (AC ¶¶ 107-12.) The supplement stated that "Vancocin's labeling was fundamentally and extensively changed in the new sNDA with numerous new conditions of use." (AC ¶ 110.) On January 5, 2012, ViroPharma issued a press release stating that "as a result of our sNDA approval, we believe Vancocin…meets the requirements for, and thus has, three years of exclusivity and that generic vancomycin capsules will not be approved during this period…" (AC ¶ 113.) On January 11, 2012, Mr. Milano made a presentation at the J.P. Morgan Global Healthcare Conference where he stated "we believe we've gotten three years of exclusivity by taking advantage of the legislation that provides all the antibiotics three years of exclusivity, if you can update

Case 3:16-cv-00085-MEM    Document 176-1    Filed 09/25/20    Page 93 of 147

In re Viropharma Inc. Securities Litigation, Not Reported in Fed. Supp. (2016)

2016 WL 312108, Fed. Sec. L. Rep. P 99,007

the label with meaning safety and efficacy data, which we did through the licensing of data from a study that Genzyme had done…" (AC ¶ 118.) On February 28, 2012, ViroPharma issued a press release announcing their 2011 year-end results, announcing "the approval of our Vancocin sNDA leading to modernized labeling and, we believe, three years of exclusivity." (AC ¶ 125.) On February 28, 2012, Mr. Milano stated that ViroPharma "received the sNDA approval for Vancocin, which we believe merits three years of additional exclusivity." (AC ¶ 128.) That same day, ViroPharma submitted its Annual Report on Form 10-K with the Securities and Exchange Commission (the "SEC") and included similar statements about ViroPharma's belief that Vancocin would retain its marketing exclusivity. (AC ¶ 131.) In total, Lead Plaintiff alleges that Defendants made at least eight material misrepresentations and omissions in press releases, SEC filings, conference calls, public statements, and letters. (AC ¶¶ 75-96, 98-99, 110-11, 113-15, 118-20, 122, 125-26, 128, 132-33.) Lead Plaintiff alleges that all of these statements were false and misleading because ViroPharma knew that the FDA would not approve Vancocin for a new condition of use solely on the basis of the Genzyme Study.

On April 9, 2012, the FDA denied ViroPharma's Citizen's Petition, which terminated ViroPharma's market exclusivity over Vancocin. (AC ¶¶ 22, 92, 134; Gardner ¶ 20.) In its denial letter, the FDA wrote that ViroPharma's failure to conduct an assessment of the safety and effectiveness of the product for the claimed new condition of use in pediatric patients, as required by the Pediatric Research Equity Act, clearly showed that ViroPharma "did not believe [its] labeling changes constituted a new indication…" (AC ¶ 93.) That same day, the FDA approved three generic versions of Vancocin produced by ViroPharma competitors. (AC ¶ 94.) ViroPharma shares declined by roughly twenty two percent (22%). (AC ¶¶ 22-23, 147.) This date marks the end of the Class Period.

### b. Procedural History

On December 20, 2012, Defendant filed a Motion to Dismiss. (Dkt No. 41.) Following extensive briefing and oral argument, the Court denied the Motion to Dismiss. (Dkt Nos. 60, 61.) On July 15, 2014, Defendants answered the Amended Complaint. (Dkt No. 72.) Following another period of extensive briefing, on September 5, 2014, the Court denied Defendants' request for certification for interlocutory appeal of the Court's denial of the Motion to Dismiss. (Dkt No. 78.)

**\*4** At the Federal Rule of Civil Procedure 16 conference, the parties requested mediation. The parties conducted expedited discovery in preparation for mediation. (Gardner Decl. ¶ 3.) During this process, Lead Counsel reviewed almost five thousand documents (totaling over 39,000 pages). (Gardner Decl. ¶¶ 3, 35-39.) Lead Counsel served document subpoenas on the FDA and ANI Pharmaceuticals, Inc. ("ANI"), the current owner of Vancocin. (Gardner Decl. ¶ 40.) Lead Counsel reviewed thousands of pages of documents produced in response to these subpoenas. (Gardner Decl. ¶ 40.) In response to a subpoena form ANI, Lead Counsel produced roughly 3,500 pages. (Gardner Decl. ¶ 41.) Lead Counsel also hired Forensic Economics, Inc. to conduct an expert analysis of the damages at issue in the case. (Gardner Decl. ¶¶ 42-43.) Finally, prior to the mediation, Lead Counsel also consulted a regulatory expert, David B. Ross, M.D., Ph.D. (Gardner Decl. ¶¶ 44-45.) Dr. Ross was responsible for regulatory oversight of Vancocin at the FDA from 1996-2004. (Gardner Decl. ¶ 44.)

On January 5, 2015, all parties participated in an arm's-length mediation session facilitated by the Honorable Layn R. Phillips, United States District Court Judge (Ret.). (Gardner Decl. ¶¶ 5, 60-61.) Between January 5, 2015 and February 5, 2015, the parties continued to participate in mediation communications with Judge Phillips's assistance. (Gardner Decl. ¶¶ 60-61.) On February 5, 2015, the parties reached an agreement to settle the dispute. (Settlement Agreement, Dkt No. 87-3 [hereinafter SA]; Gardner Decl. ¶ 63.)

### c. The Settlement Agreement

On April 29, 2015, Lead Plaintiff filed an Unopposed Motion for Preliminary Approval of Settlement and Approval of Notice to the Settlement Class, (Dkt No. 87), which the Court granted on May 7, 2015. (Dkt No. 88.) Pursuant to that Order, members of the Settlement Class received Notice of the terms of the Settlement (the "Notice"). (Dkt No. 91, Ex. 3-A [hereinafter Notice].) No members of the Settlement Class filed objections.

On September 24, 2015, Lead Plaintiff filed an Unopposed Motion for Settlement, (Dkt No. 91), and Memorandum of Law in support thereof. (Settlement Mot.) On October 22, 2015, Lead Plaintiff filed an Unopposed Response in Support of the Motion. (Resp.)

Case 3:16-cv-00085-MEM    Document 176-1    Filed 09/25/20    Page 94 of 147

In re ViroPharma Inc. Securities Litigation, Not Reported in Fed. Supp. (2016)
2016 WL 312108, Fed. Sec. L. Rep. P 99,007

Defendants admit no wrongdoing. (SA at 4 ¶ O, 32-33 ¶¶ 47-48.) While admitting no underlying liability, Defendants executed the Settlement Agreement after concluding "that continuation of the Action would be protracted and expensive, and [that they] have taken into account the uncertainty and risks inherent in any litigation, especially a complex case like this Action, and believe that the Settlement set forth in this Settlement Agreement is in their best interests." (SA at 4 ¶ O.)

Similarly, while maintaining that their claims are meritorious and supported by evidence, Lead Plaintiff executed the Settlement Agreement because they "are mindful of the inherent problems of proof and the possible defenses to the claims alleged in the Action," and, therefore, "believe that the Settlement set forth in this Settlement Agreement confers substantial monetary benefits upon the Settlement Class and is in the best interest of the Settlement Class." (SA at 4 ¶ N.)

The Settlement Agreement has three main points. First, the parties agree to certification of the following class for the purposes of settlement only:

> [A]ll Persons that purchased or otherwise acquired ViroPharma Securities between December 14, 2011 and April 9, 2012, inclusive, and were damaged thereby.

**\*5** (SA at 12 ¶ 1mm, 15 ¶ 3.)[4] The parties further agreed to the certification of the Lead Plaintiff as Class Representative for the Settlement Class and the appointment of Lead Counsel as Class Counsel for the Settlement Class. (SA at 15 ¶ 3.)

4    The Settlement Agreement clarifies that the following persons are excluded from the Settlement Class: "Defendants; the Company's officers, directors, and employees during the Class Period; the Company's successors, and assigns; any person, entity, firm, trust, corporation or other entity related to, affiliated with, or controlled by any of the Defendants, as well as the Immediate Families of the Individual Defendants. Also excluded from the Settlement Class are those Persons who submit valid and timely requests for exclusion from the Settlement Class in accordance with the requirements set forth in the Notice." (SA at "Certain Definitions" ¶ 1mm.)

Second, Lead Plaintiff and every member of the Settlement Class agreed to release all claims against settling Defendants and dismiss such claims with prejudice. (SA at 15 ¶¶ 4-5.)

Third, the parties agreed to a settlement amount of eight million dollars ($8,000,000.00) in cash, to be placed in a Settlement Fund. (SA at 12 ¶ 1*ll*, 16 ¶ 6.) This represents an average recovery before reduction for litigation fees and expenses of approximately $0.49 per allegedly damaged common share and approximately $2.13 per allegedly damaged note. (Notice at 2.) After deducting attorneys' fees and expenses, notice and relevant administration costs, banking fees, and applicable taxes, the balance will go to the members of the Settlement Class (the "Net Settlement Fund"). (SA at 17 ¶ 9.) After expected deductions, this recovery reflects approximately $0.33 per share and $1.42 per note. (Notice at 2.) A clear process is outlined for how putative class members can become "Authorized Claimants" in the "Plan of Allocation." (SA at 24-26 ¶ 30.)

**II. Notice**
Notice to members of a putative class action pending settlement must be directed in a "reasonable manner to all class members who would be bound by the proposal, Fed. R. Civ. P. 23(e)(1)," and be "the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B). Class members must "have certain due process protections in order to be bound by a class settlement agreement." *In re Diet Drugs Prods. Liab. Litig.,* 431 F.3d 141, 145 (3d Cir. 2005) ("*Diet Drugs*").

In the Court's Preliminary Approval Order, the Court appointed the Garden City Group, LLC as Claims Administrator. (Dkt No. 88.) The Claims Administrator was instructed to disseminate copies of the Notice of Pendency of Class Action and Proposed Settlement and Motion for Attorneys' Fees and Expenses and the Proof of Claim. (Dkt No. 88; Dkt No. 91, Ex. 3 [hereinafter Mailing Decl.].) The Notice contained information about (1) the nature and procedural history of the case, (2) the material terms of the Settlement, including (a) the recovery under the Settlement, (b) the Plan of Allocation, (c) a description of the claims that will be released in the Settlement; (d) explanation of the right and the mechanism by which Settlement Class members could exclude themselves from the Settlement; (e) the Fee Application; (f) and an explanation of the right and the mechanism by which Settlement Class members could object to the Settlement, the Plan of Allocation, and/or the Fee Application. (Notice.) The Notice explained that someone would be an Authorized Claimant if he or she purchased or otherwise acquired ViroPharma Securities during the Class Period. (Notice at 3, 5.) The following actions were taken to provide the Notice to the Settlement Class:

2016 WL 312108, Fed. Sec. L. Rep. P 99,007

(1) 18,618 copies of the Notice were mailed to potential Settlement Class members and their nominees;

(2) a summary of the Notice was published in *Investor's Business Daily* on June 3, 2015;

 **\*6**  (3) a summary of the Notice was published over the *PR Newswire* on June 5, 2015;

(4) the Notice, the Proof of Claim form, the Settlement Agreement and its exhibits, and the Preliminary Approval Order were all posted on a case-specific website identified in the Notice;

(5) relevant Settlement documents were posted on Lead Counsel's firm website.

(Mailing Decl. ¶¶ 3-8; Gardner Decl. ¶¶ 64-69.) To date, no objections have been filed.

The Court finds that the Notice met the requirements of Federal Rule of Civil Procedure 23. *See, e.g., Zimmer Paper Prods., Inc. v. Berger & Montague, P.C.*, 758 F.2d 86, 91 (3d Cir. 1985). ("[F]irst-class mail and publication regularly have been deemed adequate under the stricter notice requirements...of Rule 23(c)(2).").

### III. Class Certification

#### a. Legal Standard

The Court is permitted to certify a class for settlement purposes only so long as the Court finds that the Settlement Class satisfies the Federal Rule of Civil Procedure 23 requirements. *In re General Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 778 (3d Cir. 1995) ("*GMC*"). Plaintiffs must satisfy the four prerequisites of Federal Rule of Civil Procedure 23(a):

One or more members of a class may sue or be sued as representative parties on behalf of all members only if:

(1) the class is so numerous that joinder of all members is impracticable;

(2) there are questions of law or fact common to the class;

(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

(4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).If the prerequisites of Rule 23(a) are met, plaintiffs then must prove that "the action is maintainable under Rule 23(b)(1), (2), or (3)." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 614 (1997). Under Rule 23(b)(3), class certification "is permissible when the court 'finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.' " *In re Hydrogen Peroxide*, 552 F.3d 305, 310 (3d Cir. 2008) ("*Hydrogen Peroxide*") (quoting Fed. R. Civ. P. 23(b)(3)). The two requirements of Rule 23(b)(3) are commonly referred to as "predominance" and "superiority." *Hydrogen Peroxide*, 552 F.3d at 310.

"The requirements set out in Rule 23 are not mere pleading rules." *Id.* at 311. A request for class certification "may be [granted] only if the court is "satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied." *Beck v. Maximus, Inc.*, 457 F.3d 291, 297 (3d Cir. 2006) (quoting *General Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147, 161 (1982) (internal quotations omitted)). A court must "assess all of the relevant evidence admitted at the class certification stage." *In re Constar Int'l Inc. Sec. Litig.*, 585 F.3d 774, 779 (3d Cir. 2009) (quoting *Hydrogen Peroxide*, 552 F.3d at 317, 323) (internal quotations omitted).

#### b. Rule 23(a) Factors

#### i. Numerosity

 **\*7**  The Court must find that the class is "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1); *see generally In re Prudential Ins. Co. Amer. Sales Practices Litig.*, 148 F.3d 283, 309 (3d Cir. 1998) ("*Prudential*"). Although no minimum number is required to maintain a class action suit, the Third Circuit has held that "classes in excess of forty members" will generally satisfy the numerosity requirement. *Vista Healthplan, Inc. v. Cephalon, Inc.*, 2015 WL 3623005, at \*13 (E.D. Pa. 2015); *see also Stewart v. Abraham*, 275 F.3d 220, 226-27 (3d Cir. 2001).

During the Class Period, there were approximately seventy million shares of issued and outstanding ViroPharma Securities. (AC ¶ 172.) Notice was mailed to 18,618 potential

Case 3:16-cv-00085-MEM    Document 176-1    Filed 09/25/20    Page 96 of 147

In re Viropharma Inc. Securities Litigation, Not Reported in Fed. Supp. (2016)

2016 WL 312108, Fed. Sec. L. Rep. P 99,007

Settlement Class members and their nominees. (Mailing Decl. ¶¶ 3-6.) The Court finds that the Settlement Class is sufficiently numerous.

### ii. Commonality

To find commonality, Lead Plaintiff must "share at least one question of fact or law with the grievances of the prospective class." *Baby Neal v. Casey*, 43 F.3d 48, 56 (3d Cir. 1994). "A finding of commonality does not require that all class members share identical claims." *Prudential*, 148 F.3d at 310.

Common questions dominate the Class, including whether Defendants' statements to the investing public during the Class Period caused the price of ViroPharma's securities during the Class Period to artificially inflate. The Court finds that the putative class shares commonality.

### iii. Typicality

"Rule 23(a)(3) requires that the claims or defenses of the representative parties be typical of the claims or defenses of the class." *Weiss v. York Hosp.*, 745 F.2d 786, 809 (3d Cir. 1984). "The heart of this requirement is that the plaintiff and each member of the represented group have an interest in prevailing on similar legal claims." *Seidman v. Am. Mobile Sys., Inc.*, 157 F.R.D 354, 360 (E.D. Pa. 1994). "[C]ases challenging the same unlawful conduct which affects both the named plaintiffs and the putative class usually satisfy the typicality requirement irrespective of the varying fact patterns underlying the individual claims." *Baby Neal*, 43 F.3d at 58; *see also In re Cmty Bank of N. Va.*, 418 F.3d 277, 303 (3d Cir. 2005).

Lead Plaintiff's claims are typical of the claims of the members of the Class. Lead Plaintiff and all Settlement Class members allege violations of the federal securities laws stemming from Defendants' same course of conduct.

### iv. Adequacy of Representation

Adequacy of representation is met by a two-fold showing: "that (1) class counsel is competent and qualified to conduct the litigation; and (2) class representatives have no conflicts of interests." *Hawk Valley, Inc. v. Taylor*, 301 F.R.D. 169, 183

(E.D. Pa. 2014) (citing *New Directions Treatment Services v. City of Reading*, 490 F.3d 293, 313 (3d Cir. 2007)).

Both are met here. First, Plaintiff's Counsel was appointed precisely because of their expertise and ability to represent the class in this matter. (*See, e.g.*, Labaton Sacharow LLP Firm Resume, Securities Class Action Litigation, Dkt No. 91, Ex. 4-A [hereinafter Labaton Resume]; Goldman Scarlato & Penny, P.C. Firm Resume, Dkt No. 91, Ex. 5-A [hereinafter Goldman Resume]; Robbins Gellar Rudman & Dowd LLP Firm Resume, Dkt No. 91, Ex. 6-A [hereinafter Robbins Resume].) Second, no conflicts of interests have been identified between either Lead Plaintiff and the Settlement Class members, or Lead Counsel and the Settlement Class members. Finally, Notice was sent to 18,000 prospective Settlement Class members and nominees and no Settlement Class member has filed an objection to Lead Counsel, or the amount that they seek in their fee petition.

### c. Rule 23(b)(3) Factors

**\*8** The parties seek certification of the class under Rule 23(b)(3), which requires common questions of law or fact to predominate over individual questions, and that the class action structure is the superior method of litigating the claims.

### i. Predominance

The predominance factor is "readily met" in many securities fraud actions. *Amchem Prods., Inc.*, 521 U.S. at 625. The central issues for Lead Plaintiff and for the putative class members are whether or not Defendants' statements to investors during the Class Period violated securities law, and whether such violations artificially inflated the cost of ViroPharma Securities during the Class Period. The only issues that would be distinct for Lead Plaintiff and each Settlement Class member would be the amount of damages owed. However, "[a]lthough individual damage claims will differ depending on when and what type of stock was acquired, these issues cast no doubt on the finding of predominance." *In re Ikon Office Solutions, Inc. Sec. Litig.*, 194 F.R.D. 166, 178 (E.D. Pa. 2000) ("*Ikon*") (citing *Eisenberg v. Gagnon*, 766 F.2d 770, 786 (3d Cir. 1985) and *In re Data Access Sys. Sec. Litig.*, 103 F.R.D. 130, 138-40, 42 (D.N.J. 1984)). The Court finds predominance.

Case 3:16-cv-00085-MEM    Document 176-1    Filed 09/25/20    Page 97 of 147

In re Viropharma Inc. Securities Litigation, Not Reported in Fed. Supp. (2016)
2016 WL 312108, Fed. Sec. L. Rep. P 99,007

## ii. Superiority

Under the superiority factor analysis, the Court considers "the class members' interest in individually controlling the prosecution or defense of separate actions...the desirability...or concentrating the litigations of the claims in the particular forum," whether there is already any litigation filed by class members, and any difficulties in managing the class action. Fed. R. Civ. P. 23(b)(3). Class certification is the superior way to manage a case with this many Settlement Class members, all complaining of the same behavior by Defendants. The alternative would produce individual suits throughout the country, redundantly wasting judicial resources to litigate the same claims over and over.

## d. Conclusion

The Court grants Lead Plaintiff's Motion to certify the class for the purposes of Settlement.

## IV. Settlement

A federal class action may be settled only with the approval of a court. Fed. R. Civ. P. 23(e). "[T]he district court acts as a fiduciary who must serve as a guardian of the rights of absent class members." GMC, 55 F.3d at 785 (quoting Grunin v. Int'l House of Pancakes, 513 F.2d 114, 123 (8th Cir. 1975) (internal quotations omitted)).

## a. The Court finds that the Settlement deserves an initial presumption of fairness.

The Court may apply an "initial presumption of fairness when the Court finds that: (1) the negotiations occurred at arm's-length; (2) there was sufficient discovery; (3) the proponents of the settlement are experienced in similar litigation; and (4) only a small fraction of the class objected." Id.; see also In re Warfarin Sodium Antitrust Litig., 391 F.3d 516, 535 (3d Cir. 2004) ("Warfarin"); In re Cendant Corp. Litig., 264 F.3d 201, 232 n. 18 (3d Cir. 2001) ("Cendant"). First, the parties negotiated the Settlement at arm's-length, with the assistance of an experienced mediator, Judge Phillips. (Gardner Decl. ¶¶ 60-62.) "[T]he participation of an independent mediator in settlement negotiations virtually insures [sic] that the negotiations were conducted at arm's length and without collusion between the parties." Hall v.

AT&T Mobility LLC, 2010 WL 4053547, at *7 (D.N.J. 2010) (quoting Bert v. AK Steel Corp., 2008 WL 4693747) (internal quotations omitted). Second, substantial expedited discovery occurred. (Gardner Decl. ¶¶ 3, 35-39.) Third, as discussed in greater detail supra in the Court's analysis of the class certification requirement for adequacy of representation, Plaintiff's Counsel are experienced with securities litigation class actions. (See, e.g., Labaton Resume; Goldman Resume; Robbins Resume.) Fourth, no member of the Settlement Class objected. (Gardner Decl. ¶¶ 3, 5, 35-45, 60-62.) The Court finds that an initial presumption of fairness applies to the Settlement.

## b. The Settlement is fair, adequate and reasonable under the *Girsh* factors and the *Prudential* considerations.

*9 "The decision of whether to approve a proposed settlement of a class action is left to the sound discretion of the district court." Girsh v. Jepson, 521 F.2d 153, 156 (3d Cir.1975). District courts must conduct independent analysis into the settlement to ensure its fairness. Final approval of a class action settlement requires the district court to determine whether "the settlement is fair, adequate, and reasonable." Stoetzner v. U.S. Steel Corp., 897 F.2d 115,118 (3d Cir. 1990) (quoting Walsh v. Great Atlantic & Pacific Tea Co., Inc., 726 F.2d 956, 965 (3d Cir. 1983) (internal quotations omitted)); see also Cendant, 264 F.3d at 231. Even where there is a presumption of fairness, the Third Circuit advises courts to consider the following factors (the "Girsh factors") in deciding whether to approve a settlement of a class action under Rule 23(e), including:

(1) the complexity, expense and likely duration of the litigation;

(2) the reaction of the class to the settlement;

(3) the stage of the proceedings and the amount of the discovery completed;

(4) the risks of establishing liability;

(5) the risks of establishing damages;

(6) the risks of maintaining the class action through trial;

(7) the ability of the defendants to withstand a greater judgment;

2016 WL 312108, Fed. Sec. L. Rep. P 99,007

(8) the range of reasonableness of the settlement fund in light of the best possible recovery; and

(9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

*Girsh*, 521 F.2d at 157 (quoting *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir. 1974)). The Circuit also advises the Court to address the following considerations (the "*Prudential* considerations"):

the maturity of the underlying substantive issues, as measured by experience in adjudicating individual actions, the development of scientific knowledge, the extent of discovery on the merits, and other facts that bear on the ability to assess the probable outcome of a trial on the merits of liability and individual damages; the existence and probable outcome of claims by other classes and subclasses; the comparison between the results achieved by the settlement for individual class or subclass members and the results achieved—or likely to be achieved—for other claimants; whether class or subclass members are accorded the right to opt out of the settlement; whether any provisions for attorneys' fees are reasonable; and whether the procedure for processing individual claims under the settlement is fair and reasonable.

*Prudential*, 148 F.3d at 323. District courts "must make findings as to each of the *Girsh* factors, and the *Prudential* factors where appropriate" in an "independent analysis of the settlement terms." *In re Pet Foods Prods. Liab. Litig.*, 629 F.3d 333, 350-51 (3d Cir. 2010). Finally, the Circuit advises district courts to conduct "a thorough analysis of settlement terms" to determine "the degree of direct benefit provided to the class," including whether "the number of individual awards compared to both the number of claims and the estimated number of class members, the size of the individual awards compared to claimants' estimated damages, and the claims process used to determine individual awards."*In re Baby Products Antitrust Litig.*, 708 F.3d 163, 174 (3d Cir. 2013).

### .i. The *Girsh* factors

### 1. Complexity, expense and likely duration of litigation

This factor is intended to capture "the probable costs, in both time and money, of continued litigation." *GMC,* 55 F.3d at

812 (internal citations omitted). Settlement was roughly two and half years after the case was first filed. As of this date, the case has been ongoing for almost four years. In total, Plaintiff's Counsel invested 4,517.25 hours of time to this case. (Gardner Decl. ¶¶ 11, 83.) As described in greater detail *infra*, under the Court's lodestar analysis, such work would cost $2,660,617.50 in attorneys' fees, with an additional $155,197.23 in expenses. (Gardner Decl. ¶¶ 83-92.) If this case were to continue, through motions for class certification, summary judgment, trial, and appeals, that number would grow many millions greater.

**\*10** If this case were to proceed to trial, it would likely take years. The projected length of the case arises from the complexity of the case. In order for the Settlement Class to succeed at trial, they would likely have to show that Defendants knowingly made materially false and misleading statements to the market that omitted material information that the FDA had told Defendants regarding the success of their Citizen's Petition. They would then have to show that ViroPharma Securities traded at artificially inflated prices during the Class Period due to Defendants' material omissions. This is a complicated matter necessarily requiring extensive briefing.

By way of example, Defendants' Motion to Dismiss took nearly seventeen months to resolve. The Court heard oral argument, and the parties submitted supplemental memoranda of law. Like the Motion to Dismiss, for any motions for class certification or summary judgment, the Court would expect that oral argument and an extensive briefing schedule would be required. Moreover, both a motion for class certification and a motion for summary judgment would be heavily reliant on experts; leading to potential *Daubert* challenges and battles between competing expert reports. Given the length of time to resolve the arguably simpler Motion to Dismiss, the projected schedule for resolution of class certification and summary judgment would require a significant number of months.

Further, if the Court were to grant the class certification motion, Defendants would likely seek reconsideration or seek permission to appeal the class certification decision. Even after resolving class certification, and summary judgment, trial would be another massive undertaking. "This is partly due to the inherently complicated nature of large class actions alleging securities fraud: there are literally thousands of shareholders, and any trial on these claims would rely heavily

2016 WL 312108, Fed. Sec. L. Rep. P 99,007

on the development of a paper trial [*sic*] through numerous public and private documents." *Ikon*, 194 F.R.D. at 179.

When considering the class certification process, interlocutory appeal of the class certification, summary judgment motion practice, trial, post-trial motions, and the likely appeal of the trial by the losing party, this matter could take years to resolve. This factor weighs heavily in favor of approving the Settlement.

## 2. The reaction of the class to the settlement

No member of the class has filed any objections to the Settlement. In addition, no member of the Settlement Class opted out. Lead Plaintiff supports the Settlement. (Carpenters' Decl. ¶ 5.) The fact that no one objected weighs heavily in favor of Settlement.

## 3. The stage of the proceedings and the amount of the discovery completed

Under the third factor, the Court considers "the degree to which the litigation has developed prior to settlement." *In re Rent-Way*, 305 F.Supp.2d 491, 502 (W.D. Pa. 2003). The Court determines "whether counsel had an adequate appreciation of the merits of the case before negotiating." *GMC*, 55 F.3d at 813. "This factor captures the degree of case development that class counsel have accomplished prior to settlement. Through this lens, courts can determine whether counsel had an adequate appreciation of the merits of the case before negotiating." *Cendant*, 264 F.3d at 235.

This case reached Settlement after the parties fully briefed Defendants' Motion to Dismiss, and after expedited discovery. There was extensive briefing regarding the Motion to Dismiss. (Gardner Decl. ¶¶ 27-30.) Further, extensive briefing followed a motion for certification of interlocutory appeal. (Gardner Decl. ¶¶ 32-33.) This briefing procedure allowed the parties to grapple with the relative strengths and weaknesses of their positions.

**\*11** Further, the parties met and conferred multiple times pursuant to Federal Rule of Civil Procedure 26(f). (Gardner Decl. ¶¶ 34-35.) The parties also proposed a confidentiality agreement and a proposed Federal Rule of Evidence 502(d) Order. (Gardner Decl. ¶ 34.) During expedited discovery in preparation for mediation, Defendants produced

approximately five thousand core documents. (Gardner Decl. ¶¶ 3, 36-39.) Lead Counsel served document subpoenas on the FDA and ANI, and reviewed thousands of pages of documents produced in response to these subpoenas. (Gardner Decl. ¶¶ 40-41.) In response to a subpoena from ANI, Lead Counsel produced roughly 3,500 pages. (Gardner Decl. ¶ 41.) Lead Counsel also hired Forensic Economics, Inc. to conduct an expert analysis of the damages at issue in the case. (Gardner Decl. ¶¶ 42-43.) Finally, prior to the mediation, Lead Counsel also consulted a regulatory expert. (Gardner Decl. ¶¶ 44-45.)

The case settled following this expedited discovery process. Thus, the case settled prior to the class certification stage, prior to any motions for summary judgment, and even prior to full discovery. However, though expedited, the discovery was merits-based. (Gardner Decl. ¶ 40.) The parties produced a substantial amount of discovery. (Gardner Decl. ¶ 40.)

In short, the Court finds that this case settled at a time in which Lead Plaintiff, and Lead Counsel, had developed a significant appreciation for the merits of the case. They had fully briefed the main issues in the case and conducted merits-based expedited discovery. *Cf. Cendant*, 264 F.3d at 236 (affirming settlement where "Lead Counsel mainly engaged in only informal discovery"). Lead Plaintiff has accumulated sufficient information and understanding to negotiate the Settlement.

Moreover, when the settlement results from arm's-length negotiations, the Court "affords considerable weight to the views of experienced counsel regarding the merits of the settlement." *McAlarnen v. Swift Transp. Co., Inc.*, 2010 WL 365823, at *8 (E.D. Pa. 2010); *see also In re General Instrument Sec. Litig.*, 209 F.Supp.2d 423, 430 (E.D. Pa. 2001) ("*General Instrument*") ("Significant weight should be attributed to the belief of experienced counsel that the settlement is in the best interests of the class."). This case settled after an arm's-length negotiation mediated by Judge Phillips.

In conclusion, both in deference to Plaintiff's Counsel's support of the Settlement, and upon the Court's independent review that Lead Plaintiff was in an appropriate stance to evaluate the relative merits of the claims, the Court finds that this factor weighs in favor of approving the Settlement.

Case 3:16-cv-00085-MEM    Document 176-1    Filed 09/25/20    Page 100 of 147

In re Viropharma Inc. Securities Litigation, Not Reported in Fed. Supp. (2016)
2016 WL 312108, Fed. Sec. L. Rep. P 99,007

### 4. The risks of establishing liability and damages.

"By evaluating the risks of establishing liability, the district court can examine what the potential rewards (or downside) of litigation might have been had class counsel elected to litigate the claims rather than settle them." *GMC*, 55 F.3d at 814. Class action securities litigation cases are notoriously difficult cases to prove. *See, e.g., Alaska Elec. Pension Fund v. Flowserve Corp.*, 572 F.3d 221, 235 (5th Cir. 2009) ("To be successful, a securities class-action plaintiff must thread the eye of a needle made smaller and smaller over the years by judicial decree and congressional action.").

Section 10(b) of the Exchange Act makes it unlawful for any person, through the use of "any means of interstate commerce, the mails, or any national securities exchange, to employ… any manipulative or deceptive devise or contrivance in contravention of rules" promulgated by the SEC. 15 U.S.C. § 78j. Rule 10b-5 prohibits the making of "any untrue statement of a material fact" or the omission of "a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading" connected to the purchase or sale of securities. 17 C.F.R. § 240.10B-5 (1951). Lead Plaintiff's allegations concern omissions of material fact. To state a claim for omissions under Section 10(b) of the Exchange Act and Rule 10b-5, a plaintiff must allege: (1) a material misrepresentation or omission; (2) scienter; (3) a connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation. *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005) (internal citations omitted); *see also In re Merck & Co. Sec. Litig.*, 432 F.3d 261, 268 (3d Cir. 2005) ("[A] plaintiff must show that (1) the defendant made a materially false or misleading statement or omitted to state a material fact necessary to make a statement not misleading; (2) the defendant acted with scienter; and (3) the plaintiff's reliance on the defendant's misstatement caused him or her injury.") (internal quotations omitted).

**\*12** Section 20(a) provides that:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith

and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t. Section 20(a) is a derivative cause of action, predicated upon § 10(b) liability.

Liability in this type of case will be difficult to prove. The Court notes that two aspects of this case would be particularly difficult to prove: (1) scienter and (2) loss causation. First, proving that Defendants acted with knowledge or recklessness[5] as to the alleged falsity of their omissions would present difficulties. "Since stockholders normally have 'little more than circumstantial and accretive evidence to establish the requisite scienter,' proving scienter is an 'uncertain and difficult necessity for plaintiffs.'" *Smith v. Dominion Bridge Corp.*, 2007 WL 1101272, at \*5 (E.D. Pa. 2007) (quoting *General Instrument*, 209 F.Supp.2d at 430). One of Lead Plaintiff's strongest arguments would be that Defendants Doyle and Rowland sold some of their ViroPharma Securities during the Class Period. (Gardner Decl. ¶ 49.) However, as Lead Plaintiff admits, Defendants Doyle and Rowland also retained significant ViroPharma Securities. (Gardner Decl. ¶ 49.) Moreover, Defendants Milano and Wolf did not sell stock during the Class Period. (Gardner Decl. ¶ 49.) Further, internal communications from the Class Period could show that the Defendants genuinely believed that they would succeed in netting three additional years of marketing exclusivity for Vancocin. (Gardner Decl. ¶ 50.)

5       Actual knowledge, rather than recklessness, would be required if the Court determined that the safe harbor provisions of the PSLRA were triggered. 15 U.S.C. § 78U-5(c).

In addition, scienter could likely only be shown by proving that the communications from the FDA to ViroPharma disclosed the FDA's clear intent to reject Defendants' Citizen's Petition. Lead Plaintiff correctly theorizes that Defendants would have had strong defenses regarding whether these communications in fact showed the FDA's intent given that the FDA's interim communications are not binding as agency actions and the FDA's own documents from that time may have showed that they had not yet decided the Citizen's Petition. (Gardner Decl. ¶ 40.) Overall, the Court agrees with Lead Plaintiff that proving scienter would be a risky proposition. (Gardner Decl. ¶¶ 48-55.)

Second, proving loss causation and damages would be equally difficult. Lead Plaintiff would need to show that Defendants' omissions caused the drop in the ViroPharma Securities' prices following the corrective disclosure. Such proof would

necessitate a battle of the experts. Lead Plaintiff would be permitted to present expert testimony on their theory of loss causation, and Defendants would be permitted to submit a rebuttal expert report arguing that the omissions had no impact on the value of ViroPharma Securities. *See, e.g.*, *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S.Ct. 2398, 2425 n. 8 (2014). Of note, Lead Plaintiff points the Court to the fact that at the end of the Class Period, ViroPharma promulgated three separate disclosures pertaining to Vancocin, only one of which allegedly contained material misstatements or omissions. (Gardner Decl. ¶ 57.) As such, to prove causation, Lead Plaintiff would need to show that the fraudulent disclosure was the cause of the drop in stock price, not the information contained in the non-fraudulent disclosures released around the same time. (Gardner Decl. ¶ 57.)

 **\*13**  Further, this issue of causation directly impacts the difficulty in proving damages. "The conflicting damage theories of defendants and plaintiffs would likely have resulted in an expensive battle of the experts and it is impossible to predict how a jury would have responded." *In re Corel Corp. Inc. Sec. Litig.*, 293 F.Supp.2d 484, 492 (E.D. Pa. 2003).

Lead Plaintiff and Lead Counsel considered such issues and determined that the Settlement was in the best interest of the Settlement Class. (Gardner Decl. ¶¶ 8-9.) The Court agrees. This factor weighs heavily in favor of the Settlement.

### 5. The risks of maintaining the class action through trial.

With any class action, the Court may decertify or modify the class during the litigation should the class prove unmanageable. Fed. R. Civ. P. 23(c)(1). Even if the Court certified the class, there is always a risk that the class would be modified or decertified. However, there is nothing specific to the record to suggest that a putative certification of the Settlement Class would be particularly vulnerable to decertification. As such, this factor weighs neither in favor nor against approving the Settlement.

### 6. The ability of the defendants to withstand a greater judgment.

The Court must consider whether the Defendants "could withstand a judgment for an amount significantly greater than the Settlement." *Cendant*, 264 F.3d at 240. This factor is not alone dispositive. "[I]n any class action against a large corporation, the defendant entity is likely to be able to withstand a more substantial judgment, and, against the weight of the remaining factors, this fact alone does not undermine the reasonableness of the instant settlement." *Sullivan v. DB Investments, Inc.*, 667 F.3d 273, 323 (3d Cir. 2011). In this case, the Court finds that Defendants could likely pay more; however, this factor is not dispositive.

### 7. The range of reasonableness of the settlement fund in light of the best possible recovery and in light of the attendant risks of litigation.

The last two factors analyze "the present value of the damages plaintiffs would likely recover if successful, appropriately discounted for the risk of not prevailing...compared with the amount of the proposed settlement." *Prudential*, 148 F.3d at 322 (quoting *GMC*, 55 F.3d at 806). These factors ask "whether the settlement represents a good value for a weak case or a poor value for a strong case." *Warfarin*, 391 F.3d at 538. "The touchstone of this examination is the 'economic valuation of the proposed Settlement.'" *Erie County Retirees Ass'n*, 192 F.Supp.2d 369, 376 (W.D. Pa. 2002) (quoting *In re Safety Components, Inc. Sec. Litig.*, 166 F.Supp.2d 72, 92 (D.N.J. 2001)). However, there is no specific formula, threshold, or equation that a Court must use to determine whether a settlement amount is reasonable. Even a settlement that is only a "fraction of the potential recovery" can be deemed appropriate. *In re Sunrise Sec. Litig.*, 131 F.R.D. 450, 457 n. 13 (E.D. Pa. 1990).

The proposed Settlement is reasonable considering the best possible recovery for the Settlement Class and the risks of further litigation. The Settlement is reasonable both in contrast to other settlements of its ilk, and to the maximum potential recovery in this case. First, the Settlement is larger than the median reported settlement amount of $6-6.5 million in 2014. *Compare* Renzo Comolli & Svetlana Starykh, Recent Trends in Securities Class Action Litigation: 2014 Full-year Review [Hereinafter Nera Rpt], Nera Economic Research Associates, Inc., 28 (Jan. 20 2015), *available at* http://www.nera.com/content/dam/nera/publications/2015/ PUB_2014_Trends_0115.pdf (reporting $6.5 million as the median) *with* Laarni T. Bulan, Ellen M. Ryan & Laura E. Simmons, Securities Class Action Settlements: 2014 Review and Analysis [Hereinafter Cornstone Rpt], Cornerstone Research, at 6 (2015), *available*

In re Viropharma Inc. Securities Litigation, Not Reported in Fed. Supp. (2016)

2016 WL 312108, Fed. Sec. L. Rep. P 99,007

*at* https://www.cornerstone.com/GetAttachment/701f936e-ab1d-425b-8304-8a3e063abae8/Securities-Class-Action-Settlements-2014-Review-and-Analysis.pdf (reporting $6.0 million as the median).[6]

[6] The NERA and Cornerstone Research studies provide the Court with comprehensive reporting on nationwide trends in securities class actions. *C.f. In re Omnivision Techs, Inc.*, 559 F.Supp. 2d 1036, 1042 (N.D. Cal. 2007) (relying on a 2005 NERA report); *In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*, 2007 WL 313474, at *10 (S.D.N.Y. 2007) (relying on a 2005 Cornerstone Research report); *In re Linerboard Antitrust Litig.*, 2004 WL 1221350, at *14 (E.D. Pa. 2004) (citing a 1996 NERA study).

**\*14** Second, the Settlement is a healthy percentage of the total possible recovery. Lead Plaintiff retained an expert to analyze the alleged damages. (Gardner Decl. ¶ 6.) Lead Plaintiff's expert estimated that the Settlement Class sustained damages ranging from approximately $78.5 million (representing the one-day drop following the corrective disclosure) to $90 million (representing the two-day drop following the corrective disclosure). (Gardner Decl. ¶ 6.) Thus, the settlement of $8 million reflects roughly 9-10% of the maximum estimated losses. Across the last ten years, in cases where the estimated recovery was roughly the same as this case, the median settlement as a percentage of estimated recovery was about 5%. *See* CORNERSTONE RPT, *supra*, 8 (reporting that in cases between 2005 and 2013, where the estimated damages ranged between $50-124 million, the median settlement as a percentage of estimated damages was 5.0%); NERA RPT, *supra*, 32 (reporting that in cases between 1996 and 2014, where the estimated damages ranged between $50-99 million, the median settlement as a percentage of projected investor losses was 4.8%); *see also Ikon*, 194 F.R.D. at 183-84 (approving 5.2-8.7% recovery of estimated maximum losses).

Moreover, this estimated damages range represents the maximum estimated losses if a jury found that ViroPharma Securities prices dropped entirely due to Defendants' material misrepresentations or omissions. As previously addressed, around the time ViroPharma made its last allegedly fraudulent statement, ViroPharma also made two non-fraudulent disclosures. In proving causation, Lead Plaintiff faced a real risk that a jury would find that the other disclosures were at least partly responsible for the drops in prices. Thus, while the recovery is only 9-10% of the maximum estimated losses, it likely reflects an even higher

percentage of the estimated losses Lead Plaintiff could have foreseeably recovered. This factor weighs in favor of approving the Settlement.

**ii. The *Prudential* considerations**

None of the *Prudential* considerations weighs against Settlement: (1) following extensive briefing on substantive issues, expedited discovery, and an arm's-length mediation process, Lead Plaintiff, and Lead Counsel, appropriately understood the merits of the case such that they could knowingly enter into the Settlement; (2) given that there were no objections by the Settlement Class and that no persons opted out of the Settlement Class, there are no claims by other classes or subclasses related to the underlying facts of this case; (3) there are no known other claimants beyond those represented by the Settlement Class; (4) Settlement Class members were accorded the right to opt out of the Settlement, and none chose to do so; (5) as discussed in greater detail *infra*, the demand for attorneys' fees is reasonable; and (6) the Plan of Allocation is fair and reasonable.

As to the sixth factor, "[t]he court's principal obligation is simply to ensure that the fund distribution is fair and reasonable as to all participants in the fund." *Walsh*, 726 F.2d at 964. Pursuant to the Notice, any Settlement Class members who wished to participate in the distribution of the Settlement had to submit a valid proof of claim no later than September 21, 2015. (Notice at 6-8; Dkt No. 88.) As the Notice outlines, after deducting attorneys' fees and expenses, Notice and relevant administration costs, banking fees, and taxes, the remaining fund amount (the "Net Settlement Fund") will be distributed according to the Plan of Allocation. (Notice at 6-7, 10; SA at 17 ¶ 9; Gardner Decl. ¶ 70.) The Plan of Allocation outlines that the Net Settlement Fund will be distributed on a *pro rata* basis among Authorized Claimants. (Notice at 11.) The Notice explains that the maximum recovery available for call options and put options is three percent of the Net Settlement Fund. (Notice at 11.)

The Plan of Allocation describes formulas for determining the Total Inflation Loss[7] and the Net Trading Loss,[8] disaggregated by the type of ViroPharma Security and the date of sale. (Notice at 11-13.) The Plan of Allocation explains that the Authorized Claimant will recover the Total Inflation Loss, or the Net Trading Loss, whichever is lesser. (Notice at 14.) These formulas were developed with Lead Plaintiff's expert. (Gardner Decl. ¶ 72.) Only Authorized Claimants

In re Viropharma Inc. Securities Litigation, Not Reported in Fed. Supp. (2016)
2016 WL 312108, Fed. Sec. L. Rep. P 99,007

whose prorated shares will be greater than $10.00 will receive payment. (Notice at 14.) The Garden City Group, under Lead Counsel's oversight, will determine each Authorized Claimant's *pro rata* share. (Gardner Decl. ¶ 73.)

7    An Inflation Loss is the amount of loss calculated based on the amount of inflation in the price of ViroPharma common stock, notes or call options, or deflation in the price of ViroPharma put options based on methodology described in the Plan of Allocation. (Notice at 11.) The Total Inflation Loss is the sum of all Inflation Losses for all transactions in all ViroPharma Securities. (Notice at 13.)

8    A Trading Loss is the amount by which the amount paid for ViroPharma Securities purchased or acquired during the Class Period, excluding all fees, taxes, and commissions, (the "Purchase Amount") exceeds the amount received for sales of ViroPharma Securities sold during the Class Period, excluding all fees, taxes, and commissions (the "Sales Proceeds"). (Notice at 11.) A Trading Gain means the amount by which the Sales Proceeds exceeds the Purchase Amount for each transaction. An Authorized Claimant has a Net Trading Gain when his or her total Trading Gains exceed or are equal to his or her Total Trading Losses. (Notice at 13.)

**\*15** If there is any balance remaining in the Net Settlement Fund six months after all litigation fees and expenses, taxes, and payments to Authorized Claimants have been made, and enough balance remains, Lead Counsel shall reallocate such remaining balance to the Authorized Claimants. (Notice at 14.) If any amount remains after reallocation, but such amount is too small for further reallocation, the remaining balance shall go to the Council of Institutional Investors, a non-profit organization. (Notice at 14.) The Court finds that this procedure is fair and reasonable.

### iii. Conclusion

In sum, all of the *Girsh* and *Prudential* factors are either neutral or weigh in favor of the Settlement, with the sole exception that Defendants could likely withstand a greater judgment. Given that the Settlement came two and half years into a well-litigated case, after an arm's-length negotiation process meditated by the Honorable Layn R. Phillips, United States District Court Judge (Ret.), with no objections coming from the over 18,000 member Settlement Class, and with the Settlement Fund reflecting an above-average recovery, this

Court approves the Settlement. Further, the Court approves the Plan of Allocation.

### V. Attorneys' Fees

"In a certified class action, the court may award reasonable attorney's fees and nontaxable costs that are authorized by law or by the parties' agreement." Fed. R. Civ. P. 23(h). "The common fund doctrine provides that a private plaintiff, or plaintiff's attorney, whose efforts create, discover, increase, or preserve a fund to which others also have a claim, is entitled to recover from the fund the costs of his litigation, including attorneys' fees." *GMC*, 55 F.3d at 820 n. 39 (citing *Vincent v. Hughes Air West, Inc.*, 557 F.2d 759 (9th Cir. 1977)). This Court must conduct a "thorough judicial review" to determine whether and how much of an award counsel is due. *Prudential*, 148 F.3d at 333; *GMC*, 55 F.3d at 819. The determination rests with the discretion of the Court. *Id.* at 821.

Plaintiff's Counsel requests an award of 30% of the Settlement Fund. In support of this Motion, Lead Counsel submitted a declaration related to fees and expenses. (Jonathan Gardner on behalf of Labaton Sucharow LLP Declaration, Dkt No. 91, Ex. 4 [hereinafter Labaton Decl.].)

#### a. Legal Standard

The percentage-of-recovery method is "generally favored" in cases involving a settlement that creates a common fund. *Sullivan*, 667 F.3d at 330; *In re. AT&T Corp. Sec. Litig.*, 455 F.3d 160, 164 (3d Cir. 2006) ("*AT&T*"); *In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 300 (3d Cir. 2005) ("*Rite Aid*"); *Cendant*, 243 F.3d at 734. Where the Lead Plaintiff approves the Lead Plaintiff's counsel's request fee award – as Lead Plaintiff does here – the Court should afford the fee requested a presumption of reasonableness. *Cendant*, 264 F.3d at 220.

The Court should also consider:

(1) The size of the fund created and the number of persons benefitted;

(2) The presence or absence of substantial objections by members of the Class to the settlement terms and/or fees requested by counsel;

(3) The skill and efficiency of the attorneys involved;

(4) The complexity and duration of the litigation;

Case 3:16-cv-00085-MEM    Document 176-1    Filed 09/25/20    Page 104 of 147

In re Viropharma Inc. Securities Litigation, Not Reported in Fed. Supp. (2016)
2016 WL 312108, Fed. Sec. L. Rep. P 99,007

(5) The risk of nonpayment;

(6) The amount of time devoted to the case by plaintiffs' counsel; and

(7) The awards in similar cases.

*Gunter v. Ridgewood Energy Corp.*, 223 F.3d 190, 195 n. 1 (3d Cir. 2000). The factors "need not be applied in a formulaic way...and in certain cases, one factor may outweigh the rest." *Diet Drugs*, 582 F.3d at 541.

Second, the Court should compare the proposed percentage against the lodestar cross-check. The lodestar cross-check is performed by calculating the "lodestar multiplier." *AT&T,* 455 F.3d at 164. The multiplier is determined by dividing the requested fee award, determined from the percentage-of-recovery method, by the lodestar. *Id.* To determine the lodestar method's suggested total, the court multiplies "the number of hours reasonably worked on a client's case by a reasonable hourly billing rate for such services based on the given geographical area, the nature of the services provided, and the experience of the attorneys." *Rite Aid,* 396 F.3d at 305. To determine the number of hours used in calculating the lodestar, courts must exclude hours that are "excessive, redundant, or otherwise unnecessary." *McKenna v. City of Phila.,* 582 F.3d 447, 455 (3d Cir. 2009) (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983)).

### b. Analysis

 **\*16** In this case, Plaintiff's Counsel requests 30% of the Settlement Fund. Because Lead Plaintiff approves of the Attorneys' Fees, the Court affords the attorneys' fees requested a presumption of reasonableness. *Cendant*, 264 F.3d at 220. The Court determines that the fees are appropriate under the required factors as well.

### i. *Gunter* Factors

### 1. **The size of the fund created and the number of persons benefited**

The "most critical factor" for the Court to weigh is "the degree of success obtained." *Hensley*, 461 U.S. at 436 The Settlement established a common fund of $8,000,000, intended for roughly 18,000 Settlement Class members. (Gardner Decl. ¶

79.) As discussed in greater detail *supra* during the Court's analysis of the *Girsh* factors, the Court finds that 9-10% recovery of the total estimated maximum losses is a higher than average recovery for cases of this type. This factor weighs in favor of the award of attorneys' fees.

### 2. **The presence or absence of substantial objections by members of the Class to the settlement terms and/or fees requested by counsel**

No Settlement Class member filed any objections. (Gardner Decl. ¶ 95.) Lead Plaintiff supports the request for attorneys' fees. (Carpenters' Decl. ¶ 6.) This factor weighs in favor of the award of attorneys' fees.

### 3. **The skill and efficiency of the attorneys involved**

The skill and efficiency of the attorneys involved are measured by the "quality of the result achieved, the difficulties faced, the speed and efficiency of the recovery, the standing, experience and expertise of counsel, the skill and professionalism with which counsel prosecuted the case and the performance and quality of opposing counsel." *In re Computron Software, Inc.*, 6 F.Supp.2d 313, 323 (D.N.J. 1998).

First, as described *supra* during the Court's analysis of the *Girsh* factors regarding risks, this outcome is an extremely favorable resolution for the Settlement Class given the risks attendant with securities litigation. Second, as discussed *supra* during the Court's analysis of the class certification requirement for adequacy of representation, Plaintiff's Counsel is highly experienced in this area of litigation and was chosen specifically due to their expertise in these matters. (*See* Labaton Resume, Goldman Resume, Robbins Resume.) Third, opposing counsel in this case is as highly regarded as Plaintiff's Counsel. Both sides litigated this case aggressively and professionally. The submissions from the parties were consistently well-researched, of high-quality, and timely submitted. The Court notes with appreciation that the parties conducted expedited discovery without any Court intervention. This factor weighs in favor of the award of attorneys' fees.

### 4. **The complexity and duration of the litigation**

Case 3:16-cv-00085-MEM    Document 176-1    Filed 09/25/20    Page 105 of 147

In re Viropharma Inc. Securities Litigation, Not Reported in Fed. Supp. (2016)
2016 WL 312108, Fed. Sec. L. Rep. P 99,007

As addressed *supra* in the Court's analysis of the *Girsh* factor on the stage of the proceedings, this case settled fairly early in the life of the case. However, this posture reflects the comprehensive and substantial briefing the parties completed for Defendants' Motion to Dismiss and motion to certify for interlocutory appeal. In addition, in preparation for mediation, the parties conduct expedited discovery. Throughout this process, Plaintiff's Counsel zealously represented the Lead Plaintiff and Settlement Class.

Moreover, even if the Settlement Class could recover a larger judgment at trial, such recovery would be postponed for years. The Settlement secures a lesser, but actual, payment for the Settlement Class now, rather than the speculative promise of a larger payment years from now. "Here, the trial, as...all securities fraud trials, will be long and complex...Thus, the complexity, expense and duration of the litigation weigh in favor of settlement." *Hoffman Elec., Inc. v. Emerson Elec., Co.*, 800 F.Supp. 1279, 1285 (W.D. Pa. 1992). This factor weighs in favor of the award of attorneys' fees.

### 5. The risk of nonpayment

 **\*17**  Plaintiff's Counsel worked on an entirely contingent basis. (Gardner Decl. ¶ 11.) "Courts routinely recognize that the risk created by undertaking an action on a contingency fee basis militates in favor of approval." *In re Schering-Plough Corp. Enhance ERISA Litig.*, 2012 WL 1964451, at \*7 (D.N.J. 2012). In litigating this case for nearly four years now, without pay, shouldering all expenses, Plaintiff's Counsel took on significant risk of non-payment. Given the length and complexity of this case, this factor weighs in favor of the award of attorneys' fees.

### 6. The amount of time devoted to the case by Plaintiff's Counsel

Plaintiff's Counsel estimates that they invested more than 4,500 hours of attorney and other professional and paraprofessional time on this case. (Gardner Decl. ¶ 11.) This factor weighs in favor of the award of attorneys' fees.

### 7. The awards in similar cases

"In common fund cases, fee awards generally range from anywhere from nineteen percent (19%) to forty-five percent (45%) of the settlement fund." *Bredbenner v. Liberty Travel,*

*Inc.*, 2011 WL 1344745, at \*21 (D.N.J. 2011). The median award for attorneys' fees for securities class action settlements of this size is roughly twenty five percent (25%). *See NERA Rpt*, *supra*, at 34 (reporting that between 2012-2014, settlements worth between \$25-100 million awarded a median percentage of 25%). In this Circuit, "awards of thirty percent are not uncommon in securities class actions." *Ikon*, 194 F.R.D at 194; *see also Esslinger v. HSBC Bank Nev., N.A.*, 2012 WL 5866074, at \*12 (E.D. Pa. 2012) (approving 30% of the settlement amount); *In re Sterling Financial Corp. Sec. Class* Action, 2009 WL 2914363, at \*3 (E.D. Pa. 2009) (approving thirty percent award); *Smith v. Dominion Bridge Corp.*, 2007 WL 1101272, at \*9 (E.D. Pa. 2007) (awarding one-third); *In re Ravisent Technologies, Inc. Sec. Litig.*, 2005 WL 906361, at \*11 (E.D. Pa. 2005) ("[C]ourts within this Circuit have typically awarded attorneys' fees of 30% to 35% of the recovery, plus expenses."); *In re Corel Corp. Inc. Sec. Litig.*, 293 F.Supp.2d 484, 497 (E.D. Pa. 2003) (awarding one-third); *In re Aetna Inc. Sec. Litig.*, 2001 WL 20928, at \*14 (E.D. Pa. 2001) ("[A]wards of thirty percent are commonly awarded in other settlements of securities fraud cases."). The Court finds that the thirty percent recovery is appropriate given the size of the recovery.

### ii. Lodestar cross-check

To conduct the lodestar cross-check, the Court will compute the hours worked by all Plaintiff's Counsel and multiply such amounts against the appropriate hourly rates. Lead Counsel spent 2,952.90 hours on the case. (Labaton Decl., Ex. B [hereinafter Labaton Lodestar Rpt.]; Summary of Lodestars, Dkt No. 91, Ex. 7 [hereinafter Lodestar Summary]; Labaton Decl. ¶ 6.) Based on Lead Counsel's current billing rates, the total lodestar amount for attorney and professional time for Lead Counsel was \$1,807,603.50. (Labaton Lodestar Rpt.; Lodestar Summary; Labaton Decl. ¶ 6.) Liaison counsel spent 542.10 hours on the case. (Paul J. Scarlato on behalf of Goldman Scarlato & Penny, P.C., Dkt No. 91, Ex. 5 [hereinafter Goldman Decl.] ¶ 7; Lodestar Summary.) Based on liaison counsel's billable rates, the lodestar analysis totals \$376,759.50. (Goldman Decl. ¶ 7; Goldman Decl., Ex. B [hereinafter Goldman Lodestar Rpt.]; Lodestar Summary.) Additional plaintiff's counsel spent 1,022.25 hours on the case. (David W. Mitchell on behalf of Robbins Geller Rudman & Dowd LLP, Dkt No. 91, Ex. 6 [hereinafter Robbins Decl.] ¶ 6; Lodestar Summary.) Based on additional plaintiff's counsel's billable rates, the lodestar analysis totals

In re Viropharma Inc. Securities Litigation, Not Reported in Fed. Supp. (2016)

2016 WL 312108, Fed. Sec. L. Rep. P 99,007

$476,254.50. (Robbins Decl. ¶ 6; Robbins Decl., Ex. B [hereinafter Robbins Lodestar Rpt.]; Lodestar Summary.)

**\*18** Plaintiff's Counsel, and relevant staff, in total, incurred 4,517.25 billable hours. (Lodestar Summary; Gardner Decl. ¶ 92.) The hourly billing rates of all of Plaintiff's Counsel range from $610 to $925 for partners, $475 to $750 for of counsels, and $350 to $700 for other attorneys. (Gardner Decl. ¶ 91.) The total lodestar amount is $2,660,617.50. (Lodestar Summary; Labaton Lodestar Rpt.; Goldman Lodestar Rpt.; Robbins Lodestar Rpt.; Gardner Decl. ¶¶ 83, 92.)

Given that 30% of the Settlement Fund reflects $2,400,000, the lodestar multiplier here is negative 0.90. (Gardner Decl. ¶ 92.) The lodestar cross-check confirms that the percentage-of-recovery method produces an appropriate recovery. The Court grants the Motion for Attorneys' Fees.

## VI. Expenses

Counsel in a class action are entitled to reimbursement of expenses that were "adequately documented and reasonable and appropriately incurred in the prosecution of the class action." *Abrams v. Lightolier, Inc.*, 50 F.3d 1204, 1225 (3d Cir. 1995).

Lead Counsel requests $89,650.74 in expenses, including costs for meals/hotels/transportation, duplicating, postage, telephone/facsimile, messenger/overnight delivery, filing, witness and other court fees, court reporting and transcripts, online legal and financial research fees, experts, and contributions to Litigation Expense Fund. (Lodestar Summary; Labaton Decl. ¶¶ 8-9.) Liaison counsel requests $751.73 in expenses including duplicating, postage, messenger/overnight delivery, and online legal and financial research fees. (Lodestar Summary; Goldman Decl. ¶ 9.) Additional plaintiff's counsel requests $64,794.76 in expenses including filing, witness and other fees, transportation, hotels and meals, telephone, messenger/overnight delivery, expert report, photocopies, online legal and financial research services. (Lodestar Summary; Robbins Decl. ¶¶ 8-9.)

In total, Plaintiff's Counsel requests $155,197.23 in expenses. (Lodestar Summary; Gardner Decl. ¶¶ 11, 75, 83, 98, 100.) This amount includes $72,468 related to investigation of the claims and expert analysis, and $31,208.33 in mediation fees assessed by Judge Phillips. (Gardner Decl. ¶ 102.) Lead Plaintiff supports the application for expenses.

The Court finds the expenses reasonable and grants all expenses requested.

## All Citations

Not Reported in Fed. Supp., 2016 WL 312108, Fed. Sec. L. Rep. P 99,007

---

**End of Document** © 2020 Thomson Reuters. No claim to original U.S. Government Works.

 © 2020 Thomson Reuters. No claim to original U.S. Government Works.

2020 WL 3578342
Only the Westlaw citation is currently available.
United States District Court, E.D. Kentucky,
Central Division.
(at Lexington).

Carrie JOHNSON, Individually
and on Behalf of Others
Similarly Situated, Plaintiffs,
v.
BLC LEXINGTON, SNF, LLC,
d/b/a Brookdale Richmond
Place SNF, et al., Defendants.

Civil Action No. 5: 19-064-DCR
|
Signed 07/01/2020

**Attorneys and Law Firms**

Justin Peterson, Laraclay Drake Parker, J. Dale Golden, Kellie Marie Collins, Golden Law Office, PLLC, Lexington, KY, for Plaintiffs.

Donald L. Miller, II, Julie Cheatham Foster, Quintairos, Prieto, Wood & Boyer, P.A., Louisville, KY, J. Peter Cassidy, III, Quintaros, Prieto, Wood & Boyer, P.A., Lexington, KY, Matthew Coleman Cocanougher, Attorney General's Office, Frankfort, KY, for Defendants BLC Lexington SNF, LLC, ARC Richmond Place, Inc., American Retirement Corporation, Brookdale Senior Living Communities, Inc., Brookdale Senior Living, Inc., Ann Phillips, BRE Knight SH KY Owner, LLC, Emeritus Corporation, Park Place Investments, LLC, BKD Personal Assistance Services, LLC, Horizon Bay Management, LLC, Emericare Inc., BKD Richmond Place Propco, LLC, Brookdale Employee Services - Corporate LLC, Brookdale Employee Services, LLC, BKD Twenty One Management Company, Inc., ARC Therapy Services, LLC, Brookdale Associate Fund, Inc., Benita Dickenson.

Donald L. Miller, II, Quintairos, Prieto, Wood & Boyer, P.A., Louisville, KY, for Defendants ARC Richmond Place Real Estate Holdings, LLC, HCP, Inc., HBP Leaseco Inc.

**MEMORANDUM OPINION AND ORDER**

Danny C. Reeves, Chief Judge

**\*1** Plaintiff Carrie Johnson has sued a host of defendants for alleged negligence and fraud related to her care at BLC Lexington, SNF, LLC. [Record No. 27] She asserts multiple claims on behalf of a proposed class of persons who sought care from BLC Lexington from 2014 to 2018. Johnson has filed a motion to certify the class and requests a hearing and oral argument under Local Rule 7.1(f). [Record No. 241] The defendants responded in opposition to the motion to certify the class, asserting that the plaintiff could not meet any of the prerequisites for certification of a class action. After reviewing this matter in full, the Court concludes that it is ill-suited for resolution as a class action. Because individualized issues will predominate, the motions to certify a class and to appoint class counsel will be denied. Oral argument is not needed to resolve the motion; therefore, Johnson's request for a hearing will be denied.

**I.**

Johnson was a resident at a skilled nursing facility, BLC Lexington, from October 20, 2017, to November 9, 2017. [Record No. 27, p. 9] BLC Lexington held the license to operate the skilled nursing facility where Johnson received care. It is a subsidiary of Brookdale Senior Living, Inc. Johnson alleges that Brookdale Senior Living, Inc., through its employees and shell corporations, defrauded Kentucky consumers by advertising false staffing information and inflating star ratings from April 1, 2014, to March 31, 2018. She asserts that BLC Lexington managers submitted false CMS-671 forms over the course of five years. Johnson further contends that BLC Lexington advertised false data about its staffing levels on a website (Nursing Home Compare) which in turn gave BLC Lexington a higher star rating than was warranted. She also asserts an individual claim of medical negligence.

This Court previously granted, in part, a motion to dismiss for failure to state a claim. Therefore, Johnson's remaining individual claims include negligence (Count I), medical negligence (Count II), corporate negligence (Count III), and violation of long-term care residents' rights (Count IV). Her remaining class claims include fraud in

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.   1

Johnson v. BLC Lexington, SNF, LLC, Slip Copy (2020)
2020 WL 3578342

the inducement (Count IX), fraudulent misrepresentation, concealment, nondisclosure (Count X), negligence (Count XII), unjust enrichment (Count XVI), violation of the Kentucky Consumer Protection Act (Count XVII), and attorneys' fees (Count XXIII).

The Court also granted a renewed motion to dismiss for lack of person jurisdiction filed by the following defendants: Lucinda Baier, in her capacity as Owner and Manager of Various Defendants; Chad C. White, in his capacity as Owner and Manager of Various Defendants; Mary Sue Patchett, in her capacity as Owner and Manager of Various Defendants; Joanne Leskowicz, in her capacity as Owner and Manager of Various Defendants; George T. Hicks, in his capacity as Owner and Manager of Various Defendants; Labeed Diab, in his capacity as Owner of Brookdale Richmond Place, SNF; Geraldine Gordon-Krupp, in her capacity as Owner of Brookdale Richmond Place, SNF; Bryan Richardson, in his capacity as Owner of Brookdale Richmond Place, SNF; and Thomas Smith, in his capacity as Owner of Brookdale Richmond Place, SNF. Next, the Court denied the following defendants' motion to dismiss for lack of personal jurisdiction: ARC Richmond Place, Inc. d/b/a Brookdale Richmond Place PCH (KY), Brookdale Lexington IL/AL/MC (KY), and Brookdale Home Health; Bre Knight SH KY Owner, LLC; Emeritus Corporation; Park Place Investments, LLC; BKD Personal Assistance Services, LLC; Horizon Bay Management, LLC; Emericare, Inc.; BKD Richmond Place Propco, LLC; Brookdale Employee Services – Corporate LLC; BKD Twenty One Management Company, Inc., and Brookdale Associate Fund, Inc.

**\*2** Johnson has now filed a motion for class certification and a motion to appoint class counsel. [Record Nos. 241, 243] Both parties have filed a plethora of motions *in limine*, motions to strike, and motions for summary judgment. The focus of this opinion is the plaintiff's motion for class certification and to appoint class counsel.

## II.

The defendants first argue that the plaintiff and the proposed class do not have standing to bring these claims because alleged misrepresentations regarding staffing resulted in class-wide economic damages and the plaintiff did not actually suffer economic harm. Standing requires an injury in fact, a causal connection, and likely redressability. *Lujan v.*

*Defenders of Wildlife*, 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992).

The defendants argue more specifically that the plaintiff's alleged injury is based on the services for which she paid; however, the plaintiff paid nothing for her nursing care because it was covered by Medicare. Thus, they believe she does not have an economic injury in fact. Conversely, Johnson asserts that she paid co-insurance of her managed care plan for part of her stay but even if she had not, the payor source would be irrelevant.

"A dollar of economic harm is still an injury-in-fact for standing purposes." *Carpenters Indus. Council v. Zinke*, 854 F.3d 1, 5 (D.C. Cir. 2017) (citing *Czyzewski v. Jevic Holding Corp.*, —— U.S. ——, 137 S. Ct. 973, 197 L.Ed.2d 398 (2017)). And while not exactly on point, the collateral source rule provides support for the proposition that, even if insurance covered the cost of her stay, there would still be standing to sue.

"The collateral source rule provides that benefits received by an injured party for his [or her] injuries from a source wholly independent of, and collateral to, the tortfeasor will not be deducted from or diminish the damages otherwise recoverable from the tortfeasor." *Schwartz v. Hasty*, 175 S.W.3d 621 (Ky. Ct. App. 2005).[1] The justification for this rule is that "the wrongdoer should not receive a benefit by being relieved of payment for damages because the injured party had the foresight to obtain insurance," and the deterrent impact of tort liability would be undermined if the tortfeasor was not required to pay the full extent of the damages. *Id.*

[1]   Medicare benefits are governed by the collateral source rule and treated as any other type of insurance. *Baptist Healthcare Systems, Inc. v. Miller*, 177 S.W.3d 676 (Ky. 2005).

Analogously, just because the payor source was from insurance rather than direct payment by the plaintiff, there is still a potential injury in fact because the plaintiff would not have received the value of the services for which she contracted. It is counter-intuitive to shield a defendant from liability because insurance is the payor source when the individual would still be liable for payment under the contract.

The Court also agrees with the plaintiff that *Rideau v. Keller Indep. Sch. Dist.*, 819 F.3d 155 (5th Cir. 2016), is instructive on this point. In *Rideau*, the defendant argued that the plaintiff lacked standing to sue because there was a third-party payor

for a child's medical expenses, specifically a trust set-up to provide support and maintenance for the remainder of the child's life. *Id.* at 160. The court in *Rideau* noted that even though there was a third-party payor there was standing because the plaintiffs could have incurred the obligation to pay the medical expenses. *Id.* at 161. The medical bills at issue in *Rideau* were addressed to the plaintiff, notwithstanding the fact that there was a third-party payor. *Id.* The court concluded that the existence of a trust did not create an impediment to an Article III injury any more than the existence of insurance. *Id.*

**\*3** Here, the plaintiff would have an obligation to pay the expenses incurred at BLC Lexington. Having Medicare cover those costs is not an impediment to Article III standing.

## III.

Rule 23 of the Federal Rules of Civil Procedure sets forth the requirements for maintaining a class action. For the Court to certify a class, the proposed class must satisfy the following threshold requirements of Rule 23(a): numerosity, commonality, typicality, and adequacy of representation. *In re American Medical Sys., Inc.*, 75 F.3d 1069, 1079 (6th Cir. 1996). If each prerequisite is established, the plaintiffs must also demonstrate that the class may be maintained under one of the theories available under Rule 23(b). *Glazer v. Whirlpool Corp. (In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.)*, 722 F.3d 838, 851 (6th Cir. 2013), *cert. denied*, 571 U.S. 1196, 134 S.Ct. 1277, 188 L.Ed.2d 298 (2014).

A party seeking to certify a class bears the burden of establishing that certification is proper. *In re American Medical Sys., Inc.*, 75 F.3d at 1079. Further, a class action may not be approved simply "by virtue of its designation as such in the pleadings," nor may prospective class representatives simply rely upon "mere repetition of the language of Rule 23(a)" to support their motion. *Id.* Instead, an adequate basis for each prerequisite must be pled and supported by the facts. *Weathers v. Peters Realty Corp.*, 499 F.2d 1197, 1200 (6th Cir. 1974); *see also Pipefitters Local 636 Ins. Fund v. Blue Cross Blue Shield of Michigan*, 654 F.3d 618, 629 (6th Cir. 2011), *cert. denied*, 565 U.S. 1261, 132 S. Ct. 1757, 182 L.Ed.2d 532 (2012). The Court conducts a rigorous analysis to determine whether the prerequisites of Rule 23 are satisfied. *Glazer*, 722 F.3d at 851.

### i. Class Definition

Before reviewing the 23(a) factors, the Court must decide whether the class definition is "sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member of the proposed class." *Young v. Nationwide Mut. Ins. Co.*, 693 F.3d 532 (6th Cir. 2012). The Court must also determine whether the named plaintiff is a member of the proposed class. *Brashear v. Perry County*, No. 06-143, 2006 WL 3021135, at \*2, 2006 U.S. Dist. LEXIS 77471, at \*4 (E.D. Ky. Oct. 20, 2006); *Thacker v. Chesapeake Appalachia, L.LC.*, 259 F.R.D. 262, 266 (E.D. Ky. 2009).

Johnson asserts that there is a readily ascertainable class and she is a member of that class. She contends that the proposed class consists of residents or legal representatives of the residents at BLC Lexington from January 1, 2014, to the present and are citizens of the Commonwealth of Kentucky. [Record No. 241-1, p. 8] She also "proposes a temporal narrowing of this class category to be limited to residents or the legal representatives of those residents at Richmond Place from April 1, 2014 to March 31, 2018, based on her expert reports documenting the duration of Defendants' fraud." [*Id.*] Johnson notes that she is a member of this class because she sought care at BLC Lexington during the requisite period and is a citizen of Kentucky. The defendants, however, contend that the proposed class is not ascertainable because it is a fail-safe class and requires extensive factual inquiries in determining whether an individual is part of it.

**\*4** "Ascertainability" requires that class members can be identified without extensive and individualized fact-finding. *EQT Production Co. v. Adair*, 764 F.3d 347, 358 (4th Cir. 2014); *Chaz Concrete Co. v. Codell,* No. 3: 03-52-KKC, 2006 WL 2453302, at \*5, 2006 U.S. Dist. LEXIS 60013, at \*15 (E.D. Ky. Aug. 23, 2006) ("Where extensive factual inquiries are required to determine whether individuals are members of a proposed class, class certification is likely improper."). "For a class to be sufficiently defined, the court must be able to resolve the question of whether class members are included or excluded from the class by reference to objective criteria." *Young v. Nationwide Mut. Ins. Co.*, 693 F.3d 532, 538 (6th Cir. 2012) (quoting 5 James W. Moore, et al., Moore's Federal Practice § 23.21[3] (Matthew Bender, 3d ed. 1997)).

In *Chaz Concrete Co. v. Codell,* 2006 WL 2453302, at \*1, 2006 U.S. Dist. LEXIS 60013, at \*3-4, United States District Judge Caldwell declined to certify a class action in a Racketeer Influenced and Corrupt Organizations Act ("RICO") case, where the plaintiffs

Johnson v. BLC Lexington, SNF, LLC, Slip Copy (2020)

2020 WL 3578342

asserted that the defendants violated RICO by committing fraud in awarding contracts under a Disadvantaged Business Enterprise program. Judge Caldwell concluded that attempts to define the class demonstrated that the action was unsuitable for certification because the proposed class definition included individuals who were not harmed by the defendants. *Id.* at *12, 2006 U.S. Dist. LEXIS 60013, at *34, 2006 WL 2453302. Because the class definition included those who entered the program without relying on a misrepresentation, the definition was overly broad and would include those who were not harmed by the defendant. *Id.*

Judge Caldwell concluded that "the class must be defined to include only those properly certified DBEs who took some action in reliance on one of the Defendant's misrepresentations." *Id.* But any class definition that includes reliance requires the Court to make an individualized factual inquiry to determine the members of the proposed class, which renders the action inappropriate for a class action. *Id.*; *see also Nevada-Martinez v. Ahmad*, 2016 WL 7888046, at *4, 2016 U.S. Dist. LEXIS 191052, at *8-11 (E.D. Ky. June 17, 2016) (noting that the class definition required that the court make an individual finding whether a member met the cancellation requirements and about each class member's state of mind).

Here, it would be difficult to ascertain whether an individual is a member of the class without conducting an individualized inquiry and touching on the merits of each individuals' claims. Johnson originally asserts that her class definition is not limited to those that were victims of the fraudulent schemes and argues that the defendants were limiting her class definition. But if the Court were to leave her class definition to include any Kentucky resident who sought care at BLC Lexington from 2014 to 2018, it would include those who potentially were not harmed by the alleged fraud. However, limiting the class to those who relied on the misrepresentations of the defendants would require an individualized factual inquiry before determining membership in the class.

The defendants also argue that the class is a "fail-safe" class, meaning that a person is a member only if he or she has a valid claim. *Young*, 693 F.3d at 538. "A fail-safe class includes only those who are entitled to relief, and is improper because a class member either wins or, by virtue of losing, is defined out of the class and therefore not bound by the judgment." *Nevada-Martinez*, 2016 WL 7888046, at *6, 2016 U.S. Dist. LEXIS 191052, at *15. The plaintiff counters that the class

is not a fail-safe class because the defendants read the class definition in tandem with the factual basis for the plaintiff's class theories. But as noted above, her definition would be overbroad if it was not limited to those who relied on the defendant's misrepresentations. Limiting the class definition to those who relied on the misrepresentation of the defendants would then depend on whether the potential class member has a valid claim and would require resolution on the merits. Accordingly, it would be a "fail-safe" class. Thus, Johnson's proposed class is not ascertainable.

#### ii. Rule 23(a)

**\*5** Rule 23(a) states:

> One or more members of a class may sue or be sued as representative parties on behalf of all members only if:
>
> > (1) the class is so numerous that joinder of all members is impracticable;
> >
> > (2) there are questions of law or fact common to the class;
> >
> > (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
> >
> > (4) the representative parties will fairly and adequately protect the interests of the class.

Johnson asserts that joinder would be impracticable because the proposed class consists of between 884 and 3,102 members. While there is no specific minimum number necessary to meet the requirements for impracticability of joinder, the plaintiff must demonstrate "the existence of the numbers of persons [she] purports to represent ..." Further, "the Court cannot rely on speculation or conclusory allegations of the proposed representatives." *Gevedon v. Purdue Pharma*, 212 F.R.D. 333, 337-38 (E.D. Ky. 2002). As discussed above, the Court cannot determine member of the proposed class without a specific factual inquiry concerning each proposed member's claims. The inquiry would further involve whether the proposed member is subject to binding arbitration. In short, the Court cannot determine if the class is sufficiently numerous to meet the requirement of Rule 23(a)(1).

Johnson next asserts that there is a common course of conduct involving standardized documents that are necessary for resolution of the class claims including violations of the Kentucky Consumer Protection Act, unjust enrichment, and

Johnson v. BLC Lexington, SNF, LLC, Slip Copy (2020)

2020 WL 3578342

fraud. The defendants contend in response that the course of conduct is not common and would involve an individualized finding for each class member.

To demonstrate commonality, a plaintiffs' claims must be based on a common contention that is "of such a nature that it is capable of class wide resolution – which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349, 131 S.Ct. 2541, 180 L.Ed.2d 374 (2011). "The commonality test is qualitative, rather than quantitative, that is, there need be only a single issue common to all members of the class." *In re American Medical Sys.*, 75 F.3d at 1080. "[T]he commonality requirement will not be met ... if each class members' claim would necessitate an individualized determination of liability." *Schilling v. Kenton County*, 2011 WL 293759, 2011 U.S. Dist. LEXIS 8050 (E.D. Ky. Jan. 27, 2011) (citing 5 James Wm. Moore, Moore's Federal Practice § 23.23 [2] ).

The Court agrees with the defendants that the proposed class would require multiple individualized determinations for each class member. The defendants note that the star ratings and actual staffing levels underpinning the fraud claim are not static but change monthly. Further, as discussed in detail above, determining prospective class members' claims would require individualized findings on reliance and causation.

And as noted above, a threshold inquiry impacting the commonality requirement concerns whether class members are subject to binding arbitration. The admission agreement to enter BLC Lexington includes a provision requiring binding arbitration. [Record No. 35-1, pp. 11-12] Johnson was not subject to the binding arbitration provision because her husband signed the admission agreement without authority to bind her it.

**\*6** In *Spotswood v. Hertz Corp.*, 2019 WL 498822, 2019 U.S. Dist. LEXIS 20536 (D. Md. Feb. 7, 2019), the court concluded that putative class members of the class potentially being subject to signed arbitration waivers that could prevent them from joining the class was the threshold question. It found that this threshold arbitrability question predominates over common merits questions and destroys commonality. *Id.* The *Spotswood* court had previously held that "where certain members of a class are subject to contracts containing arbitration clauses, while other class members are not, those differences in contractual relationships destroy[ ]

commonality and typicality of the class." *Id.* (citing *In re Titanium Dioxide Antitrust Litigation*, 962 F. Supp. 2d 840, 861 (D. Md. 2013)). It further explained that the named class member was not an adequate representative because he was not subject to arbitration defenses like other putative class members might be.

And in *Conde v. Sensa*, 2018 WL 4297056, \*11, 2018 U.S. Dist. LEXIS 154031, \*34-35 (S.D. Cal. Sept. 10, 2018), the court for the Southern District of California concluded that, if the proposed class was certified, it would then have to determine which class members may be subject to the arbitration provision. And these determinations would overshadow the common issues in the case. *See also Hill v. T-Mobile USA, Inc.*, No. 2:09-CV-1827-VEH, 2011 WL 10958888, 2011 U.S. Dist. LEXIS 157669 (N.D. Ala. May 16, 2011). Here, determining whether potential members of the class are subject to binding arbitration destroys commonality and typicality of the class.

The plaintiff argues that the defendants waived the right to arbitration because they have engaged in extensive litigation and discovery. But the defendants cannot waive their rights "to enforce contractual causes at issue until the class composition [is] final." *In re Titanium*, 962 F. Supp. 2d at 853 (referencing *Muhammad v. Giant Food Inc.*, 108 F. App'x 757, 765 n.5 (4th Cir. 2004) (per curiam)). Accordingly, the Court concludes that the commonality requirement is not met in this case.

Johnson further asserts that her claims are typical of the class because they are identical and only the amount of damages would be different. Rule 23(a)(3) requires that the claims of the representatives be typical of the claims of the class.

> Typicality determines whether a sufficient relationship exists between the injury to the named plaintiff and the conduct affecting the class, so that the court may properly attribute a collective nature to the challenged conduct.... Thus, a plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members, and if his or her claims are based on the same legal theory.

*In re American Medical Sys.*, 75 F.3d at 1082 (internal citations and quotations omitted). But as noted above, typicality is destroyed if there is a necessary threshold arbitrability question. Johnson's situation is not typical because her husband did not have the authority to bind her to arbitration. Accordingly, typicality is not met.

2020 WL 3578342

Finally, the Court must "measure the adequacy of the class members' representation based upon two factors: '1) the representatives must have common interests with unnamed members of the class, and 2) it must appear that the representatives will vigorously prosecute the interests of the class through qualified counsel.' " *Greenberg v. Procter & Gamble Co.* (*In re Dry Max Pampers Litig.*)*, 724 F.3d 713, 721 (6th Cir. 2013)* (quoting *Vassalle v. Midland Funding LLC*, 708 F.3d 747, 757 (6th Cir. 2013)*). Class representatives are generally adequate if the representatives are "part of the class and possess the same interest and suffer the same injury as the class members." *East Tex. Motor Freight Sys. Inc. v. Rodriguez*, 431 U.S. 395, 403, 97 S.Ct. 1891, 52 L.Ed.2d 453 (1977).

 **\*7** Johnson is not an adequate representative because she is not subject to a binding arbitration defense like other potential class members might be. Additionally, there are individualized questions for each potential class member that must be answered regarding reliance, making it impossible for Johnson to represent the interests of all unnamed plaintiffs.

Additionally, "[i]n making the determination of adequacy of representation the district court should consider the experience and ability of counsel for the plaintiffs." *Cross v. National Trust Life Ins. Co.*, 553 F.2d 1026, 1031 (6th Cir. 1977). While the plaintiff's attorneys assert that they have extensive experience in class actions and nursing home litigation, the Court cannot conclude based on the lack of commonality among Johnson and potential unnamed class members that the adequacy of representation is satisfied in this case.

In summary, because the plaintiff cannot satisfy the requirements of Rule 23(a) of the Federal Rules of Civil Procedure, the motion for class certification will be denied.

### iii. Rule 23(b)

As noted above, the plaintiff has failed to establish that this action meets the prerequisites for certification under Rule 23(a). Although extensive analysis is not needed due to the conclusions reached above, that Court also concludes that individualized questions predominate over common questions. Therefore, a class action is not the superior method for adjudicating these claims.

Johnson has also moved for certification of this class action under Rule 23(b)(3), which provides that:

A class action may be maintained if Rule 23(a) is satisfied and if ...

(3) the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The matters pertinent to these findings include:

(A) the class members' interests in individually controlling the prosecution or defense of separate actions;

(B) the extent and nature of any litigation concerning the controversy already begun by or against class members;

(C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

(D) the likely difficulties in managing a class action.

"In discerning whether a putative class meets the predominance inquiry, courts are to assess 'the legal or factual questions that qualify each class member's case as a genuine controversy,' and assess whether those questions are 'subject to generalized proof, and thus applicable to the class as a whole.' " *Sandusky Wellness Center, LLC v. ASD Specialty Healthcare, Inc.*, 863 F.3d 460, 468 (6th Cir. 2017) (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997)); *Bridging Communities, Inc. v. Top Flite Fin., Inc.*, 843 F.3d 1119, 1124 (6th Cir. 2016). Rule 23(b)(3) also requires that a class action be the superior method for fairly and efficiently adjudicating the controversy.

"A fraud case may be unsuited for treatment as a class action if there was material variation in the representations made or in the kinds or degrees of reliance by the persons to whom they were addressed." Fed. R. Civ. P. 23 advisory committee's note to 1996 amendment; *see also Stout v. J.D. Byrider*, 228 F.3d 709, 718 (6th Cir. 2000) (internal quotation marks and citation omitted). Additionally, "common questions, will rarely, if ever predominate an unjust enrichment claim, the resolution which turns on individualized facts." *Bearden v. Honeywell Int'l, Inc.*, 2010 WL 1223936, 2010 U.S. Dist. LEXIS 28331 (E.D. Tenn. Mar. 24, 2010) (quoting *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1274 (11th Cir. 2009)).

 **\*8** In *Nevada-Martinez*, 2016 WL 7888046, at \*4, 2016 U.S. Dist. LEXIS 191052, at \*12, District Judge Joseph Hood

concluded that individualized factual and legal inquiries would predominate the action because the causes of action asserted by the plaintiff included elements of knowledge, reliance, and/or consent. Accordingly, Judge Hood concluded that the Court could strike the class allegations because individual questions would predominate. *Id.* at *5, 2016 U.S. Dist. LEXIS 191052, at *14, 2016 WL 7888046. Likewise, in the present case, individualized questions predominate over common questions of law and fact.

A class action is not the superior method for fairly and efficiently adjudicating the potential class members' claims. The defendants correctly note that the Court would have to determine whether each class member relied upon the star ratings in choosing to obtain care at BLC Lexington and what the star ratings and staffing levels were each time a proposed class member decided to seek care at the facility. Individualized findings of reliance would predominate over common questions. Further, as previously noted, claims of unjust enrichment are generally ill-suited for class actions because of the individualized determinations necessary. And the plaintiff makes claims on behalf of the class for negligence which would require a breach of duty and proximate cause analysis for each member of the class. Thus, individualized inquiries predominate over common questions.

## IV.

Johnson has also moved the Court to appoint class counsel. She requests that this Court appoint Laraclay Parker as lead counsel and J. Dale Golden as co-lead counsel. [Record No. 243] Rule 23(g) requires that the Court appoint class counsel when certifying a class. However, because the Court is not certifying the class, there is no need to appoint class counsel. Accordingly, this motion will be denied.

## V.

Johnson seeks to strike the affidavit of Becky Stocker attached to the memorandum in opposition to the motion to certify the class because Stocker was not disclosed as being an individual likely to have discoverable information or included in any supplementary information. [Record No. 287]

Parties are required to disclose individuals who are likely to have discoverable information under Federal Rule of Civil Procedure 26(a), and supplement disclosures if they are

incomplete or incorrect. *See* Fed. R. Civ. P. 26(e). A party who fails to provide the information required by Rule 26(a), "is not allowed to use that information ... to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1).

The test for exclusion under Rule 37(c) is "very simple: the sanction is mandatory unless there is a reasonable explanation of why Rule 26 was not complied with or the mistake was harmless." *Bessemer & Lake Erie R.R. Co. v. Seaway Marine Transp.*, 596 F.3d 357, 370 (6th Cir. 2010) (internal quotations omitted). An omission is "harmless" if it involves "an honest mistake on the part of a party coupled with sufficient knowledge on the part of the other party." *Vance ex rel. Hammons v. United States*, No. 98-5488, 1999 WL 455435, *1, *5, 1999 U.S. App. LEXIS 14943, *1, *17 (6th Cir. June 25, 1999) (emphasis omitted).

The defendants oppose the motion, arguing that the affidavit provides useful information to the Court. However, the defendants do not dispute that they failed to provide the information in accordance with Rule 26(a) or make any attempt to explain how the failure was substantially justified or harmless. Accordingly, exclusion is mandatory and Johnson's motion to strike the affidavit of Becky Stocker will be granted.

## VI.

 **\*9** Based on the foregoing reasoning and analysis, it is hereby

**ORDERED** as follows:

1. Plaintiff Carrie Johnson's motion to certify the class and request for a hearing [Record No. 241] is **DENIED**.

2. Plaintiff Johnson's class-specific claims for fraud in the inducement (Count IX), fraudulent misrepresentation, concealment, nondisclosure (Count X), negligence (Count XII), unjust enrichment (Count XVI), violation of the Kentucky Consumer Protection Act (Count XVII), and attorneys' fees (Count XXIII) are **DISMISSED**.

3. Johnson's motion to appoint class counsel [Record No. 243] is **DENIED**.

**Johnson v. BLC Lexington, SNF, LLC, Slip Copy (2020)**
2020 WL 3578342

4. Johnson's motion to strike the affidavit of Becky Stocker [Record No. 287] is **GRANTED.**

5. Johnson's motion for summary judgment regarding reliance for claims Count IX and X of the Third Amended Complaint [Record No. 271] is **DENIED**, as moot.

6. Johnson's individual claims for negligence (Count I), medical negligence (Count II), corporate negligence (Count III), and violation of long-term care residents' rights (Count IV) remain pending.

**All Citations**

Slip Copy, 2020 WL 3578342

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

2012 WL 5570624

2012 WL 5570624
Only the Westlaw citation is currently available.
United States District Court, W.D. Virginia,
Charlottesville Division.

Lori KING, Plaintiff,
v.
CAPITAL ONE BANK (USA), N.A. and
Incharge Debt Solutions, Defendants.

No. 3:11–cv–00068.
|
Nov. 15, 2012.

**Attorneys and Law Firms**

David James Vendler, Morris Polich & Purdy LLP, Los Angeles, CA, Anne Marie Murphy, Eric J. Buescher, Niall Padraic McCarthy, Cotchett Pitre & McCarthy, LLP, Burlingame, CA, Garrett Minor Smith, Garrett M. Smith, PLLC, Gregory Scott Duncan, Charlottesville, VA, for Plaintiff.

Allison Perry Monger, Bryan A. Fratkin, McGuire Woods LLP, Richmond, VA, James Francis Neale, Mcguire Woods LLP, Charlottesville, VA, for Defendants.

*MEMORANDUM OPINION*

NORMAN K. MOON, District Judge.

**\*1** Plaintiff Lori King ("Plaintiff") brings this putative class action against Defendants InCharge Debt Solutions ("InCharge") and Capital One Bank (USA), N.A. ("Capital One"), alleging that both defendants violated section 1679b(a)(4) of the Credit Repair Organizations Act ("CROA"), 15 U.S.C. § 1679, *et seq.* Plaintiff alleges that InCharge, which promotes itself as a non-profit, tax-exempt credit counseling agency whose main purpose is to act on behalf of consumers and their interests, in fact operates as a partner, joint venturer, and/or agent of the very creditors that the consumers were trying to get out from under, including Capital One. Plaintiff also brings numerous other claims solely against InCharge under the CROA and the Fair Debt Collection Practices Act ("FDCPA"), as well as state law claims under Georgia Code § 18–5–3.2[1] and Florida Code § 817.801.[2] The matter is before the Court on InCharge's

motion to dismiss and compel arbitration or in the alternative to strike Plaintiff's class allegations (docket no. 18) and Capital One's motion to dismiss and stay (docket no. 23).

[1]  Under the Georgia Debt Adjusting Act, any person engaged in the business of "debt adjusting" must disburse to the appropriate creditors all funds received from a debtor within 30 days of their receipt.

[2]  Under Florida law, any person engaged in debt management or credit counseling services must disburse to the appropriate creditors all funds received from a debtor (less any permitted fees) within 30 days of their receipt.

A bench trial on the threshold factual issue of whether Plaintiff signed an agreement obliging her to arbitrate her disputes is scheduled to begin on December 18, 2012. At a hearing on September 24, 2012, I asked counsel to identify any legal issues that could be resolved prior to that trial. After considering counsel's oral arguments and briefs, for the reasons that follow I will grant InCharge's motion to strike Plaintiff's class allegations, but I will defer consideration of Defendants' motions to dismiss and compel arbitration until after the bench trial.

## I. Background

### A. InCharge's Credit Counseling Activities

Credit counseling agencies ("CCAs") are organizations that pledge to help debt-troubled individuals avoid personal bankruptcy by developing manageable strategies for coping with large amounts of debt. The chief tool placed at the disposal of CCAs by banks and credit card companies is the debt management plan ("DMP"). Generally, after a debt-troubled consumer contacts a CCA and is directed towards proceeding with a DMP, the CCA contacts the consumer's creditors and submits a DMP proposal based on criteria previously provided by the creditors. Upon acceptance by all or some of the consumer's creditors, the consumer typically makes a single monthly payment directly to the CCA. The CCA then deposits the consumer's monthly payment into a trust account from which it forwards monthly payments to each of the consumer's creditors in an amount determined by the DMP (as dictated by the creditors).

The principal service that InCharge offered consumers was the formation and maintenance of a DMP. InCharge told

consumers that when developing DMPs, it would negotiate on their behalf with their banks and credit card lenders with the ostensible benefits being the potential elimination of late and over-the-limit fees and the re-aging of credit accounts. InCharge offered these services for the express purpose of improving consumers' credit records, histories, and/or ratings. Plaintiff maintains that by providing such services, InCharge brought itself within the coverage of the CROA.[3] Additionally, Plaintiff claims that InCharge used its ostensible non-profit, tax-exempt status in its advertising materials, telling consumers that it needed their voluntary "contributions" (i.e.fees), which InCharge expressly (though falsely) asserted would merely cover the cost of establishing the consumers' DMPs.

[3]    InCharge argues that as an organization that maintains tax-exempt status under § 501(c)(3) of the Internal Revenue Code, it is not subject to many of the CROA provisions referenced in the Complaint. The CROA's definitions section does in fact specifically exclude "any nonprofit organization which is exempt from taxation under section 501(c)(3)" from the definition of the term "credit repair organization." 15 U.S.C. § 1679a(3)(B)(i). However, the mere fact that a CCA has obtained 501(c)(3) status does not insulate it from CROA coverage. See Zimmerman v. Cambridge Credit Counseling Corp., 409 F.3d 473, 478 (1 st Cir.2005) ("[T]o be excluded from the CROA under 15 U.S.C. § 1679a(3)(B)(i), a credit repair organization must actually operate as a nonprofit organization and be exempt from taxation under section 501(c)(3)"); Polacsek v. Debticated Consumer Counseling, Inc., 413 F.Supp.2d 539, 550 (D.Md.2005) ( "501(c)(3) status of the CCAs is not ipso facto dispositive of whether a CCA is exempt from CROA. The Court is obliged to consider whether in operation they truly functioned as such."). Plaintiff has alleged sufficient facts that, taken as true, suggest that InCharge is not truly operating as a non-profit and therefore falls within the CROA's coverage.

## B. InCharge's Relationship with Capital One

**\*2**  Plaintiff alleges that at all pertinent times, Capital One knew about InCharge's false representations. More specifically, Plaintiff alleges that Capital One knew that there were no "negotiations" being conducted between it and InCharge and that the "benefits" being offered by InCharge were actually pre-set by Capital One and dictated to InCharge in the form of periodic benefits sheets that Capital One unilaterally changed from time to time. Further, Capital One knew from its reviews and audits of InCharge's policies that InCharge was not operating in a manner consistent with its non-profit status. Significantly, Plaintiff also alleges that the reduction of interest rates, the re-aging of accounts, and the waiver of fees were all "benefits" that were exclusively under the control of Capital One. Thus, according to Plaintiff, Capital One entirely controlled the product that InCharge was effectively selling to consumers. Moreover, Capital One exercised control over InCharge's policies by conditioning its tens of millions of dollars of support on InCharge's compliance with Capital One's directives.

According to Plaintiff, the benefits to Capital One from having InCharge perform this role included, among other things: (1) improved collection rates from having a friendly "non-profit" induce consumers into continuing to make payments; (2) lessening of Capital One's collection costs by inducing consumers to pay "voluntary contributions" to support the "non-profit" InCharge; (3) the ability to claim Community Reinvestment Act credits for its "donations" to InCharge (which were actually booked as ordinary fee-for-service business expenses and treated that way on Capital One's tax returns); and (4) immunization of Capital One from existing regulations such as the CROA and the FDCPA by having a layer of protection between it and consumers.

In the end, Plaintiff alleges that InCharge is nothing more than a debt collector that has partnered with Capital One to collect its accounts under the guise of a non-profit good Samaritan rescuing consumers from their debt. Instead of operating a non-profit entity, Plaintiff alleges, InCharge distributed the monthly payments it collected from consumers to Capital One while also keeping a share for itself. The share kept by InCharge effectively functioned as a quid pro quo payment from Capital One. Such payment, known in industry parlance as "fair share," was hidden from consumers, who were informed only that their creditors might make charitable "contributions" to InCharge. According to Plaintiff, creditors like Capital One are willing to share debt collection proceeds in the form of "fair share" because the amount they end up remitting is much less than the 25%–33% that is standard payment to ordinary collection agencies. Plaintiff alleges that Capital One paid InCharge tens of millions of dollars in "fair share." In addition, Plaintiff maintains that the "voluntary contributions" that InCharge requested from consumers far exceeded the costs of the services it rendered and that, contrary to its non-profit status, InCharge kept these fees rather than returning the money or lowering DMP prices. Ultimately, Plaintiff alleges that InCharge deceived and

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

cheated consumers, and that Capital One was a direct or at least an indirect cause of (as well as one of the biggest beneficiaries of) the fraud.

### C. The Representative Plaintiff

 **\*3**  Plaintiff Lori King, a Georgia resident, contacted InCharge by phone in the fall of 2007. She established with InCharge a DMP that included two Capital One credit card accounts. InCharge collected what was denominated a "contribution," but which was in fact a setup fee in the amount of $49, the maximum setup fee permitted by Georgia law. Thereafter, InCharge collected a $49 monthly fee from Plaintiff. Both fees were assessed and received by InCharge before performing any services for Plaintiff, allegedly in violation of the CROA.

Plaintiff continued to pay InCharge for its DMP service at least through the filing of this action, and Capital One received monthly payments from Plaintiff until 2011. Plaintiff alleges that she received no counseling from InCharge. She states further that InCharge represented to her that her DMP would be paid in full in 2 ½ years; however, after making payments to InCharge for 3 ½ years, Plaintiff still owed money to her creditors. Plaintiff alleges that InCharge violated the CROA by failing to provide Plaintiff or any of its other clients with DMP contracts, mandatory pre-contract disclosures, or a "cooling off period."

Finally, Plaintiff argues that Defendants should be equitably estopped from relying upon the statute of limitations or, alternatively, that the doctrine of equitable tolling should apply to bar Defendants from relying on any statute of limitations. According to Plaintiff, neither she nor any members of the classes described below had any way of knowing that InCharge was really a commercial enterprise, an agent of Capital One, or the recipient of tens of millions of dollars in financial support from Capital One on a quid pro quo basis. Similarly, Plaintiff contends that she and others similarly situated had no way of knowing that InCharge was not actually negotiating with creditors like Capital One, and that InCharge and Capital One acted as if they were partners.

### D. Class Allegations

Plaintiff alleges that InCharge has had hundreds of thousands of DMP clients, of which a substantial subset had Capital One accounts. Correspondingly, she outlines two distinct but overlapping classes and one-sub-class:

- Class 1 (the "Capital One Class") consists of all consumers who were indebted to Capital One and who contracted for DMP services from InCharge; and

- Class 2 (the "InCharge Class") consists of all consumers who entered into a DMP with InCharge.

- Subclass 1 consists of all Georgia residents from whom InCharge accepted charges, fees, contributions, or a combination thereof and for whom InCharge failed to disburse to creditors all payments within thirty days of receipt of such funds.

Plaintiff estimates that there are over 200,000 members of the InCharge Class and at least 30,000 members of the Capital One Class. Thus, joining the individual members of the putative class, Plaintiff contends, would be impracticable.

Additionally, Plaintiff submits that issues of law and fact that are common to the members of the classes predominate over the questions affecting the individual members of the classes, including Plaintiff. Plaintiff also asserts that her claims are typical of the claims of the class members. Plaintiff concedes that the specific amounts of the fees paid by each of InCharge's customers may differ depending on the amount of an individual customer's overall debt, the number of months the customer was on her DMP, and the number of accounts that the customer entrusted to InCharge for servicing. Plaintiff nonetheless suggests that the damages suffered by each of the members of the classes will be calculable under a single formula—the total amount of fees the customer paid to InCharge. Individual claims in this case would probably be insufficient in amount to support individual actions; therefore, Plaintiff submits that class certification would allow actual litigation of the claims. In addition, individual class members are unlikely to be aware of their rights and are thus not in a position to commence individual litigation against Defendants. Finally, Plaintiff represents that she is not burdened by conflicts with any members of the classes that would prohibit her from serving as the class representative, and Plaintiff states that she is represented by able counsel who will faithfully represent the proposed classes. In sum, Plaintiff maintains that a class action is the superior mechanism by which to pursue this case.

### II. Standard of Review

2012 WL 5570624

**\*4** A motion to dismiss for lack of subject matter jurisdiction is governed by Federal Rule of Civil Procedure 12(b)(1). As a general matter, the plaintiff has the burden of demonstrating that subject matter jurisdiction properly lies in federal court. *See Evans v. B.F. Perkins Co., a Division of Standex Int'l Corp.,* 166 F.3d 642, 647 (4th Cir.1999). "When a defendant challenges subject matter jurisdiction pursuant to Rule 12(b)(1), 'the district court is to regard the pleadings as mere evidence on the issue, and may consider evidence outside the pleadings without converting the proceeding into one for summary judgment.' " *Id.* (quoting *Richmond, Fredericksburg & Potomac R.R. Co. v. United States,* 945 F.2d 765, 768 (4th Cir.1991)). "[I]f the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law," the Rule 12(b)(1) motion should be granted. *Richmond,* 945 F.2d at 768. Thus, even though the motion is not converted into one for summary judgment, it is effectively the summary judgment standard that applies. Accordingly, reasonable inferences should be drawn in the light most favorable to the nonmoving party. *See Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000).

### III. Discussion

Defendant InCharge has moved to dismiss all claims by Plaintiff and compel individual arbitration pursuant to an arbitration clause contained in the "Terms of Debt Management" page of a "Client Agreement" that outlined the terms and conditions of the DMP agreed upon by Plaintiff and InCharge. Plaintiff flatly denies that she ever signed any agreement containing the arbitration clause, either by hand or electronically. She contends that she entered into her DMP and provided her debt and bank account information entirely over the phone. Because there is a genuine dispute of material fact as to whether Plaintiff signed any agreement containing an arbitration clause, I have ordered a bench trial to determine whether the evidence shows that Plaintiff did in fact enter into an agreement to arbitrate disputes relating to her DMP with InCharge. As such, any ruling on defendants' motions to dismiss and compel arbitration must be deferred until after trial on the threshold issue.

In considering InCharge's motion in the alternative to strike the class allegations from the Complaint, however, I find that regardless of whether Plaintiff entered into an agreement to arbitrate with InCharge, she cannot state a claim for class action relief. On the one hand, if she did enter into the Client Agreement, I find that the arbitration clause it contains is valid and enforceable, and its express terms prohibit Plaintiff from pursuing her claims in a class action lawsuit. On the other hand, if she did not enter into the Client Agreement, I find that Plaintiff cannot satisfy the requirements for bringing a class action set forth in Federal Rule of Civil Procedure 23. I will analyze each of these possibilities in turn.

### A. The Client Agreement

**\*5** For the purposes of this discussion, I assume that defendants can prove at trial that Plaintiff signed either by hand or electronically the "Client Agreement" outlining the terms of Plaintiff's individual DMP. The Client Agreement incorporates by reference a page entitled "Terms of Debt Management," which includes the following provision:

> ***Construction; Applicable Law; Arbitration; Hold Harmless:*** This Agreement and all attached documents, forms, and schedules contain the complete agreement between you and InCharge Debt Solutions regarding the DMP. All questions concerning the agreement between you and InCharge will be governed by the laws of the State of Florida without reference to any conflict of law rules. Any provision of this Agreement (the specific sentence, section, or part thereof only) is not effective where prohibited by applicable law. Any dispute between us that cannot be amicably resolved, and all claims or controversies arising out of this Agreement, shall be settled solely and exclusively by binding arbitration in the City of Orlando, Florida administered by the American Arbitration Association under the then prevailing Commercial Arbitration Rules (it being expressly acknowledged that you will not participate in any class action lawsuit in connection with any such dispute, claim, or controversy, either as a representative plaintiff or as a member of a putative class), and judgment upon the award rendered by the arbitrator(s) may be entered in any court of competent jurisdiction.

If defendants can prove that Plaintiff entered into the Client Agreement containing this arbitration clause, the next step is to determine whether such clause is valid and enforceable. *See Glass v. Kidder Peabody & Co.,* 114 F.3d 446, 453 (4th Cir.1997) (noting that courts considering motions to compel arbitration must undertake "a limited review to ensure that the dispute is arbitrable—i.e., that a valid agreement to arbitrate exists between the parties and that the specific dispute falls within the substantive scope of that agreement." (quoting

King v. Capital One Bank (USA), N.A., Not Reported in F.Supp.2d (2012)

2012 WL 5570624

*PaineWebber, Inc. v. Hartmann,* 921 F.2d 507, 511 (3d Cir.1990)).

### 1. Validity of the Agreement

As a general matter, there can be no doubt that federal law, in the form of the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1, *et seq.,* highly favors the arbitrability of disputes and the enforcement of arbitration agreements. *See, e.g.,* 9 U.S.C. § 2 (making arbitration agreements "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract"); *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.,* 473 U.S. 614, 631, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985) (observing that the FAA reflects an "emphatic federal policy in favor of arbitral dispute resolution"); *Dean Witter Reynolds, Inc. v. Byrd,* 470 U.S. 213, 218, 105 S.Ct. 1238, 84 L.Ed.2d 158 (1985) (stating that the FAA "leaves no place for the exercise of discretion by a district court, but instead mandates that district courts shall direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed"); *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.,* 460 U.S. 1, 24–25, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983) (noting that "questions of arbitrability [must] ... be addressed with a healthy regard for the federal policy favoring arbitration" and "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration"). Moreover, the Supreme Court has emphasized that arbitration is favored in consumer disputes:

> **\*6** We agree that Congress, when enacting [the FAA], had the needs of consumers, as well as others, in mind.... [T]he Act, by avoiding the delay and expense of litigation, will appeal to big business and little business alike, ... corporate interests [and] ... individuals. Indeed, arbitration's advantages often would seem helpful to individuals, say, complaining about a product, who need a less expensive alternative to litigation.

*Allied–Bruce Terminix Cos., Inc. v. Dobson,* 513 U.S. 265, 280, 115 S.Ct. 834, 130 L.Ed.2d 753 (1995) (internal quotations marks and citation omitted).

Notwithstanding the presumption favoring the validity of arbitration agreements, such agreements may nevertheless be unenforceable. Section 2 of the FAA contains a savings clause that allows arbitration agreements to be invalidated "upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2; *see also AT &*

*T Mobility, LLC v. Concepcion,* —— U.S. ——, ——, 131 S.Ct. 1740, 1746, 179 L.Ed.2d 742 (2011) ( "This saving clause permits agreements to arbitrate to be invalidated by 'generally applicable contract defenses, such as fraud, duress, or unconscionability,' but not by defenses that apply only to arbitration or that derive their meaning from the fact that an agreement to arbitrate is at issue.") (quoting *Doctor's Associates, Inc. v. Casarotto,* 517 U.S. 681, 687, 116 S.Ct. 1652, 134 L.Ed.2d 902 (1996)); *Murray v. United Food and Commercial Workers Intern. Union,* 289 F.3d 297, 302 (4th Cir.2002). Unless the party resisting arbitration can prove such a generally applicable contract defense would invalidate the agreement, the agreement must be enforced according to its terms. *See Volt Information Sciences, Inc. v. Board of Trustees of Leland Stanford Junior University,* 489 U.S. 468, 478, 109 S.Ct. 1248, 103 L.Ed.2d 488 (1989). Given that the express terms of the arbitration clause state that "[a]ll questions concerning the agreement between you and InCharge will be governed by the laws of the State of Florida without reference to any conflict of law rules," Florida law applies when determining whether any generally applicable contract defenses would prevent enforcement of the clause.

In her complaint, Plaintiff made no reference to any arbitration agreement whatsoever, let alone any allegations that the provision at issue is unenforceable. In their motions to dismiss and compel arbitration, InCharge and Capital One preemptively offered reasons why this Court should find that the arbitration provision is not unconscionable, clearly expecting Plaintiff to make such an argument in her response brief. Plaintiff made no such argument, asserting only that the question of unconscionability of the provision is not ripe for decision since she disputes ever seeing the agreement in question, let alone agreeing to be bound by it.

To the extent that Plaintiff could have asserted other possible state law contract defenses to the arbitration agreement such as fraud or duress, I find that she has waived any such defenses as she did not raise them either in her complaint or in her response briefs. With respect to the issue of unconscionability, I find that even if Plaintiff has not waived such a defense to the arbitration agreement, the arbitration agreement in this case is not unconscionable and is therefore valid and enforceable. This conclusion is based on a straightforward application of the Supreme Court's recent decision in *AT & T Mobility v. Concepcion,* —— U.S. ——, 131 S.Ct. 1740, 179 L.Ed.2d 742 (2011), and two Eleventh Circuit cases applying *Concepcion* to arbitration clauses that, like the one in this case, selected Florida law as the applicable law.

**\*7** In *Concepcion,* 131 S.Ct. at 1753, the Supreme Court decided that the FAA pre-empted a California rule, set forth in *Discover Bank v. Superior Court,* 36 Cal.4th 148, 30 Cal.Rptr.3d 76, 113 P.3d 1100 (2005), that class action waivers in arbitration agreements contained in certain types of consumer contracts of adhesion were unconscionable and unenforceable. Under the *Discover Bank* rule, California courts frequently found arbitration agreements containing class action waivers unconscionable. *See Concepcion,* 131 S.Ct. at 1746. According to the Supreme Court, the California rule amounted to requiring the availability of classwide arbitration, which "interfere[d] with fundamental attributes of arbitration and thus creates a scheme inconsistent with the FAA." *Id.* at 1748.

Less than three months after the Supreme Court decided *Concepcion,* in *Cruz v. Cingular Wireless,* 648 F.3d 1205 (11th Cir.2011), the U.S. Court of Appeals for the Eleventh Circuit considered the validity under Florida law of a class action waiver contained in an arbitration agreement. The agreement at issue in *Cruz* provided that customers of a cell phone service provider had to submit any disputes with the provider to arbitration on an individual basis only. *See* 648 F.3d at 1207. Thus, the terms of the agreement forbade class action lawsuits and class action arbitrations. *See id.* The plaintiff argued that the waiver was unenforceable because it defeated the remedial purpose of a Florida law prohibiting deceptive and unfair trade practices. *Id.* at 1212. The issue the Eleventh Circuit decided was "whether the arbitration agreement's class action waiver [was] unenforceable as a violation of Florida public policy." *Id.* at 1210. The court held that:

> in light of *Concepcion,* the class action waiver in the Plaintiffs' arbitration agreements is enforceable under the FAA. Insofar as Florida law would invalidate these agreements as contrary to public policy (a question we need not decide), such a state law would stand as an obstacle to the accomplishment and execution of the FAA.

*Id.* at 1207 (internal citation and quotation marks omitted).

While the plaintiffs in *Cruz* framed their objections to the class action waiver in the arbitration clause as violations of Florida's public policy, in *Pendergast v. Sprint Nextel Corp.,* 691 F.3d 1224, 1225 (11th Cir.2012), the Eleventh Circuit addressed a case where the plaintiff explicitly argued that a class action waiver in an arbitration agreement was unconscionable under Florida law and therefore unenforceable. Prior to the Supreme Court's decision in

*Concepcion,* the Eleventh Circuit had certified to the Florida Supreme Court four questions of Florida law, including whether the particular class action waiver at issue in *Pendergast* was procedurally or substantively unconscionable under Florida law and whether it was void under Florida law for any other reason. *See* 691 F.3d at 1230. After the U.S. Supreme Court decided *Concepcion,* the defendant in *Pendergast* moved to withdraw certification of the state law questions to the Florida Supreme Court. The Eleventh Circuit denied the defendant's request, but concluded that it would not have certified the questions had *Concepcion* been decided before the certification. *See id.* The Florida Supreme Court then declined jurisdiction and returned the case to the Eleventh Circuit. *See Pendergast v. Sprint Nextel Corp.,* No. SC 10–19, 2012 WL 2948594 (Fla. July 17, 2012). The Eleventh Circuit proceeded to consider the state law issues in light of *Concepcion* and its own earlier decision in *Cruz.*

**\*8** In essence, the plaintiff in *Pendergast* argued that the arbitration agreement at issue was unconscionable because it disallowed classwide procedures. *See* 691 F.3d at 1234. Terming its analysis "a straightforward application of *Concepcion* and *Cruz,*" the court in *Pendergast* concluded that it "need not decide whether the class action waiver [at issue] is unconscionable under Florida law ... because to the extent Florida law would invalidate the class action waiver, it would still be preempted by the FAA." *Id.* In other words, even if Florida state law held that an arbitration agreement that prohibited class action lawsuits was unconscionable (which both the Florida Supreme Court and the Eleventh Circuit declined to decide), such law would be inconsistent with the FAA and would necessarily be preempted under *Concepcion.*

Applying *Concepcion, Cruz,* and *Pendergast* to this case, I find there is no basis upon which to find the arbitration clause and class action waiver unconscionable. To the extent that the class action waiver in this case appears in a contract of adhesion, may make it more difficult to pursue small claims, and eliminates the availability of class action suits, the analysis is the same as in *Concepcion, Cruz,* and *Pendergast.* Just as in *Pendergast,* if Florida law were to find the arbitration clause contained in the Client Agreement unconscionable for any of those reasons, it would be preempted by federal law as set forth in the FAA and *Concepcion* . As a result, the arbitration clause containing the class action waiver is valid and enforceable.

The clause in this case states that the parties "expressly acknowledge [ ] that [Plaintiff] will not participate in any class

King v. Capital One Bank (USA), N.A., Not Reported in F.Supp.2d (2012)
2012 WL 5570624

action lawsuit in connection with any such dispute, claim, or controversy, either as a representative plaintiff or as a member of a putative class." While the parties dispute whether the class action waiver means that Plaintiff cannot proceed in arbitration on a class basis, I need not and do not address that issue here since I am only considering InCharge's motion to strike the class allegations. The explicit language of the clause states that the Plaintiff will not participate in "any class action lawsuit," a term that undoubtedly encompasses a class action lawsuit brought in federal district court. As a result, if the facts show that Plaintiff did in fact sign the Client Agreement, then by its terms she cannot bring a class action in this Court.

**2. The Scope of the Agreement**

The next question to consider is whether "the specific dispute falls within the substantive scope of [the arbitration] agreement," *Glass,* 114 F.3d at 453, and thus whether the class action waiver applies to all of Plaintiff's claims. Plaintiff argues that some of her claims arose prior to the existence of the Client Agreement and therefore are not covered by the arbitration clause containing the class action waiver. Specifically, Plaintiff alleges that InCharge failed to give the pre-contract disclosures and notice of rights required by the CROA,[4] and that InCharge violated the FDCPA by failing to disclose in its initial oral communication with Plaintiff that it was a debt collector attempting to collect a debt and that any information obtained would be used for that purpose. *See* 15 U.S.C. § 1692e(11). According to Plaintiff, claims based on these failures "vested" prior to entry into the Client Agreement and are not covered by the terms of the arbitration clause.

[4]    "CROA requires credit repair organizations to provide customers with a written disclosure statement describing the customer's rights before entering into a contract for the provision of credit repair services." *Kindred v. McLeod,* 2010 WL 4814360, at *5 (W.D.Va. Nov.19, 2010) (citing 15 U.S.C. § 1679c(a)).

 **\*9** The language of the arbitration clause containing the class action waiver is very broad, covering "*[a]ny dispute* between us that cannot be amicably resolved, and all claims or controversies arising out of this Agreement." (Emphasis added). Plaintiff's argument ignores the words "any dispute." Her claims clearly constitute a dispute that is covered by the plain meaning of the contract language. *See Jones v. Genus Credit Management Corp.,* 353 F.Supp.2d 598, 602 (D.Md.2005) (rejecting the same argument made by Plaintiff

and holding that language identical to the language in this case "self-evidently is broad enough to cover the claims asserted by plaintiffs"); *Gay,* 511 F.3d at 376 (summarily rejecting a similar argument). Accordingly, all of Plaintiff's claims are covered by the class action waiver.

**3. Waivability of Class Actions Under CROA**

Even though the express terms of the arbitration clause forbid her from participating "in any class action lawsuit," Plaintiff nevertheless argues that she must be allowed to proceed on a class basis because the availability of a class action is a "protection" that cannot be waived under the CROA. Plaintiff bases this argument in the CROA's broad non-waiver provision, set forth in 15 U.S.C. § 1679f(a), which provides that "[a]ny waiver by any consumer of any protection provided by or any right of the consumer under this subchapter—(1) shall be treated as void; and (2) may not be enforced by any Federal or State court or any other person." The CROA not only prohibits waiver of the rights and protections it provides to consumers, it also makes "[a]ny attempt by any person to obtain a waiver from any consumer of any protection provided by or any right of the consumer under this subchapter" a separate violation. 15 U.S.C. § 1679f(b).

The logic of Plaintiff's argument is simple. First, Plaintiff notes that the CROA provides for awards of punitive damages in class actions, *see* 15 U.S.C. § 1679g(a)(2)(B), has its own punitive damages provision applicable to the "named plaintiff," 15 U.S.C. § 1679g(a)(2)(B)(i), and lists specific separate criteria for the establishment of punitive damages in class actions. *See* 15 U.S.C. § 1679g(b)(4). Thus, Plaintiff argues, the availability of a class action is a "protection" provided by the CROA. Accordingly, since the CROA's non-waiver provision says that "any waiver" of "any protection provided by" the Act is void, Plaintiff argues that under the express terms of § 1679f(a), she cannot have lawfully waived her ability to bring a class action alleging violations of the Act.

Although Plaintiff's argument may make sense in the abstract, her conclusion cannot survive in the face of the Supreme Court's decision in *CompuCredit Corp. v. Greenwood,* ––– U.S. ––––, 132 S.Ct. 665, 181 L.Ed.2d 586 (2012). The issue in *CompuCredit* was "whether the CROA precludes enforcement of an arbitration agreement in a lawsuit alleging violations of that Act." *Id.* at 668. In general, the FAA permits arbitration of federal statutory claims "unless the FAA's

2012 WL 5570624

mandate has been 'overridden by a contrary congressional command.' " *CompuCredit,* 132 S.Ct. at 669 (quoting *Shearson/American Express Inc. v. McMahon,* 482 U.S. 220, 226, 107 S.Ct. 2332, 96 L.Ed.2d 185 (1987)). Despite a binding arbitration provision in the agreements they had signed, the plaintiffs in *CompuCredit* brought a class-action lawsuit against credit repair organizations, alleging violations of the CROA. *See id.* Under the CROA, credit repair organizations are required to tell consumers that they "have a right to sue a credit repair organization that violates the [CROA]." 15 U.S.C. § 1679c(a). The plaintiffs in *CompuCredit* argued that the "right to sue" meant the right to bring an action in a court of law, and because the CROA's non-waiver provision prohibits the waiver of any "right," a provision mandating arbitration could not be enforced. *See* 132 S.Ct. at 669.

 **\*10** The Supreme Court rejected plaintiffs' argument. *Id.* at 669–70. First, the "right to sue" language came from the CROA's disclosure provision, which required credit repair organizations to provide a notice to consumers that contained the "right to sue" language. *Id.* at 670. The actual right to sue was provided elsewhere in the CROA, namely in § 1679g, which provides for civil liability for violations of the Act. *See id.* The Court concluded that nothing in § 1679g amounted to a congressional command that the FAA should not apply. *Id.* at 671. Further, the "right to sue" language is simply "a colloquial method of communicating to consumers that they have the legal right, enforceable in court, to recover damages from credit repair organizations that violate the CROA." *Id.* at 672. Ultimately, nothing in § 1679g required the availability of a suit in a court of law in the first instance as long as consumers were still able to vindicate their rights under the statute. *Id.* at 671–72.

Admittedly, *CompuCredit* is not directly on point; it addressed whether arbitration of CROA claims can be compelled, not whether class-based prosecution of such claims can be waived. However, the reasoning in *CompuCredit* applies equally to Plaintiff's theory in this case. In *CompuCredit,* the plaintiffs argued that the CROA's repeated use of terms "action," "class action," and "court" call to mind a judicial proceeding and thus create a "right" to bring an action in court. *Id.* at 670. The Court stated that "if a cause-of-action provision mentioning judicial enforcement does not create a right to initial judicial enforcement, the waiver of initial judicial enforcement is not the waiver of a 'right of the consumer.' " *Id.* at 671. As the Court pointed out:

if one believes that § 1679g's contemplation of court suit (combined with § 1679f(a)) establishes a nonwaivable right to initial judicial enforcement, one must also believe that it establishes a nonwaivable right to initial judicial enforcement in *any* competent judicial tribunal, since it contains no limitation. We think it clear, however, that this mere "contemplation" of suit in any competent court does not *guarantee* suit in all competent courts, disabling the parties from adopting a reasonable forum-selection clause. And just as the contemplated availability of all judicial forums may be reduced to a single forum by contractual specification, so also can the contemplated availability of judicial action be limited to judicial action compelling or reviewing initial arbitral adjudication. The parties remain free to specify such matters, so long as the *guarantee* of § 1679g—*the guarantee of the legal power to impose liability*—is preserved.

*Id.* In other words, the mere fact that the statute mentions a particular concept or procedure does not mean that such concept or procedure is a "right" or "protection" that cannot be waived. Nowhere in the CROA does Congress state that consumers have the right to bring actions on a class basis. Instead, the CROA merely alludes, in a few instances, to the possibility of pursuing class-based CROA claims and provides guidance on how to address such cases. Following the reasoning of *CompuCredit,* just as parties can agree to arbitrate CROA-based claims, so too can they agree to litigate such claims on an individual basis, rather than on a class basis, so long as the guarantee of the legal power to impose liability is preserved. And that guarantee is preserved in this case: Plaintiff will either be able to pursue her claim in this Court on an individual basis, or she will be able to pursue it in arbitration, a result explicitly sanctioned by the Supreme Court in *CompuCredit.*

 **\*11** Finally, Plaintiff cites no authority to support her reasoning that the right to bring a class action is a protection that cannot be waived under the CROA. There is, however, authority supporting the opposite conclusion. *See, e.g., Gay v. CreditInform,* 511 F.3d 369, 385 (3d Cir.2007) (construing the CROA's anti-waiver provision "as only extending to rights premised on the imposition of statutory duties, absent contrary language in the statute."); *Arnold v. Goldstar Fin. Sys., Inc.,* No. 01 C 7694, 2002 WL 1941546, at \*9 (N.D.Ill. Aug.22, 2002) ("As a general matter, the right to bring a class action in federal court is a procedural right created by Rule 23 of the Federal Rules of Civil Procedure. The only references to class actions in the CROA concern the calculation of punitive damages. These provisions do not

create a substantive right to bring a class action, so agreeing in an arbitration clause to forego the class action mechanism does not amount to a waiver of a protection provided by or statutory right under the CROA.") (citations omitted). I therefore conclude that the CROA does not provide a nonwaivable right to bring a class action. As a result, if Plaintiff did sign the Client Agreement, the terms of the arbitration clause containing the class action waiver prevent her from proceeding in this Court on a class basis, and I must strike her class allegations.

**4. Applicability of the Agreement to Capital One**

Although any decision regarding whether to compel arbitration must wait until I decide at trial whether Plaintiff actually signed the Client Agreement, because the arbitration clause also contains the class action waiver, I find that now is the appropriate time to determine whether Capital One can also rely on the arbitration clause. The Supreme Court has held that state law governs the right of a non-signatory to rely on an arbitration agreement. *See Arthur Andersen LLP v. Carlisle,* 556 U.S. 624, 632, 129 S.Ct. 1896, 173 L.Ed.2d 832 (2009). The applicable provision in the Client Agreement states that "[a]ll questions concerning the agreement between [Plaintiff] and InCharge will be governed by the laws of the State of Florida without reference to any conflict of law rules." Whether a non-signatory can rely on the class action waiver is clearly a question concerning that agreement, so the Client Agreement's choice of law provision applies. As a result, I must apply Florida law in determining whether Capital One can rely on the arbitration clause.

Capital One argues that it can rely on the arbitration clause under the doctrine of equitable estoppel. Under Florida law:

> [e]quitable estoppel is warranted under two circumstances: (1) when the signatory to a contract containing an arbitration clause must rely on the terms of the contract in asserting its claims against the non-signatory; and (2) when the signatory to a contract containing an arbitration clause raises allegations of substantially interdependent and concerted misconduct by both the non-signatory and one or more of the signatories to the contract.

**\*12** *Talk Fusion, Inc. v. Ulrich,* No. 8:11–cv–1134, 2011 WL 4102215, at \*4 (M.D.Fla. Aug.30, 2011); *see also Bahena v. American Voyager Indem. Ins. Co.,* No. 8:07–cv–1057, 2008 WL 780748, at \*2 (M.D.Fla. Mar.19, 2008). Plaintiff argues that under *In re Humana, Inc. Managed Care Litig.,*

285 F.3d 971 (11th Cir.2002), *rev'd on other grounds sub nom. PacifiCare Health Sys., Inc. v. Book,* 538 U.S. 401, 123 S.Ct. 1531, 155 L.Ed.2d 578 (2003), equitable estoppel can only apply if her claims rely on the underlying contract containing the arbitration clause. According to Plaintiff, allegations of substantially interdependent and concerted misconduct do not constitute a sufficient basis to apply equitable estoppel. This argument ignores numerous Florida cases post-dating *In re Humana* that continue to state that interdependent and concerted misconduct can permit a non-signatory to rely on the equitable estoppel doctrine. *See, e.g., Roman v. Atl. Coast Constr. and Dev., Inc.,* 44 So.3d 222, 224 (Fla.Dist.Ct.App.2010); *Kolsky v. Jackson Square, LLC,* 28 So.3d 965, 969 (Fla.Dist.Ct.App.2010); *Armas v. Prudential Sec., Inc.,* 842 So.2d 210, 212 9 (Fla.Dist.Ct.App.2003). Thus, it appears that Florida law continues to recognize that equitable estoppel applies when a party alleges interdependent and concerted misconduct by a non-signatory and a signatory.

Plaintiff has certainly alleged interdependent and concerted misconduct in this case. The Complaint alleges, among other things, that Capital One knew that InCharge was not operating as a legitimate non-profit, that it "exercised control" over InCharge, and that it did business with InCharge "precisely because the misrepresentations InCharge was practicing on consumers directly benefited Capital One." Plaintiff's allegations that Capital One and InCharge worked together to mislead and take advantage of consumers, if true, clearly constitute interdependent and concerted misconduct, and such allegations would allow Capital One to rely on the arbitration agreement.

Even if equitable estoppel requires that Plaintiff rely on the underlying contract in making out her claims against Capital One, I find that Capital One would be entitled to rely on the arbitration clause. Plaintiff argues that because her claim against Capital One is based on a federal statute, it does not rely on the underlying contract for credit repair services. But Plaintiff would not have any claims in the absence of some type of agreement. Her sole claim against Capital One is that Capital One "engaged in practices, and/or courses of business that constituted or resulted in the commission of, or attempts to commit, by InCharge, frauds or deceptions against consumers in connection with the offer or sale of the services of credit repair organizations in violation of 15 U.S.C. § 1679b(a)(4)." The services offered or sold are those outlined in the DMP agreed to between Plaintiff and InCharge, and without the DMP, she would have no claims under the statute.

2012 WL 5570624

In effect, she is trying to "have it both ways" by relying on the DMP to establish her statutory claims while simultaneously disclaiming the agreement in order to avoid arbitration. I find that under either prong of Florida equitable estoppel, Capital One can rely on the arbitration clause containing the class action waiver.

## B. The Class Action Allegations

 **\*13**  If, contrary to the assumption underlying the discussion above, Defendants cannot prove that Plaintiff entered into the Client Agreement containing the arbitration clause and class action waiver, Plaintiff will be able to pursue her claims in this Court. In order to pursue her claims as the representative of a class, however, Plaintiff must still demonstrate that a class action would be permissible and appropriate under Federal Rule of Civil Procedure 23. Given the unusual circumstances surrounding the formation and execution of Plaintiff's DMP, I find that Plaintiff would not be able to satisfy Rule 23's requirements. Accordingly, even if Plaintiff did not sign the Client Agreement, I must still strike her class allegations.

Rule 23(c)(1)(A) provides that "[a]t an early practicable time after a person sues or is sued as a class representative, the court must determine by order whether to certify the action as a class action." Although Plaintiff has not yet moved to certify a class, such motion is not required for a court to decide the certification issue when doing so is practicable and appropriate. *See* 7AA Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 1785 (3d ed. 2005) ("[T]he court has an independent obligation to decide whether an action brought on a class basis is to be so maintained even if neither of the parties moves for a ruling under subdivision (c)(1)."); *see also* Pettit v. Gingerich, 427 F.Supp. 282, 284 (D.Md.1977); *Boring v. Medusa Portland Cement Co.,* 63 F.R.D. 78, 80 (M.D.Pa.1974) (stating that a "court may act sua sponte or the defendant may move to have the court rule the action unmaintainable as a class action"). InCharge has moved to strike Plaintiff's class allegations, and having considered the factual and legal issues relating to class certification, I find it appropriate and practicable to address the certification issue at this time.

Rule 23(a) sets forth four "prerequisites" that any class action suit must satisfy. The rule permits a suit by one or more members of a class as representative parties on behalf of other members of that class only if:

(1) The class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

If Plaintiff can satisfy these prerequisites, she must also demonstrate that her action fits into one of three types described in Rule 23(b). Rule 23(b)(1) permits class actions when:

prosecuting separate actions by or against individual class members would create a risk of: (A) inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class; or (B) adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests.

 **\*14**  Rule 23(b)(2) permits a class action when "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." And finally, Rule 23(b)(3) permits a class when "the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."

Assuming, as I must, that Plaintiff entered into a DMP with InCharge in the manner pleaded in her complaint, she cannot meet Rule 23's requirements. Plaintiff seeks to represent two classes and a sub-class. The Capital One Class would consist of all consumers who were indebted to Capital One and who contracted for debt management plan services from InCharge Debt Solutions. The InCharge Class would consist of all consumers who entered into DMPs with InCharge, and there would be a sub-class of all Georgia residents who paid to InCharge fees or contributions that were not disbursed to creditors within 30 days of receipt by InCharge. Leaving aside the issue of how Plaintiff could have "contracted for debt management plan services" without signing any agreement either on paper or electronically, the question remains whom Plaintiff could actually represent if she were to move forward on a class basis. If Plaintiff did not sign the Client Agreement containing the arbitration clause, surely she cannot represent

King v. Capital One Bank (USA), N.A., Not Reported in F.Supp.2d (2012)

2012 WL 5570624

anyone who did sign it, either on paper or electronically. Such individuals would be bound by the express terms of their agreements with InCharge to arbitrate their claims. Plaintiff could not fairly and adequately represent in this Court the interests of individuals who are bound to pursue their claims in arbitration. More fundamentally, allowing Plaintiff to represent individuals bound to pursue their claims in arbitration would render the arbitration clauses totally useless, in contravention of the FAA.

That leaves the possibility that Plaintiff could represent the class of individuals who entered into and paid for DMPs but who, like Plaintiff, did not sign the Client Agreement containing the arbitration clause. While I found that InCharge has not presented evidence sufficient to grant a motion to dismiss Plaintiff's individual case, in light of the evidence InCharge has presented about its standard procedures for signing up clients, I find it exceedingly implausible that there are very many, if any, other individuals who entered into DMPs without either signing either a paper or an electronic copy of the Client Agreement containing the arbitration clause. There are almost certainly not enough to satisfy Rule 23(a)(1)'s numerosity requirement.

Even if there were enough such individuals that joinder would be impracticable, there would be too many factual variations in the cases for a class action to be appropriate. For each class member, the factfinder would have to decide whether the facts in that individual's case show that he or she did not sign the Client Agreement and therefore is not bound by the arbitration clause. Further, as Plaintiff herself acknowledges, class members' damages would vary depending on such factors as their overall debt, how long they were on their DMP, and how many accounts were entrusted to InCharge for servicing. Plaintiff glances over this problem, asserting that damages could simply be calculated under a single formula —the amount of total fees paid to InCharge. But such a formula ignores the language of the statute, which provides

that the amount of actual damages awarded be the "greater of" any amount paid to the credit repair organization or the amount of actual damage sustained. 15 U.S.C. 1679g(a)(1). Plaintiff's proposal would render the "greater of" language ineffective: under Plaintiff's formula, an individual who could prove actual damages greater than the amount of fees paid to InCharge would not receive the compensation to which he or she is entitled under the statute. In sum, in the unlikely event that there are enough people in Plaintiff's position to satisfy the numerosity requirement, the factual differences between each person's case render the class action procedure inappropriate. Because I find that Plaintiff cannot meet Rule 23's requirements for certifying a class action, I must strike her class allegations.

### IV. Conclusion

**\*15** The foregoing analysis shows that regardless of whether Plaintiff signed the Client Agreement with InCharge or not, she cannot proceed in this Court on a class basis. If she did sign the Agreement, the class action waiver contained in the arbitration clause precludes her from participating in any class action. If she did not sign the Agreement, her unique situation renders her unable to satisfy Federal Rule of Civil Procedure 23's prerequisites for bringing a class action. Accordingly, I will grant InCharge's motion to strike the class allegations against InCharge from the Complaint. An appropriate order accompanies this memorandum opinion.

The Clerk of the Court is hereby directed to send a certified copy of this memorandum opinion and the accompanying order to all counsel of record.

### All Citations

Not Reported in F.Supp.2d, 2012 WL 5570624

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

Case 3:16-cv-00085-MEM   Document 176-1   Filed 09/25/20   Page 126 of 147

Schuler v. Medicines Company, Not Reported in Fed. Supp. (2016)

2016 WL 3457218

2016 WL 3457218
Only the Westlaw citation is currently available.
NOT FOR PUBLICATION
United States District Court, D. New Jersey.

Warren H. SCHULER, individually
and on behalf of other persons
similarly situated, Plaintiff,

v.

The MEDICINES
COMPANY, et al., Defendant.

Civil Action No.: 14-1149 (CCC)
|
Signed June 23, 2016
|
Filed 06/24/2016

**Attorneys and Law Firms**

Bruce Daniel Greenberg, Lite DePalma Greenberg, LLC, Newark, NJ, Jeffrey Alan Shooman, Spiro LLC, Short Hills, NJ, for Plaintiff.

Brian J. McMahon, J. Brugh Lower, Gibbons, PC, Newark, NJ, for Defendant.

**OPINION**

CECCHI, District Judge

# I. INTRODUCTION

 **\*1**  Plaintiff Warren H. Schuler ("Lead Plaintiff") brings this action on behalf of himself and all other similarly situated individuals (collectively, "Plaintiffs") against Defendants the Medicines Company ("MDCO"), Clive A. Meanwell, Paul M. Antinori, and Glenn P. Sblendorio (collectively, the "Individual Defendants" and, together with MDCO, "Defendants") for violation of federal securities laws. ECF No. 1. On February 25, 2016, the Court granted preliminary certification of the settlement class and collective action and preliminarily approved the settlement. ECF No. 59. Presently before the Court are Plaintiffs' unopposed motions for final approval of the settlement and for an award of attorneys' fees. ECF Nos. 65, 66. The Court held a final fairness hearing on June 7, 2016. ECF No. 69. For the reasons that follow,

the Court grants final certification of the settlement class and collective action, approves the settlement agreement, awards litigation costs and expenses, and dismisses this action with prejudice.

# II. BACKGROUND

### A. Summary of Factual Allegations

Lead Plaintiff brings this action on behalf of investors who purchased the securities of MDCO between January 8, 2013 and February 12, 2014 (the "Class Period"). See Corrected First Amended Class Action Complaint ("Compl." or "Complaint"), ECF No. 28, ¶ 1. MDCO is a pharmaceutical company that focuses on acute cardiovascular care, surgery and perioperative care, and serious infectious disease care. During the Class Period, one of its most promising products in development was cangrelor, an anti-platelet blood thinner that was once expected to generate up to $450 million in annual sales. Id. ¶¶ 27-29. Lead Plaintiff alleges that Defendants knowingly or recklessly made materially false and misleading misstatements about cangrelor and the results of clinical trials MDCO conducted for cangrelor. Id. ¶¶ 59-86. The Complaint further alleges that investors were harmed when the Food and Drug Administration ("FDA") criticized the cangrelor drug trial and ultimately recommended against approving cangrelor for its proposed indications, causing the value of MDCO stock to fall. Id. ¶¶ 87-98.

### B. Procedural History

On February 21, 2014, Plaintiff David Serr commenced a securities class action against Defendants.[1] ECF No. 1. On July 18, 2014, the Court appointed Warren Schuler as Lead Plaintiff, Pomerantz LLP as Lead Counsel, and Lite DePalma Greenberg, LLC, as liaison counsel. ECF No. 26. On September 17, 2014, Lead Plaintiff filed a corrected First Amended Complaint against Defendants, alleging violations of Section 10(b) of the Securities Exchange Act of 1934 (the "Act"), 15 U.S.C. § 78j(b), Section 20(a) of the Act, 15 U.S.C. § 78t(a), and Securities and Exchange Commission Rule 10b–5, 17 CFR § 240.10b–5 (2013). See Compl. ¶¶ 122-138.

---

[1]    Although this action was initially commenced with David Serr as the named plaintiff, on May 6, 2014, Warren Schuler moved to be appointed as lead Plaintiff, with no opposition. ECF No. 22

 **\*2**  On November 17, 2014, Defendants moved to dismiss the Complaint. ECF No. 31. On June 22, 2015, after

Case 3:16-cv-00085-MEM    Document 176-1    Filed 09/25/20    Page 127 of 147

Schuler v. Medicines Company, Not Reported in Fed. Supp. (2016)
2016 WL 3457218

Defendants' motion to dismiss was fully briefed, the FDA approved cangrelor for one indication. See ECF No. 58 Ex. A at 2. On July 16, 2015, the Court heard oral argument on Defendants' motion to dismiss and recommended that the parties pursue mediation. See ECF Nos. 55, 66-1 at 8. After a full-day mediation on November 2, 2015, the parties reached an agreement to settle this matter. See ECF No. 66-1 at 8.

On February 25, 2016, the Court issued an order granting: (1) preliminary approval of the parties' settlement (the "Settlement"); and (2) preliminary certification of a settlement class consisting of "[a]ll persons who purchased or otherwise acquired the securities of ... MDCO between January 8, 2013 and February 12, 2014." ECF No. 59 ¶¶ 1-2. The Court further ordered Lead Counsel or the Claims Administrator to use reasonable efforts to cause a copy of the Notice of Proposed Settlement, Motion for Attorneys' Fees and Expenses, Settlement Fairness Hearing, and the Proof of Claim and Release forms to be mailed to all Class Members by no later than April 5, 2016. See id. ¶ 4(b).

By May 31, 2016, Lead Counsel mailed 37,488 Notice Packets to potential Class Members. Supplemental Declaration of Ryan Kao ("Supp'l Kao Decl."), ECF No. 68-4, ¶ 3. In addition, the Claims Administrator published the Summary Notice in Investor's Business Daily and over PR Newswire and maintained a website and a toll-free telephone number dedicated to this Settlement. Declaration of Ryan Kao ("Kao Decl."), ECF No. 65-3, ¶¶ 10-12. Class Members who wished to be excluded from the Class were required to submit a request in writing no later than May 17, 2016. Supp'l Kao Decl. ¶ 5. Lead Counsel have received no requests for exclusion or objections to the Settlement. Id.; see also Tr.[2] 3:2-5, 4:9-10.

[2]    "Tr." refers to the transcript of the Final Fairness Hearing held on June 7, 2016.

### C. Terms of the Settlement Agreement
The Settlement Agreement provides that Defendants will pay $4,250,000 ("Settlement Amount") into an escrow account for the benefit of the Class. See ECF No. 58, Ex. ¶¶ 2.0. The Settlement Amount is inclusive of all payments to Class Members as well as to Lead Counsel and Lead Plaintiff.

Lead Counsel seeks an award of $1,402,500[3] in attorneys' fees, which represents 33% percent of the common fund created by the Settlement Agreement, and an award of $33,569.20 in expenses incurred while prosecuting this

litigation. In addition, Lead Plaintiff requests an award in the amount of $3,500 to compensate him for his time and service to the Class. To date, there have been no objections to the forgoing requests for litigation fees and expenses.

[3]    Plaintiffs' Motion for Award of Attorneys' Fees and Expenses and Lead Plaintiff Award initially stated that 33% of the Settlement Amount equaled $1,141,666.67. See ECF No. 70. Plaintiffs have since clarified that 33% of the Settlement Amount is in fact $1,402,500. Id. This error was purely typographical. Moreover, as the notice to Class Members stated merely that Lead Counsel would seek "fees up to 33% of the Settlement Amount," see ECF No. 28 Ex. C at 2, this adjustment is of no consequence and could not have caused confusion to the Class Members.

### III. CLASS CERTIFICATION
Federal Rule of Civil Procedure 23 requires the Court to engage in a two-step analysis to determine whether to certify a class action for settlement purposes. First, the Court must determine whether Plaintiffs have satisfied the prerequisites for maintaining a class action as set forth in Rule 23(a). Second, if Plaintiffs can satisfy these prerequisites, the Court must then determine whether the requirements of Rule 23(b) are met. See Fed. R. Civ. P. 23(a) advisory committee's note.

#### A. Rule 23(a) Requirements
*3  For a lawsuit to be maintained as a class action, four prerequisites must be met: (1) numerosity: the class is so numerous that joinder of all members is impracticable; (2) commonality: there are questions of law or fact that are common to the class; (3) typicality: the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) adequacy of representation: the representative parties will fairly and adequately protect the interests of the class. See Fed. R. Civ. P. 23(a).

#### i. Numerosity

There is no minimum number of individuals necessary for certification of a class, and a prospective class that includes over forty members will generally satisfy the numerosity requirement. See Stewart v. Abraham, 275 F.3d 220, 226-27 (3d Cir. 2001); Eisenberg v. Gaenon, 766 F.2d 770, 785-86 (3d Cir. 1985). As of June 7, 2013, 148 claims were fully processed. Tr. 4:16-22. In addition, Lead Counsel's damages expert estimates that 33.6 million shares of MDCO common

stock were affected by Defendants' alleged misconduct during the Class Period, suggesting that there may be thousands of potential class members. See P1. Br. in Support of Final Approval of Class Settlement, ECF No. 66-1, at 26. Defendants do not contest that estimate. Accordingly, the Court finds that the numerosity requirement is satisfied.

### ii. Commonality

Next, Plaintiffs must demonstrate that there are questions of fact or law common to the class to satisfy the commonality requirement. Fed. R. Civ. P. 23(a)(2). "Commonality requires the plaintiff to demonstrate that the class members have suffered the same injury." Wal-Mart Stores, Inc. v. Dukes, 131 S. Ct. 2541, 2551 (2011) (quoting Gen. Tel. Co. of the Sw. v. Falcon, 457 U.S. 147, 157 (1982)). "Their claims must depend upon a common contention" such that the "determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." Id.

Here, the questions common to the Class include: (1) whether Defendants made misrepresentations concerning cangrelor and the clinical trial; (2) whether Defendants acted knowingly or recklessly in issuing the alleged false and misleading statements; and (3) whether the price of MDCO securities during the Class Period was artificially inflated by Defendants' misconduct. These questions are common to all Class Members. Accordingly, the Court finds that the commonality requirement is satisfied.

### iii. Typicality

Third, Rule 23(a)(3) requires that a representative plaintiff's claims be "typical of the claims ... of the class. The typicality requirement is designed to align the interests of the class and the class representatives so that the latter will work to benefit the entire class through the pursuit of their own goals." Barnes v. Am. Tobacco Co., 161 F.3d 127, 141 (3d Cir. 1998) (citation omitted). As with numerosity, the Third Circuit has "set a low threshold for satisfying" typicality, stating that "[i]f the claims of the named plaintiffs and putative Class Members involve the same conduct by the defendant, typicality is established ...." Newton v. Merrill Lynch, Pierce. Fenner & Smith. Inc., 259 F.3d 154, 183-84 (3d Cir. 2001); see also Baby Neal v. Casey, 43 F.3d 48, 58 (3d Cir. 1994). The typicality requirement "does not mandate that all putative Class Members share identical claims." Newton, 259 F.3d at 184 (citation omitted); see also Hassine v. Jeffes, 846 F.2d 169, 176-77 (3d Cir. 1988).

Here, the claims made by the Lead Plaintiff and those made on behalf of the other Class Members arise out of a common course of conduct by Defendants, involve the same legal theories, and are capable of class-wide resolution. Further, there is no evidence that Lead Plaintiff's claims are materially different than those of any other Class Member. See, e.g., In re Pet Food Prods.Liab. Litis., 629 F.3d 333, 342 (3d Cir. 2010) (affirming the District Court's certification of the settlement class where "the claims of the class representatives [were] aligned with those of the Class Members since the claims of the representatives ar[o]se out of the same conduct and core facts"). Thus, the typicality requirement is also satisfied.

### iv. Adequacy of Representation

**\*4** Finally, when making an adequacy determination, the Court must consider (l)the qualifications, experience, and general abilities of the plaintiffs' lawyers to conduct the litigation; and (2) whether the interests of the lead plaintiffs are sufficiently aligned with the interests of the absentees. See In re Warfarin Sodium Antitrust Litis., 391 F.3d 516, 532 (3d Cir. 2004); In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litis., 55 F.3d 768, 800 (3d Cir. 1995). Here, Lead Counsel has extensive experience litigating complex securities class actions and obtaining class action settlements. See Declaration of Murielle J. Steven Walsh in Support of Final Approval of Settlement, Plan of Allocation, and Awards to Lead Counsel and Lead Plaintiff, ("Walsh Decl."), ECF No. 66-2, ¶ 2. Further, there is no indication that Lead Plaintiff's interests are antagonistic to those of the class. Consequently, the adequacy requirement is met.

### B. Rule 23(b)(3) Requirements

The Court must next consider whether this class action comports with the requirements of Rule 23(b)(3). Under Rule 23(b)(3), the Court must find that "the questions of law or fact common to Class Members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). For the reasons set forth below, the Court finds that this class action meets the predominance and superiority requirements.

Schuler v. Medicines Company, Not Reported in Fed. Supp. (2016)
2016 WL 3457218

### i. Predominance

To satisfy the predominance requirement, parties must do more than merely demonstrate a "common interest in a fair compromise;" rather, they must provide evidence that the proposed class is "sufficiently cohesive to warrant adjudication by representation." Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 623 (1997); see also Sullivan v. DB Invs., Inc., 667 F.3d 273, 297 (3d Cir. 2011) (noting that the predominance requirement is "more stringent" than the Rule 23(a) commonality requirement). For the reasons set forth below, the Court finds that the predominance requirement is satisfied.

### a. Section 10(b) and Rule 10b–5 Claims

Here, all of Plaintiffs' Section 10(b) and Rule 10b–5 claims involve common questions of law or fact. In general, to succeed on Section 10(b) and Rule 10b–5 claim, a plaintiff must prove: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." Amgen Inc. v. Connecticut Ret. Plans & Trust Funds, 133 S. Ct. 1184, 1192 (2013). " '[T]he questions of whether Defendants' statements or omissions were material, whether they were made in connection with the purchase or sale of securities, and whether they were made with scienter, are necessarily common to each class member given that Defendants' conduct alone is relevant to their proof.' " In re NeuStar. Inc. Sec. Litis., 2015 WL 5674798, at *6 (E.D. Va. Sept. 23, 2015) (quoting Menkes v. Stolt-Nielsen S.A., 270 F.R.D. 80, 91 (D. Conn. 2010)). "Additionally, class members would prove loss causation through common evidence like event studies, expert testimony, or other evidence demonstrating that the 'misrepresentation or omission was one substantial cause of the investment's decline in value.' " Id. (quoting Katyle v. Penn Nat. Gaming, Inc., 637 F.3d 462, 472 (4th Cir. 2011)).

Finally, a presumption of class-wide reliance is created where the plaintiff makes the following showings: "(1) that the alleged misrepresentations were publicly known, (2) that they were material, (3) that the stock traded in an efficient market, and (4) that the plaintiff traded the stock between the time the misrepresentations were made and when the truth was revealed." Halliburton Co. v. Erica P. John Fund, Inc., 134

S.Ct. 2398, 2408 (2014) (citation omitted). Here, Plaintiffs can show that: (1) the alleged misrepresentations were in SEC filings and public presentations; (2) they concerned the efficacy of the Company's new drug, which was once expected to generate up millions in annual sales; (3) MDCO securities traded on NASDAQ; and (4) Class members, by definition, purchased or acquired MDCO securities during the Class Period. Accordingly, the Court finds that the common questions of law or fact underlying Plaintiffs' Section 10(b) and Rule 10b–5 claims predominate over questions affecting only individual Class Members.

### b. Section 20(a) Claims

**\*5** To prove a violation of Section 20(a), a "plaintiff must prove that one person controlled another person or entity and that the controlled person or entity committed a primary violation of the securities laws." In re Suprema Specialties, Inc. Sec. Litig., 438 F.3d 256, 284 (3d Cir. 2006). Here, each Class Member's Section 20(a) claim "should be identical given that [the Individual] Defendants' conduct alone is relevant to satisfying the applicable standard, and given that each [C]lass [M]ember's claim arises from the same statements made by [the Individual] Defendants." Menkes, 270 F.R.D. at 91. Thus, Plaintiff's Section 20(a) claims also satisfy the predominance requirement.

### ii. Superiority

To satisfy the superiority requirement, the Court must "balance, in terms of fairness and efficiency, the merits of a class action against those of 'alternative available methods' of adjudication." Georgine v. Amchem Prods., Inc., 83 F.3d 610, 632 (3d Cir. 1996) (citing Katz v. Carte Blanche Corp., 496 F.2d 747, 757 (3d Cir. 1974) (en banc)). Factors relevant to this Court's superiority analysis include:

> (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

Johnston v. HBO Film Memt., Inc., 265 F.3d 178, 185 (3d Cir. 2001) (citing Fed. R. Civ. P. 23(b)). In addition, "[c]lass

Schuler v. Medicines Company, Not Reported in Fed. Supp. (2016)
2016 WL 3457218

actions have been held to be especially appropriate where 'it would be economically infeasible for [individual Class Members] to proceed individually.' " Id. (quoting Stephenson v. Bell Atl. Corp., 177 F.R.D. 279, 289 (D.N.J. 1997)).

For the following reasons, the Court finds that this class action satisfies the superiority requirement. First, the record in this case does not indicate an interest among Class Members in individually controlling the prosecution of separate actions. As stated above, no Class Member has requested exclusion from the class action. This suggests a lack of interest in pursuing claims individually. Second, the parties do not dispute that this Court is an appropriate forum for the lawsuit. Moreover, "[t]o litigate the individual claims of even a tiny fraction of the potential Class Members would place a heavy burden on the judicial system and require unnecessary duplication of effort by all parties." Henderson v. Volvo Cars of N. Am., LLC, Civ. No. 09-4146(CCC), 2013 WL 1192479, at *6 (D.N.J. Mar. 22, 2013). By contrast, nothing in the record indicates that the litigation of Plaintiffs' claims as a class action would be unmanageable. Thus, the superiority requirement is satisfied.

## IV. FINAL APPROVAL OF THE SETTLEMENT

Having certified the proposed class action under Rule 23, the Court must evaluate the fairness of the Settlement pursuant to Rule 23(e). Under Rule 23(e), approval of a class settlement is warranted only if the settlement is "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2). Acting as a fiduciary responsible for protecting the rights of absent class members, the Court is required to "independently and objectively analyze the evidence and circumstances before it in order to determine whether the settlement is in the best interest of those whose claims will be extinguished." In re Cendant Corp. Litis., 264 F.3d 201, 231 (3d Cir. 2001) (quoting Gen. Motors Corp., 55 F.3d at 785). This determination rests within the sound discretion of the Court. Girsh v. Jepson, 521 F.2d 153, 156 (3d Cir. 1975). In Girsh, the Third Circuit identified nine factors to be used in the approval determination:

*6 (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; (9) and the range of reasonableness of

the settlement fund to a possible recovery in light of all the attendant risks of litigation.

Id. at 157 (internal quotation marks, alterations, and citation omitted).

Additionally, a presumption of fairness exists where a settlement has been negotiated at arm's length, discovery is sufficient, the settlement proponents are experienced in similar matters, and there are few objectors. Warfarin, 391 F.3d at 535. Finally, settlement of litigation is especially favored by courts in the class-action setting. "The law favors settlement, particularly in class actions and other complex cases where substantial judicial resources can be conserved by avoiding formal litigation." Gen. Motors Corp., 55 F.3d at 784; see also Warfarin, 391 F.3d at 535 (explaining that "there is an overriding public interest in settling class action litigation, and it should therefore be encouraged"). Turning to each of the Girsh factors, the Court finds as follows:

### A. Complexity, Expense, and Likely Duration of the Litigation

The first factor is intended to capture "the probable costs, in both time and money, of continued litigation." Gen. Motors Corp., 55 F.3d at 812 (internal quotations and citation omitted). Here, the "risk, expense, complexity, and likely duration of further litigation" were likely to be substantial. This case is extremely factually complex and would have been expensive and time-consuming to litigate, requiring expert testimony about biochemistry and clinical medical practice regarding blood thinners and loading doses, FDA clinical drug trials, and the significance of the indication for which a drug is approved, among other issues. By reaching a settlement, the parties have avoided the significant expenses connected with these issues and provided immediate and substantial benefits for the settlement class. Thus, this factor weighs in favor of approval.

### B. Reaction of the Class to the Settlement

This second factor "attempts to gauge whether members of the class support the settlement." In re Lucent Techs., Inc., Sec. Litig., 307 F. Supp. 2d 633, 643 (D.N.J. 2004) (internal quotation marks and citation omitted). The Third Circuit has found that "[t]he vast disparity between the number of potential Class Members who received notice of the Settlement and the number of objectors creates a strong presumption that this factor weighs in favor of the Settlement." Cendant Corp., 264 F.3d at 235. Here, the

Schuler v. Medicines Company, Not Reported in Fed. Supp. (2016)
2016 WL 3457218

Court has received no timely objections to the Settlement. Therefore, this factor weighs in favor of approval.

### C. The Stage of the Proceedings and the Amount of Discovery Completed

Third, the Court considers the stage of the proceedings and the amount of discovery completed in order to evaluate the degree of case development that Lead Counsel has accomplished prior to settlement. "Through this lens, courts can determine whether counsel had an adequate appreciation of the merits of the case before negotiating." Cendant Corp., 264 F.3d at 235 (quoting Gen. Motors Corp., 55 F.3d at 813). "Generally, post-discovery settlements are viewed as more likely to reflect the true value of a claim as discovery allows both sides to gain an appreciation of the potential liability and the likelihood of success." In re Auto. Refinishing Paint Antitrust Litig., 617 F. Supp. 2d 336, 342 (E.D. Pa. 2007) (citing Bell Atl. Corp. v. Bolger, 2 F.3d 1304, 1314 (3d Cir. 1993)).

**\*7** Although there has been no formal discovery, Lead Counsel had ample information to evaluate the prospects for the Class and to assess the fairness of the Settlement. Prior to settlement, Lead Counsel: (1) reviewed and analyzed public filings, annual reports, press releases, quarterly-earnings-call and industry-conference transcripts, and other public statements; (2) conducted extensive investigation and analysis of publicly available scientific literature, data, presentations, and other relevant materials, including the detailed analyses contained in the FDA's briefing documents; (3) reviewed and analyzed stock trading data relating to MDCO as well as reports by major financial news services and analysts; (4) consulted with an FDA expert; (5) investigated biochemical, pharmaceutical, and medical company practices with respect to the process of seeking FDA approval of new drugs and devices; (6) researched the FDA's rules and procedures; (7) drafted the initial complaint and the detailed Corrected First Amended Class Action Complaint to comply with the Private Securities Litigation Reform Act of 1995 ("PSLRA") and to include highly technical allegations regarding the FDA and the new drug application process, as well as pharmaceutical industry-specific allegations; (8) researched and drafted an opposition to Defendants' motion to dismiss; (9) prepared for and attended an oral argument on Defendants' motion to dismiss; and (10) prepared for and engaged in a mediation, including drafting a mediation statement. Accordingly, the Court is satisfied that, by the time the parties reached a settlement, Lead Counsel "had developed enough information about the case to appreciate sufficiently the value of the claims." In re Nat'l Football

League Players Concussion Injury Litis., No. 15-2206, 2016 WL 1552205, at \*19 (3d Cir. Apr. 18, 2016) (affirming district court's determination that the third Girsh factor was satisfied where the parties had engaged in informal discovery and ten months of settlement discussions). Therefore, this factor weighs in favor of approval.

### D. Risks of Establishing Liability

Fourth, the risks of establishing liability should be considered to "examine what the potential rewards (or downside) of litigation might have been had class counsel decided to litigate the claims rather than settle them." Cendant Corp., 264 F.3d at 237 (quoting Gen. Motors Corp., 55 F.3d at 814). "The inquiry requires a balancing of the likelihood of success if 'the case were taken to trial against the benefits of immediate settlement.' " In re Safety Components Int'l, Inc. Sec. Litig., 166 F. Supp. 2d 72, 89 (D.N.J. 2001) (quoting In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions, 148 F.3d 283, 319 (3d Cir. 1998)).

Here, Lead Counsel faced several significant obstacles to establishing liability. Investigating and proving liability would have required considerable and expensive consultation with experts in biochemistry, clinical medical practice, and the substantive and procedural law of FDA new drug applications. In addition, proving scienter would have required Lead Counsel to educate a jury about running a clinical trial and interpreting and portraying trial results, primarily through highly technical expert testimony and circumstantial evidence. See In re AT&T Corp. Sees. Litig., 455 F.3d 160, 170 (3d Cir. 2006) (emphasizing that "the difficulty of proving actual knowledge under § 10(b) of the Securities Exchange Act ... weighed in favor of approval of the fee request" (citation omitted)). In contrast, the Settlement provides immediate and certain recovery for the Class Members. In light of the uncertainty of success at trial and the certain, immediate benefit provided by the Settlement, this factor weighs in favor of approval.

### E. Risks of Establishing Damages

This fifth factor, like the factor before it, "attempts to measure the expected value of litigating the action rather than settling it at the current time." Cendant Corp., 264 F.3d at 238 (quoting Gen. Motors Corp., 55 F.3d at 816). Here, establishing loss causation and damages at trial would have required Lead Counsel to disentangle the market's reaction to various contemporaneous news items, similarly requiring expensive testimony by financial economics experts using

Schuler v. Medicines Company, Not Reported in Fed. Supp. (2016)
2016 WL 3457218

complex methodologies that are highly contested within the field. "In this 'battle of experts,' it is virtually impossible to predict with any certainty which testimony would be credited, and ultimately, which damages would be found to have been caused by actionable, rather than the myriad nonactionable factors such as general market conditions." In re Warner Commc'ns Sec. Litig., 618 F. Supp. 735, 744–5 (S.D.N.Y. 1985). The Court agrees that Plaintiffs faced significant risks in establishing damages. Thus, this factor weighs in favor of approval.

### F. Risks of Maintaining Class Action Status through Trial

Although the continued significance of this sixth factor in the settlement-only context is unclear, see Prudential, 148 F.3d at 321, the Court nonetheless finds that this factor weighs in favor of approval. The Court may, at any time before final judgment, decide to decertify a class if the class proves to be unmanageable. Fed. R. Civ. P. 23(c)(1)(C). Defendants may choose to challenge the certification of a litigation class if the case were to move forward. Thus, because there are significant risks in maintaining class certification, the Court finds that this factor weighs in favor of settlement approval.

### G. The Settling Defendant's Ability to Withstand a Greater Judgment

**\*8** The seventh factor examines whether Defendants "could withstand a judgment for an amount significantly greater than the settlement." Cendant Corp., 264 F.3d at 240. This factor weighs in favor of settlement. As discussed above, Lead Counsel has determined that settlement is appropriate in light of the significant risks in proving liability. Moreover, even if Defendants had the ability to pay more, it does not mean that they would be <u>required</u> to pay more following a trial. See Warfarin, 391 F.3d at 538 (noting that "the fact that [defendant] could afford to pay more does not mean that it is obligated to pay any more than what the ... class members are entitled to under the theories of liability that existed at the time the settlement was reached"). Thus, this factor weighs in favor of approval.

### H. The Range of Reasonableness of the Settlement Fund in Light of the Best Possible Recovery and the Attendant Risks of Litigation

The eighth and ninth factors, concerning the range of reasonableness of the settlement fund in light of the best

possible recovery and the attendant risks of litigation, also weigh in favor of approval.

> The fact that a proposed settlement may only amount to a fraction of the potential recovery does not, in and of itself, mean that the proposed settlement is grossly inadequate and should be disapproved. The percentage recovery, rather[,] must represent a material percentage recovery to plaintiff in light of all the risks considered under Girsh.

In re Cendant Corp. Sec. Litis., 109 F. Supp. 2d 235, 263 (D.N.J. 2000) (internal quotation marks and citation omitted). Here, Lead Counsel represents that the Settlement Amount reflects approximately 4.0% of the estimated recoverable damages in this case. See ECF No. 66-1 at 23. This percentage falls squarely within the range of previous settlement approvals. See, e.g., In re AT&T, 455 F.3d at 169 (affirming settlement for 4% of total damages). Moreover, the Settlement Amount is the product of an arm's-length transaction by experienced counsel and facilitated by an experienced mediator. Accordingly, the Settlement is presumed to be fair and reasonable. See Warfarin, 391 F.3d at 534.

Therefore, the nine Girsh factors weigh in favor of approval. In addition, as discussed above, the settlement agreement was reached after arm's-length negotiations between counsel and after completion of, and access to, a significant amount of research, investigation, and analysis. Thus, the Settlement represents a fair, reasonable, and adequate result for the settlement class considering the substantial risks Plaintiffs face and the immediate benefits provided by the Settlement. See Reibstein v. Rite Aid Corp., 761 F. Supp. 2d 241, 255-56 (E.D. Pa. 2011).

### V. ATTORNEYS' FEES AND EXPENSES AND LEAD PLAINTIFF AWARD

Finally, having found that final certification of the Class for settlement purposes is warranted and that the Settlement is fair and reasonable, the Court turns to Plaintiffs' request for litigation fees and expenses. Under the common fund doctrine, "a private plaintiff, or plaintiff's attorney, whose efforts create, discover, increase, or preserve a fund to which others also have a claim, is entitled to recover from the fund the costs of his litigation, including attorneys' fees." In re Diet Drugs (Phentermine/ Fenfluramine/ Dexfenfluramine) Prod. Liab. Litig., 582 F.3d 524, 540 (3d Cir. 2009) (citations omitted). This ensures that "competent counsel continue to be willing to undertake risky, complex, and novel litigation."

**Schuler v. Medicines Company, Not Reported in Fed. Supp. (2016)**

2016 WL 3457218

Gunter v. Ridgewood Energy Corp., 223 F.3d 190, 198 (3d Cir. 2000) (citation omitted). "In addition, counsel for a class action is entitled to reimbursement of expenses that were adequately documented and reasonably and appropriately incurred in the prosecution of the class action." Safety Components. Inc, 166 F. Supp. 2d at 108 (citing Abrams v. Liehtolier. Inc., 50 F.3d 1204, 1225 (3d Cir. 1995)). For the reasons set forth below, this Court grants the requested awards.

### A. Attorneys' Fees

**\*9** Here, Lead Counsel seeks an award of $1,402,500 in attorneys' fees, which represents 33% of the common fund created by the Settlement. When calculating attorneys' fees in common-fund cases such as this one, the percentage-of-recovery method is generally favored. See In re Diet Drugs, 582 F.3d at 540 (citation omitted). Nevertheless, the Third Circuit has suggested that, in addition to the percentage-of-recovery approach, district courts should "cross-check" the percentage fee award against the "lodestar" method. In re Rite Aid Corp. Sec. Litis., 396 F.3d 294, 305 (3d Cir. 2005) (citing Prudential, 148 F.3d at 333).

### i. Percentage-of-Recovery Analysis

In evaluating whether a percentage fee award is reasonable, this Court must consider the following factors:

> (1) the size of the fund created and the number of beneficiaries, (2) the presence or absence of substantial objections by members of the class to the settlement terms and/or fees requested by counsel, (3) the skill and efficiency of the attorneys involved, (4) the complexity and duration of the litigation, (5) the risk of nonpayment, (6) the amount of time devoted to the case by plaintiffs' counsel, (7) the awards in similar cases, (8) the value of benefits attributable to the efforts of class counsel relative to the efforts of other groups, such as government agencies conducting investigations, (9) the percentage fee that would have been negotiated had the case been subject to a private contingent fee arrangement at the time counsel was retained, and (10) any innovative terms of settlement.

In re Diet Drugs, 582 F.3d at 541 (citing Gunter, 223 F.3d at 336-40; Prudential, 148 F.3d at 336-40). These factors "need not be applied in a formulaic way because each case is different, and in certain cases, one factor may outweigh the rest." Id. at 545 (internal citations and quotation marks omitted).

Regarding the first factor, the size of the common fund is $4,250,000 and is expected to benefit over 148 people. Tr. 3:17, 4:16-22. Lead Counsel represented to the Court that based on the claims processed as of June 7, 2016, Class Members would receive up to approximately 33% of their recognized losses.[4] Tr. 5:4-7. Accordingly, the first factor is met. Next, the second factor is satisfied because, as stated above, there have been no objections to the Settlement or to Lead Counsel's fee request. The absence of objections indicates that the settlement terms and the attorneys' fees are reasonable. See In re Rite Aid Corp. Sec. Litis., 396 F.3d 294, 305 (3d Cir. 2005). The third, fourth, and fifth factors are likewise met because, as discussed above, Lead Counsel are skilled attorneys, this litigation was highly complex, fraught with risk, and would likely have taken years to resolve.

[4]    At the final fairness hearing on June 7, 2016, Lead Counsel represented that 148 Class Members had already filed claims, though more were expected to file claims before the June 13, 2016 deadline. Tr. 4:16-22. Lead Counsel represented that the percentage of losses recovered was subject to change as more Class Members submitted claims. Tr. 5:2-7.

The sixth factor—time devoted to the litigation—also supports the requested fee award. Lead Counsel and their professionals have spent, in the aggregate, 644.40 hours litigating this case, with a lodestar of $396,439. Walsh Decl. ¶ 19. The requested fee would result in a lodestar multiplier of 3.57, which is reasonable under the Third Circuit's precedent. See Prudential, 148 F.3d at 341 (noting that lodestar multipliers ranging from one to four are frequently awarded in common fund cases); AT&T, 455 F.3d at 172 (noting the Third Circuit's prior "approv[al] of a lodestar multiplier of 2.99 in ... a case [that] was neither legally nor factually complex." (internal quotation marks and citation omitted)).

**\*10** The seventh factor is also satisfied because Lead Counsel's request for a fee award of 33% of the Settlement Amount falls within the range of reasonable fee awards. See Brumley v. Camin Cargo Control, Inc., No. CIV.A. 08-1798 JLL, 2012 WL 1019337, at \*12 (D.N.J. Mar. 26, 2012) ("The Third Circuit has noted that fee awards generally range from 19% to 45% of the settlement fund when the percentage-of-recovery method is utilized to assess the reasonableness of requested attorneys' fees.") (citing In re GMC Pick-Up Truck Fuel Tank Prods. Liab. Litis., 55 F.3d 768, 822 (3d Cir. 1995)); In re Safety Components, Inc. Sec. Litis., 166 F.

2016 WL 3457218

Supp. 2d 72, 109 (D.N.J. 2001) (granting a requested fee of one-third of a $4,309,205.36 settlement fund). In addition, the ninth factor is met because "[t]he attorneys' fees request of one-third of the settlement fund ... comports with privately negotiated contingent fees negotiated on the open market." Id.

Further, the fee request meets the eighth factor because Lead Counsel did not benefit from the work of any government investigations or enforcement actions against Defendants. See In re Diet Drugs, 582 F.3d at 544 (affirming fee award where the District Court concluded that "while Class Counsel was in some sense beholden to the scholars who linked the diet drugs to VHD, and ... to the FDA for its efforts to remove the drugs from the market, Class Counsel had not relied on 'the government or other public agencies to do their work for them as has occurred in some cases' " (internal citation omitted)).

Finally, although the tenth factor regarding innovation does not appear to be directly applicable here given the Settlement's traditional terms, the Court finds that, overall, the fee requested is reasonable in light of the foregoing considerations. See Brumley, 2012 WL 1019337, at *12.

### ii. Lodestar Cross-Check

The lodestar cross-check is performed by "multiplying the number of hours reasonably worked on a client's case by a reasonable hourly billing rate for such services based on the given geographical area, the nature of the services provided, and the experience of the attorneys." Rite Aid, 396 F.3d at 305. When performing this analysis, the court "should apply blended billing rates that approximate the fee structure of all the attorneys who worked on the matter." Id. at 306. Thus, the lodestar multiplier is equal to the proposed fee award divided by the product of the total hours and the blended billing rate. If the lodestar multiplier is large, the award calculated under the percentage-of-recovery method may be deemed unreasonable, and a trial judge may consider reducing the award appropriately. Id. at 306. The multiplier, however, "need not fall within any pre-defined range, provided that the [d]istrict [c]ourt's analysis justifies the award." Id. at 307. Further, the Court is not required to engage in this analysis with mathematical precision or "bean-counting." Id. at 306. Instead, the Court may rely on summaries submitted by the attorneys and is not required to scrutinize every billing record. Id. at 306-07.

As discussed above, Lead Counsel submits that the total number of hours expended by attorneys and their professionals is 644.40, with a lodestar of $396,439. Walsh Decl. ¶ 19. This lodestar value is based on the blended billing rates of all attorneys and professionals involved in the case, see id., and results in a lodestar multiplier of 3.57, see ECF No. 65-1 at 2. Multipliers of one to four are often used in common fund cases. Prudential, 148 F.3d at 341; see also AT&T, 455 F.3d at 172 (noting the Third Circuit's prior "approv[al] of a lodestar multiplier of 2.99 in ... a case [that] 'was neither legally nor factually complex.' " (citation omitted)); Meijer, Inc. v. 3M, No. 04-5871, 2006 WL 2382718 at *24 (E.D. Pa. Aug. 14, 2006) (approving a 4.77 multiplier); In re Rite Aid Corp. Sees. Litis., 362 F. Supp. 2d 587, 589-90 (E.D. Pa. 2005) (approving a multiplier of 6.96); In re AremisSoft Corp. Sec. Litis., 210 F.R.D. 109, 135 (D.N.J. 2002) (approving a multiplier of 4.3).

**\*11** Accordingly, and in light of the high risk of non-payment and the excellent result achieved in this Settlement, the Court finds that Lead Counsel's requested fees are also reasonable under the lodestar analysis. Therefore, the Court will grant Lead Counsel's fee in full.

### B. Attorneys' Expenses

Lead Counsel seeks an award of $33,569.20 in expenses incurred while prosecuting this litigation. "Counsel for a class action is entitled to reimbursement of expenses that were adequately documented and reasonably and appropriately incurred in the prosecution of the class action." In re Safety Components, Inc. Sec. Litis., 166 F. Supp. 2d 72, 108 (D.N.J. 2001) (citing Abrams v. Lightolier. Inc., 50 F.3d 1204, 1225 (3d Cir. 1995)). The Court has received no objection to Lead Counsel's requested expenses. Moreover, from the submissions, it appears the expenses requested by Lead Counsel were adequately documented, reasonable, and appropriately incurred in the litigation of this matter. Accordingly, the Court grants Lead Counsel's motion for an award of attorneys' expenses.

### C. The Lead Plaintiff Award

Finally, Lead Plaintiff requests an award in the amount of $3,500 to compensate him for his time and service to the Class. The PSLRA permits a lead plaintiff to receive an "award of reasonable costs and expenses (including lost wages) directly relating to the representation of the class." 15 U.S.C. § 78u-4(a)(4). "[T]here are no set factors that a District Court must employ in determining the amount of class

Case 3:16-cv-00085-MEM Document 176-1 Filed 09/25/20 Page 135 of 147

Schuler v. Medicines Company, Not Reported in Fed. Supp. (2016)
2016 WL 3457218

representative incentive awards." Brady v. Air Line Pilots Ass'n, 627 Fed.Appx. 142, 146 (3d Cir. 2015) (affirming an award of $640,000).

The Court finds that Lead Plaintiff has adequately represented the Class and is therefore entitled to his requested compensation. Lead Plaintiff reviewed filings, gathered transaction records, conferred with Lead Counsel about the litigation, and remained apprised about the progress of the case and the Company generally. See Declaration of Warren H. Schuler in Support of Final Approval of Settlement, ECF No. 67, ¶¶ 3-4. These are the types of activities courts have found to support reimbursement to class representatives. See, e.g., In re Evergreen Ultra Short Opportunities Fund Sec. Litig., No. CIV.A. 08-11064-NMG, 2012 WL 6184269, *2 (D. Mass. Dec. 10, 2012) (awarding $54,626 to institutional lead plaintiffs who had "worked closely with counsel throughout the case, communicated with counsel on a regular basis, reviewed and provided input with respect to counsel's submissions, provided information, produced documents, and participated in settlement discussions"); In re Marsh & McLennan Cos. Sec. Litig., No. 04 Civ. 8144, 2009 WL 5178546, at *21 (S.D.N.Y. Dec. 23, 2009) (awarding over $200,000 to lead plaintiffs to compensate them "for their reasonable costs and expenses incurred in managing this litigation and representing the Class" and noting that these efforts were "precisely the types of activities that support awarding reimbursement of expenses to class representatives"); In re Xcel Energy, Inc., 364 F. Supp. 2d 980, 1000 (D. Minn. 2005) (awarding $100,000 to eight lead plaintiffs who "communicated with counsel throughout the litigation, reviewed counsels' submissions, indicated a willingness to appear at trial, and were kept informed of the settlement negotiations, all to effectuate the policies underlying the federal securities laws"). Accordingly, the Court grants Lead Plaintiff's requested award.

## VI. CONCLUSION

**\*12** For the reasons set forth above, the Court certifies the Rule 23 class action, approves the proposed Settlement in full, awards attorneys' fees and expenses and a lead-plaintiff award, and dismisses this action with prejudice. An appropriate order accompanies this Opinion.

## All Citations

Not Reported in Fed. Supp., 2016 WL 3457218

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

2008 WL 5451021

2008 WL 5451021
Only the Westlaw citation is currently available.
United States District Court, D. New Jersey.

Steven M. SHUBERT, Plaintiff,

v.

WELLS FARGO AUTO
FINANCE, INC., Defendant.

Civil No. 08-3754 (NLH).
|
Dec. 31, 2008.

**Attorneys and Law Firms**

Michael H. Landis, Smolow & Landis, Esqs., Trevose, PA, for Plaintiff.

Mariah E. Murphy, Martin C. Bryce, Ballard, Spahr, Andrews & Ingersoll, LLP, Voorhees, NJ, for Defendant.

*OPINION AND ORDER*

JOEL SCHNEIDER, United States Magistrate Judge.

 **\*1** This matter is before the Court on the "Motion to Compel Individual Arbitration and Stay this Action" [Doc. No. 7], filed by Martin C. Bryce, Jr., Esquire, counsel for Defendant, Wells Fargo. Defendant asks the Court to compel Plaintiff, Steven Shubert, to arbitrate his claims individually and stay Plaintiff's class action lawsuit. Defendant argues that pursuant to an express contractual provision in Plaintiff's Motor Vehicle Lease Agreement ("Lease"), Plaintiff agreed to pursue all claims against Defendant individually in arbitration. Plaintiff opposes Defendant's motion [Doc. No. 10]. The Court received and considered Defendant's reply brief [Doc. Nos. 16 & 17] and Plaintiff's sur-reply brief [Doc. No. 18] and heard oral argument on the issues. For the reasons stated herein, the Court grants Defendant's motion.

*Background*
Only a brief recitation of the relevant background facts is necessary because the Court's decision does not address the merits of Plaintiff's claims. In March 2004, Plaintiff leased a 2004 Audi from Atlantic Chrysler Plymouth ("Plymouth") of Pleasantville, New Jersey and signed a Motor Vehicle Lease

Agreement. (Complaint ¶ 10 [Doc. No. 1, Exh. A].) Section N of the Lease states:

**ARBITRATION**

Any controversy or claim between or among you and me, including, but not limited to those arising out of or relating to this lease or any related agreement or any claim based on or arising from an alleged tort, shall at the request of either party be determined by arbitration. The arbitration shall be conducted in accordance with the United States Arbitration Act (Title 9, U.S.Code), notwithstanding any choice of law provision in this lease, and under the authority and rules of the American Arbitration Association then in effect. Neither I nor you shall be entitled to join or consolidate disputes by or against others in any arbitration, or to include in any arbitration any dispute as a representative or member of a class, or to act in any arbitration in the interest of the general public or in a private attorney general capacity.

Subsequently, Plymouth assigned its rights and interests in the Lease to Wells Fargo. (*Id.* at ¶ 11.) On March 15, 2008, Plaintiff returned the leased vehicle to Wells Fargo's designated drop-off location in Hatfield, Pennsylvania. (*Id.* at ¶ 13.) Approximately five days later, Plaintiff received a $578.79 bill from Wells Fargo for alleged excess wear and use. (*Id.* at ¶ 14 .) Plaintiff then contacted Wells Fargo seeking information about the alleged damage to the vehicle. (*Id.* at ¶¶ 15, 16.) Plaintiff alleges that Wells Fargo threatened to initiate collection and a negative credit report if he did not pay the bill. (*Id.* at ¶ 18.) Thus, under protest and duress, Plaintiff paid the bill. (*Id.* at ¶ 18.)

On June 20, 2008, Plaintiff filed his class action complaint in New Jersey Superior Court on behalf of himself and all similarly situated persons in New Jersey whose motor vehicle leases terminated since August 2002 and who were charged for excess wear and use. (Complaint at ¶¶ 1, 4, 27.) In his complaint Plaintiff claims Defendant breached the Lease, violated the New Jersey Consumer Protection Leasing Act ("CPLA"), N.J.S.A. § 56:12-66 et seq. and violated the New Jersey Consumer Fraud Act, ("CFA") N.J.S.A. § 56:8-1 et seq. when it billed him for excessive wear and use after he returned his vehicle. (Complaint at ¶¶ 33-50.) In response to Plaintiff's complaint, Defendant removed the action [Doc. No. 1] and filed the motion presently before the Court to compel Plaintiff to arbitration.

*Summary of the Arguments*

2008 WL 5451021

**\*2** Defendant contends that Plaintiff is obligated to arbitrate all of his claims individually because (1) a valid arbitration agreement exists and (2) Plaintiff's claims fall within the scope of the agreement. Defendant argues that the express and broad language of Plaintiff's Lease requires that any controversy arising out of the Lease will be arbitrated and Plaintiff cannot meet his burden to show that the arbitration agreement is invalid. (*See* Defendant's Brief ("Def.Br.") at 4, 8.) Defendant also argues that pursuant to express language in the Lease, the Federal Arbitration Act, 9 U.S.C. § 1-14 (2006) ("FAA") governs this action and that the FAA preempts any conflicting state law and applies to Plaintiff's consumer claims. (*Id.* at 5, 9.) Defendant also argues that Plaintiff expressly agreed to arbitrate all claims arising out of the Lease on an individual basis, and therefore Plaintiff's class action claim should be barred.

Plaintiff does not dispute that he received, read and executed the Lease. Rather, Plaintiff argues that Defendant has no right to compel arbitration because Defendant did not request arbitration in accordance with the American Arbitration Association's rules ("AAA") and thus has not satisfied a condition precedent necessary to trigger the arbitration clause. (Plaintiff's Opposition Brief ("Pl.Opp."), 6.) Defendant admitted in oral argument that it did not formally demand arbitration before it filed its motion, but contends that its Motion to Compel is such a request.

Notwithstanding Defendant's alleged failure to trigger the arbitration clause, Plaintiff also argues that his claims against Defendant fall outside the scope of the clause. Plaintiff interprets the Lease's arbitration clause to mean that either party has the right to request arbitration unless there is a class action claim. (Plaintiff's Declaration at ¶ 7.) Plaintiff argues that the Lease is a contract of adhesion, and thus it should be interpreted strictly against the drafter. (Pl. Opp. at 8.) Therefore, Plaintiff argues, even if Defendant requests arbitration of Plaintiffs individual claims, he is permitted to litigate his class action in court. (*Id.* at 9.)

Lastly, Plaintiff argues that even if the Court finds (1) Defendant requested arbitration and (2) the dispute falls within the scope of the arbitration clause, the matter should proceed in arbitration as a class action because the no-class arbitration clause is severable and unconscionable under New Jersey law. (*Id.* at 9-10.) Plaintiff argues that a no-class action provision in an adhesive consumer contract where the dispute involves a small amount of money is exculpatory and unconscionable under the New Jersey Supreme Court's

holding in *Muhammad v. County Bank of Rehoboth Beach, Del.,* 189 N.J. 1, 912 A.2d 88 (2006). Plaintiff contends he could not get financing from any other lending institution in New Jersey without entering into a lease that gave the lender the right to compel arbitration and waived the lessee's right to bring a class action. (Plaintiff's Declaration at ¶ 6).[1]

1    The Court rejects Plaintiff's argument that he should be permitted to conduct non-merits discovery before Plaintiff's motion is decided. The Court entered a Consent Order permitting Plaintiff to serve discovery requests on Defendant, but limited the discovery to fact information related solely to the individual plaintiff [Doc. No. 22]. The Court has determined that the present motion can be decided without discovery. *See O.N. Equity Sales Co. v. Emmertz,* 526 F.Supp.2d 523, 528 (E.D.Pa.2007) (finding that the evidence before the court was sufficient to determine the issue of arbitrability without further discovery and noting that "discovery may serve to undermine the advantages offered by arbitration"). Plaintiff requests discovery to establish that his arbitration clause is unconscionable under New Jersey law (sur-reply 11-13). However, for the reasons discussed *infra,* even if the Court accepts Plaintiff's unconscionablity argument his arbitration provision is enforceable because New Jersey law is preempted by the FAA.

### Discussion

**\*3** By way of background, the parties' arbitration agreement is governed by the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1-16 (2006). The FAA applies to any "written provision in any ... contract evidencing a transaction involving commerce to settle by arbitration a controversy arising out of such contract or transaction." 9 U.S.C. § 2. Section two of the FAA "extend[s] the Act's reach to the limits of the Congress' Commerce Clause power ." *Allied-Bruce Terminix Cos. v. Dobson,* 513 U.S. 265, 268, 115 S.Ct. 834, 130 L.Ed.2d 753 (1995). "The Third Circuit has thus found that an agreement to arbitrate in a matter that is 'within Congress' power to reach under the Commerce Clause' is governed by the FAA." *Barbour v. CIGNA Healthcare of New Jersey, Inc.,* Civ. No. 02-417, 2003 WL 21026710, \*3 (D.N.J. March 4, 2003) (citing *Roadway Package Sys., Inc. v. Kayser,* 257 F.3d 287, 292 (3d Cir.2001)). Here, the Lease is between citizens of different states, Defendant is a citizen of California and Pennsylvania and Plaintiff is a citizen of New Jersey. Plaintiff returned his car to Wells Fargo in Pennsylvania and was assessed the excessive wear and use fee in Pennsylvania.

Shubert v. Wells Fargo Auto Finance, Inc., Not Reported in F.Supp.2d (2008)

2008 WL 5451021

Thus, the Lease falls within the scope of interstate commerce and is governed by the FAA.

There is a strong federal policy in favor of compelling arbitration over litigation. *See Sandvik AB v. Advent Intern. Corp.,* 220 F.3d 99, 104 (3d Cir.2000). The FAA was enacted "to reverse the longstanding judicial hostility to arbitration agreements ... and to place arbitration on the same footing as other contracts." *Gay v. CreditInform,* 511 F.3d 369, 378 (3d Cir.2007) (citing *Gilmer v. Interstate/Johnson Lane Corp.,* 500 U.S. 20, 24, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991)). The FAA allows a party to petition a district court for an order compelling arbitration when another party refuses or fails to arbitrate a claim pursuant to a written arbitration agreement so long as the district court would have jurisdiction over a suit on the underlying dispute. 9 U.S.C. § 4. "[I]f a party petitions to enforce an arbitration agreement, '[t]he court shall hear the parties, and upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue, the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement .' " *Sandvik AB,* 220 F.3d at 104 (citing 9 U.S.C. § 4).

When determining whether to compel arbitration the court must decide (1) if the parties entered into a valid arbitration agreement and, if so (2) whether the dispute between the parties is within the scope of the agreement. *Trippe Mfg. Co. v. Niles Audio Corp.,* 401 F.3d 529, 532 (3d Cir.2005). The court "is not to consider the merits of the claims giving rise to the controversy." *Great W. Mortgage Corp. v. Peacock,* 110 F.3d 222, 228 (3d Cir.1996) (citing 9 U.S.C. § 2). The party opposing the enforcement of the arbitration agreement bears the burden of proving that the claims at issue are not subject to arbitration. *Green Tree Fin. Corp. Ala. v. Randolph,* 531 U.S. 79, 91-92, 121 S.Ct. 513, 148 L.Ed.2d 373 (2000). Here, Plaintiff does not challenge the validity of his arbitration agreement "in toto" but only the provision barring class actions. (*See* Pl. Sur-reply at 4.) In fact, Plaintiff relies on specific terms of the arbitration agreement in challenging Defendant's motion. (*Id.*) Thus, the Court will only consider the validity of the class arbitration waiver.

A. *Defendant's motion to compel satisfies the requirement that it request arbitration.*

**\*4** The Court finds Defendant's Motion to Compel Arbitration is an adequate request for arbitration, thus triggering the arbitration clause in the Lease. Plaintiff's argument that Defendant cannot enforce the arbitration agreement because Defendant failed to formally request arbitration in writing pursuant to the AAA overemphasizes form over substance. By filing its motion Defendant has clearly demonstrated its desire to pursue Plaintiff's claims in arbitration. It would be nonsensical to deny Defendant's motion based on its failure to formally request arbitration because Defendant would subsequently request arbitration and re-file its motion. Plaintiff also argues if Defendant's motion is granted, Plaintiff would be compelled to initiate arbitration and be forced to pay the arbitration fee. However, this argument has been addressed because at oral argument Defendant agreed to pay the arbitrator's fee if its motion is granted.

B. *Plaintiff's claims fall within the scope of the arbitration agreement.*

Because the Lease expressly prohibits class arbitration and there is no ambiguity on this point, and no contract interpretation is required, the Court, and not the arbitrator, will determine the scope of the arbitration clause in the Lease. The Supreme Court explained that "whether the parties have submitted a particular dispute to arbitration, i.e., the question of arbitrability, is a question for the court," but "procedural questions which grow out of the dispute and bear on its final disposition are presumptively not for the judge, but for an arbitrator, to decide." *Howsam v. Dean Witter Reynolds, Inc.,* 537 U.S. 79, 83-84, 123 S.Ct. 588, 154 L.Ed.2d 491 (2002) (internal quotations omitted). Questions of arbitrability to be decided by the court include certain "gateway matters, such as whether the parties have a valid arbitration agreement at all or whether a concededly binding arbitration clause applies to a certain type of controversy." *Green Tree Financial Corp. v. Bazzle,* 539 U.S. 444, 452, 123 S.Ct. 2402, 156 L.Ed.2d 414 (2003). Issues requiring interpretation of a vague or ambiguous arbitration clause are left to the arbitrator. *See id.* In *Bazzle,* the petitioner sought to compel individual arbitration arguing that class actions were precluded by the contracts in question. A plurality of the Supreme Court found that because (1) there was a dispute about whether the language of the contracts permitted class arbitration and (2) the parties agreed to submit to binding arbitration "all disputes, claims or controversies" arising from the contracts, the dispute over class arbitration was a matter of contract interpretation to be decided by the arbitrator. *Id.* at 451-54.

Here the Court finds that there is no dispute that the Lease prohibits class arbitration and therefore, *Bazzle* is not applicable. *Bazzle* "stand[s] for the proposition that,

Shubert v. Wells Fargo Auto Finance, Inc., Not Reported in F.Supp.2d (2008)
2008 WL 5451021

when an arbitration provision does not expressly permit or prohibit class-wide arbitration, the decision as to whether the contract [ ] forbid[s] class arbitration, ... is for the arbitrator." *Gipson v. Cross Country Bank,* 354 F.Supp.2d 1278, 1285 (M.D.Ala.2005). However, when an arbitration agreement contains an express class action prohibition, courts have held that the validity and enforceability of an express class action waiver clause is a gateway issue to be determined by the court. *Id.; see also Jock v. Sterling Jewelers, Inc.,* 564 F.Supp.2d 307, 310 (S.D.N.Y.2008) (distinguishing *Bazzle* because the contract at issue expressly prohibited class arbitration). *See also Litman v. Cellco Partnership,* Civ. No. 07-4886, 2008 WL 4507573 (D.N.J. Sept.29, 2008) (district court decided whether Plaintiff's class action claims were subject to arbitration); *Davis v. Dell,* Civ. No. 07-630, 2008 WL 3843837 (D.N.J. Aug. 15, 2008) (affirming magistrate judge's order compelling Plaintiff's claims to proceed to arbitration). Here, both Plaintiff and Defendant agree that the Lease specifically prohibits class arbitration, therefore, unlike in *Bazzle,* there is no need for the arbitrator to interpret the contract to determine whether class arbitration is permitted. As a result, the Court finds that it is appropriate for it to decide Plaintiff's motion and not an arbitrator.

**\*5** The Court also finds that Plaintiff's claims are subject to arbitration under the plain terms of the Lease. When deciding whether Plaintiff's claims must be arbitrated, the court must consider the term's "plain and ordinary meaning" along with the "objective manifestations of the parties' intent." *Nester v. O'Donnell,* 301 N.J.Super. 198, 210, 693 A.2d 1214 (App.Div.1997) (internal citations omitted). The FAA "establishes that, as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability." *Moses H. Cone Memorial Hosp. v. Mercury Const. Corp.,* 460 U.S. 1, 24-25, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983) (finding that there is a liberal federal policy favoring arbitration agreements). When these principles are applied to the language in the Lease, it is plain that Plaintiff's claims must be arbitrated. Here, the arbitration agreement states that "[a]ny controversy or claim between or among you and me, including ... those arising out of or relating to this lease ... shall at the request of either party be determined by arbitration." By use of the term "any" the Lease is expressing a broad scope of arbitration so long as a claim arises out of or relates to the lease. *See Prima Paint Corp. v. Flood & Conklin Mfg. Co.,* 388 U.S. 395, 406, 87 S.Ct. 1801,

18 L.Ed.2d 1270 (1967) (finding that "[a]ny controversy or claim" language in parties' contract evidenced an intent to give a broad scope to the arbitration agreement). There is no serious issue that Plaintiff's claims arise out of or relate to the Lease. Therefore, according to the plain language in the Lease, Plaintiff's claims must be determined by arbitration. The arbitration provision next states that neither party shall be entitled to bring a class action in arbitration. Because Plaintiff's claims must be determined by arbitration, and because class actions are waived in arbitration, Plaintiff must bring his claims individually in arbitration.

The Court rejects Plaintiff's argument that the language in the Lease is ambiguous and, because the contract is adhesive, any ambiguity should be construed against the drafter. Whether a term is clear or ambiguous is ... a question of law." *Kaufman v. Provident Life and Cas. Ins. Co.,* 828 F.Supp. 275, 282 (D.N.J.1992), affd, 993 F.2d 877 (3d Cir.1993). A writing is interpreted as a whole. *Krosnowski v. Krosnowski,* 22 N.J. 376, 387, 126 A.2d 182 (1956); *see Jones v. The Chubb Institute,* Civ. No 06-4937, 2007 WL 2892683, at \*4 (D.N.J. Sept.28, 2007) (compelling plaintiff to arbitrate claims despite asserted ambiguity in arbitration provision because plaintiffs' reading of the contract was illogical considering the contract as a whole). In addition, like this case, other courts have compelled individual arbitration where the plaintiffs filed lawsuits on behalf of a class and the contract language precluded class arbitration but did not specifically state that class actions were prohibited in court. *See Homa v. American Exp. Co.,* 496 F.Supp.2d 440, 451 (D.N.J.2007) (finding that the class-arbitration waiver was enforceable and dismissing the action in favor of individual arbitration).

**\*6** Plaintiff interprets the arbitration clause to mean that either party has the right to request arbitration unless there is a class action claim, and if there is a class action claim then neither party can request arbitration. (Plaintiff's Declaration at ¶ 7.) The same argument was raised and rejected in *Jones, supra,* where the court addressed a class arbitration waiver similar to that in Plaintiff's Lease. The *Jones* plaintiffs argued that the class action waiver applied only to claims pursued in the arbitration process and not in filed law suits. *Id.* However, in *Jones,* the court found that because the agreement stated that "any and all claims" must be brought through arbitration, plaintiff's interpretation, whereby an individual claimant would be required to arbitrate his claim while a group of claimants could sue in court as a class, would lead to an illogical result and was not in keeping with the plain meaning

2008 WL 5451021

of the agreement. *Id.* This Court agrees with *Jones.* Like the court found in *Jones,* Plaintiff's interpretation of the agreement is illogical considering the plain and unambiguous language of the agreement and the general policy favoring enforcement of arbitration provisions. Accordingly, the Court finds that Plaintiff's Lease bars him from pursuing a class action claim against Defendant in arbitration and in court.

C. *The no-class action arbitration provision is valid.*
Plaintiff argues that the arbitration clause is invalid under New Jersey law and may not be enforced. The Court finds that Plaintiff's class action waiver is valid and enforceable under the FAA, even if it is unconscionable under New Jersey law, because New Jersey law on this issue is preempted by the FAA. "[A]rbitration agreements within the scope of the FAA may be enforced even if they conflict with state law policies that would preclude arbitration." *Great Western Mortg. Corp. v. Peacock,* 110 F.3d 222, 230 (3d Cir.1997) (citing *Mastrobuono v. Shearson Lehman Hutton, Inc.,* 514 U.S. 52, 115 S.Ct. 1212, 131 L.Ed.2d 76 (1995)). *See Gay,* 511 F.3d at 394-95 (finding that state law principle dealing uniquely with arbitration agreements was preempted by federal law); *Litman,* 2008 WL 4507573, at *6 (finding federal law preempted the New Jersey law which held certain class arbitration waivers invalid).

Plaintiff argues that the provision barring class actions in arbitration is unenforceable because it is unconscionable pursuant to generally applicable New Jersey law. Plaintiff relies on the New Jersey Supreme Court's holding in *Muhammad v. County Bank of Rehoboth Beach, Del.,* 189 N.J. 1, 912 A.2d 88 (2006).[2] In *Muhammad,* the court found that the presence of a class arbitration waiver in a consumer adhesion contract where the amount of recovery is small rendered the agreement unconscionable and unenforceable. The court held that "adhesive consumer contracts which are ordinarily enforceable, nonetheless may rise to the level of unconscionablity when substantive contractual terms and conditions impact public interests adversely." *Id.* at 19, 912 A.2d 88. The court also noted that "in New Jersey, exculpatory waivers that seek a release from a statutorily imposed duty are void against public policy." *Id.* The court found that although the plaintiff's class arbitration waiver was not exculpatory in the strictest sense, because it allowed the plaintiff to individually bring a claim in arbitration, the fact that consumer fraud cases often involve small damages rendered individual enforcement of rights "difficult if not impossible" and in effect exculpatory. *Id.*

at 19-20, 912 A.2d 88. The *Muhammad* court therefore found "that the presence of the class-arbitration waiver in Muhammad's consumer arbitration agreement renders that agreement unconscionable." *Id.* at 22, 912 A.2d 88.

2      The Lease agreement contains a forum selection clause stating that it will be interpreted according to the laws of the state where it is signed by the lessee. Plaintiff signed the lease in New Jersey, therefore New Jersey contract law applies.

*7 Even if the Court were to find that the Lease's waiver of class actions in arbitration is unconscionable under New Jersey law, an issue this Opinion does not address, such a finding is preempted by the FAA because the state law principle in *Muhammad* is unique to arbitration agreements as opposed to contracts generally. Federal law determines whether an issue governed by the FAA is referable to arbitration. *See Harris v. Green Tree Fin. Corp.,* 183 F.3d 173, 178 (3d Cir.1999). Pursuant to section two of the FAA, the court refers to state law on the formation of contracts to determine whether there is a valid arbitration agreement under the FAA. *Gay,* 511 F.3d at 394. In discussing the choice-of-law issue, the Supreme Court distinguished between state law principles that apply to contracts generally and those that are unique to arbitration agreements. *Id.* A "state law ... is applicable if that law arose to govern issues concerning the validity, revocability, and enforceablity of contracts generally. A state-law principle that takes its meaning precisely from the fact that a contract to arbitrate is at issue does not comport with this requirement of § 2." *Perry v. Thomas,* 482 U.S. 483, 492 n. 9, 107 S.Ct. 2520, 96 L.Ed.2d 426 (U.S.1987). Thus, applying federal law, the Third Circuit has "reinforced that the FAA establishes a strong federal policy in favor of resolution of disputes through arbitration." *Litman,* 2008 WL 4507573 at *7.

The district court in *Litman* and the Third Circuit in *Gay* considered almost the identical unconscionablity argument raised by Plaintiff and determined that the FAA preempted state law that precluded enforcement of an arbitration provision barring class actions. *See Litman,* 2008 WL 4507573, at *4; *Gay,* 511 F.3d at 393. In *Litman,* the court stated, "the issue before th[e] Court is whether the FAA preempts the holding of *Muhammed* here. The Third Circuit addressed this precise issue in *Gay,* where the court held that a state law determination that precludes on unconscionablity grounds, enforcement of an agreement to arbitrate low value consumer claims on an individual basis is preempted by the FAA." *See Litman,* 2008 WL 4507573, at *4. Thus,

2008 WL 5451021

the *Litman* court held "that in-sofar [sic] as the FAA and *Muhammad* are inconsistent, federal law preempts the holding in *Muhammed." Id.* at *6, 912 A.2d 88.

The *Gay* and *Litman* decisions compel the Court to reject Plaintiff's argument that Defendant's no-class action provision is unenforceable. In *Gay,* the plaintiff purchased credit repair services from the defendant and brought a class action alleging that the company violated two Pennsylvania statutes. After the district court granted defendant's motion to compel arbitration pursuant to the arbitration clause in the parties' service agreement, the plaintiff appealed arguing *inter alia,* that the arbitration provision barring class actions was unconscionable under Pennsylvania law. *Gay,* 511 F.3d at 392-93. The plaintiff relied on two Pennsylvania Superior Court decisions where the court refused to enforce arbitration clauses that waived class action arbitrations on the ground that they were unconscionable under state law. *Id.* After a conflicts of law analysis, the *Gay* court applied Virginia law to decide the unconscionablity issue. *Id.* at 394. However, the court found that federal law preempted Pennsylvania law because the state law principle dealt uniquely with agreements to arbitrate and not contracts in general, and was not in conformity with the Supreme Court's holding in *Perry, supra. Id.* at 394-95. Although this discussion is *dicta* the Court finds the analysis instructive and persuasive.

 **\*8** After *Gay* was decided the court in *Litman* considered almost the exact issue presented in this case. The plaintiffs in *Litman,* Verizon customers, brought a class action alleging Verizon improperly imposed an administrative charge on their cellular phone accounts. Verizon filed a motion to compel arbitration in accordance with the parties' customer agreement. The plaintiffs argued that the provisions of the arbitration agreement prohibiting class actions should be invalidated as unconscionable under *Muhammad.* The court rejected plaintiff's argument and found that in *Muhammad,* the court only looked at the class waiver in arbitration and not the broad class action waiver. *Litman,* 2008 WL 4507573, at *5. The *Litman* court held that, pursuant to *Gay,* federal law applied and compelled arbitration. *Id.* at *6

Plaintiff asserts that the *Litman* court misread *Gay,* and relied on *dicta* to support its holding. Plaintiff also argues that the New Jersey Supreme Court applied general state law principles in deciding *Muhammad,* citing the sentence following the *Muhammad* court's holding, "as a matter of generally applicable state contract law, it was unconscionable for defendants to deprive Muhammad of the mechanism

of a class-wide action, whether in arbitration or in court litigation." *Id.* at 22, 912 A.2d 88. The Court agrees with the finding in *Litman* that the *Muhammad* court's "mention of 'class wide ... in court litigation' is *dicta." Litman,* 2008 WL 4507573, at *5. The language cited by Plaintiffs is not the *Muhammad* court's holding because the court explicitly stated it was only considering the class-waiver in the context of the arbitration clause. *Id.* at 14, 912 A.2d 88. The loan agreement in *Muhammad* contained a mandatory individual (no-class) arbitration clause as well as a separate broad class action waiver. *Id.* at 9-10, 912 A.2d 88. The *Muhammad* court stated that it would not consider whether the broad class action waiver was unconscionable because that provision "could be considered as part of the contract as a whole." *Id.* at 14, 912 A.2d 88. Therefore, because the *Muhammad* court only considered the no-class action arbitration provision in the contract, its holding can only apply to the arbitration clause.

Plaintiff also attempts to distinguish *Litman* and *Gay,* arguing that the plaintiffs in those cases challenged the validity of the arbitration agreements "in toto" and here, Plaintiff only challenges the class action waiver provision. (*See* Pl. Sur-reply at 4.) The Court does not find this argument convincing because the *Litman* and *Gay* courts distinctly analyzed the no-class action arbitration clauses and found that federal law preempted the conflicting state law.

*Conclusion*
In conclusion, the Court finds that Defendant has satisfied the provision in the lease requiring that it request arbitration. The Court also finds that the relevant arbitration provision does not permit plaintiff to pursue a class action in court. Lastly, the Court finds that even if Plaintiffs no-class action provision is unconscionable under New Jersey law, this finding is preempted by the FAA and Plaintiff may not pursue class wide relief in arbitration. Accordingly, for all the reasons stated herein,

 **\*9** IT IS on this 31st day of December 2008 hereby

ORDERED that Defendant's Motion to Compel Arbitration is GRANTED and the parties shall proceed to arbitration in accordance with the arbitration provision in Plaintiff's Lease; and it is further

ORDERED that the parties shall advise the Court in writing when the case is referred to arbitration and thereafter this matter will be stayed.

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

**Shubert v. Wells Fargo Auto Finance, Inc., Not Reported in F.Supp.2d (2008)**

2008 WL 5451021

**All Citations**

Not Reported in F.Supp.2d, 2008 WL 5451021

---

**End of Document**                                            © 2020 Thomson Reuters. No claim to original U.S.
Government Works.

---

Case 3:16-cv-00085-MEM Document 176-1 Filed 09/25/20 Page 143 of 147

Tan v. Grubhub, Inc., Not Reported in Fed. Supp. (2016)
2016 WL 4721439

2016 WL 4721439
Only the Westlaw citation is currently available.
United States District Court, N.D. California.

Andrew TAN, et al., Plaintiffs,
v.
GRUBHUB, INC., et al., Defendants.

Case No. 15-cv-05128-JSC
|
Signed 07/19/2016

**Attorneys and Law Firms**

Matthew David Carlson, Lichten & Liss-Riordan, P.C., San Francisco, CA, Shannon Liss-Riordan, Lichten & Liss-Riordan, P.C., Thomas Fowler, Boston, MA, for Plaintiffs.

Theodore J. Boutrous, Jr., Justin Tyler Goodwin, Theane Evangelis Kapur, Gibson, Dunn & Crutcher LLP, Los Angeles, CA, Dhananjay Saikrishna Manthripragada, Gibson Dunn and Crutcher, Washington, DC, Michele Leigh Maryott, Gibson Dunn & Crutcher LLP, Irvine, CA, for Defendants.

**ORDER GRANTING DEFENDANTS' MOTION FOR AN ORDER DENYING CLASS CERTIFICATION**

Re: Dkt. No. 51

JACQUELINE SCOTT CORLEY, United States Magistrate Judge

**\*1** In this putative class action, Plaintiffs Andrew Tan ("Tan") and Raef Lawson ("Lawson," and together, "Plaintiffs") sue Grub Hub Holdings Inc. and GrubHub Inc. ("GrubHub" or "Defendants"), a service that provides food delivery to customers via an on demand dispatch system. The gravamen of Plaintiffs' Second Amended Complaint ("SAC") is that the delivery driver plaintiffs were misclassified as independent contractors and denied the benefits of California wage-and-hour laws. (Dkt. No. 41.[1]) Now pending before the Court is Defendants' motion for an order denying class certification. (Dkt. No. 51.) Having considered the parties' written submissions, and having had the benefit of oral argument on July 13, 2016, the Court GRANTS Defendants' motion and denies class certification. As discussed in detail below, because Lawson is one of only two GrubHub delivery drivers in California who opted out of GrubHub's arbitration and class waiver provisions, Plaintiffs cannot satisfy the requirements of Federal Rule of Civil Procedure 23.

[1]    Record citations are to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of the documents.

**BACKGROUND**

The Court previously discussed the factual background of this case in previous orders and incorporates that discussion here. (Dkt. Nos. 38, 64.)

Additionally, before delivery drivers can begin to provide services through GrubHub they must enter into a Delivery Service Provider Agreement; these agreements govern the relationship between GrubHub and the delivery drivers. (Dkt. No. 52 ¶¶ 5, 9; Dkt. Nos. 52-1 to 52-6 (Exs. 1-6).) The agreements all contain arbitration provisions requiring GrubHub and the delivery drivers to arbitrate any claims or disputes they may have. (Dkt. No. 52 ¶ 11 (referencing various arbitration provisions).) Further, the agreements contain class action waiver provisions whereby both GrubHub and the delivery drivers waive the right to have any disputes or claims heard or arbitrated as a class action. (Dkt. No. 52-1 ¶ 14.1.2 (requiring drivers to "waive their right to have any dispute or claim brought, heard or arbitrated as a class action"); Dkt. No. 52-2 ¶ 14.1.2 (requiring drivers to "waive their right to have any dispute or claim brought between or among them, heard or arbitrated as a class action"); Dkt. No. 52-3 ¶ 14.1.2 (same); Dkt. No. 52-4 ¶ 14.1.2 (same); Dkt. No. 52-5 ¶ 12(b) (requiring drivers to "waive their right to have any dispute or claim brought between them heard or arbitrated as a class action"); Dkt. No. 52-6 ¶ 12(b) (same).)

As of July 2015, GrubHub's Delivery Service Provider Agreements have also contained opt-out provisions that allow delivery drivers to opt out of arbitration (and the accompanying class action waivers). (Dkt. No. 52 ¶ 14; *see also* Dkt. No. 52-4 ¶ 14.1.7; Dkt. No. 52-5 ¶ 12(e); Dkt. No. 52-6 ¶ 12(e).) To opt out of arbitration, a delivery driver must provide written notice, via email or letter, to GrubHub within 30 days of acceptance of the Delivery Service Provider Agreement. (*Id.*) GrubHub maintains a record of all written notices received from drivers opting out of the arbitration and class action waiver provisions. (Dkt. No. 52 ¶¶ 15-16.)

**\*2** Lawson entered into two Delivery Service Provider Agreements with GrubHub, on August 31, 2015 and March 11, 2016. (Dkt. Nos. 52-11, 52-12.) According to GrubHub's records, Lawson opted out of the arbitration and class action waiver provisions contained in the August 28, 2015 agreement by email to GrubHub on August 31, 2015. (Dkt. No. 52 ¶ 21.) Similarly, Lawson opted out of the arbitration and class action waiver provisions in the March 11, 2016 agreement by email to GrubHub on March 12, 2016.[2] (*Id.*) Aside from Mr. Lawson, GrubHub's records indicate that only one other delivery driver in California submitted a written notice opting out of the arbitration and class action waiver provisions. (*Id.* ¶¶ 22, 24.) GrubHub represents that it has contracted with "thousands" of delivery drivers in California. (*Id.* ¶ 25.)

[2]    The Declaration of Stan Chia states that Mr. Lawson opted out of the March 11, 2016 agreement's arbitration and class action waiver provisions on March 12, 2015. (Dkt. No. 52 ¶ 21.) Given the timing of the events, this appears to have been done in error; the Court assumes, for purposes of this motion, that the correct date is March 12, 2016.

## DISCUSSION

### I. Rule 23 Requirements

"A defendant may move to deny class certification before a plaintiff files a motion to certify a class." *Vinole v. Countrywide Home Loans, Inc.*, 571 F.3d 935, 941 (9th Cir. 2009). To have a class properly certified, Plaintiffs must satisfy each of the threshold requirements of Rule 23(a) as well as the requirements for certification under one of the subsections of Rule 23(b). *Mazza v. Am. Honda Motor Co., Inc.*, 666 F.3d 581, 588 (9th Cir. 2012). Defendants argue that Lawson cannot satisfy any of the requirements of Rule 23 because he, unlike all but one other GrubHub delivery driver operating in California, opted out of the class action waiver provisions set forth in GrubHub Delivery Service Provider Agreements. (Dkt. No. 51 at 15-21.) As discussed below, the Court agrees that the requirements of Rule 23(a)—numerosity, typicality, adequacy of representation, commonality—and Rule 23(b)(3) are lacking here and class certification is therefore inappropriate.

### A. Rule 23(a)(3) and (4): Typicality and Adequacy of Representation

Rule 23(a)(3) requires that "the [legal] claims or defenses of the representative parties [be] typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). "Typicality refers to the nature of the claim or defense of the class representative and not on facts surrounding the claim or defense." *Hunt v. Check Recovery Sys., Inc.*, 241 F.R.D. 505, 510 (N.D. Cal. 2007) (citing *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992)). "The test of typicality is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." *Evon v. Law Offices of Sidney Mickell*, 688 F.3d 1015, 1030 (9th Cir. 2012) (internal quotation marks and citation omitted). The typicality requirement ensures that "the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *Gen Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 158 n.13 (1982).

Rule 23(a)(4) imposes a closely related requirement to typicality: that the class representative will "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). To determine whether Plaintiffs will do so, the Court must ask: "(1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *Evon*, 688 F.3d at 1031 (quoting *Hanlon*, 150 F.3d at 1020); *see also Brown v. Ticor Title Ins.*, 982 F.2d 386, 390 (9th Cir. 1992) (noting that adequacy of representation "depends on the qualifications of counsel for the representatives, an absence of antagonism, a sharing of interests between representatives and absentees, and the unlikelihood that the suit is collusive") (citations omitted); Fed. R. Civ. P. 23(g)(1)(B) (stating that "class counsel must fairly and adequately represent the interests of the class"). Because "the typicality and adequacy inquiries tend to significantly overlap[,]" *Woods v. Vector Mktg. Corp.*, No. C-14-0264 EMC, 2015 WL 5188682, at \*11 (N.D. Cal. Sept. 4, 2015) (citation omitted), the Court will address them together. In reviewing a defendant's objections to the adequacy of the class representative, "a court must be wary of a defendant's efforts to defeat representation of a class on grounds of inadequacy when the effect may be to eliminate any class representation[.]" *In re Computer Memories Sec. Litig.*, 111 F.R.D. 675, 682 (N.D. Cal. 1986). As Lawson is the only class representative at this time, the Court will scrutinize Defendants' adequacy challenge closely.

Tan v. Grubhub, Inc., Not Reported in Fed. Supp. (2016)
2016 WL 4721439

**\*3** As noted above, Lawson is one of just two individuals in California to opt out of the class action waiver provisions. All other GrubHub drivers in California are potentially subject to some form of class action waiver as set forth in the GrubHub service agreements. (Dkt. No. 51 at 10; Dkt. No. 52 ¶¶ 21-22, 24.) Lawson therefore cannot satisfy either the typicality or adequacy requirements of Rule 23; that is, because Lawson is in a position unique from all but one other driver in California, his claims are not typical of the putative class members nor can he adequately represent the interests of those members, who are potentially bound by the arbitration and class action waiver provisions. For example, Lawson— having opted out of two separate agreements— would be unable to credibly make several procedural unconscionability arguments on behalf of unnamed class members, such as that delivery drivers felt compelled to accept the arbitration provisions as a condition of employment or that the opt-out provision was not sufficiently noticeable.

The Ninth Circuit's decision in *Avilez v. Pinkerton Government Services, Inc.*, 596 Fed.Appx. 579 (9th Cir. 2015), is instructive. In that case, the named plaintiff's arbitration agreement did not contain a class action waiver, but the district court nevertheless certified classes and subclasses that included employees who had signed class action waivers. *Id.* at 579. The Ninth Circuit held that the district court abused its discretion in certifying those classes and subclasses because "those who signed such waivers have potential defenses that [the named plaintiff] would be unable to argue on their behalf." *Id.* Thus, the Ninth Circuit concluded, the named plaintiff was "not an adequate representative, Fed. R. Civ. P. 23(a)(4), and her claim lack[ed] typicality, Fed. R. Civ. P. 23(a)(3)." *Id.* Other courts have similarly found typicality and adequacy of representation to be lacking where the lead plaintiff was not subject to the same arbitration provisions as unnamed plaintiffs. *See, e.g.*, *Tschudy v. J.C. Penney Corp., Inc.*, No. 11CV1011 JM (KSC), 2015 WL 8484530, at \*3 (S.D. Cal. Dec. 9, 2015) (finding that named plaintiffs, who were not subject to arbitration agreement, failed to satisfy typicality and adequacy requirements where putative class members had arbitration provisions); *Quinlan v. Macy's Corp. Servs., Inc.*, No. CV1200737DDPJCX, 2013 WL 11091572, at \*3 (C.D. Cal. Aug. 22, 2013) (finding typicality requirement not satisfied where the plaintiff "asserts claims that the overwhelming majority of purported class members may be barred from bringing in this court" because over 90% of proposed class, but not lead plaintiff, was subject to binding arbitration); *King v. Capital One Bank (USA), N.A.*, No. 3:11-

CV-00068, 2012 WL 5570624, at \*14 (W.D. Va. Nov. 15, 2012) (finding that the plaintiff not subject to the arbitration provision "could not fairly and adequately represent in this Court the interests of individuals who are bound to pursue their claims in arbitration"); *Renton v. Kaiser Found. Health Plan, Inc.*, No. C00-5370RJB, 2001 WL 1218773, at \*7 (W.D. Wash. Sept. 24, 2001) (concluding no typicality where, "[u]nlike many class members, [plaintiff] was not subject to an arbitration agreement under her plan").[3] Lawson, too, does not satisfy the typicality and adequacy requirements for the same reasons.

3    At oral argument, Plaintiffs argued that the arbitration and class action waiver provisions should not preclude class certification because the court in the Uber litigation certified a class that included Uber drivers that had not opted out of arbitration provisions. *See O'Connor v. Uber Techs., Inc.*, 311 F.R.D. 547 (N.D. Cal. 2015). There, the court initially certified a class of drivers that included only those who, among other requirements, had opted out of arbitration agreements that included notice and opt-out provisions that the court had mandated. *Id.* at 550. The court then requested supplemental briefing on class certification and ultimately certified a subclass of individuals who had not opted out of those arbitration agreements because, the court found, the arbitration provisions included an unenforceable and non-severable PAGA waiver. *Id.* at 554-564. The Ninth Circuit granted Uber's Rule 23(f) petition to appeal the order certifying the subclass of drivers subject to arbitration provisions, though argument on that issue has been stayed pending approval of the parties' settlement in the case. Given the circumstances of that case, and that the Court sees no reason to depart from the reasoning set forth by the Ninth Circuit in *Avilez*, the Court still finds that Lawson fails to satisfy the typicality and adequacy requirements.

### B. Rule 23(a)(1): Numerosity

**\*4** A putative class satisfies the numerosity requirement "if the class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). Because Lawson's claims are not typical of delivery drivers who have not opted out of the arbitration and class action waiver provisions, and because Lawson and one other individual are the only drivers in California that have opted out, the proposed class would consist of just two total members. Joinder of one other driver to this case—in addition to Lawson—would not be impracticable. The numerosity requirement is therefore not satisfied.

Case 3:16-cv-00085-MEM   Document 176-1   Filed 09/25/20   Page 146 of 147
Tan v. Grubhub, Inc., Not Reported in Fed. Supp. (2016)
2016 WL 4721439

## C. Rule 23(a)(2): Commonality

The Court must also find that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). "[C]ommonality requires that the class members' claims 'depend on a common contention' such that 'determination of its truth or falsity will resolve an issue that is central to the validity of each [claim] in one stroke.' " *Mazza*, 666 F.3d at 588-89 (quoting *Wal-Mart Stores v. Dukes*, 131 S. Ct. 2541, 2551 (2011)). "The plaintiff must demonstrate the capacity of classwide proceedings to generate common answers to common questions of law or fact that are apt to drive the resolution of the litigation." *Id.* (internal quotation marks and citation omitted). The commonality requirement is construed permissively and is "less rigorous than the companion requirements of Rule 23(b)(3)." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019 (9th Cir. 1998).

Defendants argue that proceedings here will not generate common answers because the arbitration and class waiver provisions "preclude the vast majority of class members from having their claims litigated in this action." (Dkt. No. 51 at 20.) The Court agrees. *See, e.g.*, *In re Titanium Dioxide Antitrust Litig.*, 962 F. Supp. 2d 840, 861 (D. Md. 2013) ("[W]here certain members of a class are subject to contracts containing arbitration clauses, while other class members are not, those differences in contractual relationships destroy[ ] the commonality and typicality of the class."); *Renton*, 2001 WL 1218773, at *5 (finding no commonality in part because some putative class members may be subject to mandatory arbitration or to the exhaustion of administrative remedies). Lawson thus cannot satisfy the commonality requirement.

## D. Rule 23(b): Predominance and Superiority

Plaintiffs must also meet one of the provisions of Rule 23(b) in order to have a class certified. *See* Fed. R. Civ. P. 23(b); *Berger v. Home Depot USA, Inc.*, 741 F.3d 1061, 1067 (9th Cir. 2014). In the SAC (*see* SAC ¶¶ 24-32), Plaintiffs maintain that Lawson has satisfied the requirements of Rule 23(b)(3): "the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."

To meet the predominance requirement of Rule 23(b)(3), "the common questions must be a significant aspect of the case that can be resolved for all members of the class in a single adjudication." *Berger v. Home Depot USA, Inc.*, 741 F.3d 1061, 1068 (9th Cir. 2014) (internal quotation marks and alterations omitted).

Factors relevant to the superiority requirement include:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
>
> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
>
> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

**\*5** Fed. R. Civ. P. 23(b)(3). "A consideration of these factors require the court to focus on the efficiency and economy elements of the class action so that cases allowed under subdivision (b)(3) are those that can be adjudicated most profitably on a representative basis." *Zinser v. Accufix Research Institute, Inc.*, 253 F.3d 1180, 1190 (9th Cir. 2001) (internal citation omitted).

As discussed above, because all but one of the unnamed class members are potentially bound by the class action waiver provisions, Lawson cannot satisfy the commonality requirement of Rule 23(a); he therefore also cannot satisfy the more stringent predominance requirement in Rule 23(b)(3). *See In re Titanium Dioxide Antitrust Litig.*, 962 F. Supp. 2d at 861-63. Notably, the class action waiver provisions prevent the resolution of claims for all members in a single adjudication—to the contrary, each driver must have her claims arbitrated on an individual basis. This restriction also prevents Lawson from establishing that the class action procedure is a superior method of adjudication. *See Pablo v. ServiceMaster Glob. Holdings Inc.*, No. C 08-03894 SI, 2011 WL 3476473, at *2 (N.D. Cal. Aug. 9, 2011) (finding class action not superior method of adjudication where a significant number of putative class members signed arbitration agreements).

Accordingly, the Court finds that the Lawson's decision to opt out of the arbitration and class waiver provisions precludes him from satisfying any of the requirements of Rule 23.

## II. Plaintiffs' Arguments

Instead of addressing the requirements of Rule 23, Plaintiffs provide three arguments as to why the arbitration and class action waiver provisions, and Lawson's decision to opt out of those provisions, should not defeat class certification: (1) unnamed class members are not part of this lawsuit and

2016 WL 4721439

the class action waiver provisions in their delivery service provider agreements are therefore irrelevant; (2) the class action waivers at issue do not restrict unnamed class members from participating passively in a class action brought on their behalf; and (3) the class waiver provisions are unenforceable.

With respect to (1), Plaintiffs contend that the arbitration and class waiver provisions are irrelevant because the unnamed class members do not themselves have active claims or disputes being adjudicated here. Rather, the unnamed class members' claims are being brought by Lawson on behalf of those unnamed members and so the unnamed members are not parties to the litigation; thus, Plaintiffs reason, the unnamed members' class action waivers do not apply. (Dkt. No. 59 at 4.) The Court disagrees. Were the Court to certify a class as Plaintiffs seek, *i.e.*, of all GrubHub drivers in California (*see* SAC ¶ 24), any judgment in this case would bind the unnamed class members (unless they opted out of the class)—in other words, the unnamed class members would become parties and their claims would be heard and adjudicated. *See, e.g.*, *Devlin v. Scardelletti*, 536 U.S. 1, 10 (2002) ("What is most important to this case is that nonnamed class members are parties to the proceedings in the sense of being bound by the settlement."); *Smith v. Bayer Corp.*, 564 U.S. 299, 313 (2011) (noting that "an unnamed member of a *certified* class may be 'considered a 'party' for the [particular] purpos[e] of appealing' an adverse judgment") (emphasis and alterations in original); *In re Checking Account Overdraft Litig.*, 780 F.3d 1031, 1037 (11th Cir. 2015) ("Certification of a class is the critical act which reifies the unnamed class members and, critically, renders them subject to the court's power.").

 **\*6**  Regarding (2) and (3), the Court declines to reach these arguments now because Lawson has no standing to challenge the applicability or enforceability of the arbitration and class action waiver provisions. Lawson cannot challenge those provisions himself because, in light of his decision to opt out, they do not apply to him. *See, e.g.*, *Meyer v. T-Mobile USA Inc.*, 836 F. Supp. 2d 994, 1003 (N.D. Cal. 2011) (finding that because plaintiff "has not shown how the modification clause [in the arbitration agreement] has been applied to her," she "thus lacks standing to challenge the provision"); *Arellano v. T-Mobile USA, Inc.*, No. C 10-05663 WHA, 2011 WL 1362165, at \*5 (N.D. Cal. Apr. 11, 2011) ("Plaintiff does not have standing to challenge the change-in-terms provision, because it has never been applied to her[.]"). Nor can he challenge the provisions on behalf of unnamed putative class members who have agreed to those provisions. *See, e.g.*, *In re Checking Account Overdraft Litig.*, 780 F.3d at 1039 (finding that, where named plaintiffs were not subject to arbitration, they "lack[ed] standing to assert any rights the unnamed putative class members might have to preclude Wells Fargo from moving to compel arbitration because the named plaintiffs have no cognizable stake in the outcome of that question"). And, in any event, Lawon is not a typical or adequate representative to make applicability or enforceability arguments on behalf of the unnamed class members.

## CONCLUSION

For the reasons set forth above, the Court GRANTS Defendants' motion for an order denying class certification.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2016 WL 4721439

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.