## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

**ANGELO R. RESCIGNO, SR.,**   :
**AS EXECUTOR OF THE ESTATE**
**OF CHERYL B. CANFIELD,**   :

**Plaintiff**   :   **CIVIL ACTION NO. 3:16-85**

**v.**   :   **(JUDGE MANNION)**

**STATOIL USA ONSHORE**   :
**PROPERTIES INC.,**
:
**Defendant**

## <u>MEMORANDUM</u>

Presently before the court is the lead plaintiff Angelo R. Rescigno, Sr.'s ("Rescigno") motion for final approval of the settlement and plan of allocation, (Doc. 175), as well as a motion for attorneys' fees and expenses and a service award to Rescigno and the class representatives, (Doc. 179). Several class members have filed objections to the settlement agreement, plan of allocation, and motion for attorneys' fees. (Doc. 188). Upon review, the motion for final approval will be **GRANTED**, as will the motion for attorneys' fees and expenses, as modified.

## I.    BACKGROUND

The court has set forth the extensive factual background of this case in its prior memoranda and need not repeat it herein. Pertinent here, Rescigno brought this class action against Statoil USA Onshore Properties, Inc. ("SOP") and two other defendants. His Complaint alleged seven claims which revolved around the royalty clause in the lease agreements of Rescigno and other property owners in Northern Pennsylvania and challenged the way in which SOP calculated the royalties. (Doc. 1). Ultimately, the court dismissed all claims against the two other defendants besides SOP and dismissed all but one claim against SOP: breach of the implied duty to market. (Doc. 72; Doc. 73).

The parties reached a settlement agreement, and, on July 8, 2020, the court granted preliminary approval of the settlement agreement and appointment of class representatives and class counsel. (Doc. 152; Doc. 153).

On August 5, 2020, 13,445 notices were mailed to the Class Members and the parties have maintained a toll-free helpline and website to accommodate inquiries. (Doc. 184). On September 25, 2020, Rescigno moved for final approval of the settlement and plan of allocation, (Doc. 175),

as well as for attorneys' fees and expenses and a service award to Rescigno and the class representatives, (Doc. 179).

### a. Terms of Settlement

The settlement agreement identifies the class as "Royalty Owners in Northern Pennsylvania[1] who have entered into oil and gas leases, regardless of the type of lease, that provide that the Royalty Owner is to be paid Royalties and to whom [SOP] has (or had) an obligation to pay Royalties on production attributable to [SOP]'s working interest." (Doc. 137 p.5).

The settlement agreement divides all plaintiffs and named plaintiffs into two groups. The first group, termed the "Lease Form 29 Group," or "L-29 Group," includes those class members whose leases contain the following provision governing valuation of royalty on natural gas:

> To pay Lessor on gas and casinghead gas produced from the leased premises, percentages of proceeds . . . based on: (1) the Gross Proceeds paid to Lessee from the sale of such gas and

---

1 Northern Pennsylvania is defined in the settlement agreement as: "The area of Pennsylvania in which [SOP] owns working interests in oil and gas leases and from which it produces and sells Natural Gas production for delivery into Rome, Liberty, Allen, Meadow, Warrensville, Seely, Canoe Run, Tombs Run, and PVR Wyoming gathering systems and includes oil and gas leases owned in whole or in part by [SOP] in the following counties: Bradford, Lycoming, Sullivan, Susquehanna, and Wyoming." (Doc. 137, at 10).

casinghead gas when sold by Lessee in an arms-length sale to an unaffiliated third party, or (2) the Gross Proceeds, paid to an Affiliate of Lessee, computed at the point of sale, for gas sold by lessee to an Affiliate of Lessee . . . .

(Doc. 137 p.9-10). The L-29 Group comprises approximately 7% of the class and the settlement agreement provides that they will be allocated 18% of the net settlement fund. (Doc. 137-2 p.7).

The second group, termed the "Other Lease Group," includes those class members with interests under all other lease forms. The Other Lease Group comprises approximately 93% of the class and the settlement agreement provides that they will be allocated approximately 82% of the net settlement fund. (Doc. 137-3 p.4).

SOP has agreed to pay $7,000,000, plus interest, to settle all claims relating to SOP's use of the index pricing methodology as the basis for calculation of royalties. The class has agreed to a release which will permit SOP to continue using the index pricing methodology to calculate royalties for a period of five years from the effective date of the settlement for the Other Lease Group. However, for those in the Lease Form 29 Group, SOP agrees to base the royalties on the resale price and to no longer use the index pricing methodology going forward. Upon final approval of the settlement, SOP will make this change effective retroactively to the first full

production month after preliminary approval of the settlement. (Doc. 137 p.7, 17-18).

Ultimately, all class members who are eligible and participate in the agreement will release all claims asserted in the complaint or that relate to the methodology of determining royalties paid on natural gas produced from the class members' wells. (Doc. 137 p.23).

### b. Objections

A small group of class members, Jerry J. Cavalier, Alan Marbaker, and Carol Marbaker, have repeatedly made their disagreement with the settlement in this case clear through their brief in opposition to the motion for preliminary approval, (Doc. 111), and their motions to consolidate, (Doc. 108), intervene, (Doc. 138), and stay the proceedings, (Doc. 155). Most recently, those four class members, as well as 141 other class members (collectively, "Objectors"), raise 13 objections to all aspects of the settlement agreement in a 50-page document, attached to which are 180 pages of exhibits. (Doc. 188). Rescigno and SOP filed responses. (Doc. 218; Doc. 224).

After numerous COVID-19-related delays, the court held a final fairness hearing on April 22, 2021, at which Objectors appeared and presented argument.

## II.   MOTION FOR FINAL APPROVAL

### a. Whether Certification is Reasonable

#### i.  Rule 23(a) Factors

##### a) Numerosity, Commonality, and Typicality

Rule 23(a)(1) requires that "the class [be] so numerous that joinder of all members is impracticable." Fed.R.Civ.P. 23(a)(1). The class here satisfies the numerosity requirement since it includes approximately 13,445 individuals, and therefore joinder of all these plaintiffs would be impractical.

As to commonality, Rule 23(a)(2) requires that class members' claims share common questions of law or common questions of fact. "The standard is not stringent; only one common question is required." *In re Nat. Football League Players' Concussion Injury Litigation*, 307 F.R.D. 351, 371 (E.D.Pa. 2015), *aff'd*, 821 F.3d 410 (3d Cir. 2016); *see also Rodriguez v. National City Bank*, 726 F.3d 372, 382 (3d Cir. 2013) (concluding the bar commonality sets "is not a high one"); *In re Prudential Ins. Co. of Am. Sales Practice Litig.*, 148 F.3d 283, 310 (3d Cir.1998) (holding this factor is satisfied "if the named plaintiffs share at least one question of fact or law" with the prospective class (internal quotation marks omitted)). To satisfy commonality, class claims "must depend upon a common contention . . . of such a nature that it is capable of classwide resolution—which means that

determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal–Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011).

Here, there are factual issues common to all class members regarding whether SOP used an index pricing methodology to calculate royalties.

Finally, Rule 23(a)(3) requires that the class representatives' claims be typical of the class members' claims such that "the action can be efficiently maintained" and the class representatives have incentives that align with the class members. *Baby Neal v. Casey*, 43 F.3d 48, 57 (3d Cir. 1994).

The Third Circuit has "set a low threshold for satisfying" the typicality requirement. *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 183 (3d Cir. 2001). "Even relatively pronounced factual differences will generally not preclude a finding of typicality where there is a strong similarity of legal theories or where the claim arises from the same practice or course of conduct." *Prudential*, 148 F.3d at 311 (internal quotation marks omitted); *see also In re Warfarin Sodium Antitrust Litigation*, 391 F.3d 516, 532 (3rd Cir. 2004) (finding no abuse of discretion in a finding that the typicality requirement was satisfied where the claims of

- 7 -

the representative plaintiffs arose "from the same alleged wrongful conduct . . . [and] the same general legal theories").

Here, although the specific language of the individual leases may vary, the claim of the class representatives, like those of the putative class members, is that SOP should not have used the index pricing methodology and, therefore, the requirement of typicality is present.

### b) Adequacy of Representation

With regard to the adequacy of representation, the court finds that both the proposed class representatives and class counsel satisfy this requirement.

### a. Class Representatives

"[T]he linchpin of the adequacy requirement is the alignment of interests and incentives between the representative plaintiffs and the rest of the class." *Dewey v. Volkswagen Aktiengesellschaft*, 681 F.3d 170, 183 (3d Cir. 2012). "The purpose of the adequacy requirement is to identify intra-class conflicts that may prevent the representative plaintiffs from adequately representing the entire class." *In re Comcast Set-Top Cable Television Box Antitrust Litigation*, 333 F.R.D. 364, 376 (E.D.Pa. 2019). But, "[o]nly a fundamental intra-class conflict will violate Rule 23(a)(4)." *Id.*

- 8 -

"A fundamental conflict exists where some [class] members claim to have been harmed by the same conduct that benefitted other members of the class." *Dewey*, 681 F.3d at 184. Alternatively, "[a] conflict concerning the allocation of remedies amongst class members with competing interests can be fundamental." *Id.* Thus, in determining whether representative plaintiffs may adequately represent the class, a court must address: "(1) whether an intra-class conflict exists; and if so, (2) whether that conflict is 'fundamental.'" *Id.*

The class representatives are Rescigno and Donald Keith Stine and Mary Stine ("the Stines"). The court finds that the class members' interests have been adequately represented by Rescigno and the Stines. Ninety-three percent of the leases at issue, like Rescigno's, require royalties to be paid on revenue realized. The remaining leases contain a provision with language more favorable to the royalty owners. The Stines' lease contains this more favorable provision and, thus, the L-29 Group has adequate representation in the Stines. Finally, Rescigno and the Stines capably discharged their duties, having indicated that they were informed of and approved all significant developments in the case. *See In re Nat. Football League Players' Concussion Injury Litigation*, 307 F.R.D. 351, 375 (E.D.Pa. 2015), *aff'd*, 821 F.3d 410 (3d Cir. 2016).

### b. Class Counsel

"Class counsel must fairly and adequately represent the interests of the class." Fed.R.Civ.P. 23(g)(4). In considering the adequacy of class counsel, courts must assure that class counsel "(1) possessed adequate experience; (2) vigorously prosecuted the action; and (3) acted at arm's length from the defendant." *In re General Motors Corp. Pick-Up Truck Fuel Tank Products Liability Litigation*, 55 F.3d 768, 801 (3d Cir. 1995).

As previously stated when preliminarily certifying the class, the court is satisfied that class counsel have fairly and adequately represented the interests of the class pursuant to Rule 23(g)(4). The class is represented by Francis P. Karam of the law firm Robbins Geller Rudman & Dowd LLP (hereinafter "Robbins Gellar"), who provided a declaration to the court, (Doc. 104), along with the firm's resume, (Doc. 104-2). Attorney Karam has had prior experience in representing clients in oil and gas matters both before this court and in state court. Robbins Gellar Rudman & Dowd LLP has litigated numerous actions against oil and gas companies in both state and federal courts around the country. Attorney Karam's co-counsel, Douglas Clark of the Clark Law Firm, P.C (hereinafter "Clark Law Firm"), and John F. Harnes of the Law Offices of John F. Harnes PLLC (hereinafter "John F.

Harnes PLLC"), also provided their firms' resumes. (Doc. 104-3; Doc. 104-4).

Since 2016 when this case was filed, class counsel has vigorously litigated this case at arms' length, investigating the potential claims, responding to two motions to dismiss, reviewing what they represent to be thousands of documents in discovery, and retaining experts to assist and verify data. Further, class counsel has had to defend this against numerous attacks on its fairness by the Objectors in, for example, a later-stricken brief in opposition to the motion for preliminary approval, a motion to consolidate, a motion to intervene, a motion to stay, and a motion for discovery. No doubt that the questions raised by Objectors—many of which are reiterated in their present Objections—have required class counsel to investigate the claims and become all the more confident in the strengths and weaknesses of their case and the fairness of the settlement.

In their Objection Number 4, Objectors contend that class counsel's interests are not aligned with those of all class members and that they have not adequately represented the class. Objectors argue this is because class counsel: (1) did not pursue claims in arbitration against SOP, (2) did not use an arbitration award issued to L-29 lessors Richard and Denise Kuffa on November 8, 2019 (the "*Kuffa* arbitration award") to improve the settlement

terms on behalf of L-29 class members, (3) failed to inform class members of the *Kuffa* arbitration award, and (4) reached a settlement that provides L-29 class members with "materially" less money than an amount SOP had offered in May 2017, and (4) failed to inform (Doc. 188 at 17-25).

The court finds the Objectors' arguments unconvincing and that their concerns tend to mitigate in favor of the conclusion that the class's interests were sufficiently pursued by class counsel. First, while class counsel opted to not pursue claims in arbitration against SOP, such a decision could be reasonably construed as one which benefits members of the class whose leases contain arbitration clauses. At the time of the commencement of this class action in January 2016, a separate suit filed in this district was litigating the issue of whether certain standard arbitration clauses in oil-and-gas leases allow for class arbitration. *See Chesapeake Appalachia, LLC v. Scout Petroleum, LLC*, No. 4:14-cv-0620, 2017 WL 1541659, at *5 (M.D. Pa. Apr. 28, 2017). The issues litigated in the *Scout Petroleum* action, which was pending a decision on appeal during settlement negotiations in this case, called into question whether class arbitration may arise from leases containing arbitration clauses in the instant action. Because the class arbitrability of certain leases in this action was unclear, class counsel's decision to not pursue arbitration against SOP could reasonably be

construed as advancing the interests of class members to pursue their claims on a class basis.

Second, even if class counsel did not use the *Kuffa* arbitration award to improve the settlement terms, such conduct does not meaningfully suggest that class counsel failed to adequately represent the interest of class members with L-29 leases under the present circumstances. The Kuffas, who held L-29 leases, litigated their royalty payment claim against SOP in an arbitration proceeding before the American Arbitration Association ("AAA"). (Doc. 188-3, at 5-6). The *Kuffa* arbitration resulted in an arbitration award which, as relevant here, concluded that SOP breached the L-29 lease and awarded the Kuffas injunctive relief to prohibit SOP from using index prices to calculate royalties, as well as $3,611.74 in damages. *Id*.

As to L-29 leases, the settlement agreement provides that SOP will not use the index pricing methodology and will instead base royalty calculations on resale price going forward. (Doc. 137, at ¶2.4). Further, the settlement agreement provides for a settlement amount of $7 million, the proceeds of which are to be distributed equally among class members, with the exception of members with L-29 leases, who will receive payment twice as that of other class members. (Doc. 138, at ¶1.e(i)). As such, the

settlement agreement contains terms favorable to L-29 class members and comparable to corresponding awards issued in the *Kuffa* arbitration. This suggests that class counsel, in reaching such settlement terms, adequately advanced the interest of L-29 class members.

Third, we find that the class counsel adequately represented the interest of the class even if they did not notify class members of the *Kuffa* arbitration award. Objectors argue that class counsel breached their fiduciary duty to the class by failing to notify class members of the *Kuffa* award. They argue this is because the *Kuffa* arbitration award collaterally estops SOP from relitigating the legal determinations made in the *Kuffa* arbitration.

Class counsel are fiduciaries to absent class members. *Greenfield v. Villager Indus., Inc.*, 483 F.2d 824, 832 (3d Cir. 1973) ("…in addition to the normal obligations of an officer of the court, and as counsel to parties to the litigation, class action counsel possess, in a very real sense, fiduciary obligations to those not before the court."). Initially, the Objectors do not cite to any caselaw in support of breach of fiduciary duty claim.[2] Moreover, the record as a whole suggests that class counsel has treated class members

---

[2] Further, insofar the Objectors assert that collateral estoppel should be applied in the above-captioned action, they do not make such an argument in a proper motion. Accordingly, the court does not reach the issue of whether collateral estoppel could apply in this suit.

fairly. As the settlement agreement provides that SOP will not use the index pricing methodology as to L-29 leases, and members with L-29 leases will receive payment twice as that of other class members from the proceeds of the settlement amount, the court is satisfied that class counsel has adequately represented the interests of the class members.

Fourth, the court is not persuaded that class counsel's agreement to a settlement which allocates less money to L-29 than what SOP offered in May 2017 indicates their failure to adequately represent the class. (Doc. 188 at 23). Class counsel points out that the disparity between the sum of the instant settlement and that of SOP's May 2017 offer is attributable to rulings in this case and other relevant cases which made legal risks more favorable to SOP by the time settlement was reached.

The court finds class counsel's position persuasive. The settlement agreement was filed with the court in March 2020, about three years after SOP made its May 2017 offer. (Doc. 188 p.24). Over the course of the three years, this court denied plaintiff's motion for reconsideration of its dismissal of two claims against SOP, (Doc. 85), and courts in the Third Circuit issued rulings which called into question the arbitrability of class claims arising from oil-and-gas leases. *Chesapeake Appalachia, LLC v. Scout Petroleum, LLC*, No. 4:14-cv-0620, 2017 WL 1541659, at *5 (M.D. Pa. Apr. 28, 2017), *aff'd*

727 F. App'x 749 (3d Cir. 2018). It thus appears plausible that the settlement amount is less than the amount SOP offered in May 2017 and the court does not find that the settlement amount suggests that class counsel failed to adequately pursue the class's interest.

Accordingly, the court is satisfied that class counsel fairly and adequately represented the interests of the class.

### ii. Rule 23(b)(3)

Under Rule 23, the court must find that one of three grounds justifying this class action. Here, the parties rely on Rule 23(b)(3), which applies when (1) "questions of law or fact common to class members predominate over any questions affecting only individual members," and (2) when "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed.R.Civ.P. 23(b)(3).

The "predominance inquiry" tests "whether the defendant's conduct was common as to all of the class members, and whether all of the class members were harmed by the defendant's conduct." *Sullivan v. DB Investments, Inc.*, 667 F.3d 273, 298 (3d Cir. 2011). Furthermore, the Third Circuit explained, "'Predominance under Rule 23(b)(3) cannot be reduced to a mechanical, single-issue test'"; rather, "'[a]s long as a sufficient

constellation of common issues binds class members together, variations in the sources and application'" of applicable laws will not foreclose" the commonality of the class. *Id.* at 301 (quoting *In re Linderboard Antitrust Litig.*, 305 F.3d 145, 162-63 (3d Cir. 2002).

The defendant's conduct was common to all class members regarding whether SOP used an index pricing methodology to calculate royalties. Each class member was allegedly harmed by the defendant's conduct. Although the Objectors argue that there are varying remedies contained within the Settlement, the Third Circuit has explained that "variations in the rights and remedies available to injured class members … [do] not defeat commonality and predominance." *Sullivan v. DB Investments, Inc.*, 667 F.3d 273, 302 (3d Cir. 2011) (en banc) (quoting *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 529 (3d Cir. 2004)).

In this matter, a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. With a class of over 13,000 members, a class action favors efficiency over individually filing suit through the courts or arbitration. Objectors contend that arbitration would prove more promising to L-29 class members with arbitration clauses. However, this argument is unconvincing. First, the Defendant's contend that collateral estoppel would be extended from the first arbitration proceeding to

subsequent proceedings, which would therefore reduce the cost for each arbitration. Assuming collateral estoppel between each arbitration proceeding would be possible, SOP correctly explains from *Lake Carey* that every arbitration would still involve the defendant arguing at which stage the gas was marketable, which requires expert testimony to determine. Objectors would not be able to simply apply the previous holding of one arbitrator and immediately succeed in a subsequent case. Each case would require expert testimony pertaining to the marketability of the gas, which in turn would drive up costs for each plaintiff. *See Lake Carey Investments, LLC v. Statoil USA Onshore Properties, Inc.*, AAA Case No. 01-17-0007-3491 (noting that while the *Kuffa* arbitration decision would extend collateral estoppel as to SOP violating the lease agreement, but damages would require additional evidence and expert testimony pertaining to the marketability of the gas out of the wellhead and post-production deductions). Second, as this Court already expressed during the fairness hearing, the recovery by each plaintiff during arbitration would likely be so small that no attorney would accept the case without some sort of prior connection to the plaintiff, essentially doing them a favor. Third, each plaintiff would be responsible for the costs of arbitration, which likely outweigh the cost of arbitrating the case in the first instance. *See Richard &*

*Denise Kuffa v. Statoil USA Onshore Properties, Inc*., AAA Case No. 01-17-0005-6012 (awarding Kuffas $3,611.74 plus interest).

Objectors argue that other class members would benefit from the collateral estoppel that emerged from the *Kuffa* arbitration. However, this fails to take into account the inherent cost of an arbitrator and the cost of experts. The court finds that fairness and efficiency would better be served through a class action rather than arbitrating on an individual basis. It should also be noted that although Objectors challenge the class action settlement, they have not opted-out of the settlement to proceed with individual arbitration. This is puzzling to the court because they argue that individual arbitration is a viable and better option, but are unwilling to proceed with this process on their own accord.

### b. Whether Notice to the Class Was Reasonable

As noted above, the court previously approved the notice scheme and, according to the parties, they have successfully followed that procedure. On August 5, 2020, 13,445 notices were mailed to the Class Members and the parties have maintained a toll-free helpline and website to accommodate inquiries. (Doc. 184).

Objectors contend the notice to the class was improper on the basis that it omitted "critical information" and did not "provide class members with

the information they need[ed] to make informed decisions about the settlement." (Doc. 188, at 24). Namely, Objectors argue that the notice did not "disclose that the Court dismissed all but one of Plaintiff's claims." (Doc. 188, at 25). Obviously, there is no such requirement that a notice provide detailed information regarding the court's disposition on a prior motion to dismiss and, unsurprisingly, Objectors do not cite to any authority for this proposition.

They also argue that the website maintained by the settlement administrator is deficient because it does not contain various case filings that a notice checklist created by the Federal Judicial Center indicates are "reasonable to post" such as the complaint, nor does it post "[o]ther orders, such as [] rulings on motions to dismiss," that "should ordinarily be made available." Judges' Class Action Notice and Claims Process Checklist and Plain Language Guide (fjc.gov). Clearly, the checklist referenced by Objectors is not a set of mandatory legal requirements for certification but merely an aid to assist judges in managing class actions. The court declines to find the notice, which contains all of the information required by Rule 23(c)(2)(B), deficient where an optional website maintained by the administrator does not contain all case documents referenced in a judicial

checklist guide.[3] Moreover, the notice indicates that all court records were available for inspection and provides the contact information of class counsel and the settlement administrator, as well as the court's address.

Objectors also argue that the notice is not in plain, easily understandable language. To the contrary, the notice is written in clear, concise, and easily understood language, contains appropriately bolded headings, and provides the contact information of class counsel in the event class members had any questions. Class counsel reports that no class members reached out to them. Moreover, as Rescigno observes, there is no basis to suggest that class members, who are parties to complex leases, could not understand the simple concepts addressed in the notice.

"Generally speaking, the notice should contain sufficient information to enable class members to make informed decisions on whether they should take steps to protect their rights, including objecting to the settlement or, when relevant, opting out of the class." *In re Baby Prods. Antitrust Litigation*, 708 F.3d 163, 180 (3d Cir. 2013). The notice did so here. Therefore, in

---

[3] Objectors also argued that the website did not contain Rescigno's motion for final approval or motion for attorneys' fees; however, upon review, the website does indeed have Rescigno's briefs in support of these motions as well as the attached declarations. *See Statoil Class Action Website: Case Documents*, http://www.statoilsettlement.com/case-documents.aspx.

accordance the court's earlier approval of the notice scheme, the court finds

that notice to the class was reasonable.

### c. Whether the Proposed Settlement Is Fair

The Third Circuit directed district courts to consider the following nine

factors in *Girsh v. Jepson*:

> (1) the complexity, expense and likely duration of the
> litigation; (2) the reaction of the class to the
> settlement; (3) the stage of the proceedings and the
> amount of discovery completed; (4) the risks of
> establishing liability; (5) the risks of establishing
> damages; (6) the risks of maintaining the class
> action through the trial; (7) the ability of the
> defendants to withstand a greater judgment; (8) the
> range of reasonableness of the settlement fund in
> light of the best possible recovery; (9) the range of
> reasonableness of the settlement fund to a possible
> recovery in light of all the attendant risks of litigation.

*Girsh v. Jepson*, 521 F.2d 153, 157 (3d Cir. 1975) (internal quotation marks

and ellipses omitted). Later, the Third Circuit held that, "because of a "sea-

change in the nature of class actions," it might be useful to expand the *Girsh*

factors to include several permissive and non-exhaustive factors:

Courts should also apply the following *Prudential* factors where

applicable:

> the maturity of the underlying substantive issues, as
> measured by experience in adjudicating individual
> actions, the development of scientific knowledge, the

> extent of discovery on the merits, and other facts that bear on the ability to assess the probable outcome of a trial on the merits of liability and individual damages; the existence and probable outcome of claims by other classes and subclasses; the comparison between the results achieved by the settlement for individual class or subclass members and the results achieved—or likely to be achieved— for other claimants; whether class or subclass members are accorded the right to opt out of the settlement; whether any provisions for attorneys' fees are reasonable; and whether the procedure for processing individual claims under the settlement is fair and reasonable.

*In re Prudential Ins.*, 148 F.3d at 323.

Finally, in *In re Baby Products Antitrust Litigation*, the Third Circuit set forth additional considerations:

> one of the additional inquiries for a thorough analysis of settlement terms is the degree of direct benefit provided to the class. In making this determination, a district court may consider, among other things, the number of individual awards compared to both the number of claims and the estimated number of class members, the size of the individual awards compared to claimants' estimated damages, and the claims process used to determine individual awards.

708 F.3d at 174. The Third Circuit made clear that a district court must have specific details about the value of the settlement to class members.

### i. The *Girsh Factors*

#### a) Complexity, Expense, and Likely Duration of Litigation

This factor "captures the probable costs, in both time and money, of continued litigation." *In re Warfarin Sodium Antitrust Litigation*, 391 F.3d 516, 535-36 (3rd Cir. 2004) (internal quotation marks omitted).

This action has been pending since 2016 and, since then, the docket of this case has over 230 filings. If litigation continued in this action, the parties would have to engage in protracted discovery, extensive pretrial motions, and a lengthy and likely complicated trial involving numerous experts with significant expert fees. Accordingly, the complexity, expense, and likely duration of litigation all weigh in favor of approval of the settlement.

#### b) Reaction of the Class to the Settlement

The second *Girsh* factor "attempts to gauge whether members of the class support the settlement." *Warfarin*, 391 F.3d at 536 (quoting *Prudential*, 148 F.3d at 318). Out of an estimated 13,445 class members, 194 have timely opted out and 144 have objected to the settlement.[4]

---

[4] Counsel indicates that the settlement administrator received 194 timely requests for exclusion, as well as eight untimely requests. (Doc. 219). One class member who opted out later wrote to rescind that decision.

The objections are addressed throughout the court's analysis but ultimately do not provide a legitimate reason to disturb the settlement in this action.

The very small percentage of objectors and opt-outs, approximately 2.5% of class members, weighs in favor of the conclusion that the reaction of the class is strongly favorable. *See Bell Atl. Corp. v. Bolger*, 2 F.3d 1304, 1314 (3d Cir. 1993) (holding that the "small proportion of objectors does not favor derailing settlement."). Accordingly, this factor weighs in favor of approving the settlement.

### c) The Stage of the Proceedings and Amount of Discovery Completed

"The third *Girsh* factor captures the degree of case development that class counsel [had] accomplished prior to settlement. Through this lens, courts can determine whether counsel had an adequate appreciation of the merits of the case before negotiating." *NFL Concussion Litig.*, 821 F.3d 410, 438-39 (3d Cir. 2016) (internal quotation marks omitted). "[F]ormal discovery is not a requirement for the third *Girsh* factor. What matters is not the amount or type of discovery class counsel pursued, but whether they had

---

Additionally, the settlement administrator indicates that he was in receipt of 23 requests for exclusion that could not be identified on the list of class members.

developed enough information about the case to appreciate sufficiently the value of the claims." *Id.* at 439.

Here, during the two years leading up to the settlement, the parties engaged in significant formal and informal discovery related to royalties and pricing which allowed them to adequately appreciate the merits of the case before negotiating the settlement. Class counsel indicates they received and reviewed thousands of pages of documents over the course of several months, including complex data setting forth the actual revenues received by SOP, the costs incurred, the terms of the various leases of class members, and the potential damages incurred by each individual class member. Additionally, they state they retained experts with whom they reviewed monthly index pricing data and back-up; monthly resale pricing calculations, worksheets, and supporting data; sales invoices and statements; lease records; pipeline invoices and statements; royalty payment records; and index price methodology supporting documentation.

Further, the settlement agreement was reached after briefing on the two motions to dismiss filed by the two dismissed defendants and SOP. As a result, the parties gained a complete understanding of the strengths and weaknesses of their cases and they indicate that the settlement represents

an informed resolution of this case. Therefore, this factor weighs in favor of approving the settlement.

### d) Risk of Establishing Liability and Damages and the Risk of Maintaining a Class Through Trial

"The fourth and fifth *Girsh* factors survey the possible risks of litigation in order to balance the likelihood of success and the potential damage award if the case were taken to trial against the benefits of an immediate settlement." *Id.* (quoting *Prudential*, 148 F.3d at 319). The sixth factor "measures the likelihood of obtaining and keeping a class certification if the action were to proceed to trial." *Warfarin*, 391 F.3d at 537. "Because class certification is subject to review and modification at any time during the litigation, *see, e.g.*, *Zenith Labs., Inc. v. Carter-Wallace, Inc.*, 530 F.2d 508, 512 (3d Cir. 1976), the uncertainty of maintaining class certification favors settlement." *In re Comcast Set-Top Cable Television Box Antitrust Litigation*, 333 F.R.D. 364, 383 (E.D. Pa. 2019).

Rescigno indicates that litigating the claim that SOP improperly calculated the royalty paid would be complex and may involve evidence regarding the alleged sham nature of SOP's intra-company sales, good faith, the prices the natural gas sold for, and SOP's efforts to market the

natural gas. This would require testimony of experts, fact witnesses, and a voluminous discovery record.

Beyond prevailing on their claims, class members additionally would have to overcome the affirmative defenses raised by SOP—the primary one being that, in using an index price, it only deducted a small portion of the costs incurred in post-production and thus it is entitled to offset any such expenses against any recovery. SOP has argued that, for several years after it acquired the leases, its use of the index prices resulted in SOP paying a higher price than it actually received when selling to third parties. SOP has maintained that class members should not be able to keep the benefit of the index price when it was higher while being compensated for the index price when it was lower.

Proving these claims at trial would require expert testimony to determine what costs were incurred to make the gas marketable, the deductions SOP took from royalties, and the costs that enhanced the market value of the gas. Moreover, this defense has force since courts, including the Fifth Circuit, have held favorable on this counterclaim. *See Potts v. Chesapeake Exploration, LLC*, 760 F.3d 470, 474-75 (5th Cir. 2014) (holding that deduction of post-production costs incurred between the

wellhead and the downstream point at which market value could be ascertained was required).

Additionally, the largest obstacle identified by the parties in proceeding with litigation is that the vast majority of the class signed arbitration agreements that "could potentially preclude them even from participating in this [a]ction and would relegate them to individual arbitrations that [would be] uneconomic to pursue." (Doc. 176 p.9). In fact, in *Marbaker v. Statoil USA Onshore Properties, Inc.*, 801 Fed.App'x 56, 60 (3d Cir. 2020), the Third Circuit stated that the five original objectors' leases did not permit class arbitration.

As a result, Rescigno notes that, without settlement, many class members would be left to arbitrate their claims on an individual basis, the cost of which would exceed the potential damages they received from the use of an index pricing methodology instead of a resale price. That is precisely what occurred in the Kuffas' arbitration that Objectors have repeatedly referenced throughout this case (and do so again here) as an example of a better potential individual outcome. There, while Objectors note that they were awarded 100% of their damages, Richard and Denise Kuffa spent $17,625.00 to arbitrate their claims against SOP and but ultimately recovered only $3,611.74 plus interest. (Doc. 138-2; Doc. 138-7

p.3). This is the likely scenario for all class members with arbitration provisions who elect to opt out and pursue their claims against SOP individually. Accordingly, Objectors' contention that the settlement is inadequate for those with L-29 leases because they stand to receive 100% of their claims simply does not hold water.

While Objectors argue that some class members have lease provisions allowing for the recovery of attorneys' fees, which would make it more economical to pursue individual arbitration, the settlement allocation plan accounts for this. Rescigno's lease, like those in the Other Lease Group, do not have the L-29 language but also do not have arbitration provisions. The Stines' lease, like the rest of the L-29 Group, has L-29 language but also a compulsory arbitration clause, as does most of the class. Consequently, the settlement accounts for this difference by apportioning a higher recovery for those in the L-29 Group with the more favorable language. The differing levels of compensation reflects the underlying strength of the two groups of class members' claims. *See Pet Food*, 629 F.3d at 347 (affirming district court's conclusion that differing awards to class members "reflect[s] the relative value of the different claims," not "divergent interests between the allocation groups"). Contrary to Objectors' arguments, this apportionment is not indicative of a conflict of

interest. *See Petrovic v. Amoco Oil Co.*, 200 F.3d 1140, 1146 (8th Cir.1999) ("If the objectors mean . . . that a conflict of interest requiring subdivision is created when some class members receive more than other class members in a settlement, we think that the argument is untenable.").

Therefore, in light of the difficulties faced by the class in establishing liability and damages, and the alternatives available, the court agrees that the risks of continued litigation weigh in favor of an early resolution.

As to the risk of maintaining the class action through trial, Third Circuit has recognized that "[t]here will always be a 'risk' or possibility of decertification, and consequently the court can always claim this factor weighs in favor of settlement." *Prudential*, 148 F.3d at 321. Consequently, this factor "deserve[s] only minimal consideration." *In re Nat'l Football League*, 821 F.3d 410. Therefore, this factor weighs in favor of approving the settlement; however, its weight merits only minimal consideration.

### e) Ability of Defendants to Withstand Greater Judgment

This factor "is most relevant when the defendant's professed inability to pay is used to justify the amount of the settlement." *NFL Concussion Litig.*, 821 F.3d at 440. Such is not the case here as the court has not been presented with evidence that SOP is at risk of insolvency. Further, district

courts in this Circuit "regularly find a settlement to be fair even though the defendant has the practical ability to pay greater amounts." *McDonough v. Toys R Us, Inc.*, 80 F.Supp.3d 626, 645 (E.D. Pa. 2015) (internal quotation marks omitted). Moreover, other *Girsh* factors far outweigh the question of whether SOP can withstand a greater judgment. Accordingly, this factor is neutral and neither supports nor undercuts approval of the settlement.

### f) Range of Reasonableness of the Settlement Fund in Light of the Best Possible Recovery and Attendant Risk of Litigation

In evaluating the final two *Girsh* factors, the court asks "whether the settlement represents a good value for a weak case or a poor value for a strong case." *NFL Concussion Litig.*, 821 F.3d at 440 (internal quotation marks omitted). These factors "test two sides of the same coin: reasonableness in light of the best possible recovery and reasonableness in light of the risks the parties would face if the case went to trial." *Id.* Notably, "[t]he present value of the damages plaintiffs would likely recover if successful, appropriately discounted for the risk of not prevailing, should be compared with the amount of the proposed settlement." *Id.*

"The fact that a proposed settlement may only amount to a fraction of the potential recovery does not, in and of itself, mean that the proposed settlement is grossly inadequate and should be disapproved. Rather, the

recovery percentage must represent a material percentage recovery to plaintiff, in light of all the risks considered under *Girsh.*" *McDonough*, 80 F.Supp.3d at 645-46 (internal citations and quotation marks omitted).

In this case, the settlement amount represents 12.08% of the $58 million possible recovery the aggregate of the difference between the index price and the resale price that SOP received for all class members. Other courts have found reasonable percentages ranging from 1.6% to 37%. *Id.* As discussed, even if the full recovery were proven at trial, it could be reduced by SOP's affirmative defenses. If successful, SOP would be entitled to recover $4.5 million. In that case, the settlement represents 13.08% of possible recovery. Thus, this recovery is well within the range of reasonableness.

In light of the complexity of this case and the potential obstacles to establishing liability and damages, the court concludes the amount of the settlement is reasonable.

Objectors present varying arguments that work against each other. First, Objectors contend that it is unreasonable for this court to award a greater percentage of the settlement to the L-29 leases because the court found that SOP did not violate certain portions of the L-29 leases. (Doc. 72 & 73). Second, Objectors contend that the L-29 leases should not settle for

anything less than 100% of their claim. (Doc. 188 p.38). Objectors specifically support this argument by citing to the *Kuffa* and *Lake Carey* decisions as they provide that collateral estoppel could be utilized by L-29 lease holders against SOP. However, as this court previously explained, the *Kuffa* and *Lake Carey* decisions may provide collateral estoppel grounds for a violation of the lease, but each decision specifically withheld a damages determination because it required the testimony of experts and the submission of evidence. The *Lake Carey* decision even specifically noted how the damages hearing would be necessary because it is a fact determination dependent upon the marketability of the gas at each wellhead. The *Kuffa* decision hardly resolved this point because it also held a damages hearing and needed to resolve the question of post-production deduction costs.

The *Kuffa* and *Lake Carey* decisions more aptly illustrate that the settlement is reasonable because L-29 leaseholders proceeding with arbitration would need to present expert testimony and evidence about the marketability of the gas at their specific well and present arguments about post-production deductions. While Objectors portray the arbitration process as a simple task due to the collateral estoppel emerging from the *Kuffa* and *Lake Carey* decisions, in reality, this process will be much more expensive

than portrayed on paper. Experts and counsel will be required all adding expense to each individual plaintiff.

Objectors again contradict themselves by presenting the argument that "arbitration cannot be disfavored even when it is not a not feasible forum for the vindication of legal rights because the amounts at issue do not warrant the costs of arbitration." (Doc. 188 p.32) (citing *American Express Co. v. Italian Colors Restaurant*, 570 U.S. 228 (2018). It is irrational that leaseholders would go forward with claims that may cost them thousands of dollars more to vindicate their legal interests than if they were simply to not bring forward their claims. While *Italian Colors* does present that a plaintiff's claims cannot be removed from arbitration simply because the recovery would be outweighed by the costs to proceed through arbitration, the case is easily differentiated. 570 U.S. 228 (2018). *Italian Colors* represented small restaurants suing American Express based on a breach of the contract between the parties. Italian Colors Restaurant sought to proceed with class arbitration, but the contract included a waiver of class arbitration. American Express argued enforcement of the contract required individual arbitration by the class members regardless of the cost each individual restaurant would face. The Supreme Court's holding reflects this factual background because it is based on the enforcement of the contractual provision between

the two parties. This case is distinctly different because both parties to the lease agreement are seeking to avoid arbitration. It is now the Objectors arguing in favor arbitration, which this court has dissected on several grounds as not being as reasonable or fair as the presented settlement.

### ii.  The Prudential Factors

Here, the relevant *Prudential* factors that have not been addressed above or that will not be addressed below lend further support for approving this settlement. Namely, the comparison between results achieved by settlement and results achieved, and likely to be achieved, by others support the fairness of the settlement.

### iii.  Rule 23(e)(2) Factors

#### a) Whether the Class Representatives and Class Counsel have Adequately Represented the Class

As discussed above in connection with the adequacy of the class representatives and class counsel, it is clear that class counsel is well informed, and their actual performance has been commendable.

- 36 -

### b) Whether the Proposal was Negotiated at Arm's Length

Once again, as was discussed above in connection with the adequacy of class counsel, the court is convinced that the settlement was negotiated at arms'-length.

### c) Whether the Relief Provided for the Class Was Adequate

Rule 23(e) lists four factors to consider regarding this requirement:

> (i) the costs, risks, and delay of trial and appeal; (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims; (iii) the terms of any proposed award of attorney's fees, including timing of payment; and (iv) any agreement required to be identified under Rule 23(e)(3).

Fed.R.Civ.P. 23(e)(2)(C). Consistent with the court's discussion of the first *Girsh* factor, as well as the *Prudential* factors, the first two factors have been met. The third factor will be discussed below in the analysis of class counsel's motion for attorneys' fees. The final factor is inapplicable since the parties represent that there "are no other agreements or any additional settlement terms, not fully disclosed in the Settlement Notice and public filings." (Doc. 176 p.23).

### d) Whether the Proposal Treats Class Members Equitably Relative to Each Other

This factor "calls attention to a concern that may apply to some class action settlements--inequitable treatment of some class members vis-a-vis others." Fed.R.Civ.P. 23(e)(2), advisory committee's note to 2018 amendment. "Matters of concern could include whether the apportionment of relief among class members takes appropriate account of differences among their claims, and whether the scope of the release may affect class members in different ways that bear on the apportionment of relief." *Id.*

As noted above, under the terms of the settlement, the L-29 Group, which comprises approximately 7% of the class, will be allocated 18% of the net settlement fund. The Other Lease Group, which comprises approximately 93% of the class will be allocated approximately 82% of the net settlement fund.

The court concludes that this distribution plan treats class members equitably relative to each other because it appropriately accounts for the differences in their leases and, consequently, their claims.

### III.   MOTION FOR AWARDS OF ATTORNEYS' FEES, COSTS, AND CLASS REPRESENTATIVE AWARDS

The court is required to approve the amount of requested attorneys' fees in the proposed settlement agreement. *See In re Gen. Motors Corp.*, 55 F.3d at 819. Pursuant to 42 U.S.C. §1988(b), the Court may award the prevailing party reasonable attorneys' fees. *See also* Fed.R.Civ.P. 23(h) ("In a certified class action, the court may award reasonable attorney's fees and nontaxable costs that are authorized by law or by the parties' agreement.").

The starting point for determining "reasonable" attorneys' fees is the lodestar amount, which is calculated by multiplying the number of hours reasonably expended on the litigation by a reasonable hourly rate. *McKenna v. City of Phila.*, 582 F.3d 447, 455 (3d Cir.2009). The lodestar is calculated according to prevailing market rates in the community for attorneys of comparable skill, reputation, and ability. *Gunter v. Ridgewood Energy Corp.*, 223 F.3d 190, 199 (3d Cir. 2000). The petitioner bears the burden of showing that the fees and costs requested are reasonable by producing evidence that supports the hours and costs claimed. *See In re Diet Drugs*, 582 F.3d 524, 538 (3d Cir.2009).

Plaintiffs' counsel has submitted a motion for attorneys' fees, litigation expenses, and costs in the amount of 25% of the settlement, which amounts

to $1,750,000. Utilizing the lodestar method, Plaintiff's counsel submitted their billable hours with rates prior to the fairness hearing. Robbins Geller submitted a bill with attorney's fees amounting to $1,335,007.50 and expenses of $122,087.35. (Doc. 181).[5] John F. Harnes PLLC submitted a bill with attorney's fees totaling $1,325,887.50 and expenses of $1,897.93. (Doc. 183). The Clark Law Firm submitted a bill with attorney's fees amounting to $177,000 with expenses of $1,480.75. (Doc. 182). Therefore, attorney's fees totaled $2,837,895 and expenses amounted to $125,466.03. Therefore, using the attorney's fees as submitted would result in a lodestar multiplier of .62. While the court does note the excessive rates presented in this case (upwards of $1,325 per hour), even with a reduction of all hourly rates over $500 reduced to $500 per hour, the resulting lodestar multiplier would still only be 1.18. This is well within the acceptable range when the lodestar method is applied. *See In re Veritas Software Corp. Sec. Litig.*, 396 F. App'x 815, 819 (3d Cir. 2010) (finding lodestar of 1.51 was "well within the range of attorneys' fees awarded and approved by this Court"); *see also In re Cendant Corp.*, 243 F.3d , 742 (holding a lodestar multiplier of three would be reasonable and appropriate); *In re Prudential Co. Am. Sales Practice Litig Agent Actions*, 148 F.3d 283, 341 (3rd Cir. 1998) ("Multiples

---

[5] Robbins Geller retained experts in the case, which amounted to $115,921.56 of their submitted expenses of $122,087.35.

ranging from one to four are frequently awarded in common fund cases when the lodestar method is applied").[6]


## IV.  OBJECTIONS

The court has addressed some of the objections above but will address the remaining ones here.

### a. Objection Regarding the Existence of a Motion for Certification

Initially, Objectors contend that the court cannot consider the settlement terms because "[t]here is no motion for class certification before the court." (Doc. 188 p.5). This is because Rescigno's motion purportedly makes no mention of Rules 23(a) and (b), which must be considered independently of Rule 23(e).

Unsurprisingly, Objectors present no authority for the notion that a court cannot finally certify a class action for purposes of settlement unless the plaintiff's brief in support of final approval sufficiently mentions Rule23(a)

---

[6] The court notes that it has reviewed the supplemental authority provided by the Objectors, *Briseno v. Henderson*, 998 F.3d 1014 (9th Cir. 2021), in which the Ninth Circuit reversed approval of a class action settlement because the district court did not apply the *Bluetooth* factors to scrutinize the fee arrangement and determine if collusion "may have led to class members being shortchanged." *Id.* at 1026 (citing *In re Bluetooth Handset Products Liability Litigation*, 654 F.3d 935 (9th Cir. 2011)). The court does not find that the *Bluetooth* factors, even if a required part of the analysis here, suggest collusion.

and (b), where those factors were discussed at the fairness hearing and have been thoroughly addressed by the court in the above analysis.

### b. Objections Regarding Individual Issues and Ascertainability, commonality, predominance:

First, Objectors challenge the Rule 23(a) adequacy, typicality, commonality, and predominance of the class on the basis that the leases of the class members differ. According to them, this "matters here" because, in ruling on the motions to dismiss, "other tribunals looking at other leases different from Rescigno's have reached different conclusions on issues such as whether the lease is ambiguous or not." (Doc. 188 p.9).

Essentially, the Objectors note that particular provisions in Rescigno's lease, including "at the well" language, were the basis for the court's dismissal of all but one of the claims against SOP; however, Objectors contend that many of the other class members' leases do not contain such language which directly pertains to the key issue in this case of whether the leases permit transfers to an affiliate and an 'index price' to be the basis for the royalty payment. Thus, Objectors contend that other class members would have potentially successful breach of contract claims against SOP where Rescigno does not.

Objectors observe that while the parties have referred to two subclasses—the L-29 Group, whose leases have a specific provision regarding royalties, and the Other Lease Group whose leases have all other lease forms—SOP had provided Rescigno with thirty different lease forms that Rescigno organized into five different categories. Consequently, they contend that Rescigno cannot show his lease is typical of all leases, there is no common question because answering questions about Rescigno's lease does not answer questions about other lease forms, and that the record does not show that class members can prove their claims using predominately common evidence.

Relatedly, Objectors dispute the adequacy of the Stines as class representatives, arguing that they are not parties, have never asserted claims in this case, and "appeared only after there was a settlement." (Doc. 188 p.14). Objectors note that, in evaluating adequacy of a class representative, a court should consider whether the class member merely lent his name after settlement has been negotiated. *See Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 856 n.31 (1999).

With respect to their claims about the Rule 23(a) and (b)(3), there is indeed a difference between certification of a class for settlement and certification of a class for litigation. *See Sullivan v. DB Investments, Inc.*,

667 F.3d 273, 303 (3d Cir. 2011). "Confronted with a request for settlement-only class certification, a district court need not inquire whether the case, if tried, would present intractable management problems . . . for the proposal is that there be no trial." *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 620 (1997).

The Third Circuit has stated, "We have never required the presentation of identical or uniform issues or claims as a prerequisite to certification of a class." *Sullivan*, 667 F.3d at 301. The Third Circuit continued:

> Nothing in our case law or the language of Rule 23 commands that everyone in a class must allege precisely identical or "uniform" causes of action, *see Sullivan*, 613 F.3d at 149, and statutory variations do not defeat predominance in the presence of other exceedingly common issues. Instead, as *Prudential* and *GM Truck* explain, where a defendant's singular conduct gives rise to one cause of action in one state, while providing for a different cause of action in another jurisdiction, the courts may group both claims in a single class action. This tactic in litigation advances the laudatory purposes of the class action device, preserv[ing] the resources of both the courts and the parties by permitting issues affecting all class members to be litigated in an efficient, expedited, and manageable fashion.

*Id.* at 302 (internal citations and quotation marks omitted).

- 44 -

So too is the case with the variations in contact provisions here. There is indeed a common question amongst the class members—whether the sale of gas by SOP to its affiliate, Statoil Natural Gas, LLC, was not a bona fide sale and whether SOP inappropriately used an index price for calculating royalties. (Doc. 1 p.4-5). The variations in the lease language are immaterial in light of the fact that the question of SOP's liability is central to all class members and is subject to generalized proof. *See Fankhouser v. XTO Energy, Inc.*, NO., 2010 WL 5256807, at *6 (W.D.Okla. Dec. 16, 2010) ("All members of the class base their claims on the same legal theory: that defendant's royalty payment formula has at its heart a price component that is improper under Oklahoma and Kansas law. The question of defendant's liability is central to all class members and is subject to generalized proof. The variations in . . . lease language are immaterial given defendant's identical treatment of all class members for royalty purposes.").

As with commonality, the typicality does not "mandate[] that all putative class members share identical claims." *Neal*, 43 F.3d at 56. "Cases challenging the same unlawful conduct which affects both the named plaintiffs and the putative class usually satisfy the typicality requirement irrespective of the varying fact patterns underlying the individual claims." *Id.* at 58.

- 45 -

Although Objectors contend that some class members may have more favorable lease language than Rescigno, "even relatively pronounced factual differences will generally not preclude a finding of typicality where there is a strong similarity of legal theories." *Id.* at 58.

As to the Stines in particular, this is not a case in which they appeared only after a settlement was reached since the parties filed a stipulation to include the Stines as lead plaintiffs and class representatives, simultaneously with the motion for settlement and preliminary approval was filed. (Doc. 101; Doc. 103). Additionally, the court specifically discussed the Stines in its memorandum granting the motion for preliminary approval and found them adequate representatives. (Doc. 152 p.13). Thus, the notion that they somehow escaped this court's review or that the court did not appoint them class representatives is plainly unsubstantiated.

Significantly, although Objectors contend the Stines "have not asserted claims," Objectors do not argue the Stines are not part of the class or the L-29 Group. Moreover, as Rescigno previously noted in this case, in applying Rule 23, other courts have appointed individuals as class representatives who were not named in the complaint. *In re Facebook, Inc., IPO Sec. & Derivative Litig.*, 312 F.R.D. 332, 345 (S.D.N.Y. 2015); *In re Oxford Health Plans, Inc.*, 191 F.R.D. 369, 380 (S.D.N.Y. 2000)

(determining that the court had the power to designate a class representative who was not also a lead plaintiff since nothing in Rule 23 prevented it). Thus, Objectors concern that the Stines are not named plaintiffs does not defeat a finding of adequacy.

Moreover, "[c]ourts rarely deny class certification on the basis of the inadequacy of class representatives" and do so "only in flagrant cases, where the putative class representatives display an alarming unfamiliarity with the suit, display an unwillingness to learn about the facts underlying their claims, or are so lacking in credibility that they are likely to harm their case." *In re Facebook, Inc.*, 312 F.R.D. at 345 (internal quotation marks omitted). Those circumstances are not present here.

Finally, with respect to Objectors' contentions that the class is not ascertainable, as Rescigno notes, that the class has been ascertained given that 13,445 notices have been sent out to the class members.

Consequently, the court has no hesitation in holding that the requirements of Rule 23(a) and Rule 23(b)(3) are met.

### c. Objection that the record does not support the request for incentive awards.

Objectors contend that the record does not establish an incentive award of $5,000 for Rescigno and $2,500 each for the Stines. Class

Counsel present a declaration explaining the involvement of Rescigno and Canfield. The declaration explains the involvement of Rescigno throughout the development of the case. The Stines participated from the preliminary approval of the Settlement and worked with Class Counsel to assist in this process. As was previously explained, Objectors do not contend that the Stines are not part of the class or the L-29 Group. Courts have appointed individuals as class representatives who were not named in the complaint. *In re Facebook, Inc., IPO Sec. & Derivative Litig.*, 312 F.R.D. 332, 345 (S.D.N.Y. 2015); *In re Oxford Health Plans, Inc.*, 191 F.R.D. 369, 380 (S.D.N.Y. 2000). The court finds that the Stines participated and provided the Class and Class Counsel with valuable assistance in this matter.

### d. Objection that Plaintiff offers no rationale or analysis justifying the plan of distribution's proposed allocation of the Settlement.

Objectors contend that the different treatment between the two lease groups is improper. However, Objectors' argument plainly misses the mark. The differing levels of compensation reflects the innate strength of the two groups of class members' claims. *See Pet Food*, 629 F.3d at 347 (affirming district court's conclusion that differing awards to class members "reflect[s] the relative value of the different claims"). Objectors' attempt to argue some

impropriety by Class Counsel in sorting the thirty different lease forms into five categories and then eventually forming two sub-groups: L-29 Group or the Other Lease Type Group. As already explained, the L-29 leases contain stronger lease language than all the other lease types, which is the exact reason why the L-29 leases were separated into their own group receiving more compensation. Objectors even argue in their very next objection the strength of the L-29 lease claims. (Doc. 188 p.38).

### e. Objection that the going-forward terms of the settlement unfairly rewrite the L-29 leases.

The Settlement provides that the L-29 leases will be paid based upon a "Resale Price" instead of the "Gross Proceeds." Objectors challenge this transformation by claiming this is a radical change rewriting the L-29 leases. However, Class Counsel explains that the current L-29 leases already contain a "Market Enhancement Clause" that expressly allows for the deduction of costs after the gas is marketable.

"Resale Price" is defined in the Settlement as the "net weighted average sales price (*net of mainline interstate pipeline tariffs, fees, and costs*). (Doc. 137, ¶1.32 (emphasis added). "Gross Proceeds" is defined as "the total consideration paid for oil, gas, associated hydrocarbons, and

marketable by-products, produced from the leased premises…" (Doc. 138-6, ¶4(d)). As the L-29 leases are currently written, most contain a "Market Enhancement Clause." The "Market Enhancement Clause" allows for deductions of costs after the gas is marketable. One clear point that the parties explained at the fairness hearing is that marketability is a contested issue requiring experts to determine. The transformation in the Settlement establishes a clear point in time as defined as "net of mainline interstate pipeline tariffs, fees, and costs." (Doc. 137, ¶1.32). While the parties may contest when the gas is actually considered marketable, it is hardly farfetched to believe gas is marketable at the interstate pipeline, which quite literally is the market. *See Devon Energy Corp. v. Kempthorne*, 551 F.3d 1030, 1037 (D.C. Cir. 2008) (holding that for federal leases, gas is in marketable condition when it meets interstate pipeline specifications "that serve its typical purchasers"); *Anderson Living Tr. v. WPX Energy Prod., LLC*, 306 F.R.D. 312, 326 (D.N.M.), *adhered to on reconsideration*, 312 F.R.D. 620 (D.N.M. 2015) ("natural gas generally comes into marketable condition when it is of sufficient quality to be accepted into the interstate pipeline system").

There is no prohibition "forever" as the Objectors hyperbolize, but rather, the Settlement contains a clear provision allowing for class members to challenge deductions from the royalty payments. The Settlement states:

> Nothing in this Settlement addresses or affects the Parties' rights concerning deductions from the price of Royalty for post-production costs, including the Parties' respective rights and positions as to whether "market enhancement," "ready for sale or use," or similar clauses allow for deductions of post-production costs, and no compromise, settlement, or release is intended by any Party as to prior or future taking of post-production cost deductions.

(Doc. 137, ¶2.6). L-29 leaseholders still have the ability to challenge any post-production deductions that occur. The Settlement creates a more clearly establishment point at which the gas can be considered "marketable."

Notwithstanding the previous discussion, Objectors do not present any meaningful argument that the Settlement becomes "unfair" to L-29 leaseholders, who are being compensated at an increased amount due to the more favorable terms within their leases.

### f. Objection that the going-forward terms of the settlement that apply to non-L-29 leases are unfair

Objectors contend that the release for non-L-29 class members is unfair because of the five-year release. The Objectors' argument

misconstrues ¶2.5 of the Settlement. The release allows for SOP to use the "Index Pricing Methodology to calculate and pay Royalties for a period continuing until the Sunset Date." (Doc. 137, ¶2.5). The release is for the specific methodology used. If SOP does not use the Index Pricing Methodology or does not pay the Class Members correctly based on Index Pricing Methodology, then class members still maintain their right to sue.

As was just explained with ¶2.6 of the Settlement, the parties still have the ability to challenge post-production costs and the release is not intended by any party to impact prior or future taking of post-production cost deductions. (Doc. 137, ¶2.6).

## V.    CONCLUSION

Pursuant to the above analysis, the court has determined that Rule 23(a) and (b)(3) have been met and, consequently, certification is proper. After review of the *Girsh, Prudential*, and Rule 23(e)(2), the terms of settlement appear fair, reasonable, and adequate. Consequently, the motion for final certification is **GRANTED**. Additionally, the court will grant the motion for attorneys' fees and expenses and a service award to Rescigno and the class representatives.

An appropriate order follows.


*s/ Malachy E. Mannion*
**MALACHY E. MANNION**
**United States District Judge**

**DATE: January 10, 2023**
16-0085-09

- 53 -