UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ANGELO R. RESCIGNO, SR., AS EXECUTOR OF THE ESTATE OF CHERYL B. CANFIELD, | : : : | |
| Plaintiff, | : | CIVIL ACTION NO. 3:16-85 |
| v. | : | (JUDGE MANNION) |
| STATOIL USA ONSHORE PROPERTIES INC., et al., | : : | |
| Defendants. | : | |

## MEMORANDUM

Presently before the court is the objectors' motion for reconsideration, (Doc. 237). The objectors filed a brief in support, (Doc. 238), on January 1, 2023. The plaintiff filed a brief in opposition, (Doc. 239), on February 2, 2023. The objectors then filed a reply brief, (Doc. 240), on February 8, 2023. The matter is now ripe for disposition.

### I. Standard of Review

"The purpose of a motion for reconsideration is to correct manifest errors of law or fact or to present newly discovered evidence." Harsco v. Zlotnicki, 779 F.2d 906, 909 (3d Cir. 1985). "Accordingly, a judgment may be altered or amended if the party seeking reconsideration shows at least one

of the following grounds: (1) an intervening change in the controlling law; (2) the availability of new evidence that was not available when the court granted the motion for summary judgment; or (3) the need to correct a clear error of law or fact or to prevent manifest injustice." Howard Hess Dental Labs. Inc. v. Dentsply Intern., Inc., 602 F.3d 237, 251 (3d Cir. 2010) (quoting Max's Seafood Café ex rel. Lou-Ann, Inc. v. Quinteros, 176 F.3d 669, 677 (3d Cir. 1999)); Chesapeake Appalachia, LLC v. Scott Petroleum, LLC, 73 F. Supp. 3d 488, 491 (M.D. Pa. 2014) (Generally, reconsideration motions should be granted sparingly). "The standard for granting a motion for reconsideration is a stringent one ... [A] mere disagreement with the court does not translate into a clear error of law." Chesapeake Appalachia, LLC, 73 F.Supp. 3d at 491 (quoting Mpala v. Smith, 2007 WL 136750, at *2 (M.D. Pa. Jan. 16, 2007), aff'd, 241 Fed.Appx. 3 (3d Cir. 2007)) (alteration in original).

The burden for reconsideration is on the moving party.

## II. Discussion

Objectors have filed the present motion arguing the need to correct a clear error of law or to prevent manifest injustice in light of the Supreme

Court's decision in TransUnion LLC v. Ramirez, 141 S.Ct. 2190 (2021).[1] In TransUnion, the Supreme Court had to address whether a portion of class members suffered an injury without a "potential match" report being sent to a third-party entity. TransUnion created a service for businesses where a program would determine if an individual's name was a "potential match" to a list maintained by the United States Treasury Department's Office of Foreign Assets Control (OFAC) of terrorists, drug traffickers, and other serious criminals. The class contained individuals whose names were similar to those on the OFAC list and TransUnion had listed these individuals as "potential matches" to the list through their service. There were two groups within the class: individuals whose names were sent to third-party businesses and individuals whose names were marked as a "potential match," but not sent to a third-party business. A question arose as to whether the portion of the class whose name was not sent outside of TransUnion ever suffered an injury to therefore have standing. The court held that the portion of the class who did not have their name sent outside of TransUnion did not

---

[1] While objectors claim TransUnion establishes a clear error of law or to prevent manifest injustice, they knew of the pending case in December of 2020. The decision by the Supreme Court was issued in June of 2021. Since then, objectors did not file any update with the court indicating the case's impact. The court ruled on the motion for final approval of the settlement and attorneys' fees well after TransUnion was decided. (Doc. 234 & 235).

suffer a concrete injury. Without suffering a concrete injury, there can be no standing.

Objectors now file a motion for reconsideration to claim some sort of "injustice." Objectors' motion is nothing more than an ill-fated effort to challenge the results of the court's prior order. Objectors claim one paragraph of the settlement proves faulty to the entire agreement. The settlement agreement defines the class as:

> Royalty Owners in Northern Pennsylvania who have entered into oil and gas leases, regardless of the type of lease, that provide that the Royalty Owner is to be paid Royalties and to whom Statoil [SOP] has (or had) an obligation to pay Royalties on production attributable to Statoil [SOP]'s working interest.

(Doc. 137, p.5). Additionally, objectors claim that the class notice includes "people whom EOP 'potentially' will pay royalties." (Doc. 238, p.2).[2] Objectors seize upon the phrase "Royalty Owner *is to be paid* Royalties" in order to craft the argument that there is some futuristic nature to the defined class. In isolating one paragraph of the settlement agreement, objectors attempt to compare the defined class to the portion of the class in

---

[2] Objectors' argument related to the notice including the word "potential" lacks any basis. Courts have routinely approved settlement notices with "potential" because the purpose of a notice is to identify potential class members. In re Cendant Corp. Litig., 264 F.3d 201, 226 (3d Cir. 2001) ("[T]he court approved the form of the notice of the class action to be sent to potential class members.")

TransUnion that was deemed to not have suffered an injury. As commonly arises when one reads one paragraph of an agreement without reading it in context of the full agreement, issues can arise.

Within the definition of the class, the phrase "to be paid" is used to clarify the type of lease agreement. While objectors misconstrue the phrase to craft some more grandiose argument about potential harm, the full phrase describes the type of lease the Settlement covers. As read in context, "oil and gas leases ... that provide that the Royalty Owner is to be paid Royalties[.]" (Doc. 137, p.5). The objectors improperly seize upon three words within the definition that merely serve to clarify the leases to which the settlement refers.

Several other definitions provided within the Settlement must be stated to understand the full context of the agreement. A class member is defined as:

> [A] member of the Class, and any of their respective past, present, or future officers, directors, stockholders, agents, employees, legal or other representatives, partners, associates, trustees, subsidiaries, divisions, affiliates, heirs, executors, administrators, purchasers, predecessors, successors, and assigns, who does not submit a valid Request for Exclusion pursuant to the Notice or is otherwise excluded pursuant to ¶1.2.

(Doc. 137, ¶1.4). Royalty is defined as "the amount owed to a lessor by Statoil pursuant to an oil and gas lease (including any fractional interest

therein) or an overriding royalty derived from the lessor's interest in such an oil and gas lease." (Doc. 137, ¶1.33). Royalty Owner is defined as "any person who owns a Royalty interest in the Relevant Leases and is entitled to receive payment on such Royalty from Statoil." (Doc. 137, ¶¶1.33, 1.34). Northern Pennsylvania is defined as:

> [T]he area of Pennsylvania in which Statoil owns working interests in oil and gas leases and from which it produces and sells Natural Gas production for delivery into Rome, Liberty, Allen, Meadow, Warrensville, Seely, Canoe Run, Tombs Run, and PVR Wyoming gathering systems and includes oil and gas leases owned in whole or part by Statoil in the following counties: Bradford, Lycoming, Sullivan, Susquehanna, and Wyoming.

(Doc. 137, ¶1.19). The definitions in the Settlement read together, as class counsel explains in their brief, means the Class contains those currently holding a lease ("who have entered into oil and gas leases") entitling them to royalty payments owed by SOP ("that provide the Royalty Owner is to be paid royalties") in the relevant area ("Northern Pennsylvania"), as well as their predecessors, successors, agents, and other representatives. (Doc. 239, p.6-7).

Turning to the objectors' arguments, objectors remain in the hypothetical realm arguing that the class definition may contain an individual that holds or held a lease agreement with Statoil but was never paid a royalty. Working against the objectors' argument are the definitions within the

Settlement. Royalty is defined as "the amount owed to a lessor by Statoil pursuant to an oil and gas lease (including any fractional interest therein) or an overriding royalty derived from the lessor's interest in such an oil and gas lease." (Doc. 137, ¶1.33). The definition of Royalty does not include an amount yet to be paid, but rather, is defined as "the amount *owed*." (Doc. 137, ¶1.33) (emphasis added). Therefore, no current leaseholder can argue they *will* be owed a royalty payment and therefore can qualify. The Settlement's definition of Royalty requires an amount already owed based on a previously formed contract. Objectors could contend that an amount owed but not yet paid would constitute a future harm. However, the circumstances would still generate a concrete harm based upon the amount owed and never paid was required by the lease. Furthermore, the objectors do not identify a single party in the settlement that would fall into this realm of a yet to be injured plaintiff. They remain purely in the hypothetical alone.

Additionally, a royalty is only generated when gas is taken. It is the very act of gas being removed that creates the obligation to pay a royalty. This is why royalty is defined in the past tense as amount owed. While it may be true that the amount to be paid on the gas is determined at a later point once the gas is sold to another party, the obligation to pay a royalty immediately arises once the gas is removed. The argument that you can have a lease,

Settlement. Royalty is defined as "the amount owed to a lessor by Statoil pursuant to an oil and gas lease (including any fractional interest therein) or an overriding royalty derived from the lessor's interest in such an oil and gas lease." (Doc. 137, ¶1.33). The definition of Royalty does not include an amount yet to be paid, but rather, is defined as "the amount *owed*." (Doc. 137, ¶1.33) (emphasis added). Therefore, no current leaseholder can argue they *will* be owed a royalty payment and therefore can qualify. The Settlement's definition of Royalty requires an amount already owed based on a previously formed contract. Objectors could contend that an amount owed but not yet paid would constitute a future harm. However, the circumstances would still generate a concrete harm based upon the amount owed and never paid was required by the lease. Furthermore, the objectors do not identify a single party in the settlement that would fall into this realm of a yet to be injured plaintiff. They remain purely in the hypothetical alone.

Additionally, a royalty is only generated when gas is taken. It is the very act of gas being removed that creates the obligation to pay a royalty. This is why royalty is defined in the past tense as amount owed. While it may be true that the amount to be paid on the gas is determined at a later point once the gas is sold to another party, the obligation to pay a royalty immediately arises once the gas is removed. The argument that you can have a lease,

but not suffer an injury yet again attempts to create a hypothetical situation lacking an understanding grounded in the reality of the process. Thus, when the class is defined as has or had an obligation to pay royalties, this means gas has already been removed and an obligation to pay a royalty simultaneously emerged with the gas removal. There is no "future" harm that has yet to arise as objectors contend.

Even comparing the objectors' argument with TransUnion displays the clear differences between the cases. In TransUnion, some of the class members never had their "potential match" sent out to a third party. The status remained within TransUnion and did not create any sort of harm. It was only a potential unrealized harm. Here, class members entered into lease agreements with SOP. As the settlement explained, the class members were to be paid royalties.[3] As the Settlement defined royalties as an amount *owed*, the term described a previous obligation that arose in the past, not the future. The royalty obligation arose simultaneous with the removal of gas from the property. While TransUnion described a yet to be realized harm, the harm here occurred when SOP violated the obligation to pay the royalties according to the lease.

---

[3] The "to be paid" language describing the nature of the agreements.

The objectors claim one final point about the full range of leases not being contained within the record. The argument critiques the class definition since it is not tied to specific lease language, which objectors state could lead to uninjured persons being granted relief. Objectors fail to cite any case law or statutory requirement that the full range of leases must be submitted on the record. Yet again, objectors hyper fixate on one definition without reading the Settlement in its full context. The Settlement defines "Relevant Leases" as "each and every oil and gas lease in Northern Pennsylvania owned in whole or part by Statoil from which Statoil produces and sells Natural Gas and pays a Royalty to Royalty Owners." (Doc. 137, ¶1.30). Northern Pennsylvania is defined as:

> [T]he area of Pennsylvania in which Statoil owns working interests in oil and gas leases and from which it produces and sells Natural Gas production for delivery into Rome, Liberty, Allen, Meadow, Warrensville, Seely, Canoe Run, Tombs Run, and PVR Wyoming gathering systems and includes oil and gas leases owned in whole or part by Statoil in the following counties: Bradford, Lycoming, Sullivan, Susquehanna, and Wyoming.

(Doc. 137, ¶1.19). Additionally, the Settlement even further refines the lease agreements into two groups: L-29 Group and the other lease group. The two groups are based off the strength of the language contained within the lease agreements. This is a thinly veiled attempt by objectors to again litigate the differences between the two groups. While the court held that the index

- 9 -

pricing method did not breach the royalty terms of plaintiff's "at the well" lease, the court allowed a claim pertaining to the duty to market to proceed, which is a basis for relief in the Settlement. Objectors' own argument serves as evidence that there is a difference between the L-29 Group and the Other Lease Group pertaining to the language contained within each agreement. Objectors only argument pertains to the royalty pricing methodology and ignores the other claims that survived the motion to dismiss.

Objectors clearly do not demonstrate that any of the three grounds exist in this case, which are required for the court to grant reconsideration. Further, since this court's Memorandum and Order, (Doc. 234 & 235), which are the subject of the objectors' instant motion, gave thorough explanations, the court will not repeat this discussion. Also, simply because objectors are unhappy with the results of the court's Order, "is an insufficient basis to grant [them] relief." Kropa v. Cabot Oil & Gas Corp., 716 F.Supp.2d 375, 378 (M.D. Pa. 2010) (citation omitted).

MALACHY E. MANNION
United States District Judge

DATE: February 13, 2023
16-85-10